UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re:<br><br>ENRON CORP., et al.,<br><br>               Debtors. | District Court<br>Case No. 05-CV-2710 (RCC) |
| ENRON POWER MARKETING, INC.,<br><br>             Appellee-Plaintiff,<br><br>    -against-<br><br>PUBLIC UTILITY DISTRICT NO. 1 OF<br>SNOHOMISH COUNTY,<br><br>             Appellant-Defendant. | Bankruptcy Court<br>Case No. 01-16034 (AJG)<br><br>Adv. Pro. No. 03-2064 (AJG) |

**BRIEF OF APPELLANT PUBLIC UTILITY DISTRICT NO. 1
OF SNOHOMISH COUNTY, WASHINGTON**

<div align="right">

Alan Kolod Esq.
Alan E. Gamza, Esq.
Philippe Zimmerman, Esq.
MOSES & SINGER LLP
1301 Avenue of the Americas
New York, New York  10019
212-554-7800

Michael A. Goldfarb, Esq.
LAW OFFICES OF MICHAEL A. GOLDFARB
1150 Market Place Tower
2025 First Avenue
Seattle, Washington 98121
206-374-7090

*Attorneys for Defendant-Appellant*

</div>

# TABLE OF CONTENTS

I.      JURISDICTION ................................................................................................ 1

II.     STATEMENT OF THE ISSUES .................................................................... 1

III.    STATEMENT OF THE CASE ......................................................................... 1

        A.    Nature of Proceedings, Course of Proceedings, and Disposition Below ................ 1

        B.    Statement of Facts ................................................................................ 4

              1.    The Western Wholesale Power Crisis ........................................... 4

              2.    Enron-Related FERC Regulatory Proceedings ............................ 4

                    a.    The Enron Market-Based Rate Proceeding .................................... 4

                    b.    The Gaming/Partnership Proceedings ................................. 6

              3.    Enron's Bankruptcy and the Adversary Proceeding .................................. 9

                    a.    The Enron-Snohomish Contract .................................... 9

                    b.    The Adversary Proceeding .............................................. 9

IV.     ARGUMENT ................................................................................................ 11

        A.    The Bankruptcy Court's Ruling That Certain Future and
              Prospective Rulings by FERC are "Void *Ab Initio*" is an
              Improper Advisory Opinion ................................................................ 12

        B.    The Bankruptcy Court's Advisory Opinions are also
              Contrary to Law and Interfere with FERC's Exclusive
              Jurisdiction to Issue Relief in the Gaming/Partnership Proceedings ................... 15

V.      CONCLUSION ............................................................................................ 20

# TABLE OF AUTHORITIES

## Cases

*Aetna Life Ins. Co. v. Haworth,*
  300 U.S. 227 (1937) .......................................................................................... 13

*B.T. Produce Co. v. Robert A. Johnson Sales, Inc.,*
  354 F.Supp.2d 284 (S.D.N.Y. 2004) ............................................................... 10

*Bank of New York v. Adelphia Communications Corp*
  *(In re Adelphia Communications Corp.),*
  307 B.R. 432, n.5 (Bankr. SDNY 2004) ..................................................... 12, 13

*Board of Governors of the Federal Reserve System v. MCorp Financial, Inc.,*
  502 U.S. 32 (1991) ........................................................................................... 19

*City of Tacoma v. Taxpayers of Tacoma,*
  357 U.S. 320 (1958) ......................................................................................... 18

*Flast v. Cohen,*
  392 U.S. 83 (1968) ........................................................................................... 12

*Gulf States Exploration Co. v. Manville Forest Prods. Corp.*
  *(In re Manville Forest Prods. Corp.),*
  896 F.2d 1384 (2d Cir. 1990) ............................................................................. 1

*In re Enron Corp.,*
  2004 WL 2711101 (S.D.N.Y. Nov. 23, 2004) ................................................. 15

*In re Federal Communications Commission,*
  217 F.3d 125 (2d Cir. 2000) ....................................................................... 18, 19

*In re Nextwave Personal Communications, Inc.,*
  200 F.3d 43 (2d Cir. 1999) .............................................................................. 19

*In re NRG Energy, Inc.,*
  2003 WL 21507685 (S.D.N.Y. June 30, 2003) ............................................... 15

*In re Personal Communications Network, Inc.,*
  249 B.R. 233 (Bankr. E.D.N.Y. 2000) ............................................................ 19

*Kagge v. I.R.S.,*
  71 F.3d 1995 (2d Cir. 1995) ............................................................................ 10

*Lockyer v. FERC,*
  383 F.3d 1006 (9th Cir. 2004) ........................................................................... 4

*Marchi v. Board of Cooperative Educational Services of Albany,*
    173 F.3d 469 (2d Cir. 1999) ................................................................ 13

*Maryland Casualty Co. v. Pacific Coal & Oil Co.,*
    312 U.S. 270 (1941) ............................................................................ 12

*Mississippi Power & Light Co. v. Mississippi,*
    487 U.S. 354 (1988) ............................................................................ 15

*Olin Corporation v. Consolidated Aluminum Corporation,*
    5 F.3d 10 (2d Cir. 1993) ...................................................................... 15

*Preiser v. Newkirk,*
    422 U.S. 395 (1975) ............................................................................ 12

*Princeton University v. Schmid,*
    455 U.S. 100 (1982) ............................................................................ 13

*Rivers Elec. Co. v. 4.6 Acres of Land,*
    731 F. Supp. 83 (N.D.N.Y. 1990) ....................................................... 18

*Shugrue v. Air Line Pilots Assoc. Int'l*
    *(In re Ionosphere Clubs, Inc.),*
    922 F.2d 984 (2d Cir. 1990) .................................................................. 1

*State of New Jersey, Department of Environmental Protection and Energy, v.*
    *Heldor Industries, Inc.,*
    989 F.2d 702 (3d Cir. 1993) ......................................................... 14, 15

*United States v. Broadcast Music, Inc.,*
    275 F.3d 168 (2d Cir. 2001) ..................................................... 12, 13, 14

*United States v. Fruehauf,*
    365 U.S. 146 (1961) ............................................................................ 14

## Statutes

16 U.S.C. § 824(a) ......................................................................................... 16

16 U.S.C. § 824(e) ......................................................................................... 16

16 U.S.C. § 824d(a) ....................................................................................... 16

16 U.S.C. § 824d(c) ....................................................................................... 16

16 U.S.C. § 824d(c), (e) ................................................................................. 16

16 U.S.C. § 824e(a) ........................................................................................ 16

16 U.S.C. § 825h ........................................................................................... 16

16 U.S.C. § 825l(b) ....................................................................................... 18

28 U.S.C. § 158(a) ........................................................................................... 1


## Other Authorities

*American Elec. Power Serv. Corp.*,
   103 F.E.R.C. ¶ 61,345 (2003) ...................................................................... 6

*El Paso Electric Co.*,
   108 FERC ¶ 61,071 (2004) .......................................................................... 2

*El Paso Electric Co.*,
   110 FERC ¶ 61,280 (2005) .......................................................................... 8

*El Paso Electric Co.*,
   111 FERC ¶ 63,001 (2005) ........................................................................ 11

*Enron Power Marketing, Inc.*,
   102 FERC ¶ 61,316 (2003) .......................................................................... 5

*Enron Power Marketing, Inc.*,
   102 FERC ¶ 61,316 (2003), 103 FERC ¶ 61,343 (2003),
   *reh'g denied*, 106 FERC ¶ 61,024 (2004) .................................................. 5

*Enron Power Marketing, Inc.*,
   102 FERC ¶ 61,316 (2003),
   *order revoking market-based rate authority*, 103 FERC ¶ 61,343 (2003) .............................. 5

*Enron Power Marketing, Inc.*,
   103 F.E.R.C. ¶ 61,346 (2003) ...................................................................... 6

*Fact Finding Investigation of Potential Manipulation of
   Electric and Natural Gas Prices*,
   98 FERC ¶ 61,165 (2002) ............................................................................ 4


## Rules

Fed. R. Evid. 201(b) ..................................................................................... 10

# I.  JURISDICTION

Appellant Public Utility District No. 1 of Snohomish County, Washington ("Snohomish")

timely appealed the Bankruptcy Court's Order of January 14, 2005 (the "Order").  (A.305-306).[1]

The Order contains an improper advisory opinion and, within that advisory opinion, contains an

inaccurate statement of the law.  This Court has jurisdiction over this appeal under 28 U.S.C. §

158(a).

# II.  STATEMENT OF THE ISSUES

1.      Did the Bankruptcy Court err in issuing an advisory opinion on the validity of

future actions that FERC may or may not take?

2.      Did the Bankruptcy Court err in asserting the power to review and declare "void

*ab initio*" actions indisputably within FERC's exclusive jurisdiction?

The standard of review on this appeal is *de novo* as the issues raised concern errors of

law.  See *Shugrue v. Air Line Pilots Assoc. Int'l (In re Ionosphere Clubs, Inc.)*, 922 F.2d 984,

988 (2d Cir. 1990); *Gulf States Exploration Co. v. Manville Forest Prods. Corp. (In re Manville

Forest Prods. Corp.)*, 896 F.2d 1384, 1388 (2d Cir. 1990).

# III.  STATEMENT OF THE CASE

## A.      Nature of Proceedings, Course of Proceedings, and Disposition Below.

On January 31, 2003, Enron Power Marketing, Inc. ("EPMI" or "Enron"), a subsidiary of

Enron Corp., commenced an adversary proceeding (the "Adversary Proceeding") against

Snohomish seeking to collect a $117 million "termination payment" under a wholesale power

contract (the "Agreement") between EPMI and Snohomish.  (A.17-31).  The Adversary

---

[1]  Citations to pages of the Appellant's Appendix are referenced herein as "A.__"

Proceeding (see A.17-31), which is one of a number of cases characterized as "Trading Cases," has been stayed since March 4, 2003.

Also in 2003, in response to investigations of the Federal Energy Regulatory Commission ("FERC") staff, FERC, *sua sponte*, initiated a series of administrative proceedings under the Federal Power Act ("FPA") to remedy Enron's rampant violations of the FPA, FERC-approved tariffs and FERC orders governing Enron's participation in the then newly-deregulated electricity markets on the West Coast (the "Gaming/Partnership Proceedings").

On July 22, 2004, FERC issued an order in those proceedings stating that, at the conclusion of the evidentiary hearing, Enron could be required to disgorge profits for all of the wholesale power transactions Enron executed in the Western electricity market during the period in which Enron was in violation of FERC tariffs and orders, a period that may reach back as far as 1997. *El Paso Electric Co.*, 108 FERC ¶ 61,071 at P. 2 (2004).

On August 4, 2004, in response to FERC's order, a group of state regulators, Attorneys General, and municipal and investor-owned utilities, including Snohomish, filed a "Clarification Request" with FERC. These parties jointly requested clarification that the unjust profits being considered in the FERC proceeding included not only unjust profits already collected, but also included unjust profits that EPMI is attempting to collect from Snohomish and others in the form of "termination payments."

On October 25, 2004, almost three months after the Clarification Request was filed, EPMI filed a motion in this case (the "Injunction Motion"), pursuant to Section 362 of the Bankruptcy Code, seeking to enjoin Snohomish from pursuing the Clarification Request. FERC was not a party to the Injunction Motion and did not appear.

On January 14, 2005, the Bankruptcy Court issued the Order properly denying the Injunction Motion.  (A.305-306).  However, the Order went beyond a simple denial and contained the following additional provisions:

> …to the extent that FERC were to undertake to interpret the terms of the Agreement or to determine the rights of the parties under the Agreement, any such action would be void *ab initio*, and it is further
>
> Ordered, that Snohomish's request to annul the automatic stay is denied, and it is further
>
> Ordered, that to the extent FERC were to order disgorgement related to the Termination Payment, there would remain issues for this Court to determine as to how any such order for disgorgement would impact on the adversary proceeding or how the disgorgement would be treated for purposes of distribution under a plan of reorganization.

These provisions of the Order went far beyond the narrow issue raised in EPMI's Injunction Motion, which was focused simply on whether Snohomish's participation in the Clarification Request at FERC violated the automatic stay contained in Section 362(a) of the Bankruptcy Code.

Since EPMI's Injunction Motion raised no other issues, and because the Order makes a decision on future events which may or may not occur, that language in the Order is an improper advisory opinion which should be vacated.  In addition, the substance of the advisory language is also contrary to law.  FERC, in its Gaming/Partnership Proceedings, is acting in a regulatory capacity pursuant to its exclusive jurisdiction.  Any challenge to a FERC ruling in that proceeding must be made in the Court of Appeals.  The Bankruptcy Court, therefore, has no jurisdiction or other authority to declare possible future actions of FERC taken in the Gaming/Partnership Proceedings "void *ab initio.*"  (See A.305-306).

B.    **Statement of Facts**.

1.    **The Western Wholesale Power Crisis**.

This case arises from the well-documented Western electric power crisis of 2000-2001.

As the Ninth Circuit recently concluded, between May 2000 and June 2001:

> [T]he California energy market was subjected to artificial manipulation on a massive scale.  With FERC abdicating its regulatory responsibility, California consumers were subjected to a variety of market machinations, such as 'round trip trades' and 'hockey-stick bidding,' coupled with manipulative corporate strategies, such as those nick-named 'FatBoy,' 'Get Shorty,' and 'Death Star.'

*Lockyer v. FERC,* 383 F.3d 1006, 1015 (9th Cir. 2004), *petition for rehearing pending*.

According to one study, the resulting economic crisis reduced 2002 Gross Regional Product in the Western U.S. by $35 billion, and employment by 589,000.  Ottie Nabors, George Backus & Jeff Amlin, *Simulating Effects of Business Decisions on Regional Economy:  Experience During the California Energy Crisis*, J. INDUS., COMPETITION & TRADE, vol. 2, at 143 (June 2002). (A.111-127).  Princeton economics professor Paul Krugman has appropriately called the 2000-01 crisis "the most spectacular abuse of market power since the days of the robber barons."  Paul Krugman, *In Broad Daylight*, N.Y. Times, Sept. 27, 2002.

2.    **Enron-Related FERC Regulatory Proceedings**.

a.    **The Enron Market-Based Rate Proceeding**.

On February 13, 2002, FERC, on its own initiative, ordered its staff to investigate whether Enron, or any other entity, manipulated prices for electricity or natural gas in the Western United States.  *Fact Finding Investigation of Potential Manipulation of Electric and Natural Gas Prices*, 98 FERC ¶ 61,165 (2002).  (See A.128-162).

On March 26, 2003, FERC issued the final report of the FERC staff (the "Final Report") documenting widespread market abuses by Enron and others.  The Final Report concludes, "[t]he

preponderance of evidence reviewed by Staff during this investigation indicates that Enron and its affiliates intentionally engaged in a variety of market manipulation schemes that had profound adverse impacts on market outcomes."  FERC Staff, *Fact-Finding Investigation of Potential Manipulation of Electric and Natural Gas Prices*, Docket No. PA02-2-000, Final Report on Price Manipulation in Western Markets, at VI-1 (Mar. 2003).  (A.163-180).  The Final Report further concludes, "the Enron Power Marketers appear to have engaged in gaming and misrepresentation, and also failed to disclose significant changes in their market shares to FERC."  Based on these findings, on March 26, 2003, FERC issued an order requiring Enron to show cause why its market-based rate authority should not be revoked.  *Enron Power Marketing, Inc.,* 102 FERC ¶ 61,316 (2003).  (A.214-264).

On June 25, 2003, after reviewing the show cause response submitted by Enron and numerous replies to that response, including one filed by Snohomish, FERC revoked Enron's market-based rate authority effective as of that date.  *Enron Power Marketing, Inc.,* 102 FERC ¶ 61,316 (2003), *order revoking market-based rate authority*, 103 FERC ¶ 61,343 (2003), *reh'g denied*, 106 FERC ¶ 61,024 (2004), *appeals pending in 9th Cir.*  (A.265-268).  Noting that Enron had not disputed the facts set forth in the Final Report, FERC concluded that Enron had engaged in a variety of gaming practices involving "fraud, deception, and misrepresentation," that it had engaged in a "marketing program based on the use of other entities' assets . . . to carry out its trading strategies" without properly notifying FERC of these arrangements, and that Enron's behavior "undermines the functioning of the wholesale power market and our reliance on that market to ensure just and reasonable rates."  103 FERC ¶ 61,343, at PP 51-56.

On January 22, 2004, FERC issued an order denying petitions for rehearing of its June 25, 2003 order.  In doing so, FERC reaffirmed its conclusion that Enron had "engaged in a range

of unjust and unreasonable practices," including "gaming in the form of inappropriate trading strategies in the electric markets," which resulted in "unjust and unreasonable rates," and "not only exploitation, but also abuse, overreaching, and gouging."  106 FERC ¶ 61,024 at PP 2, 9, and 29.  However, FERC declined at that time to determine whether Enron's violations justified termination of its market-based rate authority on a date prior to June 25, 2003, concluding that the issue should be addressed in the Gaming/Partnership Proceedings.  See 106 FERC ¶ 61,024 at P 47.

In connection with the foregoing, FERC also considered and flatly rejected Enron's claim that FERC's show cause orders violated the automatic stay provisions of the Bankruptcy Code. In rejecting Enron's claim, FERC concluded that it was acting within the police and regulatory powers exception of Section 362 of the Bankruptcy Code, 11 U.S.C. § 362(b)(4), and that Enron was improperly attempting to use the Bankruptcy Code as a shield to hide its illegal conduct. 103 FERC ¶ 61,343 at PP 82-83.  Enron did not appeal this determination.

### b.    The Gaming/Partnership Proceedings.

FERC's Gaming/Partnership Proceedings were also initiated in response to the March 26, 2003 FERC Final Staff Report.  Based upon the evidence contained in the Final Report, FERC, *sua sponte*, initiated two new show-cause proceedings, later consolidated, against a large group of sellers in the Western markets, including Enron.  The new show-cause orders required respondents to demonstrate why the evidence of market manipulation, market power abuse, and collusion in the Final Report should not result in the loss of their market-based rate authority, the disgorgement of unjust profits arising from their abusive activities, or other appropriate remedies.  *Enron Power Marketing, Inc.*, 103 F.E.R.C. ¶ 61,346 (2003); *American Elec. Power Serv. Corp.*, 103 F.E.R.C. ¶ 61,345 (2003).

FERC initiated trial-type evidentiary hearings before a FERC administrative law judge ("ALJ") in September 2003 and those hearings are still ongoing. FERC has settled with or dismissed all of the other parties originally named in the show cause orders, and Enron is the sole remaining respondent. Snohomish has been an active participant in these Gaming/Partnership Proceedings and has filed testimony demonstrating that Enron was engaged in market manipulation schemes throughout the period at issue in this case.

On February 27, 2004, Snohomish submitted testimony to FERC laying out this evidence and asserting that, as a result of Enron's gross violations of market rules, Enron's market-based rate authority should be revoked effective to the date when Enron began violating those rules. Snohomish further asserts that Enron should be denied any profits for the period after revocation of its market-based rate authority, including any profit that might be obtained by Enron under the "termination payment" provisions of electricity contracts entered after the date of revocation.[2]

On May 17, 2004, Snohomish submitted 82 transcriptions of taped telephone conversations of Enron's electricity traders that show, for example, traders in the act of manipulating the electricity market to artificially inflate Enron's profits.[3] The tapes include discussions in which the Enron principal who negotiated the Agreement instructed his attorney to lie to Snohomish and her agreement to do so. The tapes also show that manipulations of the short-term power markets of the type engaged in by Enron had a direct role in the price ultimately paid by Snohomish.[4]

---

[2]  On January 31, 2005, Snohomish and several other parties submitted supplemental testimony addressing these points in light of the expanded scope of the proceeding.

[3]  Exhs. SNO-204, SNO-222, submitted in FERC Docket No. EL03-180 (May 17, 2004).  (See A.184-202).

[4]  Exhs. SNO-182, SNO-194, SNO-228, SNO-244.  Snohomish submitted a large number of additional tapes and transcripts with its January 31, 2005, testimony.  FERC's Trial Staff also submitted testimony concerning Enron trader tapes on March 1, 2005, and is expected to submit additional testimony on April 15, 2005.

On July 22, 2004, FERC issued an order clarifying the scope of the Gaming/Partnership Proceedings to include a "comprehensive review of all evidence relevant to Enron conduct that violated or may have violated Commission tariffs or orders and the appropriate remedy for such violations."  108 FERC ¶ 61,071.  Among other remedies, FERC noted that Enron could be required to disgorge "profits for <u>all</u> of its wholesale power sales in the Western Interconnect for the period January 16, 1997 to June 25, 2003."  *Id.*[5]

On August 4, 2004, seven parties, including Snohomish, filed the Clarification Request.[6] These seven parties who had all intervened in the FERC proceedings requested that FERC make clear that the hearing encompassed *all* unjust profits sought by Enron, including those from the "termination payment" claims asserted by Enron, which are at base nothing more than a measure of expected profits from terminated wholesale power contracts.  *Id.*

On March 11, 2005, FERC issued an order, in response to the Clarification Request, concluding that "Enron's profits under the terminated contracts fall within the scope of this proceeding" because "termination payments are based on profits Enron projected to receive under its long-term, wholesale power contracts executed during the period when Enron was in violation of conditions of its market-based rate authority."  *El Paso Electric Co.,* 110 FERC ¶ 61,280 at P 11 (2005).

---

[5]  The July 22 order also substantially affirmed an ALJ's recommendation that Enron be required to disgorge $32.5 million in unjust profits gained in an improper collusive relationship with El Paso Electric, and concluded that the El Paso relationship was but "a subset of broader Enron relationships and practices in the West" and that the $32.5 million in profits "represents only a fraction of Enron's profits in the Western Interconnect for the period it violated its market-based rate authority." 108 FERC ¶ 61,071 at P32.  FERC, therefore, consolidated several Enron-related dockets into the Gaming/Partnership Proceedings and ordered the ALJ to conduct a comprehensive evaluation of Enron's improper practices and a complete accounting of its illegal profits.

[6]  Request for Clarification by the Western Parties, *El Paso Elec. Co.*, Docket Nos. EL02-113-000, *et al.* (Aug. 4, 2004).  The seven parties included the Office of the Nevada Attorney General's Bureau of Consumer Protection, the Attorney General of the State of Washington, the Public Utilities Commission of Nevada, one investor-owned utility, and two municipal utilities.  (See A.203-213).

### 3.    Enron's Bankruptcy and the Adversary Proceeding.

#### a.    The Enron-Snohomish Contract.

In December 2000, at the height of the Western electricity crisis, spot electricity prices in the Northwest spiked to $3,300 per megawatt-hour ("MWh"), nearly 150 times their historical average, threatening to wipe out Snohomish's cash reserves and to force large and unpredictable rate increases on its consumers.  Accordingly, Snohomish concluded it could not rely on the spot markets for even a small percentage of its consumers' needs.  On December 22, 2000, Snohomish sent a Request for Proposals for power supply to the 17 purportedly creditworthy suppliers it was able to identify then operating in the Northwest in order to fill the 75-100 megawatts ("MW") Snohomish projected it would require in 2001.

Snohomish received responsive offers from only three suppliers, including EPMI.  Each ultimately refused to offer more than 25 MW to fill Snohomish's projected 75-100 MW need.  On January 26, 2001, Snohomish entered into the Agreement with EPMI, guaranteed by Enron Corp., for 25 MW of power for the period April 1, 2001 to December 31, 2009, at a rate of $109 per MWh.[7]  On November 28, 2001, Enron Corp.'s investment rating fell below investment grade, and Snohomish terminated the Agreement in accordance with its terms.

#### b.    The Adversary Proceeding.

On December 2, 2001, Enron Corp., and numerous affiliates, including EPMI, filed petitions under Chapter 11 of the Bankruptcy Code in the Southern District of New York.  On January 31, 2003, EPMI filed the Adversary Proceeding against Snohomish seeking a "termination payment" of approximately $117 million plus interest.  (A.17-31).  On March 4, 2003, the Bankruptcy Court entered an order, which was amended on March 20, 2003 (as

---

[7]  By contrast, in the decade prior to the Western power crisis, prices in the Pacific Northwest averaged approximately $24 per MWh.

amended, the "Mediation Order") (A.32-35), staying in favor of mediation essentially all activity in the Adversary Proceeding (A.17-31), along with certain other adversary proceedings known as the Trading Cases.

On October 25, 2004, EPMI filed the Injunction Motion with the Bankruptcy Court. In the motion, EPMI requested only the following relief:

> An order (1) enforcing the automatic stay and the [Mediation Order]; and (2) enjoining [Snohomish] from seeking clarification from [FERC] (i) as to whether the FERC intended to exclude from the scope of the [Gaming/Partnership Proceedings] energy trading contracts under which Enron is owed Termination Payments from, among others, Snohomish and (ii) as to whether the FERC intended to make available to Snohomish the remedy of an order holding that Enron forfeited its right to receive the Termination Payments, and ordering Snohomish to withdraw its [Clarification Request] forthwith.

(A.11-12).

On January 14, 2005, the Bankruptcy Court issued the Order at issue in this appeal. (A.305-306). As noted above, the Bankruptcy Court properly denied the Injunction Motion. However, the Order went on to provide advisory language addressing issues not before the Court: "to the extent that FERC were to undertake to interpret the terms of the [Enron-Snohomish] Agreement or to determine the rights of the Parties under the Agreement, any such action would be "void *ab initio.*" (A.305-306).

Enron has already twice cited this advisory language in an attempt to further positions it has advanced at both FERC and in the bankruptcy proceedings. First, Enron cited this language in a motion requesting an interlocutory appeal at FERC of an ALJ's ruling adverse to it on discovery issues.[8] There, Enron argued that FERC's conclusion that profits under "termination

---

[8] Snohomish respectfully requests that the Court, pursuant to Fed. R. Evid. 201(b), take judicial notice of Enron's motion. See *Kagge v. I.R.S.*, 71 F.3d 1995 (2d Cir. 1995); *B.T. Produce Co. v. Robert A. Johnson Sales, Inc.*, 354 F.Supp.2d 284 (S.D.N.Y. 2004). If the Court requires the filing of a formal motion regarding Snohomish's request

payment" claims are properly considered as part of FERC's larger effort to develop a remedy for

Enron's ubiquitous misconduct created a jurisdictional conflict with the Bankruptcy Court.[9]

Second, Enron cited the language in a motion recently filed in the Bankruptcy Court

seeking to amend the Mediation Order so that the Adversary Proceeding (A.17-31) (as well as

three other adversary proceedings) could proceed, even while the Court-ordered mediation

continues.[10]

## IV. <u>ARGUMENT</u>

The Bankruptcy Court properly denied EPMI's motion to enjoin Snohomish's

participation in the Clarification Request made in the FERC proceedings. That was the only

issue raised in the Injunction Motion and was the only ruling that was necessary to adjudicate the

motion.

The Bankruptcy Court, at EPMI's invitation, and over the vigorous objection of

Snohomish, went on to determine that certain potential FERC administrative rulings, if ever

made, would be "void *ab initio.*"  (A.305-306).  This portion of the Bankruptcy Court's ruling is

not only an improper advisory opinion, but it also conflicts with both the Bankruptcy Code and

the FPA, which preclude the Bankruptcy Court from either interfering in ongoing regulatory

proceedings or reviewing FERC orders.

---

to take judicial notice of the documents attached hereto, Snohomish will, of course, do so promptly.  A true and accurate copy of Motion of Enron for Leave to File an Interlocutory Appeal of Orders Denying Discovery, or, in the Alternative, for Reconsideration of Order Denying Motions to Compel Discovery, and Granting Enron an Extension of Time to Conduct Discovery, *Enron Power Marketing, Inc.,* Docket Nos. EL03-180-000, *et al.*, at 13 (filed March 29, 2005) is attached hereto as No. 1.

[9]  The FERC ALJ flatly rejected Enron's claim. *El Paso Electric Co.,* 111 FERC ¶ 63,001 at P 5 (slip op. filed April 1, 2005).

[10]  Motion of Reorganized Debtor Enron Power Marketing, Inc. for Limited Modification of First Amended Order Governing Mediation of Trading Cases In Light of Federal Energy Regulatory Commission Orders Issued March 11 and 24, 2005, *Enron Corp. et al.,* No. 01-16034, at 9 (Bankr. S.D.N.Y. filed March 28, 2005).  A true and accurate copy of the motion is attached hereto as No. 2, of which the Court is respectfully requested to take judicial notice.  See n.8.

A.     **The Bankruptcy Court's Ruling That Certain Future and Prospective Rulings by FERC are "Void _Ab Initio_" is an Improper Advisory Opinion.**

In the Order, the Bankruptcy Court declared "void _ab initio_" any future FERC order that might "undertake to interpret the terms" of the Agreement or "determine the rights of the parties."  (A.305-306).  The Order also prospectively reserves to the Bankruptcy Court the right to determine how an order of FERC for disgorgement (which has not been entered and could, if entered, take numerous forms) would impact on the Adversary Proceeding or how the disgorgement would be treated for purposes of distribution under a plan of reorganization.

These portions of the Order are improper advisory opinions because they globally decide prospective issues not before the Court.  Snohomish requests that these improper advisory opinions be stricken from the Order.

Article III of the Constitution limits the jurisdiction of federal courts to actual cases or controversies.[11]  _Preiser v. Newkirk,_ 422 U.S. 395, 401 (1975).  The rule that federal courts do not have the power to render advisory opinions is "the oldest and most consistent thread in the federal law of justiciability."  _Flast v. Cohen_, 392 U.S. 83, 96 (1968).  As the Supreme Court has noted, a case or controversy exists only if "the facts alleged, under all the circumstances, show that there is a substantial controversy between parties having an adverse legal interest of _sufficient immediacy and reality_" to justify judicial resolution.  _Maryland Casualty Co. v. Pacific Coal & Oil Co.,_ 312 U.S. 270, 273 (1941).  Courts must avoid premature adjudication of contingent future events that may never occur.  _United States v. Broadcast Music, Inc.,_ 275 F.3d 168, 178 (2d Cir. 2001).

---

[11]  Although bankruptcy courts are not Article III courts, they are subject to the jurisdictional constraints of Article III.  _Bank of New York v. Adelphia Communications Corp (In re Adelphia Communications Corp.)_, 307 B.R. 432, n.5 (Bankr. SDNY 2004).

12

In *Broadcast Music,* the court examined a consent decree establishing a rate mechanism enabling the court to set fees for licenses to use music in a performing rights organization's repertory. The court was asked to determine whether, under the decree, the copyright holders of the music must consent to the rate determination arrived at by the court. At the time, no copyright holders had challenged the rate determination. The court declined to rule on the issue because the applicants had suffered no injury at the time, and the threat of injury was "speculative – a 'contingent future event' that 'may not occur at all.'" *Broadcast Music,* 275 F.3d at 178; see also *Princeton University v. Schmid,* 455 U.S. 100, 102 (1982) (federal courts do not decide hypothetical issues or give advisory opinions); *Aetna Life Ins. Co. v. Haworth,* 300 U.S. 227, 241(1937) (the controversy must be "real and substantial … admitting of specific relief through a decree of a conclusive character, as distinguished from an opinion advising what the law would be upon a hypothetical state of facts"); *Marchi v. Board of Cooperative Educational Services of Albany,* 173 F.3d 469, 476 (2d Cir. 1999) (a hypothetical or abstract dispute does not present a case or controversy); *Adelphia Communications,* 307 B.R. at 437 ("courts should not endeavor to resolve contingencies that may or may not occur as expected or may not happen at all").

The challenged advisory paragraphs in the Order are a premature adjudication of contingent future events. At this juncture, FERC has not issued any order which has the effect of determining the rights of the parties under the Agreement. Similarly, since no FERC order requiring disgorgement or providing any other remedy for Enron's violation of the FPA has been issued, the Order improperly provides an advisory opinion that "there would remain issues for this Court to determine as to how any such order for disgorgement would impact on the adversary proceedings…." (A.305-306).

13

In short, the contingent future issues addressed in the Bankruptcy Court's advisory opinion were not before the court and were never fully briefed by the parties. See *United States v. Fruehauf,* 365 U.S. 146, 157 (1961) (courts do not have the power to issue advisory opinions which are "not pressed before the court with that clear concreteness provided when a question emerges precisely framed and necessary for decision from a clash of adversary argument exploring every aspect of a multifaceted situation embracing conflicting and demanding interest"); *Broadcast Music*, 275 F.3d 168 (upholding the District Court's decision that determination of the issue would be advisory only, because it had been neither presented to the court, nor adequately briefed by the parties).

The only question actually before the Bankruptcy Court was the extraordinarily narrow issue of whether Snohomish should be required to withdraw from the Clarification Request. The Bankruptcy Court properly denied that relief.

The issue of whether FERC could make future determinations that might impact the rights of the parties under FERC-jurisdictional wholesale power contracts was simply not before the Court. FERC was not even a party to the Injunction Motion, was not served with Enron's pleadings, and had no opportunity to be heard. Nonetheless, the Order declares that certain possible future action by FERC would be "void *ab initio*" and that the implementation of any such order would be controlled by the Bankruptcy Court.

Snohomish respectfully requests that the Court vacate the portions of the Order containing the advisory opinion. *State of New Jersey, Department of Environmental Protection and Energy, v. Heldor Industries, Inc.,* 989 F.2d 702, n.10 (3d Cir. 1993) (vacating bankruptcy judge's order because it constituted an advisory opinion on an issue not before the court); *Olin*

*Corporation v. Consolidated Aluminum Corporation,* 5 F.3d 10, 17 (2d Cir. 1993) (vacating district court's holding because there was no actual controversy before the court).

The Bankruptcy Court also erred when it rejected Snohomish's alternative request to annul the automatic stay. Snohomish had only requested that the automatic stay be annulled in the event the Court found the stay to be violated. Snohomish's pleadings before the Bankruptcy Court made the contingent nature of its request unmistakably clear: "*In the unlikely event that this Court finds that the Consolidated FERC Proceeding or filing the Clarification Request violated the automatic stay*, this Court should annul the stay for cause to permit the Consolidated FERC Proceeding to proceed." (Snohomish Opposition to Injunction Motion at 37).

The Bankruptcy Court denied Enron's motion to require Snohomish to withdraw from participating in the Clarification Request. Therefore, the contingent event for Snohomish's request to annul the automatic stay never occurred, and Snohomish's request became moot. *See Heldor Industries,* 989 F.2d at 707 (issues that cannot affect the rights of the parties are moot).

The Bankruptcy Court's denial of Snohomish's contingent request to annul the automatic stay was therefore improper and should also be stricken.

### B.    The Bankruptcy Court's Advisory Opinions are also Contrary to Law and Interfere with FERC's Exclusive Jurisdiction to Issue Relief in the Gaming/Partnership Proceedings.

There is no dispute in this case that FERC is acting within its exclusive jurisdiction in conducting the Gaming/Partnership Proceedings. FERC has exclusive jurisdiction over the rates, terms, and conditions of service provided for in wholesale electricity contracts. *Mississippi Power & Light Co. v. Mississippi,* 487 U.S. 354, 370-72 (1988); *In re NRG Energy, Inc.,* 2003 WL 21507685 at *3 (S.D.N.Y. June 30, 2003) (Casey, J.); *In re Enron Corp.*, 2004 WL 2711101 at *4 (S.D.N.Y. Nov. 23, 2004) (Casey, J.).

15

In enacting the FPA, Congress declared, "the business of transmitting and selling electric energy for ultimate distribution to the public is affected with a public interest" and that federal regulation of "the transmission of electric energy in interstate commerce and the sale of such energy at wholesale in interstate commerce is necessary in the public interest." 16 U.S.C. § 824(a). Congress, thus, granted FERC exclusive jurisdiction to ensure that all contracts affecting wholesale electric power transactions are just and reasonable. Specifically, Section 205 of the FPA declares unequivocally:

> All rates and charges made, demanded or received by any public utility for or in connection with the transmission or sale of electric energy *. . . shall be just and reasonable*, and any such rate or charge that is not just and reasonable *is hereby declared to be unlawful*.

16 U.S.C. § 824d(a) (emphasis added).[12] To ensure this statutory standard is met, the FPA requires that "all *contracts* that in any manner affect or relate to such rates [and] charges" for jurisdictional electric service to be filed with and approved by FERC. 16 U.S.C. §§ 824d(c), (e) (emphasis added).

Further, under FPA Section 206, FERC may initiate regulatory action on its own motion, as it has done with respect to Enron, and when it does so, if it finds that any "contract affecting such rate, charge, or classification is unjust, unreasonable, unduly discriminatory or preferential," it "*shall* determine the just and reasonable rate, charge, ... or *contract* to be thereafter observed and in force, and *shall* fix the same by order." 16 U.S.C. § 824e(a) (emphasis added). And, under FPA Section 309, FERC may "perform any and all acts" and may "prescribe, issue, amend, and rescind such orders as it may find necessary or appropriate" to carry out its responsibilities under the FPA. 16 U.S.C. § 825h.

---

[12]  Enron is a regulated "public utility" under the FPA because it engaged in the wholesale sale and transmission of electric power in interstate commerce. See 16 U.S.C. § 824(e).

FERC's Gaming/Partnership Proceedings are within FERC's exclusive jurisdiction because FERC is there examining "all evidence of violations of tariffs on file or orders of [FERC] . . . involving Enron's role in the Western power crisis." *El Paso Elec. Co.,* 108 FERC ¶ 61,071 at P 2 (2004).

The Bankruptcy Court has recognized that it lacks jurisdiction to interfere with FERC's exercise of its regulatory powers. For example, in the process of issuing the Order, the Bankruptcy Court stated:

> insofar as FERC determines that certain payments should be disgorged based on the exercise of FERC's police and regulatory power in formulating a remedy for any market manipulation or market abuse, such determination would be excepted from the automatic stay even if it were to impact property of the [Enron bankruptcy] estate.

See *In re Enron Corp.,* Case No. 01-16034 (*Enron Power Marketing, Inc. v. Public Utility District No. 1 of Snohomish County*), Tr. at 19:17-24 (Bankr. S.D.N.Y. Dec. 21, 2004) (written order issued Jan. 14, 2005). (A.301).

In another ruling involving FERC-jurisdictional contracts, the Bankruptcy Court, in refusing to enjoin the City of Santa Clara from pursuing such issue, recognized that Enron conceded that FERC has exclusive jurisdiction to determine if Enron's market-based rates should be retroactively revoked:

> EPMI, however, concedes that two issues presented by the City are within FERC's exclusive jurisdiction. The first concerns the notice of termination provision under regulations promulgated by FERC. The other concerns whether the market-based rates charged were fair. With respect to the latter issue, the City argues that EPMI should have its market-based rate authority revoked retroactively and EPMI should not be able to take advantage of market-base rates and that the rates are not just and proper. Nevertheless, EPMI argues that this Court should enjoin the City from prosecuting any aspect of the FERC Action as the arguments related to the alleged unreasonable rates charged and to the revocation of market-based authority are redundant of arguments

> currently before FERC in another proceeding – the "gaming and partnership" proceeding involving the same parties.

*See* the December 29, 2004 Decision and Order of United States Bankruptcy Judge Arthur

Gonzalez, *In re Enron Corp.,* Case No. 01-16034 (*Enron Power Marketing Inc. v. City of Santa*

*Clara)* (Adv. Pro. No. 02-2719(AJG))(emphasis added).[13]

In short, it is beyond dispute that FERC's Gaming/Partnership Proceeding is a matter of

FERC's exclusive jurisdiction.  The Bankruptcy Court cannot infringe upon FERC's exclusive

jurisdiction by declaring – prospectively or otherwise – that rulings issued or to be issued by

FERC are "void *ab initio."*

The FPA contains mandatory and jurisdictional finality and exhaustion requirements.  A

party aggrieved by a final decision of FERC – which has not yet occurred in this case – is

entitled to seek relief only in the form and manner set forth in the FPA.  Section 313 of the FPA

provides the "exclusive" avenue for seeking to "affirm, modify or set aside" FERC orders, which

is to file a petition for review in the United States Courts of Appeals.  16 U.S.C. § 825l(b).  This

procedure is "the specific, complete and exclusive mode for judicial review of FERC's orders."

*City of Tacoma v. Taxpayers of Tacoma*, 357 U.S. 320, 336 (1958).  "Failure to comply with 16

U.S.C. § 825l(b) creates a jurisdictional bar to judicial review of complaints regarding the

[challenged] procedure."  *Rivers Elec. Co. v. 4.6 Acres of Land*, 731 F. Supp. 83, 86-87

(N.D.N.Y. 1990).

In a strongly analogous case, the Second Circuit in *In re Federal Communications*

*Commission*, 217 F.3d 125 (2d Cir. 2000) ("*NextWave II*"), concluded that that the sole remedy

to correct any agency errors was to appeal in the statutorily prescribed forum and that the

---

[13]  A true and accurate copy of the Decision and Order is attached hereto as No. 3,  of which the Court is respectfully requested to take judicial notice.  See n.8.

bankruptcy court therefore was "utterly without the power" to review or modify the FCC's

regulatory action. *Id.* at 139-141. As the Second Circuit concluded:

> The [Commission] need not defend its regulatory calculus in the *bankruptcy court*; whenever [a Commission] decision implicates its exclusive power to dictate the terms and conditions of licensure, the decision is regulatory. And if the decision is regulatory, it may not be altered or impeded by any court lacking jurisdiction to review it.

*NextWave II*, 217 F.3d at 135 (emphasis added). The Second Circuit similarly concluded that the

automatic stay does not create an exception to this rule:

> In short, notwithstanding the automatic stay provision, the bankruptcy court lacks jurisdiction to decide whether the [Commission's] regulatory decision is a proper exercise of discretion, or to decide whether it is provident and in the public interest. All of these decisions are within the exclusive jurisdiction of the federal court of appeals.

*Id.*; see *In re Personal Communications Network, Inc.*, 249 B.R. 233 (Bankr. E.D.N.Y. 2000).

Accordingly, the Second Circuit rejected the Bankruptcy Court's attempt to prevent the

FCC from enforcing provisions of its licenses, concluding that the bankruptcy court "lacked

jurisdiction to declare" FCC's regulatory action "null and void on any ground," and further

concluding that the bankruptcy court's attempt to interfere with the FCC's regulatory proceeding

required the issuance a writ of mandamus to correct the bankruptcy court's clear error. *Id.* at

139; *See also In re Nextwave Personal Communications, Inc.,* 200 F.3d 43, 55 (2d Cir. 1999)

(the bankruptcy court is "*utterly without the power*" to alter the FCC's regulatory orders in

dispute (emphasis added)).

The Order also violates *Board of Governors of the Federal Reserve System v. MCorp

Financial, Inc.,* 502 U.S. 32 (1991) in that the Bankruptcy Court's advisory opinions regarding

possible FERC actions in the ongoing Gaming/Partnership Proceedings inappropriately interferes

with FERC's ongoing proceeding. In *MCorp*, the Supreme Court held that the provisions of the

automatic stay do not "have any application to ongoing, nonfinal administrative proceedings." *Id.*, at 41. Yet, the Bankruptcy Court – presumably relying on the automatic stay – interfered with the Gaming/Partnership Proceedings by declaring possible future FERC action void *ab initio*.

Accordingly, the Bankruptcy Court's assertion of authority to declare a ruling of FERC "void *ab initio"* is contrary to law.

## V.  <u>CONCLUSION</u>

For the reasons stated herein, the Court should strike the following provisions of the January 14, 2005 Order:

> [H]owever, to the extent that FERC will undertake to interpret the terms of the Agreement or to determine the rights of the parties under the terms of the Agreement, any such action would be void *ab initio*, and it is further
>
> Ordered, that Snohomish's request to annul the automatic stay is denied, and it further
>
> Ordered, that to the extent FERC were to order disgorgement related to the Termination Payment, there would remain issues for this Court to determine as to how any such order for disgorgement would be treated for purposes of distribution under a plan of reorganization.

Dated:  April 7, 2005                RESPECTFULLY SUBMITTED


                                     By:  **/s/ Alan E. Gamza**
                                     Alan E. Gamza (AG-2014)
                                     Alan Kolod (AK-3108)
                                     Philippe Zimmerman (PZ-7744)
                                     MOSES & SINGER LLP
                                     1301 Avenue of the Americas
                                     New York, New York 10019-6076
                                     (212) 554-7800
                                     agamza@mosessinger.com

                                     and

                                     Michael A. Goldfarb (MG-6497)
                                     LAW OFFICES OF MICHAEL A. GOLDFARB
                                     1150 Market Place Tower
                                     2025 First Avenue
                                     Seattle, Washington 98121
                                     (206) 374-7090
                                     mgoldfarb@goldfarb-law.com

                                     Counsel for Public Utility District No. 1 of
                                     Snohomish County, Washington

# NO. 1

UNITED STATES OF AMERICA
BEFORE THE
FEDERAL ENERGY REGULATORY COMMISSION

| | | |
|---|---|---|
| **Enron Power Marketing, Inc. and** | ) | **Docket No. EL03-180-000** |
| **Enron Energy Services, Inc.** | ) | |
| | ) | |
| **Enron Power Marketing, Inc. and** | ) | **Docket No. EL03-154-000** |
| **Enron Energy Services, Inc.** | ) | |
| | ) | |
| **El Paso Electric Company, Enron Power** | ) | **Docket No. EL02-113-000** |
| **Marketing, Inc., and Enron Capital and Trade** | ) | |
| **Resources Corporation** | ) | |
| | ) | |
| **Portland General Electric Company** | ) | **Docket No. EL02-114-007** |
| | ) | |
| **Enron Power Marketing, Inc.** | ) | **Docket No. EL02-115-008** |

MOTION OF ENRON FOR LEAVE TO FILE AN INTERLOCUTORY APPEAL OF
ORDERS DENYING DISCOVERY, OR, IN THE ALTERNATIVE, FOR
RECONSIDERATION OF ORDER DENYING MOTIONS TO COMPEL DISCOVERY,
AND GRANTING ENRON AN EXTENSION OF TIME TO CONDUCT DISCOVERY

To:     The Honorable Carmen A. Cintron
        Presiding Administrative Law Judge

Pursuant to Rule 715(b)(1) of the Rules of Practice and Procedure of the Federal Energy

Regulatory Commission's ("Commission" or "FERC") Rules of Practice and Procedure, 18

C.F.R. § 385.715(b)(1) (2004), Enron Power Marketing, Inc., Enron Energy Services Inc. and

Enron Capital and Trade Resources Corporation (collectively "Enron") respectfully request that

the Presiding Administrative Law Judge permit an interlocutory appeal of her March 24, 2005

Order Confirming Rulings ("March 24 Order"), or, in the alternative, that she reconsider her

March 24 Order, and respectfully request that this motion be granted expedited consideration.  In

addition, if the Presiding Judge reconsiders her ruling or the Commission later changes that

ruling to allow for the discovery at issue, Enron should be afforded a reasonable amount of time

to resume the discovery that was denied.  Enron submits that extraordinary circumstances exist

which warrant prompt Commission review of this ruling.  In support of this motion, Enron states as follows:

## I.    BACKGROUND

On July 22, 2004, the Commission issued its "Order on Initial Decision and Consolidating Dockets," 108 FERC ¶ 61,071 (2004) ("July 22 Order").  The July 22 Order, *inter alia*, consolidated the remedial actions to be taken in Docket No. EL02-113-000 with the on-going proceedings of Docket Nos. EL03-180-000 and EL03-154-000, and directed the Administrative Law Judge "to determine, based on a totality of the evidence in all the dockets, the total amount of profits that Enron should be required to disgorge as supported by the consolidated records."  July 22 Order at ¶ 32.

On August 4, 2004, the Western Parties[1] filed a request for clarification, seeking a statement from the Commission that issues relating to the long-term bilateral contracts not governed by the CAISO or CalPX tariffs had also been set for hearing in the consolidated proceeding (the "Western Parties' Motion").  On August 19, 2004, Enron filed an Answer to the Western Parties' Request for Clarification ("Enron Answer").[2]

On March 11, 2005, the Commission granted the Western Parties' request for clarification, finding that:

---

[1]    The "Western Parties" consist of the Nevada Power Company and Sierra Pacific Power Company (collectively, the "Nevada Companies"), Public Utility District No. 1 of Snohomish County, Washington ("Snohomish"), the City of Palo Alto, California ("Palo Alto"), the Office of the Nevada Attorney General's Bureau of Consumer Protection, the Attorney General of the State of Washington, and the Public Utilities Commission of Nevada.

[2]    Enron also filed a motion before the United States Bankruptcy Court for the Southern District of New York ("Bankruptcy Court") arguing that the clarification sought by certain of the Western Parties violated the Automatic Stay under § 362(a)(3) of the Bankruptcy Code and the Bankruptcy Court's "Order Governing Mediation of Trading Cases," *In Re Enron Corp., et al.*, Case No. 01-16034 (Mar. 4, 2003). *See, e.g.*, "Memorandum of Law in Support of Enron Power Marketing, Inc.'s Motion for an Order (1) Enforcing the Automatic Stay and the Court's Mediation Order and (2) Enjoining Public Utility District No. 1 of Snohomish County from Seeking Clarification from the FERC" *In Re Enron Corp., et al.*, No. 01-16034; *Enron Power Mktg. Inc. v. Public Utility District No. 1 of Snohomish County*, Adv. Pro. No. 03-02064 A (AJG) (Bankr. S.D.N.Y., filed Oct. 25, 2004), attached herein as Exhibit A.

2

> Upon consideration of the Western Parties' argument, the
> Commission finds that Enron's profits under the terminated
> contracts fall within the scope of this proceeding. The termination
> payments are based on profits Enron projected to receive under its
> long-term, wholesale power contracts executed during the period
> when Enron was in violation of conditions of its market-based rate
> authority. The Commission finds that these matters would benefit
> from a full examination at hearing. Therefore, the Commission
> directs that these matters be examined in the ongoing consolidated
> hearing before the ALJ in Docket No. EL03-180, *et al.*, subject to
> any applicable bankruptcy restrictions.

"Order on Clarification," 110 FERC ¶ 61,280 (March 11, 2005) ("March 11 Order") at ¶ 11.

## II.    PRESIDING JUDGE'S RULING

On March 14, 15 and 16, 2005, Enron filed four motions for orders compelling discovery

responses from Snohomish, the Metropolitan Water District of Southern California ("Met

Water"), the City of Santa Clara, California d/b/a Silicon Valley Power ("Santa Clara") and

Valley Electric Association, Inc. ("Valley") (collectively, the "Indicated Intervenors").[3] As

indicated in their Answers to Enron's Motions to Compel, these entities refused to respond to

certain of the Data Requests propounded by Enron on the basis that Enron's inquiries for

background materials regarding their involvement in the markets are not at issue in these

consolidated proceedings.[4]

---

[3]     *See generally* "Motion of Enron Power Marketing, Inc. and Enron Energy Services, Inc. for an Order Compelling Data Request Responses From Public Utility District No. 1 of Snohomish County, Washington," Docket No. EL03-180-000, *et al.* (filed Mar. 14, 2005) ("Motion to Compel Snohomish"); "Motion for an Order Compelling Data Responses to Data Requests From the Metropolitan Water District of Southern California of Enron Power Marketing, Inc. and Enron Energy Services Inc.," Docket No. EL03-180-000, *et al.* (filed Mar. 15, 2005) ("Motion to Compel Met Water"); "Motion for an Order Compelling Responses to Data Requests from the City of Santa Clara, California d/b/a Silicon Valley Power of Enron Power Marketing, Inc. and Enron Energy Services Inc.." Docket No. EL03-180-000, *et al.* (filed Mar. 15, 2005) ("Motion to Compel Santa Clara"); "Motion of Enron Power Marketing, Inc. and Enron Energy Services, Inc. for an Order Compelling Data Request Responses From Valley Electric Association, Inc.," Docket No. EL03-180-000, *et al.* (filed Mar. 16, 2005) ("Motion to Compel Valley").

[4]     *See generally* "Answer of Public Utility District No. 1 of Snohomish County, Washington in Opposition to Motion of Enron for an Order Compelling Data Request Responses," Docket No. EL03-180-000, *et al.* (filed Mar. 21, 2005) ("Snohomish Answer to Motion to Compel") at 9-20; "Answer of the Metropolitan Water District of Southern California to the Motion for an Order Compelling Responses to Data Requests of Enron Power Marketing, Inc. and Enron Energy Services, Inc.," Docket No. EL03-180-000, *et al.* (filed Mar. 21, 2005) ("Met Water Answer to Motion to Compel") at 3-4; "Answer of the City of Santa Clara, California, to the Motion of Enron Power

Enron's motions sought information from the Indicated Intervenors concerning a variety of matters addressed explicitly or implicitly in their Supplemental Testimony. Specifically, the motions sought information relating to (1) the Indicated Intervenors' non-statutory remedies (*i.e.*, equitable remedies, remedies other than prospective refunds); (2) the Indicated Intervenors' claims of harm to themselves (specifically, the impact of Enron upon the Indicated Intervenors' wholesale and retail activities); (3) claims for refunds (without specifying precisely the bases therefor); and (4) the Indicated Intervenors' claims of harm to the market.

There is language contained in statements made by the presiding ALJ from the bench, as well as language in her March 24 Order Confirming Rulings, which suggests that she understands the Commission's orders in this proceeding effectively to deny Enron the right and opportunity to discover any information that is not related to Enron's costs or profits. The Presiding ALJ denied Enron's Motions "to the extent that these motions sought discovery of 'wholesale market activities' of [Indicated Intervenors] including their usage of power, market expectations and potential retail sales." March 24 Order at ¶ 2(b); *see also* Tr. at 650:20-22 ("the profit and losses or the conduct of other market participants is not relevant...").[5] The Motions were also denied "concerning the remedies sought by these parties, their harm and whether the remedies sought in this proceeding, such as, contract rescission are similar to the remedies in the Bankruptcy proceeding, is deemed to be irrelevant to this proceeding." *Id.*

---

Marketing, Inc. and Enron Energy Services, Inc., for an Order Compelling Production of Responses to Data Requests, Interrogatories, and Requests for Admissions " Docket No. EL03-180-000, *et al.* (filed Mar. 21, 2005) ("Santa Clara Answer to Motion to Compel") at 3-6; "Answer of Valley Electric Association, Inc. to the Motion top Compel of Enron Power Marketing, Inc. and Enron Energy Services Inc.," Docket No. EL03-180-000, *et al.* (filed Mar. 21, 2005) ("Valley Answer to Motion to Compel") at 2-5.

[5]        At the March 23 prehearing conference, counsel for Enron clarified that Enron was not seeking to inquire into others' "conduct," with the aim of asserting that they themselves had violated any tariffs or orders but rather for the purpose of testing their claims to have been affected by Enron's behavior, whether referred to as "impact," "injury," "harm," "damages," "unjust profits" or the like. Tr. 652:24-653:5.

4

III.    **SHOWING UNDER RULE 715**

Rule 715 requires a showing of "extraordinary circumstances which make prompt Commission review of the contested ruling necessary to prevent detriment to the public interest or irreparable harm to any person." This standard is plainly met.

A.    **Detriment to the Public Interest.**

The public interest will be harmed if there is a failure of due process. *See El Paso Natural Gas Co.*, 28 FERC ¶ 63,070 at 65,155 (1984) (J. Benkin). Not only does the public have an inherent interest in seeing that justice is served – and there can be no justice without due process[6] – but vast amounts of public resources will have been wasted on a pointless proceeding if the supervisory tribunal determines that due process has not been afforded. Moreover, the public will benefit from the development of a full and complete record in this proceeding, and will not be harmed if Enron is granted an opportunity to conduct discovery for that purpose.[7]

At the March 23, 2005 prehearing conference, counsel for Enron urged the Presiding Administrative Law Judge to certify the questions at issue – questions relating to the permitted scope of Enron's discovery – to the Commission. Commission Trial Staff supported that request for certification. *See* Tr. at 655:1-11, 19-25. Trial Staff explained its position as follows:

> I think it's better to get a full answer out of [the Commission] . . . .
> We think that's the best result to do. Enron will know one way or
> the other, and at least we won't have the exceptional circumstance
> when the Commission comes in after your Honor has ruled on the
> case, oh, no they didn't get to put in half their defenses. That's the
> last thing I want to see happen.

---

[6]    The Commission's spokesman was quoted recently as stating that the Commission had a duty to provide Enron with due process. "[T]he commission has an obligation to render a judgment based on due process." Blaine Harden, *Utility Exposes Enron Greed at Its Core; Exclusive Tapes Portray Lust for Profit, Lack of Concern for Consumers*, WASH. POST, Mar. 1, 2005, at E1.

[7]    *See Portland General Electric Co. and Enron Power Marketing, Inc.*, 103 FERC ¶ 63,003 (2003) (J. Massey) ("The public's interest is best served by a fairly developed record, even if it means the lawyers have to work a little harder."); and *Cities of Anaheim and Riverside Calif.*, 107 FERC ¶ 63,055 (2004).

Tr. at 656:1-8. On this point, Trial Staff is correct. The public interest would be ill-served if Enron is deprived of its right to appropriate defenses in this proceeding and, consequently, the proceeding ultimately has to be retried altogether. [8]

As explained in greater detail below, we respectfully submit, the Presiding Judge's interpretation of the March 11 Order and the Initiating Orders in this proceeding[9] has required the Presiding Judge and the Commission to invade the jurisdiction of the Bankruptcy Court by putting before the Commission issues under the parties' contracts with Enron. At the same time, the Presiding Judge's interpretation of these orders has precluded Enron from conducting discovery that is necessary for mounting certain defenses necessary to rebut allegations of wrongdoing and the party-specific contract remedies sought by the Indicated Intervenors. The Presiding Judge's interpretation of these orders does not even allow Enron to inquire as to whether the Indicated Intervenors believe the remedies they seek here are the same as, or similar to remedies sought before the Bankruptcy Court despite the fact that the March 11 Order stated that the proceeding was to be conducted in a manner consistent with the jurisdiction of the Bankruptcy Court. Assuming that these interpretations are correct, they create due process and jurisdictional problems.

---

[8] *See* Order Denying Staff Motion to Strike Testimony, *Enron Power Marketing, Inc. and Enron Energy Services Inc., et al.*, Docket Nos. EL03-180-000 et al., (May 11, 2004) (J. Benkin) (unreported) ("Order Denying Motion to Strike") ("Experience teaches that the consequence of attempting to avoid a broad-ranging hearing through precipitous decision-making may well be a flawed decision that leads to the necessity to conduct an even larger, more complex and more expensive hearing than would have been necessary if a more inclusive trial-type hearing were conducted in the first instance. *See, e.g., Exxon USA v. Amerada Hess Pipeline Co.*, 87 FERC ¶ 61,133 (1999), *vacated and remanded, Exxon Co. USA v. FERC*, 182 F.3d 30 (D.C. Cir. 1999), *Trans Alaska Pipeline Sys.*, 97 FERC ¶ 61,150 (order establishing consolidated hearing).")

[9] *Enron Power Marketing, Inc., et al.*, 103 FERC ¶ 61,346 (2003) and *American Electric Power Service Corporation, et al.*, 103 FERC ¶ 61,345 (2003).

**B.    Irreparable Harm.**

Enron will be irreparably harmed if it is forbidden from pursuing any defenses available to it in this proceeding. Discovery is set to close imminently. In fact, discovery will almost certainly have closed by the time the presiding ALJ or the Commission acts on this Request.

More fundamentally, the public interest will have been irreparably harmed. If Enron is deprived of an opportunity to adduce defenses, due process will not have been served. The Fifth Amendment provides that "no person shall . . . be deprived of life, liberty, or property without due process of law." U.S. CONST. amend. V. Moreover, Enron enjoys a right under Rule 505 "to present such evidence, including rebuttal evidence, to make such objections and arguments, and to conduct such cross-examination, as may be necessary to assure true and full disclosure of the facts." 18 C.F.R. § 385.505 (2004). The Commission is bound by its own regulations. *Panhandle Eastern Pipe Line Co. v. FERC*, 613 F.2d 1120, 1135 (D.C. Cir. 1979), *cert. denied*, 449 U.S. 889 (1980) ("It has become axiomatic that an agency is bound by its own regulations.")

The public always has an interest in seeing that justice is done, and due process is the central feature of our system of justice. Moreover, the Commission has set certain issues for hearing. If the hearing fails adequately to address those issues, or if the hearing fails to accord any party due process, then the hearing will have failed in a fundamental way.

In light of such a fundamental failure created by the Commission's orders, extensive efforts will need to be marshaled to correct it. These efforts, as Judge Benkin has noted "do not come cheap."[10] Both the individual parties to this proceeding and the Commission itself have better ways of allocating their limited resources than trying and retrying the same tired set of

---

[10]    Order Denying Motion to Strike at ¶ 18.

7

facts over and over again simply because due process was not afforded or because the proceeding did not fully address the issues set for hearing. Similarly, neither the presiding ALJ nor this Commission has any interest in straying into the jurisdiction of the Bankruptcy Court,[11] and certain of the information sought by Enron's motions would clarify whether, and to what extent the Indicated Intervenors are attempting to expand this proceeding into what they themselves ironically admit is the "exclusive jurisdiction" of the Bankruptcy Court. See, e.g., Valley's Response to Motion to Compel at 4.

Moreover, given the current procedural schedule in place in this proceeding, Enron has only been permitted until April 1, 2005 to conduct discovery on the Indicated Intervenors' supplemental testimony.[12] Enron issued the discovery requests that are the subject of the March 24 Order as early as February 14, 2005.[13] Accordingly, Enron has lost much of its limited opportunity to conduct discovery which, barring an order from the ALJ or the Commission, will conclude imminently, on April 1, 2005.

Due process requires, at a minimum, an opportunity to be heard "at a meaningful time and in a meaningful manner." *Mathews v. Eldridge*, 424 U.S. 319, 333 (1976); *Cuadras v. INS*, 910 F.2d 567, 573 (9th Cir. 1990). If Enron is deprived of an opportunity to conduct discovery

---

[11]    March 11 Order at ¶ 11.

[12]    Enron is the only remaining respondent in this proceeding. Prior to the July 22 Order, Staff and Intervenors had enjoyed a period of approximately 28 months to promulgate discovery on Enron in connection with each of the now-consolidated dockets. Since the July 22 Order, Staff and Intervenors have enjoyed a period of approximately four months promulgating discovery requests for the purposes of developing their allegations. Enron, by contrast, has only been granted a period of approximately two months to conduct discovery related to allegations contained in the supplemental testimony of approximately thirty different Staff and Intervenor witnesses. Now even those modest rights have been eviscerated.

[13]    Specifically, on February 14, Enron issued the First Set of Data Requests to Santa Clara. On February 16, Enron issued the Seventeenth Set of Data Requests to Snohomish. On February 18, Enron issued the Eighteenth Set of Data Requests to Snohomish. On February 22, Enron issued the First Set of Data Requests to Met Water, the Second Set of Data Requests to Santa Clara and the Twentieth Set of Data Requests to Snohomish. On March 2, Enron issued the First Set of Data Requests to Valley. On March 4, Enron issued the Second Set of Data Requests to Met Water.

necessary to develop its defenses in this proceeding, then it will have been deprived of an opportunity to be heard "in a meaningful manner." Unless the Presiding Administrative Law Judge or the Commission acts promptly, Enron will also have been deprived of its right to be heard "at a meaningful time." Although constrained by her reading of the Commission's decisions in this proceeding, the Presiding Administrative Law Judge indicated that she regarded the limitations on Enron's discovery rights implied by those Commission decisions as unprecedented. See Tr. at 613:14 – 618:20.[14] Accordingly, Enron's difficulty may be with the Commission's orders, rather than with the Presiding Administrative Law Judge.

## IV.    ARGUMENT

### A.    The March 24 Order's Interpretation of the Commission's Orders Is Inconsistent with the Law of the Case.

The March 24 Order operates to deprive Enron of a meaningful opportunity to mount a defense to an array of allegations as to which over a billion dollars hangs in the balance. Last year, under slightly different circumstances, former Presiding Administrative Law Judge Benkin addressed similar questions, but reached a contrary conclusion. In so doing, he created a rule for this proceeding which should be followed.

On April 13, 2004, Commission Trial Staff moved to strike several large portions of testimony from several parties, including Enron. The Enron testimony that Trial Staff sought to strike was testimony designed to show that certain trading practices did not constitute violations of the Market Monitoring Information Protocols ("MMIP") of the California ISO and PX tariff, and therefore did not constitute "gaming" for the purposes of this proceeding. In particular,

---

[14]    Note especially Tr. 618:13-20: "Enron has the right to a defense. And your argument, if I may be so cavalier and bold to say, strikes me as saying: No. Their only defense is the one we say they have a right to. As far as I am concerned, I have never heard that in any proceeding. They have a right to any defense they want to present."

Enron argued – both in its testimony and in its answer to Staff's motion to strike – that if the practices of which it is accused of having engaged did not harm the markets in California and elsewhere in the West, then those practices did not cause unjust or unreasonable rates, and therefore disgorgement or refunds would not be proper.

Former Presiding Administrative Law Judge Benkin ruled that "Enron's attempt to adduce evidence showing that its activities during the relevant period did not harm the operations of the market or represented standard business practices may prove unavailing, but it is nevertheless entitled to try to make that case." Order Denying Motion to Strike at ¶ 18. Judge Benkin went on to opine that "this case represents the last clear chance for [the evidence at issue] to come before the Commission. If Enron and the Intervenors cannot attempt to prove their core cases on the record in this proceeding, there may be no other opportunity for them to put the evidentiary material they have proffered in an administrative or judicial record." *Id*. at ¶ 19. Enron submits that the current situation is even more grave than the one with which Judge Benkin was faced: Here, Enron is being deprived an opportunity even to *develop* an evidentiary case.

Early in this proceeding, Enron went on the record to secure its right to demonstrate that the practices of which it is accused did not result in unjust rates or harm to consumers and therefore that evidence that any unjust profits are *de minimis* is relevant. The initial prehearing conference contained the following colloquy between counsel for Enron and Judge Benkin:

> MR. BEHRENDS: Our opinion, our position, is that if there were activities which may have been technical violations of the Act, but those activities did not lead to unjust or unreasonable rates or otherwise damage consumers, then that should affect the remedy, if any, which the Commission would impose. And so we would

hope that Your Honor would consider the issue of the effect upon consumers and the effect on just and reasonable rates.

PRESIDING JUDGE: Yes well, I'm perfectly willing to consider that. I think that's issue one, Mr. Behrends.

MR. BEHRENDS: Thank you, Your Honor.

PRESIDING JUDGE: Well, to the extent, well, it's actually in two of the issues, to the extent that, you know, there was acting in concert is a de minimis. That's issue number one.

And then finally under issue three, how much was the profit? Was the profit de minimis because nobody got hurt? You're perfectly entitled to make that case if you want to.

MR. BEHRENDS: Thank you, Your Honor. And we would also I think reserve the right to present evidence that these actions did not result in any unjust or unreasonable rate, if that's all right. Thank you.

PRESIDING JUDGE: Thank you, Mr. Behrends, that's useful.

Tr. at 41:7-42:7.

The rule of the case is therefore clear: Enron is entitled to advance theories and to seek discovery of evidence that would tend to show that its actions did not harm consumers or that such harm was *de minimis*. Such material was the subject of Enron's motions, to the extent that these motions sought discovery related to the Indicated Intervenor's claims of harm to themselves or to the market allegedly resulting from Enron's actions. Yet the March 24 Order, relying upon the Commission's prior orders, apparently forbids discovery of such matters. Enron therefore respectfully requests leave to seek interlocutory appeal of the March 24 Order or, in the alternative, requests that the Presiding Administrative Law Judge reconsider her March 24 Order.

**B.    The March 24 Order's Interpretation of the March 11 Order Invades the Exclusive Jurisdiction of the Bankruptcy Court.**

The March 24 Order, among other things, denied Enron's attempts to obtain discovery regarding certain claims by the Indicated Intervenors, including discovery requests "concerning the remedies sought by these parties, their harm, and whether the remedies sought in this proceeding, such as, contract rescission are similar to the remedies in the Bankruptcy proceeding," on the grounds that such discovery was "irrelevant to this proceeding." March 24 Order at ¶ 2(b). However, the March 24 Order's interpretation of the March 11 Order puts the Presiding Judge squarely in the position of interpreting the contracts between Enron and the Indicated Intervenors. This is not a problem created by the Presiding Judge,[15] but one that may be repaired only by the Commission on interlocutory appeal.

The Commission has directed that the contract matters be "examined" in the ongoing proceeding "subject to any applicable bankruptcy restrictions." March 11 Order at ¶ 11. The "applicable bankruptcy restrictions" however, seem to foreclose evaluation of contract-related claims before the Commission, such as the determination that termination payments are not due.

The Commission does not have the authority to revise the provisions of the long-term contracts or otherwise adjudicate the termination payment claims. Issues related to the termination payments under these disputed contracts involve the property of Enron's Estate and, accordingly, are subject to the automatic stay provisions of the Bankruptcy Code.[16] As the Enron Answer set forth, the Western Parties' contract claims do not arise under the California ISO or PX tariffs; they do not involve the behavior defined in the Show Cause Order of the

---

[15]    See Tr. at 596:10-597:25. Here the Presiding Administrative Law Judge notes that, "it would never have occurred to me that the contract terminations would even have come up," but for the March 11 Order, and further notes that she is aware that another FERC Administrative Law Judge "had another proceeding where she was estopped by Judge Gonzalez [of the Bankruptcy Court]." Tr. at 596:18-20 and 597:23-25.

[16]    The narrow exception to the automatic stay for governmental units does not apply to the request for clarification. This argument is more fully discussed in Exhibit A.

"Gaming Proceeding" in Docket No. EL03-154-000, *et al.*;[17] and they do not involve the entities

named in the Show Cause Order of the "Partnership Proceeding" in Docket No. EL03-180-000,

*et al.*[18] Accordingly, any resolution of these disputed termination payments should not be

considered in these ongoing proceedings and should be heard where it is already pending—at the

Bankruptcy Court, which has exclusive jurisdiction over the contract disputes.

In response to Enron's concerns about the jurisdictional reach of the Western Parties'

Motion, the Bankruptcy Court has already stated, in relevant part:

> [B]ecause it is unclear precisely what relief Snohomish seeks from
> FERC in its Request for Clarification, dated August 4, 2004,
> Enron's Motion seeking that Snohomish withdraw the Request for
> Clarification is denied, in essence, as premature as it could not be
> determined if such relief were necessary; however, to the extent
> that FERC were to undertake to interpret the terms of the
> Agreement or to determine the rights of the parties under the terms
> of the Agreement, any such action would be void *ab initio* ...

"Order (i) Granting Motion by Enron Power Marketing, Inc. Seeking an Order Enforcing the

Automatic Stay, and (ii) Denying Motion by Enron Power Marketing Inc. Seeking to Compel

Public Utility District No. 1 of Snohomish County to Withdraw its Request for Clarification,

dated August 4, 2004, Pending Before FERC," *In Re Enron Corp., et al.*, No. 01-16034; *Enron*

*Power Mktg. Inc. v. Public Utility District No. 1 of Snohomish County*, Adv. Pro. No. 03-2064 A

(AJG) (Bankr. S.D.N.Y., Jan. 14, 2005) at 2, attached herein as Exhibit B.  Further, the

Bankruptcy Court has stated that:

> to the extent FERC were to order disgorgement related to the
> Termination Payment, there would remain issues for this Court to
> determine as to how any such order for disgorgement would
> impact on the adversary proceeding or how the disgorgement
> would be treated for purposes of distribution under a plan of
> reorganization.

---

[17]     *American Electric Power Service Corp., et al.*, 103 FERC ¶ 61,345 (2003), *reh'g denied*, 106 FERC ¶
61,020 (2004).

[18]     *Enron Power Marketing Inc., et al.*, 103 FERC ¶ 61, 346 (2003), *reh'g denied*, 106 FERC ¶ 61,020 (2004).

*Id.* Accordingly, any "examination" of these contracts by the Presiding Judge will conflict with the jurisdiction of the Bankruptcy Court.

The Bankruptcy Court has already determined that the disputes regarding the termination payments associated with these long-term contracts falls under its jurisdiction. For example, in response to Enron's challenge to a complaint submitted by the City of Santa Clara, California before the Commission, the Bankruptcy Court stated, in relevant part:

> EPMI's rights under the Agreement are property of the Debtor's estate and any interpretation of issues concerning that contract are properly before this Court. A commercial contract dispute does not involve FERC's police or regulatory powers and FERC could only exercise its concurrent jurisdiction in that area if the City obtained relief of the automatic stay from this Court. Without obtaining relief from the stay, any action taken by FERC to interpret the terms of the contract would be void *ab initio*.

"Decision and Order Read into the Record on December 29, 2004," *In Re Enron Corp., et al.*, No. 01-16034; *Enron Power Mktg. Inc. v. City of Santa Clara*, Adv. Pro. No. 02-2719 (AJG) (Bankr. S.D.N.Y., Dec. 29, 2004) at 4. While it is clear that this Commission has exclusive jurisdiction to ensure that the rates, terms and conditions set forth in contracts affecting wholesale electric power transactions are just and reasonable under the Federal Power Act ("FPA"), "the Commission does not have exclusive jurisdiction over the breach of a FERC approved contract unless the challenge is *directly* to the filed rate." *Id.* at 3, citing *Mirant Corp. v. Potomac Elec. Power Co. (In re Mirant Corp.)*, 378 F.3d 511, 519 (5th Cir. 2004). Neither the March 11 Order[19] nor the March 24 Order has explained how to reconcile the Bankruptcy Court proceedings with the simultaneous "examination" of these issues in these consolidated proceedings.

As one of the Indicated Intervenors, Valley, has stated:

---

[19]    Nor the Western Parties Motion, for that matter.

> Enron seeks discovery on matters related to Valley's power costs, its damages, and the pursuit of remedies in the Adversary Proceeding initiated by Enron's filing of its lawsuit against Valley in the Bankruptcy Court. All of these matters have been reserved for the Bankruptcy Court's exclusive jurisdiction. Judge Gonzalez of the Enron Bankruptcy Court expressly ruled that state-law contract claims are exclusively within his jurisdiction.

*See* Valley Answer to Motion to Compel at 4. *See also* Tr. at 602:25-603:16.

### C.    At a Minimum, Enron Should Be Permitted to Inquire as to Whether the Remedies Sought by the Indicated Intervenors Are the Same as or Similar to Remedies They Seek at the Bankruptcy Court.

In the March 24 Order, the Presiding Judge determined that "[t]he information requested by Enron concerning the remedies sought by these parties, their harm and whether the remedies sought in this proceeding, such as, contract rescission are similar to the remedies in the Bankruptcy proceeding, is deemed to be irrelevant to this proceeding." *Id.* at ¶ 2(b). If nothing else, Enron should be permitted to require the Indicated Intervenors to state whether they believe that the remedies described in their testimony overlap with those they have requested at the Bankruptcy Court. The Commission's March 11 Order permitted the terminated contracts to be "examined" in this proceeding "subject to any applicable bankruptcy restrictions." March 11 Order at ¶ 11. Accordingly, in order to avoid any inadvertent conflict with what may transpire before the Bankruptcy Court, the Commission should demand that these Intervenors respond to the data requests or otherwise provide the Commission an understanding of the remedies they seek here as opposed to those sought in the Bankruptcy Proceeding, and whether the remedies are the same as, or overlap with, those sought in the Bankruptcy Proceeding. It is apparent that the Indicated Intervenors prefer this forum to address the disputed termination payments. The Commission should not permit itself to be used in that fashion.

The Indicated Intervenors object to this line of questioning on the basis that, among other things, it calls for a legal interpretation or opinion. *See, e.g.*, Answer of Met Water to Motion to

15

Compel at 9-12; *see also* Tr. 666:13-19. These data requests pose questions of fact. A party should not be excused from responding because its lay witness may not be required to respond to a question calling for a legal conclusion, in light of the Commission's determination not to trespass on the Bankruptcy Court's exclusive jurisdiction. Moreover, if a party's witness is competent to testify to legal justifications for remedies sought before this Commission, the witness by definition is sufficiently competent to answer the question whether the remedies sought by the parties is the same as or related to those requested at the Bankruptcy Court, if he or she knows the answer.

Accordingly, interlocutory appeal is appropriate so the Commission may clarify that any remedies that are properly within the jurisdiction of the Bankruptcy Court must remain within the exclusive jurisdiction of the Bankruptcy Court and that Enron may take discovery as to whether the remedies sought by the Indicated Intervenors are the same as or related to claims at the Bankruptcy Court.

**D.    Enron Should Be Permitted to Conduct Discovery Regarding the Party-Specific Contract Remedies Sought by the Indicated Intervenors.**

The Commission should not allow the Indicated Intervenors to file testimony relating to contract termination payments, while at the same time forbidding Enron from seeking discovery of that same matter. If, as indicated by the March 11 Order, the Commission views contract termination payments as within the ambit of this proceeding, then the Indicated Intervenors must be subject to discovery relating to the same matters. If, on the other hand, the Commission will not permit Enron to conduct discovery of the Indicated Intervenors with respect to the issue of termination payments, then the Indicated Intervenors should not be permitted to distort the record with untested testimony on that issue.

16

Enron is entitled to conduct discovery regarding the party-specific contract remedies sought by the Indicated Intervenors. The fundamental question with respect to remedies is whether injury is irrelevant where a party is seeking remedies beyond those provided by statute. In other words, is the injury expressly alleged in the testimony of the Indicated Intervenors relevant to this proceeding, and legally relevant to the remedies urged by the Indicated Intervenors in their testimony? Enron maintains that the Supplemental Testimony proffered by the Indicated Intervenors made their alleged injuries relevant to this proceeding by repeatedly pleading "harm," "injury," "unjust profits," "impact on consumers" and the like. Accordingly, Enron should be permitted to conduct discovery regarding the party-specific contract remedies sought by the Indicated Intervenors.

The Indicated Intervenors filed their Supplemental Testimony in this proceeding on January 31, 2005. Each of these Indicated Intervenors provided testimony regarding party-specific contract remedies that the Presiding Judge and Commission should consider as a result of acts of Enron.[20] Certain of the Indicated Intervenors allege that they suffered specific injury or harm as a result of Enron's alleged conduct.[21] Others among the Indicated Intervenors argue

---

[20]    Testimony of Ann M. Hatcher on Behalf of Silicon Valley Power, Exh. SVP-1, Docket Nos. EL03-180-00, et al., ("Hatcher Testimony") at 34:12-14 ("[T]he Commission should protect consumers by retroactively rescinding EPMI's ability to make sales and enforce terms of agreements made at market-based rates ..."); Hatcher Testimony at 31:20-21; Prepared Supplemental Testimony of Carl D. Pechman on Behalf of Public Utility District No. 1 of Snohomish County, Washington, Exh. SNO-247 ("Pechman Supplemental Testimony") at 160:28-161:2 (Identifying "approximately $120 million in unjust profits Enron is still seeking to collect from Snohomish in the form of a contract termination payment."); Prepared Supplemental Testimony of Robert McCullough, Exh. SNO-710 at 181:15-17 ("Even though the contract was terminated, Enron is still demanding that Snohomish pay Enron an approximately $117 million termination payment composed wholly of unjust profits, plus interest."); Supplemental Testimony of Louis R. Holveck on Behalf of Valley Electric, Exh. VEA-16 at 80:16-17 ("Enron should not be permitted to collect unjust future profits on transactions involving the Valley Contracts."); and Answering Testimony of Jon Lambeck on Behalf of the Metropolitan Water District of Southern California, Docket No. EL03-180-000, et al. (filed Jan. 31, 2005), at Exh. MWD-1 at 8:18-27.

[21]    Hatcher Testimony at 3:5-13 ("SVP is directly impacted by EPMI's tariff violations and Enron's unlawful practices at issue, and recommends that the Commission grant appropriate and complete relief to SVP and others impacted by EPMI's wrongful conduct.") With respect to Snohomish, Dr. Pechman testifies that, unless Enron's market-based rate authority is rescinded retroactively to March 7, 2000, "the consumers FERC is charged with the responsibility of protecting will suffer extremely inequitable consequences." Pechman Supplemental Testimony at 161:17-18.

that "[n]othing in the Commission's order in this proceeding requires Valley to demonstrate harm

or damages to Valley as a basis for the imposition of these remedies for Enron's regulatory

violations." Answer of Valley to Motion to Compel at 3.  "The Commission has not expanded

this proceeding to determine the harm to individual market participants, although the

Commission certainly reserved the right for parties to show further illegality by Enron." Answer

of Met Water to Motion to Compel at 4.  Demonstrating illegality is a far cry from seeking to be

relieved of any obligation to make payments under the long-term contracts.

Each of these entities, however, has asked the Commission to consider party-specific

contract remedies over and above disgorgement of profits.  Each party has stated that

disgorgement of profits, the very remedy set by the Commission initially as its purported

statutory remedy[22] would be insufficient as to that party.[23]

---

[22]    July 22 Order at ordering para. (C) (stating that "[t]he ALJ in the consolidated proceeding shall determine the total amount of disgorgement of profits by Enron for the violation found by the Commission in this order, as well as for any additional violations found by the ALJ").

[23]    In addition to arguing that the Commission should impose the equitable remedy of disgorgement of all of Enron's "profits" (however defined), Santa Clara urges the Commission to direct Enron to refund money paid by Santa Clara for power already delivered pursuant to Santa Clara's short-term contracts and long-term contracts with Enron, and (in effect, if not explicitly) to rescind the long-term contracts so as to enable Santa Clara to avoid making early termination payments in accordance with the formula set forth therein. Hatcher Testimony at, *e.g.*, 4:16-18; 30:1-3; 31:13-15.

For its part, the testimony for Met Water states that its witness is not urging disgorgement of profits for the following reasons:

> While disgorgement may be sufficient to ensure Enron retains no profit from payments already received, disgorgement will not ensure that Enron retains no profits from potential future payments associated with terminated contracts.  What I propose supplements disgorgement for the class of contracts that involves potential future payments to Enron associated with terminated contracts, as would be the case if Metropolitan made a payment to Enron in the future.  Moreover, my recommendation is consistent with disgorgement since, it ensure that Enron is denied all profits, including those received from potential future payments.

Answering Testimony of Jon Lambeck on Behalf of the Metropolitan Water District of Southern California, Docket No. EL03-180-000, *et al.* (filed Jan. 31, 2005), at Exh. MWD-1 at 8:18-27.

The information sought by Enron is directly related to any defense it may mount to counter these requests for equitable relief. As former Presiding Administrative Law Judge Benkin noted in his Order Denying Motion to Strike:

> It is well-settled that in a case involving the imposition of sanctions for the perpetration of socially undesirable activities, evidence in mitigation, extenuation or aggravation of the offenses with which the accused Respondent is charged are admissible, not to demonstrate that the Respondent is a bad person but to establish the degree of harm arising out of the offenses.

Order Denying Motion to Strike at ¶ 18.

We respectfully submit that Judge Benkin was right. The Indicated Intervenors seek equitable relief – relief over and above the refunds on and following the "refund effective date" explicitly afforded by the statute. 16 U.S.C. § 824e(b) (2005). The Commission may *not* order refunds or disgorgement if there is no equitable basis for doing so. *Towns of Concord, Norwood, and Wellesley, Mass., v. FERC*, 955 F.2d 67 (D.C. Cir. 1992) (upholding Commission's refusal to order refunds for a violation of the fuel adjustment clause); *Connecticut Valley Elec. Co. v. FERC*, 208 F.3d 1037 (D.C. Cir. 2000) (upholding FERC's discretion in not ordering a remedy of a violation of Section 3(17)(C)(ii) of the Federal Power Act governing qualifying facility status). It would be an abuse of discretion for the Commission and the Presiding Judge to permit the Trial Staff and Indicated Intervenors to proffer testimony about equitable remedies they claim the Commission has the authority to provide, while at the same time denying Enron an opportunity to discover the basis for their assertions.

As the Presiding Judge has construed the Commission's orders, the Commission has created a situation where the Indicated Intervenors' claim harm and seek remedies based thereon, but Enron is precluded from mounting any defense that rebuts these allegations of harm. If the disputed termination payments are at issue in this proceeding, due process requires that Enron be

permitted to seek information about the facts underlying these issues, including whether

Intervenors suffered any injustice.  The Commission's regulations permit "discovery of any

matter, not privileged, that is relevant to the subject matter of the pending proceeding."  18

C.F.R. § 385.402(a).  Contrary to the allegations of the Indicated Intervenors, Enron's requests

are certainly not a "fishing expedition."[24]  *See Consolidated Edison Co. of New York Inc.*, 68

FERC ¶ 61,332 at 62,334 (1994) (when the justness and reasonableness of a rate is set for

hearing, all questions relevant to that determination are set for hearing.).  As described more fully

in Enron's motions to compel, there is ample basis for Enron's belief that its inquiries would yield

facts essential to its defense.

Due process permits Enron to mount any defense necessary to rebut these allegations.

However, as the Presiding Judge notes, her reading of the March 11 Order allows the Indicated

Intervenors to include testimony regarding their contracts with Enron, while at the same time

precluding Enron from seeking discovery related to substantial portions of that testimony.[25]  This

result cannot be correct.

Certain of the Indicated Intervenors allege harm or injury to them as a result of Enron's

purported activities.  A demonstration of harm, or lack thereof, is relevant to claims of injury,

---

[24]    Answer of Valley to Motion to Compel at 3; Answer of Santa Clara to Motion to Compel at 3.
[25]    *See* Tr. at 613:8-24:

> MR. McBRIDE: ... But since they [Indicated Intervenors] got the Commission to say these contract-specific issues are in the case, then I get discovery about whether they were harmed or not because they claim harm.  And we get to put on defenses.  And that is what this is all about.  And we think we ought to just –
> PRESIDING JUDGE: But I think they are saying that you don't get to put on defenses, counsel.
> MR. McBRIDE: I get no defenses when they say –
> PRESIDING JUDGE: If I read the Commission's Orders correctly, I am sorry, but the Commission talks and Staff can enlighten me if they disagree with me, if I read the Commission's Orders correctly – and not that I am disagreeing with you legally – I am saying, if I read the Commission's Orders literally, the Commission told you to go jump in a creek; you're up the creek without a paddle; you don't have a defense.

especially where the remedies sought are not specified by statute.[26] Injury is relevant –to the

core issues in this proceeding, whether Enron earned "unjust profits" – and to the remedies urged

by the Indicated Intervenors.

For these reasons, Enron seeks Your Honor's leave to file interlocutory appeal of the

March 24 Order. It is essential that the Commission clarify the Presiding Judge's interpretation

of the March 11 Order, which is silent as to Enron's ability to conduct discovery, and which does

not explicitly place any limitation on Enron's rights to present defenses heretofore deemed

applicable in similar instances of parties seeking damages for alleged harm.

## V.    REQUEST FOR EXPEDITED CONSIDERATION

As noted above, under the current procedural schedule, Enron's opportunity for

conducting discovery relating to the Indicated Intervenors' supplemental testimony – testimony

that raises the issues as to which Enron sought discovery in its motions to compel – will close on

Friday, April 1, 2005. The Indicated Intervenors have refused to respond to Enron's requests.

Unless the Presiding Administrative Law Judge or the Commission both act promptly, Enron

---

[26] The Commission has held that, absent the demonstration of harm or injury remedial relief is not appropriate. *See, e.g.*, *United Gas Pipe Line Company*, 64 FERC ¶ 61,014, 61,101 (1993) (stating that "with a showing that United's four unlawful filings inflicted no actual financial harm, there would be no basis for ordering a remedy."); *Massachusetts Municipal Wholesale Electric Company v. Power Authority of the State of New York*, 30 FERC 61,323 at 61,654 (1985) citing *Power Authority of the State of New York v. FERC*, 743 F.2d 93, 108 (2nd Cir. 1984) ("[T]he remedy cannot be fashioned in a vacuum; it must be designed with the injury in mind so that the least disruptive correction is ordered"); *Northeast Utilities Service Company*, 50 FERC ¶ 61,266 at 61,843 (1990) (Trabandt, concurring) (arguing that "we must limit the remedy to the harm"); *see also Columbia Gas Transmission Corporation*, 27 FERC ¶ 61,475 at 61,903 (1984) (Hughes, dissenting in part, concurring in part) ("[T]he Natural Gas Act and Federal Power Act do not prescribe criteria any more explicitly than that rates charged must be just and reasonable. The Acts are silent as to whether injury to the complaining party must be shown. The Supreme Court, however, decided in *Montana-Dakota Utilities Co. v. Northwestern Public Service Co.*, 341 U.S. 246 (1951), that a complaining utility company could not sustain its cause of action for rate relief, even if the court were to adjudicate the matter, because no injury had been shown to result from the allegedly unreasonable rates. …Until more case-by-case adjudications have reached this Commission, I think it would be helpful in defining excessive purchased gas costs to establish a burden for complaining parties to allege and prove some harm which may have been suffered or will be suffered if abusive purchasing practices are continued. However, I do not believe that a determination of abuse should have to await a showing of *significant adverse effects* before a remedy could be prescribed."); *cf. FirstEnergy Operating Companies*, 95 FERC ¶ 61,237 (2001) (The Commission stated that "[o]ur precedent in section 203 proceedings requires that we find a nexus between an alleged harm and the proposed transaction before we exercise our conditioning authority to remedy the specific harm.").

will be irreparably harmed. If the Indicated Intervenors had responded to the discovery requests when issued, Enron would have had an opportunity to review their responses and to promulgate follow-up discovery. Similarly, if the Presiding Administrative Law Judge had granted Enron's Motions to Compel at the March 22 and 23, 2005 prehearing conferences, Enron would have had an opportunity to review their responses and to promulgate follow-up discovery. Now, that opportunity is all but lost.

Enron has a right to be heard at a meaningful time and in a meaningful manner. *See Mathews v. Eldridge*, 424 U.S. at 333; *Cuadras v. INS*, 910 F.2d at 573 (9th Cir. 1990). If the scope of Enron's discovery rights is not determined until after Enron's opportunity to conduct discovery has closed, then Enron will effectively have been denied these rights. Thus, due to the importance of the issues addressed in this Motion, as well as the currently-scheduled imminent close of Enron's opportunity to conduct discovery, Enron respectfully requests that an order be issued expeditiously, without waiting awaiting answers thereto, permitting it to file this interlocutory appeal with the Commission. No party would be harmed by issuance of such a procedural order.

## VI.    CONCLUSION

WHEREFORE, for the foregoing reasons, Enron respectfully requests permission to file an interlocutory appeal of the March 24 Order (and related oral orders on March 23, 2005) to the Commission, or, in the alternative, that the Presiding Administrative Law Judge reconsider her March 23-24 Orders and grant Enron's Motions to Compel Discovery. Should those Motions be granted either by the Presiding Administrative Law Judge or by the Commission, Enron should also be permitted at least two additional weeks from the date of that order to conduct additional

22

discovery because at least that amount of time was lost while these Motions have been pending.

Furthermore, for good cause shown, Enron seeks expedited consideration of this Motion.

<div style="margin-left: 40%;">

Respectfully submitted,

*Michael F. McBride*

Samuel Behrends, IV
Michael F. McBride
Samuel G. Backfield
LeBoeuf, Lamb, Greene & MacRae, L.L.P.
1875 Connecticut Ave., N.W.
Suite 1200
Washington, DC 20009
Tel. 202-986-8000
Fax. 202-986-8102

*Attorneys for Enron Power Marketing, Inc., Enron
Energy Services Inc. and Enron Capital and Trade
Resources Corporation*

</div>

Dated: March 29, 2005

# NO. 2

**Hearing Date:** May 12, 2005 at 10:00 a.m.
**Objection Deadline:** May 9, 2005 at 5:00 p.m.

WEIL, GOTSHAL & MANGES LLP
Attorneys for the Reorganized Debtors
767 Fifth Avenue
New York, New York 10153
Peter Gruenberger (PG 6040)
Melanie Gray (Pro Hac Vice)

CADWALADER, WICKERSHAM & TAFT
Special Counsel to the Reorganized Debtors
One World Financial Center
New York, New York 10281
Telephone: (212) 504-6000
Edward A. Smith (ES 2461)

Mark C. Ellenberg
1201 F Street, NW
Washington, DC 20004
Telephone: (202) 862-2200

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

-----------------------------------------------------------------x
                                          :
                                          :    Chapter 11
                                          :
ENRON CORP., et al.,                      :
                                          :    Case No. 01-16034 (AJG)
                                          :
                                          :    Jointly Administered
                     Reorganized Debtors. :
-----------------------------------------------------------------x

**MOTION OF REORGANIZED DEBTOR ENRON POWER MARKETING, INC.
FOR LIMITED MODIFICATION OF FIRST AMENDED ORDER GOVERNING
MEDIATION OF TRADING CASES IN LIGHT OF FEDERAL ENERGY
REGULATORY COMMISSION ORDERS ISSUED MARCH 11 AND 24, 2005**

## INTRODUCTION

        1.     Reorganized Debtor Enron Power Marketing, Inc. ("EPMI") seeks

to redress an inequitable and unanticipated litigation imbalance resulting from

proceedings involving four trading contract counterparties before the Federal Energy

Regulatory Commission ("FERC").  On March 11, 2005, FERC entered an "Order for Clarification" in what is known as the Partnership and Gaming Proceeding.  The order potentially permits four counterparties to trading contracts with EPMI to have FERC determine whether the termination payments owed pursuant to the terms of those contracts should be paid.  Each of the four counterparties and each of the trading contracts is also the subject of an adversary proceeding commenced by EPMI in this Court.  The adversary proceedings are covered by the First Amended Order Governing Mediation of Trading Cases, entered by this Court on March 20, 2003 (the "Mediation Order").

　　　　　2.　　　The Mediation Order stays EPMI, as well as all other Reorganized Debtor parties and counterparties, from advancing the Trading Case adversary proceedings in this Court.  However, the four counterparties at issue are freely conducting one-sided litigation at FERC.  As the Court is already aware from having ruled on motions involving two of those four counterparties, the FERC litigation could both determine issues that should properly be decided by this Court in the adversary proceedings and infringe on the exclusive jurisdiction of this Court over the Reorganized Debtors' estates.  When this Court established a mediation process and stayed all pending litigation related to the trading cases in 2003, it intended to divert the parties' energies and attention to dispute resolution and away from litigation.  This regime did not anticipate that substantial litigation on precisely the same issues as those presented in the trading cases would be proceeding in other *fora*.  Ideally, there would have been no litigation activity related to the trading cases, apart from mediation.  But suspending litigation in the Bankruptcy Court – while litigation instituted by the counterparties

2

proceeds hammer and tong at FERC – creates an imbalance that prejudices the movants, undermines the mediation process and undercuts this Court's jurisdiction.

3.    EPMI accordingly requests that the Court redress this imbalance by amending the Mediation Order to permit the four adversary proceedings involving the counterparties affected by the March 11 FERC Order to proceed in this Court, unencumbered by any stay, while also permitting the mediation process to continue. The requested relief would allow the prospect for a mediated settlement to remain alive, allow EPMI to protect its rights as a Reorganized Debtor and protect the jurisdiction of this Court, in light of the competing proceedings at FERC.  EPMI specifically does not request that the Court terminate the mediation process with respect to these four (or any other) cases.  Rather, EPMI is prepared to continue to attempt resolution of all matters with these counterparties through mediation.  Indeed, under the circumstances, the requested modification of the stay might well enhance the prospects for successful mediation.

## FACTS

### *The Mediation Order*

4.    On March 20, 2003, the Court entered the Mediation Order.[1]  The Mediation Order expressly applied to EPMI v. Santa Clara, Adversary Proceeding No. 02-02719, EPMI v. Public Utility District No. 1 of Snohomish County, Adversary Proceeding No. 03-02064, and EPMI v. Valley Electric Association, Inc., 03-02107. Subsequently, EPMI v. Metropolitan Water District, Adversary Proceeding No. 04-

---

[1]    A copy of the Mediation Order, as amended, is attached to the accompanying Declaration of Mark C. Ellenberg dated March 28, 2005 as Exhibit A.

3

02968, was filed and became subject to the Mediation Order. These are the four trading cases as to which EPMI requests relief.[2]

      5.     Pursuant to the Mediation Order, each of these cases was "referred to coordinated and confidential mediation to be conducted by the Honorable Allan L. Gropper of the United States Bankruptcy Court for the Southern District of New York, who shall have the broadest possible discretion as mediator ...." The Mediation Order further provided that "until further Order of this Court ... all proceedings in the Trading Cases, including pre-trial conferences, shall be adjourned and all discovery shall be stayed ...."

      6.     Pursuant to the Mediation Order, the Reorganized Debtors have, to date, engaged in over 110 mediation sessions with counterparties. Two-thirds of these matters have culminated in settlements. EPMI has had several mediation sessions with each of Santa Clara, Snohomish, and Valley Electric, but has not been able to achieve a settlement with any of these parties. EPMI has not yet had a mediation session with Metropolitan Water District.

***The Partnership and Gaming Proceeding and the March 24, 2005 Order***

      7.     In companion orders issued June 25, 2003 in FERC Docket Nos. EL03-180 and EL03-154 (the "Partnership and Gaming Proceeding"), FERC found that EPMI and others who had engaged in certain trading activities in the California market, could be found to have engaged in "gaming and/or anomalous market behavior" in

---

[2]   The case of <u>EPMI v. Nevada Power Co.</u>, Adv. Pro. No. 02-2520A, is also subject to the mediation order and Nevada Power is an active participant in the Partnership and Gaming Proceeding. However, because a motion for summary judgment was already briefed and calendared for hearing at the time the Mediation Order was entered, the case has proceeded unstayed. Accordingly, EPMI does not need to request additional relief with request to this proceeding.

violation of FERC-approved tariffs during the period from January 1, 2000 through June 20, 2001. FERC ordered EPMI and other entities to show cause in a trial-type evidentiary proceeding why they should not be found to have engaged in prohibited gaming practices, and authorized the Administrative Law Judge to recommend monetary remedies of disgorgement of unjust profits and any other appropriate non-monetary remedies. 103 FERC ¶ 61,345, 2003 WL 21480252 (June 25, 2003) (Gaming Order); 103 FERC ¶ 61,346, 2003 WL 21480249 (June 25, 2003) (Partnership Order).[3]

8.    On July 22, 2004, FERC entered an order affirming the Administrative Law Judge's decision in the El Paso Electric proceeding that EPMI had to disgorge $32 million in profits. The July 22 order also consolidated the El Paso proceeding with the Partnership and Gaming Proceeding, so that the presiding Administrative Law Judge could take the El Paso order into account when formulating a final disgorgement remedy against EPMI.

9.    Following the consolidation with the El Paso Electric proceeding, FERC expanded the scope of the potential disgorgement remedy under consideration in the Partnership and Gaming Proceeding and commenced a new round of discovery against Enron. Snohomish, Santa Clara, Valley Electric and Metropolitan Water District have actively participated in this discovery effort, lodging numerous substantial requests for production on EPMI. An example of the discovery requests is attached.[4] Following the discovery period, Snohomish, Valley Electric, Santa Clara and Metropolitan Water District filed testimony in the Partnership and Gaming Proceeding. In each case, the testimony expressly mentions the termination payment provisions of the trading contracts

---

[3]    Ellenberg Decl., Exs. B, C.

[4]    Ellenberg Decl, Ex D

with EPMI and states that EPMI should not be permitted to collect termination payments.

For example, Santa Clara filed with FERC the written testimony of Ann M. Hatcher, who

states the following:

> Q: DO YOU MAKE ANY RECOMMENDATIONS IN
> YOUR TESTIMONY?
>
> A: Yes. In my testimony, I recommend that the
> Commission grant necessary and appropriate remedies for
> Enron's fraudulent, deceptive, manipulative and unlawful
> practices. Specifically, I recommend that the Commission:
> …(5) enjoin Enron from charging or seeking to collect
> unearned profits calculated using market-based rates for
> power it never delivered to counterparties such as SVP…."[5]

10.    In the adversary complaint filed by EPMI in this Court, EPMI

seeks a judgment against Santa Clara for the termination payment due under the trading

contract between them. Ms. Hatcher's request that FERC enjoin EPMI from charging or

seeking to collect amounts due with respect to power it never delivered to counterparties

is a direct attack on the relief being sought by EPMI in this Court.

11.    Similarly, Snohomish filed the testimony of Dr. Carl Pechman,

who states:

> Q: WHAT REMEDIES DO YOU RECOMMEND THE
> COMMISSION ADOPT IN THESE PROCEEDINGS?
>
> A: ….With respect to profits Enron has not yet collected
> from customers in the Western Interconnect, I recommend
> that Enron be limited to charging no more than the just and
> reasonable costs of power serving those customers….
>
> Q: WHAT IS YOUR CURRENT ESTIMATE OF THE
> LEVEL OF UNJUST PROFITS ENRON COLLECTED
> OR STILL SEEKS TO COLLECT FROM SNOHOMISH
> UNDER CONTRACTS EXECUTED DURING THE
> PERIOD JANUARY 16, 1997 TO JUNE 25, 2003?

---

[5]    Ellenberg Decl, Ex. E, p. 4.

6

A: My current estimate is $23 million for unjust profits related to power delivered to Snohomish in 2000 and 2001 <u>in addition to the approximately $120 million in unjust profits Enron is still seeking from Snohomish in the form of a contract termination payment</u>.....With regard to the $120 million, Enron's cost of service is $0 and, therefore, the entire amount is unjust profits. As Enron admitted in its responses to Snohomish data request SNO-ENR-155 (d) and (e), Enron made no purchases to serve Snohomish after November 28, 2001. (emphasis added)[6]

12.    In the adversary complaint filed by EPMI against Snohomish in this Court, EPMI seeks to recover a termination payment of $116,847,876, plus interest.[7] Thus, the Pechman FERC testimony is a direct attack on the relief EPMI seeks in this Court.

13.    Following the submission of testimony by the complaining parties, FERC procedural rules gave EPMI the opportunity to conduct discovery with respect to that testimony. However, the four counterparties refused to respond to many of EPMI's questions. They asserted as a basis for their refusal that the Partnership and Gaming Proceeding is only about Enron's conduct, not theirs. [8]

14.    On March 24, 2004, the FERC Administrative Law Judge presiding over the trial phase of the Partnership and Gaming Proceeding denied Enron's motion to compel discovery. The March 24 order effectively tells Enron to obtain the requested discovery in this Court. The order states,

Enron's Motions for an Order Compelling Responses to Data Requests from Valley Electric Association, Inc.; the City of Santa Clara, California d/b/a Silicon Valley Power; the Metropolitan Water District of Southern California and

---

[6]    Ellenberg Decl., Ex. F, pp. 160-61.

[7]    Ellenberg Decl, Ex. G.

[8]    Ellenberg Decl., Ex. H.

Public Utility District No. 1 of Snohomish County,
Washington were denied to the extent that these motions
sought discovery of "wholesale market activities" of these
parties including their usage of power, market expectations
and potential retail sales. The information requested by
Enron concerning the remedies sought by these parties,
their harm and whether the remedies sought in this
proceeding, such as, contract rescission are similar to the
remedies in the Bankruptcy proceeding, is deemed to be
irrelevant to this proceeding. This ruling is based on the
reading of the Commission's Orders concerning this
proceeding. These orders state that Enron shall show cause
why its behavior does not constitute gaming or anomalous
market behavior and the Presiding Judge is to quantify the
full extent to which Enron may have [been] unjustly
enriched as a result of its conduct and may recommend the
monetary remedy of disgorgement of unjust profits and
other non-monetary remedies. Additionally it is apparent
that Enron has defenses available to it.[9]

### The Motion for Clarification and the March 11 Order

15.    Following the consolidation of the El Paso Electric Proceeding

with the Partnership and Gaming Proceeding, certain parties, including Snohomish, filed

a motion for clarification of the July 22 order. The motion requested FERC to make clear

that the disgorgement remedy under consideration could preclude the collection of

termination payments owed to EPMI under trading contracts.[10]

---

[9]    Ellenberg Decl., Ex I (citations omitted).

[10]    Santa Clara took the slightly different procedural tack of filing a complaint in FERC,
seeking determinations, among other things, that EPMI did not properly terminate the
trading contact between the parties and that EPMI could not enforce the termination
payment provision. EPMI filed a motion in this Court seeking to enjoin Santa Clara from
litigating before FERC issues being litigated in this Court. On December 29, 2004, the
Court granted EPMI's motion, allowing Santa Clara to bring before FERC only two
issues: (1) whether the FPA required EPMI to provide additional notice of its intention to
terminate the trading contract and (2) whether EPMI's market based rate authority should
be retroactively revoked.

16.    On October 25, 2004, EPMI moved the Court for an order enjoining Snohomish from prosecuting the motion for clarification at FERC. In denying this relief, the Court stated, in an Order dated January 14, 2005,

> [B]ecause it is unclear precisely what relief Snohomish seeks from FERC in its Request for Clarification, dated August 4, 2004, Enron's Motion seeking that Snohomish withdraw the Request for Clarification is denied, in essence, as premature as it could not be determined if such relief were necessary; however, to the extent that FERC were to undertake to interpret the terms of the Agreement or to determine the rights of the parties under the terms of the Agreement, any such action would be void *ab initio....*[11]

17.    The Court also stated in the January 14 Order,

> [T]o the extent FERC were to order disgorgement related to the Termination Payment, there would remain issues for this Court to determine as to how any such order for disgorgement would impact on the adversary proceeding or how the disgorgement would be treated for purposes of distribution under a plan of reorganization.[12]

18.    On March 11, 2005, the FERC granted the motion for clarification.[13] The March 11 FERC Order states,

> [T]he Commission finds that Enron's profits under the terminated contracts fall within the scope of this proceeding. The termination payments are based on profits Enron projected to receive under its long-term, wholesale power contracts executed during the period when Enron was in violation of conditions of its market-based rate authority. The Commission finds that these matters would benefit from a full examination at hearing. Therefore, the Commission directs that these matters be examined in the

---

[11]    Ellenberg Decl., Ex. J, p. 2.

[12]    Id.

[13]    Ellenberg Decl, Ex. K.

ongoing consolidated hearing before the ALJ …, subject to any applicable bankruptcy restrictions.[14]

19.    Obviously, these four counterparties are asking FERC to rule in areas over which this Court has exclusive jurisdiction.

## ARGUMENT

### THE FERC MARCH 11 ORDER REQUIRES MODIFICATION OF THE MEDIATION ORDER TO PERMIT LITIGATION OF THE PENDING ADVERSARY PROCEEDINGS

20.    The United States Code gives this Court exclusive jurisdiction over the EPMI estate. The district courts "have original and *exclusive* jurisdiction of all cases under title 11." 28 U.S.C. § 1334(a). Further, "[t]he district court in which a case under title 11 is commenced or is pending shall have *exclusive* jurisdiction of *all of the property, wherever located, of the debtor*, as of the commencement of such case, *and of the property of the estate*." 28 U.S.C. § 1334(e) (emphasis added); see also Collier on Bankruptcy ¶ 3.01. In its decision concerning the City of Redding, the Court has made clear, although there could hardly be any doubt, that the termination payments due to EPMI under trading contracts are part of the EPMI estate. In re Enron Corp., 2002 WL 32155353, *2-3 (Bankr. S.D.N.Y. Mar. 19, 2002). The Court effectively recognized this as well in the findings encompassed in the January 14 Order denying EPMI's request for an injunction.

---

[14]  Id. at 6.  Parenthetically, the FERC is not correct in stating that the termination payment obligations represent EPMI's profit on the transactions.  The termination payment obligation does not reflect profit, or even indicate that EPMI would profit from the terminated transactions.  The same day as it issued this order, FERC issued an order on Santa Clara's complaint.  FERC rejected Santa Clara's notice argument.  FERC also deferred ruling on the market based rate authority argument, pending a ruling in the Partnership and Gaming Proceeding.  See Ellenberg Decl, Ex L.

21.     The current scope of the Partnership and Gaming Proceeding, as described in the March 11 FERC Order, clearly creates the potential for intrusion by FERC into the exclusive domain of this Court.  Certainly, the relief requested in the testimony of Santa Clara and Snohomish, which would, if granted, appear to prohibit EPMI from collecting termination payments, impermissibly crosses the jurisdictional boundary.  While it remains unclear whether FERC will accept the parties' invitation to cross a line it should not cross, it is clear that any FERC decision in the proceeding will, one way or another, have a direct impact on the relief being sought in the four adversary proceedings before this Court.  Standing still in the adversary proceedings while the FERC proceeding moves forward places the primacy of this Court's jurisdiction and EPMI's rights as a Reorganized Debtor in jeopardy.

22.     What is more, the pendency of the FERC litigation has perverted the Mediation Order stay.  The stay was intended to remove litigation, at least temporarily, as an option for resolving trading contract disputes and to force the parties into the less volatile and less costly alternative of mediation.  With FERC providing a litigation outlet for the defendants in these four cases, however, the stay of litigation in the Bankruptcy Court now discourages a mediated resolution.  The counterparties are free to pursue litigation that could, at least in their view, free them from any termination payment obligation, without fear that a loss would result in imposition of that liability on them.  The best EPMI can do in the FERC litigation is stave off an adverse order.  Only this Court can issue a judgment requiring payment of the termination obligations.  In short, the counterparties now have the best of all possible worlds.  They can seek relief from FERC, and impose enormous discovery burdens on EPMI in the process, without fear of a judgment on the termination payments or even reciprocal discovery.

11

23.    It is not a coincidence that the Snohomish, Santa Clara, Valley Electric and Metropolitan Water District cases remain unsettled. EPMI, and its affiliated Reorganized Debtors who are parties to trading contracts, have repeatedly demonstrated their good faith approach to the mediation process and to the assessment of litigation risk. The evidence of the Reorganized Debtors' good faith resides in the two-thirds settlement rate. EPMI has even reached a settlement with municipalities who purchased west power, such as UAMPS, with respect to which this Court has approved a settlement, and the City of Palo Alto, with respect to which EPMI has reached an agreement in principle. The difference is that UAMPS and Palo Alto were not material participants in the Partnership and Gaming Proceeding, while Snohomish, Santa Clara, Valley Electric and Metropolitan Water District have been among the most active and vociferous participants. Restoring balance to the litigation by freeing up the adversary proceedings may not lead to a mediated settlement, but could only help.

24.    Accordingly, EPMI requests that the Mediation Order be amended to permit all litigation relating to EPMI v. Santa Clara, Adversary Proceeding No. 02-02719, EPMI v. Public Utility District No. 1 of Snohomish County, Adversary Proceeding No. 03-02064, EPMI v. Valley Electric Association, Inc., 03-02107 and EPMI v. Metropolitan Water District, Adversary Proceeding No. 04-02968, to proceed side by side with mediation, which we continue to ask the counterparties to pursue with us. A copy of a proposed order granting this Motion is attached hereto as Exhibit A.

25.     Pursuant to Local Bankruptcy Rule for the Southern District of New York 9013-1(b), because there are no novel issues of law presented herein, the Debtors respectfully request that this Court waive the requirement that they file a memorandum of law in support of this Objection.

Dated:  New York, New York
        March 28, 2005

                                    Respectfully submitted,

                                    CADWALADER, WICKERSHAM &
                                    TAFT LLP

                                    By:/s/ Edward A. Smith_____
                                        Edward A. Smith (ES 2461)
                                        One World Financial Center
                                        New York, New York 10281
                                        Telephone: (212) 504-6000

                                        Mark C. Ellenberg
                                        1201 F Street, NW
                                        Washington, DC  20004
                                        Telephone: (202) 862-2200

                                        SPECIAL COUNSEL FOR
                                        REORGANIZED DEBTORS

                                        and

                                        Peter Gruenberger (PG 6040)
                                        Melanie Gray (Pro Hac Vice)
                                        WEIL, GOTSHAL & MANGES LLP
                                        767 Fifth Avenue
                                        New York, New York
                                        Telephone:  (212) 310-8000
                                        Facsimile:  (212) 310-8007

                                        ATTORNEYS FOR REORGANIZED
                                        DEBTORS

13

# NO. 3

# Minutes of Proceedings

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

```
----------------------------------------------------------------x
Date:    December 29, 2004                                      :
----------------------------------------------------------------x
In re:                                                          :
                                                               :
Enron Corp., et al.,                                           :    Case No. 01-16034 (AJG)
                              Debtor(s).                        :
----------------------------------------------------------------x
Enron Power Marketing, Inc.,                                   :
                              Plaintiff                         :
                                                               :    Adversary Proceeding No.
         v.                                                    :    02-2719 (AJG)
                                                               :
City of Santa Clara,                                           :
                              Defendant.                        :
----------------------------------------------------------------x
```

Present:     Hon. Arthur J. Gonzalez          Lynda Nulty            _____
             Bankruptcy Judge                 Courtroom Deputy           Court Reporter

**As set forth on the record at the Hearing**

| | | |
|---|---|---|
| Trustee _____ | Counsel | _____ |
| Debtor(s) _____ | Counsel | _____ |
| 1. Creditor _____ | Counsel | _____ |
| 2. Creditor_____ | Counsel | _____ |
| 3. Plaintiff/Applicant _____ | Counsel | _____ |
| 4. Defendant/Respondent _____ | Counsel | _____ |

**Proceedings:**      ▢ Motion for Relief from Automatic Stay Filed By _____
             ▢ Motion to Void Lien Held By _____
             ▢ Motion to Dismiss Filed By _____
             ▢ Motion to Confirm/Modify Plan _____
             ▢ Motion to Convert to Chapter _____
             X Motion By **the Plaintiff for an order enforcing the automatic stay and the Court's Mediation Order; enjoining the Defendant's further prosecution to the FERC Action and for civil contempt sanctions.**
             ▢ Complaint By _____
             ▢ Appearances made, arguments presented_____
             ▢ No appearances _____
             ▢ Oral findings and conclusions made of record _____
             ▢ Witnesses sworn          ▢ See attached list   ▢ Exhibits entered   ▢ See attached list
             ▢ Pretrial _____   ▢ Status Conference _____
             ▢ Other_____
             ▢ Continued to _____ at _____ for _____

**Orders:**      ▢ Relief sought in complaint/motion:
             X Granted **as set forth in the attached Decision and Order (Exhibit A).**
             ▢ Denied          ▢ Dismissed          ▢ Awarded by Default
             ▢ Judgment to enter for:
             ▢ Plaintiff          ▢ Defendant          ▢ Applicant          ▢ Respondent
             ▢ In the amount of $ _____   ▢ Cost in the amount of $ _____
             ▢ Matter taken under advisement
             ▢ Formal order or Judgment to enter

¤ Confirmation/modification of plan          ¤ granted        ¤ denied
¤ Other _____

FOR THE COURT: Kathleen Farrell, Clerk of the Court

BY THE COURT:

.

  *s/Arthur J. Gonzalez*              12/29/04              Lynda Nulty_____
United States Bankruptcy Judge          Date           Courtroom Deputy

**EXHIBIT A**

**Decision and Order Read into the Record on December 29, 2004**

Before the Court is the motion filed by Enron Power Marekting Inc. ("EPMI") seeking to enforce the automatic stay and the mediation order (the "Mediation Order") that this Court entered concerning various adversary proceedings (the Trading Cases) pending before this Court and to enjoin the City of Santa Clara (the "City") from further prosecution of the action it filed before the Federal Energy Regulatory Commission ("FERC") against EPMI (the "FERC Action") and ordering the City to withdraw the complaint filed in the FERC Action (the "FERC Complaint"), and for contempt sanctions.

On July 22, 2002, EPMI commenced an adversary proceeding against the City in this Court seeking to collect an early termination payment (the "Termination Payment") it alleged was owed based upon the terms of a Master Energy Purchase and Sale Agreement (the "Agreement") previously entered into by the parties.  As such, any amount due as a Termination Payment is property belonging to EPMI's estate.

As a defense to the adversary proceeding, the City alleged that there was no default or basis for the Termination Payment under the terms of the Agreement.  The City also alleged, among other things, that EPMI's entitlement to the Termination Payment violated certain standards of the Federal Power Act (the "FPA").

On November 1, 2002, the City moved before the District Court for withdrawal of the reference to the Bankruptcy Court and, on January 8, 2003, the District Court denied that request.

1

On July 2, 2004, the City filed the FERC Action seeking a ruling that it does not have to pay the Termination Payment based on the same defenses interposed before this Court.

EPMI argues that the FERC Action violates the automatic stay as it is an effort to obtain control over property of EPMI's estate.  Further, EPMI argues that the FERC Action is a violation of the Mediation Order issued by this Court.  EPMI requests that the Court issue an injunction against the City to enjoin it from further prosecution of the FERC Action.  In addition, EPMI seeks that sanctions be imposed.

The City argues that it has not violated the automatic stay or the Mediation Order because the defenses it seeks to pursue in the FERC Action are within FERC's exclusive jurisdiction and, pursuant to 11 U.S.C. § 362(b)(4), are exempt from the automatic stay as an exercise of FERC's police and regulatory power.

FERC has exclusive jurisdiction to ensure that the rates, terms and conditions set forth in contracts affecting wholesale electric power transactions are just and reasonable.  *See* Federal Power Act ("FPA"), Section 205.  Any contract which affects or relates to such rates, charges, classifications, and services, must be filed with and approved by FERC.  16 U.S.C. § 824d(c),(e).  Section 206 of the FPA authorizes FERC to find that the terms of a wholesale power contract are "unjust, unreasonable, unduly discriminatory or preferential," and to modify the contract to include the "just and reasonable" terms "to be *thereafter* observed and in force" (16 U.S.C. §824e(a)). (emphasis added).

The governmental unit exception provided in section 362(b)(4) of the Bankruptcy Code applies only in relation to actions enforcing "generally applicable regulatory laws" governing a debtor's conduct. *See Corporacion de Servicios Medicos Hospitalarios de Fajardo v. Mora (In re Corporacion de*

2

*Servicios Medicos Hospitalarios de Fajardo)*, 805 F.2d 440, 445 (1st Cir. 1986). The exception is narrowly construed. *Id*. at 447. Even where an action by a governmental agency is related to the agency's general regulatory power, where the action seeks to enforce a contractual right, the action remains subject to the automatic stay. *Corporacion de Servicios*, 805 F.2d at 445.

While the "police and regulatory power" exception to the automatic stay applies to issues concerning adjustments to the filed rate [FPA, Section 205] and modifications to contracts under the auspices of the agency [(16 U.S.C. §824e(a))], as well as to the enforcement of provisions promulgated by the agency, *Board of Governors of the Federal Reserve System v. MCorp Financial, Inc., et al. (In re MCorp Financial Inc., et al.*, 502 U.S. 32, 43-44, 112 S.Ct. 459, 462, 116 L.Ed.2d 358 (1991), the exception does not apply to any private state-law contractual dispute.

In instances, however, where FERC is acting in its capacity as a regulator, the fact that its enforcement action could affect the Bankruptcy Court's control over property of the estate would not stay such enforcement proceeding as it would be expressly exempted by §362(b)(4)." *Board of Governors of the Federal Reserve System v. MCorp Financial, Inc., et al. (In re MCorp Financial Inc., et al.*, 502 U.S. 32, 41, 112 S.Ct. 459, 464, 116 L.Ed.2d 358 (1991). Actions taken by FERC in its capacity as regulator are not subject to substantive review by a bankruptcy court.

Pursuant to the FPA, FERC has exclusive jurisdiction to alter the terms of the contracting parties' agreement. *NRG Power Marketing, Inc. v. Blumenthal (In re NRG Energy, Inc.)*, 2003 WL 21507685, at *3. However, FERC does not have exclusive jurisdiction over the breach of a FERC approved contract unless the challenge is *directly* to the filed rate. *Mirant Corp. v. Potomac Elec. Power Co. (In re Mirant Corp.)*, 378 F.3d 511, 519 (5th Cir. 2004). Therefore, as long as the

3

basis for the relief is not that the filed rate was excessive, a court may interpret an energy contract and void that contract if it is determined that such "contract was obtained unconscionably or by fraud without interfering with FERC's rulemaking power." *Mirant*, 378 F.3d at 519, *citing*, *Gulf States Utils. Co. v. Ala. Power Co.*, 824 F.2d 1465, 1472 (5th Cir. 1987).

This applies even if there is an *indirect* effect on the rate such as would be the case if a rate were eliminated, such indirect effect would not result in pre-emption by FERC. *Mirant*, 378 F.3d at 521.

EPMI's rights under the Agreement are property of the Debtor's estate and any interpretation of issues concerning that contract are properly brought before this Court. A commercial contract dispute does not involve FERC's police or regulatory powers and FERC could only exercise its concurrent jurisdiction in that area if the City obtained relief of the automatic stay from this Court. Without obtaining relief from the stay, any action taken by FERC to interpret the terms of the contract would be void *ab initio*.

The City argues that its defenses to the adversary proceeding which were also presented in the FERC Action are related to the FPA and that only FERC, as the regulatory agency, can resolve those issues. The City contends that it did not violate the automatic stay or the Mediation Order by seeking resolution of those defenses before FERC as it is not a violation of the automatic stay to assert defenses. The City argues it was justified in asserting its defenses before FERC because FERC has exclusive jurisdiction over the issues presented and those issues must be resolved prior to the contract interpretation.

EPMI argues that by means of the FERC Action, the City is attempting to bring matters before FERC that are not within FERC's police and regulatory authority as they only concern purely state-law

4

contract interpretation issues. EPMI, however, concedes that two issues presented by the City are within FERC's exclusive jurisdiction. The first concerns the notice of termination provision under regulations promulgated by FERC. The other concerns whether the market-based rates charged were fair. With respect to the latter issue, the City argues that EPMI should have its market-based rate authority revoked retroactively and EPMI should not be able to take advantage of market-based rates and that the rates are not just and proper. Nevertheless, EPMI argues that this Court should enjoin the City from prosecuting any aspect of the FERC Action as the arguments related to the alleged unreasonable rates charged and to the revocation of market-based authority are redundant of arguments currently before FERC in another proceeding - the "gaming and partnership" proceeding - involving the same parties. Moreover, with respect to the notice issue that is not currently pending before FERC, EPMI argues that because of the City's failure to seek and secure relief from the automatic stay prior to commencing the FERC Action, it should be required to refile a complaint concerning any issues raised in the FERC Action.

In the FERC Action, the City seeks a determination that EPMI is not entitled to the claimed Termination Payment based on its alleged improper attempt to cancel the Agreement with the City. The City also seeks a determination that EPMI's cancellation of the two long-term confirmations with the City is void, and that the City's attempt to obtain the Termination Payment is a nullity because of EPMI's failure to provide notice to and obtain approval from FERC. Alternatively, the City seeks a determination that if EPMI is entitled to a Termination Payment by the terms of the Agreement, that FERC require EPMI to calculate the charge on a cost of service basis, and/or revoke EPMI's market-based rate authority effective at least as of January 2000. Finally, the City seeks any alternative and

5

additional relief deemed appropriate by FERC.

The Court agrees with EPMI's assessment that the vast majority of the issues raised in the FERC Action concern state-law contract interpretation issues that are within this Court's jurisdiction. The majority of the defenses raised before FERC flow from the obligations under the Agreement.

The adversary proceeding before this Court concerns the commercial dispute between the parties on the issues of failure to make a margin call, suspension of performance and failure to pay for power. The issue of whether or not there was a default under the Agreement is an issue of contract interpretation - as are the issues of whether there was a basis for a termination payment, whether there is a good faith dispute concerning entitlement to the Termination Payment and whether performance assurance was required by the terms of the Agreement.

All of these issues are raised in the FERC Complaint. Recognizing that FERC is charged with the role of ensuring that the rates, terms and conditions set forth in contracts affecting wholesale electric power transactions are "just and reasonable" and of modifying, for future application, any contracts that contain "unjust and unreasonable terms," the City has attempted to transform its ordinary contract interpretation issues into issues within the framework of FERC's exclusive jurisdiction by repeatedly using the terms "unjust and unreasonable" in describing the allegations. Nevertheless, the majority of the issues presented in the FERC Complaint are pure state-law contract interpretation issues.

In the FERC Complaint, the City seeks a determination of the enforceability of EPMI's declaring a default and recovering a Termination Payment under the terms of the Agreement and confirmations [¶¶ 78, 103, 104, 105]. The City also seeks a determination

- that, under the terms of the Agreement and the confirmations, there was an improper

6

cancellation of the contract [¶ 82, 101];

- that, under the terms of the Agreement, EPMI actually owed the City money on a net basis at the time of the termination [¶¶ 84 through 90].

- that the termination was not made in good faith and as such was not permitted under the terms of the Agreement or the confirmations [¶ 82].

- that it is not obligated for amounts owed that it claims were not  assessed pursuant to the terms of the Agreement and confirmations. [¶80].

Further, in the FERC Complaint, the City details certain provisions of the Agreement concerning the early termination of the Agreement, events of default, and netting and setoff.  These all concern contract interpretation issues that are properly before this Court and absent relief from stay are not to be pursued before FERC.

The City argues that because EPMI's entitlement to the Termination Payment was disputed by the City, only FERC may make the preliminary determination of the bona fides of such dispute. According to the City, this is because any attempt to terminate a contract subject to a good faith dispute is a modification of the contract and, therefore, within FERC's exclusive jurisdiction.  The City argues that if FERC concludes that there is a good faith dispute as to whether there was a default under the terms of the contract, then FERC determines if the termination was proper.

The Court disagrees and finds that the issue of the existence of a good faith dispute is relevant to the contract interpretation issue within this Court's competence to determine.

The City makes an additional attempt to frame the issues presented as within FERC's exclusive jurisdiction to modify an energy contract or to set just and reasonable rates and terms.  In this effort, the City first argues that there was no default under the Agreement and that the cancellation of the Agreement was improper under the terms of the Agreement.  The City argues that, consequently, EPMI's efforts to enforce an entitlement to the Termination Payment or cancel the Agreement is a

7

unilateral modification of the contract or an attempt to enforce unjust and unreasonable terms and practices.

However, whether EPMI is entitled to the Termination Payment under the terms of the Agreement and the confirmations and whether it properly cancelled the Agreement is precisely the issue to be determined by this Court. As previously noted, it is within this Court's competence to interpret the terms of the Agreement and the confirmations.

The City further argues - and EPMI concedes - that the issue of whether EPMI violated the FPA and its regulations when it sought to terminate the Agreement without providing the notice and FERC approval that the City alleges was required is an issue within FERC's exclusive jurisdiction. The City contends that resolving the dispute concerning the notice requirement is a prerequisite to interpretation of the Agreement. Thus, the City argues that this Court should stay the pending adversary proceeding awaiting the resolution before FERC of the notice issue. However, prosecution of the notice issue before FERC is similar to prosecution of the issue concerning retroactive revocation of market-based rate authority or similar to any proceeding to alter a fixed rate under the filed rate doctrine. In each case, the Court would proceed with its contract interpretation and any ruling by FERC concluding that the rate or practice was unjust or unreasonable that would impact the Court's decision would be incorporated into the Court's interpretation at whatever stage was reached when FERC issued its ruling. The Court, however, would not be required to stay its proceeding awaiting any such ruling. Moreover, the Court would not be interfering with FERC's authority to determine whether termination of the contract was in violation of the FPA or whether any such violation rendered the charge or practice unjust and unreasonable.

8

Based upon the foregoing, the Court finds that the filing and prosecution of the FERC Complaint, except with regard to those portions based upon its allegation that EPMI's cancellation of the Agreement is void for failure to provide notice in compliance with Section 205(d) of the FPA as contained in ¶¶ 121 through 140 ("Notice Issues") and the issues concerning the fairness of the market-based rates charged and the retroactive revocation of EPMI's market-based rate authority as contained in ¶¶ 141 through161 ("Market-Based Rate Authority Issues") violated the automatic stay in that the filing and prosecution of those aspects of the FERC Complaint other than the Notice Issues and the Market-Based Rate Authority Issues are not within FERC's exclusive jurisdiction and may not be pursued absent relief from the automatic stay.  As to those excepted portions referenced above, the City may continue to prosecute those issues.  It is for FERC to determine whether it finds the Market-Based Rate Authority Issues redundant with those raised in the "gaming and partnership" docket and whether it would seek to consolidate it with that proceeding.  This Court, however, cannot preclude the City from pursuing an issue before FERC within FERC's police and regulatory power.  However, this Court does have authority to enjoin the City from violating the automatic stay.  Thus, other than the two specific issues that the Court has carved out, the City is enjoined from further prosecuting the balance of the FERC Action which comprises the major part of the FERC Complaint and the City is to withdraw those portions of the FERC Complaint.  The Court reserves on the issue of sanctions for the City's violation of the automatic stay and the issue of whether the Mediation Order was violated and, if so, any awarding of sanctions therefrom until the conclusion of the Court ordered mediation.

Therefore, based upon the foregoing, it is

ORDERED, that the City is enjoined from prosecuting the FERC Action with respect to any

9

portion of the FERC Complaint, except the prosecution of the Notice Issues under Section 205(d) of the FPA as contained in ¶¶ 121 through 140 and the Market-Based Rate Authority Issues regarding the fairness of the market-based rates charged and the retroactive revocation of in ¶¶ 141 through 161 of the FERC Complaint; and it is further

ORDERED, that the City is directed to withdraw all portions of the FERC Complaint, except those portions regarding the Notice Issues and the Market-Based Rate Authority Issues as set forth above within ten(10) days of the entry of this decision and order; and it is further

ORDERED, that the Court's ruling regarding the issue of sanctions against the City for violating the automatic stay and whether the Mediation Order was violated and, if so, any awarding of sanctions therefrom until the conclusion of the Court ordered mediation; and it is further

ORDERED, that to the extent any of the enumerated paragraphs regarding the Notice Issues or the Market-Based Rate Authority Issues seek relief beyond the scope of such issues, further relief may be sought from the Court to enjoin the prosecution thereof.

The Court will enter a Minute Order reflecting this Decision and Order.

10

IN THE

# United States District Court

FOR THE

# Southern District of New York

Docket No. 05-CV-2710 (RCC)

▶▶◀◀

In re: ENRON CORP., *et al.*,

*Debtors.*

ENRON POWER MARKETING INC.,

*Plaintiff-Appellee,*

*against*

PUBLIC UTILITY DISTRICT NO. 1 OF SNOHOMISH COUNTY,

*Defendant-Appellant.*

*On Appeal from the United States Bankruptcy Court
for the Southern District of New York*

## APPELLANT'S APPENDIX

Mark C. Ellenberg, Esq.
Edward A. Smith, Esq.
CADWALADER, WICKERSHAM
  & TAFT LLP
One World Financial Center
New York, New York 10281
212-504-6000

*Attorneys for Plaintiff-Appellee*

Alan Kolod, Esq.
Alan E. Gamza, Esq.
Philippe Zimmerman, Esq.
MOSES & SINGER LLP
1301 Avenue of the Americas
New York, New York 10019
212-554-7800

Michael A. Goldfarb, Esq.
LAW OFFICES OF
  MICHAEL A. GOLDFARB
1150 Market Place Tower
2025 First Avenue
Seattle, Washington 98121
206-374-7090

*Attorneys for Defendant-Appellant*

# Table of Contents

**Page**

Bankruptcy Court Docket Entries . . . . . . . . . . . . . . . . . . . . . . . . . . . A1

Defendant's Designation of Record on Appeal and Statement of
    Issues to be Presented, dated February 3, 2005 . . . . . . . . . . . . . . A7

Notice of Motion by Plaintiff for, *inter alia,* Enforcement of
    Automatic Stay, dated October 26, 2004 . . . . . . . . . . . . . . . . . . . A11

Affidavit of Jonathan D. Polkes, for Plaintiff, in Support of
    Motion, sworn to October 25, 2004 . . . . . . . . . . . . . . . . . . . . . . . A14

        Exhibit A to Polkes Affidavit -
        Complaint, dated January 31, 2003 . . . . . . . . . . . . . . . . . . . A17

        Exhibit B to Polkes Affidavit -
        First Amended Order Governing Mediation of
        Trading Cases, dated March 20, 2003 . . . . . . . . . . . . . . . . . A32

Defendants' Memorandum of Law in Opposition to Plaintiff's
    Motion, dated November 17, 2004, with Appendix I . . . . . . . . A36

Affidavit of Eric L. Christensen, for Defendant, in Opposition
    to Motion, sworn to November 17, 2004 . . . . . . . . . . . . . . . . . . A85

        Exhibit 1 to Christensen Affidavit -
        Ninth Circuit Court of Appeals Decision in *Lockyer*
        *v. FERC,* Issued September 9, 2004 . . . . . . . . . . . . . . . . . . . A90

        Exhibit 2 to Christensen Affidavit -
        "Simulating Effects of Business Decisions on Regional
        Economy: Experience During the California Energy
        Crisis" (June 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A111

**Table of Contents**
**(Continued)**

**Page**

Exhibit 7 to Christensen Affidavit -
Order Revoking Market-Based Rate Authorities and
Terminating Blanket Marketing Certificates, Issued
June 25, 2003 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A128

Exhibit 11 to Christensen Affidavit -
Order on Initial Decision and Consolidating Dockets,
Issued July 22, 2004 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A163

Exhibit 15 to Christensen Affidavit -
Excerpts of the Deposition of John P. White,
taken April 27, 2004 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A181

Exhibit 16 to Christensen Affidavit -
Exhibits SNO-204 and SNO-222, Submitted in FERC
Docket No. EL03-180 . . . . . . . . . . . . . . . . . . . . . . . . . . . . A184

Exhibit 19 to Christensen Affidavit -
Request for Clarification by the Western Parties,
dated August 4, 2004 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A203

Exhibit 21 to Christensen Affidavit -
Petition for Rehearing, dated August 23, 2004,
with Attachments A and B . . . . . . . . . . . . . . . . . . . . . . . . . A214

Exhibit 23 to Christensen Affidavit -
Order Denying Rehearing, Issued January 22, 2004 . . . . . A265

Exhibit 24 to Christensen Affidavit -
Order Directing Staff Investigation,
Issued July 26, 2000 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A281

Transcript of Proceedings Before the Honorable
Arthur J. Gonzalez, dated December 21, 2004 . . . . . . . . . . . A283

-ii-

**Table of Contents**
**(Continued)**

**Page**

Order of the Honorable Arthur J. Gonzalez, Appealed From,
dated January 14, 2005 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A305

Notice of Appeal, dated January 24, 2005 . . . . . . . . . . . . . . . . . . A307

Amended Notice of Appeal, dated January 25, 2005 . . . . . . . . . . . A311

# U.S. Bankruptcy Court
## Southern District of New York (Manhattan)
## Adversary Proceeding #: 03-02064-ajg

*Assigned to:* Judge Arthur J. Gonzalez
*Related BK Case:* 01-16034
*Related BK Title:* Enron Corp.                          *Date Filed:* 01/31/03
*Demand:* $8000
*Nature of Suit:* 454


**Plaintiff**
------------------------

**Enron Power Marketing, Inc.**        represented by    **Jonathan D. Polkes**
1400 Smith Street                                        Cadwalader, Wickersham & Taft LLP
Houston, TX 77002                                        One World Financial Center
Tax id: 76-0413675                                       New York, NY 10281
                                                         (212)504-6021
                                                         Fax : (212) 504-6666
                                                         Email: jonathan.polke@cwt.com
                                                         *LEAD ATTORNEY*


V.


**Defendant**
------------------------

**Public Utility District No. 1 of**    represented by    **Alan E. Gamza**
**Snohomish County**                                      Moses & Singer LLP
                                                          1301 Avenue of the Americas
                                                          New York, NY 10036
                                                          (212) 554-7800
                                                          Fax : (212) 554-7700
                                                          Email: Agamza@mosessinger.com


                                                          **Alan Kolod**
                                                          Moses & Singer LLP
                                                          1301 Avenue of the Americas
                                                          New York, NY 10019-6076
                                                          (212) 554-7866
                                                          Fax : (212) 554-7700
                                                          Email: akolod@mosessinger.com


                                                          **Mark Nelson Parry**
                                                          Moses & Singer LLP
                                                          1301 Avenue of the Americas
                                                          New York, NY 10019

(212) 554-7800
Fax : (212) 554-7700
Email: mparry@mosessinger.com

| Filing Date | # | Docket Text |
|---|---|---|
| 01/31/2003 | 1 | Complaint against Public Utility District No. 1 of Snohomish County *for Declaratory Relief and for Damages;* Filed by Jonathan D. Polkes, Enron Power Marketing, Inc. on behalf of Enron Power Marketing, Inc.. (Polkes, Jonathan) (Entered: 01/31/2003) |
| 01/31/2003 | | Receipt of Complaint(03-02064) [cmp,cmp] ( 150.00) Filing Fee. Receipt number 0208B1670804. Fee amount 150.0. (U.S. Treasury) (Entered: 01/31/2003) |
| 02/03/2003 | | Judge Arthur J. Gonzalez added to the case. (Lopez, Mary). (Entered: 02/03/2003) |
| 02/04/2003 | 2 | Summons and Notice of Pre-Trial Conference against Public Utility District No. 1 of Snohomish County Answer Due: 03/6/2003. Filed by Clerk's Office of the U.S. Bankruptcy Court. with Pre-Trial Conference set for 3/20/2003 at 10:00 AM at Courtroom 523 (AJG), (Lopez, Mary) (Entered: 02/04/2003) |
| 02/06/2003 | 3 | Affidavit of Service *of Summons and Notice of Pretrial Conference in a Adversary Proceeding and Complaint for Declaratory Relief and for Damages;* (related document(s)2, 1) filed by Jonathan D. Polkes on behalf of Enron Power Marketing, Inc.. (Polkes, Jonathan) (Entered: 02/06/2003) |
| 03/05/2003 | 4 | Order Signed 3/4/2003 Governing Mediation of Trading Cases and Appointing The Honorable Allan L. Gropper as Mediator. (Suarez, Aurea). (Entered: 03/10/2003) |
| 03/25/2003 | 5 | So Ordered Stipulation signed on 3/24/2003 extending defendant's time to answer to the complaint to April 7, 2003. (DePierola, Jacqueline) (Entered: 03/25/2003) |
| 03/28/2003 | 6 | Motion for Adjournment *Expedited Motion for Adjournment of Time to Respond to Complaint* filed by Alan Kolod on behalf of Public Utility District No. 1 of Snohomish County. with hearing to be held on 4/3/2003 (check with court for location) (Attachments: # 1 Notice of Expedited Hearing# 2 Affidavit of Service) (Kolod, Alan) (Entered: 03/28/2003) |
| 04/01/2003 | 7 | Affidavit *Certification in Support of Expedited Motion for Adjournment of Time to Respond to Complaint* (related document(s)6) filed by Alan E. Gamza on behalf of Public Utility District No. 1 of Snohomish County. (Attachments: # 1 Exhibit A - Proposed Scheduling Order for Hearing of Emergency Motion# 2 Affidavit of Service)(Gamza, Alan) (Entered: 04/01/2003) |

| 04/02/2003 | 8 | Memorandum of Law / *Enron Power Marketing, Inc.'s Memorandum in Opposition to Public Utility District No. 1 of Snohomish County's Expedited Motion for Adjournment Time to Respond to the Complaint;* filed by Jonathan D. Polkes on behalf of Enron Power Marketing, Inc.. (Polkes, Jonathan) (Entered: 04/02/2003) |
|---|---|---|
| 04/02/2003 | 9 | Order signed on 4/2/2003 scheduling a hearing to consider the motion filed by Public Utility District No. 1 of Snohomish County for adjournment of its time to respond to the complaint. The hearing is to be held on 4/3/2003 at 10:00 AM at Courtroom 523 (AJG). (Nulty, Lynda) (Entered: 04/02/2003) |
| 04/03/2003 | 10 | Affidavit of Service *of Enron Power Marketing, Inc.'s Memorandum in Opposition to Public Utility Districy No. 1 of Snohomish County's Expedited Motion for Adjournment of Time to Respond to the Complaint;* (related document(s)8) filed by Jonathan D. Polkes on behalf of Public Utility District No. 1 of Snohomish County. (Polkes, Jonathan) (Entered: 04/03/2003) |
| 04/07/2003 | 11 | Order signed on 4/7/2003 denying Public Utility District No. 1 of Snohomish County's expedited motion for adjournment of time to respond to the complaint (Related Doc # 6). (DePierola, Jacqueline) (Entered: 04/07/2003) |
| 04/14/2003 | 12 | Notice of Dismissal *Notice of Motion to Dismiss Adversary Proceeding or, In the Alternative, to Stay It Pending Arbitration* filed by Alan E. Gamza on behalf of Public Utility District No. 1 of Snohomish County. (Attachments: # 1 Declaration of Eric Christensen# 2 Exhibit A to Christensen Declaration# 3 Exhibit B to Christensen Declaration# 4 Exhibit C to Christensen Declaration# 5 Exhibit D to Christensen Declaration# 6 Exhibit E to Christensen Declaration# 7 Exhibit F to Christensen Declaration# 8 Exhibit G to Christensen Declaration# 9 Exhibit H to Christensen Declaration)(Gamza, Alan) (Entered: 04/14/2003) |
| 04/14/2003 | 13 | Memorandum of Law *in Support of Motion to Dismiss Adversary Proceeding or, In the Alternative, To Stay It Pending Arbitration* (related document(s)12) filed by Alan E. Gamza on behalf of Public Utility District No. 1 of Snohomish County. (Gamza, Alan) (Entered: 04/14/2003) |
| 04/14/2003 | 14 | Affidavit of Service (related document(s)12, 13) filed by Alan E. Gamza on behalf of Public Utility District No. 1 of Snohomish County. (Gamza, Alan) (Entered: 04/14/2003) |
| 06/03/2003 | 15 | Application for pro hac vice admission of Michael A. Goldfarb to represent Public Utility District N. 1 of Snohomish County.(Attachments: # 1 Affidavit of Service) (Gamza, Alan) Modified on 6/4/2003 (Bush, Brent) (Entered: 06/03/2003) |
| 06/04/2003 | 16 | Order signed on 6/4/2003 admitting Michael A. Goldfarb to practice pro hac vice in this Court. (Related Doc # 15) (Nulty, Lynda) (Entered: 06/04/2003) |

| 10/25/2004 | 17 | Motion to Stay / *Memorandum of Law in Support of Enron Power Marketing, Inc.'s Motion for an Order (1) Enforcing the Automatic Stay and the Court's Mediation Order and (2) Enjoining Public Utility District No. 1 of Snohomish County form Seeking Clarification from the Ferc;* filed by Jonathan D. Polkes on behalf of Enron Power Marketing, Inc.. (Attachments: # 1 Proposed Order to Show Cause) (Polkes, Jonathan) (Entered: 10/25/2004) |
|---|---|---|
| 10/25/2004 | 18 | Affidavit *of Jonathan D. Polkes in Support of Enron Power Marketing, Inc.'s Motion for an Order (1) Enforcing the Automatic Stay and the Court's Mediation Order and (2) Enjoining Public Utility District No. 1 of Snohomish County form Seeking Clarification from the Ferc;* (related document(s)17) filed by Jonathan D. Polkes on behalf of Enron Power Marketing, Inc.. (Attachments: # 1 Exhibit A# 2 Exhibit B# 3 Exhibit C# 4 Exhibit D# 5 Exhibit E# 6 Exhibit F# 7 Exhibit G# 8 Exhibit H# 9 Exhibit I) (Polkes, Jonathan) (Entered: 10/25/2004) |
| 10/26/2004 | 19 | Motion to Stay / *Motion of Enron Power Marketing, Inc. for an Order (1) Enforcing the Automatic Stay and the Court's Mediation Order and (2) Enjoining Public Utility District No. 1 of Snohomish County form Seeking Clarification from the Ferc;* (related document(s)18, 17) filed by Jonathan D. Polkes on behalf of Enron Power Marketing, Inc.. (Polkes, Jonathan) (Entered: 10/26/2004) |
| 10/26/2004 | 20 | Order to Show Cause signed on 10/25/2004 regarding the motion of Enron Power Marketing, Inc. for an Order (1) Enforcing the Automatic Stay and the Court's Mediation Order and (2) Enjoining the City of Palo Alto from Seeking Clarification from the FERC. The hearing will be held on 11/4/2004 at 10:00 AM at Courtroom 523 (AJG). (related document(s)19) (Nulty, Lynda) (Entered: 10/26/2004) |
| 10/26/2004 | 21 | Affidavit of Service (related document(s)18, 19, 20, 17) filed by Jonathan D. Polkes on behalf of Enron Power Marketing, Inc.. (Polkes, Jonathan) (Entered: 10/26/2004) |
| 11/04/2004 | 22 | So Ordered Stipulation and Order signed on 11/4/2004 scheduling hearing (related document(s)19). Motion scheduled to be heard on 12/1/2004 at 02:00 PM at Courtroom 523 (AJG). (DePierola, Jacqueline) (Entered: 11/04/2004) |
| 11/17/2004 | 23 | Opposition Brief *Memorandum of Law In Opposition to the Motions of Enron Power Marketing, Inc. and Enron North America Corp. for Orders (1) Enforcing the Automatic Stay and the Court's First Amended Order Governing Mediation of Trading Cases and (2) Enjoining Palo Alto and Snohomish from Seeking Clarification from the Federal Energy Regulatory Commission Regarding Its July 22, 2004 Order* (related document(s)19) filed by Alan E. Gamza on behalf of Public Utility District No. 1 of Snohomish County. with hearing to be held on 12/1/2004 at 2:00 PM at Courtroom 523 (AJG) Reply due by 11/24/2004, (Gamza, Alan) (Entered: 11/17/2004) |

| 11/17/2004 | <u>24</u> | Statement *Public Utility No. 1 Snohomish County Washington?s Counterstatement of Facts in Opposition to Enron Power Marketing, Inc.?s Motion for an Order (1) Enforcing the Automatic Stay and the Court?s Mediation Order and (2) Enjoining Public Utility District No. 1 of Snohomish County From Seeking Clarification From the FERC* (related document(s)<u>23</u>) filed by Mark Nelson Parry on behalf of Public Utility District No. 1 of Snohomish County. (Parry, Mark) (Entered: 11/17/2004) |
|---|---|---|
| 11/17/2004 | <u>25</u> | Declaration *of Philippe Zimmerman* (related document(s)<u>23</u>) filed by Mark Nelson Parry on behalf of Public Utility District No. 1 of Snohomish County. (Attachments: # <u>1</u> Exhibit A# <u>2</u> Exhibit B# <u>3</u> Exhibit C# <u>4</u> Exhibit D# <u>5</u> Exhibit E) (Parry, Mark) (Entered: 11/17/2004) |
| 11/17/2004 | <u>26</u> | Declaration *Affidavit of Eric L. Christensen* (related document(s)<u>23</u>) filed by Mark Nelson Parry on behalf of Public Utility District No. 1 of Snohomish County. (Attachments: # <u>1</u> Exhibit 1# <u>2</u> Exhibit 2# <u>3</u> Exhibit 3# <u>4</u> Exhibit 4# <u>5</u> Exhibit 5# <u>6</u> Exhibit 6# <u>7</u> Exhibit 7# <u>8</u> Exhibit 8# <u>9</u> Exhibit 9# <u>10</u> Exhibit 10# <u>11</u> Exhibit 11# <u>12</u> Exhibit 12# <u>13</u> Exhibit 13# <u>14</u> Exhibit 14# <u>15</u> Exhibit 15# <u>16</u> Exhibit 16# <u>17</u> Exhibit 17# <u>18</u> Exhibit 18# <u>19</u> Exhibit # <u>20</u> Exhibit 20# <u>21</u> Exhibit 21# <u>22</u> Exhibit 22# <u>23</u> Exhibit 23# <u>24</u> Exhibit 24# <u>25</u> Exhibit 25# <u>26</u> Exhibit 26# <u>27</u> Exhibit 27# <u>28</u> Exhibit 28# <u>29</u> Exhibit 29# <u>30</u> Exhibit 30# <u>31</u> Exhibit 31# <u>32</u> Exhibit 32# <u>33</u> Exhibit 33) (Parry, Mark) (Entered: 11/17/2004) |
| 11/19/2004 | <u>27</u> | Certificate of Service *of Snohomish Response Papers to EPMI's Motion to Enforce the Automatic Stay, et seq.* (related document(s)<u>23</u>, <u>24</u>, <u>25</u>, <u>26</u>) filed by Alan E. Gamza on behalf of Public Utility District No. 1 of Snohomish County. (Gamza, Alan) (Entered: 11/19/2004) |
| 11/24/2004 | <u>28</u> | Memorandum of Law *in Reply to City of Palo Alto's and Public Utility District No. 1 of Snohomish County's Memorandum of Law in Opposition to Enron Power Marketing, Inc.'s and Enron North America Corp.'s Motion for an Order (1) Enforcing the Automatic Stay and the Court's Mediation Order and (2) Enjoining the City of Palo Alto and Public Utility District No. 1 of Snohomish County from Seeking Clarification from the FERC;* filed by Jonathan D. Polkes on behalf of Enron Power Marketing, Inc.. (Attachments: # <u>1</u> Exhibit A# <u>2</u> Exhibit B) (Polkes, Jonathan) (Entered: 11/24/2004) |
| 11/29/2004 | <u>29</u> | Affidavit of Service *of Memorandum of Law in Reply to City of Palo Alto's and Public Utility District No. 1 of Snohomish County's Memorandum of Law in Opposition to Enron Power Marketing, Inc.'s and Enron North America Corp.'s Motion for an Order (1) Enforcing the Automatic Stay and the Court's Mediation Order and (2) Enjoining the City of Palo Alto and Public Utility District No. 1 of Snohomish County from Seeking Clarification from the FERC;* (related document(s)<u>28</u>) filed by Jonathan D. Polkes on behalf of Enron Power Marketing, Inc.. (Polkes, Jonathan) (Entered: 11/29/2004) |

| 01/14/2005 | 30 | Order signed on 1/14/2005 (i) granting the motion by Enron Power Marketing, Inc. seeking an order enforcing the automatic stay and (ii) denying the motion by Enron Power Marketing, Inc. seeking to compel Public Utility District No. 1 of Snohomish County to withdraw its request for clarification, dated August 2, 2004, pending before FERC. (Related Doc # 19) (Nulty, Lynda) (Entered: 01/14/2005) |
|---|---|---|
| 01/20/2005 | 31 | Notice of Appearance / *Notice of Change of Firm Name and Address;* filed by Jonathan D. Polkes on behalf of Enron Power Marketing, Inc.. (Polkes, Jonathan) (Entered: 01/20/2005) |
| 01/24/2005 | 32 | Notice of Appeal *Notice of Appeal* (related document(s)30) filed by Alan E. Gamza on behalf of Public Utility District No. 1 of Snohomish County. (Gamza, Alan) (Entered: 01/24/2005) |
| 01/24/2005 |  | Receipt of Notice of Appeal(03-02064-ajg) [appeal,97] ( 255.00) Filing Fee. Receipt number 2904493. Fee amount 255.00. (U.S. Treasury) (Entered: 01/24/2005) |
| 01/24/2005 | 33 | Affidavit of Service *Affidavit of Service* (related document(s)32) filed by Alan E. Gamza on behalf of Public Utility District No. 1 of Snohomish County. (Gamza, Alan) (Entered: 01/24/2005) |
| 01/25/2005 | 34 | Amended Notice of Appeal (related document(s)30, 32) filed by Alan E. Gamza on behalf of Public Utility District No. 1 of Snohomish County. Filing fee collected, receipt #2904493.(Gamza, Alan) (Entered: 01/25/2005) |
| 01/25/2005 | 35 | Affidavit of Service *of the Amended Notice of Appeal* (related document(s)34) filed by Alan E. Gamza on behalf of Public Utility District No. 1 of Snohomish County. (Gamza, Alan) (Entered: 01/25/2005) |
| 01/30/2005 | 36 | Affidavit of Service *of Notice of Change of Firm Name and Address;* (related document(s)31) filed by Jonathan D. Polkes on behalf of Enron Power Marketing, Inc.. (Polkes, Jonathan) (Entered: 01/30/2005) |
| 02/03/2005 | 37 | Designation of Contents (appellant). *Public Utility District No. 1 of Snohomish County Washington's Designation of Record on Appeal and Statement of Issues to be Presented* (related document(s)34, 32) filed by Alan E. Gamza on behalf of Public Utility District No. 1 of Snohomish County. (Gamza, Alan) (Entered: 02/03/2005) |
| 02/03/2005 | 38 | Affidavit of Service *of Public Utility District No. 1 of Snohomish County Washington's Designation of Record on Appeal and Statement of Issues to be Presented* (related document(s)37) filed by Alan E. Gamza on behalf of Public Utility District No. 1 of Snohomish County. (Gamza, Alan) (Entered: 02/03/2005) |
| 03/18/2005 | 39 | Civil Cover Sheet *received from the U.S. District Court - In Re: Case Number 05CV2710 assigned to Judge Richard C. Casey* (related document(s)32) filed by Clerk's Office of the U.S. Bankruptcy Court. (Ebanks, Liza) (Entered: 03/18/2005) |

MOSES & SINGER LLP
Alan Kolod (AK 3108)
Alan E. Gamza (AG 2014)
Philippe Zimmerman (PZ 7744)
1301 Avenue of the Americas
New York, New York 10019
(212) 554-7800

LAW OFFICES OF MICHAEL A. GOLDFARB
Michael A. Goldfarb (MG-6497)
1150 Market Place Tower
2025 First Avenue
Seattle, Washington 98121
(206) 374-7090

Counsel for Public Utility District No. 1
of Snohomish County, Washington

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re:<br><br>ENRON CORP, et al.,<br><br>            Debtors. | Chapter 11<br>Case No. 01-16034 (AJG)<br>Jointly Administered |
| ENRON POWER MARKETING, INC.,<br><br>            Plaintiff,<br><br>v.<br><br>PUBLIC UTILITY DISTRICT NO. 1 OF<br>SNOHOMISH COUNTY,<br><br>            Defendant. | Adv. Pro. No. 03-02064 (AJG) |

## PUBLIC UTILITY DISTRICT NO. 1 OF SNOHOMISH COUNTY WASHINGTON'S DESIGNATION OF RECORD ON APPEAL AND STATEMENT OF ISSUES TO BE PRESENTED

Public Utility District No. 1 of Snohomish County, Washington ("Snohomish"),

pursuant to Rule 8006 of the Federal Rules of Bankruptcy Procedure, hereby provides its

(i) designation of the items to be included in the record on appeal and (ii) statement of the issues to be presented on appeal with respect to the Order entered by the United States Bankruptcy Court for the Southern District of New York on January 14, 2005 denying the Motion of Enron Power Marketing, Inc. for an order (1) Enforcing the Automatic Stay and the Court's Mediation Order, (2) Enjoining the Public Utility District No. 1 of Snohomish County from Seeking Clarification from the FERC (Docket No. 30).

### A.     Designation of Record

The following items are to be included in the record on appeal:

1.    Motion of Enron Power Marketing, Inc. for an Order (1) Enforcing the Automatic Stay and the Court's Mediation Order and (2) Enjoining Public Utility District No. 1 of Snohomish County from Seeking Clarification from the FERC (Docket No. 19);

2.    Memorandum of Law in Support of Enron Power Marketing, Inc.'s Motion for an Order (1) Enforcing the Automatic Stay and the Court's Mediation Order and (2) Enjoining Public Utility District No. 1 of Snohomish County from Seeking Clarification from the FERC (Docket No. 17);

3.    Affidavit of Jonathan D. Polkes in Support of Enron Power Marketing, Inc.'s Motion for an Order (1) Enforcing the Automatic Stay and the Court's Mediation Order and (2) Enjoining the Public Utility District No. 1 of Snohomish County from Seeking Clarification from the FERC (Docket No. 18);

4.    Memorandum of Law in Opposition to the Motions of Enron Power Marketing, Inc. and Enron North America Corp. for Orders (1) Enforcing the Automatic Stay and the Court's First Amended Order Governing Mediation of Trading Cases and (2) Enjoining Palo Alto and Snohomish from Seeking Clarification from the Federal Energy Regulatory Commission Regarding its July 22, 2004 Order (Docket No. 23);

5.    Public Utility District No. 1 of Snohomish County, Washington's Counterstatement of Facts in Opposition to Enron Power Marketing, Inc.'s Motion for an Order (1) Enforcing the Automatic Stay and the Court's Mediation Order and (2) Enjoining the Public Utility District No. 1 of Snohomish County from Seeking Clarification from the FERC (Docket No. 24);

6.    Declaration of Philippe Zimmerman, with attached exhibits A through E (Docket No. 25);

7.    Affidavit of Eric L. Christensen, with attached exhibits 1 through 33 (Docket No. 26);

8.    Memorandum of Law in Reply to City of Palo Alto's and Public Utility District No. 1 of Snohomish County's Memorandum of Law in Opposition to Enron Power Marketing, Inc.'s and Enron North America Corp.'s Motion for an Order (1) Enforcing the Automatic Stay and the Court's Mediation Order and (2) Enjoining the City of Palo Alto and Public Utility District No. 1 of Snohomish County from Seeking Clarification from the FERC (Docket No. 28);

9.    Transcript of December 21, 2004 Hearing re motion filed by Enron Power Marketing, Inc. for an order (i) enforcing the automatic stay and (ii) enjoining Public Utility District No. 1 of Snohomish County from seeking Clarification from the FERC (Case No. 01-16034, Docket No. 22856);

10.   Order (i) Granting Motion by Enron Power Marketing, Inc. Seeking an Order Enforcing the Automatic Stay, and (ii) Denying Motion by Enron Power Marketing, Inc. Seeking to Compel Public Utility District No. 1 of Snohomish County to Withdraw its Request for Clarification, Dated August 4, 2004, Pending Before FERC ( Docket No. 30).

11.   Notice of Appeal, dated January 24, 2005 (Docket No. 32); and

12.   Amended Notice of Appeal, dated January 25, 2005 (Docket No. 34).

**B.    <u>Statement of Issues</u>**

1.    Did the Bankruptcy Court err in ruling that "to the extent that FERC were to undertake to interpret the terms of the Agreement or to determine the rights of the parties under the terms of the Agreement, any such action would be void *ab initio*" where FERC has made no such ruling(s) and the Court's Order is prospective, and is not necessary to reach the denial of EPMI's Motion?

2.    Did the Bankruptcy Court err in ruling that Snohomish's request to annul the automatic stay is denied, where that request was made only in the alternative if the Court found a violation of the automatic stay under 11 U.S.C. 362(a), which the Court did not, rendering Snohomish's request to annul the stay moot?

3.    Did the Bankruptcy Court err in seeking to limit FERC's ability to act in an administrative proceeding within FERC's exclusive jurisdiction by ruling that "to the extent that FERC were to undertake to interpret the

terms of the Agreement or to determine the rights of the parties under the terms of the Agreement, any such action would be void *ab initio*"?

4.    Did the Bankruptcy Court err in concluding that an ongoing nonfinal administrative proceeding (or a particular pleading therein) is subject to the automatic stay under 11 U.S.C. 362(a)?

5.    Did the Bankruptcy Court err in concluding that a Bankruptcy Court may determine if an administrative proceeding (or a particular pleading therein) is subject to the automatic stay under 11 U.S.C. 362(a)?

6.    Did the Bankruptcy Court err in finding that a regulatory agency's consideration of issues of contract interpretation in a matter subject to the concurrent jurisdiction of the agency and the courts would necessarily violate the automatic stay under 11 U.S.C. 362(a) and, therefore, be void *ab initio*?

Dated: February 3, 2005.
      New York, New York.

MOSES & SINGER LLP

By: _____/s/ Alan E. Gamza_____
Alan E. Gamza (AG-2014)
Alan Kolod (AK-3108)
Philippe Zimmerman (PZ-7744)
1301 Avenue of the Americas
New York, New York 10019-6076
(212) 554-7800

and

Michael A. Goldfarb (MG-6497)
LAW OFFICES OF MICHAEL A. GOLDFARB
1150 Market Place Tower
2025 First Avenue
Seattle, Washington 98121
(206) 374-7090

Counsel for Public Utility District No. 1 of
Snohomish County, Washington

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re:<br><br>        ENRON CORP., et. al.,<br><br>                                    Debtors. | Case No. 01-16034 (AJG)<br>Chapter 11<br>Jointly Administered |
| ENRON POWER MARKETING, INC.,<br>                                    Plaintiff,<br>        - against –<br><br>PUBLIC UTILITY DISTRICT NO. 1 OF SNOHOMISH<br>COUNTY,<br>                                    Defendant. | Adv. Proc. No. 03-2064 (AJG) |

**MOTION OF ENRON POWER MARKETING, INC.
FOR AN ORDER (1) ENFORCING THE AUTOMATIC STAY
AND THE COURT'S MEDIATION ORDER AND (2) ENJOINING THE
PUBLIC UTILITY DISTRICT NO. 1 OF SNOHOMISH COUNTY FROM SEEKING
<u>CLARIFICATION FROM THE FERC</u>**

CADWALADER, WICKERSHAM & TAFT LLP
Jonathan D. Polkes (JDP 4265)
100 Maiden Lane
New York, NY  10038
(212) 504-6000

Mark C. Ellenberg (ME 6927)
1201 F Street, NW
Washington, DC  20004
(202) 862-2200

*Special Counsel to Enron Corp.*

Debtor Enron Power Marketing, Inc. ("EPMI" or "Enron") respectfully submits this motion, pursuant to Section 105 of title 11 of the United States Bankruptcy Code (the "Code") and Rules 9014 and 9020 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), for an order: (1) enforcing the automatic stay and the Court's First Amended Order Governing Mediation of Trading Cases (the "Mediation Order"); and (2) enjoining the Public Utility District No. 1 of Snohomish County ("Snohomish" or "Defendant") from seeking clarification from the Federal Energy Regulatory Commission (the "FERC") (i) as to whether the FERC intended to exclude from the scope of the consolidated proceedings in Docket Nos. EL02-113-000, EL03-180-000 and EL03-154-000 (the "Consolidated FERC Proceeding") energy trading contracts under which Enron is owed Termination Payments from, among others, Snohomish and (ii) as to whether the FERC intended to make available to Snohomish the remedy of an order holding that Enron forfeited its right to receive the Termination Payments, and ordering the Defendant to withdraw its Request for Clarification forthwith.

As set forth more fully in EPMI's accompanying memorandum of law, Defendant's Request for Clarification violates the automatic stay and this Court's Mediation Order.

Dated: New York, New York
      October 26, 2004

CADWALADER, WICKERSHAM & TAFT LLP


By: /s/ Jonathan D. Polkes
      Jonathan D. Polkes (JDP 4265)

100 Maiden Lane
New York, NY 10038

1

(212) 504-6000

Mark C. Ellenberg (ME 6927)

1201 F Street, NW
Washington, DC 20004
(202) 862-2200

Special Counsel to Enron Power Marketing, Inc.
and Enron North America Corp.

2

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re: | Case No. 01-16034 (AJG) |
| ENRON CORP., et. al., | Chapter 11 |
| Debtors. | Jointly Administered |
| ENRON POWER MARKETING, INC., | |
| Plaintiff, | |
| - against - | Adv. Proc. No. 03-2064 (AJG) |
| PUBLIC UTILITY DISTRICT NO. 1 OF SNOHOMISH COUNTY, | |
| Defendant. | |

### AFFIDAVIT OF JONATHAN D. POLKES IN SUPPORT OF ENRON POWER MARKETING, INC.'S MOTION FOR AN ORDER (1) ENFORCING THE AUTOMATIC STAY AND THE COURT'S MEDIATION ORDER AND (2) ENJOINING PUBLIC UTILITY DISTRICT NO. 1 OF SNOHOMISH COUNTY FROM SEEKING CLARIFICATION FROM THE FERC

| | |
|---|---|
| STATE OF NEW YORK | ) |
| | : ss.: |
| COUNTY OF NEW YORK | ) |

JONATHAN D. POLKES, being duly sworn, deposes and says:

1.    I am a member of the Bar of the State of New York and a member of the law firm of Cadwalader, Wickersham & Taft LLP, attorneys for Enron Power Marketing, Inc. ("EPMI" or "Enron").

2.    I make this affidavit in support of Enron's Motion for an Order: (1) enforcing the automatic stay and the Court's First Amended Order Governing Mediation of Trading Cases (the "Mediation Order"); (2) enjoining the Public Utility District No. 1 of Snohomish County ("Snohomish" or "Defendant") from seeking clarification from the Federal Energy Regulatory Commission (the "FERC") (i) as to whether the FERC intended to exclude from the scope of the consolidated proceedings in Docket Nos. EL02-113-000, EL03-180-000 and EL03-154-000 (the "Consolidated FERC Proceeding") energy trading contracts under which

Enron is owed Termination Payments from, among others, Snohomish and (ii) as to whether the FERC intended to make available to Snohomish the remedy of an order holding that Enron forfeited its right to receive the Termination Payments, and ordering Snohomish to withdraw its Request for Clarification forthwith; and (3) for such other relief as may be appropriate (the "Enron Motion").

3.       The purpose of this affidavit is to describe, and insofar as may be necessary, formally make part of the record, the documentary evidence that is referred to in the Enron Motion.

4.       Submitted herewith as Exhibit A is a true and correct copy of the Complaint filed by EPMI against Snohomish dated January 31, 2003.

5.       Submitted herewith as Exhibit B is a true and correct copy of the First Amended Order Governing Mediation of Trading Cases dated March 20, 2003.

6.       Submitted herewith as Exhibit C is a true and correct copy of the General Order Regarding Adoption of Procedures Governing Mediation of Matters in Bankruptcy Cases and Adversary Proceedings dated November 10, 1993.

7.       Submitted herewith as Exhibit D is a true and correct copy of the Request for Clarification filed by Nevada Power Company, Sierra Pacific Power Company, Snohomish, the City of Palo Alto, Office of the Nevada Attorney General's Bureau of Consumer Protection, Attorney General of the State of Washington, and Public Utilities Commission of Nevada with the FERC on August 4, 2004.

8.       Submitted herewith as Exhibit E is a true and correct copy of an Order on Initial Decision and Consolidating Dockets issued by the FERC on July 22, 2004. (108 FERC ¶ 61,071).

9.       Submitted herewith as Exhibit F is a true and correct copy of a news article concerning Snohomish dated August 4, 2004.

10.      Submitted herewith as Exhibit G is a true and correct copy of an amicus curiae brief filed by Snohomish in connection with <u>Enron Power Marketing, Inc. v. City of Santa Clara</u>, Adv. Pro. No. 02-02719 (AJG), dated July 19, 2004.

11.      Submitted herewith as Exhibit H is a true and correct copy of a portion of the transcript of a judicial conference held before the Honorable Arthur J. Gonzalez dated June 24, 2004.

12.      Submitted herewith as Exhibit I is a true and correct copy of the Order Denying Motion of Dynegy Entities to Withdraw Adversary Proceeding No. 02-03468 From Mediation dated July 8, 2004.

WHEREFORE, I respectfully request that this Panel find in favor of Enron Power Marketing, Inc. on the entirety of its motion for an order: (i) enforcing the automatic stay and the Court's Mediation Order and (ii) enjoining Snohomish from seeking clarification from the FERC.

<div style="text-align:right">

<u>/s/ Jonathan D. Polkes</u>
Jonathan D. Polkes

</div>

Sworn to before me this 25th
day of October, 2004.

<u>/s/ Lynn Rahnama</u>
Notary Public

Lynn Rahnama
Notary Public, State of New York
No. 41-4806438
Qualified in Queens County
Commission Expires July 31, 2006

<div style="text-align:center">-3-</div>

CADWALADER, WICKERSHAM & TAFT
100 Maiden Lane
New York, NY 10038
(212) 504-6000
Jonathan D. Polkes (JDP 4265)

1201 F Street, NW
Washington, DC 20004
(202) 862-2200
Mark C. Ellenberg (ME 6927)

Special Counsel to the Debtors

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re:<br><br>ENRON POWER MARKETING, INC.,<br><br>Debtor-in-Possession. | Case No. 01-16034 (AJG)<br><br>Chapter 11<br><br>Jointly Administered |
| ENRON POWER MARKETING, INC.,<br><br>Plaintiff,<br><br>-against-<br><br>PUBLIC UTILITY DISTRICT NO. 1 OF SNOHOMISH COUNTY,<br><br>Defendant. | Adversary Proceeding<br>No. _____ |

**ENRON POWER MARKETING INC.'S COMPLAINT
FOR DECLARATORY RELIEF PURSUANT TO THE
BANKRUPTCY CODE AND RULES AND FOR DAMAGES**

Debtor Enron Power Marketing, Inc. ("EPMI"), by and through its attorneys

Cadwalader, Wickersham & Taft, alleges as and for its Complaint against defendant Public

Utility District No. 1 of Snohomish County ("Snohomish") as follows:

## NATURE OF ACTION

1.  This action arises from Snohomish's refusal to honor its contractual obligations and pay a post-petition debt it owes to EPMI under a Master Power Purchase and Sale Agreement (the "MPPSA") entered into between the parties.

2.  As discussed below in greater detail, pursuant to the MPPSA, the parties agreed that EPMI would sell, and Snohomish would buy, wholesale power at a specified price and for a fixed period of time.  In addition, the parties agreed that if a party's conduct triggers an Event of Default,[1] the Non-Defaulting Party may declare an Early Termination Date, and one party would have to pay the other a Termination Payment.  As discussed below, the Termination Payment is a function of movements in the market price of wholesale power during the term of the underlying transactions.  If, at the time of Early Termination, the forward market price curve for wholesale power at the pertinent delivery point was higher than the contract price curve, then EPMI (the seller) would owe Snohomish (the buyer) the Termination Payment.  On the other hand, if at the time of Early Termination, the forward market price curve for wholesale power at the pertinent delivery point was lower than the contract price curve, then Snohomish would owe EPMI the Termination Payment.   Importantly, the MPPSA expressly provides that the Termination Payment must be paid to whomever it is owed, regardless of which party is the Defaulting Party. This provision is commonly referred to as a "full two-way payment" clause.

3.  On December 21, 2001, Snohomish informed EPMI that EPMI was in default and that Snohomish was designating that date as the Early Termination Date.  To the extent such termination was proper, the MPPSA obligated Snohomish, as the Non-Defaulting Party, to calculate the Termination Payment; however, Snohomish refused to make any such calculation. As a result, EPMI made its own calculation and determined that, because the forward price curve

---

[1]   Terms with capital letters are defined terms set forth in the MPPSA.

for energy had declined between the date of the transactions and the Early Termination Date, EPMI was entitled to a Termination Payment in the amount of at least $116,847,876, plus interest at the contract rate. On July 30, 2002, EPMI notified Snohomish of the calculation and demanded from Snohomish the Termination Payment; however, to date, Snohomish has refused to provide the Termination Payment to EPMI. Accordingly, EPMI has filed this action for turnover, breach of contract, unjust enrichment and violation of the automatic stay.

## THE PARTIES

4. Plaintiff EPMI is a Delaware corporation with its principal place of business in Houston, Texas.

5. Defendant Snohomish is a chartered municipal corporation of the State of Washington with its principal place of business in Everett, Washington.

## JURISDICTION AND VENUE

6. On December 2, 2001, EPMI filed a petition for relief under Chapter 11 of the United States Bankruptcy Code. As of the date hereof, EPMI continues to operate its business as debtor in possession pursuant to Sections 1107(a) and 1108 of the Bankruptcy Code.

7. This adversary proceeding is commenced pursuant to 11 U.S.C. §§ 105 and 542(b) and Federal Rule of Bankruptcy Procedure 7001.

8. This Court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. §§ 157 and 1334 as the claims or causes of action arise under Title 11, or arise in or are related to the voluntary petitions for relief under Chapter 11 of the Bankruptcy Code filed by plaintiff EPMI.

9. This is a core proceeding under 28 U.S.C. § 157. Additionally, the allegations set forth in the Complaint serve as EPMI's initial objection pursuant to Bankruptcy Rule 3007 to

the proofs of claim submitted by Snohomish, although EPMI reserves its right to further object or modify its objection as additional facts become known.

10. Venue properly lies in this district pursuant to 28 U.S.C. § 1409(a) because this adversary proceeding arises in or is related to the above-captioned Chapter 11 case pending in this district.

### BROAD RAMIFICATIONS OF THE ISSUES PRESENTED

11. The core issues presented in this adversary proceeding will have broad ramifications in each of the Debtors' chapter 11 cases.[2]

12. The MPPSA contains a clause providing for the arbitration of disputes among the parties. See Section 10.12. Despite the existence of this arbitration clause, however, it is imperative that this Court resolve the core bankruptcy issues raised in this Complaint. In addition to the other claims for relief asserted in this Complaint, EPMI seeks a declaration that the arbitration provision within the MPPSA should not be enforced.

13. The issues to be addressed in this adversary proceeding are not unique to Snohomish. Rather, the issues will be involved in the adjudication of the claims of numerous trading counterparties. The Debtors are parties to thousands of contracts for the physical delivery of coal, energy, natural gas, electricity, and other commodities. The Debtors are also parties to thousands of financial contracts (swaps, options, and swaptions) that are referenced to various commodity prices or other indexes. The substantial majority of these physical and financial trading contracts contain arbitration clauses. In addition, virtually all of these trading contracts contain netting and setoff provisions, termination provisions, or provisions related to final settlement payments upon termination that implicate core bankruptcy issues. And, like

---

[2]   The term "Debtors," as used herein and unless specified otherwise, shall mean each of the subsidiaries or affiliates of Enron Corp., that have instituted bankruptcy proceedings before this Court.

Snohomish, numerous counterparties are attempting to avoid their obligations under the trading contracts by asserting a right of rescission based on fraud in the inducement. The counterparties to the various trading contracts owe more than $6 Billion in accounts receivable and termination payments to the Debtors. Thus, the decision on the core bankruptcy issues implicated by all such trading agreements will directly affect the claims of literally hundreds, perhaps thousands, of creditors. Equally important, the decision of these issues will have dramatic impact on the distribution of assets by the Debtors to all their creditors.

14. These accounts receivable and settlement or termination payments represent either the largest or one of the largest remaining assets of the Debtors' estates.

15. Disputes raised by the counterparties to these agreements, including Snohomish's implicate core bankruptcy issues under several sections of the Bankruptcy Code, including, but not limited to, sections 362, 365, 541, 542, and 553.

16. The success or failure of the reorganization effort and the extent of the recoveries for all creditors depends on a uniform, consistent application of these core bankruptcy issues to these claims. The significant core bankruptcy issues implicated by the adjudication of these agreements, many of which will be cases of first impression, should be resolved by this Bankruptcy Court and not by different arbitrators or courts in different jurisdictions.

## FACTUAL BACKGROUND

### The MPPSA

17. To effectuate its wholesale transactions, and as a part of its ordinary course of business, EPMI entered into contractual relationships with utilities and other companies for the sale of wholesale electric power.

18. To this end, on or about January 26, 2001, EPMI and Snohomish entered into the MPPSA. <u>See</u> Exhibit A.[3]   The MPPSA sets forth the basic terms pursuant to which the parties could engage in subsequent individual transactions to buy or sell wholesale electric power at a specified price and for a fixed term.  Each purchase or sale transaction could be effectuated orally or by means of a written confirmation.  <u>See</u> <u>id.</u> § 2.1.

19. Pursuant to the MPPSA, during the course of 2001, the parties entered into a series of transactions whereby EPMI agreed to sell wholesale power to Snohomish at a specified price and Snohomish agreed to accept delivery of and pay for this power on specific dates in the future.  The terms of each of these transactions were reflected in written confirmations.   For example, on or about January 26, 2001, the parties entered into a confirmation letter whereby EPMI agreed to sell, and Snohomish agreed to buy, wholesale power at a specified price during the period April 1, 2001 through December 31, 2009. <u>See</u> Exhibit B.

1.    **Events of Default**

20. Section 5.1 of the MPPSA provides a list of "Events of Default," including, inter alia:  (i) the failure to make, when due, any payment required pursuant to the MPPSA if such failure is not remedied within three business days after written notice of such failure (<u>see</u> § 5.1(a)); (ii) any representation or warranty made by a Party shall at any time prove to be false or misleading in any material respects (<u>see</u> § 5.1(b)); (iii) the failure to perform any covenant set forth in the MPPSA (<u>see</u> § 5.1(c)); (iv) the bankruptcy of a Party (<u>see</u> § 5.1(d)); and (v) the failure of a Party to satisfy the creditworthiness/collateral requirements pursuant to Article 8 of the MPPSA. <u>See</u> § 5.1(e).

---

[3]    This Complaint is being filed without any exhibits in light of the confidentiality provision contained in the MPPSA.  We will submit exhibits under seal after an appropriate Confidentiality Stipulation has been agreed to by the Parties.

-6-

**2.    Early Termination Resulting From Default**

21. If one Party's conduct triggers an Event of Default, the MPPSA provides a specific mechanism for terminating the outstanding Transactions under the MPPSA. Specifically, Section 5.2 of the Agreement provides that if an Event of Default occurs at any time during the term of the Agreement, the Non-Defaulting Party may, for so long as the Event of Default is continuing, designate an early termination date ("Early Termination Date") on which all Transactions shall terminate. See § 5.2.

**3.    Termination Payment**

22. When an Early Termination Date has been designated, one Party owes the other a Termination Payment. As set forth above, the Termination Payment is largely a function of movements in the forward price curve for wholesale power at the relevant delivery points during the term of each underlying Transaction. The Termination Payment is determined by calculating a Settlement Amount for each Terminated Transaction and netting all Settlement Amounts together with other amounts due under the MPPSA. Given the nature of the Transactions at issue, if the forward price curve for wholesale power declined relative to the price confirmed for a Transaction, then the buyer (Snohomish) owes the seller (EPMI) a Termination Payment. If the forward price curve for wholesale electricity increased relative to the price confirmed for a Transaction, then the seller (EPMI) owes the buyer (Snohomish) a Termination Payment. Importantly, the MPPSA expressly provides that the Termination Payment must be paid to whoever it is owed based on factors set forth in the MPPSA, regardless of which party created an Event of Default. See §§ 5.2, 5.3.

23. Specifically, the MPPSA provides that, upon the designation of an Early Termination Date, the Non-Defaulting Party shall calculate, in a commercially reasonable manner, a Settlement Amount for each Terminated Transaction by calculating its Gains and

Losses resulting from the termination. The Gains and Loses shall be determined by calculating the amount that would be incurred or realized to replace or to provide the economic equivalent of the remaining payments or deliveries in respect of the Terminated Transactions. See § 5.3. The Non-Defaulting Party shall aggregate Settlement Amounts with respect to all Terminated Transactions together with other amounts due under the Agreement into a single net amount, the Termination Payment (§ 5.3), and notify the Defaulting Party, in writing, of the amount of the Termination Payment and whether the Termination Payment is due to or due from the Non-Defaulting Party. See § 5.4. The Termination Payment shall be made by the Party that owes it within two business days after such notice is effective. See § 5.4.

**4.     Credit Downgrade and Performance Assurance**

24. The MPPSA expressly contemplates that either Party's credit position could be downgraded. The MPPSA further provides that in the event of such a downgrade, the other Party may require the downgraded Party to provide certain assurances to the other Party. Specifically, Section 8.2(d) provides that if there is a Downgrade Event with respect to EPMI (i.e., Enron Corp.'s credit rating falls below BBB- from S&P or Baa3 from Moody's or if Enron Corp. is not rated by either S&P or Moody's), Snohomish may require EPMI to provide Snohomish with Performance Assurance in an amount determined by Snohomish in a commercially reasonable manner. If EPMI fails to provide the requested Performance Assurance, an Event of Default shall be deemed to have occurred and Snohomish is entitled to the remedies set forth in Section 5 (i.e., declare default and designate an Early Termination Date). See § 8.2.

**Snohomish Terminates The Transactions And Owes EPMI A Termination Payment**

25. On November 28, 2002, in light of a downgrade in Enron Corp.'s credit rating and EPMI's and Enron Corp.'s imminent bankruptcy filing, Snohomish sent a letter to EPMI

stating that it was suspending further performance under the MPPSA.  The letter also advised

EPMI that it was in "potential" default of the MPPSA and, thus, pursuant to Section 5.2 of the

MPPSA, Snohomish was immediately terminating the agreement.  See Exhibit C.  Snohomish's

purported termination of the MPPSA, however, was improper because as it acknowledged in its

letter no Event of Default by EPMI had yet occurred.

      26. Realizing that its purported termination on November 28, 2001 was improper,

on December 21, 2001 Snohomish sent EPMI a second letter advising EPMI that it was in

Default and that Snohomish was terminating the MPPSA; however, this second purported

termination notice also was invalid.  In light of EPMI's filing for bankruptcy protection on

December 2, 2001, Snohomish's purported termination was improper and invalid as a matter of

law because it violated the automatic stay of section 362(a) of the Code.  While section 556 of

the Code does permit the termination of certain agreements notwithstanding the automatic stay,

Snohomish, as a governmental unit, cannot avail itself of section 556.

      27. To the extent the termination was effective, Section 5.3 and 5.4 of the MPPSA

obligated Snohomish to calculate a Termination Payment amount and to notify EPMI, in writing,

of the Termination Payment amount and whether the Termination Payment was due to or from

Snohomish.  Notwithstanding this clear obligation, in its December 21, 2001 letter Snohomish

advised EPMI that it was not going to calculate or pay the Termination Payment.  See Exhibit D.

      28. On May 17, 2002, EPMI sent Snohomish a letter informing Snohomish that

(a) its termination was ineffective and that it was obligated to continue accepting power from

EPMI and (b), in any event, it was obligated under the MPPSA to calculate the Termination

Payment amount and to provide EPMI with notice of a Termination Payment amount.  See

Exhibit E.  However, Snohomish refused to either accept continued performance or submit a

termination calculation. Rather, on June 19, 2002, it sent EPMI a letter once again stating that it would not accept additional power from EPMI and would not calculate or provide EPMI with the Termination Payment. See Exhibit E.

29. EPMI made its own calculation and determined that, because the forward price curve for wholesale power had dropped between the date of the transactions and the Early Termination Date, EPMI was entitled to a Termination Payment in the amount of at least $116,847,876, plus interest at the contract rate. On July 30, 2002, EPMI notified and demanded from Snohomish this Termination Payment. See Exhibit F.

30.    Pursuant to Section 5.4 of the MPPSA, Snohomish was required to pay the Termination Payment within two business days after receipt of such notice. However, to date, Snohomish has failed and refused to pay the Termination Payment of at least $116,847,876, plus interest at the contract rate.

### FIRST CLAIM FOR RELIEF
### (Turnover of Property to the Estate under 11 U.S.C. § 542(b))

31. EPMI repeats and realleges paragraphs 1 through 30 hereof.

32. Section 542(b) of the Bankruptcy Code provides that "an entity that owes a debt that is property of the estate and that is matured, payable on demand, or payable on order, shall pay such debt to, or on the order of, the trustee . . . ." 11 U.S.C. § 542(b).

33. The Termination Payment is a matured debt owed to EPMI and is property of the EPMI estate.

34. As detailed above, EPMI is entitled to the Termination Payment; demand has been made upon Snohomish for the Termination Payment, but Snohomish has failed and refused to comply with such demand.

35. Accordingly, Snohomish is wrongfully in possession, custody and control of the Termination Payment, which is property belonging exclusively to the estate, and Snohomish should be ordered to turnover the property immediately. Therefore, pursuant to 11 U.S.C. § 542, EPMI requests that this Court enter an order requiring Snohomish to turnover the proceeds in its possession that originate from the conduct described in the Complaint.

### SECOND CLAIM FOR RELIEF
**(Declaratory Relief that Snohomish Violated the Automatic Stay Provided for by Section 362 of the Bankruptcy Code)**

36. EPMI repeats and realleges paragraphs 1 through 30 hereof.

37. As described above, EPMI's estate is entitled to a Termination Payment from Snohomish resulting from the early termination of the MPPSA.

38. Snohomish is in violation of the automatic stay provisions of 11 U.S.C. § 362, because it has exercised control over property of the estate by wrongfully suspending performance (i.e., payment) under the MPPSA.

39. Snohomish is also in violation of the automatic stay because it improperly terminated the MPPSA after EPMI filed for bankruptcy.

40. Accordingly, the Court should declare that Snohomish has violated the automatic stay provisions of 11 U.SC. § 362.

### THIRD CLAIM FOR RELIEF
**(Breach of Contract)**

41. EPMI repeats and realleges paragraphs 1 through 30 hereof.

42. The MPPSA is a valid, binding and enforceable contract between and among EPMI and Snohomish.

-11-

43. Snohomish's failure to accept continued performance of the contract by EPMI and to pay the Termination Payment constitutes a breach of contract under the terms of the MPPSA.

44. As a result of the foregoing, EPMI has been damaged in the amount of at least $116,847,876, plus interest at the contract rate.

### FOURTH CLAIM FOR RELIEF
**(Damages Resulting From Snohomish's Unjust Enrichment)**

45. EPMI repeats and realleges paragraphs 1 through 30 hereof.

46. By engaging in the conduct described in the preceding paragraphs, particularly, its withholding of the Termination Payment which belongs exclusively to EPMI and its estate, Snohomish has received a benefit of at least $116,847,876, plus interest at the contract rate.

47. This withholding of funds represents an unjust benefit to Snohomish (at the expense of EPMI) because this remedy was not contemplated in or provided for in the MPPSA.

48. As a direct result of Snohomish's conduct, EPMI has suffered substantial damages (proximately caused by Snohomish) in an amount to be proven at trial.

### FIFTH CLAIM FOR RELIEF
**(Declaratory Relief That Any Claim By Snohomish For Fraud**
**In the Inducement And Rescission Of The MPPSA Is A Core**
**Issue Involving Property of the Estate Under Bankruptcy Code Section 541(c))**

49. EPMI repeats and realleges paragraphs 1 through 30 hereof.

50. Upon information and belief, Snohomish will seek to avoid its contractual obligations to pay EPMI the Termination Payment as complained of herein by claiming that the MPPSA is void and unenforceable as a result of EPMI's fraudulent inducement of Snohomish.

-12-

51. Because the MPPSA is property of EPMI's estate under 11 U.S.C. § 541(c), any claim by Snohomish for fraud and rescission of the MPPSA is a core claim pursuant to 28 U.S.C. § 157.

52. Accordingly, EPMI seeks a declaration from this Court that any claim by Snohomish for fraud and rescission of the MPPSA is a core claim.

<div align="center">

**SIXTH CLAIM FOR RELIEF**
**(Declaratory Relief That Snohomish Is Not Entitled To Rescission Of The MPPSA)**

</div>

53. EPMI repeats and realleges paragraphs 1 through 30 hereof.

54. As set forth above, upon information and belief, Snohomish will seek to avoid its contractual obligations to pay EPMI the Termination Payment due to EPMI as complained of herein by claiming that the MPPSA is void and unenforceable as a result of EPMI's fraudulently inducing Snohomish to enter into the agreement.

55. However, Snohomish cannot establish the elements of fraud in the inducement, Snohomish cannot establish that it is entitled to the equitable remedy of rescission, and Snohomish cannot establish that it has not ratified the MPPSA and waived any right to rescission after receiving knowledge of the alleged fraudulent acts.

56. Accordingly, EPMI seeks a declaration from this Court that Snohomish is not entitled to rescission of the MPPSA.

<div align="center">

**SEVENTH CLAIM FOR RELIEF**
**(Declaratory Relief That The Arbitration**
**Provision In The MPPSA Should Not Be Enforced)**

</div>

57. EPMI repeats and realleges paragraphs 1 through 30 hereof.

58. As the allegations set forth in this Complaint demonstrate, the dispute over the default provisions in the MPPSA implicate numerous substantive core Bankruptcy Code issues.

59. Such core issues and Bankruptcy Code provisions implicated by the default provisions require application of fundamental principles of Bankruptcy law that should not be decided by one, much less dozens of arbitrators.

60. Given these core issues, this Court has discretion and should exercise such discretion to resolve all issues in this adversary proceeding.

61. Accordingly, the Court should declare that the arbitration provision within Section 10.12 of the MPPSA should not be enforced.

## RELIEF REQUESTED

WHEREFORE, plaintiff EPMI respectfully demands judgment on its Complaint as follows:

(1)     ordering that Snohomish turnover property ($116,847,876, plus interest at the contract rate belonging exclusively to EPMI's estate;

(2)     declaring that any claim by Snohomish for rescission of the MPPSA is a core claim;

(3)     declaring that Snohomish is not entitled to rescission of the MPPSA;

(4)     declaring that the arbitration provision within the MPPSA should not be enforced;

(5)     declaring that Snohomish has violated the automatic stay;

(6)     awarding damages (in an amount to be determined at trial) resulting from Snohomish's failure to pay a Termination Payment resulting from the early termination of the MPPSA;

(7)     awarding damages (in an amount to be determined at trial) resulting from Snohomish's unjust enrichment;

(8)     awarding EPMI pre-judgment and post-judgment interest;

-14-

(9)    awarding EPMI its attorneys' fees and other expenses incurred in this action; and

(10)    awarding EPMI such other and further relief as the Court may deem just and proper.

Dated:  New York, New York
        January 31, 2003

CADWALADER, WICKERSHAM & TAFT

By: /s/ Jonathan D. Polkes
Jonathan D. Polkes (JP 4265)

100 Maiden Lane
New York, NY 10038
(212) 504-6000

Mark C. Ellenberg (ME 6927)

1201 F Street, NW
Washington, DC 20004
(202) 862-2200

Special Counsel to the Debtors

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**
————————————————————x
                                                            :
                                                            :
In re                                                       :
                                                            :
ENRON CORP., et al.,                                        :  Chapter 11
                                                            :
            Debtors.                                        :  Case No.: 01-16034 (AJG)
                                                            :
                                                            :  Jointly Administered
                                                            :
                                                            :
————————————————————x

## FIRST AMENDED ORDER GOVERNING MEDIATION OF TRADING CASES

The Court having *sua sponte* directed the mediation of all adversary

proceedings involving trading agreements and the Court having defined for the parties the

procedures to be followed, it is hereby:

ORDERED that, in light of certain common issues shared, including the

enforceability and applicability of setoff, recoupment, arbitration, and termination

provisions, the calculation and payment of termination payments, alleged grounds for

rescission and the significant dollar amounts at issue for both Debtors and the

counterparties, the twenty five (25) adversary proceedings listed on Exhibit "A" hereto

(the "Pending Trading Cases") and any future adversary proceedings between or among

counterparties to wholesale trading and retail agreements (collectively the "Trading

Cases") are referred to coordinated and confidential mediation to be conducted by the

Honorable Allan L. Gropper of the United States Bankruptcy Court for the Southern

District of New York, who shall have the broadest possible discretion as mediator,

consistent with the Standing Order described below, in regard to each Trading Case,

including without limitation, the grouping of Trading Cases and, if the affected parties

agree, certifying specific legal issues to this Court for decision; and it is further

NY1:\1678170\05\P13D05!.DOC\43889.0003

ORDERED that, to facilitate such mediation, each plaintiff and defendant-side to a Pending Trading Case shall by no later than 5:00 p.m. (EST) on March 5, 2003, unless otherwise ordered by the Court, prepare and provide to Judge Gropper (and serve only on opposing counsel in that case), a brief summary of the essential issues in the matter (the "Summaries"), attach thereto any significant pleadings previously filed by the side providing the Summary and identify by docket number all pleadings previously filed by that side; and it is further

ORDERED that, Summaries are not to be filed with this Court electronically or otherwise, nor otherwise disclosed to any other person or party, unless consented to by the party who submitted the Summary; and it is further

ORDERED that, counsel (only) for each party to a Pending Trading Case shall appear in person on March 12, 2003 at 2:30 p.m. (EST) in Courtroom 617 of the United States Bankruptcy Court for the Southern District of New York, located at Alexander Hamilton Custom House, One Bowling Green, New York, New York, for the initial (non-public) mediation, at which time Judge Gropper will provide further instructions; and it is further

ORDERED that, until further Order of this Court, all pending motions seeking to arbitrate or to modify the automatic stay in order to seek arbitration (including any scheduled hearings on, and any scheduled briefing in, already pending motions) are stayed and no party shall take any action to commence arbitration of an issue or dispute related to a Trading Case, but such party may file a motion to compel arbitration or to modify the automatic stay to seek arbitration; provided, however, that nothing in this paragraph shall prevent any party that has not yet filed an answer to a complaint in a Trading Case from stating in its answer that the matter should be determined by

arbitration, which statement will be deemed to preserve the issue of seeking entitlement to arbitration notwithstanding the filing of an answer; and it is further

ORDERED that, future Trading Cases may be commenced by filing adversary complaints by or against the Debtors, provided that (i) a copy of this Order and Exhibit "A" hereto (updated to include all then-pending Trading Cases), shall be served with the summons accompanying any such adversary complaint filed by the Debtors and the Debtors shall file a copy of this Order when an adversary complaint is served on them by a Trading Counterparty, and (ii) each such Trading Case shall be deemed referred to Judge Gropper for mediation as provided for in this Order; and its is further

ORDERED that, for all Trading Cases (notwithstanding the terms of this Order) motions to dismiss, motions involving collection matters, matters already *sub judice*, and the service and filing of adversary complaints, answers to such complaints, replies to counterclaims and dispositive motions in lieu of an answer, shall not be stayed and shall proceed as provided for in the Federal Rules of Bankruptcy Procedure and the Second Amended Case Management Order, and any response to such dispositive motion is hereby stayed; provided however, that although matters already *sub judice* are not stayed, any such *sub judice* matters, upon the joint request of the parties to any Trading Case, may be made the subject of the mediation and may be stayed by the Court; and it is further

ORDERED that, until further Order of this Court, except for those proceedings referred to above, all proceedings in the Trading Cases, including pre-trial conferences, shall be adjourned and all discovery shall be stayed; and it is further

ORDERED that, this Order shall not affect the right of any party to file a motion to withdraw the reference of its case to this Court, and seek therein any other

appropriate relief, provided that a copy of this Order accompany any such motion filed with a District Court; and it is further

ORDERED that, all the provisions of the General Order #M – 117, dated November 10, 1993, providing for "Procedures Governing Mediation of Matters in Bankruptcy Cases and Adversary Proceedings" in the Bankruptcy Court for the Southern District of New York, and all amendments and future amendments thereto (the "Standing Order") shall apply to the mediation of the Trading Cases; and it is further

ORDERED that, the Official Committee of Unsecured Creditors may receive reports on the mediation from Debtors and Debtors may consult with the Committee in order to discharge the Committee's duties. The Committee also shall be permitted to participate in the mediation as permitted by the mediator in the exercise of the mediator's discretion. The Committee must maintain the confidentiality of information it receives directly through participation in the mediation or from a party in the mediation according to the terms of the Standing Order and such information may not be used in any manner inconsistent with the Standing Order. Nothing contained in this paragraph shall have any bearing on whether or not the Committee may intervene in any of the Trading Cases or any other adversary proceeding, a subject which is not addressed herein; and it is further

ORDERED that, the Court in its discretion may terminate the mediation at any time.

Dated: New York, New York
       March 20, 2003

s/Arthur J. Gonzalez
United States Bankruptcy Judge

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

<div align="right">

**Hearing Date: December 1, 2004**
**Time: 2:00 p.m.**

</div>

| | |
|---|---|
| In re:<br><br>ENRON CORPORATION<br><br>Debtor. | Chapter 11<br>Case No. 01-16034 (AJG)<br>Jointly Administered |
| ENRON NORTH AMERICA CORP.,<br><br>Plaintiff,<br><br>– against –<br><br>CITY OF PALO ALTO, a Chartered California<br>Municipal Corporation,<br><br>Defendant. | Adv. Pro. No. 03-02062 |
| ENRON POWER MARKETING, INC.,<br><br>Plaintiff,<br><br>- against -<br><br>CITY OF PALO ALTO, a Chartered California<br>Municipal Corporation,<br><br>Defendant. | Adv. Pro. No. 03-02063 |
| ENRON POWER MARKETING, INC.,<br><br>Plaintiff,<br><br>– against –<br><br>PUBLIC UTILITY DISTRICT NO. 1 Of SNOHOMISH<br>COUNTY,<br><br>Defendant. | Adv. Pro. No. 03-02064 |

**MEMORANDUM OF LAW IN OPPOSITION TO THE MOTIONS OF ENRON POWER MARKETING, INC. AND ENRON NORTH AMERICA CORP. FOR ORDERS (1) ENFORCING THE AUTOMATIC STAY AND THE COURT'S FIRST AMENDED ORDER GOVERNING MEDIATION OF TRADING CASES AND (2) ENJOINING PALO ALTO AND SNOHOMISH FROM SEEKING CLARIFICATION FROM THE FEDERAL ENERGY REGULATORY COMMISSION REGARDING ITS JULY, 22, 2004 ORDER**

434318v5   008922.0102

# TABLE OF CONTENTS

Page

PRELIMINARY STATEMENT ............................................................................... 1

SUMMARY OF ARGUMENT ............................................................................... 5

FACTS ................................................................................................................. 7

ARGUMENT ........................................................................................................ 7

I.     THE MOTION MUST BE DENIED BECAUSE IT WOULD IMPROPERLY
       INTERFERE WITH AN ONGOING ADMINISTRATIVE PROCEEDING ................. 7

       A.     FERC Has Exclusive Jurisdiction Over Regulatory Issues Raised Under
              the Federal Power Act ................................................................................... 7

       B.     Enron has Failed to Include Necessary Parties ................................................ 10

       C.     The Failure to Exhaust Administrative Remedies is Fatal to the Motion ........... 11

II.    THE MOTION SHOULD BE DENIED ON THE GROUNDS OF WAIVER
       AND JUDICIAL ESTOPPEL .................................................................................. 13

       A.     Enron is Judicially Estopped from Arguing that the Consolidated FERC
              Proceeding or the Parties' Clarification Request Violates the Stay ................... 13

       B.     Enron Waived the Benefits of the Automatic Stay by Participating in the
              Consolidated FERC Proceeding .................................................................... 16

III.   ENRON HAS NOT SOUGHT AND IS NOT ENTITLED TO RELIEF UNDER
       SECTION 362 OF THE CODE ............................................................................... 18

       A.     The Consolidated FERC Proceeding Falls Squarely Within the Police and
              Regulatory Exception of Section 362(b)(4) of the Code ................................. 18

       B.     The Filing of the Clarification Request Was Not an Exercise of Control
              Over Property of the Estate and Does Not Violate §362(a)(3) ......................... 26

IV.    THE FILING OF THE CLARIFICATION REQUEST DID NOT VIOLATE THE
       MEDIATION ORDER ........................................................................................... 31

V.     ENRON IS NOT ENTITLED TO A § 105 INJUNCTION. .................................... 34

VI.    ENRON'S RELIANCE ON BANKRUPTCY RULE 9020 IS MISPLACED. .............. 36

VII.   THE STAY SHOULD BE RETROACTIVELY ANNULLED. ................................... 37

CONCLUSION ..................................................................................................... 38

# TABLE OF AUTHORITIES

## FEDERAL CASES

Arkansas Louisiana Gas Co. v. Hall, 7 FERC P 61, 175, 79 WL 167678 ...................... 21

AT&T v. Peoples Network, Inc., 1993 WL 248165 (D.N.J. Mar. 31, 1993).................... 8

Bates v. Long Island R.R. Co., 997 F.2d 1028 (2d Cir. 1993) ......................................... 13

Berg v. Good Samaritan Hospital(In re Berg), 230 F.3d 1165 (9th Cir. 2000)............... 25

Berkelhammer v. Novella (In re Berkelhammer), 279 B.R. 660 (S.D.N.Y. 2002).......... 22

Board of Governors of Federal Reserve v. MCorp., 502 U.S. 32 (1991) 111 ................. 24

In re Bona, 110 B.R. 1012 (Bankr. S.D.N.Y. 1990)........................................................ 17

Cities of Anaheim, Riverside, Banning, Colton & Azusa, Cal. v. FERC, 723 F.2d
    656 (9th Cir. 1984 (Reinhardt, J., concurring)) ........................................................ 19

City of New York v. Exxon Corp., 932 F.2d 1020 (2d Cir. 1991)................................... 24

City of Tacoma v. Taxpayers of Tacoma, 357 U.S. 320 (1958) ..................................... 12

In re Cobb, 88 B.R. 119 (Bankr. W.D. Tex. 1988)......................................................... 17

Continental Air Lines, Inc. v. Hillblom (In re Continental Air Lines, Inc.), 61
    B.R. 758 (S.D. Tex. 1986)........................................................................................ 31

Crysen/Montenay Energy Co. v. Esselen Associates, Inc. (In re Crysen/Montenay
    Energy Co.), 902 F.2d 1098 (2d Cir. 1990)............................................................. 36

Eastern Refractories Co., Inc. v. Forty Eight Insulations Inc., 157 F.3d 169 (2d
    Cir. 1998)...........................................................................................................35, 37

In re Enron Corp. et al., 306 B.R. 465, 907 F.2d 1280 (2d Cir. 1990) ........................... 37

Enron Power Marketing, Inc., 103 F.E.R.C. ¶ 61,343 (F.E.R.C. 204) ...................3, 18, 23

Enron Power Marketing, Inc. & Enron Energy Services, Inc., 103 F.E.R.C. ¶ 61,
    2003 WL 21480248 (F.E.R.C. June 25, 2003) ........................................................ 24

Enron Power Marketing, Inc. v. Cal. (In re Enron Corp.), 314 B.R. 524 (Bankr.
    S.D.N.Y. 2004) .........................................................................................15, 19, 20

Far East Conference v. U.S., 342 U.S. 570 (1952)........................................................ 8

Federal Power Commission v. Colorado Interstate Gas Co., 348 U.S. 492 (1955) ......... 12

In re Federal Communications Commission, 217 F.3d 125 (2d Cir. 2000)..................... 23

Federal Power Commission v. Sierra Pacific Power Co., 350 U.S. 348 (1956) .............. 19

Ford Motor Credit Co. v. Florio (In re Florio), 229 B.R. 606 (S.D.N.Y. 1999) ............. 36

Foster v. INS, 2004 WL 1663475, 2 (2d Cir. July 16, 2004).......................................... 12

GAF Corp. v. Johns-Manville Corp. (In re Johns-Manville Corp.), 26 B.R. 405
    (Bankr. S.D.N.Y. 1983)..................................................................................... 34

GATX Terminals Corp. v. Tarricone (In re Tarricone, Inc.), 77 B.R. 430 (Bankr.
    S.D.N.Y. 1987) ................................................................................................. 34

General American Tank Car Corp. v. El Dorado Terminal Co., 308 U.S. 422
    (1939) ............................................................................................................... 36

Gordon v. Whitmore (In re Merrick), 175 B.R. 333 (B.A.P. 9th Cir. 1994) ................... 30

In re Hoskins, 266 B.R. 872 (Bankr. W.D. Mo. 2001) ................................................... 17

King v. Allied Vision, Ltd., 65 F.3d 1051 (2d Cir. 1995)................................................. 36

In re Levitz Furniture, Inc. et al., 267 B.R. 516 (Bankr. D. Del. 2000)........................... 31

Lovett v. Honeywell, Inc. (In re Transportation Systems International, Inc.), 110
    B.R. 888 (D. Minn. 1990).................................................................................. 29

McMullen, supra at 328 ................................................................................................. 29

Marrero Pichardo v. Ashcroft, 374 F.3d 46 (2d Cir. 2004)............................................ 12

Massachusetts v. First Alliance Mortgage Co. (In re First Alliance Mortgage Co.),
    263 B.R. 99 (9th Cir. 2001) ..........................................................................24, 25

In re Massenzio, 121 B.R. 688 (N.D.N.Y. 1990) ........................................................... 22

McHugh v. Rubin, 220 F.3d 53 (2d Cir. 2000) .............................................................. 12

In re Megan-Racine Associates, Inc., 180 B.R. 375 (Bankr. N.D.N.Y. 1995) ............ 8, 11

In re Metiom, 301 B.R. 634 (Bankr. S.D.N.Y. 2003)..................................................... 30

Mitchell v. Washingtonville Central School District, 190 F.3d 1 (2d Cir. 1999) ............ 14

In re Mohawk Greenfield Motel Corp., 239 B.R. 1 (Bankr. D. Mass. 1999)................... 25

Muller v. Sevigny (In re Muller), 386 F.3d 320 (1st Cir. 2004) ..................................... 27

Myers v. Bethlehem Shipbuilding Corp., 303 U.S. 41 (1938) ........................................ 11

N.Y. State Electric & Gas Corp. v. N.Y. Independent System Operator, 168 F.
    Supp. 2d 23 (N.D.N.Y. 2001) .................................................................................. 8

Nantahala Power & Light Co. v. Thornburg, 476 U.S. 953 (1986)................................ 38

National Communications Association, Inc. v. AT&T, 46 F.3d 220 (2nd Cir.
    1995)........................................................................................................................ 8

National Labor Relation Board v. 15th Avenue Iron Works, Inc., 964 F.2d 1336
    (2d Cir. 1992)......................................................................................................... 25

New Hampshire v. Maine, 532 U.S. 742 (2001) ............................................................ 13

NRG Power Marketing, Inc. v. Blumenthal (In re NRG Energy Inc.) 2003 WL
    21507685 ...............................................................................................8, 23, 34, 38

Parisi v. Davidson, 405 U.S. 34 (1972) ........................................................................ 11

Perez v. Danbury Hospital, 347 F.3d 419 (2d Cir. 2003) .............................................. 36

Port of Boston Marine Terminal Association v. Rederiaktiebolaget Transatlantic,
    400 U.S. 62 (1970).................................................................................................. 35

Portland General Electric Co., 72 F.E.R.C. P 61, 009, 1995 WL 394547, at 3 .............. 21

PPL Electric Utilities Corp., 101 FERC P 61, 370, 2002 WL 31975213, at 3 ................ 21

Reiter v. Cooper, 507 U.S. 258 (1993) .................................................................... 8, 11

Ricci v. Chicago Mercantile Exchange, 409 U.S. 289 (1973) ........................................ 36

Rivers Electric Co. v. 4.6 Acres of Land, 731 F. Supp. 83 (N.D.N.Y. 1990)................... 12

Russ v. Simms, 1995 U.S. Dist. LEXIS 17686 (S.D.N.Y. Nov. 29, 1995) ..................... 10

S.E.C. v. Thrasher, 2002 WL 523279, at 2 (S.D.N.Y. Apr. 8, 2002).............................. 24

S.E.C. v. Towers Finance Corp., 205 B.R. 27 (S.D.N.Y. 1997) ...................................... 24

SSS of Kentucky, Inc. v. Lawrence Picus Pos of Kentucky, Inc.(In re SSS of
    Kentucky, Inc.), 29 B.R. 19 (Bankr. W.D. Ky. 1983) ..........................................27, 35

Safety-Kleen, Inc. v. Wyche (In re Pinewood), 274 F.3d 846 (4th Cir. 2001) .....18, 19, 20

Simon v. Safelite Glass Corp., 128 F.3d 68 (2d Cir. 1997) ............................................. 13

Southern California Edison Co., 85 FERC P 61, 389, 1998 WL 881293, at 2 ................ 21

Townview Nursing Home v. New York (In re Townview Nursing Home), 28
    B.R. 431 (Bankr. S.D.N.Y. 1983) .............................................................................. 17

U.S. v. Western Pacific R. Co., 352 U.S. 59 (1956)......................................................... 8

United States v. Commonwealth Cos., Inc. (In re Commonwealth Cos., Inc.), 913
    F.2d 518 (8th Cir.  1990) ........................................................................................... 18

United States v. Inslaw, Inc., 932 F.2d 1467 (D.C. Cir. 1991) ....................................... 30

In re Universal Life Church, Inc. v. United States (In re Universal Life Church),
    128 F.3d 1294 (9th Cir. 1997) ................................................................................... 19

Wight v. Bankamerica Corp., 219 F.3d 79 (2d Cir. 2000)............................................... 13

Williams Pipe Line Co., v. Empire Gas Corp., 76 F.3d 1491 (10th Cir. 1996) ................ 8

Yellow Cab Cooperative Associate v. Metropolitan Taxi, Inc. (In re Yellow Cab
    Cooperative Associate), 132 F.3d 591 (10th Cir. 1997) ......................................27, 35

Yniguez v. Arizona, 939 F.2d 727 (9th Cir. 1991) .......................................................... 14

## DOCKETED CASES

City of Palo Alto v. FERC, D.C. Cir. Nos. 04-1036.......................................................... 3

Enron Power Marketing, Inc. v. People of the State of California, ex rel. Bill
    Lockyer (In re Enron Corp.), Adv. No. 04-03386 (the "California Litigation") ........ 14

## FEDERAL STATUTES

11 U.S.C. § 362(b)(4).................................................................................................passim

16 U.S.C. § 824(a) ........................................................................................................... 7

16 U.S.C. § 824e ................................................................................................ 8

16 U.S.C. § 825*l*(b) ..................................................................................... 3, 12

28 U.S.C. § 157(d) and (ii) ............................................................................ 30

FERC. 16 U.S.C. § 824d(a), (c), (e) ............................................................... 7

Fed. R. Civ. P. 19 ........................................................................................... 10

16 U.S.C. § 825l(a) ....................................................................................... 12

The City of Palo Alto ("Palo Alto") and the Public Utility District No. 1 of Snohomish County, Washington ("Snohomish") submit this joint memorandum of law in opposition to the identical motions (the "Motion") of Enron Power Marketing, Inc. and Enron North America (together, "Enron"), pursuant to Section 105 of Title 11 of the United States Bankruptcy Code (the "Code") and Rules 9014 and 9020 of the Federal Rules of Bankruptcy Procedure, for an order (1) enforcing the automatic stay and the Court's First Amended Order Governing Mediation of Trading Cases (the "Mediation Order") and (2) enjoining Palo Alto and Snohomish from seeking clarification from the Federal Energy Regulatory Commission ("FERC") regarding its July 22, 2004 Order.[1]

## PRELIMINARY STATEMENT

Nearly three years after FERC initiated an investigation of Enron in February 2002, more than two years after FERC initiated a proceeding to determine whether Enron's failure to disclose its "partnership" arrangement with El Paso Electric violated the terms of Enron's market based authority, and more than a year after FERC commenced the "Gaming" and "Partnership" show cause proceedings to determine the remedies for Enron's fraudulent and abusive activities during the Western energy crisis of 2000-01, Enron asks this Court to step into those proceedings and restrict the participation of two of the many parties participating in the regulatory proceedings commenced by FERC.

Enron did not object in April 2003 when Snohomish and Palo Alto moved to intervene in Docket Nos. EL03-77-000 and RP03-31-000 (the "MBR Revocation Proceeding"). Nor did

---

[1]   Palo Alto and Snohomish are defendants in the above-captioned adversary proceedings (the "Adversary Proceedings") commenced by EPMI to collect early termination payments under contracts with Enron, which actions were commenced in the first quarter of 2002.

Enron object when Snohomish and Palo Alto moved to intervene in Docket Nos. EL03-154-000

and EL03-180-000 (the "Gaming and Partnership Proceeding") in July 2003 and April 2004,

respectively. Enron, Palo Alto, Snohomish and many others are active participants in the

Gaming and Partnership Proceeding. Enron has taken numerous depositions (including that of

John White of Snohomish, who signed Snohomish's contract with Enron) and filed more than 80

pleadings in those and many related FERC proceedings.

Enron never sought permission from this Court or the mediator to participate and never

objected to either Palo Alto's or Snohomish's (collectively, the "Parties") participation in the

Gaming and Partnership Proceeding or in the other FERC proceedings where Palo Alto and/or

Snohomish have intervened. Until now, Enron never once claimed that the Parties' regular

participation in various proceedings at FERC in any way violated the automatic stay or the

Mediation Order.

To the contrary, at a hearing before this Court on the motion to enjoin the City of Santa

Clara (the "Santa Clara Motion") on July 20, 2004, Enron acknowledged that the Gaming and

Partnership proceeding could affect the trading cases and were properly before FERC as a part of

FERC's exclusive jurisdiction:

> That issue Judge, is already fully presented before the FERC, in a
> different docket before the FERC involving the same parties . . .
> That is the gaming and partnership docket, which is scheduled for
> a full FERC hearing this September. In that case, the exact same
> issue is before the FERC. That Enron should have its market-
> based rate authority revoked retroactively, and that Enron should
> not be able to take advantage of market-based rate and that the
> rates were not just and proper.

Transcript of July 20, 2004, pp. 19, L. 9-25, pp. 20, L. 2-6.

At that time Enron's counsel represented that:

> We are not contending that certain issues can't and shouldn't be
> properly brought before the FERC. We are not contending that the

> currently extensive FERC docket involving Enron related matters
> should be interrupted in any way.

Transcript of July 20, 2004 Hearing, pp. 4, L. 19-25, pp. 5, L. 2-5 (emphasis added).

Enron's admission was hardly surprising given that FERC had flatly rejected Enron's contention that FERC is barred from exercising its police and regulatory powers by the automatic stay:

> We also do not believe that the automatic stay provision of the Bankruptcy Code bars us from ensuring that rates and charges under the FPA . . . are just and reasonable. . . . The Bankruptcy Code is not, as Enron would have it, a shield to protect market manipulation, unjust and unreasonable rates, and continued failure to comply with Commission orders. . . .
>
> '[T]he commencement or continuation of an action or proceeding by a governmental unit to enforce such governmental unit's police or regulatory power' is excepted from the automatic stay under 11 U.S.C. § 362(b)(4) (2000). Thus, an agency, such as the Commission, given the statutory mandate to ensure just and reasonable rates, retains its traditional control over rates throughout bankruptcy.

Enron Power Marketing, Inc., 103 FERC ¶ 61,343, at pp. 83-84 (2003), order on reh'g, 105 FERC ¶ 61,063 (2003), reh'g denied, 106 FERC ¶ 61,024 (2004), appeals pending sub num. City of Palo Alto v. FERC, D.C. Cir. Nos. 04-1036 et al. Enron's present attempt to collaterally attack FERC's order is improper. Enron can challenge FERC rulings in the U.S. Courts of Appeals, but not in the bankruptcy court. 16 U.S.C. § 825l(b).

Two days after this court heard oral argument on Enron's motion to enjoin Santa Clara, on July 22, 2004, FERC issued its Order on Initial Decision and Consolidating Dockets (the "July 22 Order"). In that Order, FERC consolidated the Gaming and Partnership Proceeding with the El Paso Electric Company Proceeding, Docket No. EL02-113-000 (collectively, the "Consolidated FERC Proceeding" or the "Consolidated Proceeding"). FERC also substantially increased the scope of those proceedings and directed the presiding FERC administrative law

judge ("ALJ") to determine the total amount of unjust profits that Enron should disgorge going back to as early as January, 1997. Enron did not try to enjoin FERC from conducting the Consolidated FERC Proceeding.

On August 4, 2004, Palo Alto, Snohomish and five other parties (collectively, the "Western Parties"[2]), several of whom are not involved in litigation with Enron, filed a request in the Consolidated FERC Proceeding seeking guidance from FERC as to the scope of the newly consolidated proceedings, the remedies FERC would consider, and the nature of the evidence it would entertain (the "Clarification Request"). Although Enron sent a letter to this Court regarding the Clarification Request (Zimmerman Declaration, hereinafter Zim. Dec., Ex. E), Enron did not contend that the Clarification Request violated the automatic stay or the Mediation Order. Instead, Enron filed a response to the Clarification Request at FERC. Then on August 23, 2004, Enron filed at FERC a Request for Rehearing of the July 22, 2004 Order, as did certain of the Western Parties, including Snohomish -- again without objection by Enron.

Nearly three months later, on October 25, 2004, Enron filed this Motion belatedly asking this Court to enjoin Palo Alto and Snohomish from seeking clarification from FERC. The Motion leaves unclear Enron's goals and motivation because its failure to join FERC and the five other Western Parties who filed the Clarification Request makes it impossible for this Court to grant effective relief.[3]

---

[2]    In addition to Palo Alto and Snohomish, the Western Parties are Nevada Power Company, Sierra Pacific Power Company (collectively, the "Nevada Companies"), the Office of the Nevada Attorney General's Bureau of Consumer Protection, the Attorney General of the State of Washington and the Public Utilities Commission of Nevada.

[3]    Enron's failure to include the Nevada Companies, who are respondents to another motion contending that a different FERC proceeding in which they are involved violates the automatic stay, raises substantial questions as to Enron's basis for filing this Motion.

## SUMMARY OF ARGUMENT

The Motion should be denied. Enron has failed to meet its burden of demonstrating that by filing a Clarification Request in an ongoing administrative proceeding initiated by FERC, Palo Alto or Snohomish violated either the automatic stay or the Mediation Order. Enron's claim that the Clarification Request violated § 362 of the Code fails for numerous reasons, including:

(1)     The motion is both a premature challenge to a proper administrative proceeding of a nature that this Court has already found to be outside of its jurisdiction and an illegal collateral attack on FERC orders that have specifically rejected the claims it raises here;

(2)     Enron waived any right to assert the stay by its own participation before FERC;

(3)     Enron is judicially estopped from claiming a violation of § 362 based on its prior representations regarding the permissible scope of FERC proceedings;

(4)     The Clarification Request is exempt from the stay pursuant to § 362(b)(4) because it was made in a proceeding where FERC is acting within its police and regulatory power; and

(5)     The Clarification Request was not an act to control property under § 362(a)(3).

There is also no merit to Enron's contention that by filing the Clarification Request, Palo Alto and Snohomish violated the Mediation Order. The General Mediation Order vests the mediator with exclusive authority to raise the issue of a party's good faith attendance and participation. Judge Gropper has not questioned either Palo Alto's or Snohomish's good faith as a result of their participation in the FERC proceedings, although Enron-related FERC proceedings have been ongoing since the initiation of mediation.[4] Enron even concedes that both

---

[4]     Enron also fails to mention that FERC has a settlement process and that Enron has pressed parties to participate in that process as well.

Parties have to date actively participated in the mediation in good faith. Since the Clarification Request was filed, Palo Alto and Snohomish have each participated in an additional mediation session with Judge Gropper, and Palo Alto has met privately, without its counsel, with Enron.[5]

In essence, Enron argues that the Parties violated the Mediation Order by doing the very same thing Enron has been doing – participating in a FERC proceeding to protect their rights. The Mediation Order does not entitle Enron to actively pursue its interests before FERC while preventing Snohomish and Palo Alto from participating in proceedings instituted by FERC to address issues within FERC's exclusive jurisdiction that affect their vital interests.

Enron is misusing the mediation process. The purpose of mediation is to attempt to resolve the dispute before this Court without the need for a trial, by establishing a neutral forum where the parties can explore the relative merits of their position. The fact that ongoing FERC proceedings may affect the merits of the trading cases is a proper subject for discussion in mediation. But the existence of mediation is not a lawful reason to either enjoin those proceedings or enjoin the Parties from participating in those proceedings. Mediation is a neutral settlement tool, not a lever for Enron to use to enhance its negotiating power by derailing ongoing FERC proceedings or preventing the Parties' proper participation in those proceedings.

Finally, Enron's request for a § 105 injunction (supported only by a footnote in its brief) is also without merit. Section 105 does not create any remedy beyond the substantive provisions of the Code. Because Enron has not established any substantive right to enforce the automatic stay, its request for injunctive relief is baseless. Moreover, it would be improper to issue a § 105

---

[5]    Enron's statement in footnote 1 of its brief that either Party has recently indicated that it does not desire to have certain issues addressed in mediation is both false and a violation of the confidentiality of the mediation.

injunction since FERC, which has exclusive jurisdiction of the issues in the Consolidated FERC Proceeding, must decide those issues before the Adversary Proceedings can be concluded.

## FACTS

The relevant facts are set forth in separate statements of facts being filed simultaneously herewith by Palo Alto and Snohomish and in the declarations of Grant Kolling, Jeffrey Schwarz, Eric Christensen and Philippe Zimmerman.

## ARGUMENT

### I.    THE MOTION MUST BE DENIED BECAUSE IT WOULD IMPROPERLY INTERFERE WITH AN ONGOING ADMINISTRATIVE PROCEEDING

#### A.    FERC Has Exclusive Jurisdiction Over Regulatory Issues Raised Under the Federal Power Act

In enacting the Federal Power Act ("FPA"), Congress declared that "the business of transmitting and selling electric energy for ultimate distribution to the public is affected with a public interest" and that federal regulation of "the transmission of electric energy in interstate commerce and the sale of such energy at wholesale in interstate commerce is necessary in the public interest." 16 U.S.C. § 824(a). Accordingly, Congress granted exclusive jurisdiction to FERC to ensure the justness and reasonableness of all rates, terms and conditions set forth in contracts affecting wholesale electric power transactions are just and reasonable. Specifically, Section 205 of the FPA requires that "[a]ll rates and charges" imposed by a jurisdictional entity such as Enron "shall be just and reasonable, and any such rate or charge that is not just and reasonable is hereby declared to be unlawful." 16 U.S.C. § 824d(a) (emphasis added). This requirement extends to "all contracts which in any manner affect or relate to such rates, charges, classifications, and services," which must be filed with and approved by FERC. 16 U.S.C. § 824d(c), (e) (emphasis added). Section 206 of the FPA similarly requires that whenever FERC finds that any "contract affecting" a jurisdictional "rate, charge, or classification is unjust,

<u>unreasonable, unduly discriminatory or preferential,</u> [FERC] <u>shall</u> determine the just and reasonable rate, charge, ... or <u>contract</u> to be thereafter observed and in force, and <u>shall</u> fix the same by order."[6]  16 U.S.C. § 824e (emphasis added).

FERC has exclusive jurisdiction over the issues in the Consolidated FERC Proceeding, including the scope thereof as raised in the Clarification Request. <u>NRG Power Marketing, Inc., v. Blumenthal,</u> 2003 WL 21507685, at 3 (S.D.N.Y. 2003).  Consistent with the <u>NRG</u> decision, this Court has acknowledged that FERC is the *only* tribunal that can resolve the issues of the type raised in the Consolidated FERC Proceeding.  (See Transcript of Proceedings, In Re: Enron Power Marketing, Inc. v. Nevada Power Co. & Sierra Pacific Co. Motion by Defendants for Reconsideration or Clarification and for Continuance, p. 15 L 6-9, p. 18 L18-22 (Zim. Dec., Ex. A.)  Thus, this Court must allow FERC to proceed even if that means lifting the stay and staying the Adversary Proceedings.[7]

---

[6] The Clarification Request as discussed below does not raise any issues of state contract law.  But even if it somehow did, in this context, FERC's concurrent jurisdiction over those issues would require that this Court defer to the FERC pursuant to the doctrine of primary jurisdiction.  <u>See</u> Nat'l Communications Ass'n, Inc. v. AT&T, 46 F.3d 220 (2nd Cir. 1995); <u>Reiter v. Cooper,</u> 507 U.S. 258 (1992).  Deference to the FERC would be appropriate because there is a pending proceeding before FERC,  the issues are within the FERC's field of special expertise and there is a need for uniformity of regulation.

[7]    The decision of a court as to whether to allow an agency to act under the rule of primary jurisdiction is not discretionary and is subject to <u>de novo</u> appellate review.  <u>National Communications Ass'n v. A.T.&T.,</u> 46 F.3d 220, 222 (2d Cir. 1995)  When a defense is within an agency's primary jurisdiction (and meets the criteria for agency determination), the court cannot decide the defense itself nor can it disregard or dismiss the defense and proceed with the action.  <u>U.S. v. Western Pacific R. Co.,</u> 352 U.S. 59, 64 (1956); <u>Far East Conference v. U.S.,</u> 342 U.S. 570 (1952); <u>Williams Pipe Line Co., v. Empire Gas Corp.,</u> 76 F.3rd 1491 (10th Cir. 1996) (In action to enforce pipeline contract, defense that contract provision was not "just and reasonable" must be referred to the FERC); <u>N.Y. State Elec. & Gas Corp. v. N.Y. Indep. Sys. Operator,</u> 168 F. Supp. 2d 23 (N.D.N.Y. 2001) (In action by N.Y.S.E.G. for breach of contract, where N.Y.I.S.O. raised defense of "filed tariff", court referred issues of tariff interpretation to the FERC); <u>AT&T v. Peoples Network, Inc.,</u> 1993 WL 248165 (D.N.J. Mar. 31, 1993) (In action to collect tariff rate, defense that services provided did not comply with tariff must be referred to FCC); <u>Niagara Mohawk Power Corp. v. Megan Racine Assocs., Inc. (In re Megan-Racine Assocs., Inc.),</u> 180 B.R. 375 (Bankr. N.D.N.Y. 1995) (Where party sued debtor for declaration that contract was void because facility failed to meet FPA standards for "QF" and debtor moved for judgment on ground that the *(footnote continued on next page)*

The Consolidated FERC Proceeding, including the Clarification Request, concerns only the proper remedies that may be imposed by the FERC under the FPA for Enron's serious violations of the FPA. The propriety of those proceedings is unquestionable, and Enron does not challenge them directly. In fact, Enron's Motion does not even mention the FPA. Instead, Enron makes the bizarre and unsupported assertion that the Clarification Request is an attempt by the Parties to strip this Court of its jurisdiction and address at FERC the same contract issues presented in the Adversary Proceedings. (Enron Br. 9-10; hereinafter "Enron Br."). This assertion is contrary to the law, the facts, the prior rulings of this Court, and Enron's prior representations to this Court as to the interplay of FERC's jurisdiction and the jurisdiction of this Court. The Parties have made no effort to divest this Court of jurisdiction over any issue within its jurisdiction. To the contrary, Snohomish and Palo Alto have done nothing more than participate in administrative proceedings at FERC on issues under the FPA, which are within FERC's exclusive jurisdiction and which could never be decided by this Court. In contrast, by its Motion, Enron is seeking to have this Court interfere with FERC's legitimate exercise of its exclusive jurisdiction.

The issues raised in the Consolidated Proceeding have nothing to do with state law contract issues but go to the very heart of FERC's statutory mission under the FPA to ensure that all rates and charges for wholesale electric energy are "just and reasonable," including rates and charges contained in FERC-jurisdictional contracts. Similarly, the Clarification Request concerns only the question of the scope of remedies available under the FPA for the violations the FERC is investigating in the Consolidated Proceeding and has nothing to do with any issues

---

FERC had never denied facility "QF" status, bankruptcy court stayed proceedings and referred matter to FERC to decide "QF" status).

of contract law before this Court. Enron's assertion to the contrary is simply false (Enron Br. 1-2) and cannot be substantiated by any out of context quotation from the Clarification Request. The truth is that the Motion can only be understood as an effort by Enron to achieve indirectly what it is forbidden to do directly, namely interfere with an ongoing FERC regulatory proceeding. This is evident from the fact that Enron has not named the FERC or the other signatories to the Clarification Request, all indispensible parties, in its Motion and also from the fact that Enron seeks relief prematurely before the administrative proceedings have reached a conclusion.

**B.     Enron has Failed to Include Necessary Parties**

The Motion is procedurally defective. Enron has neither moved to enjoin FERC from acting on the Clarification Request nor has Enron named the other Western Parties who joined in the Clarification Request. Yet each of those parties is a necessary party, pursuant to Fed. R. Civ. P. 19, because complete relief cannot be granted in their absence. Russ v. Simms, 1995 U.S. Dist. LEXIS 17686, *9 (S.D.N.Y. Nov. 29, 1995). Because Enron did not name the other parties to the Clarification Request in this Motion, the Motion cannot result in an order prohibiting the other parties to the Clarification Request from continuing forward. Because Enron chose not to join FERC in the Motion, the Motion cannot result in a prohibition of FERC's consideration of the Clarification Request. Thus, Enron cannot obtain any effective relief without naming these necessary parties.

It appears that the only result if the Motion were granted would be to require Snohomish and Palo Alto to remove their names from the Clarification Request. No legitimate purpose would be served by such relief. If the FERC were ultimately to grant the relief the Western Parties advocate, would Enron later contend that the Parties could not present evidence at the FERC or could not benefit from a FERC order declaring Enron contracts unenforceable? The

Motion appears to be the first step in an effort to muzzle the Parties before the FERC by subjecting each pleading they file to potential oversight and review by this Court and possible sanction. Enron's implicit suggestion that this Court pass judgment on the propriety of each pleading to be filed in an existing FERC docket and, possibly, exercise control over the effect of a FERC ruling on the Parties is an unprecedented attempt by Enron to interfere with a police and regulatory proceeding and chill the due process rights of Snohomish and Palo Alto. Enron, not surprisingly, has cited no authority for the proposition that this Court, on a pleading by pleading basis, may supervise a party's participation in an ongoing administrative proceeding dealing with issues outside of this Court's jurisdiction.

C.    The Failure to Exhaust Administrative Remedies is Fatal to the Motion

The fact that Enron improperly seeks to interfere with an ongoing administrative proceeding, before the FERC has ruled, is fatal to the Motion. See Myers v. Bethlehem Shipbuilding Corp., 303 U.S. 41 (1938). ("[N]o one is entitled to judicial relief for a supposed or threatened injury, until the prescribed administrative remedy has been exhausted.") See also Niagara Mohawk Power Corp. v. Megan-Racine Associates, Inc. (In re Megan-Racine Associates, Inc.), 180 B.R. 375 (Bankr. N.D.N.Y. 1995). See also Board of Governors of Federal Reserve v. MCorp, 502 U.S. 32 (1991) ("possibility that administrative proceedings may affect Bankruptcy Court control over property of the estate does not justify imposition of automatic stay").

The purpose behind this doctrine is to allow "an administrative agency to perform functions within its special competence – to make a factual record, to apply its expertise *and to correct its own errors* so as to moot judicial controversy." Parisi v. Davidson, 405 U.S. 34, 37 (1972) (emphasis added). Thus, "[w]here relief is available from an administrative agency, the

plaintiff is ordinarily required to pursue that avenue of redress before proceeding to the courts . . . ." Reiter v. Cooper, 507 U.S. 258, 269 (1993).

"The requirement of administrative exhaustion can be either statutorily or judicially imposed." Marrero Pichardo v. Ashcroft, 374 F.3d 46, 52 (2d Cir. 2004). "Statutory exhaustion requirements . . . are 'mandatory, and courts are not free to dispense with them.'" Foster v. INS, 2004 WL 1663475, *2 (2d Cir. July 16, 2004) (quoting United States v. Gonzalez-Roque, 301 F.3d 39, 47 (2d Cir. 2002)).  Accordingly, "[i]f a statute does indeed route the initial adjudication of a claim through an administrative agency, a district court is without jurisdiction to hear the claim until administrative review is complete." McHugh v. Rubin, 220 F.3d 53, 59 (2d Cir. 2000).

The FPA contains mandatory and jurisdictional finality and exhaustion requirements.  A party aggrieved by a final decision of FERC – which has not even occurred yet in this case – is entitled to seek relief only in the form and manner set forth in the FPA.  The FPA, in turn, contains a mandatory requirement that the aggrieved party must seek a rehearing before FERC as an initial matter. 16 U.S.C. § 825*l*(a).[8]  Following rehearing, a party may then seek review before a United States Court of Appeals. Id. at § 825*l*(b).  This procedure is "the specific, complete and exclusive mode for judicial review of FERC's orders." City of Tacoma v. Taxpayers of Tacoma, 357 U.S. 320, 336 (1958). "Failure to comply with 16 U.S.C. § 825*l*(b) creates a jurisdictional bar to judicial review of complaints regarding the [challenged] procedure." Rivers Elec. Co. v. 4.6 Acres of Land, 731 F. Supp. 83, 86-87 (N.D.N.Y. 1990).  If Enron believes that FERC has violated the automatic stay by moving forward against Enron in the Consolidated Proceedings,

---

[8]    The rationale for this requirement is both one of exhaustion of administrative remedies and the deference to the specialized expertise of the agency. Fed. Power Comm'n v. Colorado Interstate Gas Co., 348 U.S. 492 (1955).

the proper method for Enron to seek relief was to file for rehearing at FERC and then, assuming

denial of such an application, to seek review of FERC's ruling in the U.S. Court of Appeals.

Enron, however, has failed to raise the automatic stay issue in its petitions for rehearing of FERC

orders in the Consolidated Proceedings. It is improper for Enron to ask this Court to cure its

failure to follow the statutorily-prescribed avenue for review of FERC's orders.

## II.    THE MOTION SHOULD BE DENIED ON THE GROUNDS OF WAIVER AND JUDICIAL ESTOPPEL

### A.    Enron is Judicially Estopped from Arguing that the Consolidated FERC Proceeding or the Parties' Clarification Request Violates the Stay

Enron is judicially estopped from arguing that the filing of a pleading in the FERC

Proceeding violates the automatic stay. The doctrine of "judicial estoppel prevents a party in a

legal proceeding from taking a position contrary to a position the party has [successfully] taken

in an earlier proceeding." Simon v. Safelite Glass Corp., 128 F.3d 68, 71 (2d Cir. 1997).

Judicial estoppel is a doctrine that seeks to "protect judicial integrity by avoiding the risk of

inconsistent results in two proceedings." Bates v. Long Island R.R. Co., 997 F.2d 1028, 1038

(2d Cir. 1993). It is a doctrine "designed to prevent a party who plays fast and loose with the

courts from gaining unfair advantage through the deliberate adoption of inconsistent positions in

successive suits." Wight v. Bankamerica Corp., 219 F.3d 79, 89 (2d Cir. 2000). As the Supreme

Court has stated: "'[W]here a party assumes a certain position in a legal proceeding, and

succeeds in maintaining that position, he may not thereafter, simply because his interests have

changed, assume a contrary position. . . .'" New Hampshire v. Maine, 532 U.S. 742, 749 (2001)

(citation omitted). Thus, "'absent any good explanation, a party should not be allowed to gain an

advantage by litigation on one theory, and then seek an inconsistent advantage by pursuing an

incompatible theory.'" Id. (quoting 18B Wright & Miller, Federal Practice & Procedure § 4477

(1981)).

434318v5  008922.0102                    13

The elements of the doctrine of judicial estoppel are "(1) the party against whom the estoppel is asserted took an inconsistent position in a prior proceeding and (2) that position was adopted by the first tribunal in some manner." Mitchell v. Washingtonville Cent. School Dist., 190 F.3d 1, 6 (2d Cir. 1999). The doctrine applies both to arguments and to requests for relief. See Yniguez v. Arizona, 939 F.2d 727, 738 (9th Cir. 1991) ("From the fact that we have estopped litigants from asserting mere arguments that are inconsistent with arguments on which they prevailed in the district court, it follows *a fortiori* that we will not allow a party to seek an outcome directly contrary to the result he sought and obtained in the district court.").

On this Motion, Enron asserts that the police and regulatory exception is of "no applicability to Snohomish's and Palo Alto's Request for Clarification and the Consolidated FERC Proceeding whatsoever." (Enron Br. 14.) In Enron Power Marketing, Inc. v. People of the State of California, ex rel. Bill Lockyer (In re Enron Corp.), Adv. No. 04-03386, (the "California Litigation"), Enron successfully advocated a position directly to the contrary. In the California Litigation, the Attorney General of the State of California, Bill Lockyer ("Lockyer"), filed a complaint in California state court seeking, inter alia, an injunction and penalties for violations of state consumer protection laws. The Attorney General was also seeking monetary relief for California by participating in various FERC proceedings, including the Gaming and Partnership Proceeding and the Refund Proceedings. Enron repeatedly argued that FERC was the appropriate forum for the relief Lockyer sought, where California's claims were already pending. In making this argument, Enron relied upon Lockyer's FERC participation for the purpose of obtaining relief from Enron in arguing that Lockyer's state court action violated the automatic stay. (See Appendix 1 attached hereto setting forth numerous examples of such statements by Enron.)

Enron's position in the <u>California Litigation</u> was adopted by this Court in its decision in

<u>Enron Power Mkt'g, Inc. v. Cal. (In re Enron Corp.)</u>, 314 B.R. 524 (Bankr. S.D.N.Y. 2004). In

enjoining Lockyer from proceeding with the state court action, this Court stated:

> The Attorney General is a very active party in all three of the
> ongoing FERC proceedings noted above: the Partnership
> proceeding, Gaming Proceeding, and the Refund Proceeding. . . .
> The California Litigation serves no additional deterrent value to
> that which is served by the FERC proceedings. . . .

<u>Id.</u> at 529, 539. The court stated further:

> [W]ithout reaching the merits of whether the California Litigation
> is preempted by the ongoing FERC proceedings in this case, as
> such determination would be prohibited by <i>MCorp.</i>, 502 U.S. 32,
> 112 S. Ct. 459, the Court finds that the FERC proceeding also
> addresses the public policy concerns raised by the Attorney
> General and the California Litigation, and is therefore duplicative.
> FERC has launched a comprehensive investigation of Enron's
> trading activities in the California electricity markets, including the
> commencement of enforcement proceedings against Enron (and
> other market participants) for monetary and other remedies. On
> June 25, 2003, FERC revoked the licenses of EPMI and EES to
> participate in the California energy market and also issued
> companion orders Gaming and Partnership Orders, finding that
> EPMI and EES could also be found to have engaged in "gaming
> and/or anomalous market behavior" in violation of the CalISO and
> CalPX tariffs during the period from January 1, 2000 through June
> 20, 2001. FERC ordered EPMI, EES and other entities to show
> cause in a trial-type evidentiary proceeding why they should not be
> found to have engaged in prohibited gaming practices, and
> authorized the Administrative Law Judge to recommend monetary
> remedies of disgorgement of unjust profits and any other
> appropriate non-monetary remedies. . . . <u>The Attorney General has
> been an active participant in these proceedings.</u> The proceedings
> and investigations before FERC serve as deterrence to potential
> wrongdoers, including to those who may enter the energy markets
> in California. The Court finds that the California Litigation would
> not serve any additional deterrence beyond that which is served by
> the FERC proceedings.

<u>Id.</u> at 539-40 (emphasis added). There was no suggestion that Lockyer's seeking relief in the

Consolidated FERC Proceeding was improper or a stay violation. This Court accepted Enron's

argument that presumed Lockyer's participation was appropriate and based its decision, in part, on Lockyer's participation in the FERC proceedings.

Enron has not even attempted to explain how Lockyer's participation could be appropriate while the Parties' participation allegedly violated the automatic stay -- no principled basis for distinction exists. Enron is therefore judicially estopped from arguing that the Consolidated FERC Proceeding violates the automatic stay. [9] Enron is similarly judicially estopped from arguing that the Parties violated the stay by seeking clarification of the scope of that proceeding. The Parties had both intervened in the Gaming and Partnership Proceeding some time ago, without objection by Enron, and (like Lockyer) have been actively participating (including filing numerous pleadings) in those proceedings. Enron cannot point to Lockyer's active participation in FERC proceedings in the California Litigation as demonstrating that such FERC proceedings are the appropriate place to address issues related to the FPA but argue here that the Parties' participation in those very proceedings, through the filing of the Clarification Request, violates the automatic stay.

**B.    Enron Waived the Benefits of the Automatic Stay by Participating in the Consolidated FERC Proceeding**

The Motion, as it relates to the alleged violations of the automatic stay under § 362(a)(3), must also be denied because Enron has waived its right to enforce the stay. It has done so in two separate ways. It failed to assert the stay before FERC, and therefore cannot collaterally attack

---

[9]    The only real difference is that a FERC ruling that benefits the Parties will, in fact, be enforceable, while a FERC ruling in favor of refunds may be a dead letter. Enron has consistently taken the position that any refunds or disgorgement ordered by FERC would be subordinated claims and not entitled to any distribution. The fact that FERC could provide meaningful relief to the Parties is not grounds to distinguish the cases.

FERC's ruling that it did not apply. It has also actively participated in the Consolidated

Proceeding thereby waiving any right to involve the stay.

This Court has expressly recognized that a debtor may waive the stay by participating in

post-petition litigation. In In re Bona, 110 B.R. 1012 (Bankr. S.D.N.Y. 1990), this Court stated:

> If the debtor chooses to litigate post-filing in a non-bankruptcy forum . . .
> then the opposing party is free to participate in the litigation to the full
> extent necessary to protect its rights. See In re Cobb, 88 B.R. 119, 121
> (Bankr. W.D. Tex. 1988) (When debtor-in-possession appears and defends
> a suit on any basis other than application of the automatic stay, the debtor-
> in-possession waives the automatic stay. "To hold otherwise would allow
> a debtor-in-possession to have [a] trump card that he could play if he did
> not like the outcome of the action, but allowing him [to] take a favorable
> judgment. Such a one-sided result could hardly have been intended by
> Congress * * * ").

Id. at 1023; see also In re Hoskins, 266 B.R. 872, 879 (Bankr. W.D. Mo. 2001) (citation omitted)

("Although a debtor usually cannot waive the protection of the automatic stay, . . . when a debtor

appears and defends a suit on any basis other than application of the automatic stay, the debtor is

deemed to have waived the automatic stay as to that particular action."); Townview Nursing

Home v. New York (In re Townview Nursing Home), 28 B.R. 431, 447 (Bankr. S.D.N.Y. 1983).

Enron is vigorously participating in the Consolidated FERC Proceeding and has literally

filed dozens of pleadings, including an answer to the Clarification Request and a Request for

Rehearing of the July 22 Order. Enron even took the deposition of John White, an executive of

Snohomish who signed the underlying contract at issue in the Adversary Proceeding involving

Snohomish. To the extent any part of the Consolidated FERC Proceeding could have been

stayed, Enron has waived the automatic stay by virtue of its delay and extensive participation in

the Consolidated FERC Proceeding.

Enron's motion is not only premature, it is also a barred collateral attack on a prior FERC

ruling. Enron has previously raised the same automatic stay issue it now propounds to this

Court. FERC flatly rejected that claim, concluding that Section 362(b)(4) allows it to go forward despite Enron's bankruptcy filing and that Enron's claim that the automatic stay bars FERC action is an improper attempt to use the Bankruptcy Code as "a shield to protect market manipulation, unjust and unreasonable rates, and continued failure to comply with Commission orders." Enron Power Marketing, Inc., 103 FERC ¶ 61,343, at pp. 83-84 (2003). Enron, here, attempts to reassert the same rejected argument. The Motion should be rejected as an illegal collateral attack on FERC's orders in a previous proceeding.

III.    **ENRON HAS NOT SOUGHT AND IS NOT ENTITLED TO RELIEF UNDER SECTION 362 OF THE CODE**

A.    **The Consolidated FERC Proceeding Falls Squarely Within the Police and Regulatory Exception of Section 362(b)(4) of the Code**

It is clearly premature for any court to review or intervene in the Consolidated Proceeding. But even if such intervention were not premature, it would be clear that the Consolidated Proceeding is a valid exercise of the police power. Pursuant to § 362(b)(4) of the Code, an administrative agency is exempt from the automatic stay when it "acts to enforce police or regulatory powers." The Consolidated Proceeding, and the Clarification Request, fall squarely within this exception. That the relief FERC grants may affect the estate, or benefit Palo Alto and Snohomish, does not change this fact.

Citing this Court's decision in the California Litigation, Enron acknowledges that in determining whether "an action involves a police or regulatory power issue" the court must look at "'the purpose of the law that the governmental unit is attempting to enforce.'" (Enron Br. 15.) (emphasis added); See Safety-Kleen, Inc. v. Wyche (In re Pinewood), 274 F.3d 846, 865 (4th Cir. 2001) (the court uses an objective inquiry into "the purpose of the law that the state seeks to enforce rather than the state's intent in enforcing the law in a particular case."); United States v. Commonwealth Cos., Inc. (In re Commonwealth Cos., Inc.), 913 F.2d 518, 523 n.6 (8th Cir.

1990) ("the appropriate analysis under § 362(b)(4) is [an objective] one which focuses on the purposes underlying the law that the government is attempting to enforce" rather than an examining the government's motivation).  Where the purpose of the law is to promote "public safety and welfare" or to effectuate public policy, that is the end of the analysis and §362(b)(4) applies.  Safety-Kleen, 274 F.3d at 865; In re Universal Life Church, Inc. v. United States (In re Universal Life Church), 128 F.3d 1294, 1297 (9th Cir. 1997); In re Enron Corp., 314 B.R. at 535.

Here, the law FERC is enforcing in the Consolidated FERC Proceeding is the FPA.[10] The purpose of the FPA, as noted by the United States Supreme Court, "is the protection of the public interest, as distinguished from the private interests of the utilities. . . ." Federal Power Comm'n v. Sierra Pac. Power Co., 350 U.S. 348, 355 (1956).  This fact has been universally recognized.  See, e.g., Cities of Anaheim, Riverside, Banning, Colton & Azusa, Cal. v. FERC, 723 F.2d 656, 663 (9th Cir. 1984 (Reinhardt, J., concurring)) ("Congress' primary purpose in enacting the Federal Power Act was protection of consumers from excessive rates and inadequate service."); Senate Report No. 100-491 (Energy & Natural Resources Committee ("The Committee intends the Commission to exercise its refund authority under section 206 in a manner that furthers the long-term objectives of achieving the lowest cost for consumers consistent with the maintenance of safe and reliable service.").  It is indisputable that the purpose of the FPA is wholly public in nature.  That explains why the Motion is devoid of any mention of

---

[10]   The Parties also dispute Enron's contentions that they are not governmental entities whose regulatory actions are exempt from the Automatic Stay pursuant to Section 362(b)(4) of the Code and that the filing of the Clarification Request was not exempted from the automatic stay on this basis as well.

the FPA, let alone any discussion of its purpose. Thus, it is clear that the Consolidated FERC

Proceeding is exempt from the stay under the "objective purpose" test.[11]

Enron, however, incorrectly applies the so-called "dual purpose" test without any

explanation of why it is relevant. The "dual purpose" test is only applicable if the statute in

question has a separate pecuniary purpose in addition to the public interest purpose. Safety-

Kleen, 274 F.3d at 865. Thus, Enron improperly leaps to the irrelevant "dual purpose" test only

by failing to either identify or analyze the law in question – the FPA.

But even if one assumes that the dual purpose test applied to an action under the FPA, the

result would not change. The next step would be to examine the agency action sought to be

enjoined, i.e., the Consolidated Proceeding, in order to decide whether it seeks to vindicate

public or private rights. In re Enron Corp., 314 B.R. at 535.

The application of that analysis here makes it clear that the Consolidated  Proceeding

would be exempt from the automatic stay under §362(b)(4) of the Code.  In the Consolidated

Proceeding, FERC is examining and considering remedies for Enron's gaming of energy markets

in violation of the FPA and filed tariffs. The Consolidated Proceeding are not focused on any

single contract, and FERC is not pursuing its own pecuniary interest.  The FERC is also not

adjudicating private rights.  Rather, FERC is examining Enron's and other's misconduct as it

relates to large segments of the nation's power markets and considering appropriate remedies to

ensure (and restore) confidence in such markets.  The FERC is acting in its Congressionally-

---

[11]    Consideration of the applicability of § 362(b)(4) further confirms that necessary parties to the Motion have not been included by Enron.  The FERC should obviously have an opportunity to be heard when according to Enron one of the factors that is relevant is the purpose of the action.  Alternatively, if Enron contends that the relevant purpose is that of the parties in filing the Clarification Request, it merely highlights the misleading nature of Enron's repeated discussion in support of the Motion of issues related to the entire Consolidated FERC Proceeding.

mandated role as the protector of the nation's power markets (recognized by this Court in the California Litigation), which is of critical importance to the maintenance of a reliable and stable power market. See, e.g., PPL Electric Utilities Corp., 101 FERC P 61, 370, 2002 WL 31975213, at *3 (F.E.R.C. Dec. 26, 2002); Arkansas Louisiana Gas Co. v. Hall, 7 FERC P 61, 175, 79 WL 167678, at *2 (F.E.R.C. May 11, 1979); Southern California Edison Co., 85 FERC P 61, 389, 1998 WL 881293, at *2 (F.E.R.C. Dec. 18, 1998); Portland General Electric Co., 72 F.E.R.C. P 61, 009, 1995 WL 394547, at *3 (F.E.R.C. July 5, 1995).

Even if the dual purpose test were applied to the Clarification Request (which would be improper), it would produce the same result. The Clarification Request seeks no affirmative relief against Enron and only asks FERC to clarify its own intentions in the Consolidated FERC Proceeding, so that the Parties will know how to proceed. More significantly, it is FERC that will ultimately decide the appropriate relief in the Consolidated FERC Proceeding based on its regulatory function. Nevertheless, as discussed more extensively in Point III.B below, there is simply no authority for applying the test to a single pleading filed in a proper police and regulatory action. If Enron's argument were adopted, it would impair intervenors' ability to effectively participate in FERC proceedings and undermine FERC's jurisdiction by impeding participation in its proceedings. Remarkably, of the hundreds of pleadings filed in the FERC proceedings, Enron has objected to a procedural pleading that seeks no affirmative relief.

Thus, even under the dual purpose test articulated by this Court in its decision in the California Litigation,[12] which is not applicable to an action under the FPA, it is clear that the

---

[12] Enron incorrectly argues that this Court's decision in the California Litigation supports the Motion. However, application of the analysis used by the Court there actually compels denial of the Motion, whether the objective purpose test or the dual purpose test is used, since the Consolidated FERC Proceeding is not enforcing any pecuniary interest or private right. The Court, in fact, reached the conclusion it did based on Lockyer's active participation in the very FERC proceedings involved here.

Consolidated FERC Proceeding is exempt from the stay pursuant to §362(b)(4) of the Code. Enron attempts to evade this fatal result by the trick of examining the purpose of the wrong proceeding. Rather than testing the Consolidated Proceeding, Enron nonsensically looks at the purpose of its own Adversary Proceeding. (Enron Br. 17.) It is certainly true that each of the Adversary Proceedings presents "an ordinary commercial dispute, a simple action for breach of energy contract," (Br. 17). But that fact is immaterial, because the Consolidated FERC Proceeding (the relevant proceeding) addresses only issues related to protecting the public interest. [13]

Enron attempts to bolster its assertion that the Clarification Request and Consolidated FERC Proceeding are not exempt from the stay as a police and regulatory action by asserting that Palo Alto and Snohomish are asking FERC to consider the same contract issues that are the subject of the Adversary Proceedings. (Enron Br. 1-2, 19-20.) Enron cribs this argument from its motion to enjoin Santa Clara's filing of a complaint with FERC, but it fails to notice that this assertion has no application to the present case and is simply false. Even if that assertion were true, it would not warrant an injunction for all of the reasons set forth by the City of Santa Clara in its opposition to Enron's injunction motion against it. But there is simply no truth to Enron's assertion that the Consolidated FERC Proceeding raises state law contract issues.

The FERC is not addressing any of the contract issues involved in the adversary proceedings. Palo Alto and Snohomish have not asked FERC to do so in the Clarification

---

[13] Enron's reliance on In re Massenzio, 121 B.R. 688 (N.D.N.Y. 1990) and Berkelhammer v. Novella (In re Berkelhammer), 279 B.R. 660 (S.D.N.Y. 2002) is misplaced. Here, of course, there can be no claim made that FERC is acting for its own pecuniary benefit in the Consolidated FERC Proceeding or that it is acting without any regulatory purpose primarily to protect the Parties' rights.

Request or any other pleading.  If FERC ultimately grants relief affecting Enron's effort to

collect unjust profits in connection with certain contracts entered into by Enron between January

16, 1997 and June 25, 2003 as a result of market-wide misconduct by Enron, this relief will be

based on its unquestioned power to regulate power markets pursuant to the FPA, not on state law

contract issues.  However, Enron has no basis to complain if FERC in exercising its police and

regulatory power limits Enron's ability to enforce unlawful contracts or collect termination

payments deemed by FERC to be not just and reasonable under the FPA.[14]  Enron Power

Marketing, Inc., 103 FERC ¶ 61,343, at pp. 83-84 (F.E.R.C. 2003).  The FERC is entitled to

exercise its police and regulatory power without interference from the bankruptcy court even if

this affects Enron's estate.  In re Federal Communications Commission 217 F.3rd 125 (2d Cir.

2000); NRG Power Marketing, Inc. v. Blumenthal (In re NRG Energy Inc.) 2003 WL 21507685

(S.D.N.Y. June 30, 2003).

    Notwithstanding Enron's claims to the contrary (Enron Br.19), the fact that FERC's

exercise of its jurisdiction might affect property of the estate is irrelevant.  The fallacy of this

argument is demonstrated by the numerous cases in which administrative proceedings were held

not to violate the automatic stay, despite the fact that the proceeding would seriously affect a

bankruptcy estate.  Board of Governors of Federal Reserve v. MCorp, 502 U.S. 32, 41 (1991).  In

MCorp, the Supreme Court refused to enjoin the Board of Governors of the Federal Reserve

System from prosecuting administrative proceedings related to the debtor's violations of banking

regulations.  The court rejected the debtor's argument that the "ultimate objective of the . . .

[proceedings] is to exercise control of corporate assets," noting that the possibility existed

---

[14]    The FERC possesses not only an absolute right, but also the duty, to determine whether agreements
subject to its jurisdiction violate the FPA.

> that the Board proceedings, like many other enforcement actions,
> may conclude with the entry of an order that will affect the
> Bankruptcy Court's control over the property of the estate, but that
> *possibility* cannot be sufficient to justify the operation of the stay
> against the enforcement proceeding that is expressly exempted by
> § 362(b)(4).

Id. at 41.

FERC's revocation of Enron's market-based rate authority and proposed disgorgement of

profits did not violate the stay despite the obvious effect on estate assets.  See Enron Power

Marketing, Inc. & Enron Energy Services, Inc., 103 FERC ¶ 61, 343, 2003 WL 21480248

(F.E.R.C. June 25, 2003).  Despite its threats to do so, Enron did not even challenge such action

in this Court as a stay violation.[15]

Here, the potential magnitude of the effect on the estate derives from the magnitude of

Enron's violations of law.  There is no bankruptcy rule that permits the police powers to be

exercised only for minor infractions or only when they will have de minimis effect on the debtor-

wrongdoer.

---

[15] See Massachusetts v. First Alliance Mortgage Co. (In re First Alliance Mortgage Co.), 263 B.R. 99, 109-111 (9th Cir. 2001), where the Ninth Circuit found that a Massachusetts regulatory agency that sought injunctive relief, civil penalties, attorney's fees and restitution for citizens in an administrative action against a debtor for violations of consumer protection laws was not subject to the automatic stay. Noting that "the bankruptcy court must not become a haven for wrongdoers," the court found that civil penalties for fraudulent conduct fall within the § 362(b)(4) exemption and a judgment for restitution that the agency might award to 299 citizens constituted a proper consumer protection remedy fitting the agency's public purpose.  See also S.E.C. v. Thrasher, 2002 WL 523279, at *2 (S.D.N.Y. Apr. 8, 2002) (finding that where the S.E.C. sought to enjoin a debtor from future securities law violations and sought disgorgement, civil penalties and interest, these impositions of financial liability were appropriate uses of the agency's police and regulatory powers because they had a right to "curb such behavior by making the behavior more expensive"); S.E.C. v. Towers Fin. Corp., 205 B.R. 27 (S.D.N.Y. 1997) (holding that the S.E.C.'s action against a debtor for disgorgement of ill-gotten profits and injunction for engaging in a "Ponzi scheme" was exempted from the automatic stay because the SEC's police powers would be undermined if the agency had to pursue its public policy goals without recourse to sanctions); City of New York v. Exxon Corp., 932 F.2d 1020, 1024 (2d Cir. 1991) (holding "that government actions under CERCLA to recover costs expended in response to completed environmental violations are not stayed by the violator's filing for bankruptcy").

The fact that the exercise of FERC's jurisdiction might result in an indirect benefit to a third-party does not, contrary to Enron's position, subject the Consolidated FERC Proceeding to the automatic stay.  See, e.g., Nat'l Labor Relation Bd. v. 15th Ave. Iron Works, Inc., 964 F.2d 1336 (2d Cir. 1992) (permitting the National Labor Relations Board to enter a money judgment for payment to various union funds pursuant to its investigation of unfair labor practices because such proceedings are exempt from the automatic stay); Berg v. Good Samaritan Hosp.(In re Berg), 230 F.3d 1165 (9th Cir. 2000) (finding an award of sanctions against a debtor for attorney misconduct was exempt from the stay under § 363(b)(4) and stating that "although private parties may benefit financially from sanctions, the deterrent effect of monetary penalties can be essential for the government to protect its regulatory interests"); Massachusetts v. First Alliance Mortgage Co. (In re First Alliance Mortgage Co.), 263 B.R. 99, 109-111 (9th Cir. BAP 2001) (permitting an agency action that would ultimately result in restitution to 299 parties); In re Mohawk Greenfield Motel Corp., 239 B.R. 1 (Bankr. D. Mass. 1999) (finding that actions by the Massachusetts Commission Against Discrimination resulting in judgments on monetary awards benefiting victims of discrimination were not barred by the automatic stay because such enforcement action lay with the agency's police and regulatory power and the purpose of the monetary awards was to give "teeth" to the agency's enforcement powers).

Finally, Enron's current position that the police and regulatory exception does not apply to the Clarification Request and the Consolidated FERC Proceeding (Enron Br. 14) is directly inconsistent with statements made by counsel for Enron at the July 20, 2004 hearing on Enron's motion to enjoin the City of Santa Clara regarding both the propriety of the Gaming and Partnership Proceeding and the impact of such proceeding.  Indeed, counsel for Enron, acknowledging the potential impact of the FERC proceedings, stated at that hearing:

> That issue Judge, is already fully presented before the FERC, in a
> different docket before the FERC involving the same parties . . .
> That is the gaming and partnership docket, which is scheduled for
> a full FERC hearing this September. In that case, the exact same
> issue is before the FERC. That Enron should have its market-
> based rate authority revoked retroactively, and that Enron should
> not be able to take advantage of market-based rate and that the
> rates were not just and proper.

Transcript of July 20, 2004, pp. 19, L. 9 – 25, pp 20, L. 2-6 (emphasis added). During that

hearing Enron also admitted the propriety of the proceedings at the FERC and represented to the

Court:

> We are not contending that certain issues can't and shouldn't be
> properly brought before the FERC. We are not contending that the
> currently extensive FERC docket involving Enron related matters
> should be interrupted in any way.

Transcript of July 20, 2004 Hearing, pp. 4, L. 19-25, pp. 5, L.2-5 (emphasis added).

### B.    The Filing of the Clarification Request Was Not an Exercise of Control Over Property of the Estate and Does Not Violate §362(a)(3)

It follows from the fact that the Consolidated FERC Proceeding is exempt from the

automatic stay based on Section 362(b)(4) of the Code that participating in the proceeding,

including the filing of the Clarification Request regarding the scope of the proceeding, does not

violate Section 362(a)(3) of the Code. If the Consolidated FERC Proceeding is exempt from the

stay, pleadings filed therein (whether by FERC or intervenors) are similarly exempt. See

generally, Muller v. Sevigny (In re Muller), 386 F.3d 320 (1st Cir. 2004); See also Yellow Cab

Coop. Assoc. v. Metro Taxi, Inc. (In re Yellow Cab Coop. Assoc.), 132 F.3d 591 (10th Cir.

1997) SSS of Kentucky, Inc. v. Lawrence Picus Pos of Kentucky, Inc.(In re SSS of Kentucky,

Inc.), 29 B.R. 19, 20-21 (Bankr. W.D. Ky. 1983).

Enron has repeatedly recognized this fact by not objecting to the hundreds of pleadings

filed by parties other than FERC in the various FERC proceedings. In fact, Enron expressly

acknowledged this very fact in the <u>California Litigation</u>, by relying on Lockyer's active participation in the various FERC proceedings to argue that the action commenced by Lockyer outside of FERC should be stayed.

It would simply defy logic for FERC to be permitted to proceed with the Consolidated FERC Proceeding but to prohibit the various intervenors in the proceeding from effectively participating. This would not only deprive those intervenors of their due process rights, but would interfere with FERC's effective exercise of its jurisdiction. The FERC would be denied input from the most interested and knowledgeable parties and would be forced to act in a vacuum. Such a rule also would violate the principle that prohibits a debtor from participating in a litigation while at the same time asserting that the stay prohibits other parties from participating.

It is also clear that Section 362(a)(3) of the Code could not have been violated here because the Western Parties in the Clarification Request did not ask for anything beyond clarification as to the scope of an ongoing, FERC initiated, proper regulatory proceeding.[16] They sought no relief against Enron. Section 362(a)(3) prohibits "any act to obtain possession of property of the estate or of property from the estate or to exercise control over property of the estate." 11 U.S.C. § 362(a)(3). The Clarification Request did not seek any relief that could affect property of the estate. Indeed, the Clarification Request on page 6 expressly stated:

---

[16]    In contending that the Clarification Request violates § 362(a), Enron ignores § 362(a)(1), which prohibits the commencement or continuance of a proceeding, judicial or administrative, that could have been commenced before the bankruptcy filing <u>or</u> seeks to recover on a claim that arose before such a filing. The reason Enron ignores the only section of the Code that applies to administrative proceedings is because both that section and the case law make clear that the Clarification Request did not violate such section. The filing of the Clarification Request could not have occurred before the Petition Date and is not an attempt to recover on a pre-petition claim against Enron, and, therefore, it does not violate § 362(a)(1).

> To be clear, the Western Parties are not seeking in this petition a definitive ruling from FERC as to the precise relief to which the Western Parties are entitled. We recognize that this is the very purpose of the proceeding that FERC has now set in motion. The Western Parties are simply seeking, at this time, a confirmation of their right to present evidence on an appropriate remedy that encompasses all unjust profits sought by Enron.

Enron's statement that Palo Alto and Snohomish seek in the Clarification Request to have FERC "declare that 'Enron forfeited its privilege' to recover the Termination Payment" is simply false. Notwithstanding Enron's attempt to confuse the issue, there is a fundamental difference between a pleading seeking clarification regarding the remedies being considered and one requesting specific relief.

But even if Palo Alto and Snohomish had requested relief in the Clarification Request, the mere filing of a pleading in an administrative proceeding before FERC is not an exercise of control over property of Enron's estate. It is FERC, not Palo Alto or Snohomish, that will determine the proper scope of the Consolidated FERC Proceeding and what relief is appropriate.[17] Filing a pleading with FERC is simply not an exercise of control over anything. McMullen, supra at 328 (holding that a private party's reporting of wrongful conduct to governmental regulators is not a violation of 362(a) of the Code and noting "the same sound public policy reasons which undergird the subsection 362(b)(4) exception counsel against any rule which might dissuade private parties from providing governmental regulators with information which might require enforcement measures to protect the public from imminent

---

[17] Enron knows that the mere filing of the Clarification Request does not raise a legitimate §362(a)(3) issue and, therefore, mischaracterizes the request and its potential impact. Enron states – "If the FERC were to issue a clarification order on the question of the Termination Payment, it could render the mediation process, and indeed the adversary proceedings moot." (Enron Br. 8.) Enron's statement is simply false. If the FERC does ultimately issue an order that impacts Enron's entitlement to the full early termination payment it claims, that will not be as a result of the Clarification Request, but because of FERC's exercise of its police and regulatory authority.

harm."); <u>Lovett v. Honeywell, Inc. (In re Transportation Systems International, Inc.)</u>, 110 B.R.

888, 895 (D. Minn. 1990) (filing of complaint with ICC did not constitute a violation of §

362(a)(3) as it was not an attempt to obtain possession of the debtor's property nor an exercise to

control property of the estate).

In fact, Enron has recognized this very fact in its Modified Plan of Reorganization (the

"Plan"). In June, 2004, the Debtors modified Section 38.1 of the Plan, based in part on the

objections of Snohomish and Palo Alto. The Plan was confirmed by Order dated July 15, 2004

and will become effective on November 17, 2004.[18] Section 38.1, as revised, provides:

> 38.1 **Retention of Jurisdiction:** The Bankruptcy Court shall
> retain and have exclusive jurisdiction over any matter arising under
> the Bankruptcy Code, arising in or related to the Chapter 11 Cases
> or the Plan, or that relates to the following:
>
> . . .
>
> <u>provided, however</u>, that the foregoing is not intended to (1) expand
> the Bankruptcy Court's jurisdiction beyond that allowed by
> applicable law, (2) <u>impair the rights of an Entity to (i) invoke the
> jurisdiction of a court, commission or tribunal, including, without
> limitation, the Federal Energy Regulatory Commission, with
> respect to matters relating to a governmental unit's police and
> regulatory powers</u> and (ii) contest the invocation of any such
> jurisdiction; <u>provided, however</u>, that the invocation of such
> jurisdiction, if granted, shall not extend to the allowance or priority
> of Claims or the enforcement of any money judgment against a
> Debtor or a Reorganized Debtor, as the case may be, entered by
> such court, FERC or tribunal, and (3) impair the rights of an Entity
> to (i) seek the withdrawal of the reference in accordance with 28
> U.S.C. § 157(d) and (ii) contest any request for the withdrawal of
> reference in accordance with 28 U.S.C. § 157(d).

(emphasis added)

---

[18] The Creditors' Committee has argued in support of its motion for summary judgment subordinating
any claims of the State of California arising from the ongoing Consolidated FERC proceedings that it is
the terms of the Plan that control, notwithstanding that it has not yet become effective.

Thus, the Debtors' own Plan clearly recognizes that third parties may <u>invoke</u> FERC's jurisdiction relating to its police and regulatory powers without violating the automatic stay.

Finally, the filing of a pleading in order to defend claims asserted by a debtor (the early termination payments) is not an attempt to *obtain* or *control* property of the estate within the meaning of § 362(a)(3).  <u>See</u> <u>United States v. Inslaw, Inc.</u>, 932 F.2d 1467, 1473 (D.C. Cir. 1991) ("[S]omeone defending a suit brought by the debtor does *not* risk violation of § 362(a)(3) by filing a motion to dismiss the suit though his resistance may burden rights asserted by the bankrupt") (citations omitted);  <u>Gordon v. Whitmore (In re Merrick)</u>, 175 B.R. 333, 336 (B.A.P. 9th Cir. 1994) (holding that moving forward with summary judgment motion to dismiss debtor's pre-petition state court action was not a violation of the automatic stay, because "[i]t is most unlikely that a contention by a defendant that the trustee's claim is unfounded can be equated with exercising dominion or control over property of the estate"); <u>In re Metiom</u>, 301 B.R. 634, 638-39 (Bankr. S.D.N.Y. 2003) (holding that trustee of unrelated debtor's objection to debtor's proof of claim was not a violation of § 362(a)(3), the court stated, "[t]he Trustee is not exercising control over [the debtor's] property but, rather, simply is responding to a proof of claim filed in Metiom's chapter 11 case.  Neither the language nor the policy of § 362(a)(3) apply in that context") (citations omitted); <u>In re Levitz Furniture, Inc. et al.</u>, 267 B.R. 516 (Bankr. D. Del. 2000); <u>Continental Air Lines, Inc. v. Hillblom (In re Continental Air Lines, Inc.)</u>, 61 B.R. 758 (S.D. Tex. 1986).

## IV.    THE FILING OF THE CLARIFICATION REQUEST DID NOT VIOLATE THE MEDIATION ORDER.

Enron's attempt to convert the Mediation Order[19] or the Bankruptcy Court General Order (the "General Mediation Order") into a bar against Snohomish and Palo Alto's participation in ongoing FERC proceedings is without substance.  Enron has not identified any provision of the Mediation Order or the General Mediation Order that requires a participant in the mediation to forgo protecting its rights in a regulatory proceeding at FERC.

In fact, at the time the mediation process was implemented, this Court made it clear that, other than as discussed at the conferences, "[n]one of [a party's] rights will be abridged" by participating in the mediation process.  See Transcript of Hearing of February 20, 2003, ("Feb Trans."), p. 15 L.7-8; Transcript of Hearing of March 4, 2003, p. 82 L.15-20.  Here, the Parties' participation in the Consolidated FERC Proceeding, including the filing of the Clarification Request, was necessary to protect Snohomish's and Palo Alto's interests in the Consolidated FERC Proceeding in light of the July 22 Order.  Enron similarly protected its interests in that docket by filing an answer to the Clarification Request and by filing a Request to Rehearing the July 22 Order.  Enron took these actions without seeking leave of this Court or leave from Judge Gropper but now complains about similar FERC filings by Snohomish and Palo Alto.  If the Motion is granted, Snohomish's and Palo Alto's rights will be seriously abridged because their ability to effectively participate in the ongoing FERC proceedings will be compromised.

Enron's argument boils down to a claim that by taking action outside the mediation the Parties are violating the Mediation Order.  This argument is wrong.  The Mediation Order

---

[19]    The Parties had previously advised this Court that as governmental entities the Mediation Order may not apply to them but that they nevertheless intended to participate.

imposes no obligation on the Parties outside of the mediation.[20]  The General Mediation Order provides the mediator with the power to inform the court if it concludes that a party is engaging in a "willful failure to attend or participate in good faith."  This provision, however, provides no basis for sanctioning a party with respect to conduct outside the mediation not involving either its attendance or participation in the mediation.  Enron has not asserted (and cannot assert) that either Palo Alto or Snohomish has willfully refused to attend or to participate in good faith in the mediation.  In attempting to explain why it waited three months to file the motion, Enron makes the factually unsupported statement (Enron Br. p.2, n.1) that Palo Alto and Snohomish are no longer interested in having particular issues addressed in the mediation.  That statement is false and is a gross misrepresentation of statements made by Palo Alto and Snohomish.  The Parties continue to be interested in settling the Adversary Proceedings, and are willing to address in the mediation all of the issues necessary to reach a settlement.  Furthermore, how can Enron know what the Parties are willing to address in the mediation unless the Parties have stated that in the mediation?  But, if that is the source of Enron's statement, then Enron has improperly breached the confidentiality of the mediation.

Enron does not claim that either Snohomish or Palo Alto has failed to date to participate in the mediation in good faith.  Certainly, no such finding has been made by Judge Gropper and, at present both Snohomish and Palo Alto are continuing to participate in the mediation process.

---

[20]  Enron fundamentally distorts the purpose of mediation.  Enron seeks to use the mediation as a ground to enjoin Palo Alto and Snohomish from exercising their First and Fifth Amendment rights in an effort to coerce them to pay Enron a "settlement."  That is not the purpose of mediation.  Mediation is a means of resolving a dispute without the necessity of a trial not a tool for coercing "settlement" payments.  The Adversary Proceedings involve claims against Palo Alto and Snohomish for breach of contract.  The fact that the Consolidated FERC Proceeding might resolve or affect Enron's claims in the Adversary Proceedings, does not place the Consolidated FERC Proceeding into conflict with the mediation.

Snohomish has also participated with Enron in a mediation process conducted by FERC trial staff.

Palo Alto has in good faith attended four mediation sessions with Judge Gropper (one after the filing of the Clarification Request), is preparing to participate in another mediation session on December 8, 2004, and has provided Judge Gropper and Enron with several lengthy written submissions. Palo Alto has also engaged in private negotiations with Enron representations without the mediator (some of which have occurred after the filing of the Clarification Request). Similarly, Snohomish has also in good faith attended three mediation sessions (one after the filing of the Clarification Request), has provided Judge Gropper and Enron with lengthy submissions, engaged in discussions with Enron business people outside the presence of the mediator, and just recently provided Enron with additional information requested at the last mediation session.

If any party has violated both the letter and spirit of the Mediation Order, it is Enron. Enron seeks to use the mediation to abridge the Parties' rights. It presumes the purpose of the mediation is to put money in its own pocket rather than to avoid an unnecessary trial. It has usurped the prerogative of the mediator to challenge the Parties' good faith in the mediation process. It has made accusations about the Parties' intentions that are both baseless and a violation of the Mediation Order's confidentiality mandate.

## V.    **ENRON IS NOT ENTITLED TO A § 105 INJUNCTION.**

Enron asks this Court (relying on a single footnote) to use its equitable powers under § 105 of the Code to enjoin the Parties' continued pursuit of the Clarification Request. Enron is not entitled to the requested injunction.[21]

If the filing of the Clarification Request were truly a violation of the automatic stay, there would be no necessity for a § 105 injunction. Enron would ask the Court to simply enforce § 362(a) of the Code. However, as noted above, the filing of the Clarification Request was not a violation of the stay and Enron does not even seek relief against the Parties pursuant to § 362 of the Code. (Compare the Order to Show Cause here to the one filed in the California Litigation.) (Zim. Dec. Ex. B).

A similar attempt by a debtor to have a federal district court prevent FERC from considering matters within its exclusive jurisdiction was recently rejected in NRG Power Marketing, Inc. v. Blumenthal (In re NRG Energy, Inc.), 2003 WL 21507685 (S.D.N.Y. June 30, 2003), where Judge Casey rejected a bankrupt power company's attempt to enjoin certain parties

---

[21]    A party seeking an injunction under § 105 of the Code must comply with the requirements of Rule 65 of the Federal Rules of Civil Procedure. See GATX Terminals Corp. v. Tarricone (In re Tarricone, Inc.), 77 B.R. 430, 433 (Bankr. S.D.N.Y. 1987); see also GAF Corp. v. Johns-Manville Corp. (In re Johns-Manville Corp.), 26 B.R. 405, 415 (Bankr. S.D.N.Y. 1983) ("[A] party seeking the equitable relief of an extension of the stay must satisfy the requirements of FRCP 65 as applied to bankruptcy by Rule [7065] of the Rules of Bankruptcy Procedure."). Thus, in order to obtain in order to obtain a §105 injunction EPMI must demonstrate:

    (1)  it has a strong or substantial likelihood or probability of success on the merits;

    (2)  it will suffer irreparable injury;

    (3)  whether the issuance of an injunction would cause substantial harm to others; and

    (4)  whether the public interest would be served by issuing an injunction.

In re Tarricone, 77 B.R. at 433.

from commencing actions against it at FERC on the grounds that such action would violate the stay or interfere with bankruptcy court jurisdiction over a core matter. In doing so, the Court explicitly rejected the debtor's contention – also made by Enron here – that the Court was "confronted with a simple bankruptcy case that is nothing more than a dispute between two parties to a financial arrangement." Id. at 3. The Court held:

> [G]iven the unique regulatory framework for the business of selling electric energy and the pending FERC proceeding, the Court lacks jurisdiction to grant Plaintiff's requested relief. As the Second Circuit stated in the context of a Federal Communications Commission proceeding, "It is for [the federal regulatory agency] to state its conditions ... and for a court with power to review [its decisions] to say if they are arbitrary or valid" [cit. om.].

Id.

The Court further held that "pursuant to section 313 of the FPA, codified as 16 U.S.C. § 825*l*(b), actions taken by FERC are reviewable only by the federal courts of appeals." Id. See also Yellow Cab Coop. Assoc. v. Metro Taxi, Inc. (In re Yellow Cab Coop. Assoc.), 132 F.3d 591 (10th Cir. 1997) (overturning a bankruptcy court injunction against taxi companies and the Colorado Public Utilities Commission to whom the companies had brought a complaint that the debtor should not be allowed to transfer a portion of its license; the government agency had authority under § 362(b)(4) of the Code to enforce its regulatory power in the public interest and this action did not constitute taking property from the estate); SSS of Kentucky, Inc. v. Lawrence Picus Pos of Kentucky, Inc., 29 B.R. 19, 20-21 (Bankr. W.D. Ky. 1983)

Finally, issuance of an injunction to prevent Palo Alto and Snohomish from being heard by FERC on a matter within its exclusive jurisdiction would be an abuse of discretion as a matter of law. Eastern Refractories Co., Inc. v. Forty Eight Insulations Inc., 157 F.3d 169, 172 (2d Cir. 1998); Port of Boston Marine Terminal Assn. v. Rederiaktiebolaget Transatlantic, 400 U.S. 62 (1970). The appropriate action is, rather, to stay proceedings in this Court pending FERC's

determination whether Enron's "termination payment" claims are "just and reasonable" under Sections 205, 206 and 309 of the FPA.  See General American Tank Car Corp. v. El Dorado Terminal Co., 308 U.S. 422 (1939) ("When it appeared in the course of the litigation that an administrative problem, committed to the ICC, was involved, the court should have stayed its hand pending the ICC's determination of the lawfulness and reasonableness of the practices under the terms of the Act.  There should not be a dismissal, but, as in Mitchell Coal Co. v. Pennsylvania R. Co., supra, the cause should be held pending the conclusion of an appropriate administrative proceeding. Thus any defenses the petitioner may have will be saved to it."); Ricci v. Chicago Mercantile Exchange, 409 U.S. 289 (1973).

## VI.    ENRON'S RELIANCE ON BANKRUPTCY RULE 9020 IS MISPLACED.

Although Enron does not expressly seek to hold the Parties in contempt, the Motion refers to Bankruptcy Rule 9020 (which refers to motions for contempt).  Nevertheless, it is clear that no basis for holding the Parties in contempt exists.  In order to prove contempt, "a movant must establish that (1) the order the contemnor failed to comply with is clear and unambiguous, (2) the proof of noncompliance is clear and convincing, and (3) the contemnor has not diligently attempted to comply in a reasonable manner."  King v. Allied Vision, Ltd., 65 F.3d 1051, 1058 (2d Cir. 1995); Perez v. Danbury Hosp., 347 F.3d 419 (2d Cir. 2003) (same).

None of the elements are satisfied here.  Enron has not shown by "clear and convincing evidence" (or for that matter any evidence) that the Parties acted with maliciousness and lacked a "good faith argument or belief that their actions did not violate the stay." Crysen/Montenay Energy Co. v. Esselen Assocs., Inc. (In re Crysen/Montenay Energy Co.), 902 F.2d 1098, 1104 (2d Cir. 1990); Ford Motor Credit Co. v. Florio (In re Florio), 229 B.R. 606, 608 (S.D.N.Y. 1999).  On the contrary, in light of Enron's representations to this Court that the ongoing FERC proceedings are a proper exercise of FERC's police powers and there is no basis for this Court to

interfere in those proceedings, Snohomish and Palo Alto were fully justified in their good faith belief that going forward at FERC was proper. Nor is there any basis for finding the Parties in contempt for violating the Mediation Order for the reasons discussed above.

## VII.    THE STAY SHOULD BE RETROACTIVELY ANNULLED.

In the unlikely event that this Court finds that the Consolidated FERC Proceeding or filing the Clarification Request violated the automatic stay, this Court should annul the stay for cause to permit the Consolidated FERC Proceeding to proceed. See Eastern Refractories Co., Inc. v. Forty Eight Insulations Inc., 157 F.3d 169, 172 (2d Cir. 1998). Although the Code does not define the meaning of "for cause," case law has identified twelve factors to be considered in determining whether to lift or annul the automatic stay:  "(1) whether relief would result in a partial or complete resolution of the issues; (2) lack of any connection with or interference with the bankruptcy case; (3) whether the other proceeding involves the debtor as a fiduciary; (4) whether a specialized tribunal with the necessary expertise has been established to hear the cause of action; (5) whether the debtor's insurer has assumed full responsibility for defending it; (6) whether the action primarily involves third parties; (7) whether litigation in another forum would prejudice the interests of other creditors; (8) whether the judgment claim arising from the other action is subject to equitable subordination; (9) whether movant's success in the other proceeding would result in a judicial lien avoidable by the debtor; (10) the interests of judicial economy and the expeditious and economical resolution of litigation; (11) whether the parties are ready for trial in the other proceeding; and (12) the impact of the stay on the parties and the balance of harms."  In re Enron Corp. et al., 306 B.R. 465, 475-76 (Bankr. S.D.N.Y. 2004) (citing Sonnax Indus., Inc. v. Tri Component Prods. Corp. (In re Sonnax Indus., Inc.), 907 F.2d 1280, 1286 (2d Cir. 1990).

While not every factor is applicable, those factors that are relevant compel annulment. Permitting the Consolidated FERC Proceeding (including the Clarification Request) to proceed will not interfere with the bankruptcy case, the rights of any third creditors or the rights of any third parties. A plan of reorganization has been approved and is set to become effective on November 17, 2004.

Moreover, since FERC has exclusive authority over the issues presented in the Consolidated FERC Proceeding, NRG, 2003 WL 21507865, at *3; Nantahala Power & Light Co. v. Thornburg, 476 U.S. 953, 966 (1986), the issues must be resolved before the Adversary Proceedings can be concluded. The Consolidated FERC Proceeding could also narrow the issues that must be decided in the Adversary Proceedings. Thus, allowing the Consolidated FERC Proceeding to go forward and FERC to determine the regulatory issues involved is in the interest of judicial economy and the expeditious resolution of the issues presented therein. This is particularly true as the Consolidated FERC Proceeding has been in process for several years and involves numerous parties other than Enron.

Finally, a balancing of the harm caused by application of the stay supports annulment of the stay, if applicable. While the Parties could be prevented from participating in substantive issues directly relevant to their interests and may be subject to the *in terrorem* effect of a determination that the stay is applicable, Enron -- as it has been doing for several years -- can simply continue to participate in the Consolidated FERC Proceeding.

Thus, factors 1, 2, 4, 6, 7, 10 and 12 support annulment, and no other countervailing factor is present. Accordingly, annulment of the stay is appropriate.

## CONCLUSION

The Parties did not violate either the automatic stay or the Mediation Order and, therefore, the Motion should be denied in its entirety. Enron has also failed to establish any

grounds for the issuance of a § 105 injunction that will interfere with FERC's carrying out of its

regulatory responsibilities or the right of the Parties to seek clarification in a FERC proceeding in

which Enron has been an active participant. If this Court finds that the automatic stay applies to

the Consolidated FERC Proceeding or the Clarification Request, the stay must be annulled.

Dated: November 17, 2004.

RESPECTFULLY SUBMITTED

By: /s/ Alan E. Gamza
Alan Kolod (AK-3108)
Alan E. Gamza (AG-2014)
Philippe Zimmerman (PZ-7744)
MOSES & SINGER, LLP
1301 Avenue of the Americas
New York, New York 10019-6076
(212) 554-7800

Attorneys for City of Palo Alto and
Public Utility District No. 1 of Snohomish County,
Washington

Michael A. Goldfarb
LAW OFFICES OF MICHAEL A. GOLDFARB
1150 Market Place Tower
2025 First Avenue
Seattle, Washington 98121
(206) 374-7090

Eric Christensen, Esq.
Snohomish County PUD
2320 California Street
P.O. Box 1107
Everett, WA. 98206
(425) 783-8649
(425) 267-6071

Attorneys for the Public Utility District No. 1 of
Snohomish County

David Duperrault
SILICON VALLEY LAW GROUP
152 N Third Street, Suite 900

San Jose, CA 95112
(408) 573-5700

Gary Baum, Esq.
Grant Kolling, Esq.
City of Palo Alto
City Hall, 8th Floor
250 Hamilton Avenue
Palo Alto, CA 94301
Phone: (650) 329-2171
Fax:    (650) 329-2646

Attorneys for the City of Palo Alto

APPENDIX 1

For example, in Enron's July 9, 2004 Memorandum of Law in Support of Application for

Preliminary Injunction to Enforce the Automatic Stay or Other Expedited Relief, Enron stated:

>     •     "The relief requested by Lockyer is fully redundant . . . of
> the requests for relief in the pending FERC proceedings. . . . Thus,
> Lockyer's only recourse is to obtain relief at FERC . . . ." (p. 4.)

>     •     "Lockyer is a very active party in all three of the ongoing
> FERC proceedings noted above: the Partnership proceeding,
> Gaming proceeding and the Refund Proceeding.  He has filed, and
> is aggressively prosecuting, claims against Enron and other
> participants in the CalISO and CalPX markets."  Lockyer filed
> motions "just yesterday" asking FERC "to consider the additional
> evidence -- which they say, is already on file in the Gaming and
> Partnership proceedings – to determine whether the remedies
> FERC had already provided were adequate." (pp. 9-10.)

>     •     "Lockyer's only recourse on the claims asserted is in
> FERC, where the claims are already pending."  (p. 23.)

In its July 16, 2004 Reply Memorandum of Law in Further Support of Application for

Preliminary Injunction, Enron stated:

>     •     "FERC is the forum where Lockyer's claims should be
> adjudicated." (p. 3.)

>     •     "Lockyer's only recourse on the claims asserted in the
> California Litigation is in FERC, where the claims are already
> pending." (p. 8.)

>     •     [T]he Attorney General's office is intimately involved in
> and fully familiar with the FERC proceedings that are referred to
> in the motion."  (p. 11.)

Finally, in its August 2, 2004 Sur-Reply Memorandum of Law in Further Support of

Motion for a Permanent Injunction, Enron stated:

>     •     The state action was "redundant of . . . claims asserted by
> Lockyer in pending proceedings at FERC" (p. 3.)

A84

- The State of California would suffer no harm if its state action was enjoined because "Lockyer can liquidate the claims in the California Litigation in the proceedings filed before FERC, in which he is a full participant. (p. 4.)

- The California Litigation would be wasteful because "[t]he exact same conduct at issue in the Lockyer Complaint is already the subject of a FERC proceeding. Initial written testimony has been filed in the FERC case and a trial is scheduled for September. . . . What is more, FERC is the only forum where Lockyer's claims can be heard." (pp. 11-12.)

- "[A]ll of the strategies that form the basis for the complaint – including the claims relating to ancillary services – are already the subject of proceedings in the FERC." (p. 16.) The State of California is participating actively in the Consolidated Gaming Proceedings and this litigation "unquestionably belongs before, and is already pending before, the FERC. (pp. 17-18, 21.)

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re:<br><br>ENRON CORP, et al.,<br><br>      Debtor. | Chapter 11<br>Case No. 01-16034 (AJG)<br>Jointly Administered |
| ENRON POWER MARKETING, INC.,<br><br>      Plaintiff,<br><br>  -against-<br><br>PUBLIC UTILITY DISTRICT NO. 1 OF<br>SNOHOMISH COUNTY,<br><br>      Defendant. | Adv. Pro. No. 03-02064 (AJG) |

**AFFIDAVIT OF ERIC L. CHRISTENSEN**

| | |
|---|---|
| STATE OF WASHINGTON | ) |
| | ) ss. |
| COUNTY OF SNOHOMISH | ) |

Eric L. Christensen, being first duly sworn, deposes and says:

1.  I am assistant general counsel of the Public Utility District No. 1 of Snohomish County, Washington, a creditor in the above-referenced bankruptcy and the defendant in the above-referenced adversary proceeding. I have personal knowledge of the matters contained herein and will testify under oath before this Court if called upon to do so. I have reviewed the factual matters addressed in Snohomish's Counterstatement of Facts and the facts set forth therein regarding the procedural history of the mediation process in this matter are true and correct to the

best of my knowledge as are the statements regarding the procedural history of various FERC proceedings addressed in the memorandum.

2.      Attached are true and correct copies of the following documents:

Exhibit 1:     Ninth Circuit Court of Appeals decision in *Lockyer v. FERC*, No. 02-73093, issued September 9, 2004;

Exhibit 2:     Ottie Nabors, George Backus & Jeff Amlin, *Simulating Effects of Business Decisions on Regional Economy: Experience During the California Energy Crisis*, J. INDUS., COMPETITION & TRADE, vol. 2, at 143 (June 2002);

Exhibit 3:     Docket from *Enron Power Marketing, Inc.*, EL03-180;

Exhibit 4:     Docket from *American Electric Power Service Corp.*, EL03-137;

Exhibit 5:     Docket from *Enron Power Marketing, Inc.*, EL03-77 (the "Revocation Proceeding");

Exhibit 6:     Docket from *El Paso Electric Co.*, EL02-113;

Exhibit 7:     *Enron Power Marketing, Inc.*, 103 FERC ¶ 61,343;

Exhibit 8:     *Fact Finding Investigation of Potential Manipulation of Electric and Natural Gas Prices*, 98 FERC ¶ 61,165 (2002);

Exhibit 9:     *El Paso Electric Co.*, 100 FERC ¶ 61,188 (2002);

Exhibit 10:    *Enron Power Marketing, Inc.*, 104 FERC ¶ 63,010 (2003);

Exhibit 11:    *Enron Power Marketing, Inc.*, 108 FERC ¶ 61,071 (2004);

Exhibit 12:    FERC Staff, *Fact-Finding Investigation of Potential Manipulation of Electric and Natural Gas Prices*, Docket No. PA02-2-000, Final Report on Price Manipulation in Western Markets, at VI-1 (Mar. 2003) ("Staff Report" or "Final Staff Report");

Exhibit 13:    Motions to Intervene of the Public Utility District No. 1 of Snohomish County, Washington in *American Electric*

*Power Company*, EL03-137, and in *Ernon Power Marketing, Inc.*, EL03-180, dated July 17, 2003;

**Exhibit 14:** Order Granting Motions to Intervene, issued August 6, 2003 in both EL03-137 and EL03-180;

**Exhibit 15:** Excerpts from the Deposition of John White, taken by EPMI on April 27, 2004, in EL03-180;

**Exhibit 16:** Exhs. SNO-204, SNO-222, submitted in FERC Docket No. EL03-180 (May 17, 2004);

**Exhibit 17:** Exhs. SNO-182, SNO-194, SNO-228, SNO-244, submitted in FERC Docket No. EL03-180 (May 17, 2004);

**Exhibit 18:** Order of Chief Judge Extending Initial Decision Deadline and Suspending Procedural Schedule in *Enron Power Marketing, Inc.*, EL03-180, et al., issued May 25, 2004;

**Exhibit 19:** Request for Clarification by the Western Parties, *El Paso Elec. Co., et al.,* Docket Nos. EL02-113-000, *et al.* (Aug. 4, 2004);

**Exhibit 20:** Answer of Enron Entities to Request for Clarification by the Western Parties, *El Paso Elec. Co., et al.*, Docket Nos. EL02-113-000 *et al.*, at 6 (Aug. 19, 2004);

**Exhibit 21:** Petition for Rehearing of the Public Utility District No. 1 of Snohomish County, Washington, *El Paso Elec. Co., et al.,* Docket Nos. EL02-113-000, *et al.* (Aug. 23, 2004);

**Exhibit 22:** *Enron Power Marketing, Inc., et al.,* 102 FERC ¶ 61,316 (2003);

**Exhibit 23:** *Enron Power Marketing, Inc., et al.,* 102 FERC ¶ 61,316 (2003), order revoking market-based rates authority, 103 FERC ¶ 61,343 (2003), *reh'g denied*, 106 FERC ¶ 61,024 (2004);

**Exhibit 24:** *Order Directing Staff Investigation,* 92 FERC ¶ 61,160 (2000);

| | |
|---|---|
| **Exhibit 25:** | *San Diego Gas & Elec. Go. v. Sellers of Energy Into Cal ISO and PX Markets,* 92 FERC ¶ 61,172 (2000); |
| **Exhibit 26:** | *San Diego Gas,* 93 FERC ¶ 61,121 (2000) and *San Diego Gas & Elec. Co.,* 95 FERC ¶ 61,418 (2001); |
| **Exhibit 27:** | 93 FERC ¶ 61,294; |
| **Exhibit 28:** | *San Diego Gas,* 96 FERC ¶ 61,120 (2001); |
| **Exhibit 29:** | *Nevada Power Co., et al.,* 99 FERC ¶ 61,047 (2002); |
| **Exhibit 30:** | Reply Memorandum of Law in Support of Plaintiff Enron Power Marketing, Inc.'s Motion for Summary Judgment With Respect to Its Third Claim for Relief dated December 16, 2002, in *Enron Power Marketing, Inc. v. Nevada Power Company,* Adv. Pro. No. 02-02520; |
| **Exhibit 31:** | Decision Regarding Remaining Portion of Motion for Summary Judgment and Related Relief in *Nevada Power Company v. Enron Power Marketing, Inc.,* Adv. Pro. No. 02-02520, issued August 28, 2003; and *Nevada Power Co., el al.,* 101 FERC ¶ 63,031 at P 101 (2002); |
| **Exhibit 32:** | Order on Initial Decision, Rehearing Requests, and Motions in *Nevada Power Company,* EL02-28, issued June 26, 3003; 103 FERC ¶ 61,353; and |
| **Exhibit 33:** | Provisional Motion to Intervene, *City of Santa Clara, California v. Enron Power Marketing, Inc.,* Docket No. EL04-114-000 (Sep. 23, 2004). |

EXECUTED this 17th day of November, 2004 at Everett, Washington.

Eric L. Christensen

- 4 -

STATE OF WASHINGTON )
) ss.
COUNTY OF SNOHOMISH )

On this 17th day of November, 2004, personally appeared before me, the undersigned Notary Public, Eric L. Christensen, to me known to be the individual described in and who executed the within and foregoing instrument and acknowledged to me that he/she signed the same as his/her free and voluntary act and deed for the uses and purposes therein mentioned.

GIVEN under my hand and official seal the day and year first above written.



Notary Public in and for the State of
Washington, residing at _Snohomish WA_
My Commission expires _2/14/08_

**FOR PUBLICATION**

## UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

STATE OF CALIFORNIA, ex rel. Bill
Lockyer, Attorney General,
*Petitioner,*

CORAL POWER, LLC; DUKE ENERGY
NORTH AMERICA, LLC; DUKE
ENERGY TRADING AND MARKETING,
LLC; TRANSCANADA ENERGY LTD.;
CITY OF TACOMA, WASHINGTON;
PORTLAND GENERAL ELECTRIC
COMPANY; DYNEGY POWER
MARKETING, INC.; EL SEGUNDO
POWER LLC, LONG BEACH
GENERATION LLC; CABRILLO POWER
I LLC; CABRILLO POWER II LLC;
MIRANT AMERICAS ENERGY
MARKETING LP; MIRANT
CALIFORNIA, LLC; MIRANT DELTA,
LLC; MIRANT POTRERO, LLC;
PUBLIC SERVICE COMPANY OF NEW
MEXICO; EL PASO MERCHANT
ENERGY LP; BP ENERGY CO.;
PUBLIC SERVICE COMPANY OF
COLORADO; PINNACLE WEST
CAPITAL CORPORATION; ARIZONA
PUBLIC SERVICE CO.; PACIFICORP;
PACIFICORP POWER MARKETING,
INC.; STRATEGIC ENERGY LLC,
*Intervenors,*

No. 02-73093
No. FERC-EL02-
71-000

OPINION

MORGAN STANLEY CAPITAL GROUP,
INC.,
                    *Respondent-Intervenor,*

AES COMPANIES; RELIANT ENERGY
SERVICES, INC.; ENRON POWER
MARKETING, INC.; ENRON ENERGY
SERVICES, INC.,
                    *Intervenors,*

POWEREX CORP.; PUGET SOUND
ENERGY; AVISTA ENERGY, INC.;
SEMPRA ENERGY TRADING CORP.,
SEMPRA ENERGY SOLUTIONS; SEMPRA
ENERGY RESOURCES,
          *Respondents-Intervenors,*

CALIFORNIA PUBLIC UTILITIES
COMMISSION,
                *Petitioner-Intervenor,*

WILLIAMS ENERGY MARKETING &
TRADING COMPANY,
                    *Intervenor,*

                    v.

FEDERAL ENERGY REGULATORY
COMMISSION,
                    *Respondent,*

AVISTA CORPORATION,
                    *Intervenor,*

LONG BEACH GENERATION LLC,
          *Respondent-Intervenor.*

A92

On Petition for Review of an Order of the
Federal Energy Regulatory Commission

Argued and Submitted
October 9, 2003—San Francisco, California

Filed September 9, 2004

Before: Sidney R. Thomas, M. Margaret McKeown, and
Richard R. Clifton, Circuit Judges.*

Opinion by Judge Thomas

---

*Following oral argument of this case, Judge Hawkins recused himself.
Judge McKeown was drawn as a replacement judge.

## COUNSEL

Paul Stein, Ken Alex, Tom Greene, Richard Frank, Deputy Attorneys General, San Francisco and Sacramento, California, for petitioner Bill Lockyer.

Beth G. Pacella, Dennis Lane, Cynthia A. Marlette, Federal Energy Regulatory Commission, Washington, D.C., for respondent Federal Energy Regulatory Commission.

Howard E. Shapiro, Gary D. Bachman, Cheryl Feik Ryan, Van Ness Feldman, P.C., and Kenneth W. Irvin, Beth S. Brinkmann, Lois K. Perrin, Morrison & Foerster, LLP, Washington, D.C., for intervenor Wholesale Power Suppliers.

Gary Cohen, Arocles Aguilar, Harvy Y. Morris, Elizabeth McQuillan, Michael Edson, San Francisco, California, for amicus curiae California Public Utilities Commission.

## OPINION

THOMAS, Circuit Judge:

This case presents the question, *inter alia*, of whether the Federal Energy Regulatory Commission ("FERC") properly authorized and administered market-based energy tariffs. The State of California ("California"), through its Attorney General, claims that it did not, and that California energy consumers are entitled to as much as $2.8 billion in refunds. We conclude that FERC's authorization of market-based tariffs in

this case complied with the Federal Power Act, but that FERC abused its administrative discretion by declining to order refunds for violations of its reporting requirements. We therefore grant California's petition in part and remand this case to FERC for refund proceedings.

## I

California's energy crisis in 1995 prompted the California Public Utilities Commission[1] and the California legislature to restructure the electric energy industry. The resulting legislation, Assembly Bill 1890 ("AB 1890"), was designed to dismantle the investor-owned, government-regulated utility model and create a deregulated market in which price would be established by competition. Act of September 23, 1996, 1996 Cal. Legis. Serv. 854, *codified in* Cal. Pub. Util. Code §§ 330-398.5. Under AB 1890, the major investor-owned, vertically-integrated[2] utilities were required to divest a substantial portion of their power generation plants, to sell the output of their remaining generation capacity to a newly created wholesale clearinghouse known as the California Power Exchange Corporation ("CalPX"). CalPX, which was created

---

[1]The Commission is an agency established by the California Constitution. Cal. Const. art. XII. One of the Commission's duties is the regulation of retail rates for electricity charged by investor owned utilities in California. Cal. Pub. Util. Code § 451. The Commission's restructuring order is contained in *Re Proposed Policies Governing Restructuring California's Electric Services Industry and Reforming Legislation*, D. 95-12-063 (Dec. 20, 1995), *modified by* D. 96-01-009 (Jan. 10, 1996).

[2]In the power industry, there are three major vertical components: generation, transmission, and distribution. Generation involves the production of power through a variety of means. Transmission generally refers to the transmission of high voltage electric power from the points of generation to substations for conversion to delivery voltages. Distribution refers to the delivery of the converted low voltage energy from substations to individual consumers. Under the vertically integrated model, one government-regulated company owned the generation resources, the transmission lines, and the distribution facilities. Under a deregulated model, different entities separately own the generation, transmission, and distribution assets.

by AB 1890, was to provide a centralized auction market for the trading of electricity. It was thus deemed a public utility pursuant to the Federal Power Act, *see* 16 U.S.C. § 824(e), and thus subject to regulation by FERC, *see* 16 U.S.C. § 824(b), (d).[3]

AB 1890 created another non-profit entity, the Independent System Operator ("ISO"), also subject to FERC jurisdiction, which was to be responsible for managing California's electricity transmission grid and balancing electrical supply and demand. Its operations were to be governed by a tariff and protocols filed with FERC. Under AB 1890, purchases and sales of wholesale power by investor-owned utilities were now subject to FERC jurisdiction. *So. Cal. Edison*, 307 F.3d at 801.

Thereafter, three major investor-owned utilities filed applications with FERC seeking approval of the establishment of CalPX and the ISO, authority to convey operational control of the transmission facilities to the ISO, and authority to sell electrical energy at market based rates. *See Pacific Gas and Electric Co.*, 77 FERC ¶ 61,265 (1996); *Pacific Gas and Electric Co.*, 77 FERC ¶ 61,204 (1996); *Pacific Gas and Electric Co.*, 77 FERC ¶ 61,077 (1996).

A condition of FERC's approval of an entity's market-based rate authority was a FERC determination that the entity lacked, or had adequately mitigated market power in the California markets. FERC conducted these inquiries as a means of

---

[3]This is not our first foray into the thicket of California's attempt to deregulate the power industry. Thus, an exhaustive rendition of the factual background is not required. Further general details are provided in some of our previous decisions. *See, e.g., State of California ex rel. Lockyer v. Dynegy*, ___ F.3d ___, 2004 WL 1488195 (9th Cir. July 6, 2004); *Southern California Edison Co. v. Lynch*, 307 F.3d 794, 801 (9th Cir. 2002); *In re California Power Exchange Corporation*, 245 F.3d 1110, 1114-19; *Duke Energy Trading and Marketing, L.L.C. v. Davis*, 267 F.3d 1042, 1045-46 (2001).

carrying out its statutory mandate under the Federal Power Act to ensure "just and reasonable" wholesale rates for electricity. 16 U.S.C. § 824d(a). FERC approved the utilities' requests, and granted permission for the utilities to sell electricity at market-based rates in California. FERC also approved the establishment of the ISO and CalPX, which then commenced operations in late March 1998. *See generally Pacific Gas and Electric Co.*, 81 FERC ¶ 61,122 (1997).

In June 2000, wholesale electricity prices increased dramatically. In August, San Diego Gas & Electric Company filed a complaint under § 206 of the Federal Power Act ("FPA"), 16 U.S.C. § 824e(a), against all sellers of energy and ancillary services into the CalPX and ISO markets. In response, FERC instituted hearing procedures under FPA § 206 to investigate the justness and reasonableness of the rates of sellers that were subject to FERC jurisdiction into the ISO and CalPX markets.

Electricity prices remained at high levels in the winter of 2001, and California's largest utility, Pacific Gas and Electric Company, filed a voluntary petition in bankruptcy under Chapter 11 of the United States Bankruptcy Code. In January of 2001, the Governor of the State of California declared a state of emergency. Pursuant to that order, and in light of rolling blackouts, the Governor directed the State Department of Water Resources ("DWR") to purchase wholesale power on the spot market. By October of 2001, California Energy Resources Scheduler ("CERS"), a division of DWR, had spent approximately $10 billion buying energy on the spot market.

In November of 2000, having reviewed San Diego Gas & Electric's complaint, FERC adopted several reform measures. FERC found that the "California market structure provide[d] the opportunity for sellers to exercise market power" in times of tight supply and that such market power could result in "unjust and unreasonable rates." *San Diego Gas & Electric*

*Co. v. Sellers of Energy and Ancillary Services into Markets Operated by the California Independent System Operator and the California Power Exchange*, 93 FERC ¶ 61,121 (2000). In addition to ordering structural and rule changes, FERC ordered an evidentiary hearing to determine the appropriate refund. However, FERC limited the refund to ISO and CalPX spot market transactions during the period from October 2, 2000 through June 20, 2001.

A year later, the State of California filed the instant complaint against all sellers of power and ancillary services subject to FERC jurisdiction in markets operated by the ISO and CalPX and sellers of power to CERS (collectively, "California Wholesalers"), alleging that FERC's market-based rate filing requirements violated the FPA and that, even if valid, the reports filed by electricity sellers did not contain the transaction-specific information the FPA requires. California claimed that FERC's improper decision to limit the refund period reduced the refunds owed to California purchasers by as much as $2.8 billion.

In order to remedy the alleged violations, California urged FERC to:

> 1)   require the California Wholesalers to comply, on a prospective basis, with Section 205 rate-filing requirements;

> 2)   to the extent the information [was] not already being provided . . . require the California Wholesalers to provide transaction-specific information to FERC on all of their short-term sales to the ISO, CalPX and CERS for the calendar years 2000-2001;

> 3)   to the extent that any rates for short-term power sold to the ISO, CalPX, or CERS are found to exceed just and reasonable levels, require the California Wholesalers to refund the difference between

the rate charged and a just and reasonable rate, plus interest;

4)  issue a declaration specifying that the rates for short-term power sold to the ISO, CalPX, and CERS are not subject to the filed rate doctrine; and

5)  institute proceedings to determine whether any other further relief is necessary or appropriate, up to and including the revocation of the California Wholesalers' market based rate authority.

The California Wholesalers contended, and FERC ultimately concluded, that California's complaint amounted to an impermissible collateral attack on prior Commission orders pertaining to FERC's market-based rate authority and procedures, on prior FERC determinations regarding refund liability, and as to FERC's decisions to grant the various defendants their respective market-based rate authority. FERC granted the complaint in part, holding that where the California Wholesalers had reported aggregated rather than transaction-specific data, the reports failed to comply with FPA § 205(c). Rather than ordering refunds for the reporting violations, however, FERC held that "the failure to report transactions in the format required by FERC for quarterly reports is essentially a compliance issue" for which "re-filing of quarterly reports to include transaction-specific data is an appropriate and sufficient remedy." 99 FERC ¶ 61,247 at 62,068 (2002).

California timely filed a petition for review of FERC's decision and properly invokes our jurisdiction to review final orders of FERC pursuant to 16 U.S.C. § 8251(b).

II

[1] The Federal Power Act governs the transmission and wholesale sales of electrical energy in interstate commerce.

16 U.S.C. § 824(b). Pursuant to its authority under the FPA, FERC has exclusive jurisdiction over interstate wholesale power rates. *Id.*; *Nantahala Power and Light Co. v. Thornburg*, 476 U.S. 953, 956 (1986). The FPA requires that all rates for the transmission and sale of wholesale electricity be filed with FERC and published for public review. 16 U.S.C. § 824d(c). FERC is obligated to ensure that wholesale power rates are "just and reasonable," 16 U.S.C. § 824d(a), and applied in a non-discriminatory manner, 16 U.S.C. § 824d(b); *Entergy Louisiana, Inc. v. Louisiana Public Service Com'n*, 539 U.S. 39, 41 (2003). Indeed, FERC's authority to determine whether wholesale rates are "just and reasonable" is exclusive. *Mississippi Power & Light Co. v. Mississippi*, 487 U.S. 354, 371 (1988).

Much of the theory that underpins the present controversy has its roots in the "filed rate doctrine," which is central to FERC's operations. "The 'filed rate doctrine' was developed in the 19th century as part of a program to regulate the ruthless exercise of monopoly power by the Nation's railroads." *Maislin Industries, U.S., Inc. v. Primary Steel, Inc.*, 497 U.S. 116, 138 (1990) (Stevens, J., dissenting). During that period, railroad companies often charged substantially higher rates on noncompetitive routes, granted secret discounts to preferred shippers, and overcharged competitors of preferred customers. These concerns, among others, led to the passage of the Interstate Commerce Act ("ICA") in 1887. *See* Interstate Commerce Act, ch. 104, 24 Stat. 379 (1887) (codified as amended at scattered sections of 49 U.S.C.). The "great purpose" of the ICA, as the Supreme Court has said, was "to regulate commerce, whilst seeking to prevent unjust and unreasonable rates, . . . to secure equality of rates as to all, and to destroy favoritism, these last being accomplished by requiring the publication of tariffs, and by prohibiting secret departures from such tariffs, and forbidding rebates, preferences, and all other forms of undue discrimination." *New York, N.H. & H.R. Co. v. ICC*, 200 U.S. 361, 391 (1906). Under the ICA, a carrier could charge a shipper only those rates incorporated in a

tariff that the carrier had filed with the ICC. The rate became effective after it was filed unless the rate or the practice employed by the carrier was deemed unreasonable by the ICC. The requirement that carriers collect only the rate they filed, or that the ICC established, became commonly referred to as the "filed rate doctrine." The doctrine, as applied, also meant that private parties could not contract for a price other than the filed rate.

[2] The Supreme Court first articulated the filed rate doctrine as applied to the power industry in 1951 in *Montana-Dakota Utils. Co. v. Northwestern Pub. Serv. Co.*, 341 U.S. 246, 251-52 (1951). The Court held that rates established in power sales contracts filed with and accepted by FERC's predecessor, the Federal Power Commission, were not only binding on the parties, but on the federal courts. *Id.* In short, under the filed rate doctrine, once rates have been accepted for filing under FPA § 205, utilities must adhere to those rates absent a waiver. *Arkansas Louisiana Gas Co. v. Hall*, 453 U.S. 571, 577 (1981). The rate filed by the wholesale seller of electricity or fixed by FERC is the only lawful charge and "[d]eviation from it is not permitted upon any pretext." *AT&T v. Central Office Telephone, Inc.*, 524 U.S. 214, 222 (1986). Unless the filed rates are challenged administratively, the filed rates become the legal rates. If the rates are challenged, then FERC decides whether the rates are "just and reasonable" and not "unduly discriminatory." Parties may challenge FERC's resolution of these issues in a petition for review before the appropriate United States Court of Appeals. 16 U.S.C. § 825l(b). However, appellate review is deferential. *See City of Seattle v. FERC*, 923 F.2d 713, 715 (9th Cir. 1991).

With a fixed rate tariff, the review process is relatively straightforward. A wholesaler would file a rate, which would become the legal rate unless challenged. If FERC determined that the rate was not "just and reasonable" after a challenge, then it would order refunds.

**[3]** However, approximately a decade ago, companies began to file market-based tariffs that did not specify the precise rate to be charged. As a result, FERC then departed from its historical policy of basing rates upon the cost of providing service plus a fair return on invested capital, and began approving market-based tariffs.

California contends that the market-based tariff system approved by FERC in this case violates the FPA because it relies on unfiled, privately negotiated rates to satisfy statutory rate filing requirements, and that this cannot be sustained even when the agency has made a prior determination that market forces will drive rights into a zone of reasonableness.

In considering FERC's tariff-approving authority, the Supreme Court has emphasized "that the just and reasonable standard does not compel the Commission to use any single pricing formula . . . ." *Mobil Oil Exploration & Producing Southeast Inc. v. United Distribution Co.*, 498 U.S. 211, 224 (1991) (discussing the "just and reasonable" requirement in the natural gas context). The Court has recognized that the "just and reasonable" requirement accords FERC "broad rate-making authority." *Id.*

The use of market-based tariffs was first approved in the natural gas context, *see Elizabethtown Gas Co. v. FERC*, 10 F.3d 866, 870 (D.C. Cir. 1993), then as to wholesale sellers of electricity, *see Louisiana Energy and Power Authority v. FERC*, 141 F.3d 364, 365 (D.C. Cir. 1998). However, approval of such tariffs was conditioned on the existence of a competitive market. *Id.* Thus, market-based applications were approved only if FERC made a finding that "the seller and its affiliates [did] not have, or adequately [had] mitigated, market power." *Id.*[4] The principle justifying this approach as

---

[4]FERC defines market power as a seller's ability to "significantly influence price in the market by withholding service and excluding competitors for a significant period of time." *Citizens Power & Light Corp.*, 48 FERC ¶ 61,210 at 61,777 (1989).

"just and reasonable" was that "[i]n a competitive market, where neither buyer nor seller has significant market power, it is rational to assume that the terms of their voluntary exchange are reasonable, and specifically to infer that the price is close to marginal cost, such that the seller makes only a normal return on its investment." *Tejas Power Corp. v. FERC*, 908 F.2d 998, 1004 (D.C. Cir. 1990).

In support of its contention that market-based tariffs are impermissible under the FPA, California relies on *MCI Telecommunications Corp. v. AT&T*, 512 U.S. 218 (1994) and *Maislin Indus. USA v. Primary Steel Inc.*, 497 U.S. 116, 132 (1990). In *MCI*, the Supreme Court held that the FCC could not eliminate rate-filing requirements for any class of carrier, even when necessary to promote competitive markets. In *Maislin*, the Court held that the ICC could not allow common carriers to charge unfiled, privately negotiated rates lower than the filed rates, even when the carriers were in highly competitive markets. *Id.* at 132-33. As the Court stated in *Maislin*, the existence of a competitive market "cannot provide the ICC authority to alter well-established statutory filed rate requirements." *Id.* at 135.

However, the regulatory scheme before us is different from those under consideration in *MCI* and *Maislin*. The agencies in *MCI* and *Maislin* relied on market forces alone in approving market-based tariffs. In contrast, FERC's system consists of a finding that the applicant lacks market power (or has taken sufficient steps to mitigate market power), coupled with strict reporting requirements to ensure that the rate is "just and reasonable" and that markets are not subject to manipulation. Here, FERC required the wholesale seller to file a market analysis every four months, and quarterly reports summarizing its transactions during the preceding three months. These transaction summaries include both long and short-term contracts, purportedly with reports of some sales for intervals as small as ten minutes. FERC has affirmed in its presentation before us that it is not contending that approval of a market-

based tariff based on market forces alone would comply with the FPA or the filed rate doctrine. Rather, the crucial difference between *MCI/Maislin* and the present circumstances is the dual requirement of an ex ante finding of the absence of market power *and* sufficient post-approval reporting requirements. Given this, FERC argues that its market-based tariff does not run afoul of *MCI* or *Maislin*, and we agree.

California argues that different reporting requirements should have been established. However, Congress specified that filings be "within such time and within such form" and under "such rules and regulations as the Commission may prescribe," 16 U.S.C. § 824d(c). Thus, so long as FERC has approved a tariff within the scope of its FPA authority, it has broad discretion to establish effective reporting requirements for administration of the tariff.

For all of these reasons, California's facial challenge to market-based tariffs fails.[5]

### III

Our determination that market-based tariffs do not, *per se*, violate the FPA does not end our inquiry. California also argues that, even if market-based tariffs are lawful in concept, FERC failed to administer the tariffs in accordance with their

---

[5]FERC argues that California's facial challenge to market-based tariffs is an impermissible collateral attack on FERC's decision in *San Diego Gas & Elec. Co.*, 96 FERC ¶ 61,120. We disagree. Both the nature and scope of California's challenge to FERC's system of market-based rates differ significantly from previous narrow challenges to particular aspects of FERC's system. Moreover, while California was a late intervenor in a pertinent proceeding, it was foreclosed from fully litigating the claims at issue in this case. Thus, FERC erred in dismissing California's claims as an impermissible collateral attack on prior Commission orders. As indicated above, however, we agree with FERC that both the Congressionally enacted statutory scheme, and the pertinent case law, indicate that market-based tariffs do not *per se* violate the FPA.

terms and abused its discretion in limiting available remedies for regulatory violations. On these issues, we agree with California.

[4] As we have discussed, there is nothing inherent in the general concept of a market-based tariff that violates the FPA; however, as *MCI* and *Maislin* affirm, a market-based tariff cannot be structured so as to virtually deregulate an industry and remove it from statutorily required oversight. The structure of the tariff complied with the FPA, so long as it was coupled with enforceable post-approval reporting that would enable FERC to determine whether the rates were "just and reasonable" and whether market forces were truly determining the price.

[5] For example, in *Enron Power Marketing, Inc.*, 65 FERC ¶ 61,305, FERC emphasized that transaction-specific reporting "is necessary so that the marketer's rates will be on file as required by section 205(c) of the FPA, to evaluate the reasonableness of the charges, and to provide for ongoing monitoring of the marketer's ability to exercise market power." Similarly, FERC has stated that transaction-specific data is the "minimum needed for market monitoring purposes." *Revised Public Utility Filing Requirements*, 99 FERC ¶ 61,107 (2002).

Despite the crucial nature of the transactional reporting, as FERC admits, the reporting requirements were not followed in the period at issue. Indeed, non-compliance with FERC's reporting requirements was rampant throughout California's energy crisis. FERC itself has acknowledged that during the height of the energy crisis the quarterly reports of several major wholesalers failed to include the transaction-specific data through which the agency at least theoretically could have monitored the California energy market:

> The quarterly reports submitted . . . by a number of the respondents do not comply with [the] require-

ments. For example, Williams Energy Marketing and Trading Company, Dynegy Power Marketing, Inc., Mirant Americas Energy Marketing, LP and Reliant Energy Services, Inc. filed aggregated data in their transaction reports for the fourth quarter 2000 and all four quarters of 2001. . . . Similarly, any other filings that report aggregate data did not comply with the reporting requirements.

*State of California ex rel. Bill Lockyer, Attorney General of the State of California v. British Columbia Power Exchange Corp. et al.*, 99 FERC ¶ 61,247 at 62,066 (2002).

Thus, the very mechanism that distinguished FERC's tariff from those prohibited by the Supreme Court in *MCI* and *Maislin* was, for all practical purposes, non-existent while energy prices skyrocketed and rolling brown-outs threatened California's businesses and citizens.

Despite the promise of truly competitive market-based rates, the California energy market was subjected to artificial manipulation on a massive scale. With FERC abdicating its regulatory responsibility, California consumers were subjected to a variety of market machinations, such as "round trip trades"[6] and "hockey-stick bidding,"[7] coupled with manipulative corporate strategies, such as those nicknamed "FatBoy," "Get Shorty," and "Death Star."[8]

---

[6] Round-trip trades are a mechanism for market manipulation through which an entity attempts to inflate transaction volume through the continuous and frequent sale of a particular commodity. The trades create the appearance of increased revenue and demand, but in actuality produce no net income.

[7] Hockey-stick bidding is a fraudulent practice whereby an extremely high price is demanded for a small portion of a product in light of known inelastic demand (as was the case for energy in California during the energy crisis).

[8] These monikers are strategies referred to in now notorious internal memos at the Enron Corporation that were released to the public by

However, despite the integral nature of the reporting requirements to an effective market-based tariff, and despite the patent failure of many of the affected companies to provide even minimal reporting, FERC's position here is that violation of tariff reporting requirements is merely a technical "compliance issue," and it is therefore without authority to order refunds retroactively based on reporting failures.

FERC misapprehends its legal authority in this context. In fact, FERC possesses broad remedial authority to address anti-competitive behavior. *See Transmission Access Policy Study Group v. FERC*, 225 F.3d 667, 686 (D.C. Cir. 2000). Indeed, in the past, FERC has ordered refunds in instances where utilities violated FPA § 205, either by violating the terms of an accepted rate, or by charging rates without first seeking approval under FPA § 205. In *The Washington Water Power Co.*, 83 FERC ¶ 61,282 (1998), FERC ordered profits disgorged because a regulated utility had violated posting requirements and conferred undue preferences on its marketing affiliate. To do otherwise would allow companies to flout our regulations, and overcharge consumers with impunity."

FERC. "FatBoy" refers to a strategy through which the Houston-based energy company allegedly withheld previously agreed-to deliveries of power so it could sell the energy at a higher price on the spot market. To execute this, the company would over-schedule its load; supply only enough power to cover the inflated schedule; and thus leave extra supply in the market, for which the ISO would pay the company. Via the "Get Shorty" strategy, traders were able to fabricate and sell emergency back-up power (known as ancillary services) to the ISO, receive payment, then cancel the schedules and cover their commitments by purchasing through a cheaper market closer to the time of delivery. Under the "Death Star" strategy, Enron allegedly sought to be paid "for moving energy to relieve congestion without actually moving any energy or relieving any congestion." *See 'FatBoy,' 'Get Shorty,' and 'Inc-Ing': A Look at Enron Trading Practices*, May 13, 2002, Electric Utility Week 7, 2002 WL 10510230; *see also Enron Memos Put FERC in the Hot Seat; All Western Sellers Will be Grilled*, May 13, 2002, Electric Utility Week 1, 2002 WL 10510221 (noting, *inter alia*, that while Enron's monikers may have been unique, its practices in the California energy market were not).

24 FERC ¶ 61,199 at 61,461, *reh'g order*, 24 FERC ¶ 61,380, *reh'g denied*, 25 FERC ¶61,308 (1983).

[6] Here, because the reporting requirements were an integral part of a market-based tariff that could pass legal muster, FERC cannot dismiss the requirements as mere punctilio. If the ability to monitor the market, or gauge the "just and reasonable" nature of the rates is eliminated, then effective federal regulation is removed altogether. Without the required filings, neither FERC nor any affected party may challenge the rate. Pragmatically, under such circumstances, there is no filed tariff in place at all. The power to order retroactive refunds when a company's non-compliance has been so egregious that it eviscerates the tariff is inherent in FERC's authority to approve a market-based tariff in the first instance. FERC may elect not to exercise its remedial discretion by requiring refunds, but it unquestionably has the power to do so. In fact, if no retroactive refunds were legally available, then the refund mechanism under a market-based tariff would be illusory. Parties aggrieved by the illegal rate would have no FERC remedy, and the filed rate doctrine would preclude a direct action against the offending seller. That result does not comport with the underlying theory or the regulatory structure established by the FPA.

[7] One of the animating ideas behind the FPA and the filed rate doctrine was, as we have discussed, the prevention of price discrimination and the imposition of unjust and unreasonable rates by requiring that all customers receive the same published rate. As the Supreme Court noted in *Maislin*, the purpose of the filed rate doctrine is undermined when it is impossible to review the reasonableness of privately negotiated, unfiled rates. 497 U.S. at 132. If the tariff is interpreted as FERC urges here, then the tariff runs afoul of *Maislin*, the filed rate doctrine, and the FPA. If, on the other hand, we view the reporting requirements as integral to the tariff, with implied enforcement mechanisms sufficient to provide substitute remedies for the obtaining of refunds for the imposition

of unjust, unreasonable and discriminatory rates, then a market-based tariff is permitted. FERC cannot have it both ways. The FPA does not permit it.

FERC argues that we owe it deference under *Chevron USA Inc. v. NRDC*, 467 U.S. 837 (1984) and that as a result, we cannot reach a contrary conclusion about the limits of its remedial authority. However, *Chevron* does not require blind deference; the Supreme Court has articulated a more thorough and nuanced approach. *See Food & Drug Admin. v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 125-26 (2000). Under *Chevron*, we must consider first "whether Congress has directly spoken to the precise question at issue." *Chevron*, 467 U.S. at 842. "If Congress has done so, the inquiry is at an end; the court 'must give effect to the unambiguously expressed intent of Congress.' " *Brown & Williamson*, 529 U.S. at 132 (quoting *Chevron*, 467 U.S. at 843).

As we have often stated, "[w]hen we look to the plain language of a statute in order to interpret its meaning, we do more than view words or sub-sections in isolation. We derive meaning from context, and this requires reading the relevant statutory provisions as a whole." *United States v. Hanousek*, 176 F.3d 1116, 1120 (9th Cir. 1999) (quoting *Carpenters Health & Welfare Trust Funds v. Robertson (In re Rufener Constr.)*, 53 F.3d 1064, 1067 (9th Cir. 1995)).

Thus, as the Supreme Court emphasized in *Brown & Williamson*, we must analyze the provision in the context of the entire governing statute, *see id.*, presuming congressional intent to create a "symmetrical and coherent regulatory scheme." *Id.* at 133 (quoting *Gustafson v. Alloyd Co.*, 513 U.S. 561, 569 (1995)).

In addition, "we must be guided to a degree by common sense as to the manner in which Congress is likely to delegate a policy decision." *Id.* If, after conducting such an analysis, we conclude that Congress has not addressed the issue, we

13140             CALIFORNIA v. FERC

"must respect the agency's construction of the statute so long as it is permissible." *Id.* at 132 (citing *INS v. Aguirre-Aguirre,* 526 U.S. 415, 424 (1999)).

[8] In this instance, our statutory construction of FERC's authority is dictated by the plain language and words of the Federal Power Act, and by a common sense application of the principles underlying the FPA. To cabin FERC's section 205 refund authority under the circumstances of this case would be manifestly contrary to the fundamental purpose and structure of the FPA, and cannot be sustained under *Maislin* and *MCI.*

FERC's construed limitations on its own authority are not supported by a careful examination of the FPA. Either the quarterly report requirement is an integral part of the authorizations under § 205, in which case violations of the requirement cannot be dismissed as mere "compliance issue[s]," or the reporting requirement is a mere compliance issue, in which case, where FERC neglects to require the filing of the reports, and thus does not engage in an active ongoing review, the only arguably serious regulatory screening that exists is FERC's initial determination with respect to a seller's market power—a determination that may bear little or no relation to the realities of subsequent circumstances.

It is true that pending a § 205 investigation, FERC may suspend a rate for a period of up to five months, at which point the proposed rate becomes effective subject to a refund if FERC ultimately determines the initially-suspended rate to be unreasonable. However, when the § 205 determination consists of a blanket approval of market-based rates determined solely (at least at the outset) on a lack of market power, the purgatorial period contemplated by the statute does not exist. Either FERC determines an entity has market power and thus is unauthorized to sell at market-based rates, or FERC determines an entity lacks market power and is thus authorized to sell at market-based rates. In the case of the former, there is

no market-based rate authority whatsoever subject to the remedies in § 205. In the case of the latter, because the "rates" are already "approved," the only remedies are prospective, and, for that matter, unavailable for a period of 60 days pursuant to § 206(b). In other words, the § 205(e) refund remedy is, practically speaking, eliminated under the scheme as FERC would have us interpret it. Such an interpretation comports neither with the statutory text nor with the Act's "primary purpose" of protecting consumers. So while we agree with FERC that market-based tariffs are not *per se* invalid under the FPA, it is clearly incorrect to conclude that the reporting requirements are anything less than essential to a valid administration of the market-based system at issue in this case.

As we have noted, FERC itself has recognized that it possesses the authority to impose retroactive refunds for § 205 violations in *Washington Water Power* and *Delmarva Power*. Here, the reporting requirements were an integral part of a market-based tariff that could pass legal muster. The FPA cannot be construed to immunize those who overcharge and manipulate markets in violation of the FPA. In short, the governing statute can be easily construed in accordance with the principles articulated by the Supreme Court in *Brown & Williamson*. Therefore, FERC's *Chevron* argument necessarily fails.

[9] For these reasons, we agree with California that FERC improperly concluded that retroactive refunds were not legally available. Although California urges us to order refunds, we decline to do so. It is more appropriate for FERC to reconsider its remedial options in the first instance. We therefore grant the petition and remand to FERC for further proceedings consistent with this opinion.

**PETITION GRANTED; REMANDED.**



Journal of Industry, Competition and Trade, 2:1/2, 143–158, 2002
© 2002 Kluwer Academic Publishers. Manufactured in The Netherlands.

# Simulating Effects of Business Decisions on Regional Economy: Experience During the California Energy Crisis

OTTIE NABORS                                                                                    ofnabors@bpa.gov
*Bonneville Power Administration (PMB-6), P.O. Box 3621, Portland, OR 97232-3621\**

GEORGE BACKUS
*Policy Assessment Corporation*

JEFF AMLIN
*Systematic Solutions Inc.*

**Abstract.** Over the last 30 years, simulation models have become accepted by the business sector as a means to understand the interaction of business decisions with their market environment. Public utilities have a history in using static models to forecast demand growth and develop "least cost resource plans." The effects of the California energy crisis were felt well outside the borders of that state. In the hydro-generation dominated system of Pacific Northwest, drought conditions constrained generation and exacerbated the demands placed on the western spot markets. This article describes the application of the ENERGY2020/REMI model to the problem of estimating the regional economic impacts of possible wholesale electricity rate increases and industrial load curtailment by a large Federal Power Marketing Agency during a period of highly volatile and uncertain energy prices.

**Keywords:** simulation, model, planning, economy, systems, energy, electricity

This paper describes the use of system simulation modeling to test business strategy options for the Bonneville Power Administration (BPA), a Federal Power Marketing Agency that was considering wholesale power rate increases and load curtailment of large industrial customers in response to the California energy crisis. The rocketing electricity prices that hit California from June 2000 through March 2001, were felt in the energy markets throughout the western United States. Tight supply and demand conditions in California along with a drought in the Northwest and high natural gas prices converged to create adverse business conditions never seen before in the industry. BPA sought the use of a simulation model to test strategies in order to gain insight into the impacts of the proposed policies on the economy of the Pacific Northwest.

In recent years, proponents of simulation and system dynamics models have advocated the need for decision makers in the energy industry to adopt these tools for policy analysis, both in the private and public sector (Bunn and Larsen, 1997; Larson et al., 2001). These models have a long tradition of use in the electricity industry to analyze conservation (Ford and Bull, 1989), U.S. Department of Energy policy analysis (Naill,

1992), feedback (Geragty and Lyneis, 1985), and effects of market structure (Ford, 2001a and Ford, 2001b).

In this paper, we explore the relationship between California and Northwest energy markets, the view of California markets from the perspective of the Northwest, and the use of an integrated energy sector-macroeconomic model to estimate the impact of proposed rate adjusts on the Northwest economy. We will then describe the model used in the simulation, describe the scenarios tested, and describe the model results. At the end, we will list several studies that are contemporaneous with the BPA work and make comparisons to these other analysis as appropriate.

## 1. Background

Over the last ten years, 16% to 27% of California's electric power needs were met by out-of-state purchases varying with in-state hydroelectric fluctuations and other economic factors. California has the capability to transfer about 15,500 MW of power from external sources, mostly from the Pacific Northwest and the Southwest (Wetherall, 2001). Historically, California has taken advantage of seasonal diversity by entering into exchange agreements where California takes electricity from the Northwest during high spring and summer water flows and replaces it with California-generated electricity in the winter, when demand in California is lower and Pacific Northwest hydro-generation is curtailed to provide bypass stream flows for protected fisheries in the Columbia River. The CEC estimates that in 2000, 70% of the 44.6 gigawatt-hours of energy imported by California from the Pacific Northwest were derived from hydro units while 30 came from coal units (Wetherall, 2001). Net import levels during peak load periods have steadily declined over the past several years because generation additions throughout the western United States have not kept pace with load growth.

Between the period of the early 1980s up to the start of the California Power Exchange in 1998, wholesale power transactions between the California and Northwest utilities were based on bilateral sales, both long-term and spot, which took advantage of the difference in seasonal peak patterns that allowed for the exchange of capacity and energy between the two regions. This situation allowed the seasonal surplus to be exported to the region requiring the energy, resulting in a more optimal use of the resources and recovery of resource costs.

The creation of the CAPX and ISO shifted the trading or exchange of energy from the traditional bilateral arrangements to spot market, day ahead, hour ahead or real-time balancing energy transactions.[1] The California IOUs were required to purchase their full retail load requirements from the CAPX. Northwest utilities would continue to sell to California, but they would sell to either the CAPX or its sister organization, the California Independent System Operator.

SIMULATING EFFECTS OF BUSINESS DECISIONS ON REGIONAL ECONOMY                    145



*Figure 1.* Mid Columbia and NP-15 average daily peak prices.

The BPA is a Federal Power Marketing Agency (PMA) with responsibility for marketing power from the 30 federal dams on the Columbia and Snake Rivers in the Northwestern United States[2] plus one nuclear facility and other resources operated by public agencies in the Northwest. All total, BPA has a sustained hydro capacity of 17,484 MW (50-hour limit) and 1162 MW for the nuclear facility. The system can produce 6671 aMWs[3] in a typical year from its hydro resources (a plant factor of 38%). By law, BPA is self-funding and is required to sell power at cost to its northwest regional utility and Direct Service Industry (DSI) customers based on published wholesale power rates.[4]

The BPA had completed its rate setting process for the 2002–2006 timeframe just before the first heat spike in California on May 15, 2000. A number of incidents involving weather and unplanned outages would cause a series of price spikes effecting both California and the Northwest. (See Figure 1.) Over the course of the summer of 2000, requirements customers began to place greater loads on the Agency than anticipated (1560 aMWs above forecast) as market conditions worsened and the northwest entered a

---

2  The BPA service territory includes Oregon, Washington, Idaho, Western Montana and public utilities that provide service in fringe counties of California, Nevada, and Wyoming.

*Table 1.* Average forecasted demand (aMw).

|  | Rate case forecast | Signed contracts |
|---|---|---|
| Public Utilities | 4143 | 6300 |
| Investor Utilities | 1000 | 1000 |
| Direct Service Industries | 990 | 1486 |
| Slice (Unshaped Hydro) | 2000 | 2000 |
| Total | 8133 | 10,786 |
| Difference |  | 2653 |

drought period in December 2000, available supplies became more expensive. (See Table 1.)

The rate case has assumed well-behaved market conditions before and over the course of the rate period. Average spot market price for heavy load hour energy at Mid-Columbia in 2000 was expected to be $29.10/MWh (nominal) while the average day-ahead price recorded at Mid-Columbia turned out to be $140/MWh.[5] Table 2 shows the spot market price forecast used in the rate case. Under the conditions expected in the rate case and under normal water conditions, BPA would have to purchase about 800 aMWs to meet expected loads placed on the Agency and the power rates reflected these purchases at an average cost of between $27.9/MWh and $34.4/MWh over the five-year period.

In the process of curtailing loads to meet the shortage of low cost power, BPA began a policy of buying out the service contracts of the DSI customers and other large retail customers served by publicly owned utilities in the Region who were willing to return the power back to the Agency.

Despite its actions to reduce dependency on market purchases to meet its load obligations, BPA realized that the financial and resource situation going into the new rate period was serious enough to call into question the rate schedule published just a few months earlier. By September, the change in market conditions would cause BPA to reconsider the initial rate settlement and invoke the Cost Recovery Adjustment Clause (CRAC) to makeup any revenue shortfalls going into the new rate period.

In March 2001 the Vice President of the Power Business inquired about the use of ENERGY 2020/REMI to analyze the effects of policy options being discussed as part of the Rate Adjustment process on the region. The Agency was considering a spectrum of possible rate increases that depended in part on curtailing service to the DSIs. The analysis itself was sensitive given the decision to implement CRAC. Job lay-offs attributed to the high cost of power were already receiving a high level of publicity and any action by the agency that increased rates even further were expected to exacerbate the negative forces at work on the regional economy. Because different parties to the Rates process had staked out different positions on this issue, the Administrator needed

*Table 2.* 2002–2006 Rate case price forecast.

| | Nominal energy prices at Mid-Columbia $/Mwh | | | | | | |
| --- | --- | --- | --- | --- | --- | --- | --- |
| | 2000 | 2001 | 2002 | 2003 | 2004 | 2005 | 2006 |
| Heavy Load Hour | 29.1 | 32.9 | 35.7 | 37.3 | 38.1 | 40.1 | 42.2 |
| Light Load Hour | 18.7 | 21.3 | 23.5 | 23.9 | 23.5 | 23.5 | 23.7 |
| Average Weighted | 24.6 | 27.9 | 30.4 | 31.5 | 31.8 | 33 | 34.4 |
| | Real energy prices at Mid-Columbia $/Mwh | | | | | | |
| | 2000 | 2001 | 2002 | 2003 | 2004 | 2005 | 2006 |
| Heavy Load Hour | 27.3 | 30.2 | 31.9 | 32.4 | 32.2 | 33.1 | 33.9 |
| Light Load Hour | 17.5 | 19.5 | 21 | 20.8 | 19.9 | 19.4 | 19 |
| Average Weighted | 23.1 | 25.6 | 27.2 | 27.4 | 26.9 | 27.2 | 27.5 |
| | Henry Hub natural gas price forecast (Real $/MMBtu) | | | | | | |
| | 2000 | 2001 | 2002 | 2003 | 2004 | 2005 | 2006 |
| Henry Hub | 2.1 | 2.15 | 2.19 | 2.23 | 2.27 | 2.3 | 2.33 |

information about which options available to him would minimize the impacts and provide the basis for defending the difficult choices the Agency faced.

Because the intended clients for this analysis were the Administrator and the Vice-President of the Power Business, and given that ENERGY 2020 had not been accepted as a tool for rate setting, the analysis was conducted parallel to but separate from the Rate Adjustment process itself.

## 2. Simulation overview

To understand the interaction and future impacts of the aforementioned dynamics, BPA chose to use the ENERGY 2020/REMI model because it utilizes feedback in its modeling dynamics. The Agency already had experience in using the model to evaluate the economic impact of the aluminum industry (Backus and Kleemann, 2000). ENERGY 2020 is used extensively for price (Kleemann, 1999), resource (Jensen, 1990), and demand forecasting (New York Times, 1991). The REMI[6] and ENERGY 2020[7] models are combined for scenario analyzes that anticipate significant expected energy price responses leading to macroeconomic impacts (Backus and Alexander, 1999). Changes in spot and wholesale prices, energy demand, and state and regional economic output and employment are major variables tracked throughout the analysis. These primary variables

148                                                                                      NABORS, BACKUS AND AMLIN

are affected by secondary variables that change as well: relative energy prices, electricity usage by customer class, commercial and industrial operating expenses; and residential purchasing power. Sometimes secondary variable changes can pull a primary variable in opposite directions and sometimes it reinforces the primary variable causing an increase in impact. The ultimate direction of the primary variable depends on the relative magnitudes of the changes.

For example, when comparing the two simulations where electric prices increase by 250% in one and where electric prices increase by 100% in the other, the expectation is that the relatively lower electric prices in the second scenario will result in the primary impact of less fuel switching (or conservation) away from electricity and thereby, result in higher levels of demand. The secondary impacts in the second price case would be the reduction in consumers' overall purchasing power resulting in less consumption of all goods, including electricity. In this instance, the primary impact (electric prices) is reinforced by the secondary impact (the income effect of higher electric prices). However, natural gas consumption would see opposing impacts—fuel switching into gas as relative prices give natural gas an advantage and reduced natural gas consumption due to the general negative income effect of higher electricity prices. Impacts that cause change in opposite directions can have net impacts that can vary with the magnitude of the change. Very high electric prices can have a very strong income effect that reduces customers' consumption of all goods, including other fuels, causing consumption of other fuels to fall, despite the relative price advantage. Over lower ranges of electric price increases, the impact of relative prices may outweigh the income effect (that is spread over all goods and services). All analyses using ENERGY 2020/REMI require an understanding of feedback.

The macroeconomic portion of the analysis was performed using the REMI model. This model has been used extensively for similar work (Fulton and Grimes, 1993) and is well documented (Treyz, 1993). It contains detailed inter-industry responses, consumer responses, and migration dynamics. The model includes the explicit macroeconomic interactions of Oregon, Washington, Idaho, Montana, and the rest of the west (California, Utah, Colorado, Wyoming, New Mexico, Arizona, Nevada as an aggregate). These entities additionally interact with a rest-of-nation region that contains basic rest-of-world interactions in it as well.

The energy dynamics are integrated with the macroeconomic analysis using ENERGY 2020. Different endogenous price responses are simulated for residential, commercial, and industrial customers. In this analysis, the ENERGY 2020 portion simulated the entire WSCC (Western System Coordinating Council—all the western states) including the Canadian portion at the state and provincial level for demands, and at the company level for energy. Transmission constraints and wholesale markets, including the deregulated California market, are explicitly simulated. Both wholesale and retail prices by class are detailed and the price changes from the smelter closings are explicitly calculated and fed back in REMI.

Full macroeconomic feedback is included in these runs via the REMI model to capture

SIMULATING EFFECTS OF BUSINESS DECISIONS ON REGIONAL ECONOMY          149



*Figure 2.* Energy 2020/REMI sector relationships.

Washington, Oregon, Idaho, Montana and the rest of the WSCC interact as the energy prices and energy trade changes with each scenario.

ENERGY 2020/REMI incorporates the full demand response to changes in energy prices by fully modeling the economy's response to higher electric prices. These price and demand signals are passed to REMI and are used to determine changes in economic output. Economic output changes are reflected in the changes in disposable household income and changed demand and profit levels for business which effect gross output, as well as general price levels that are then passed back to ENERGY 2020 and in turn affect the demand, and market price, and supply of energy. See Figure 2.

Because ENERGY 2020 is a fully integrated load and price-forecasting model, endogenous supply decisions are made by ENERGY 2020 as input fuel prices, market prices, and demand changes indicate. ENERGY 2020 endogenously builds new resources as both market prices and fuel prices make resource development profitable for generating companies. This version of the model was set to allow for building the least costly resources based on fuel, technologies, and market needs (base-load, cyclical or peaking). Building induced by cost signals in response to anticipated demand can generate price spikes as prices rise high enough to stimulate new construction. Overbuilding and building lags can occur as they do in reality. The result is that market prices, regional reserves, and new resource development tend to cycle (commonly referred to as a boom-bust) with new construction causing spot prices to fall and tight demand causing prices to rise (Ford 2001b; see also the paper in this special issue).

NABORS, BACKUS AND AMLIN

spot market, and the cost of other fuels. ENERGY 2020/REMI modeling system
delineates the separate responses in both the energy sector and the economy as a whole.

## 3. Analysis

Initially, the scenarios considered involved rate increases from 80 to 400%. Over time as
the drivers for the tests were refined, work became focused on four scenarios with two
reflecting the most likely options to be implemented. The four scenarios would test these
options to isolate economic and rate impacts attributable to the West Coast energy crisis
apart from BPA strategies. The scenarios were created from plausible assumptions that
would generate a bandwidth of potential outcomes used for comparison. These scenarios
are:

### 3.1. Before California

This scenario was generated to estimate the likely level of economic activity given the
expectations in place at the end of 1999. It portrayed a stable west coast energy market
where natural gas prices would remain at their recent historic price levels, normal water
conditions with a non-firm BPA surplus of 3000 aMW, California's electricity markets
would be "functional," and strategic bidding by independent power producers would be
at a minimum (suppliers are well behaved). Further, new generation comes on-line to
meet expected load growth. For purposes of this scenario, BPA's rates are set at the
proposed levels reached in the FY2001 rate negotiations as of early 2000. To simplify the
model runs, augmentation[8] was set at 3300 aMW, the level committed to in June of 2000.
In this scenario, BPA serves the smelter load at subscription levels (1416 aMW), and the
smelters operate at full capacity because they can find reasonably priced energy on the
spot market.

### 3.2. Base Case: benchmark for BPA action

This scenario assumes business-as-usual for BPA. There is no rate increase and the DSI
customers are served at subscription levels with 1416 aMW allocated to the aluminum
smelters. However, the nature of the energy markets changed dramatically to reflect the
California Energy Crisis. Natural gas prices spiked in 2001 to new highs. After 2003, it
was assumed that gas prices return to levels in the "Before California" scenario. Low
hydro conditions in 2001 constrain power generation by BPA, other Northwest units, and
units in Northern California. Although we assume normal water beginning in 2002, the
physical act of refilling reservoirs and recharging ground water causes constrained hydro

generation through 2002. California's energy markets become dysfunctional in 2001; supply and demand imbalances along with strategic bidding (based on profit maximization) on the part of IPPs contribute to higher then expected power prices.

### 3.3. "Path A": higher rates

The Scenario represents BPA's strategy option of not pursuing load reductions. BPA serves DSIs at the agreed to subscription level of 1490 aMW while raising rates to all customers, including the DSIs, by 250% or setting delivered rates at $83.85/MWh, to cover projected revenue shortfalls due to purchasing power on the spot market. For simplicity reasons, the rates are set over the full rate period. Market conditions remain the same as those set for the Base Case.

### 3.4. "Path B": smelter shutdown

This scenario represents BPA's strategy option of pursuing load reductions to minimize necessary rate increases. In this scenario, all DSI loads are curtailed in order to test the direct impacts of these job losses on the region. Meanwhile, wholesale power rates to all of BPA's remaining customers (Public Utilities and IOUs) are increased 100% or set to $49.90/MWh over the rate period. Again, the energy market conditions remain the same as those set for the Base Case.

## 4. Model results

The results of this analysis demonstrated to BPA's managers that "Path B", the option which pursued DSI load reductions was the superior option—not only · from the standpoint of employment impacts, but by other measures such as Gross Regional Product and Personal Income. Table 3 shows the differences that result from the two paths tested.

For purposes of measuring the impact of BPA's proposed actions, the "Business as Usual—Base Case" is used as the reference point. Either of BPA options—shutting down the smelters or raising subscription rates by 250%—causes a reduction in job growth (Table 3, "Path A" and "Path B"). Either action leads to nearly the same reduction in job growth in 2002 (16,455 fewer jobs with continued smelter use; 16,888 fewer jobs with the shut down). However, the employment changes in subsequent years exhibit different behaviors. The large increase in BPA contract prices under "Path A" results in persistent additional employment growth reductions through 2006, totaling over 34,511 jobs. In contrast, the load reduction option, "Path B", produces lower employment changes of 9487 fewer jobs per year over the five-year rate period.

152                                                                    NABORS, BACKUS AND AMLIN

*Table 3.* Summary of changes in economic measures under Path A and Path B.

| | Regional employment | | Gross regional product (billion 1998$) | |
|---|---|---|---|---|
| Scenario | 2002 | Average over rate period | 2002 | Total over rate period |
| Before California | 5,971,367 | 6,072,389 | $387.44 | $2013.46 |
| Impact Due to Energy Crisis | −145,928 | −92,571 | ($8.65) | ($31.70) |
| Benchmark for BPA Action: Base Case | 5,825,439 | 5,979,818 | $378.78 | $1981.77 |
| Path A: Higher Rates | 5,808,984 | 5,945,306 | $377.89 | $1971.21 |
| Path B: Smelter Shutdown | 5,808,551 | 5,970,330 | $377.65 | $1977.71 |
| Incremental Impact due to Path A | −16,455 | −34,511 | ($0.89) | ($10.56) |
| Incremental Impact due to Path B | −16,888 | −9487 | ($1.12) | ($4.06) |
| Difference Between Path A and Path B | −433 | 25,024 | ($0.23) | $6.50 |

| | Personal income (billion 1998$) | | Personal income per capita (1998$) | |
|---|---|---|---|---|
| Scenario | 2002 | Total over rate period | 2002 | Average over rate period |
| Before California | $297.84 | $1527.27 | $25,783.35 | $25,998.66 |
| Impact Due to Energy Crisis | ($5.02) | ($18.28) | ($230.26) | ($0.65) |
| Benchmark for BPA Action: Base Case | $292.82 | $1508.99 | $25,553.09 | $25,998.01 |
| Path A: Higher Rates | $292.28 | $1503.25 | $25,527.02 | $25,994.76 |
| Path B: Smelter Shutdown | $292.20 | $1506.76 | $25,513.99 | $25,977.30 |
| Incremental Impact due to Path A | ($0.54) | ($5.74) | ($26.07) | ($3.25) |
| Incremental Impact due to Path B | ($0.62) | ($2.22) | ($39.10) | ($20.71) |
| Difference Between Path A and Path B | ($0.08) | $3.51 | ($13.03) | ($17.46) |

| | Electricity cost (billion 1998$) | | Residential electricity cost per capita (1998$) | |
|---|---|---|---|---|
| Scenario | 2002 | Total over rate period | 2002 | Average over rate period |
| Before California | $11.24 | $59.39 | $972.99 | $1010.92 |
| Impact Due to Energy Crisis | $9.62 | $19.03 | $847.65 | $340.09 |
| Benchmark for BPA Action: Base Case | $20.86 | $78.42 | $1820.64 | $1351.01 |
| Path A: Higher Rates | $23.07 | $95.23 | $2014.47 | $1646.71 |
| Path B: Smelter Shutdown | $19.45 | $74.10 | $1698.56 | $1277.45 |
| Incremental Impact due to Path A | $2.20 | $16.81 | $193.82 | $295.70 |
| Incremental Impact due to Path B | ($1.41) | ($4.32) | ($122.08) | ($73.56) |
| Difference Between Path A and Path B | ($3.61) | ($21.13) | ($315.90) | ($369.27) |

respond to both regional electric price increases and to the closure of a primary industry. Most commercial sector employment is secondary employment and depends on regional

paying industrial job causes further employment reductions in industries that sell to the industry that has been closed, and in full and part-time service positions that feel the loss of disposable income from its employees. Job loss in the primary sector causes lower levels of job creation in the secondary employment market.

The second impact on employment growth comes from the increasing electricity costs. Increasing electricity costs raises input costs for all businesses (both primary and secondary) and makes them less competitive in national and international markets, resulting in lower rates of job formation. However, an even stronger impact is the income effect of higher prices. Higher electric prices mean fewer dollars for consumers to spend on other goods and services. The purchasing power of Northwest residents is reduced overall because a larger share of income must be spent purchasing electricity, a product with few substitutes especially in the short run. The income effect of the higher electricity prices is clearly much larger than the impact on the secondary job market from closing the smelters. Closing the smelters reduces the purchasing power of those who no longer have those jobs, but increasing electricity costs reduces the purchasing power of everyone in the region—in this case, clearly the larger impact for the region as a whole.

A review of the other economic measures on Table 3 shows that the changes in Gross Regional Product, Income, and Retail Electricity Prices are consistent with the Employment response, with ''Path B'' being the superior option. For space reasons, we cannot explore these results here except to note that estimated impacts on per capita personal income are somewhat controversial. The change in Personal Income is not dramatic relative to changes in the other economic measures and the change in income per capita impacts are not dramatic either. Overall, although ''Path B'' allows personal income to grow a little more than ''Path A'' does, the reverse appears to be true with personal income per capita. The reason lies in population changes. Closing the smelters causes population to increase more slowly in the region because the smelter unemployment causes increased migration out of the region—employees who wish to continue to work in aluminum smelting have no place to do so in the PNW. Service industry workers have skills that transfer more easily from one company to another and have more choices of employment without leaving the region. In general, the population drop is larger with ''Path B'', but year-to-year the migration rates vary. These population changes cause small year-to-year negative and positive fluctuations in per capita income.

The ''Path B'' option contains a set of counter balancing policies. A rate increase which would serve as the impetus for the jobs and income effect just mentioned, but the reduction in loads will decrease demand in the wholesale market, lowering the overall energy costs from where they would be under ''Path A''. According to the research reported by Ford (Ford, 2001b), during periods of tight reserve margins, load reductions have a ten-fold impact on prices so that a 1% load reduction would translate into a 10% reduction in the spot price of power. Our tests confirm that the price response behavior regional spot market prices are affected by BPA's choice of action. Table 4 contains the estimated spot market prices over the rate period for each scenario. Note that ''Path B'' results in a 28% reduction in summer clearing prices and a 16% reduction in winter clearing prices compared to ''Path A''. Since the DSI loads represent about 3% of total regional loads, the results are consistent with the observations by Ford.

NABORS, BACKUS AND AMLIN

*Table 4.* Northwest market prices under the four scenarios.

| | PNW Average Summer Clearing Prices (98$/MWh) | | | | | |
|---|---|---|---|---|---|---|
| | 2001 | 2002 | 2003 | 2004 | 2005 | 2006 |
| Before California | 50.30 | 53.87 | 48.21 | 42.79 | 42.61 | 40.15 |
| Base Case: Business as Usual | 300.17 | 140.77 | 65.25 | 49.16 | 49.19 | 33.19 |
| Path A: Higher Rates | 300.17 | 137.59 | 65.16 | 47.24 | 36.13 | 32.14 |
| Path B: Smelter Shutdown | 300.17 | 99.24 | 48.13 | 27.04 | 30.47 | 27.51 |
| Change Between Path A & B | | −27.9% | −26.1% | −42.8% | −15.7% | −14.4% |

| | PNW Average Winter Clearing Price (98$/MWh) | | | | | |
|---|---|---|---|---|---|---|
| | 2001 | 2002 | 2003 | 2004 | 2005 | 2006 |
| Before California | 51.63 | 54.70 | 53.29 | 50.95 | 48.99 | 47.47 |
| Base Case: Business as usual | 258.96 | 162.88 | 69.12 | 56.84 | 55.15 | 40.28 |
| Path A: Higher Rates | 258.96 | 162.88 | 68.69 | 55.35 | 52.85 | 35.94 |
| Path B: Smelter Shutdown | 258.97 | 136.56 | 63.29 | 46.61 | 48.86 | 33.36 |
| Change Between Path A & B | | −16.2% | −7.9% | −15.8% | −7.5% | −7.2% |

## 5.  Comparison with other known analysis

To crosscheck our work and to increase our confidence in using the results for policy decisions, we compared our results to those of other reputable sources. The Pacific Northwest Aluminum Industry prepared the most comparable of these (Dick Conway, 2000a, 2000b, and 2000c). An assessment of the impact of the energy crisis on possible job impacts was prepared for the Governor of Washington (Washington State Office of Financial Management 2000—OFM). In addition, an assessment of employment impacts on the Mid-Columbia economy due to closure of the smelters in The Dalles, Oregon and Goldendale, Washington was prepared for the Northern Wasco County People's Utility District (Mid-Columbia Economic Development District 2000).

The other three works are static in nature and simply use an I/O table to capture impacts. The Northern Wasco County People's Utility District used the IMPLAN model.[9] IMPLAN has comparable detail to that of the REMI model. Its short-term response is nearly identical to the short-term response of REMI. Both have essentially identical multiplier effects.[10] Both REMI and IMPLAN produce multipliers with a value of approximately 2.0. The Conway study shows multipliers of approximately 4.0. This difference is, in part, due to the Conway model being at the 2-digit SIC level while REMI is at the 3-digit level and the IMPLAN model is at the 4-digit level. Neither of these two

---

9  See http://www.implan.com.
10  A multiplier effect determines the impact of the loss of one job on the loss of additional secondary jobs that support it. For the work here, those multipliers have a range of 1.5 to almost 4.0. (That is, a multiplier of 4.0, a loss of the primary job results in three additional job losses.)

*Table 5.* 2002 state and region level employment and GRP.

| | Gross Regional Product (Billion 98$) | | | |
| --- | --- | --- | --- | --- |
| | Before California | Business as Usual | Path A | Path B |
| Oregon | 114.8 | 112.1 | 111.8 | 111.9 |
| Washington | 205.2 | 200.5 | 200.0 | 199.8 |
| Idaho | 40.0 | 39.2 | 39.1 | 39.2 |
| Montana | 27.5 | 26.9 | 26.9 | 26.8 |
| California | 1260.4 | 1242.5 | 1241.9 | 1242.1 |
| BC | 118.5 | 118.5 | 118.5 | 118.5 |
| Alberta | 154.3 | 154.3 | 154.3 | 154.3 |
| Rest of West* | 507.8 | 499.2 | 498.9 | 499.0 |

| | Employment (Thousands of Jobs) | | | |
| --- | --- | --- | --- | --- |
| | Before California | Business as Usual | Path A | Path B |
| Oregon | 1810.6 | 1764.4 | 1759.0 | 1760.6 |
| Washington | 3045.9 | 2969.7 | 2960.9 | 2958.9 |
| Idaho | 636.3 | 622.1 | 620.5 | 621.2 |
| Montana | 478.6 | 469.3 | 468.5 | 467.9 |
| California | 17,522.0 | 17,231.5 | 17,222.8 | 17,225.8 |
| BC | 5512.7 | 5512.7 | 5512.7 | 5512.7 |
| Alberta | 4318.1 | 4318.1 | 4318.1 | 4318.1 |
| Rest of West* | 8233.3 | 8081.9 | 8075.8 | 8077.5 |

analyses considers the broader impact of the energy sector on the economy. A summary comparison of the different studies is available from the BPA website.[11]

A test that used a 2-digit SIC version of the REMI also did produce multipliers that approximated 4.0. These tests gave added confidence that the ENERGY 2020/REMI work was consistent with the other studies. Due to the dynamics within the REMI model, migration, wages, energy prices, and economic structural changes cause a tempering of the impacts over time. The ENERGY 2020/REMI work also recognized the natural decline in the employment of the aluminum industry over time that was necessarily absent in the static analyses. Overall, the impacts from the dynamic analyses were only about half as large as those from the static analyses.

The OFM effort used the Washington State forecasting model to estimate the employment effects. The OFM did apply analyst judgment to estimate the changes in disposable personal income and industrial output due to the energy crisis and drought. The OFM analysis indicated a net loss of 43,000 jobs in the state. The OFM noted in a press release that this figure represented a net loss from year-to-year between test cases but that the actual number of jobs would continue to expand (OFM, 2001b).

11   Bonneville Power Administration, Summary of Aluminum Industry Studies, February 2001, hppt:// www.bpa.gov/power/pl/aluminumstudy/ReviewSummary.pdf

NABORS, BACKUS AND AMLIN

The nature of REMI allows us to observe the impacts of the power crisis on other regions of the Western U.S. not just the Northwest. This was not a stated objective of the original BPA, however this information provides a context in which to measure the extent of the crisis. Table 5 presents a snapshot of Gross Regional Product and Employment by state/region for 2002. The model results indicate that in 2002 California should realize a cumulative net loss of $17.9 billion dollars (97 Real Dollars) with a companion reduction in employment of 291,000 labor-year from the "Before California" scenario and the BPA "Business As Usual" benchmark scenario. At no time does the year-to-year changes in either GRP or Employment turn negative, suggesting that the impacts constitute an economic recession due to the energy crisis itself.[12]

The only analysis of the California power crisis we have found that takes the same integrated approach was the analysis by Cambridge Energy Research Associates Inc. (CERA) in collaboration with the UCLA Andersen School (CERA, 2001). Only the near-term economic impacts from the CERA study are directly comparable. In CERA's estimate, California should see a 0.03 to 0.7% reduction in Gross State Product (GSP) in 2001 with the reduction increasing to 2.5 to 2.8% in 2002. Unemployment is estimated to increase between 0.5 to 1.0% between 2001 and 2002. In comparison ENERGY 2020/ REMI estimates were only slightly higher then CERA's. On a year-to-year change, using the "Business as Usual" run, the growth in California's GSP drops by 1% while employment declines by four-tenths percent.

## 6. Conclusion

Simulation models of the energy industry can be an important tool employed by both the public and private sectors to improve understanding and to test policy or strategy options. These models can be useful during periods of crisis and uncertainty to test and validate our understanding of outcomes that result from actions by market participants. In this case, ENERGY 2020/REMI demonstrated that a lower overall rate increase with load reductions in the industrial sector had a smaller adverse impact on the economy than a larger rate increase with large customers drawing load.

California is a stark example of how market restructuring can go awry and impact markets beyond the market in question. Evidence shows that deregulation has resulted in high price volatility in the short-run with underlying, commodity cycles in the long run. As federal, state and regional agencies and transmission organizations consider ways to address questions of market rules, resource acquisition, and system expansion they will need new tools that can evaluate the full range of market and societal impacts. A systems dynamic approach that integrates detail from both the energy sector and macro-economy

provides the type of knowledge and insight needed to assist senior policy makers in their decision processes.

## References

Backus, G. and Alexander, M., "The effect of green taxes and carbon tax shifting on the State of Minnesota," International Journal of Public Administration, vol. 22 no. 6, pp. 975–996, 1999.

Backus, G. and Kleemann, S., "Impact of Aluminum Industry Closings on the Pacific Northwest," Policy Assessment Corporation, Denver, CO and Systematic Solutions Inc., Fairborn, OH, December 12, 2000. http://www.bpa.gov/power/pl/aluminumstudy/Al_Econ_Study.pdf

Bunn, D.W. and Larsen, E.R., Systems Modeling for Energy Policy, John Wiley & Sons: New York, 1997.

Cambridge Energy Research Associates, Inc., "Short Circuit: Will the California Energy Crisis Derail the State's Economy?" CERA, Cambridge, Massachusetts, 2001.

Conway, R., "The Washington Aluminum Industry Economic Impact Study," Dick Conway and Associates, Seattle, WA, August 2000a. http://www.bpa.gov/power/pl/aluminumstudy/Impact Conway.pdf

Conway, R., "The Oregon Aluminum Industry Economic Impact Study," Dick Conway and Associates, Seattle, WA, August 2000b. http://www.bpa.gov/power/pl/aluminumstudy/AlumConwayOregonReport.pdf

Conway, R., "The Montana Aluminum Industry Economic Impact Study," Dick Conway and Associates, Seattle, WA, August 2000c. http://www.bpa.gov/power/pl/aluminumstudy/AlumConwayMontanaReport.pdf

Ford, A. and Bull, O.M., "Using System Dynamics for Conservation Policy Analysis in the Pacific Northwest," System Dynamics Review, vol. 5, pp. 1–16, 1989.

Ford, A., "Waiting for the Boom: A Simulation Study of Power Plant Construction in California," Energy Policy, September 2001a, vol. 29, pp. 847–869. http://www.wsu.edu/~forda/waiting.pdf

Ford, A., "Simulation Scenarios for the Western Electricity Market. A Discussion Paper for the California Energy Commission Workshop on Alternative Market Structures for California," CEC, November 2001b. http://www.wsu.edu/~forda/FordCECPaper.pdf

Fulton, G.A. and Grimes, D.R., "The Economic Impact of the Domestic Automotive Industry on the United States and Its Major Regions," Mimeograph, Institute of Labor and Industrial Relations, University of Michigan, 1993.

Geraghty, G.M. and Lyneis, J.M., "Feedback Loops: The Effect of External Agents on Utility Performance," In J. Plummer, E. Oatman, and P. Gupta (eds.), Strategic Management and Planning for Electricity, Prentice Hall, Englewood Cliffs, NJ, 1986.

Jensen, V.R., et al., "The Illinois Statewide Gas Utility Plan," Illinois Department of Energy and Natural Resources, Report ILENR/RE-SP-90/03 (2 Volumes), Springfield, Illinois, February 1990.

Kleemann, S., "Trends in Electricity Prices," Area Development, February 1999.

Larsen, E.R., Lomi, A., and Dyner, J., "Learning from the Future," Global Energy Business, May/June 2001.

Mid-Columbia Economic Development District, "An Assessment of the Employment and Income Impacts of the Primary Metals Industry in Wasco and Klickitat Counties." Prepared for Northern Wasco County People's Utility District, February 10, 2000. http://www.bpa.gov/power/pl/aluminumstudy/wasco_study.pdf

Naill, R., "A system dynamics model for national energy policy planning," Systems Dynamics Review, vol. 8 no. 1, pp. 1–19, 1992.

New York Times, "Vermont's Broad New Plan on Energy," New York, January 6, 1991.

Treyz, G.I., "Regional Economic Modeling: A Systematic Approach to Economics," Forecasting and Policy Analysis, Boston: Kluwer Academic Publishers, 1993.

Washington State Office of Financial Management, "Questions and Answers Concerning the Impact of the Current Energy Situation on Washington's Economy," OFM April 13, 2001a. http://www.ofm.wa.gov/energy/energy.htm

Washington State Office of Financial Management. "For Immediate Release," OFM press release, March 13, 2001b.

Wetherall, R., "CEC 2000 Net System Power Report," California Energy Commission, April 4, 2001. http://38.144.192.166/sb1305/system_power.html

## Biography

**Jeff Amlin** is the president of the Systematic Solutions, Inc. and has worked on energy policy and deregulation for 25 years. In the mid 1980s, he was the head analyst for the U.S. Department of Energy with regard to energy policy. Mr. Amlin is the co-author, along with Dr. Backus, of ENERGY 2020. Mr. Amlin's work includes consulting and adapting ENERGY 2020 to analyze a variety of issues around for energy analysis, energy planning, and Climate Change Policy related to the Kyoto agreement for governments, regulators and utilities. The model has been adopted to analyze issues of privatization and industry restructuring in Western, Eastern, and Central Europe, Brazil, and Canada, besides the United States. Jeff Amlin received his masters degree from Dartmouth College in 1980 and has an additional degree in Systems Analysis. Before becoming the president of Systematic Solutions, Inc., Mr. Amlin was the Director of Modeling Applications at PROMULA Development Corporation (a computer simulation firm), a Principal Analyst with the Advance Modeling/Simulation Group for the Control Data Corporation (a super computer company) and a Research Scientist with Modeling Systems and Applications Group of the Battelle-Columbus Laboratories working on energy simulation. He was a contributor to The Global 2000 Report produced by President Carter in 1978.

**George Backus** is the president of the Policy Assessment Corporation. He spent a year in England where he was the Director of Energy and Environmental Research at Cambridge Econometrics Ltd. and a Visiting Scholar in the Department of Applied Economics at the University of Cambridge, where he worked on energy, environmental, and macroeconomic simulation of the United Kingdom and other European Union countries. Dr. Backus co-authored the original FOSSIL2/IDEAS model of the U.S. Department of Energy that was used for national energy policy analysis between 1978 and 1998. The Canadian governments use his comprehensive ENERGY 2020 model for national energy planning and both the US-EPA and Canada use his model to analyze Climate Change Policy related to the Kyoto agreement. U.S. AID efforts implemented the model for Eastern and Central European utilities/countries. The ENERGY 2020 model, co-authored with Jeff Amlin, has been used for energy planning by utilities and regulators in over 30 states and provinces in North America.

**Ottie Nabors** is a Public Utilities Analyst with Market Strategy and Assessment of Bonneville Power Administration's, Power Business Line. He managed the contract and provided technical oversight of the work by Policy Assessment Corporation and Systematic Solutions on their Aluminum Smelter and power rates Economic Impact Assessment. His current duties include providing technical support and representation on the Agency's RTO West team in the area of Market Monitoring and Market Design. A 15-year veteran with the agency, Mr. Nabors experience includes residential and commercial energy forecasting. Ottie Nabors has degrees in Political Science and Economics from Oregon State and Portland State Universities. Prior to Bonneville Power, Mr. Nabors worked as a contractor to PacifiCorp where he prepared an assessment of the California and west coast markets in support of the PacifiCorp-Utah Power and Light merger.

```
ERROR: ioerror
OFFENDING COMMAND: image

STACK:

-dictionary-
-savelevel-
```

20030625-0277 Issued by FERC OSEC 06/25/2003 in Docket#: EL03-77-000

103 FERC ¶ 61,343

UNITED STATES OF AMERICA
FEDERAL ENERGY REGULATORY COMMISSION

Before Commissioners: Pat Wood, III, Chairman;
William L. Massey, and Nora Mead Brownell.

| | |
|---|---|
| Enron Power Marketing, Inc.<br>and Enron Energy Services, Inc. | Docket No. EL03-77-000 |
| Bridgeline Gas Marketing L.L.C.<br>    Citrus Trading Corporation,<br>    ENA Upstream Company, LLC,<br>    Enron Canada Corp.,<br>    Enron Compression Services Company,<br>    Enron Energy Services, Inc.,<br>    Enron MW, L.L.C., and<br>    Enron North America Corp. | Docket No. RP03-311-000 |

ORDER REVOKING MARKET-BASED RATE AUTHORITIES AND
TERMINATING BLANKET MARKETING CERTIFICATES

(Issued June 25, 2003)

1.     On March 26, 2003, the Commission issued an order that directed Enron Power Marketing, Inc. (EPMI) and Enron Energy Services, Inc.'s (EESI) (collectively, Enron Power Marketers) to show cause to the Commission in a paper hearing why their authority to sell power at market-based rates should not be revoked.[1]  In addition, that order directed Bridgeline Gas Marketing L.L.C. (Bridgeline), Citrus Trading Corporation (CTC), EESI, ENA Upstream Company, LLC (EEUA), Enron Canada Corp. (ECC), Enron Compression Services Company (ECS), Enron MW, L.L.C. (EMW), and Enron

---

[1]Enron Power Marketing, Inc., et al., 102 FERC ¶ 61,316 (2003) (Show Cause Order).

20030625-0277 Issued by FERC OSEC 06/25/2003 in Docket#: EL03-77-000

Docket Nos. EL03-77-000 and RP03-311-000                                      - 2 -

North America Corp. (ENA) (collectively, Enron Gas Marketers)[2] to show cause to the
Commission in a paper hearing why the Commission should not terminate their blanket
marketing certificates. As discussed below, the Commission will revoke Enron Power
Marketers' market-based rate authorities pursuant to Sections 206 and 309 of the Federal
Power Act (FPA), 16 U.S.C. §§ 824e, 825h (2000), and terminate the natural gas blanket
marketing certificates of, EESI, EEUA, ECC, ECS, EMW, and ENA pursuant to
Sections 5, 7 and 16 of the Natural Gas Act (NGA), 15 U.S.C. §§ 717d, 717f, 717o
(2000), to the extent discussed below. In addition, the Commission has determined not
to take action against Bridgeline and CTC.

2.      This order is necessary to fulfill the Commission's obligation, pursuant to Sections
205 and 206 of the FPA, 16 U.S.C. §§ 824d, 824e (2000), to protect electricity customers
from unjust and unreasonable rates, and Sections 4 and 5 of the NGA, 15 U.S.C.
§§ 717c, 717d (2000), to protect natural gas customers from unjust and unreasonable
rates.

## I. Background

3.      On February 13, 2002, the Commission directed a Staff fact-finding investigation
into whether any entity manipulated prices in electricity or natural gas markets in the
West or otherwise exercised undue influence over wholesale electricity prices in the
West, since January 1, 2000.[3]

4.      On August 13, 2002, Staff released its Initial Report in Docket No. PA02-2-000.[4]
In that Report, Staff recommended the initiation of various company-specific
proceedings[5] to further investigate possible misconduct, and recommended several
generic changes to market-based tariffs to prohibit the deliberate submission of false
information or the deliberate omission of material information and to provide for the
imposition of both refunds and penalties for violations.

---

[2]The Enron-related entities involved in these dockets are referred to collectively as
Enron, Enron subsidiaries, or Enron affiliates.

[3]Fact-Finding Investigation of Potential Manipulation of Electric and Natural Gas
Prices, 98 FERC ¶ 61,165 (2002) (February 13 Order).

[4]The Initial Report is available on the Commission's website at
http://www.ferc.gov/electric/bulkpower/pa02-2/Initial-Report-PA02-2-000.pdf.

[5]These proceedings, which are currently pending before the Commission, are
Docket Nos. EL02-113-000, EL02-114-000, and EL02-115-000.

5.      On March 26, 2003, the Commission released the Final Staff Report on Price
Manipulation in Western Markets.[6]  The Commission found in the Show Cause Order,
based on the evidence discussed in the Final Staff Report, that Enron Power Marketers
apparently: (1) violated Section 205(a) of the FPA[7] by engaging in gaming; and (2) acted
inconsistently with their market-based rate authority, not only by engaging in gaming, but
also by failing to inform the Commission in a timely manner of changes in their market
shares by gaining influence/control over others' facilities in violation of their market-
based rate authority.

6.      In view of those findings, the Commission directed Enron Power Marketers to
show cause why their authority to sell power at market-based rates should not be revoked
by the Commission.[8]

7.      The Show Cause Order also discussed evidence developed in the Final Staff
Report investigation indicating that certain Enron Gas Marketers apparently misused
their authority under their blanket marketing certificates to make sales to and purchases
from gas markets serving California at rates that were unjust and unreasonable from the
summer of 2000 through the winter of 2000-2001.  Based on that evidence, the
Commission determined in the Show Cause Order that the Enron Gas Marketers
apparently participated in practices that manipulate prices so as to charge unjust and
unreasonable rates.  For instance, that order stated that this evidence indicates that the
Enron Gas Marketers, through their electronic trading platform, EnronOnline (EOL),[9]
apparently manipulated the price of natural gas at the Henry Hub located in Louisiana, on

---

[6]Final Staff Report on Price Manipulation in Western Markets:  Fact-Finding
Investigation of Potential Manipulation of Electric and Natural Gas Prices, Docket No.
PA02-2-000 (March 2003) (Final Staff Report).  The Final Staff Report is available on
the Commission's website at
http://www.ferc.gov/calendar/commissionmeetings/discussion_papers/03-26-03/E-18.pdf
.

[7]16 U.S.C. § 824d(a) (2000).

[8]Enron Power Marketers are authorized to sell power at market-based rates.  See
Enron Power Marketing, Inc., 65 FERC ¶ 61,305 (1993); Enron Energy Services Power,
Inc., 81 FERC ¶ 61,267 (1997).

[9]The EnronOnline system is administered by Enron Networks, an Enron Corp.
subsidiary. EnronOnline is a free, Internet-based, transaction system which allows the
Enron Gas Marketers to buy from and sell gas to third parties.

20030625-0277 Issued by FERC OSEC 06/25/2003 in Docket#: EL03-77-000

Docket Nos. EL03-77-000 and RP03-311-000                                    - 4 -

at least one occasion to profit from positions taken in the over-the-counter (OTC) financial derivatives markets (OTC markets).

8.      Given the evidence of Enron Gas Marketers' conduct and its adverse effects on gas prices, the Show Cause Order directed Enron Gas Marketers to show cause why the Commission should not terminate their blanket marketing certificates under Section 284.402 of the Commission's regulations[10] to make sales for resale at negotiated rates in interstate commerce of categories of natural gas subject to the Commission's NGA jurisdiction.[11]

## II. **Notice and Responsive Pleadings**

9.      The Show Cause Order was published in the Federal Register, 68 Fed. Reg. 15,712 (2003).  The Show Cause Order provided that any interested person desiring to be heard in the proceedings should file notices of intervention or motions to intervene with the Commission, in accordance with Rule 214 of the Commission's Rules of Practice and Procedure, 18 C.F.R. § 385.214 (2003), within 21 days of the date of the order.  Furthermore, the Show Cause Order stated that Enron's show cause submissions be filed within 21 days of the date of the order and the responses to the submissions be submitted within 15 days thereafter.

10.     The following parties filed timely motions to intervene raising no substantive issues: the People of the State of California ex rel. Bill Lockyer, Attorney General (California Attorney General), California Electricity Oversight Board (EOB), Florida Power Corp (only in RP docket), Metropolitan Water District of Southern California (Metropolitan), Nevada Power Company and Sierra Pacific Company (Nevada Companies), Pacific Gas and Electric Company (PG&E), Public Utility District No. 1 of Snohomish County, Washington (Snohomish), the City of Seattle, Washington (Seattle), the City of Santa Clara, California (Santa Clara), and Southern California Edison Company (Edison).

11.     On April 10, 2003, Bridgeline filed a motion for clarification and requested an extension of time to file their answer two weeks after the Commission acted on their motion.  On April 14, 2003, Bridgeline's request for extension of time was granted.

---

[10]18 C.F.R. § 284.402 (2003).

[11]See 15 U.S.C. §§ 717 et seq. (2000).

20030625-0277 Issued by FERC OSEC 06/25/2003 in Docket#: EL03-77-000

Docket Nos. EL03-77-000 and RP03-311-000                                    - 5 -

12.    On April 16, 2003, CTC and Enron Entities[12] each submitted show cause submissions.  On May 1, 2003, Metropolitan, the City of Palo Alto, California (Palo Alto), Santa Clara and Snohomish filed responses to the Enron Entities' submission and California Parties[13] and Nevada Companies filed responses to both submissions.

13.    On April 25, 2003, Bridgeline, Metropolitan, Palo Alto, Santa Clara, Snohomish, Bridgeline filed requests for rehearing of the Show Cause Order.  On May 12, 2003, Enron Entities and CTC filed answers to the requests.  On May 23, 2003 Palo Alto filed a motion in opposition to the Enron Entities' answer to the requests for rehearing.  On June 9, 2003, Enron Entities filed an answer in opposition to the motion.

III.    **Discussion**

14.    As we ordered in the Show Cause Order, the Commission instituted investigations, pursuant to sections 206 of the FPA and sections 5 and 7 of the NGA, into the apparent misconduct that the Enron Power Marketers and Enron Gas Marketers were engaged in.  Our investigation has led us to find that these Enron companies disrupted the energy industry.

15.    As discussed below, the Final Staff Report documents that Enron management invented numerous market manipulation schemes (which are summarized in memoranda detailing the various strategies), and used various Enron companies to execute these schemes.  In fact, several Enron managers and traders are under criminal investigations or have waived indictment and pleaded guilty to participating in such strategies.  The Final Staff Report also documents examples of wash trading by Enron, examples of market manipulation of natural gas at Henry Hub, and affiliate abuse in the use of EOL.

16.    Moreover, as is documented in the Final Staff Report, Enron routinely disregarded the corporate separation of the various Enron affiliates, and used one or another to facilitate misconduct.  For example, traders nominally employed by EPMI frequently acted as employees of EOL and controlled the bid management software that produced the prices that users saw on their screens.  Since EPMI routinely was one of the two parties to each EOL transaction, in essence, the same company that ran the trading platform was a party to transactions on that platform, a situation that would not be

---

[12]Enron Entities include EPMI and EESI (jointly, the Enron Power Marketers), and EEUA, ECC, ECS, EESI, EMW, and ENA.

[13]California Attorney General, EOB, California Public Utilities Commission, PG&E and Edison.

20030625-0277 Issued by FERC OSEC 06/25/2003 in Docket#: EL03-77-000

Docket Nos. EL03-77-000 and RP03-311-000                                    - 6 -

tolerated in a regulated trading exchange and which afforded traders from the power marketer a significant informational advantage over counter-parties. As another example, senior officers of Enron Corporation and ENA invested in partnerships that owned other Enron companies (such as the wind farms) expressly for the purposes of avoiding ownership rules.

17.     In short, Enron's management routinely failed to respect the corporate boundaries of its various subsidiaries and affiliates, but rather treated them essentially as shell corporations under a single corporate umbrella.[14] It is entirely proper to attribute misconduct of any one to the other wholly-owned and majority-owned Enron affiliates that are the subject of the show cause order, notwithstanding their claims of individual non-involvement, and to revoke all of their electric market-based rate authorizations and terminate their natural gas blanket marketing certificate.[15] (Moreover, any Enron company that emerges from reorganization must re-apply to the Commission for new authorizations. Otherwise, Enron would be free to continue the status quo ante through an individual gas or electric power marketer that has retained its authorization.) In other words, we believe that in order to ensure that the statutory purposes of the FPA and the NGA are not frustrated we are entirely justified in taking this step.[16] (Moreover, our doing so will guarantee that Enron does not participate in the future in wholesale markets absent new applications that the Commission can thoroughly scrutinize.) This will give reassurance to the industry at large as to the fairness of energy markets.

   A. **Procedural Matters**

           1.       **Interventions, Answers and Rehearings**

---

           [14]Notably, the various Enron companies (except for Citrus and Bridgeline), see supra note 12 and accompanying text, filed a joint answer to the show cause order, thereby again demonstrating the commonality of purpose among themselves, as well as their intent to mount a joint defense.

           [15]Town of Highlands, N.C. v. Nantahala Power & Light Company, Opinion No. 225, 37 FERC ¶ 61,149 at 61,356, 61,360 nn.10-12 (1986), reh'g denied, Opinion No. 255-A, 38 FERC ¶ 61,052 at 61,153 (1987).

           [16]See id.

20030625-0277 Issued by FERC OSEC 06/25/2003 in Docket#: EL03-77-000

Docket Nos. EL03-77-000 and RP03-311-000                    - 7 -

18.    Pursuant to Rule 214(c)(1) of the Commission's Rules of Practice and Procedure, the timely, unopposed motions to intervene filed by the entities seeking to intervene serve to make them parties to the proceedings in which they moved to intervene.[17]

19.    Rule 713 of the Commission's Rules of Practice and Procedure provides that rehearing may be sought only with respect to a "final Commission decision or other final order."[18]  Final agency orders "impose an obligation, deny a right, or fix some legal relationship as a consummation of the administrative process."[19]  The Show Cause Order is not a final order – it imposes no obligation, denies no right nor fixes a legal relationship; it merely establishes procedures.  Thus, we dismiss the requests for rehearing, as well as the answers.  Any arguments or issues pertinent to a revocation of market based rate authorities and blanket marketing certificates should be raised on rehearing of this order.

20.    We address Bridgeline's motion for clarification in Section IV of this order.

## 2.    **Consolidation**

21.    In its answer and in a motion filed in numerous dockets, including the two at issue here, California Parties[20] ask that the Commission use the so-called California refund

---

[17]18 C.F.R. § 385.214(c)(1) (2003).  Our granting interventions in Docket Nos. EL03-77-000 and RP03-311-000 does not alter the fact that the Commission is conducting an investigation in Docket No. PA02-2-000, in which the Commission has enforcement discretion.  Indeed, even though the Commission has, albeit rarely, allowed interventions in Part 1b investigations, 18 C.F.R. Part 1b (2003), those interventions did not transform the investigation into an adjudication.  See Baltimore Gas & Electric v. FERC, 252 F.3d 456 (D.C. Cir. 2001) (holding that notwithstanding the participation of intervenors in a section 1b investigation, the Commission had exercised unreviewable discretion in approving a settlement with the company under investigation over the objections of those intervenors); see generally Fact-Finding Investigation into Possible Manipulation of Electric and Natural Gas Prices, 103 FERC ¶ 61,019 at P 14-15 (2003), reh'g pending.

[18]18 C.F.R. § 385.713 (2003).

[19]Air California v. U.S. Dept. of Transp., 654 F.2d 616, 621 (9th Cir. 1981) citing Chicago & Southern Air Lines, Inc. v. Waterman Steamship Corp., 33 U.S. 103, 1112-13 (1948); Nevada Airlines, Inc. v. Bond, 622 F.2d 1017, 1020 n.5 (9th Cir. 1980).

[20]California Parties consists of the California Attorney General, CEOB, California
(continued...)

20030625-0277 Issued by FERC OSEC 06/25/2003 in Docket#: EL03-77-000

Docket Nos. EL03-77-000 and RP03-311-000                                    - 8 -

proceeding (Docket No. EL00-95, et al.), as a single consolidated proceeding to address remedy and damage issues and to provide for a common protective order for the numerous proceedings related to the manipulation of the California spot energy markets and other California Independent System Operator (ISO) and California Power Exchange (PX) tariff violations during 2000 and 2001.

22.    Among the responses to the motion, Metropolitan conditionally opposes the consolidation of the proceeding in Docket Nos. EL03-77-000 and EL02-113 with Docket Nos. EL00-95-000, et al. and Docket No. EL00-98-000 to the extent consolidation would limit the relief or parties eligible for relief from Enron. The Enron Entities and CTC principally argue that the motion to consolidate should be denied because there is no commonality between the transactions at issue and those in the California refund proceeding. The Commission Trial Staff filed a response supporting the California Parties' motion in part and opposing it in part. We note that this motion is being considered separately, and we do not find it appropriate to delay our action here pending a decision on that motion.

### B.    Request for Trial-Type Hearing

#### 1.    Show Cause Submission

23.    The Enron Entities and CTC argue that the Show Cause Order and the paper hearings it established violate due process. They assert that the Show Cause Order generally lacks specificity as to the facts and the law asserted and that the allegations raised in the Show Cause Order raise disputes of material fact. The Enron Entities and CTC assert that resolving these proceedings through a paper hearing will deprive them of conducting discovery and confronting and cross examining witnesses. They argue that without these opportunities they do not have adequate notice of the issues and cannot adequately defend themselves. The Enron Entities and CTC also argue that the paper hearing is essentially a summary disposition proceeding and that the Commission may not initiate such a proceeding based on the "vague and conclusory allegations"[21] in the Show Cause Order. They request that the issues raised in the Show Cause Order be addressed in a trial-type proceeding.

#### 2. Answers

---

[20](...continued)
Public Utility Commission, PG&E and So Cal Edison.

[21]Enron Entities at 7; CTC at 6.

Docket Nos. EL03-77-000 and RP03-311-000                                    - 9 -

24.     California Parties note that there is ample evidence of extensive market manipulation (and also tariff violations) in the Western power markets during the period January 1, 2000 through June 20, 2001: (1) the Commission Staff's investigation in Docket No. PA02-2 that resulted in the Initial Staff Report and the Final Staff report; (2) filings in the refund proceeding that resulted from the 100-Day Discovery Period; (3) parallel proceedings directly related to the crisis in the Western power markets,[22] criminal allegations and guilty pleas involving market manipulation in California and further fact-finding processes on physical withholding of electric capacity in California during the crisis period; and (4) recently initiated show cause proceedings.

25.     Snohomish contends that Enron's assertions that the Show Cause Order is legally defective and that Enron is entitled to greater due process already accorded to it in this proceeding are without foundation.

26.     Metropolitan states that the Show Cause Order, the Final Staff Report and proceedings in Docket No. PA02-2 provide more than enough information as to the nature of the issues involved to provide adequate notice to Enron.  Metropolitan adds that the Commission is not required to describe every single fraudulent transaction and every single instance of market manipulation and gaming.

27.     Metropolitan asserts that the Commission provided Enron with proper notice of the claims and allegations against it, adequately specifying the nature of the facts and evidence on which the Commission proposes to take action.  Metropolitan argues that adequate notice was provided because in this proceeding Enron has had a full opportunity to present evidence and arguments in the paper hearing here[23] why its market-based rate authority or blanket certificates should not be revoked.

28.     Metropolitan adds that the allegations against Enron culminate from a year-long investigation by Commission Staff to determine whether and, if so, the extent to which California and Western energy markets were manipulated during 2000 and 2001. During this investigation and up to the Show Cause Order, Enron had more than sufficient notice of the allegations against it and specific acts of misconduct alleged. In issuing its Show Cause Order, the Commission granted Enron yet another opportunity to provide any evidence or reason why it should retain its market-based rate authority and blanket certificates.  According to Metropolitan, in failing to provide any information or

---

[22]See El Paso Elec. Co., 100 FERC ¶ 61,188 (2002); Portland Gen. Elec. Co., 100 FERC ¶ 61,186 (2002); Avista Corp., 100 FERC ¶ 61,187 (2002).

[23]See Hess & Clark, Inc. v. FDA, 495 F.2d 975, 985 (D.C. Cir. 1974).

20030625-0277 Issued by FERC OSEC 06/25/2003 in Docket#: EL03-77-000

Docket Nos. EL03-77-000 and RP03-311-000                                    - 10 -

evidentiary support countering the allegations against it, Enron failed to take advantage
of this opportunity. Metropolitan concludes that Enron has failed to meet its burden and
has also failed to justify the need for any further proceedings to determine the relevant
facts.

29.     Metropolitan, Palo Alto, Snohomish and Santa Clara argue that the Commission
provided specific allegations in this proceeding which are sufficient to support the Show
Cause Order against Enron. They point to Chapter VI of the Final Staff Report which
discusses Enron's inappropriate trading strategies and the evidence indicating that Enron
worked in concert with other entities to implement these strategies in ways that
manipulated market outcomes; this chapter discusses the operations of the Cal-ISO and
PX, the tariff provisions Enron violated and a detailed description of Load Shift, export
strategies (such as megawatt laundering and ricochets), manipulation strategies based on
false information (such as Fat Boy), transmission congestion strategies (such as Death
Star), and ancillary services manipulation strategies (such as Get Shorty). They also
point to Chapter VII's discussion of wash trading through the operation of EOL, and
Enron's participation in or enabling of market manipulation by other entities. They
further note that Chapter VII discusses Enron's failure to disclose to the Commission
business arrangements through which they obtained effective control of other entities'
assets and derived informational advantages facilitating their market manipulation.

30.     Metropolitan also states that prior Commission orders regarding Enron provide
Enron with more than ample notice of the allegations, facts, and reasons supporting and
bringing about the Commission's Show Cause Order.[24]

31.     While Palo Alto states that it is not opposed to a trial-type hearing to develop
additional evidence of wrongdoing, it urges that the Commission take swift and
effective remedial action once the facts are proven to the Commission's satisfaction.

32.     Nevada Companies ask that the Commission complete its investigation in Docket
No. PA02-2-000 as soon as practical, file the record of that proceeding in the current
proceedings, and then designate an administrative law judge to address any remaining
issues.

### 3.    Commission's Response

_____

[24]See supra note 22; see also supra note 3 (order directing staff investigation of
whether any entity manipulated short term prices for electric energy or natural gas in the
West).

Docket Nos. EL03-77-000 and RP03-311-000                                           - 11 -

33.     We find that a trial-type hearing is unnecessary, as we are satisfied that the record
before us provides a sufficient basis to take action and we are prepared today to act on
that record and order appropriate remedies.  In <u>Exxon Company, U.S.A., v. FERC, et al.</u>,
182 F.3d 30, 45-46 (D.C. Cir. 1999), for example, the court explained that the
Commission may resolve factual issues on a written record.[25]  In this case, given the
nature of the matters at issue and the quantity and type of evidence available, these
matters are amenable to resolution on a written record.

34.     In addition, in <u>Louisiana Association of Independent Producers & Royalty
Owners v. FERC</u>, 958 F.2d 1101, 1113 (D.C. Cir. 1992), the court held that a party may
not complain that it was deprived of a fair hearing after receiving notice of expert
testimony on which an opposing party relied, an opportunity to review it, a chance to
submit briefs criticizing it and evidence opposing it, and the opportunity to argue before
the Commission.  In this case, Enron has had just such notice, an opportunity to submit
evidence of its own and an opportunity to criticize the evidence presented against it, as
well as opportunity to make its case to the Commission.

35.     Accordingly, we deny Enron Entities' and CTC's request for a trial-type hearing.
For the same reason, we deny Nevada Companies' request to initiate a proceeding before
an administrative law judge.

### C.     <u>Violation of Market-Based Rate Authority</u>

#### 1.     <u>Failure to Report</u>

##### a.     <u>Show Cause Submissions</u>

36.     The Enron Entities acknowledge that the Commission may revoke market-based
rate authority if a seller acquires an undue market share, measured by generation and/or
transmission capacity, or undue control of inputs to electric production or other barriers
to entry.[26]  They argue, however, that failing to report business arrangements with third
parties does not trigger revocation.  The Enron Entities state that although the Final Staff
Report alleges that business relationships which the Enron Power Marketers entered into

---

[25]While motive, intent or credibility of witnesses may weigh in favor of a trial-type
hearing, these concerns are not present here.

[26]Enron Entities at 30.

20030625-0277 Issued by FERC OSEC 06/25/2003 in Docket#: EL03-77-000

Docket Nos. EL03-77-000 and RP03-311-000                                    - 12 -

with unaffiliated market participants caused changes in their market shares,[27] the Commission has failed to establish a prima facie case for revocation because neither the Final Staff Report nor the Show Cause Order quantifies the change in market share produced by these business relationships or provides evidence that the arrangements increased market share above acceptable levels.

37.     In addition, the Enron Entities argue that the Show Cause Order fails to establish that the Enron Power Marketers violated the reporting requirements associated with their market-based rate orders. The Enron Entities state that, the mere existence of a business relationship does not invoke the Commission's reporting requirements and that the Show Cause Order did not identify any business relationship which they were required to report. They further state that: (1) many of the types of business relationships entered into by power marketers are neither jurisdictional nor required to be reported; (2) the Commission has specifically disclaimed jurisdiction over Enron in its capacity as a broker;[28] and (3) that the Show Cause Order did not identify any violation of the Enron Power Marketers' quarterly reporting obligations for failure to include a jurisdictional contract, purchase or sale transaction with a counterparty to any business relationship.

38.     Finally, the Enron Entities assert that because EPMI is part of an ongoing proceeding in Docket No. EL02-113-000 where it has been accused of violating the FPA because of its relationship with El Paso Electric Company, this accusation provides no basis for adverse action in the instant proceeding.

## b.     Answers

39.     Snohomish states that the Commission should conclude that deceptive and fraudulent activity, which involves the purposeful submission of false information to scheduling authorities and others, is a per se violation of Enron's market-based rate certificate justifying immediate revocation of that certificate. According to Snohomish, electric markets cannot function efficiently and the electric system cannot operate reliably where false information is disseminated by dishonest market participants like Enron. This is enough to justify revocation of market-based rate authority, even if the market manipulation schemes ultimately failed to achieve their goal of artificially inflating Enron's profits.

---

[27]Final Staff Report at Chapter VI pp. 37-43.

[28]Citing Enron Power Marketing, Inc., 65 FERC ¶ 61,305 at 62,403 (1993).

Docket Nos. EL03-77-000 and RP03-311-000                                              - 13 -

40.    Contrary to Enron's claim, Snohomish maintains that the testimony of the Commission Staff, in the Docket No. EL02-113-000 proceeding investigating the propriety of Enron's business arrangement with EPE, demonstrates that Enron not only violated its market-based rate authority, but Section 205 of the FPA as well, by failing to inform the Commission of material changes in its status as an entity authorized to charge market-based rates and by failing to file its power services agreement with EPE. Moreover, Enron's "practice" of gaining unduly preferential access to competitively sensitive market information through this type of business alliance, is a plain violation of FPA Section 205 and an abuse of its market-based rate authority.

## 2.    <u>Unjust and Unreasonable Rates</u>

### a.    <u>Show Cause Submissions</u>

41.    The Enron Entities argue that the Show Cause Order fails to establish a <u>prima facie</u> case under Section 206 that the conduct of the Enron Power Marketers charged or caused there to be charged any unjust or unreasonable rate. They state that the Commission's burden in a Section 206 proceeding is to show first that an existing rate is unjust or unreasonable and then that the proposed rate is just and reasonable.[29] With regard to gaming, the Enron Entities assert that the Commission must first establish the zone of reasonableness for a rate, with appropriate cost evidence, and then show what portion of the price outside the zone was the result of any "gaming" conduct on the part of the Enron Power Marketers. The Enron Entities assert that neither the Final Staff Report nor the Show Cause Order met this burden. They assert that the Commission failed to present evidence regarding: (1) the magnitude of the effect on market prices, if any, resulting from any actual transactions in which the Enron Power Marketers employed the Enron Trading Strategies; or (2) the effects on market prices of market fundamentals (<u>e.g.</u>, increased demand for electricity, lack of addition to generating capacity) unrelated to Enron's trading strategies.

42.    The Enron Entities conclude that even if: (1) "gaming" is illegal; (2) one or more of Enron's trading strategies constitutes such a violation; and (3) one or more of the Enron Power Marketers' gaming caused a power price increase in a relevant market, these facts alone do not establish proof of a violation under Section 206.

---

[29]16 U.S.C. § 824e(a) (2000).

20030625-0277 Issued by FERC OSEC 06/25/2003 in Docket#: EL03-77-000

Docket Nos. EL03-77-000 and RP03-311-000                                    - 14 -

### b.    Answers

43.    Snohomish states that Enron's assertion that gaming did not harm energy markets is irrelevant and, in any event, is without merit. Snohomish asserts that the FPA requires only that the Commission articulate a rationale for its conclusion that any "practice" is unjust and unreasonable. It further asserts that there is no requirement that the Commission find that the Enron gaming strategies resulted in some definitive increase in rates before it can take action. Snohomish states that the Final Staff Report has sufficiently articulated a basis to conclude that gaming is unreasonable; it concluded that the submission of false schedules, and the use of false information intended to, for example, circumvent applicable requirements, is per se illegal because markets cannot function properly and the electric transmission system cannot be operated reliably where false information is routinely submitted to system operators. In any event, there is ample evidence that the Enron gaming strategies provided a substantial and artificial boost to Enron's profits.

44.    Palo Alto rejects the arguments by Enron that its behavior was somehow consistent with its legal obligations, including the terms and conditions of the market-based authority. Palo Alto agrees with the Commission that certain terms and conditions were implicit in the grant of market-based rate authority, for example a presumption that a company's behavior will not involve fraud, deception or misrepresentation. Palo Alto also argues that another implicit condition in granting market-based rates (which Enron Entities either knew or should have known) is that recipients of market-based rate authority must not manipulate the markets the Commission was relying on to fulfill its statutory duty to ensure just and reasonable rates.

45.    Palo Alto states that the Final Staff Report provides evidence that the Enron Entities manipulated both gas and electricity markets by various means, including the submission of false information to the Cal ISO, the exercise of market power in thinly traded markets, and abuse of its role as owner, operator, and market-maker in EOL.

46.    Santa Clara argues that a contract that it entered into with EPMI provides another basis for the issuance of the Show Cause Order. Santa Clara explains that it entered into a contract with EPMI for a number of short term transactions under EPMI's market-based rate authority on September 10, 1999. Santa Clara explains that, to protect its customers against the volatility of the California markets, it modified this contract to enter into two long-term transactions with EPMI, a nine-year transaction and a five-year transaction. Santa Clara alleges that EPMI notified Santa Clara that it was unable to deliver power after less than one year of performance of the nine year term. Santa Clara

20030625-0277 Issued by FERC OSEC 06/25/2003 in Docket#: EL03-77-000

Docket Nos. EL03-77-000 and RP03-311-000                                            - 15 -

indicates that it suspended deliveries after EPMI's various defaults. Santa Clara contends that EPMI then subsequently claimed a right to an early termination payment from Santa Clara. Santa Clara provides that EPMI acts of default were not only illegal, but also in violation of the Commission's regulations under 18 C.F.R. § 35.15 (2003). Santa Clara argues that this reflects a misuse by EPMI of its market-based rate authority and requests that the Enron Entities' market-based rate authority be revoked.

47.    Metropolitan also notes that Enron failed to respond substantively to the allegations in the Show Cause Order. Metropolitan maintains that Enron provides no factual or evidentiary materials or information which would in any way refute the evidence developed in Docket No. PA02-2-000 and discussed in the Final Staff Report.

48.    Metropolitan asks the Commission to reject Enron's attempt to avoid responsibility for its own egregious actions by arguing that no violation of Section 206 of the Federal Power Act was shown. According to Metropolitan, the Commission has clearly established, and as discussed above, Enron has failed to refute, that Enron manipulated the market causing unjust and unreasonable rates. The Commission should order remedies for such actions, including revocation, both prospective and retroactive, of Enron's market-based rate authority and disgorgement of profits.

49.    Metropolitan, Palo Alto and Santa Clara assert that the Commission has ample remedial authority to revoke the Enron Entities' market-based rate authority retroactively and disgorge profits under these circumstances.

### 3.    Commission Response

50.    The Enron Entities contend that the Commission has not shown that their actions resulted in gaming or unjust and unreasonable rates. While the Show Cause Order properly made no findings of market manipulation and unjust and unreasonable rates, as the parties had not yet had an opportunity to respond, the Commission is now prepared to make such findings for the reasons discussed below.

51.    The Enron Entities do not dispute the facts set forth in the Show Cause Order (and the Final Staff Report that was incorporated by reference) i.e., that they engaged in the conduct referenced and that they failed to report their influence/control over other entities' facilities. Rather, they argue that these "improper" actions did not constitute gaming or result in unjust and unreasonable rates. We disagree.

20030625-0277 Issued by FERC OSEC 06/25/2003 in Docket#: EL03-77-000

Docket Nos. EL03-77-000 and RP03-311-000                                                            - 16 -

52.    We have previously explained that companies failing to adhere to proper standards are subject to immediate revocation of their market-based rate authority.[30] The Show Cause Order elaborated that "implicit in Commission orders granting market-based rates is a presumption that a company's behavior will not involve fraud, deception or misrepresentation."[31]

53.    First, we find that the Enron Power Marketers engaged in gaming in the form of inappropriate trading strategies:  (1) False Import (i.e., Ricochet or Megawatt Laundering); (2) congestion-related practices such as Cutting Non-firm (i.e., Non-firm Export), Circular Scheduling (i.e., Death Star), Scheduling counter flows on out of service lines (i.e., Wheel Out), and Load Shift; (3) ancillary services-related strategies known as Paper Trading and Double Selling; and (4) Selling Non-firm Energy as Firm.[32]

54.    With regard to the Enron Entities' "zone of reasonableness" argument, we note, for example, that Timothy N. Belden and Jeffrey S. Richter, former Enron executives, signed plea agreements in which they state that they engaged in fraudulent schemes in the California markets.[33]  Among other things, they admit that they knowingly and intentionally filed energy schedules that misrepresented the nature of electricity to be supplied and the load they intended to serve. Belden and Richter state that the purpose of filing false schedules was to artificially increase congestion on California transmission lines, which in turn, increased the market price for congestion fees for transmission between zones.  The result was, in part,  manipulated prices in the California market and congestion fees in excess of what Enron would have received with accurate schedules and bids.  It is clear that when Enron submitted false schedules, i.e., schedules that had no energy and that falsely claimed to relieve congestion, the rates that resulted were outside the zone of reasonableness.

───────────────────────

[30]Fact-Finding Investigation of Potential Manipulation of Electric and Natural Gas Prices, 99 FERC ¶ 61,272 at 62,154 (2002); San Diego Gas & Electric Company, 95 FERC ¶ 61,418 at 62,548, 62,565 (2001), order on reh'g, 97 FERC ¶ 61,275 (2001), order on reh'g, 99 FERC ¶ 61,160 (2002); accord Show Cause Order, 102 FERC ¶ 61,316 at P 8 & n.10, and cases cited therein.

[31]Show Cause Order, 102 FERC ¶ 61,316 at P 8.

[32]For a more detailed description of these trading strategies, see American Electric Power Service Corporation, et al., 103 FERC ¶ 61,345 (2003), which is being issued concurrently with this order.

[33]See U.S. v. Timothy N. Belden, (N.D. Cal. Case No. CR02-0313-MJJ); U.S. v. Jeffrey S. Richter, (N.D. Case No. CR-03-0026-MJJ).

20030625-0277 Issued by FERC OSEC 06/25/2003 in Docket#: EL03-77-000

Docket Nos. EL03-77-000 and RP03-311-000                                    - 17 -

55.     Second, and in any event, we find that the Enron Power Marketers failed to inform the Commission in a timely manner of changes in their market shares that resulted from their gaining influence/control over others' facilities.  The Final Staff Report explains that Enron created a marketing program based on the use of other entities' assets, thus avoiding large capital expenditures and the risk of owning its own resources, to carry out its various trading strategies.  Enron focused not only on partnerships and alliances with investor-owned utilities, but also on smaller utilities, such as public utility districts, municipalities, and qualifying facilities.  Enron, using these partnerships and alliances, gained market share, acquired commercially sensitive data, acquired decisionmaking authority, and promoted reciprocal dealings and equity sharing of profits, among other things.[34]  Critically for present purposes, Enron formed these business alliances or partnerships without notifying the Commission, as required under their market-based rate authorizations.[35]

56.     In their conduct described above, the Enron Power Marketers engaged in behavior that undermines the functioning of the wholesale power market and our reliance on that market to ensure that rates are just and reasonable; for example, by Enron's failure to report to the Commission changes in status that affected the facilities under the Enron Power Marketers' control and/or influence, the Commission was denied the ability to assure that the Enron Power Marketers' market shares warranted their continued authorization to charge market-based rates.  Such abuse of our market-based rate authority cannot be tolerated.  Accordingly, we find, based on the record in this proceeding, that the behavior of the Enron Power Marketers constitutes precisely the kind of behavior that would fall within the language of the orders referred to above,[36] constitutes market manipulation and results in unjust and unreasonable rates.  We also find that this same conduct violates the express requirements in our orders allowing the Enron Power Marketers to make sales at market-based rates that they report changes in their status.

---

[34]These partnerships and alliances are described in more detail in Enron Power Marketing, Inc., et al., 103 FERC ¶ 61,346 (2003), which is being issued concurrently with this order.

[35]See 16 U.S.C. § 824d (2000); Enron Power Marketing, Inc., 65 FERC ¶ 61,305 at 62,405 (1993); Enron Energy Services Power, Inc., 81 FERC ¶ 61,267 at 62,319 (1997).  Moreover, to the extent that they were jurisdictional, they were not filed with the Commission.

[36]See supra notes 30-31 and accompanying text.

20030625-0277 Issued by FERC OSEC 06/25/2003 in Docket#: EL03-77-000

Docket Nos. EL03-77-000 and RP03-311-000                                           - 18 -

**D.    Violation of Blanket Marketing Certificates**

1.    **Show Cause Submissions**

57.    The Enron Entities and CTC argue that the Commission does not have the authority to terminate the Enron Gas Marketers' blanket marketing certificates based on the circumstances in this proceeding.  First, the Enron Entities and CTC argue that the Commission may terminate a blanket marketing certificate when: (1) there has been a fundamental shift of a long-term nature in the basic premise on which the certificate was issued,[37] or (2) the certificate holder has violated a term or condition of the certificate.[38] With regard to the former, they assert that the fundamental premise of the blanket marketing certificates is a significant amount of uncommitted gas supplies and open access transportation regime.  The Enron Entities and CTC argue that there are no allegations in this proceeding that the fundamental premise of the blanket marketing certificates has fundamentally changed on a long-term basis and that even if it did, the change would apply to all holders of blanket marketing certificates and not just the Enron Gas Marketers.  With regard to the latter, the Enron Entities and CTC state that the only condition attached to the blanket marketing certificates at the time of their issuance was that affiliated transportation-only pipelines must have been restructured pursuant to order No. 636 or their restructuring proceedings terminated and that all of their affiliated pipelines have satisfied this condition.

58.    Second, the Enron Entities and CTC assert that the Commission's blanket marketing certificate authority intentionally does not include a condition that would make <u>any</u> negotiated price violative of the terms of the certificate.  They argue that in issuing the blanket marketing certificate, the Commission did not rely upon the existence of sufficient uncommitted gas supplies to prevent the certificate holder from manipulating prices but rather to prevent market power[39] and that these are not the same.  In addition, the Enron Entities and CTC point to Order No. 547 which states that "[a]ny sale effectuated pursuant to the marketing certificate issued by this rule is by definition a sale at a negotiated rate" and that "any negotiated rate received in a sale under Section

---

[37]<u>Citing</u> Trunkline LNG Co., 22 FERC ¶ 63,028 (<u>Trunkline I</u>), <u>decision and order dismissing complaints</u>, 22 FERC ¶ 61,245 at 65,422 (1983) (<u>Trunkline II</u>).

[38]Also, the Enron Entities assert that Congress did not permit the Commission to attach conditions after the issuance of a certificate under section 7.

[39]<u>Citing</u> Regulations Governing Blanket Marketer Sales Certificates, Order No. 547, FERC Stats. & Regs., Reg. Preambles January 1991- June 1996 ¶ 30,957 at 30,726 (1992), <u>order on reh'g</u>, Order No. 547-A, 62 FERC ¶ 61,239 (1993).

Docket Nos. EL03-77-000 and RP03-311-000                                    - 19 -

284.402 falls within the ambit of this rule."[40]    Further, they note that the Final Staff Report states that the "regulations contain no explicit guidelines or prohibitions for trading gas."[41]

59.    Third, they argue that the Commission's reliance on <u>Niagara Mohawk Power Corp. v. FPC</u>, 379 F.2d 153, 159 (D.C. Cir. 1967) and Section 16(a) of the NGA is misplaced.  The Enron Entities assert that Section 16(a) does not grant the Commission any authority to terminate a blanket certificate and that the only authority must be found in Section 7, if at all.

60.    Finally, the Enron Entities and CTC argue that the Show Cause order fails to establish a <u>prima facie</u> case under Section 5.  In addition, they point out that Section 5 allows the Commission to disturb existing rates only when the existing rates are shown to be unjust or unreasonable, and the remedy proposed by the Commission is shown to be just and reasonable.  They assert that rates are unjust and unreasonable only when there is a demonstration that the rates are outside the "zone of reasonableness," as discussed above.  The Enron Entities and CTC argue that the Commission has failed to demonstrate this in the Show Cause Order because it made no specific allegations and presentation of a <u>prima facie</u> case concerning the Enron Gas Marketers' costs.

## 2.    **Commission Findings**

61.    We find that the Enron Gas Marketers engaged in wash trading on EOL that resulted in the manipulation of prices.  A "wash trade" is generally defined as a prearranged pair of trades of the same good between the same parties, involving no economic risk and no net change in beneficial ownership.  It exposes the parties to no monetary risk and serves no legitimate business purpose.  A wash trade might be used to create the illusion that a market is liquid and active, or to increase reported trading revenue figures.  A wash trade might be arranged at prices that diverge from the prevailing market in an attempt to send false signals to other market participants.  Alternatively, the intent might be to affect the average or index price reported for a market, which in turn could benefit a derivatives position or affect the magnitude of payments on a contract linked to the index price.

62.    The Final Staff Report explains that EOL market traders were traders assigned to always quote both a bid price and an offer price.  The data indicates that they sometimes

------

[40]<u>Id</u>.

[41]Final Staff Report at Chapter II p. 61.

20030625-0277 Issued by FERC OSEC 06/25/2003 in Docket#: EL03-77-000

Docket Nos. EL03-77-000 and RP03-311-000                                    - 20 -

elected to set the bid-offer spread to zero, which is referred to as "choice market." The
Final Staff Report states that choice markets may, in effect, have been an invitation to
EOL customers to engage in wash trading. In general, the data reveals a trend in which
more wash trades occurred later in time. Only 5 percent of natural gas wash trades
occurred during the first 4 months (January to April 2000), while 42 percent of gas wash
trades occurred during the last 4 months (August to November 2001) examined. The
information provided about EOL trading activity during choice market periods reveals
that, in fact, 45 percent of all choice market trading in natural gas products occurred
during the last three months (September to November 2001) of the 21-month sample.
These 3 months coincide with the period of time leading up to Enron's filing for
bankruptcy.[42]In general, the data reveals a trend in which more wash trades occurred later
in time. Only 5 percent of natural gas wash trades occurred during the first 4 months
(January to April 2000), while 42 percent of gas wash trades occurred during the last 4
months (August to November 2001) examined. In addition, the Final Staff Report
reveals that Enron traders engaged in 378 wash trades with one EOL market maker
executing 111 wash trades (29.4 percent of the total) and a second market maker
executing 73 wash trades (19.3 percent of the total).

63.    One of the most egregious examples of abuse through EOL resulted in the
manipulation of natural gas prices at the Henry Hub located in Louisiana on at least one
occasion to profit from positions taken in the over-the-counter (OTC) financial
derivatives markets (OTC markets).[43] Although the price change in the physical markets
was only about $.10/MMBtu, Enron Gas Marketers nevertheless profited due to the
effect that this small change in the physical price had on its large financial position;
Enron Gas Marketers earned approximately $3.2 million from this manipulation.

64.    On July 19, 2001, a number of traders entered relatively large short positions in
the financial markets through OTC swaps and Gas Daily financial swaps. These traders
continued to increase the short positions throughout the initial phase of the manipulation,
which was the period when the EOL market maker (who was, at times, the desk
manager) quickly and steadily raised prices on EOL, resulting in the purchase of a very
large amount of next-day physical gas. This purchasing caused prices in the financial
markets to rise, but by a lesser amount.

─────────────────────

        [42]The Final Staff Report notes that this increase in trading activity may have been
an attempt to prop up Enron's presence in the market.

        [43]For a more detailed account of wash trading on EOL, see generally Final Staff
Report at Chapter 7.

Docket Nos. EL03-77-000 and RP03-311-000                                      - 21 -

65.     The financial traders stopped increasing their short positions near the end of the EOL market maker's buying streak, at a point when the EOL market maker stopped raising prices and began to hold prices steady at the high levels. Once the EOL market maker leveled out prices, the OTC swap began to fall. The EOL market maker then began to lower the prices and sold a very large amount of gas at rapidly falling prices. The falling of the physical price then further pushed down the OTC swap price, generating significant profits for the financial traders. These profits greatly exceeded the losses that were generated from the buying and selling of the physical gas.

### 3.    **Commission Determination**

66.     The Commission finds that Enron's participation in the above-described practices involving the manipulation of the natural gas sales market justifies the revocation of the authority in 18 C.F.R. § 284.402 (2003) for any Enron entity to make jurisdictional sales for resale of natural gas.[44] This action is necessary to maintain the integrity and efficiency of the Commission's program of authorizing natural gas marketers to make jurisdictional sales at negotiated rates.[45]

67.     The Commission adopted this provision granting blanket marketing certificates for natural gas marketers to make sales at negotiated rates in Order No. 547. The purpose of Order No. 547 was to "foster a truly competitive market for natural gas sales for resale in interstate commerce, giving purchasers of natural gas access to multiple sources of natural gas and the opportunity to make gas purchasing decisions in accord with market conditions."[46] Although the order was independent of Order Nos. 636 and 636-A, it was promulgated for the same reasons, including the promotion of an active and viable spot market for natural gas.[47] The Commission permitted affiliated gas marketers to sell gas at negotiated rates based on a finding that the sale of gas as a

---

[44]As discussed further below, we will issue limited authorizations to certain Enron entities to permit them to liquidate existing assets.

[45]Niagara Mohawk Power Corp. v. FPC, 379 F.2d 153, 159 (D.C. Cir. 1967) (The Commission's remedial discretion extends to denial of participation in a government program generally extended to business managers for the purpose of maintaining the fairness, equity, and efficiency of the program.)

[46]Order No. 547, FERC Stats & Regs., Reg. Preambles January 1991-June 1996 at 30,719.

[47]Id. at 30,721.

20030625-0277 Issued by FERC OSEC 06/25/2003 in Docket#: EL03-77-000

Docket Nos. EL03-77-000 and RP03-311-000                                    - 22 -

commodity would be sufficiently competitive to prevent affiliated gas marketers from exercising market power, that is, controlling prices or excluding competition. The Commission also stated in Order No. 547 that it would "monitor the operation of the market through the complaint process."[48]

68.    The Commission believes that the underlying premise of Order No. 547 -- that the natural gas commodity market is competitive -- remains valid. However, even in competitive markets, it is possible for participants to engage in anti-competitive and deceptive practices. Through its extensive participation in wash trades for no legitimate business purpose and the other manipulations discussed in the Final Staff Report, Enron has done exactly that. Such wash trades can mislead the market in a number of ways, including by sending false price signals to other market participants and making the market at particular points appear more liquid than it really is. Misleading the market in this manner undercuts the most fundamental goal of Order No. 547. In Order No. 547, the Commission stated that it sought to foster a "natural gas sales market where merchants of natural gas are influenced by market forces."[49] The Commission also stated that "most importantly, the final rule will foster a truly competitive market for natural gas sales for resale in interstate commerce giving purchasers of natural gas . . . the opportunity to make gas purchasing decisions in accord with market conditions."[50] Clearly, the creation of false price signals through wash trades is contrary to the goal of allowing gas purchasers to make purchasing decisions "in accord with market conditions."

69.    The Commission finds that it has the authority under the NGA to revoke a blanket marketing certificate authorization as it applies to particular persons who have engaged in misconduct contrary to the Commission's fundamental purpose in granting the blanket marketing certificate. Enron suggests that, because Order No. 547 authorizes certificate holders to make sales for resale at negotiated rates, no sale Enron entered into pursuant to its marketing certificate could violate any obligation it had under that certificate. However, Order No. 547 also expressly stated that the Commission would monitor the operation of the market through the complaint process. If the Commission had intended through the blanket marketing certificate to grant gas marketers carte blanche to engage

---

[48]Id. at 30,727.

[49]Id. at 30,718.

[50]Id. at 30,719. This goal of Order No. 547 was consistent with Congress' urging, when it adopted the Wellhead Decontrol Act, that the Commission "retain and improve this competitive structure in order to maximize the benefits of decontrol." H.R. Rep. No. 101-29, at 6 (1989) (emphasis in original).

20030625-0277 Issued by FERC OSEC 06/25/2003 in Docket#: EL03-77-000

Docket Nos. EL03-77-000 and RP03-311-000                                    - 23 -

in any form of conduct in connection with their jurisdictional sales for resale no matter how deceptive, trusting solely in the market to cure any problems, there would have been no reason for the Commission to state that it would entertain complaints.

70.     As the Supreme Court has held, the Natural Gas Act "was so framed as to afford consumers a complete, permanent and effective bond of protection from excessive rates and charges."[51]  Under NGA Section 7, in order for the Commission to issue a certificate, it must find that the certificated service "will be required by the present or future public convenience and necessity."  In order for the Commission to carry out the NGA's purpose of providing consumers a complete, permanent and effective bond of protection, it must have the authority to terminate a certificate when the holder violates the certificate by deliberately engaging in misconduct that undermines the basic purpose for issuing the certificate in the first instance. [52]

71.     There is nothing to the contrary in either the majority or concurring opinions in Trunkline II.  In that case, the issue was whether the Commission had authority to revoke the certificate based on "changed economic circumstances which were admittedly beyond the control of" the pipeline.[53]  In other words, the issue was whether the Commission had the authority to end certificated service when no violation of the terms of the certificate was present.   This case does not turn on whether a certificate may be revoked without a violation, but rather on acts taken by the certificate holder in violation of its obligation under the certificate.  Nothing in Trunkline I nor Trunkline II precludes revocation of a certificate as a remedy for a violation by the certificate holder.  In fact, in Trunkline II the Commission stated that "there is no question that the Commission has the authority to revoke a certificate for violation of its terms."[54]  Such action is necessary to maintain the integrity of the Commission's certificates.

     **E.       Remedies**

---

     [51]Atlantic Refining Co. v. Public Service Commission of New York, 360 U.S. 378, 388 (1959).

     [52]To rule otherwise would be to find that granting a certificate under NGA section 7 authorizes rates that are unjust and unreasonable under NGA Sections 4 and 5. Phrased differently, a certificate under NGA Section 7 does not entitle the certificate holder to charge rates that are unjust and unreasonable under NGA Sections 4 and 5.

     [53]Trunkline II, 22 FERC at 61,445 (concurring opinion).

     [54]Id. at 61,444. See also, Wyoming-California Pipeline Company, 70 FERC ¶ 61,041 at 61,130 (1995).

20030625-0277 Issued by FERC OSEC 06/25/2003 in Docket#: EL03-77-000

Docket Nos. EL03-77-000 and RP03-311-000                                    - 24 -

72.     The Commission has discretion to implement remedies when it finds conduct that has violated its policies or regulations. The agency is at its zenith in fashioning such remedies.[55] Its discretion extends to denial of participation in a government program generally extended to business managers for the purpose of maintaining the fairness, equity, and efficiency of the program.[56] Given the Enron Gas Marketers' and Enron Power Marketers' conduct and the adverse effects on gas and electricity prices, and the Enron Power Marketers' failure to abide by reporting conditions in the Commission's orders authorizing them to sell electricity at market-based rates, the Enron Gas Marketers' blanket marketing certificates will be terminated and the Enron Power Marketers' market-based rate authorities will be revoked, to the extent discussed below.[57]

### 1. "Second Chance" & Bankruptcy

#### a. Show Cause Submissions

73.     The Enron Entities and CTC state that the Administrative Procedure Act, 5 U.S.C. § 558(C) (2000), requires that before the Commission can revoke the Enron Power Marketers' market-based rate authority or the Enron Gas Marketers' blanket marketing certificates, which the Enron Entities and CTC consider licenses, the Commission must give them a "second chance" to comply with the requirements.

74.     In addition, Enron states in a footnote that the Enron Power Marketers and three of the Enron Gas Marketers are debtors under Chapter 11 of Title 11 of the United States Code (Bankruptcy Code) and that because they are entitled to the protections of the automatic stay under Section 362 of the Bankruptcy Code any attempt by the Commission to revoke their licenses – without first obtaining relief from the automatic stay – violates the automatic stay and is void ab initio. Further they argue that the

---

[55]E.g., Niagara Mohawk Power Corp. v. FPC, 379 F.2d 153, 159 (D.C. Cir. 1967). See also Connecticut Valley Electric Company, Inc. v. FERC, 208 F.3d 1037, 1044 (D.C. Cir. 2000); Louisiana Public Service Commission v. FERC, 174 F.3d 218, 225 (D.C. Cir. 1999).

[56]Niagara Mohawk Power Corp. v. FPC, 379 F.2d 153, 159 (D.C. Cir. 1967).

[57]There is no entitlement in the FPA to make sales at market-based rates; rather, the FPA provides simply that rates should be just and reasonable and not unduly discriminatory or preferential. See 16 U.S.C. §§ 824d, 824e (2000). In fact, traditionally, just and reasonable rates were defined by reference to utility costs, i.e., were cost-based rates.

20030625-0277 Issued by FERC OSEC 06/25/2003 in Docket#: EL03-77-000

Docket Nos. EL03-77-000 and RP03-311-000                                    - 25 -

forfeiture of estate assets that would result from any attempted revocation supports the issuance of an injunction under Section 105 of the Bankruptcy Code.

### b. Answers

75.    Snohomish states that Enron is not entitled to a second chance.  To begin with, it is doubtful that market-based rate authority constitutes a "license" subject to the provisions of the APA cited by the Enron Entities and CTC.  On the contrary, market-based rate authority is the product of Sections 205 and 206 of the FPA and, consistent with Farmers Union,[58] does not confer any authority on a regulated entity beyond what it already holds under the FPA:  the right to charge "just and reasonable" rates for jurisdictional electric power sales and transmission.  Furthermore, according to Snohomish, only the manner in which rates are determined changes with a grant of authority to charge market-based rates.  In any event, Snohomish maintains that even assuming that the provision of the APA cited above applies in this situation, the plain language of that statute justifies the Commission's suspension of Enron's market-based rate authority in these circumstances.  Snohomish notes that, as Enron concedes,[59] the statute does not require a second chance for a licensee to attain compliance where the licensee's actions involve willful misconduct or a threat to the public health, interest, or safety, and both exceptions are implicated here.

76.    Santa Clara asserts that the Commission is not required to give the Enron Entities an opportunity to violate the market-based rate authority prior to permanently revoking that authority.  Santa Clara argues that under the FPA, particularly Sections 205 and 206, the Commission has plenary authority to accept, reject or revise tariffs which are subject to the Commission's jurisdiction, such as EPMI's and other Enron Entities' market-based rates tariffs.  Santa Clara provides that, while it consistently opposes the retroactive imposition of remedies, the unique circumstances presented here justify departure from this standard, e.g., EPMI's status as a bankrupt entity which effectively no longer transacts electric trading activities and which may be found to have manipulated energy markets and deceived the Commission with respect to the underlying facts upon which it was granted market-based rate authority.

_____

[58]Farmers Union Central Exchange, Inc. v. FERC, 734 F.2d 1486 (D.C. Cir. 1984) (Farmers Union).

[59]Enron Filing at 41 n.27.

20030625-0277 Issued by FERC OSEC 06/25/2003 in Docket#: EL03-77-000

Docket Nos. EL03-77-000 and RP03-311-000                                    - 26 -

77.    Santa Clara also notes that Enron's answer concedes an exception to the "second chance" rule when the license holder's conduct is willful or when the public health, interest or safety require otherwise.  Santa Clara argues that the behavior outlined in the Final Staff Report, as well as the statements by officers of Enron[60] contain repeated admissions of willful improper conduct.  Santa Clara also believes that the history of rolling blackouts which occurred in California shows the impact of market manipulation on the public health, interest or safety.

78.    Santa Clara submits that substantial judicial precedent exists which holds that, in the circumstance of market manipulation and failure to abide by reporting requirements, no second chance is afforded the transgressor.[61]

79.    Santa Clara asserts that Enron Entities have failed to allege that the potential remedy, the disgorgement of market-based rate authority profits, is subject to second chance opportunities.

80.    With regard to bankruptcy, Santa Clara argues that prior rulings permit the Commission to retroactively revoke the Enron Entities' market-based rate authority and to take other actions respecting the Enron Entities' improper actions, without violating the automatic stay provisions of the Bankruptcy Code.  Santa Clara states that Enron's argument that since this proceeding could impact assets of the estate, it violates the automatic stay was rejected by the Supreme Court.[62]   Santa Clara further provides that any remaining doubt that a governmental unit can -- in exercising its police or regulatory powers – take action affecting the assets of a debtor was conclusively resolved when 362(b) of the Bankruptcy Code was amended in 1998. In the 1998 Amendment, an express reference to Bankruptcy Code Section 362(a)(3) was added to Section 362(b)(4). This change made it clear that the police and regulatory exception to the automatic stay applies to actions to obtain possession of property of the estate or of property from the estate or to exercise control over property of the estate.

### c. **Commission's Response**

---

[60]See U.S. v. Timothy N. Belden (N.D. Cal. Case No. CR02-0313).

[61]See, e.g., Cargill, Inc. v. Hardin, 452 F.2d 1154 (8th Cir.), cert. denied, 406 U.S. 932 (1971); Goodman v. Benson, 286 F.2d 896 (7th Cir. 1961); Great Western Food Distributors v. Brannan, 201 F.2d 476 (7th Cir. 1953).

[62]See Board of Governors of the Federal Reserve System v. MCorp. Financial, Inc., 502 U.S. 32 (1991).

Docket Nos. EL03-77-000 and RP03-311-000                                    - 27 -

81.     Initially, we note that we agree with Snohomish that we are not revoking a license. Rather, we are exercising our undoubted police or regulatory authority under Sections 206 and 309 of the FPA, as well Sections 5, 7 and 16 of the NGA, to ensure that rates are just and reasonable – as the FPA and NGA require.  Our actions below ensure that rates charged by Enron, including its affiliates and subsidiaries, are just and reasonable under both the FPA and the NGA.

82.     With one exception (Enron Compression Services Company), Enron's wholly-owned affiliates are in Chapter 11 (reorganization) bankruptcy; Enron claims that damage to the orderly unwinding of contracts and/or harm to innocent third-party customers would be the result of the Commission's revoking their market-based rate authority or termination of their blanket certificates.  To minimize further harm to third-parties from Enron's actions, we will allow Enron to unwind its current positions. However, we will limit its authority to market electricity and natural gas to only what is needed for such unwinding and we here revoke those authorizations entirely once unwinding ends.  Furthermore, any companies that emerge from the bankruptcy are required to apply at that time for authorization to sell electricity and natural gas at wholesale.

83.     We also do not believe that the automatic stay provision of the Bankruptcy Code bars us from ensuring that rates and charges under the FPA and the NGA are just and reasonable, especially given what has occurred to date, described above, and the Commission's actions here in response.[63]  The Bankruptcy Code is not, as Enron would have it, a shield to protect market manipulation, unjust and unreasonable rates, and continued failure to comply with Commission orders.

84.     While the Bankruptcy Code generally stays all proceedings against the debtor automatically upon the filing of the bankruptcy petition, 11 U.S.C. § 362 (2000), "the commencement or continuation of an action or proceeding by a governmental unit to enforce such governmental unit's police or regulatory power" is excepted from the automatic stay under 11 U.S.C. § 362(b)(4) (2000).  Thus, an agency, such as the Commission, given the statutory mandate to ensure just and reasonable rates, retains its

---

[63]See, e.g., Board of Governors of the Federal Reserve System v. MCorp. Financial, Inc., 502 U.S. 32, 37-42 (1991); In re FCC, 217 F.3d 125,138 (2d Cir. 2000) (FCC); National Labor Relations Board v. 15th Avenue Iron Works, Inc., 964 F.2d 1336, 1337 (2d Cir. 1992);  National Labor Relations Board v. Continental Hagen Corp., 932 F.2d 828, 834-35 (9th Cir. 1991).

20030625-0277 Issued by FERC OSEC 06/25/2003 in Docket#: EL03-77-000

Docket Nos. EL03-77-000 and RP03-311-000                                      - 28 -

traditional control over rates throughout bankruptcy.[64]  Also, as our action here is exempt from the automatic stay as a regulatory action under 11 U.S.C. § 362(b)(4) (2000), we do not have to seek relief from that stay under 11 U.S.C. § 362(d) (2000) before taking this action.[65]

    **2.**    **Findings**

85.    The following are the specific remedies we adopt here:.

    **a.**    **EMW**

86.    Prior to bankruptcy, EMW was jointly owned by Enron and a non-affiliated company (People's Gas & Light Company).  It was formed to own Enovate LLC, which was a gas marketing company.  Through Enovate LLC, EMW engaged in natural gas trading and market making in Chicago and the surrounding mid-continent producing regions.  EMW sold its stake in Enovate and is no longer engaged in natural gas trading activity.  EMW has no remaining open physical financial natural gas positions and is expected to be dissolved during reorganization.

---

[64]See In re Cajun Electric Power Cooperative, Inc., 185 F.3d 446, 453 (5th Cir. 1999) (Cajun).  See also Penn Terra Ltd. v. Dept. of Environ. Resources, 733 F.2d 267, 278 (3d Cir. 1984) ("In enacting the exceptions to Section 362, Congress recognized that in some circumstances, bankruptcy policy must yield to higher priorities.").

[65]See FCC, 217 F.3d at 138-39 (2d Cir. 2000); Eddelman v. U.S. DOL, 923 F.2d 782, 785 (10th Cir. 1991).

While the Bankruptcy Code gives a bankruptcy court power to "issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title," 11 U.S.C. § 105(a) (2000), that power is not unlimited, but can be exercised only within the confines of the Bankruptcy Code.  Cajun, 185 F.3d at 453 n.9, 458; Dept. of the Treasury for the Commonwealth of Puerto Rico v. Pagan, 279 B.R. 43, 46 (D.P.R. 2002).  Section 105 of the Bankruptcy Code does not empower a bankruptcy court to create rights that do not exist under the Code.  Id. (citing In re SPM Mfg. Corp., 984 F.2d 1305, 1311 (1st Cir. 1993); In re Morristown & Erie RR Co., 885 F.2d 98, 100 (3d Cir. 1989)).  "In short, section 105 does not permit bankruptcy courts to become 'roving commission[s] to do equity.'"  Id. (quoting In re Southmark Corp., 49 F.3d 1111, 1116 (5th Cir. 1995)).

Docket Nos. EL03-77-000 and RP03-311-000                                      - 29 -

87.    We revoke EMW's authority to make sales under 18 C.F.R. § 284.402 (2003),
given that it has fully unwound its contractual obligations and is expected to be
dissolved.  We direct EMW to notify the Commission of the date of dissolution.

### b.   ECC

88.    Prior to bankruptcy, ECC was among the largest natural gas and electricity
marketers in Canada.  Commencing January 2002, ECC has been actively winding down
its business operations.  ECC now has only:  (1) liquid assets, (2) a number of unsettled
terminated trading contracts, (3) a small number of payables, some of which are presently
in litigation, and (4) a number of contingent liabilities relating primarily to master netting
agreements entered into along with all Enron Corp affiliates.  ECC presently has no open
physical gas positions.
89.    We revoke ECC's authority to make sales under 18 C.F.R. § 284.402 (2003),
given that it has no open physical gas positions.  In the event that ECC emerges from
reorganization with a gas marketing function, it must request and receive specific
Commission authority to make such sales.

### c.   ENAU

90.    Prior to bankruptcy, ENAU was primarily engaged in physical natural gas trading
and market making for wellhead production.  ENAU is no longer engaged in any natural
gas market making activity or speculative natural gas trading activity.  The dissolution of
its gas trading book is expected to conclude by December 2003, and the remaining open
physical and financial positions have a current market value of between $200,000 to
$500,000.  ENAU is prepared to terminate its gas marketing certificate upon completion
of this process.

91.    We revoke ENAU's authority to make sales under 18 C.F.R. § 284.402 (2003) and
in place issue a limited authorization for the sole use of liquidating the existing assets,
with a self-effectuating termination date of December 31, 2003 (see 18 C.F.R.
§ 284.402(d) (2003)).  In the event that ENAU emerges from reorganization with a gas
marketing function, it must request and receive specific Commission authorization to
make such sales.

### d.   EESI

92.    Prior to bankruptcy, EESI served retail gas and electric customers in a number of
markets.  EESI has approximately $8.6 million dollars worth of gas held in storage or
imbalance by various pipelines and local distribution companies.  EESI's ongoing electric

20030625-0277 Issued by FERC OSEC 06/25/2003 in Docket#: EL03-77-000

Docket Nos. EL03-77-000 and RP03-311-000                                    - 30 -

energy-related business includes: (1) the sale of its First Energy Market Support
Generation and related customer contracts that will not completely transfer until June
2003, (2) refunds from PG&E, and (3) re-settlement with the Cal ISO due to incorrect
meter readings from December 2, 2001 through December 23, 2002.

93.    We revoke EESI's authorization to make sales under 18 C.F.R. § 284.402 (2003)
and in place issue a limited authorization for the sole use of liquidating EESI's existing
assets. EESI must report to the Commission in Docket No. RP03-311 every 30 days of
the progress made in liquidating its assets. This authorization will expire once
liquidation is completed (see 18 C.F.R. § 284.402(d) (2003)). We also immediately
revoke EESI's market-based rate authority and terminate its electric market-based rate
tariff because it has not identified any need for continued market-based rate authority. In
the event that EESI emerges from reorganization with a gas marketing function, it must
request and receive specific Commission authorization to make such sales. In the event
that EESI emerges from reorganization with a wholesale power marketing function, it
must reapply for market-based rate authority.

### e.    ECS

94.    ECS is not currently in bankruptcy. ECS manages and operates four (unregulated)
compressor stations under long-term contracts: three on Transwestern Pipeline (through
2010) and one on Florida Gas Transmission (through 2022). ECS also provides
management services for the ENA Compression Service contract with Northern Natural
Gas Pipeline (through 2017).[66] ECS buys retail electricity for an electric motor drive
system for the pipeline compression station. As compensation, ECS receives an
equivalent amount of gas that would have been consumed by a traditional gas
compression station. ECS eventually sells this gas at either an index or fixed price at
specified delivery points.

95.    We revoke ECS's authority under 18 C.F.R. § 284.402 (2003) and in place issue a
limited authorization for the sole use of marketing gas entitlements accrued under ECS's
existing compressor station contracts.

### f.    ENA

96.    ENA was formed to market natural gas products and for making markets in
physical and financial natural gas. ENA sold its trading platform to UBS Warburg
Energy in March 2002. ENA is no longer engaged in any natural gas market making

_____

[66]All three pipelines are Enron affiliates.

Docket Nos. EL03-77-000 and RP03-311-000                                    - 31 -

activity or speculative natural gas trading activity. The dissolution of the ENA gas-trading book has been underway since December 2001 and is expected to conclude by December 2003. ENA has a number of park and loan balances, storage balances, and imbalance quantities with an estimated value of around $4 million that it is currently in the process of liquidating. ENA has two ongoing contractual obligations: (1) a compressor service agreement (through 2017) with Northern Natural Gas Company, and (2) a verbal commitment to provide fuel management support services to the Ponderosa Pines Generating project, in which ENA has a small ownership interest. ENA is attempting to sell its ownership interest which may take up to a year to complete.

97.    We revoke ENA's authorization under 18 C.F.R. § 284.402 (2003) and in place issue a limited authorization that allows ENA to conduct only the activities listed above. ENA must report to the Commission in Docket No. RP03-311 every 30 days on the progress made in terminating those activities. This authorization will expire once these activities are completed (see 18 C.F.R. § 284.402(d) (2003)).

### g.    EPMI

98.    There is no description of EPMI's current status in the pleading. Enron has not identified any ongoing activity or made any specific request to allow EPMI to continue any trading function. The pleading simply states: "Because the Commission has not given the Enron Power Marketers [including EPMI] a second chance to comply, the Commission cannot lawfully revoke their market-based rate authority and the Show Cause Order is a nullity."

99.    We immediately revoke EPMI's market-based rate authority and immediately terminate its electric market-based rate tariff. Unlike the other entities that have a specified need for continued authorization, there is no request or demonstration that EPMI needs to retain its market-based rate authority for unwinding or otherwise. In the event that EPMI emerges from reorganization with a wholesale power marketing function, it must reapply for market-based rate authority.

### IV.    CTC and Bridgeline

### A.    CTC

100.    Citrus Corp. is equally owned by Enron and Southern Natural Gas Company, a wholly-owned subsidiary of El Paso Corp (El Paso). Citrus Corp. in turn owns Florida Gas Transmission (Florida) and CTC, which was formed as an independent marketing affiliate.

20030625-0277 Issued by FERC OSEC 06/25/2003 in Docket#: EL03-77-000

Docket Nos. EL03-77-000 and RP03-311-000                                    - 32 -

101.   CTC buys and sells natural gas for the markets located along the Florida pipeline system, primarily in the State of Florida.  CTC has long-term gas sales commitments to Florida Power Corp. and Auburndale Power Partners, totaling approximately 50,000 MMBtu/day.  To serve these obligations, CTC has three long-term supply contracts which total slightly more than its sales commitments.  As a result, CTC markets its excess supply to different customers.  CTC states that it does not engage in speculative natural gas trading or market making activities and has never traded on EOL.  For these reasons, it states, there is no connection to the circumstances identified in the show cause order and revocation would cause injury and harm to CTC and third-parties including the Enron Creditors that are partial owners of Citrus Corp.

102.   On the facts, we are not persuaded that CTC should be treated like the other Enron Gas Marketers, and we will dismiss CTC from Docket No. RP03-311-000.

**B.    Bridgeline**

103.   On April 10, 2003, Bridgeline filed a motion for clarification challenging the Show Cause Order's inclusion of Bridgeline in the Enron Gas Marketers and requiring Bridgeline to show cause why the Commission should terminate its blanket marketing certificate.[67]

104.   Primarily, Bridgeline argues that neither the Show Cause Order nor the Final Staff Report identify any misconduct on the part of Bridgeline.  It points out that, in fact, it is not mentioned in the Final Staff Report.  In particular, Bridgeline argues that it is not an Enron Gas Marketer; it explains that it is a wholly owned subsidiary of Bridgeline Holdings, LP, whose ownership includes a 39.6 percent limited partner interest owned by various Enron entities and a 1 percent general partner interest that is 40 percent owned by Enron North America Corp.

105.   Furthermore, Bridgeline provides that it has always functioned independently from Enron, and it has been a stand-alone company with independent officers and employees who bear a fiduciary duty to Bridgeline.  Bridgeline does admit, however, that Enron appoints two of four managers (50 percent) to Bridgeline LLC, the general partner of Bridgeline Holdings, L.P.  Bridgeline states that these managers function as a board

---

[67]A notice of extension of time granted Bridgeline an extension of time to file its response to and including fourteen days after the Commission acts on the motion for clarification.

20030625-0277 Issued by FERC OSEC 06/25/2003 in Docket#: EL03-77-000

Docket Nos. EL03-77-000 and RP03-311-000                                      - 33 -

of directors, but do not exercise control over Bridgeline's day-to-day operations, including its trading.

106.   Bridgeline states that it has no affiliation with Transwestern Pipeline Company, Citrus Corp., and/or Northern Plains Natural Gas Company, other than the indirect relationship that stems from Enron's 40 percent minority interest in Bridgeline.

107.   The Commission's description of Enron's market manipulation, according to Bridgeline, is predicated upon the Enron Gas Marketers' use of EOL to trade with third parties.  Bridgeline asserts that, because it transacted as an independent third party on EOL, it was not in a position to benefit from the market manipulation by the Enron Gas Marketers.  It argues that, to the extent those entities engaged in market manipulation, Bridgeline would have been a victim, not a beneficiary, of such misconduct.  Bridgeline also does not see how it possibly could have participated in any market manipulation in the gas markets serving California from the summer 2000 through the winter of 2000-2001, because it has never engaged in trading activity in the California gas market.[68] Bridgeline provides that to the best of its knowledge, neither Bridgeline nor any of its employees have received data requests or been interviewed by the Commission Staff. Bridgeline provides that it is unaware of any misconduct on its part, but is conducting a thorough internal investigation of its trades and positions during the period June and July 2001 to confirm that no wrongdoing took place.[69]

108.   On the facts, we are not persuaded that Bridgeline should be treated like the other Enron Gas Marketers, and we will dismiss Bridgeline from Docket No. RP03-311-000.

The Commission orders:

(A)   We hereby terminate EMW's authority to make sales under 18 C.F.R. § 284.402 and direct EMW to notify the Commission of the date of dissolution.

(B)   We hereby terminate ECC's authority to make sales under 18 C.F.R. § 284.402 and direct ECC to request and receive specific Commission authority to make gas sales if it emerges from reorganization with a gas marketing function

---

[68]Under Bridgeline Holdings, L.P.'s Amended and Restated Limited Partnership Agreement, executed March 1, 2000, Bridgeline cannot market natural gas outside the State of Louisiana.

[69]We note that no answers were filed in response to Bridgeline's motion for clarification.

20030625-0277 Issued by FERC OSEC 06/25/2003 in Docket#: EL03-77-000

Docket Nos. EL03-77-000 and RP03-311-000                                - 34 -

(C)    We hereby terminate ENAU's authority to make sales under 18 C.F.R. § 284.402 and issue a limited authorization for the sole use of liquidating the existing assets, with a self-effectuating termination date of December 31, 2003, pursuant to 18 C.F.R. § 284.402(d).  In the event that ENAU emerges from reorganization with a gas marketing function, it must request and receive specific Commission authorization to make such sales.

(D)    We hereby terminate EESI's authorization to make sales under 18 C.F.R. § 284.402 and in place issue a limited authorization for the sole use of liquidating EESI's existing assets.  EESI must report to the Commission in Docket No. RP03-311 every 30 days of the progress made in liquidating its assets.  This authorization will expire once liquidation is completed, pursuant to 18 C.F.R. § 284.402(d).  In the event that EESI emerges from reorganization with a gas marketing function, it must request and receive specific Commission authorization to make such sales.

(E)    We hereby revoke EESI's market-based rate authority and immediately terminate its electric market-based rate tariff.  In the event that EESI emerges from reorganization with a wholesale power marketing function, it must reapply for market-based rate authority.

(F)    We hereby terminate ECS's authority under 18 C.F.R. § 284.402 and in place issue a limited authorization for the sole use of marketing gas entitlements accrued under ECS's existing compressor station contracts.

(G)    We hereby terminate ENA's authorization under 18 C.F.R. § 284.402 and in place issue a limited authorization that allows ENA to conduct only the activities discussed in the body of this order.  ENA must report to the Commission every 30 days in Docket No. RP03-311 of the progress made in terminating those activities.  This authorization will expire once these activities are completed, pursuant to 18 C.F.R. § 284.402(d).

(H)    We hereby revoke EPMI's market-based rate authority and immediately terminate its electric market-based rate tariff.  In the event that EPMI emerges from reorganization with a power marketing function, it must reapply for market-based rate authority.

(I)    Bridgeline and CTC are hereby dismissed from Docket No. RP03-311-000, as discussed in the body of this order.

By the Commission.

20030625-0277 Issued by FERC OSEC 06/25/2003 in Docket#: EL03-77-000

(S E A L)

Magalie R. Salas,
Secretary.

20040722-3022 Issued by FERC OSEC 07/22/2004 in Docket#: EL02-113-000

UNITED STATES OF AMERICA 108 FERC ¶ 61,071
FEDERAL ENERGY REGULATORY COMMISSION

Before Commissioners: Pat Wood, III, Chairman;
Nora Mead Brownell, Joseph T. Kelliher,
and Suedeen G. Kelly.

| | | |
|---|---|---|
| El Paso Electric Company, Enron Power Marketing, Inc., and Enron Capital and Trade Resources Corporation | Docket No. | EL02-113-000 |
| Enron Power Marketing, Inc. and Enron Energy Services, Inc. | Docket No. | EL03-180-000 |
| Enron Power Marketing, Inc. and Enron Energy Services, Inc. | Docket No. | EL03-154-000 |

ORDER ON INITIAL DECISION AND CONSOLIDATING DOCKETS

(Issued July 22, 2004)

1.     This case is before the Commission on exceptions to an Initial Decision by an Administrative Law Judge (ALJ) in Docket No. EL02-113-000.[1] The Commission affirms the Initial Decision's finding that Enron[2] violated a condition contained in the Commission's December 2, 1993 Order authorizing Enron to charge market-based rates for wholesale power sales, by not informing the Commission of Enron's business relationship with El Paso Electric Company. The order also affirms the Initial Decision to the extent of requiring that Enron disgorge $32.5 million in profits associated with sales involving El Paso's facilities.

2.     However, the Commission also concludes that in light of the fact that the Enron-El Paso relationship was a subset of broader Enron relationships and practices in the West which are currently pending before another ALJ in Docket Nos. EL03-180-000 and EL03-154-000, it is appropriate to consolidate this docket and our decision herein with Docket Nos. EL03-180-000 and EL03-154-000, and to direct the ALJ in Docket Nos. EL03-180-000 and EL03-154-000 to determine the total amount of money that Enron

_____

[1] Enron Power Marketing, Inc., *et al.*, 104 FERC ¶ 63,010 (2003) (Initial Decision).

[2] Enron Capital and Trade Resources Corporation (currently d/b/a Enron North America) (ECT) and Enron Power Marketing, Inc. (EPMI) (collectively, Enron).

Docket Nos. EL02-113-000, EL03-180-000, and EL03-154-000                2

should be required to disgorge.  We note that based on the evidence in this docket, as well as in Docket Nos. EL03-180-000 and EL03-154-000, Enron potentially could be required to disgorge profits for all of its wholesale power sales in the Western Interconnect for the period January 16, 1997 to June 25, 2003.  However, an appropriate remedy should take into account all evidence of violations of tariffs on file or orders of the Commission in all pending dockets involving Enron's role in the Western power crisis.

3.    This order benefits customers by providing for the comprehensive review of all evidence relevant to Enron conduct that violated or may have violated Commission tariffs or orders and the appropriate remedy for such violations.

## I.    **Background**

4.    A detailed history of this proceeding is provided in the Initial Decision.[3]  In brief, this proceeding involves an examination of the business relationship between El Paso Electric Company (El Paso Electric) and two Enron companies:  ECT and its subsidiary EPMI.[4]  In brief, during certain hours of the week, Enron operated El Paso Electric's power marketing desk, and, further, entered into contracts for El Paso Electric solely at Enron's discretion – and thus gained control of El Paso Electric's generation.

5.    On August 13, 2002, under section 206 of the Federal Power Act (FPA), 16 U.S.C. § 824e (2000), the Commission ordered a hearing to investigate possible misconduct by Enron and El Paso Electric, particularly over whether they should have made filings pursuant to sections 203 and/or 205 of the FPA, 16 U.S.C. §§ 824b, 824d (2000).  This was based on an indication that these entities had entered into a contractual relationship which may have resulted in Enron acquiring control of El Paso Electric's assets without informing the Commission.[5]

---

[3] Initial Decision at P 2-6.

[4] El Paso Electric, the California Attorney General, the California Electricity Oversight Board, and the Commission Trial Staff reached a settlement as to El Paso Electric in this proceeding, which the Commission has approved.  *See* El Paso Electric Company, Enron Power Marketing, Inc., Enron Capital and Trade Resources Corporation, 104 FERC ¶ 61,115 (2003).

[5] El Paso Electric Co., 100 FERC ¶ 61,188 at P 6-10 (2002).

Docket Nos. EL02-113-000, EL03-180-000, and EL03-154-000                    3

6.      Testimony was filed by Trial Staff, Enron, El Paso Electric, the California State
Parties, and Tacoma.[6]  On July 15, 2003, the ALJ, after extensive hearings and briefing,
issued an initial decision deciding the issues raised in this case.[7]  Briefs on Exceptions
were filed by Enron, the California Parties, and PG&E.  Trial Staff and Enron filed Briefs
Opposing Exceptions.

## II.     **Discussion**

7.      We have reviewed the record, the Initial Decision and the briefs on and opposing
exceptions to the Initial Decision.  While Enron and other parties discuss numerous issues
on exceptions to the Initial Decision, their arguments largely replicate those which were
made to, and fully addressed by, the ALJ.  Nothing in their briefs persuades us to
overturn the ALJ with respect to her findings that:  (1) Enron violated its market-based
rate authority by failing to notify the Commission of its control of El Paso Electric's
assets pursuant to the Power Consulting Services Agreement (PCSA);[8] (2) Enron should
disgorge profits for this violation;[9] (3) Enron's market-based rate authority should be
revoked (which, we note, the Commission has already done prospectively in a separate

---

[6] Several parties sought, and were granted, intervenor status in this proceeding:
the City of Tacoma, Washington (Tacoma); the California Electricity Oversight Board
and the People of the State of California, *ex. rel.* Bill Lockyer, Attorney General
(collectively, California State Parties); the California Independent System Operator
Corporation (CAISO); Pacific Gas and Electric Company (PG&E); Dynegy Power
Marketing, Inc.; Californians for Renewable Energy, Inc.; Pioneer America LLC; the
City of Burbank, California; and the Public Utility District No. 1 of Snohomish County,
Washington (Snohomish).

[7] Enron Power Marketing, Inc., *et al.*, 104 FERC ¶ 63,010 (2003) (Initial
Decision).

[8] Initial Decision at P 95-112; <u>see</u> Enron Power Marketing, Inc., 65 FERC
¶ 61,305 at 62,405 (1993), *order on clarification and reh'g*, 66 FERC ¶ 61,244 (1994)
(granting market-based rate authority).

[9] Initial Decision at P 112-115.

Docket Nos. EL02-113-000, EL03-180-000, and EL03-154-000                4

proceeding);[10] and (4) it is not necessary to determine in this proceeding whether Enron's trading strategies constituted unlawful actions that adversely affected the California energy market since this issue is being addressed in a separate proceeding.[11]  No useful purpose would be served by further discussion of those issues because the ALJ's findings are supported by the record and are consistent with existing case law and Commission policy.  There are certain matters, however, which warrant further discussion, or on which we differ with the ALJ.  Those matters are discussed below.

A.    **Submission of the PCSA between Enron and El Paso Electric**

1.    **Initial Decision**

8.    The ALJ concluded that the record in this case supports a finding that Enron violated section 205(c) of the FPA, since it did not file the PCSA with the Commission. According to the ALJ, the PCSA was a contract which related to or affected the rates, charges, and classifications of jurisdictional services.  The ALJ found that, under the PCSA, Enron marketed El Paso Electric's power; Enron operated El Paso Electric's power marketing desk, buying and selling wholesale electricity without filing the PCSA for Commission approval pursuant to section 205(c) of the FPA.  The ALJ found that, contrary to Enron's claims, this was not just a consulting agreement; consequently, under section 205(c) of the FPA, it had to be approved by the Commission.[12]

---

[10] *Id.* at P 115; Enron Power Marketing, Inc., 103 FERC ¶ 61,343 (2003), *reh'g denied*, 106 FERC ¶ 61,024 (2004) (EPMI).  A revocation of market-based rates or a disgorgement of profits would not void contracts that parties may have signed; the rates may be changed prospectively, or disgorgement of profits may be ordered, but the contract remains. *See* Prior Notice and Filing Requirements Under Part II of the Federal Power Act, 64 FERC ¶ 61,139 at 61,980 (1993), *order on reh'g*, 65 FERC ¶ 61,081 (1993) (Prior Notice) (a failure to timely file for market-based rate authority may result in the rates being re-set as cost-based rates).  Any disgorgement still must let sellers recover their costs. *See, e.g.,* Coastal Oil & Gas Corp. v. FERC, 782 F.2d 1249, 1253 & n.6 (D.C. Cir. 1986); *see generally* United Gas Pipe Line Company v. Mobile Gas Service Corp., 350 U.S. 332 (1956); FPC v. Sierra Pacific Power Company, 350 U.S. 348 (1956).

[11] Initial Decision at P 115, 116, 125-127; *see* American Electric Power Services Corp., 103 FERC ¶ 61,345 (2003), *reh'g denied*, 106 FERC ¶ 61,020 (2004); *see also* Enron Power Marketing, Inc., 103 FERC ¶ 61,346 (2003), *reh'g denied*, 106 FERC ¶ 61,020 (2004).

[12] *See* Initial Decision at P 33.

Docket Nos. EL02-113-000, EL03-180-000, and EL03-154-000                5

9.    Furthermore, the ALJ found that Enron entered into contracts for El Paso Electric solely at Enron's discretion.[13]  The ALJ noted that unrebutted record evidence demonstrates that in some transactions Enron even took title to El Paso Electric's power.[14]  Due to the nature of the business relationship between both parties, the ALJ also noted that it is not possible to differentiate in which transactions this did in fact occur.  Furthermore, the ALJ determined that by Enron's actions (with no input from El Paso Electric) Enron set or affected the price El Paso Electric obtained for its power. Moreover, the ALJ noted that Enron and El Paso Electric shared profits on supplemental market sales and ancillary services sales to the California Independent System Operator (CAISO).  The ALJ concluded that this evidence proved that the relationship was not brokering.[15]  The ALJ found that Enron, by virtue of the PCSA, gained control of El Paso Electric's generators by controlling the marketing division of El Paso Electric (a utility with a franchised service area).[16]  Since Enron's previously approved tariff did not give it authority to perform these services contemplated in the PCSA, the ALJ concluded that Enron had to seek prior formal approval from the Commission under section 205(c) before providing this service.

2.    **Exceptions**

10.    In its Brief on Exceptions, Enron repeats many of the same arguments it made in its Initial Brief.  Enron argues that EPMI and other power marketers were exempt from filing individual power sales contracts or related agreements under section 205, and the Commission cannot impose such a remedy retroactively.  Although Enron admits that section 205 applies to it, Enron maintains that beginning in 1989 the Commission granted all power marketers without generation facilities a waiver of the requirement to file contracts or related agreements under section 35.1(a) of the Commission's regulations, 18 C.F.R. § 35.1(a).  Under this waiver, Enron states that, instead of filing individual contracts or related agreements, power marketers were only required to file tariffs and

---

[13] *See id.* at P 37 ("Enron could decide from whom, how and when Enron could buy or sell power on El Paso Electric's behalf").

[14] *See id.* at P 46 (citing Exs. S-40 at p. 44-45; S-39 at p. 3; S-9 at p. 6 ¶ 16; S-10 at p. 9; S-37 at p. 4).

[15] *See id.* at P 46-48 (citing Enron Power Marketing, Inc., 65 FERC ¶ 61,305 (1993) (citing Citizens Energy Corp., 35 FERC ¶ 61,198 (1986)).

[16] *See* Initial Decision at P 49.

Docket Nos. EL02-113-000, EL03-180-000, and EL03-154-000                6

quarterly reports of jurisdictional activities.[17] Enron states, if the Initial Decision is not reversed, the precedent set will have negative consequences, by requiring all power marketers to file agreements for brokering, advising, revenue sharing, and other services that have previously been exempt from filing.

11. Additionally, Enron repeats its argument that the Commission's order granting Enron market-based rate authority and accepting its power marketer tariff gave EPMI plenary authority to sell power and operate a trading desk, without limitation as to whether those sales were made on EPMI's own behalf or on behalf of others.[18]

12. Trial Staff argues that Enron failed to cite any Commission order that explicitly announced a waiver of 18 C.F.R. § 35.1(a) in its entirety for all power marketers in 1989, which it would have done unequivocally had a waiver of such magnitude occurred.[19] Trial Staff also counters that market-based rate authority does not allow a power marketer to do anything it wants. Trial Staff maintains that it merely provides a power marketer the authority to engage in those activities requested by the entity when it first filed for such authority with the Commission; if a power marketer wants to provide a new type of jurisdictional service not covered by a tariff or contract on file, Commission approval must first be obtained.

## 2.  **Commission Determination**

13. While the Commission agrees with the ALJ's finding that Enron at times exercised control over El Paso Electric's facilities, and while as discussed *infra* we affirm the ALJ's conclusions that Enron violated its market-based rate authorization and should be required to disgorge profits, we reverse the ALJ's finding that Enron violated section 205(c) of the FPA by failing to file the PCSA under section 205(c) before its implementation.

---

[17] *See* Enron's Brief on Exceptions at 6-9 (citing 18 C.F.R. § 35.1(g) (2003); Enron Power Marketing, Inc., 65 FERC ¶ 61,305 at 62,407 (1993); Citizens Power & Light Corp., 48 FERC ¶ 61,210 (1989); Southern Company Services, Inc., 87 FERC ¶ 61,214 (1999); D.E. Shaw Plasma Power, LLC, 104 FERC ¶ 61,150 (2003), and D.E. Shaw Plasma Power, LLC, *et al.*, Docket No. ER03-879-000, *et al.* (July 23, 2003) (letter order) (collectively, Plasma Power Orders)).

[18] *See* Enron's Brief on Exceptions at 10-13 (citing the Plasma Power Orders). While ECT signed the PCSA with El Paso Electric, in practice EPMI performed the services under the PCSA. *See* Initial Decision at P 31-32.

[19] *See* Trial Staff's Brief on Exceptions at 16-17.

Docket Nos. EL02-113-000, EL03-180-000, and EL03-154-000          7

14. Initially, the Commission agrees with the ALJ that Enron at times had a quantum of control and operated El Paso Electric's assets during certain off-peak periods.[20] Specifically, Enron, in its prescheduling and real-time functions, gained control of decision-making authority over sales of electric energy. Indeed, El Paso Electric admitted that it gave Enron discretion on how, when, and to whom it could sell power on El Paso Electric's behalf while Enron ran the El Paso Electric trading desk. Prompt notification to the Commission of this type of change of circumstances was specifically required of Enron.[21]

15. In the prescheduled (day-ahead) market, the quantities and acceptable prices (minimum, not ceiling) were given to Enron, who sold the power in the market. Enron had similar authority for El Paso Electric sales to CAISO's supplemental and ancillary services markets. Enron had authority to determine the timing and quantity of bids into the California Power Exchange (Cal PX) and CAISO, subject to reliability parameters. Finally, El Paso Electric allowed Enron to dispose of the output of certain generation assets.[22] In real-time, the same was essentially true.[23]

---

[20] See Initial Decision at P 39-42.

[21] See Enron Power Marketing, Inc., 65 FERC ¶ 61,305 at 62,405 (1993), order on clarification and reh'g, 66 FERC ¶ 61,244 (1994) (directing "Enron to inform the Commission promptly of any change of status that would reflect a departure from the characteristics the Commission has relied upon in approving market-based pricing.").

[22] See Initial Decision at P 42 (citing Exs. S-5 at p. 25; S-9 at p. 3 ¶ 12(a); S-32 at p. 3; Ex. S-5 at p. 28; Ex. S-9 at p. 3 ¶ 12(a); Ex. S-9 at p. 3 ¶ 11(a)).

[23] Enron manned El Paso Electric's real-time trading desk 76 percent of the time; 16 hours per day during the work week and 24 hours per day on holidays and weekends. Enron thus was responsible for monitoring and performing real-time marketing on El Paso Electric's behalf 76 percent of the time. Enron set the price and, as long as operational and reliability criteria were met, El Paso Electric could not rescind the transaction. The ALJ found no instances of any transaction being rescinded. Initial Decision at P 41 (citing, e.g., Ex. S-1 at p. 13).

Docket Nos. EL02-113-000, EL03-180-000, and EL03-154-000          8

16. In short, Enron at times had control over the quantity, availability and pricing of wholesale power sales by a competitor. The Commission's market-based rate findings are expressly premised upon a demonstration by the applicant that the applicant lacks market power.[24] If conditions changed, Enron was required to inform the Commission of those changes.[25]

17. Through Enron's control at times of El Paso Electric's sales of physical power, Enron had the ability to control this supply, and even withhold this supply from the market. These were not the circumstances that were represented to the Commission when Enron was granted its market-based rate authority, and, importantly, Enron's market-based authorization expressly required it to report departures from circumstances previously represented to the Commission. Specifically, the Commission directed: "Enron to inform the Commission promptly of any change of status that would reflect a departure from the characteristics the Commission has relied upon in approving market-based pricing."[26] The failure of Enron to follow this requirement warrants retroactive disgorgement of profits (discussed *infra*).

18. We note that Enron was fully aware of its obligation to inform the Commission promptly of any change in status that would reflect a departure from the characteristics the Commission relied upon in approving market-based pricing. For example, pursuant to this obligation, on January 21, 1997, Enron notified the Commission of a change in status when it and one of its subsidiaries acquired a majority interest in Zond Corporation.[27] On January 16, 1997, Enron executed the PCSA with El Paso Electric, and the same obligation to promptly report the change in status applied. Yet Enron did not notify the Commission of the execution of the PCSA.

---

[24] *See* Enron Power Marketing, Inc., 65 FERC ¶ 61,305 at 62,404-05 (1993), *order on clarification and reh'g*, 66 FERC ¶ 61,244 (1994); *accord, e.g.*, Heartland Energy Services, Inc., 68 FERC ¶ 61,223 at 62,060-63 (1994).

[25] *See* Enron Power Marketing, Inc., 65 FERC ¶ 61,305 at 62,405 (1993), *order on clarification and reh'g*, 66 FERC ¶ 61,244 (1994); *accord EPMI*, 103 FERC ¶ 61,343 at P 55 & n.35 (revoking Enron's market-based rate authority prospectively and stating that "we find that Enron Power Marketers failed to inform the Commission in a timely manner of changes in their market shares that resulted from their gaining influence/control over others' facilities").

[26] *See* Enron Power Marketing, Inc., 65 FERC ¶ 61,305 at 62,405 (1993), *order on clarification and reh'g*, 66 FERC ¶ 61,244 (1994).

[27] *See* Enron's January 21, 1997 filing in Docket No. ER94-24-017.

20040722-3022 Issued by FERC OSEC 07/22/2004 in Docket#: EL02-113-000

Docket Nos. EL02-113-000, EL03-180-000, and EL03-154-000          9

19. Although on January 16, 1997, when it executed the PCSA, Enron was required to notify the Commission of changes in status under the Commission's requirements in effect at the time, the PCSA was not required to be separately filed under section 205(c) of the FPA. The Commission has discretion as to precisely what contracts need to be filed under section 205(c).[28] At the time Enron and El Paso Electric executed the PCSA, January 16, 1997, Enron had already been granted blanket market-based rate authority for wholesale sales and Commission precedent did not expressly require that agreements like the PCSA needed to be separately filed with the Commission under section 205(c) of the FPA; indeed, for sellers with market-based rate authority like Enron, the Commission had waived some of the Commission's requirements, including a number of the Commission's filing requirements.[29] Even today, the Commission has not expressly required agreements such as the PCSA to be separately filed with the Commission under section 205(c), and has, in Order No. 2001, waived the requirement to file power sales agreements for sellers with market-based rate authority.[30] Accordingly, in this regard, we will reverse the Initial Decision.

---

[28] *See, e.g.,* Northeast Utilities Service Company and Select Energy, Inc. v. ISO New England Inc. and New England Power Pool, 105 FERC ¶ 61,122 at P 21 (2003); Pacific Gas and Electric Company, San Diego Gas & Electric Company and Southern California Edison Company, 80 FERC ¶ 61,128 at 61,423 (1997).

[29] *See* Enron Power Marketing, Inc., 65 FERC ¶ 61,305 at 62,407 (1993), *order on clarification and reh'g*, 66 FERC ¶ 61,244 (1994) (holding that "Enron's request for waiver of the provisions of subparts B and C of Part 35 of the Commission's regulations, except as to sections 35.12(a), 35.13(b), 35.15, and 35.16 of the Commission's regulations, is hereby granted. As to sections 35.12(a), 35.13(b), 35.15, and 35.16, Enron's request is hereby denied").

[30] Revised Public Utility Filing Requirements, Order No. 2001, 67 Fed. Reg. 31,043, FERC Stats. & Regs. ¶ 31,127, *reh'g denied*, Order No. 2001-A, 100 FERC ¶ 61,074 (2002); *see* 18 C.F.R. § 35.10a (2004).

20040722-3022 Issued by FERC OSEC 07/22/2004 in Docket#: EL02-113-000

Docket Nos. EL02-113-000, EL03-180-000, and EL03-154-000                          10

### B.     Remedies

### 1.     Initial Decision

20.  The ALJ found that Enron should refund identified profits of approximately $32.5 million that it earned in transactions involving Enron and El Paso Electric.[31]

21.  The ALJ disagreed with Enron's arguments concerning remedies.  First, the ALJ stated that the refund effective date established by the Commission does not prohibit refunds for earlier periods in cases where the utility did not file pursuant to section 205(c) of the FPA.  Additionally, the ALJ determined that the filed rate doctrine does not bar refunds in this case, since the filed rate doctrine presupposes a filed rate, which is not the situation here.  Second, the ALJ held that the Commission is authorized to order disgorgement of profits.[32]

22.  In determining a remedy for Enron's violation of section 205(c) of the FPA, the ALJ cited Prior Notice,[33] where the Commission adopted a remedy for failing to comply with the prior notice and filing requirements of section 205 of the FPA.  In Prior Notice, the ALJ explained, the Commission stated that this remedy sought to convey to the industry the seriousness with which it viewed failures to comply with these requirements, which mandated that rates or charges for jurisdictional service, or contracts affecting or

---

[31] Initial Decision at P 53, 115.

[32] *Id.* at P 55.  While we agree with the ALJ that the Commission may order disgorgement of profits based on the facts presented, as discussed *infra*, we reverse the ALJ's findings that Enron had no rate on file.

[33] *See id.* at P 52 (citing Prior Notice, 64 FERC at 61,979-80).  The situation presented here is distinguishable from that in Prior Notice.  Prior Notice dealt with situations where the seller had no rate on file.  As noted above, Enron had a rate on file, but failed to comply with the conditions of its market-based rate authorizations, *i.e.*, the conditions in the Commission's order granting it that authorization.

Docket Nos. EL02-113-000, EL03-180-000, and EL03-154-000          11

relating to such service, be filed.  The Commission held that:  "we will require the utility to refund to its customers the time value of the revenues collected, calculated pursuant to section 35.19a of our regulations, for the entire period that the rate was collected without Commission authorization."[34]  In addition, the Commission stated: "the late filing utility will receive the equivalent of a cost-based rate."[35]

23.  In the instant case, the ALJ found, the record is devoid of direct evidence of Enron's costs.  Enron asserted a number of reasons for not producing its costs, none of which the ALJ found persuasive.  Trial Staff witness Barlow thus calculated an estimated range of profits and recommended a refund amount,[36] and the ALJ found Barlow's uncontradicted testimony reasonable and entitled to substantial weight.  Barlow estimated EPMI earned approximately $19,303,468 using a so-called low profit number and $45,754,064 using a so-called high profit number, from its transactions as a result of its alliance with El Paso Electric under the PCSA.[37]  Since Enron did not provide cost data, Barlow started with Enron's total reported revenues reported to the Western Systems Power Pool (WSPP) for the period in question (1997 to 2001), and multiplied this figure by assumed high and low profit percentages based on margins obtained for energy marketers/brokers that were derived from a larger set of U.S. utilities obtained from Dominion Bond Rating Service, Ltd.  Barlow estimated that EPMI earned approximately $50,732,040 using a low profit number and $124,727,794 using a high profit number, from all of EPMI's transactions reported to the WSPP.[38]  Barlow then took these profit numbers and multiplied them by the percentage of power supplied by El Paso

---

[34] Prior Notice, 64 FERC at 61,979; *accord id.* at 61,980.

[35] *Id.* at 61,980.

[36] *See* Initial Decision at P 53 n.21.

[37] *Id.* at P 53 (citing Ex. S-50 at p. 5-6, and Attachment A at p. 1).

[38] *See* Ex. S-50 at p. 5, and Attachment A at p. 1.

Docket Nos. EL02-113-000, EL03-180-000, and EL03-154-000                12

Electric to Enron to calculate high and low profit estimates for transactions involving El Paso Electric and Enron for the period in question.[39] The ALJ stated that it is reasonable to average these two figures, and, accordingly, the ALJ determined that Enron should disgorge $32,528,766.[40]

24.  The ALJ also stated that, due to the relationship between Enron and El Paso Electric, which, because it was not brought to the Commission's attention, violated Enron's market-based rate authority, Enron should be ordered to disgorge $32,528,766 for transactions involving Enron and El Paso Electric.[41] This remedy was recommended in addition to the prospective revocation of Enron's market-based rate authority which had already been ordered by the Commission.[42] The ALJ stated that "[a]lthough Staff is correct that violation of market-based rate authority is a continuing violation which would permeate all transactions in the WSPP, the imposition of such a remedy seems outside of the jurisdictional parameters of this proceeding," especially in light of the fact that the Commission had ordered Enron to show cause in other proceedings why it should not be ordered to disgorge profits it made in violation of the CAISO and Cal PX tariffs.[43]

    2.    **Exceptions**

25.  The California State Parties and PG&E argue that since Enron's misconduct involving El Paso Electric was only a small part of a pervasive pattern of market manipulation in California, the only workable remedy is a resetting of market prices for the entire period from May 1, 2000 through June 20, 2001, using the Commission's mitigated market clearing price (MMCP) methodology. If the Commission does not implement such a market-wide remedy against all sellers, including Enron, the California State Parties and PG&E argue that Enron should be ordered to disgorge all profits it earned under its market-based rate authorization from all sources during the entire time of

---

[39] *See* Ex. S-50 at p. 2-5, and Attachment A at p. 1.

[40] While the ALJ stated that "consistent with Commission policy, as enunciated in Prior Notice, . . . [this figure] reflect[s] the equivalent of a cost-based rate," the Commission interprets this to mean that the refund of the $32,528,766 of unjust profits would leave Enron with the equivalent of a rate justified by Enron's costs. See Initial Decision at P 53.

[41] Initial Decision at P 115.

[42] *Id.* at P 115.

[43] *Id.* at P 115.

Docket Nos. EL02-113-000, EL03-180-000, and EL03-154-000          13

its relationship with El Paso Electric, 1997-2001, as quantified by California State Parties witness Merola, in the amount of $2.974 billion. In the alternative, the California State Parties and PG&E argue that, at a minimum, Enron should disgorge the profits that it earned from its activities in the WSPP, at the upper range identified by Staff witness Barlow, in the amount of $124.73 million.

26. Furthermore, PG&E argues that the Initial Decision erred in failing to set forth a methodology to allocate damages among the injured parties in California. PG&E recommends that the appropriate method of allocating damages is to distribute the damages to the purchasers of energy in the ISO market during the May 1 through October 1, 2000 period *pro rata* in proportion to their total purchases in this market.[44] Further, PG&E argues that the Initial Decision erred in failing to set forth a procedure for the damages to flow in order to provide the maximum benefit to the injured parties. Specifically, PG&E urges the Commission to direct that the amounts flow through the ISO settlement accounts, offsetting the awards against any amounts owed to Enron. Any collateral amounts that are held in the Cal PX, and that are related to Enron, should also be available to satisfy these damages in the event that the amounts to be paid by Enron exceed the amounts that are owed to it. If both the amounts owed to Enron and the Cal PX collateral amounts are exhausted, parties may then pursue the remaining amounts in court.

27. Enron argues that the ALJ erred in recommending that EPMI refund $32,528,766 in profits, all of which were earned from power sales, pursuant to EPMI's tariff on file with the Commission, made before the refund effective date of this case. Enron maintains that the proposed refund exceeds the Commission's statutory authority under section 206 of the FPA, and would violate the established prohibition against retroactive refunds. Enron argues that Part II of the FPA, which governs this proceeding, provides two monetary remedies for violations: prospective refunds and fines.[45] Enron argues that the disgorgement remedy is an unlawful retroactive refund in disguise, and is further prohibited by the filed rate doctrine. Enron distinguishes the <u>Prior Notice</u> case that the Initial Decision relied upon for disgorgement authority since that case involved the refund of rates that were never on file with the Commission.[46] Enron argues that the

---

[44] *See* PG&E's Brief on Exceptions at 7 (citing the methodology in the Commission's recent settlement with Reliant in Docket Nos. PA02-2, *et al.*).

[45] *See* Enron's Brief on Exceptions at 30 (citing section 206, 16 U.S.C. § 824e (2000), and sections 315 and 316, 16 U.S.C. §§ 825n-825o (2000)).

[46] *See* Enron's Brief on Exceptions at 30 n.47, 39-40 (citing Initial Decision at P 52-53 (citing <u>Prior Notice</u>, 64 FERC at 61,979-80)).

Docket Nos. EL02-113-000, EL03-180-000, and EL03-154-000                    14

revocation of EPMI's market-based rate tariff became effective on June 25, 2003 (the refund effective date), and at all times prior to that, including the time period during which all the relevant power sales were made, the tariff was in full force and effect, and any attempt to change those rates must comply with section 206, which provides for prospective relief upon finding an existing rate unjust, unreasonable, or unduly discriminatory or preferential.

28. In response to Enron, Trial Staff supports the Initial Decision's finding that the Commission has authority to order disgorgement of the profits Enron earned from the activities at issue here. According to Trial Staff, the record supports the Initial Decision's finding that Enron should disgorge the identified profits it earned both for violating the section 205(c) filing requirement and for violating EPMI's market-based rate tariff. Trial Staff argues that Enron failed to comply with its market-based rate tariff. Failing to comply with the filed rate, Enron's profits can be disgorged to the affected ratepayers. Moreover, Trial Staff argues that, assuming the identified sales complied with a valid tariff, the Commission can still order Enron to refund the identified profits because they were profits earned pursuant to an unfiled, and therefore unlawful, jurisdictional activity. The fact that the identified sales ultimately were executed pursuant to an otherwise (allegedly) valid tariff is immaterial.[47]

### 3.    Commission Determination

29. Initially, while we agree with the ALJ that we have authority to order disgorgement of profits based on Enron's failure to comply with the Commission's market-based rate order which directed Enron to inform the Commission of any change in status reflecting a departure from the characteristics relied upon in the order, we reverse the ALJ's finding that there was no filed rate. This is not a situation in which Enron failed to obtain any rate approval prior to engaging in wholesale sales. Enron had a filed rate – its market-based rate tariff, which the Commission previously had accepted.[48] Rather, this is a situation in which Enron failed to abide by one of the conditions in the Commission's order authorizing the rates.

30. Turning to the issue of Enron's failure to separately file the PCSA pursuant to section 205(c), since the Commission finds that Enron was not required to file the PCSA and since Enron did give prior notice under section 205 by filing for and obtaining rate approval prior to engaging in market-based sales, the ALJ's reasoning that Enron is

---

[47] Trial Staff's Brief Opposing Exceptions at 51.

[48] *See* Enron Power Marketing, Inc., 65 FERC ¶ 61,305 at 62,403, 62,405 (1993), *order on clarification and reh'g*, 66 FERC ¶ 61,244 (1994).

Docket Nos. EL02-113-000, EL03-180-000, and EL03-154-000               15

required to make refunds pursuant to <u>Prior Notice</u>[49] does not apply to the circumstances in this case. Rather, as previously discussed, the Commission finds that EPMI violated its market-based rate authorization when it failed to comply with the requirement to inform the Commission of the change in the circumstances upon which its tariff had been accepted. The question before us, then, is the appropriate remedy for this type of violation.

31. While the Commission does not have civil penalty authority under the FPA for this type of violation, it does have generally broad discretion when it comes to remedies; indeed, its discretion is at its zenith in determining an appropriate remedy.[50] Here, Enron failed to comply with its obligation to inform us of its control of El Paso Electric's assets, thereby preventing us from determining whether that change in circumstance undermined the basis for our authorization of Enron's market-based rates. The obligation to inform the Commission was express and failure to comply with the obligation impeded the Commission's ability to ensure that utilities do not acquire market power and that rates remain just and reasonable. Under these circumstances, we find that disgorgement of the profits earned on transactions involving those assets, *i.e.*, transactions "identified to have involved El Paso [Electric] and Enron,"[51] is justified.

32. However, we do not believe it is appropriate to view this proceeding in isolation. We note that Enron's relationship with El Paso Electric was a subset of other Enron relationships and practices in the West, including potential market manipulation in violation of the CAISO and Cal PX tariffs, which are currently pending before an ALJ in

---

[49] <u>Prior Notice</u>, 64 FERC at 61,980.

[50] *See* Niagara Mohawk Power Corp. v. FERC, 379 F.2d 153, 159 (D.C. Cir. 1967); *accord* 16 U.S.C. § 825h (2000); Mesa Petroleum Co. v. FERC, 441 F.2d 182, 187-88 (D.C. Cir. 1971); Gulf Oil Corporation v. FPC, 563 F.2d 588, 608 (3rd Cir. 1977), *cert. denied*, 434 U.S. 1062, *reh'g denied*, 435 U.S. 981 (1978); Consolidated Gas Transmission Corp. v. FERC, 771 F.2d 1536, 1549 (D.C. Cir. 1985). The Commission's discretion, of course, is limited in some respects by the FPA, as construed by the courts. For example, section 206, the filed rate doctrine and the rule against retroactive ratemaking preclude certain remedial options. *See* PG&E Co. v. FERC, No. 03-1108, *et al.* (D.C. Cir. July 9, 2004). Courts have also ruled that disgorgements must still let a seller recover its costs. *See, e.g.,* Coastal Oil & Gas Corp. v. FERC, 782 F.2d 1249 at 1253 (1986).

[51] *See* Initial Decision at P 115.

Docket Nos. EL02-113-000, EL03-180-000, and EL03-154-000                    16

Docket Nos. EL03-180-000 and EL03-154-000.[52] Further, the approximately $32 million in profits that the ALJ in this proceeding ordered to be disgorged for Enron's transactions involving El Paso Electric represents only a fraction of Enron's profits in the Western Interconnect for the period it violated its market-based rate authority. Accordingly, we will refer our findings in this docket to the ALJ in the other pending dockets, consolidate this docket with the other dockets, and direct the ALJ in the other dockets to determine, based on the totality of the evidence in all the dockets,[53] the total amount of profits that Enron should be required to disgorge as supported by the consolidated records.

33.    With respect to the amount of disgorgement ordered in this proceeding, the ALJ noted that the record was devoid of direct evidence of Enron's costs, and that Enron had failed to produce relevant data, instead producing vague and incomplete responses.[54] Trial Staff witness Barlow calculated a range of profits (constituting Enron's profits from its transactions involving El Paso Electric) that had been made by Enron, since it "has not volunteered a number, has not settled the case, and to this day, there's no data that has been forthcoming from Enron."[55] The ALJ determined that the averaging of Barlow's high and low estimates of Enron's profits reflected an appropriate profit amount. In light of Enron's failure to provide information on its costs, the Commission finds that the

---

[52] There are pending "show cause" proceedings before an ALJ in Docket Nos. EL03-180-000 and EL03-154-000, involving gaming practices in violation of the CAISO and the Cal PX tariffs during the 2000-2001 period, as well as Enron's alliances/partnerships that may have gamed the market in violation of the CAISO and Cal PX tariffs. The Chief Administrative Law Judge consolidated the gaming and alliance/partnership proceedings for hearing and decision. Enron Power Marketing, Inc., and Enron Energy Servs. Inc., *et al.*, Order of Chief Judge Consolidating Gaming and Partnership Proceedings for Hearing and Decision, Docket Nos. EL03-180-000, *et al.* (Jan. 26, 2004). *See also* Enron Power Marketing, Inc., and Enron Energy Servs. Inc., *et al.*, Order of Chief Judge Extending Initial Decision Deadline and Suspending Procedural Schedule, Docket Nos. EL03-180-000, *et al.* (May 25, 2004); Enron Power Marketing, Inc., and Enron Energy Servs. Inc., *et al.*, Presiding Administrative Law Judge's Notice about Suspension of Procedural Schedule, Docket Nos. EL03-180-000, *et al.* (June 8, 2004).

[53] The ALJ is considering any and all evidence of potential market manipulation including the recently discovered "Enron trader tapes."

[54] *See* Initial Decision at P 53 n.21 (stating that the missing information would most likely raise Enron's profits or reduce its costs).

[55] *See* Ex. No. S-50 at p. 1-2 (quoting Tr. 358).

20040722-3022 Issued by FERC OSEC 07/22/2004 in Docket#: EL02-113-000

Docket Nos. EL02-113-000, EL03-180-000, and EL03-154-000          17

averaging of Barlow's high and low estimates produces a reasonable approximation of Enron's profits associated with its transactions with El Paso Electric, and agrees with the ALJ's recommendation that Enron disgorge $32,528,766.

34.   The Commission will not, as requested by the California State Parties and PG&E, reset all market prices for the entire period from May 1, 2000 through June 20, 2001. There is no evidence in this proceeding to support findings of violations of tariffs or market rate authorizations by sellers other than Enron.  The violation we find here was committed by Enron and thus our remedial authority in this proceeding is limited to Enron.

35.   However, the Commission agrees with PG&E that a methodology and procedure should be set forth to distribute and allocate damages among the injured parties. Therefore, the Commission will direct Enron to deposit $32,528,766, subject to any applicable bankruptcy requirements, in the same dedicated fund that has already been established for the receipt of amounts in Docket Nos. EL03-137-000, *et al.*  In those proceedings, the Commission will determine a mechanism to fairly distribute monies to customers harmed by the various practices at issue.  Since those proceedings involve the same harm suffered by customers here, it is appropriate that the distribution of such amounts be addressed at the same time in one proceeding.  Any additional disgorgement ordered in the consolidated proceeding will also be placed in the same fund.

36.   Finally, the Commission rejects PG&E's request to use prior collateral posted by Enron and the amounts at issue here as an offset against amounts owed to Enron.  As we have held, Commission-ordered refunds or disgorgement of profits should not be reduced by claimed possible offsets for unrelated amounts.[56]

The Commission orders:

(A)  The Initial Decision issued on July 15, 2003 in this proceeding is hereby affirmed in part and reversed in part, as discussed in the body of this order.

(B)  Enron is hereby directed to pay $32,528,766 to the dedicated fund discussed in the body of this order, within 30 days of the date of this order (subject to any applicable bankruptcy requirements), and to file a report for Commission approval within 30 days thereafter, consistent with the terms of this order.

---

[56] Entergy Services, Inc., 107 FERC ¶ 61,035 at P 18 & n.12 (2004); *accord* Dominion Transmission, Inc., 101 FERC ¶ 61,160 at P 11 (2002) (citing Interstate Natural Gas Association of America v. FERC, 756 F.2d 166 (D.C. Cir. 1985)).

20040722-3022 Issued by FERC OSEC 07/22/2004 in Docket#: EL02-113-000

Docket Nos. EL02-113-000, EL03-180-000, and EL03-154-000                    18

  (C)  Docket No. EL01-113-000 is hereby consolidated with Docket Nos. EL03-180-000 and EL03-154-000 and the Commission's findings are hereby referred to the ALJ in Docket Nos. EL03-180-000 and EL03-154-000.  The ALJ in the consolidated proceeding shall determine the total amount of disgorgement of profits by Enron for the violation found by the Commission in this order, as well as for any additional violations found by the ALJ.

By the Commission.

( S E A L )

<div align="center">

Magalie R. Salas,
Secretary.

</div>

Page 1

1                    UNITED STATES OF AMERICA

2                          BEFORE THE

3             FEDERAL ENERGY REGULATORY COMMISSION

4

5    Enron Power Marketing, Inc.        Docket No. EL03-180-000

6    and Enron Energy Service, Inc.

7    Colorado River Commission          Docket No. EL03-184-000

8    Modesto Irrigation District        Docket No. EL03-193-000

9    Public Service Company of New Mexico  Docket No. EL03-200-000

10   Enron Power Marketing, Inc.        Docket No. EL03-154-000

11   and Enron Energy Services Inc.

12   Portland General Electric Company  Docket No. EL02-114-007

13   Enron Power Marketing, Inc.        Docket No. EL02-115-008

14

15   _____

16

17            DEPOSITION OF JOHN P. WHITE

18         Taken on behalf of the Respondent

19                   April 27, 2004

20

21

22

Page 154

1          And so we have on a firm basis not changed our

2     overall percentages.  But on a non-firm basis, due to our

3     Bonneville contracts, we have received potentially more

4     energy than we otherwise would have.

5          BY MR. MOORE:

6     Q.    Okay.  I wanted to get to that point to ask you

7     the next question.  And that is, do you think it is fair

8     to say that somewhere, somehow Snohomish replaced the 25

9     megawatts of power that they had contracted during the

10    Enron contract with some other power after the

11    termination?

12         MS. SWANSTROM:  Again, I object.  This is wholly

13    irrelevant to this case.  You're simply on a fishing

14    expedition, and it's improper.

15         THE WITNESS:  I think I've answered this

16    question before when you asked basically the same

17    question.  And I think I've indicated that, you know, our

18    power portfolio is dynamic.  Our loads are dynamic in that

19    we have not entered into a long-term power contract to

20    replace this energy, but that at times we may have

21    purchased for short-term periods energy that we would not

22    have had to purchase had this contract, in fact, still

Page 159

1              (Record read by the reporter.)

2       Q.    Not that.  I'm talking about the one associated

3    with the terminated AEP contract.

4       A.    My recollection is similar to the questioning

5    associated with the Enron contract in that we have a

6    dynamic portfolio, energy portfolio.  We got dynamic load

7    needs, and that at times we have had to purchase energy to

8    meet load requirements that we likely wouldn't have had to

9    had that contract been in place.  But we've not entered

10   into any other long-term contracts to replace that AEP

11   energy.

12      Q.    Okay.  What do you understand to be the purposes

13   of termination payment provision like the type that is

14   contained in SNO 4?

15            MS. SWANSTROM:  Again, objection.  This goes

16   well beyond the issues in this case and appears to me,

17   Mr. Moore, that you're trying to litigate the bankruptcy

18   case.  And I don't think it's appropriate.  I think you

19   should stick to what's in his testimony, please.

20            BY MR. MOORE:  Well, Debbie, you probably -- if

21   you can't understand where I'm going, it's not my

22   obligation to, I don't think at this point, elaborate on

1    **15-20000808-8514545-9123474  (20:49)**

2    PERSON 1:   --transmission graphs PP and Smith.

3    MALLORY:  Yeah, you can just – I don't think it's going to work very well today, 'cause

4    Maria – I don't know if you know Maria – she wrote the little query that you have to write to

5    grab the data –

6    PERSON 1:  Mm hm.

7    MALLORY:    And she doesn't have it, um, like it breaks. I don't know why it breaks. I

8    think it breaks because what it does is it goes out and just takes a picture of the web page.

9    PERSON 1:  Mm hm.

10    MALLORY:    And then it just dissects that data, and so it actually just downloads the

11    whole page and when the page changes format it screws it up, and I don't know if it changed

12    over the weekend again, or what the deal is, but that whole deal had stopped, um, stopped –

13    I haven't been able to use it in like the last four days. So, as far as like the pull in the interim

14    market

15    PERSON 1:  Mm hm.

16    MALLORY:    I've just been pasting information into that sheet.

17    PERSON 1:  OK, so I just loaded this shit from ah, for the 8th and 9th.

18    MALLORY:    Uh huh.

19    PERSON 1:  [*sneeze*] Excuse me.

20    MALLORY:    What you want – what you want to change – this is the thing that – did you

21    already – did you already change both the start and the end date?

22    PERSON 1:  Yeah.

23    MALLORY:    OK. Here's ah, um –

24    PERSON 1:  I haven't saved it, though, I mean I –

25    MALLORY:    Yeah, I wouldn't save it. The only thing you have to change is that end date

26    on sheet one.

27    PERSON 1:  Uh huh.

28    MALLORY:    So, on sheet one you go to the la -- the end date and you change that, and

29    then it recalculates the one before it. Because the thing about end date is there's some sort of

1    little funky deal where the actual dates are 1/24th off.

2    PERSON 1:   Mm hm.

3    MALLORY:    So I had the formula in the – in the start date that was like – and the end

4    date minus –

5    PERSON 1:   Oh, you had a y – in the sheet one you had a - ?

6    MALLORY:    Yeah.

7    PERSON 1:   Or in the other sheets you had that refer to that page, you had ah - ?

8    MALLORY:    Everything refers to sheet one.

9    PERSON 1:   But sheet one you had a formula in there?

10   MALLORY:    Yeah.

11   PERSON 1:   And I have a d – I don't have a formula in there now.

12   MALLORY:    You can just close it. And when you reopen it, it'll be in there.

13   PERSON 1:   'Cause it's like, I get – was it 8/8/2000, hour one, then ending on 8/9/2000,

14   hour 24.

15   MALLORY:    Oh you – that's what you put in there?

16   PERSON 1:   Mm hm.

17   MALLORY:    Yeah. I would just use the formula and then the – in the last date, like if you

18   wanted to pull in 8 – I gotta – I gotta redo this, ah, front page. I'm just going to put in the

19   front page that you just actually type in your, um, start date, I mean, your end date and it'll

20   calculate it, you know what I mean?

21   PERSON 1:   All right, so let me close this thing while I got you on the phone. It's not very

22   easy for me yet.

23   [*break in recording*]

24   PERSON 1:   You're right.

25   MALLORY:    What?

26   PERSON 1:   I said, you're right.

27   MALLORY:    I know. Well the other one was all ready to roll, but then, um –

28   PERSON 1:   Also [*inaudible*] this, you know that CA daY – CA trade sheet?

29   MALLORY:    Uh huh.

1    PERSON 1:   This couldn't be incorporated into that or would that be just too big?

2    MALLORY:   It just – there is an unbelievable amount of data in that sheet that you're

3    opening.

4    PERSON 1:   Mm hm.

5    MALLORY:   Just 'cause there's 26 lines time 24 hours times 2 days and then you got, um,

6    three different markets and then for each line you have a price and each different market and

7    you have so – that's why there's so much crap in there.

8    PERSON 1:   OK, well, I'm lookin' at this and I don't see a formula in here.

9    MALLORY:   For sheet one?

10   PERSON 1:   Right. I see 7/30/2000.

11   MALLORY:   Um, if you click on the start date, though, you'll probably see a formula. Is

12   that right?

13   PERSON 1:   Yeah.

14   MALLORY:   Yeah. So you just have –

15   PERSON 1:   ET minus 2 plus 1/24th.

16   MALLORY:   Exactly. 'Cause it's – if you don't put the 1/24th in, then it gives you like, I

17   don't know. It gives you the twenty –

18   PERSON 1:   So all you do is put in the end date then.

19   MALLORY:   Right. And the end date – it's going to sh – it's not going to show you that

20   day, it's going to show you the pre- two previous days.

21   PERSON 1:   So if I wanna get – let's see 12 the 9th.

22   MALLORY:   So you want to get – if you wanted to get the 9th today, you put in –

23   PERSON 1:   I have to put in the 10th then.

24   MALLORY:   Yeah.

25   PERSON 1:   OK.

26   MALLORY:   But that's not actually going to run in the interim market, because of that

27   data pool.

28   PERSON 1:   Because of the new [*break in recording*]

29   MALLORY:   I don't know if something changed or why, but that was – that was broken

1   and I talked to Cooper about it and it's not his deal any more, it's Maria's.

2   PERSON 1:  Mm hm.

3   MALLORY:   I think she's out of town this week.

4   PERSON 1:  He should have a what?

5   MALLORY:   He should have what?

6   PERSON 1:  He should have what this week?

7   MALLORY:   No. She's out of town this week. Maria is. It's her deal now, so –

8   PERSON 1:  So how do you – how do you load anyway, refresh worksheet?

9   MALLORY:   You should go to end date or refresh workbook. And so it's going to graph.

10  If you had the [*inaudible*] –

11  PERSON 1:  Is it going to come back and tell me that it doesn't work?

12  MALLORY:   No, it'll – it'll run, but like if you went into that today and you tried to look

13  at the 9th, the 9th won't be in there until like three o'clock, 2:30.

14  PERSON 1:  Mm hm.

15  MALLORY:   'Cause the data won't be in the database. It'll still run. It'll still work, but

16  there's just no date to be pulled in.

17  PERSON 1:  We'll have all of the data for the 8th?

18  MALLORY:   Yeah.

19  PERSON 1:  Including interim and final and –

20  MALLORY:   Yup.

21  PERSON 1:  OK. So, it's just a question of, ah, it doesn't have anything for the 9th in there,

22  not even the path ratings or anything?

23  MALLORY:   Um, it should have the path ratings. If you go to the graph, there should be

24  --

25  PERSON 1:  So what – so what's missing? The only thing that's missing is the interim

26  congestion.

27  MALLORY:   Yeah, everything's missing for the 9th, close, the interim congestion, day

28  ahead congestion, um –

29  PERSON 1:  So how did you get that in there yesterday to do – to do all the –

1  MALLORY:    I didn't actually look at the graphs yesterday because they were broken, but

2  what I did is I went to that sheet that says movement and this is the things are like that. So I

3  went to that movement sheet. And I'm going to organize these better if you guys are actually

4  going to use them. Um, like and I pasted in the flows and I pasted in – I pasted in the flows

5  on 26, and I pasted in the congestion price on 26, and I pasted in the UMCPs and that's all I

6  used to look at it. And so what I looked at was the diff – are you on that sheet?

7  PERSON 1:  Yeah. So you – you – you paste it in, ah, path 26 flow –

8  MALLORY:    Right.

9  PERSON 1:  I guess I don't have any fucki – [*break in recording*] box to tell her anything.

10  MALLORY:    Any what?

11  [*break in recording*]

12  MALLORY:    I just go to the web page and pull that right off there.

13  PERSON 1:  So, OK. You don't have a tool bar on there for – OK. So those three. Now,

14  the flow and the congestion and the UMCP.

15  MALLORY:    Right. And the, um –

16  PERSON 1:  And the cong point's still going to be twenty two fifty eight, you think?

17  MALLORY:    That's what you kinda got to look at like, once you have the flows and the

18  congestion side by side, you can see the hours where there's congestion and you just have to

19  change your cong point accordingly.

20  PERSON 1:  OK.

21  MALLORY:    Because there was like a day last week where it was congesting at like twenty-

22  four fifty. So then you can pretty much assume that – you'll see like five hours where it

23  congestion at the exact same point.

24  PERSON 1:  Right.

25  MALLORY:    And then I just assume, OK, my best guess for that day is I gotta get it to

26  that point, at least. So, and then I look at it – so I look at that, um, difference column and I

27  say – I think it's called – no, it's not called difference, is it called 'room' or something?

28  PERSON 1:  Path 26 room.

29  MALLORY:    Yeah. That tells me like how much I think I need to congest it.

1  PERSON 1:  OK.

2  MALLORY:     And that's what I look at and like yesterday I saw, OK, I think I only need

3  120, so fuck, we can congest that, you know what I mean?

4  PERSON 1:  Mm hm.

5  MALLORY:     So I look at – I look at that and then I decide if I want to move anything.

6  But the actually the other thing I look at too is if it's already congested, you see that

7  'difference' column?

8  PERSON 1:  Mm hm.

9  MALLORY:     That's taking your UMCP minus your congestion. That's what NP 15's been

10  clearing. See what I'm saying?

11  PERSON 1:  Mm hm.

12  MALLORY:     And I think that for most hours of the day, that person's willing to have

13  NP15 clear at the exact same point, so if you see the pattern of like, 130, 130, 130, 240, 130,

14  well, then I figure, OK, congestion can be a lot higher on that 240 hour, because you can

15  drop NP down a lot.

16  PERSON 1:  So the only problem is you're – you're assuming that they g – all the – the

17  weighting of the cong is going to be, ah, reducing the North price?

18  MALLORY:     Right. And that, I mean, that's what's been happening, is it –

19  PERSON 1:  Right, right, but you s – you know, I'm just thinking of – in terms of building

20  a – a model that we could use all the time, are we ever going to be –

21  MALLORY:     This one was working great when the spin was –

22  PERSON 1:  It's just going to have to have flexibility, because to – how are you ever going

23  to know how they're going to weight the cong.

24  MALLORY:     You'll never know, but I think, I think the pattern you're seeing – and I

25  don't know why it's like this –

26  PERSON 1:  Mm hm.

27  MALLORY:     -- is that like, I think it's probably somebody was loading the North who's

28  saying, I'll turn on at X price, and they're so big that they're – they're actually setting it every

29  day at whatever price they're willing to buy for.

1    PERSON 1:  Mm hm.

2    MALLORY:    And they're not shaping it across hours. It's just set. And they're the ones

3    setting the cong, especially when there's all these 250 prices –

4    PERSON 1:  Yeah.

5    MALLORY:    -- you basically know the South can't go up, 'cause who the hell wants to buy

6    for more than 250.

7    PERSON 1:  Mm hm.

8    MALLORY:    Like all the load people in the South, they're just going to shut off over 250,

9    so you can't really – it won't go above that, I don't think. So, so you know it's going to

10    decrease the North every hour there's 250 at least.

11    PERSON 1:  Right.

12    MALLORY:    If it's not 250, then it gets a little different, like you might see the South go

13    up. So –

14    PERSON 1:  OK.

15    MALLORY:    Does all that make sense or is it kinda.

16    PERSON 1:  Yeah, pretty much.

17    MALLORY:    I mean, basically, I look at A) is it congested? If it is, like based on what NP

18    would clear, do I think it has room to move up enough to move load, and then B) if it's not

19    congested, how much room do I think that path has, and can we congest it?

20    PERSON 1:  Yeah. I would see also a building in here a, ah, building here a little model that

21    would – would tier things for you.

22    MALLORY:    Ah, tier – yeah, we definitely – that's gotta be something we need to work

23    out better too, because the trick yesterday that I discovered, is like, offer to send through

24    like, you know, if it's two bucks, send through, like 4 hun – or 500 megs at like 10 dollars,

25    just 'cause you want to get, um – I usually do 400, just 'cause you want to get it above that,

26    like 10, 11, 12 dollar hump and I want to make sure you have a lot of megs willing to do

27    that, but then after that, like, I said like 300 at 64, three f – and two fifty at 64.50, 200, so just

28    havin' it that tight is going to cut you down so you're really efficient, so. That make sense?

29    PERSON 1:  Mm hm.

1    MALLORY:    Has Smith picked up?

2    PERSON 1:  Yep, I think he's on here.

3    MALLORY:    Now there's –

4    PERSON 1:  He's muted – you can't – can't hear him but he's listening.

5    MALLORY:    OK

6    PERSON 1:  He's on his little, ah, you know, whatchamacallit, Time Life Operator Wand.

7    MALLORY:    [*laughs*]

8    SMITH:  Hey Mal

9    MALLORY:  What's goin' on Smithy?

10   SMITH:  Hey! You slay the evil EnPower dragon?

11   MALLORY:  Oh Christ. I won the game. It blew up.

12   SMITH:  Well, not quite, there are still questions on Willamette.

13   MALLORY:    Oh, is there? I passed Willamette off.  I said screw Willamette.

14   [*laughter*]

15   MALLORY:    I said [*inaudible*] you – you talk to Les about this and you guys work it out.

16   So, but I'll come in and help you if you guys need it, I mean –

17   PERSON 1:   Well, we're ah, lucky with the transmission here today.

18   MALLORY:    Ah, yeah, I just paste stuff into that sheet and just don't save it when you're

19   done. Cause it – it works really well, when that data pool that they set up is goin', but it's not

20   goin' right now.

21   SMITH:   So you're – basically you're saying that when the, um, the difference of UMCT

22   and [*break*] and cong is [*inaudible*] –

23   PERSON 1:   This is the – we should probably, Smith – the – the prices here aren't – aren't

24   exactly what he was lookin' at yesterday, so he's – he's talkin' from memory and it's not

25   jiving with the sheet 'cause the numbers aren't the same as what he – were there yesterday.

26   SMITH:   But, like your example, like you'll see a pattern a 130, 130, then you'll see 250.

27   MALLORY:    Exactly.

28   SMITH:   Pickin out [*inaudible*] –

29   MALLORY:    Yeah, well you ha – you're on the – on the – on the, ah –

1  SMITH:  You look at that – you look at that – that's a big difference all of sudden that

2  pops out on that one hour and you also see that the line is – is right at the limit.

3  MALLORY:    Right –

4  PERSON 1:  As we had them yesterday –

5  SMITH:  And then y – is that – those the hour you pick on?

6  MALLORY:    Right I – well, mostly I – I pick on –

7  PERSON 1:  That's what it looked like yesterday.

8  MALLORY:    Yeah, basically that's it. And mostly it's just like, if the line's not congested –

9  PERSON 1:  Mm hm.

10  MALLORY:    - then I just look if I can congest it, 'cause then it's worth m – the – 'cause

11  those are going to be your shoulder hours anyways, and that's when replacement is super

12  cheap, right?

13  PERSON 1:  Right, right.

14  MALLORY:    So, like those hours, if you can congest it, that's a money-maker no matter

15  what, 'cause you're not losin' any money to move it down that line.

16  SMITH:  Right, right.

17  MALLORY:    You're actually just makin' money, so if you –

18  SMITH:  Like I was able to push, ah, I think 21 the other day.

19  MALLORY:    Uh huh.

20  SMITH:  I saw that it was like – the difference was – the cong was on – really on Path 15,

21  and then for like one little – it was 0, 26, 0, 26, 0, 26, 0 – in one hour it was two dollars just

22  stuck out there by itself, and that's the one I picked on.

23  MALLORY:    OK. Drove it way up?

24  SMITH:  No, I didn't, actually, it only went up like three more bucks.

25  MALLORY:    OK. How many did you move through there?

26  SMITH:  About a hundred, hundred and thirty.

27  MALLORY:    Yeah, see if you – like on an hour when two bucks if you think about it,

28  they're only makin' two bucks – I mean, 2000 dollars. Like which isn't that big of a deal, you

29  know what I mean?

Ex. SNO-204
Page 10 of 14

1    SMITH:   Right.

2    MALLORY:    And the way we've seen cong movin' is it's like, if you figure, the UMCP in

3    NP has been stickin' around like 130, that's about as low as it'll go. One – one'll – like 115 to

4    130 and you figure your prices are like 220 and shit. It's like you have like 90 dollars of room

5    there, so I think it's worth it to send through 400 megs and cost yourself 80 bucks for the

6    possibility of like shootin' it up there. You know what I mean? So if I see two bucks, I'm

7    like, I'll move 400 megs – that's like 12 dollars.

8    SMITH:   Yeah.

9    MALLORY:    Because even if you've – I mean, you're makin' six times the amount if you

10    get it to 12 bucks.

11    SMITH:   Yeah, but there was bid bad-ass ah, SP, I mean Path 15 cong too that day.

12    MALLORY:    OK. Well, if it's on 26 though?

13    SMITH:   Yeah.

14    MALLORY:    I've – I've never seen it on 26 and actually – well, I've only seen it once

15    where it was on both paths –

16    SMITH:   Yeah.

17    MALLORY:    -- and there was no congestion, and I was monkeying with stuff, but

18    whenever it's been congested on Path 26, if I send shit through that line, it never has – like

19    it's never congested path 15 as well.

20    SMITH:   Oh, really? OK.

21    MALLORY:    Yeah. So I think it's a pretty good gamble.

22    SMITH:   But if 15's already there, and –

23    MALLORY:    But if you can

24    SMITH:   - you run the risk of the adding to the 15 and adding nothing to the 26 –

25    MALLORY:    If 15's there, you don't even screw with it.

26    SMITH:   OK.

27    MALLORY:    Yeah.

28    SMITH:   All right.

29    MALLORY:    If the 15's there, don't even screw with it.

1    SMITH:   Right, because you're just going to cost yourself on 15 and you might not get

2    anything on 26.

3    MALLORY:    Right, and the – and the key thing is if it's already congested, just make sure

4    that, like, don't look at the congestion price, look at what NP would clear.

5    SMITH:   Yeah.

6    MALLORY:    Because like yesterday, there was an hour that was like $59 and all the others

7    are like 112, and I think you – the way I used to look at that, I'm like, OK, I'm going to try

8    to send stuff through on that $59 dollar hour. But if you look at the UMCP for that hour, it

9    was a lot lower. So like 59 bucks is bringing NP already down to like 111. And you're not

10   going to be able to change congestion, I don't think. See what I'm sayin'?

11   SMITH:   Because there's someone that's hovering around 130 or whatever?

12   MALLORY:    Yeah, 'cause it's – I mean, in NP, like either it's like PG&E – PG&E –

13   SMITH:   You're saying if you push it much below that, they're willing to turn off and

14   counteract you.

15   MALLORY:    and they're so huge that they're just going to cut them at that point. Like that

16   guy is probably like, PG&E willing to inc their load 3000 megs, or like Southern saying I'll

17   turn off all 4000 megs of gen.

18   SMITH:   I gotcha. So when you see the big difference of like 130 and then up to 250, you

19   got a lot of room there.

20   MALLORY:    Exactly. Because the big guy, you know – whoever the huge guy is that you –

21   you're not going to push through, is like down at 112 or 130. Y – y – you can –

22   SMITH:   Yeah, you got a lot of room before you touch him. And he – and then he moves

23   his big stuff.

24   MALLORY:    Right, I mean, if you shot through him, it might go through the roof, but

25   shooting through him, just it's not – I mean, you probably couldn't even do it, but it's not

26   worth the risk.

27   SMITH:   Right, right, OK.

28   MALLORY:    But getting to him, I've found, is pretty easy.

29   SMITH:   Getting down to that 130.

1    MALLORY:    Yeah.

2    SMITH:  OK.

3    MALLORY:    Or at least close, like yesterday we moved it from like 11 bucks to 85 bucks a

4    couple of hours, and we only moved like 148 megs. This part you'll actually like. I think you

5    might want to try it, is at least one hour try to do this. Um, you look at it and like I s – I

6    signed like a number yesterday, I was like OK, I know I can get this to 85 dollars, but I don't

7    want to move more than I have to, so I said, like I was willing to move 400 for 12 bucks.

8    That's just like the initial like, make sure you shoot it up to at least that amount.

9    SMITH:  Yeah.

10    MALLORY:    And then, after that it was like, I just had all my tiers right at one price level,

11    so it was like at 64 bucks I'll send 300 through. 64.50, I'll send 250 through. 65 I'll send 200

12    through, and 65.50 – you see what I'm saying? So like, your tiers are so close that you're

13    definitely going to get it to that point pretty much and then it just keeps cutting you down to

14    the point where the congestion would go away if you weren't there. And so yesterday, I had

15    that. And I was willing to move 300 at like 64 bucks and, but instead I only moved 140 at

16    like 65.50.

17    SMITH:  Yeah.

18    MALLORY:    So you like cut off – I mean you made yourself, I don't know how much that

19    would be – probably 20 grand, just by setting these fifty cent increments.

20    SMITH:  All right.

21    MALLORY:    Does that make sense? That was kind of screwy. Sometimes I just play with

22    it not fully  understanding it, but I think that'll work pretty well.

23    PERSON 1:  I got a vague picture now.

24    MALLORY:    'Cause if – if – if it – if congestion was going to fall below 65 – I mean, if –

25    if 300 megs gets it to 65 bucks, from that point on, basically it just keeps cutting it to the

26    point where it would drop below 65 bucks if you weren't there.

27    PERSON 1:  Yeah, so –

28    [voice] OK.

29    PERSON 1:  Cool.

1  SMITH:  Groovy.

2  MALLORY:    So how things going other than that? You guys all done with phase II?

3  PERSON 1:  So, the – the – the hour ahead crapped out.

4  MALLORY:    Did it really?

5  PERSON 1:  Oh, yeah, it's – you know, I put in a ridiculous, ah, bid to buy 100 megawatts.

6  MALLORY:    At what price?

7  PERSON 1:  Well, it ended up – we ended up buyin' ah, like hour 11 –

8  MALLORY:    Uh huh.

9  PERSON 1:  Day ahead was 153 and hour ahead was 65.

10  MALLORY:    That's a pretty sweet little buy.

11  PERSON 1:  So we bought – I bought 100 megawatts all afternoon at about 60 – 60, 70

12  bucks. 65 bid. 65 to 100.

13  MALLORY:    Wow. What'd you buy it in? In NP?

14  PERSON 1:  NP.

15  MALLORY:    OK. Cool

16  PERSON 1:  And ah, hour 16 I could have bought 160 – for 162 bucks, I could have

17  bought 100.

18  MALLORY:    NP might have even been cheaper.

19  PERSON 1:  But I opted not to, because I was thinking maybe it's crapped, and there's just

20  going to be a surplus.

21  MALLORY:    Oh.

22  PERSON 1:  'Cause they overshot their ah – ah, forecast, but there was – there was –

23  MALLORY:    Even yesterday, buyin' 67s on that peak would have made you money, I

24  think, on average.

25  PERSON 1:  Mm hm.

26  MALLORY:    I bet the [*inaudible*] ex-poste averaged 67 bucks.

27  PERSON 1:  [*inaudible*] had a hundred dollar hour ahead cong yesterday.

28  MALLORY:    Right.

29  PERSON 1:  You know, through here, so god, all you need is a little bit more of that to

1   bring that stuff down to really cheap –

2   MALLORY:    Yeah.

3   PERSON 1:   - you know, and then how – how low is ex-poste going to be on a – still hot, I

4   mean – how – how low is it going to be?

5   MALLORY:    That's true.

6   PERSON 1:   You know. Not [*inaudible*] probably not going to be 250 bucks. It may be –

7   may be 100  or 130 or something like that. Richter's bought maybe 80 bucks, worst case

8   scenario.

9   MALLORY:    Yeah, I think that's a good buy still.

10  PERSON 1:   Yeah.

11  MALLORY:    I mean, your upside's so much bigger than your downside there –

12  PERSON 1:   Yeah.

13  MALLORY:    So – Cool.

14  PERSON 1:   So, you know –

15  SMITH:   [*inaudible*] I gotta go – see you later.

16  MALLORY:    All right, see you Smith.

17  ===================================================

18  SMITH:   Enron, this is Smith.

19  Doug: Hey Smith. Doug here at the ISO.

20  SMITH:   Hey what's goin' on Doug?

21  Doug: Well, I – I got a – it looks like a duplicate tag for a schedule here.

22  SMITH:   Oh, well – whereat? COB or - ?

23  Doug: This is for Cob at Malin.

24  SMITH:   COB at Malin.

25  Doug: Uh huh.

26  SMITH:   Let me, ah – the man I need to talk to is Michael.

27  Doug: OK, great.

28  [*end of file*]

1   25-20000808-4493797-4544722

2   TIM:  This is Tim.

3   PERSON 2:  Hey, Tim, how you doin'?

4   TIM:  Hey.

5   PERSON 2:  So, OK, I'm trying to reconcile your big numbers here.

6   TIM:  OK.

7   PERSON 2:  Yesterday, I couldn't quite get to about 5 million of it, and today I can't get

8   anywhere close. Is it some transmission or something?

9   TIM:  Ah, let's see here. It is…let's first look at new deals.

10   PERSON 2:  Yeah, I don't have that.

11   TIM:  We sold ah –

12   PERSON 2:  You guys did 8 million on new deals on fuckin' – that' be good.

13   TIM:  Um, 4.4.

14   PERSON 2:  Really!

15   TIM:  Yeah, Mike sold, ah, 2 million megawatts hours to Roseville – to the City of Roseville

16   yesterday.

17   PERSON 2:  Oh, OK. For how long?

18   TIM:  Five years.

19   PERSON 2:  Oh! OK. I didn't really – the position should have came – I didn't realize the

20   position [*inaudible*]

21   TIM:  [*in background*] Did – did that go in there, Mike that Roseville sale?  Was that your four

22   and half mill? What's -- ?

23   PERSON 2:  I don't [*inaudible*]

24   TIM:  Oh, actually that's not it.

25   PERSON 2:  [*laughs*]

26   TIM:  Um –

27   PERSON 2:  Your puny megawatts that were changed.

28   TIM:  No, the, ah – actually that four and a half mill must be, um, options exercised which

1   he has every day, and then rules off.

2   PERSON 2:  What does that mean. Don't we mark – to market our ah – ?

3   TIM:  Well, yeah, but the – the – they don't liquidate – they don't do liquidations until the

4   next morning, so a new deal goes in with huge value – when you exercise your options it

5   creates a new deal at whatever you sold, ah, and you get the differential between the market

6   price and –

7   PERSON 2:  The strike?

8   TIM:  -- the strike, and then the following day, the option that you had in the book is gone

9   and so that liquidates and all the value that used to be there, it shows up as a negative.

10  PERSON 2:  Why don't – why doesn't it have it on the same day?

11  TIM:  It does, but you're looking at a prelim.

12  PERSON 2:  Ooh. I'm sorry.

13  TIM:  And you can't liquidate anything until the day's over.

14  PERSON 2:  I'm sorry. So you're not going to make 17 million [*inaudible*]

15  TIM:  It'll probably be down by four.

16  PERSON 2:  OK. And how about the – OK, how about 12? How do you make 12?

17  TIM:  [*laugh*] what – yesterday?

18  PERSON 2:  Yeah.

19  TIM:  Or today?

20  PERSON 2:  Well, for today – for yes – yeah.

21  TIM:  So, 12 –

22  PERSON 2:  Well, you did it 12 two days in a row. You made 9.6 the day before. I don't

23  know if that was final. Um --

24  TIM:  Um, well, ah, I would say, 2 million bucks a day.

25  PERSON 2:  Mm hm.

26  TIM:  Is, ah, Richter in short-term California.

27  PERSON 2:  It was 1 point – yeah, OK. [*inaudible*]

28  TIM:  Well, he makes – ah, actually he makes between one and two a day, um, which never

1  shows up on any curve shift, where he just buys it from the day-ahead. He just fucks

2  California. Then, another —

3  PERSON 2:  Wait a minute. OK.

4  TIM:  He steals money from California to the tune of about a million —

5  PERSON 2:  Will you re-phrase that?

6  TIM:  OK, he, um — he arbitrages the California market to the tune of a million bucks or

7  two a day.

8  PERSON 2:  Will that ever stop?

9  TIM:  Yeah.

10  PERSON 2:  OK. [*chuckling*] Maybe we can put him into an — a special purpose vehicle, or

11  [*inaudible*]

12  TIM:  Right.

13  [*laughter*]

14  TIM:  Um, then, ah, what else did we have yesterday? We typically get about 2 million bucks

15  a day in FTR revenue.

16  PERSON 2:  OK [*chuckling*] Is that going to go on forever?

17  TIM:  No, that's going to stop as well.

18  PERSON 2:  OK.

19  TIM:  Um, I don't know. I don't have the — I've got all these reports —

20  PERSON 2:  OK. If you got —

21  TIM:  [*simultaneously*] right now.

22  PERSON 2:  I mean that — that gets me close enough.

23  TIM:  Big story is they moved up — we moved up the back of the, ah, um — moved up the

24  back of the Midco curve and the NP 15 curve, yesterday.

25  PERSON 2:  No, I caught that, but — but not huge. Like a dollar, like 60 cents or something.

26  TIM:  Where the fuck am I — um, dollar Q2.

27  PERSON 2:  Yeah.

28  TIM:  And then ah, 50 cents for Cal 2.

1    PERSON 2:  OK, listen to me.

2    TIM:  What?

3    PERSON 2:  Take ten million dollars --

4    TIM:  Mm hm.

5    PERSON 2:  Hey, when you've been taking prudency out, who's book have you been taking

6    out of?

7    TIM:  Um, I've got ten, Motley's got 17.

8    PERSON 2:  Why don't you just create another line on my reports,

9    TIM:  Mm hm.

10    PERSON 2:  And just call it, ah, management.

11    TIM:  Mm hm.

12    PERSON 2:  And take ten million out. Redo last night's.

13    TIM:  OK.

14    PERSON 2:  Today's – whatever.

15    TIM:  Yeah.

16    PERSON 2:  Take ten million out, put it in the special C and call it that fuckin' – call it ah,

17    BPA reserve.

18    TIM:  Right. That's what we were thinkin'

19    PERSON 2:  OK.

20    TIM:  So, well, I'd rather just take it out of Mike's book.

21    PERSON 2:  Um.

22    TIM:  That's where the deal sits.

23    PERSON 2:  That's where it'll go back. Wow. Yeah OK. Ah – [*pause*] OK. But we'll – yeah,

24    OK, just keep track of who you've taken from.

25    TIM:  Well, I've got memos for every – every time we do that I have the trader write up a

26    memo that says here's this and here's what's goin' out so if they know exactly what's in and

27    out.

28    PERSON 2:  Put ten mill – put ten million.

1    TIM:  OK.

2    PERSON 2:  Thanks, man.

3    TIM:  See you.

200408045033 Received FERC OSEC 08/04/2004 02:28:00 PM Docket# EL02-113-007, ET AL.

**UNITED STATES OF AMERICA
BEFORE THE
FEDERAL ENERGY REGULATORY COMMISSION**

| | | |
|---|---|---|
| **El Paso Electric Company,** | ) | **Docket No. EL02-113-000** |
| **Enron Power Marketing, Inc., and** | ) | |
| **Enron Capital and Trade Resources** | ) | |
| **Corporation** | ) | |
| | ) | |
| **Enron Power Marketing, Inc. and Enron** | ) | **Docket No. EL03-180-000** |
| **Energy Services, Inc.** | ) | |
| | ) | |
| | ) | |
| | ) | |
| **Enron Power Marketing, Inc. and Enron** | ) | **Docket No. EL03-154-000** |
| **Energy Services, Inc.** | ) | |
| | ) | |
| | ) | |
| | ) | |

**REQUEST FOR CLARIFICATION
BY THE
WESTERN PARTIES**

Pursuant to Rule 212 of the Rules of Practice and Procedure of the Federal

Energy Regulatory Commission ("Commission" or "FERC")[1], the Nevada Power

Company, Sierra Pacific Power Company ("Nevada Companies"), Public Utility District

No. 1 of Snohomish County, Washington ("Snohomish"), the City of Palo Alto, California

("Palo Alto"), the Office of the Nevada Attorney General's Bureau of Consumer

Protection, the Attorney General of the State of Washington, and the Public Utilities

Commission of Nevada (hereinafter collectively called the "Western Parties")

respectfully submit this request for clarification of the Commission's "Order on Initial

---

[1] 18 C.F.R. § 385.212.

200408045033 Received FERC OSEC 08/04/2004 02:28:00 PM Docket# EL02-113-007, ET AL.

Decision and Consolidating Dockets," issued on July 22, 2004, in the above referenced dockets.[2]

As set forth more fully below, the Western Parties seek confirmation that: (i) the Commission did not intend to exclude from the scope of this proceeding Enron contracts that were executed during the period January 16, 1997 to June 25, 2003 and under which Enron continues to demand, but has not yet collected, unjust profits in the form of termination payments; and (ii) the Commission did not intend to foreclose parties under disputed, terminated contracts from seeking, as an "appropriate remedy" for Enron's violations of tariffs and/or Commission orders, an order holding that Enron forfeited its privilege to receive profits, in excess of Enron's actual costs, due to Enron's unlawful acts and that counterparties need not make windfall payments in excess of Enron's actual costs under those contracts. The requested clarification is consistent with the rulings made by the Commission in its July 22 Order because the termination payments Enron seeks are a measure of Enron's expected profits under the contracts. The Order recognizes that Enron is not entitled to reap unjust profits, in excess of Enron's costs, for contracts or transactions entered into when Enron was violating its market-based rate authority and other tariffs on file at FERC.

## I.

The Western Parties appreciate the action taken by the Commission in the July 22 Order to examine "any and all evidence of potential market manipulation" by Enron

---

[2] Concurrent herewith, the Office of the Nevada Attorney General's Bureau of Consumer Protection and the Attorney General of Washington are filing motions to intervene-out-of-time in the above-referenced proceedings in light of their expanded scope. On April 23, 2004, Palo Alto moved for leave to intervene out of time in Docket Nos. EL03-180-000 and EL03-154-000 for the limited purpose of responding to the April 8, 2004, "Motion of Enron Power Marketing Inc. and Enron Energy Service Inc. for Summary Disposition on Issue of Law." To the extent necessary, Palo Alto requests that it be permitted to intervene for all purposes with full rights as a party in the now-expanded scope of these consolidated proceedings.

3796862v1

200408045033 Received FERC OSEC 08/04/2004 02:28:00 PM Docket# EL02-113-007, ET AL.

and to craft remedies that take into account all unjust profits associated with contracts and transactions entered into by Enron in the Western Interconnect during the period January 16, 1997 to June 25, 2003.[3]  The July 22 Order makes clear that the aim of the expanded, consolidated proceeding is to provide "for the comprehensive review of all evidence relevant to Enron conduct that violated or may have violated Commission tariffs or orders and the appropriate remedy for such violations."[4]  The Commission observed that this review could result, among other things, in an order requiring Enron "to disgorge profits for all of [Enron's] wholesale power sales in the Western Interconnect for the period January 16, 1997 to June 25, 2003."[5]

The primary focus of the Order understandably centers on a specific remedy recommended by Judge Cintron in Docket No. EL02-113 -- namely, the "retroactive disgorgement of profits" Enron already has been paid for deliveries of electricity.[6] However, there is a significant subset of contracts executed during the period when Enron was in violation of Commission tariffs/orders and for which the remedy of "retroactive disgorgement," at least in the strict sense of disgorgement of profits already extracted by Enron, is potentially inapplicable.[7]

As the Commission is likely aware, Enron executed numerous forward contracts during the period when Enron was in violation of Commission tariffs/orders under which

---

[3] *El Paso Electric Co., et al.,* 108 FERC ¶ 61,071, at P 2 & n. 53  (2004) (hereinafter "July 22 Order").
[4] July 22 Order at P 3.
[5] *Id.* at P 2 (emphasis in original).
[6] *Id.* at P 17.
[7] The Western Parties respectfully submit that use of the phrase "retroactive" is a misnomer because, as a legal matter, the disgorgement of profits occurs prospectively from the date on which Enron's violations occurred.  And, as the Commission already has found, Enron was aware of its reporting obligations under its market-based rate authority and cannot reasonably argue it did not have notice its conduct violated tariffs on file at FERC.  July 22 Order at P 18; *American Electric Power Service Corp., et al.,* 103 FERC ¶ 61,345, at P 23 (2003), *reh'g denied,* 106 FERC ¶ 61,182 (2004).

3796862v1

200408045033 Received FERC OSEC 08/04/2004 02:28:00 PM Docket# EL02-113-007, ET AL.

Enron has not only extracted unjust profits in the past, but Enron continues to demand the payment of unjust profits in the future. These forward contracts were terminated prior to completion of Enron's performance under the contracts.[8] There is substantial evidence demonstrating that Enron engaged in a campaign designed to force termination of forward contracts so that it could sweep up cash in the form of termination payments. Once these forward contracts were terminated, Enron claimed rights to the full profits of the contracts, in the form of termination payments,[9] even though Enron was no longer supplying power under the contracts and would not incur any costs of serving customers under the contracts. Thus, payments sought by Enron under forward contracts that have been early terminated involve the recovery of unjust charges that would be pure windfall to Enron under the unique circumstance presented here.[10] For the Western Parties alone, the unjust profits Enron seeks in the form of termination payments are staggering: approximately $500 million.

## II.

The Western Parties respectfully submit that Enron should not be allowed to reap unjust profits prospectively in the form of termination payments under contracts

---

[8] The Western Parties believe that for the purposes of this proceeding -- providing equitable relief to parties with whom Enron contracted while Enron was in violation of the Commission's orders and tariffs -- it is irrelevant whether the terminations were triggered by Enron seeking lump sum payments, as was the case for the Nevada Companies, or by parties such as Snohomish terminating its contract with Enron as a consequence of Enron's defaults.

[9] For example, under Section 22 of the Western Systems Power Pool Agreement (WSPPA"), the "termination payment" is calculated by measuring the "gains" and "losses" incurred from the termination of the contract based upon a comparison of the contract price with current market prices, subtracting relevant transaction costs, and reducing to present value.

[10] The Western Parties contend that Enron has *de minimis* or even no "costs" associated with its terminated contracts, an issue that the Western Parties will pursue herein. This is particularly true because Enron's status as a bankrupt entity enables it to reject any contracts that are unfavorable to it.

4

200408045033 Received FERC OSEC 08/04/2004 02:28:00 PM Docket#  EL02-113-007, ET AL.

executed by Enron when Enron was in violation of its market-based rate authority and other tariffs on file at FERC.  Indeed, it would be illogical, as well as discriminatory, for the Commission to authorize the Presiding Judge to recommend remedies that may include "retroactive disgorgement" of "all profits" but to exclude the issue of an "appropriate remedy" for parties still subject to Enron's claims for unjust profits from early terminated contracts.  Simply put, it makes no sense to require Enron to disgorge unjust profits retroactively, but to allow Enron to extract additional unjust profits prospectively from the Western Parties.

The Western Parties are concerned, however, that Enron may over-narrowly interpret the phrase "retroactive disgorgement" in the July 22 Order and argue that the Commission's use of this phrase somehow limits the scope of the proceeding to only those contracts under which Enron has already reaped unjust profits.  The Western Parties therefore seek confirmation that the scope of the hearing instituted by the Commission's July 22 Order includes fashioning an "appropriate remedy" not only for unjust profits already paid by the Western Parties, but also for unjust profits Enron still seeks from the Western Parties in the form of termination payments.[11]

In this respect, the Western Parties further request clarification that the Commission did not intend to foreclose the parties under disputed, terminated contracts from seeking "appropriate remed[ies]" other than the "retroactive disgorgement of

---

[11] The Nevada Companies note that their complaint in Docket No. EL04-01, which is now proceeding with an evidentiary hearing as a result of an order also issued on July 22, 2004, in addition to contending that Enron is not entitled to termination payments on the grounds that it violated the WSPPA termination-related tariff obligations by acting unreasonably, also asks the Commission to use its authority under Section 309 of the FPA to relieve them of any residual obligation they otherwise may have to Enron on the basis of Enron's widespread violations of the Commission's orders and tariffs (See, Complaint, pages 22-24).  The Nevada Companies expressly reserve their rights to pursue that critical component of their complaint therein.

3796862v1

200408045033 Received FERC OSEC 08/04/2004 02:28:00 PM Docket# EL02-113-007, ET AL.

profits" narrowly construed. The Western Parties submit that an appropriate remedy for terminated contracts may include, for example, an order holding that Enron must forfeit unjust profits in excess of Enron's actual costs due to Enron's unlawful acts and that counterparties are not required to make windfall payments under terminated Enron contracts in excess of Enron's actual costs of serving those counterparties under the unique circumstances presented here.

To be clear, the Western Parties are not seeking in this petition a definitive ruling from the Commission as to the precise relief to which the Western Parties are entitled. We recognize that this is the very purpose of the proceeding that the Commission has now set in motion. The Western Parties are simply seeking, at this time, a confirmation of their right to present evidence on an appropriate remedy that encompasses all unjust profits sought by Enron.[12]

WHEREFORE, the Western Parties respectfully request that the Commission issue an order forthwith affirming that: (i) an appropriate remedy for Enron contracts executed during the relevant period that were terminated early and under which Enron is still seeking unjust profits is a matter within the scope of this proceeding; and (ii) the Commission did not intend to foreclose parties under disputed, terminated contracts from seeking, as an "appropriate remedy" for Enron's violations of Commission orders/tariffs, an order holding that that Enron forfeited its privilege to receive profits, in excess of Enron's actual costs, due to Enron's unlawful acts and that counterparties are

---

[12] Consistent with Rule 505 of FERC's Rules of Practice and Procedure, participants should have the right to present evidence on all of Enron's unjust profits, including not only the unjust profits already reaped by Enron but also the unjust profits Enron still seeks to reap, to ensure a "true and full disclosure of the facts." 18 C.F.R. § 385.505.

3796862v1

200408045033 Received FERC OSEC 08/04/2004 02:28:00 PM Docket# EL02-113-007, ET AL.

not required to make windfall payments in excess of Enron's actual costs of serving those counterparties under terminated contracts.

Respectfully submitted,

___/s/ Deborah A. Swanstrom_____
Michael J. Gianunzio,
  General Counsel
Eric Lee Christensen,
  Assistant General Counsel
Public Utility District No. 1
of Snohomish County, Washington
2320 California Street
Everett, WA 98206-1107
Telephone: (425) 783-8649

Deborah A. Swanstrom
Patton Boggs LLP
2550 M Street, N.W.
Washington, DC 20037
Telephone: (202) 457-6565

*Attorneys for Public Utility District No. 1 of
Snohomish County, Washington*

___/s/ Roger A. Berliner_____
Lyle D. Larson
J. Russ Campbell
Balch & Bingham, LLP
1710 Sixth Avenue North
Birmingham, Alabama 35203
Telephone: (205) 226-3441

Roger A. Berliner
Stephen M. Ryan
Manatt, Phelps & Phillips
1501 M Street, N.W.
Suite 700
Washington, D.C. 20005
Telephone: (202) 463-4379

*Attorneys for Nevada Power Company and
Sierra Pacific Power Company*

200408045033 Received FERC OSEC 08/04/2004 02:28:00 PM Docket#  EL02-113-007, ET AL.

___/s/ Margaret A. McGoldrick_____
Margaret A. McGoldrick
Jeffrey A. Schwarz
Spiegel & McDiarmid
1333 New Hampshire Avenue, N.W.
Washington, D.C. 20036
Telephone: (202) 879-4000

*Attorneys for the City of Palo Alto, California*

___/s/  Jeffrey D. Goltz_____
Christine O. Gregoire,
  Attorney General
Jeffrey D. Goltz,
  Deputy Attorney General
1125 Washington Street SE
PO Box 40100
Olympia, WA  98504-0100
Telephone:  (360) 753-2578

*Attorneys for the Office of the Attorney General
of the State of Washington*

___/s/ Richard L. Hinckley_____
Richard L. Hinckley,
General Counsel
Public Utilities Commission of Nevada
1150 East William Street
Carson City, Nevada 89701
Telephone: 702-486-7237

*Attorney for the Public Utilities Commission
of Nevada*

___/s/ John E. McCaffrey_____
Timothy Hay,
Chief Deputy Attorney General and
  Consumer Advocate
1000 East William Street
Suite 200
Carson City, NV  89701
Telephone: (775) 687-6300

Eric Witkoski,
Senior Deputy Attorney General
Office of the Nevada Attorney General
Bureau of Consumer Protection
555 E. Washington Ave., #3900
Las Vegas, NV 89101
Telephone: (702) 486-3129

John E. McCaffrey,
Stinson Morrison Hecker, LLP
1150 18th Street, N.W.
Suite 800
Washington, DC  20036
Telephone: (202) 785-9100

*Attorneys for the Office of the Attorney General
for the State of Nevada, Bureau of Consumer
Protection*

Dated:  August 4, 2004

3796862v1

200408045033 Received FERC OSEC 08/04/2004 02:28:00 PM Docket# EL02-113-007, ET AL.

## CERTIFICATE OF SERVICE

I hereby certify that I have this day caused an electronic copy of the foregoing document to be sent to all participants via the electronic listservs established by the Federal Energy Regulatory Commission in Docket Nos. EL02-113, EL03-137, and EL03-180.

Dated at Washington, DC this 4th day of August, 2004.

_____/s/_____ .
Adam A. Moniz *
PATTON BOGGS LLP
2550 M Street, N.W.
Washington, DC 20037
Tel.: (202) 457-6056
amoniz@pattonboggs.com

_____
* Bar admission pending

3796862v1

200408045033 Received FERC OSEC 08/04/2004 02:28:00 PM Docket#  EL02-113-007, ET AL.

Submission Contents

clarification.DOC·················································  1-11

Unofficial FERC-Generated PDF of 20040825-0096 Received by FERC OSEC 08/23/2004 in Docket#: EL02-113-007

# ORIGINAL

## UNITED STATES OF AMERICA
## BEFORE THE
## FEDERAL ENERGY REGULATORY COMMISSION

|  |  |  |
|---|---|---|
| El Paso Electric Company, | ) | Docket No. EL02-113-000 007 |
| Enron Power Marketing, Inc., and | ) | |
| Enron Capital and Trade Resources | ) | |
| Corporation | ) | Docket No. EL03-180-000 007 |
|  | ) | |
| Enron Power Marketing, Inc. and Enron | ) | |
| Energy Services, Inc. | ) | Docket No. EL03-154-000 004 |
|  | ) | |
| Enron Power Marketing, Inc. and Enron | ) | |
| Energy Services, Inc. | ) | |
|  | ) | |

## REQUEST FOR REHEARING
## OF PUBLIC UTILITY DISTRICT NO. 1 OF
## SNOHOMISH COUNTY, WASHINGTON

Pursuant to Section 313(a) of the Federal Power Act ("FPA")[1] and Rules 212 and

713 of the Rules of Practice and Procedure of the Federal Energy Regulatory

Commission ("Commission" or "FERC"),[2] Public Utility District No. 1 of Snohomish

County, Washington ("Snohomish") respectfully requests rehearing of certain aspects of

the Commission's Order issued July 22, 2004, in the above-captioned proceedings.[3]

Snohomish strongly supports the major thrusts of the Order and, in particular, the

Commission's conclusions that:

---

[1] 16 U.S.C. § 825l.
[2] 18 C.F.R. §§ 385.212, 385.713.
[3] *El Paso Electric Company, et al.*, 108 FERC ¶ 61,071 (2004) ("July 22 Order").

Unofficial FERC-Generated PDF of 20040825-0096 Received by FERC OSEC 08/23/2004 in Docket#: EL02-113-007

(a) Enron violated its market-based rate authorization;

(b) the Commission has the authority to remedy Enron's violations starting as early as January 16, 1997;

(c) a "comprehensive review of all evidence relevant to Enron conduct that violated or may have violated Commission tariffs or orders" is warranted;

(d) Enron can and should be required to disgorge profits;

(e) "Enron's relationship with El Paso Electric was a subset of other Enron relationships and practices in the West" and "the approximately $32 million in profits that the ALJ in [the Enron-El Paso Electric] proceeding ordered to be disgorged represents only a fraction of Enron's profits in the Western Interconnect for the period it violated its market-based rate authority;" and

(f) "an appropriate remedy should take into account all evidence of violations of tariffs on file or orders of the Commission" and potentially may include the disgorgement of profits "for all of [Enron's] wholesale power sales in the Western Interconnect for the period January 16, 1997 to June 25, 2003."[4]

Snohomish welcomes the opportunity to demonstrate that Enron was in gross violation of its market-based rate authority and other applicable tariffs and orders during the period January 16, 1997 to June 25, 2003, and that, as an "appropriate remedy" for those violations, Enron should be prohibited from profiting from its wholesale power sales in the Western Interconnect, including a wholesale power sale to Snohomish for which Enron continues to demand approximately $120 million in unjust profits in the form of a contract "termination payment."[5]

---

[4] July 22 Order at PP 3, 29, 31, 32 (emphasis in original).
[5] Amazingly, Enron seeks to have Snohomish's consumers pay these unjust profits even though: (1) Enron committed gross violations of the FPA, FERC orders and tariffs; (2) Enron's own managers and traders have admitted they and others at Enron engaged in criminal fraud; and (3) Enron itself defaulted on the contract with Snohomish and failed to perform in accordance with the contract.

Unofficial FERC-Generated PDF of 20040825-0096 Received by FERC OSEC 08/23/2004 in Docket#: EL02-113-007

Although Snohomish generally supports the Commission's efforts in the July 22
Order to provide all wholesale power customers of Enron in the Western Interconnect
with relief, Snohomish is compelled to seek rehearing of that Order to ensure
Snohomish's legal rights are preserved on appeal and that the relief ultimately provided
is meaningful for consumers served by Snohomish. As explained below, Snohomish
requests rehearing of certain statements made by the Commission in the July 22 Order
related to the voiding of contracts and the structuring of an appropriate remedy,
particularly in view of Enron's efforts to take advantage of its status as a bankrupt entity
and prevent customers from obtaining effective relief.

## I.    SPECIFICATION OF ERRORS

- Footnote 10 of the July 22 Order incorrectly and prematurely concludes that a
  revocation of Enron's market-based rates would not void contracts. To the extent
  this footnote is intended to stand for the proposition that contracts entered into in
  the absence of, or in violation of, market-based rate authority are not void,[6] it is
  contrary to case precedent, contrary to well-established principles arising from
  the law of contracts, contrary to the plain language of the FPA, and unsupported
  by any discernable justification that would qualify as reasoned decision-making.
  Particularly in view of Enron's unique pattern and practice of fraud, including
  Enron's misrepresentations to this Commission about its market power when
  Enron's market-based rate authority was renewed in 2000, the Commission
  should refrain from making premature or overly broad rulings on the voiding of
  Enron contracts. To be consistent with earlier rulings, the Commission must, at a
  minimum, allow parties to address at the hearing and in briefs to the Presiding
  Administrative Law Judge the issue of whether an appropriate remedy includes
  the rescission of Enron's market-based rate authority prior to June 25, 2003.  At
  least until the Commission has a complete record before it to reach a reasoned
  decision, the Commission should not prejudge the issue of whether a rescission
  of Enron's market-based rate authority prior to June 25, 2003 would void power
  sales contracts with customers such as Snohomish.

- As the Request for Clarification, filed August 4, 2004, by Snohomish and a
  number of other Western parties demonstrates,[7] the reasoning of the
  Commission's July 22 Order compels the conclusion that Enron is no more

---

[6] July 22 Order at n. 10.

[7] Request For Clarification By The Western Parties, *El Paso Electric Company, et al.*, Docket Nos. EL02-
113, *et al.* (filed August 4, 2004)  ("August 4 Request for Clarification").

3800209v3

Unofficial FERC-Generated PDF of 20040825-0096 Received by FERC OSEC 08/23/2004 in Docket#: EL02-113-007

entitled to extract additional unjust profits from Snohomish and similarly-situated parties under the guise of termination payments than Enron is to retain unjust profits already collected under those particular contracts or other contracts that were not terminated. To the extent the Commission fails to provide the requested clarification, Snohomish hereby incorporates by reference and seeks rehearing of the issues addressed in the August 4 Request for Clarification because it would be a legal error to allow Enron to profit from wholesale power sales contracts executed during the period when Enron was in violation of Commission orders and tariffs.

- Consistent with the Commission's duty to protect consumers from exploitation and provide them with a complete, permanent and effective bond of protection against unjust and unreasonable charges,[8] the Commission should clarify and/or modify the procedure, set forth in Paragraph 35 of the July 22 Order, for distributing and allocating disgorged profits to injured parties in a manner that ensures Enron does not frustrate the Commission's attempts to provide relief to the victims of Enron's illegal acts.

## II.     PETITION FOR REHEARING

### A.     The Commission Erred In Summarily Concluding, Without Reasoned Explanation Or The Support Of Substantial Evidence, That A Revocation of Enron's Market-Based Rates Would Not Void Enron Contracts

Without explanation or the support of any record evidence, the Commission's July 22 Order concludes summarily, in a brief footnote, that "[a] revocation of market-based rates or a disgorgement of profits would not void contracts that parties may have signed; the rates may be changed prospectively, or disgorgement of profits may be ordered, but the contract remains."[9] For numerous reasons, Snohomish respectfully submits that the July 22 Order errs by abruptly reaching this overly broad conclusion and Snohomish urges the Commission to clarify that the Commission did not intend to prejudge, in the absence of a completed factual record and the submission of legal briefs, the issue of whether Enron's market-based rate authority should be rescinded

---

[8] See Electrical District No. 1, et al., v. FERC, 774 F.2d 490, 492-493 (D.C. Cir. 1985). See also Atlantic Refining Co., et al., v. Public Service Commission of New York, et al., 360 U.S. 378, 388 (1959).
[9] July 22 Order at n. 10.

3800209v3

Unofficial FERC-Generated PDF of 20040825-0096 Received by FERC OSEC 08/23/2004 in Docket#: EL02-113-007

prior to June 25, 2003 and, if so, whether such a rescission would void Enron's wholesale power sales contracts with customers such as Snohomish.

To begin with, the conclusory and self-contradictory pronouncement contained in this footnote lacks even the rudiments of the reasoned explanation required for proper agency decision-making and is therefore arbitrary and capricious.[10] Even assuming "a disgorgement of profits" would not void contracts, it does not follow that a "revocation of market-based rates" would not void contracts, in whole or in part. Indeed, if a seller's market-based rate authority is revoked, the seller would not have authority to execute market-based rate contracts at all.[11]

Second, to the extent the Commission intended by this language to prejudge and summarily dispose of the issue of whether Enron's contracts would be void if Enron's market-based rate authority were rescinded prior to June 25, 2003, the Commission arbitrarily and capriciously departed from its earlier orders and has unfairly deprived parties, such as Snohomish, of fundamental due process rights. When Snohomish and other parties raised the issue of adopting a remedy that rescinds Enron's market-based rate authority prior to June 25, 2003 in Docket No. EL03-77, the Commission assured them that this so-called retroactive remedy was a subject that would be considered in the Enron gaming and partnership show cause proceedings.[12] In fact, the Commission

---

[10] See, e.g., PG&E Transmission v. FERC, 315 F.3d 383, 389-90 (D.C. Cir. 2003).

[11] See, e.g., AEP Power Marketing, Inc., et al., 107 FERC ¶ 61,018, at P 40, reh'g denied, 108 FERC ¶ 61,026 (2004) (concluding that FERC has no authority to approve market-based rates unless applicant has passed market-power tests required for market-based rate authority and/or mitigated market power).

[12] Enron Power Marketing, Inc., et al., 106 FERC ¶ 61,024, at PP 45, 47 & n. 13 (2004).

38UU209v3

Unofficial FERC-Generated PDF of 20040825-0096 Received by FERC OSEC 08/23/2004 in Docket#: EL02-113-007

specifically set for hearing in the Enron gaming and partnership show cause proceedings the issue of whether the non-monetary remedy of revoking Enron's market-based rate authority is appropriate to address Enron's tariff violations during the historical period of January 1, 2000 to June 20, 2001.[13]  Particularly in the face of the Commission's earlier commitments, it would be unlawful to now deprive Snohomish and other parties of the right to present evidence on this issue.

Third, the Commission's overly broad statement directly contradicts decades-long precedent concluding that illegal contracts are void.  For example, FERC's predecessor, the Federal Power Commission ("FPC"), concluded that contracts that violate an FPC order and the statutory requirement that rates be just and reasonable are void and of no effect.[14]  Similarly, FERC has concluded that QF contracts containing rates for wholesale sales in excess of avoided cost are void *ab initio*.[15]  In other cases, FERC has voided specific contract provisions found to be in violation of applicable statutes, regulations or orders.  For example, in a case dealing with the sale of preference power under the Niagara Redevelopment Act ("NRA"), FERC held that contract provisions violating the NRA were void.[16]  Similarly, the FPC and the courts have concluded that contract provisions that violate the Natural Gas Act ("NGA") are

---

[13] *American Electric Power Service Corp., et al.*, 103 FERC ¶ 61,345, at P 2 (2003);  *Enron Power Marketing, Inc., et al.*, 103 FERC ¶ 61,346, at P 2 (2003).
[14] *United Fuel Gas Company*, 19 FPC 300 (1958).
[15] *Connecticut Light & Power Co.*, 70 FERC ¶ 61,012, at 61,029-30 (1995), *reconsid. denied*, 71 FERC ¶ 61,035 (1995).
[16] *See Municipal Electric Utilities Association of the State of New York v. Power Authority of the State of New York*, 23 FERC ¶ 61,031, at 61,180-81 (1983) ("Opinion 151-A"), *aff'd in relevant part, Power Authority of the State of New York v. FERC*, 743 F.2d 93, 112 (2nd Cir. 1984). *See also Municipal Electric Utilities Association of New York State v. Power Authority of the State of New York*, 30 FERC ¶ 61,178 (1985).

3800209v3

void and inoperative.[17]  The conclusions reached in these cases follow from the well-established rule that contracts that are illegal or that offend the underlying purposes of a statute are void,[18] and the FPA unequivocally declares that contracts that are not just and reasonable are illegal.[19]

Fourth, it is well established that a contract entered into by a seller lacking a required license or permit is void or voidable, and that the seller has no legal authority to enforce the contract.[20]  That is particularly the case where the licensing or permitting requirement arises from a statute designed to protect the public health and welfare.[21]  Moreover, when fraud is committed in a licensing or permitting proceeding or an applicant fails to abide by the terms of a license or permit, the license or permit may be revoked.[22]  Here, Section 309 of the FPA[23] clearly empowers the Commission to rescind

---

[17] *See, e.g., Argo Oil Corporation, et al.,* 15 FPC 601, at 618 (1955), *reh'g denied,* 15 FPC 1221 (1956) ("The provisions of the [NGA] were by law automatically written into the gas sales contracts of the respondents with Texas Illinois, and any provisions of the contracts in conflict with said statutory provisions are void"); *Sun Oil Company, et al.,* 17 FPC 174, at 179, *reh'g denied,* 17 FPC 501 (1957) (where the FPC stated that contracts that have a "favored nation" increase clause must yield to the authority of regulation [the NGA] which would not permit a change to rate except after 30 days' notice to the Commission and the public); *Mississippi Power & Light Co v. Memphis Natural Gas Co.,* 162 F.2d 388, 390 (5th Cir. 1947) ("favored nation" clause became "inoperative after the passage of the Natural Gas Act." *See also Southern Star Central Gas Pipeline, Inc.,* 108 FERC ¶ 61,182 at PP 31-32 (2004) (FERC held a provision in a settlement was unlawful and unenforceable under the Natural Gas Policy Act Section 504(a)(1), which makes it unlawful to sell natural gas at a first sales price in excess of any maximum lawful price).

[18] *See, e.g., United States v. Mississippi Valley Generating Co.,* 364 U.S. 520, 563, *reh'g denied,* 365 U.S. 855 (1961); *Hartman v. Luber,* 133 F.2d 44, 45 (D.C. Cir. 1942); *Cary Oil Co., Inc., v. MG Refining & Marketing, Inc.* 230 F.Supp.2d 439, 451 (S.D. N.Y. 2002) (*citing United States v. Mississippi Valley Generating Co.* to state: "[i]t is well established that contracts that offend the underlying purpose of a statute are unenforceable"); *Walters v. Fullwood,* 675 F.Supp. 155, 161-62 (S.D.N.Y. 1987); *Board of Regents of the University of Oklahoma v. NCAA,* 601 F.Supp. 307, 308 (W.D. OK 1984).

[19] 16 U.S.C. § 824d(a).

[20] *See, e.g., Richard A. Lord,* 8 Williston on Contracts § 19:46 (4th ed. 2003); *Vedder v. Spellman,* 480 P.2d 207 (Wash. 1971) (contract entered into by builder lacking contractor registration is illegal and cannot be enforced by builder). *See also* Opinion 151-A (provisions of contracts entered into in violation of license were found void and unenforceable).

[21] *Hartman v. Luber,* 133 F.2d at 45.

[22] *See, e.g., Malta Irrigation District v. FERC,* 955 F.2d 59, 64 (D.C. Cir. 1992); *Baker Power Company,* 51 FERC ¶ 61,057 (1990).

[23] 16 U.S.C. §825h

7

Unofficial FERC-Generated PDF of 20040825-0096 Received by FERC OSEC 08/23/2004 in Docket#: EL02-113-007

its March 7, 2000 order allowing Enron the continued privilege of charging market-based rates because that order was issued in error due to Enron's fraudulent concealment of relevant facts about its market power.[24] Rescission of Enron's market-based rate authority as of no later than March 7, 2000 is particularly warranted under the unique facts presented here because Enron engaged in a large and long-standing practice of illegal acts in violation of the conditions of Enron's market-based rate authority and FERC expressly notified Enron that Enron's market-based rate schedule "shall be void" if Enron did not accept the conditions imposed on Enron's market-based rate authority.[25]

Fifth, the authority cited by the Commission for its novel realignment of contract law, *Prior Notice and Filing Requirements Under Part II of the Federal Power Act* ("*Prior Notice*"),[26] has nothing to do with the question arising in this particular case. The question addressed in *Prior Notice* was the proper remedy for contracts that are otherwise just and reasonable, but which were not filed in accordance with Commission regulations.[27] There, the Commission wished to avoid "harsh effects" of its previous remedy for such technical violations,[28] particularly in light of confusion created by the several different orders and "amnesty" periods FERC had previously issued.[29] Here, by contrast, the aim is not to avoid harsh effects for a mere technical failure to file

[24] *Enron Power Marketing, Inc., et al.*, Letter Order, Docket Nos. ER94-24-033, *et al.*, (issued March 7, 2000).
[25] *Enron Power Marketing, Inc.*, 65 FERC ¶ 61,305, at 62,407 (1993), order on clarification and reh'g, 66 FERC ¶ 61,244 (1994).
[26] *Prior Notice and Filing Requirements Under Part II of the Federal Power Act*, 64 FERC ¶ 61,139 (1993) ("*Prior Notice*"), *order on reh'g*, 65 FERC ¶ 61,081 (1993).
[27] *Prior Notice*, 64 FERC at 61,979-80.
[28] *Id.* at 61,979.
[29] *Id.* at 61,975.

8

Unofficial FERC-Generated PDF of 20040825-0096 Received by FERC OSEC 08/23/2004 in Docket#: EL02-113-007

contracts, but to develop an appropriate remedy for Enron's long-standing and criminally fraudulent[30] schemes to manipulate the Western energy markets -- conduct which the Commission has now repeatedly concluded violated conditions contained in Enron's market-based rate authority and applicable filed tariffs and resulted in unjust and unreasonable rates. In fact, the July 22 Order itself concludes that the remedies discussed in *Prior Notice* are inapplicable in this case.[31]

Sixth, contrary to the implications of the July 22 Order,[32] nothing requires the Commission to accord the protections of the filed rate doctrine to contracts that are void or voidable because they are tainted by Enron's fraud or other illegal acts. On the contrary, the Supreme Court has made clear that a rate that is void under agency rules is unenforceable and the agency has no duty to honor or enforce that rate.[33]

**B.    The "Appropriate Remedy" Required In The July 22 Order Should Equitably Preclude Enron Both From Retaining Unjust Profits Enron Already Has Reaped And From Obtaining Additional Unjust Profits Enron Still Seeks To Reap From Customers Under Wholesale Power Sales Contracts Executed During The Period When Enron Was In Violation Of Commission Orders And Tariffs**

Snohomish hereby incorporates by reference the August 4 Request for Clarification filed by Snohomish and other Western parties and, to the extent the Commission fails to grant the clarification requested therein, Snohomish hereby requests rehearing. As explained in more detail in the August 4 Request for Clarification, termination payments sought by Enron are comprised of profits Enron projected to receive under long-term, wholesale power contracts executed during the

---

[30] It is no exaggeration to state that Enron's market manipulation schemes were criminally fraudulent in light of the fact that three of Enron's Western electricity traders, Timothy Belden, Jeffrey Richter, and John Forney, have now plead guilty to criminal fraud charges and admitted that Enron had been engaged in fraudulent schemes in the electricity market as early as 1998.

[31] July 22 Order at P 30.

3800209v3

Unofficial FERC-Generated PDF of 20040825-0096 Received by FERC OSEC 08/23/2004 in Docket#: EL02-113-007

period when Enron was in violation of Commission orders and tariffs.  Hence, for purposes of fashioning the "appropriate remedy" required by the July 22 Order, relief from profits Enron already has reaped under these particular contracts or other contracts that were not terminated as well as from profits Enron is still seeking to reap in the form of termination payments is warranted.

Indeed, it would be both inequitable and unlawful to discriminate among customers by allowing Enron to collect additional unjust profits from those particular customers defending against Enron's claims for termination payments while simultaneously requiring Enron to disgorge unjust profits to other customers. Consistent with the Commission's July 22 Order, all customers who are parties to these proceedings should be permitted to submit evidence on the "total amount" of Enron's profits,[34] including profits Enron continues to demand under terminated, long-term contracts executed when Enron was in violation of Commission orders and tariffs.

If anything, the equities are even more in favor of precluding Enron from obtaining additional profits under terminated contracts than for disgorging profits where Enron actually delivered power as promised.  In Snohomish's case, for example, Snohomish terminated the Enron contract in November 2001 when Enron defaulted on the contract and Enron's credit rating fell below investment grade.[35]  Enron delivered power under the contract with Snohomish only from April 1, 2001, until the contract was terminated on November 28, 2001.  If Enron is allowed to collect the approximately

---

[32] See July 22 Order at n.10 & P 29.
[33] See, e.g., Security Services Inc. v. K Mart Corp., 511 U.S. 431 (1994).
[34] July 22 Order at P 32.
[35] Further, evidence propounded by the complainants in FERC Docket Nos. EL04-1 and EL04-114 demonstrates that, at that time, Enron was engaged in a concerted bad faith effort to force termination of such contracts so that it could sweep up cash to try to stave off bankruptcy.

3800209v3

Unofficial FERC-Generated PDF of 20040825-0096 Received by FERC OSEC 08/23/2004 in Docket#: EL02-113-007

$120 million termination payment it now seeks from Snohomish, the result would be that Snohomish would effectively pay more than $900.00 per MWh for the electricity Enron actually delivered.[36] If this rate is not unjust and unreasonable, then it is hard to imagine a rate that would be. There is simply no defensible reason to allow Enron to extract this level of profit from Snohomish's ratepayers while at the same time requiring Enron to disgorge other profits.

Accordingly, failure to grant the relief requested in the August 4 Clarification would be arbitrary and capricious and Snohomish hereby requests rehearing if the Commission fails to grant the requested clarification.

### C. The Commission Should Clarify Or Modify The Distribution Procedure Set Forth In Paragraph 35 Of The July 22 Order To Maximize Recovery For Enron's Victims In Light of Enron's Efforts To Take Advantage Of Its Status As A Bankrupt Entity

As Snohomish understands it, Paragraph 35 of the July 22 Order requires that the $32.5 million in profits required to be disgorged by Enron, to date, be placed into the dedicated fund already established by the Commission to receive disgorgements from other settling parties in the gaming and partnership proceedings. Paragraph 35 further states: "Any additional disgorgement ordered in the consolidated proceeding will also be placed in the same fund." A mechanism to "fairly distribute monies to customers harmed by the various practices at issue" would then be developed and the fund distributed in accordance with that mechanism.

---

[36] In the period between April 1, 2001, and November 28, 2001, Enron actually delivered approximately 145,000 MWh of electricity to Snohomish. If Enron succeeds in collecting the termination payment of approximately $120 million it now seeks from Snohomish, in addition to the approximately $15.8 million Snohomish paid to Enron for electricity actually delivered, Snohomish will end up paying approximately $135.8 million for the 145,000 MWh actually delivered by Enron, which amounts to more than $936 per MWh.

3800209v3

Unofficial FERC-Generated PDF of 20040825-0096 Received by FERC OSEC 08/23/2004 in Docket#: EL02-113-007

Snohomish recognizes the need to establish a procedure to fairly distribute monies previously paid to Enron. The procedure should, however, be clarified or modified with respect to customers who have already paid Enron unjust profits to take into account the fact that the Commission has not filed proofs of claim in the Enron bankruptcy proceedings relating to such unjust profits and guard against inequities that potentially could occur as a result of Enron's efforts to use its bankruptcy proceedings to deny customers effective relief. Moreover, with respect to customers from whom Enron is presently seeking to collect unjust profits in the form of termination payments, the procedure described in Paragraph 35 of the July 22 Order is unnecessary and inappropriate and likely will not result in effective relief given Enron's efforts as a debtor in bankruptcy proceedings to deny customers such relief. To protect such customers from Enron's illegal acts, a different procedural mechanism is warranted.

If the Commission requires Enron to deposit disgorged profits in a FERC account, as Paragraph 35 of the July 22 Order appears to envision, Enron potentially may make one or more of the following arguments, thereby eviscerating the Commission's effort to grant effective relief to Enron's victims: (i) that it purportedly is not required to deposit disgorged profits in a FERC-established account because the Commission did not file a proof of claim in the Enron bankruptcy proceedings; (ii) that customers from whom Enron seeks profits in the form of termination payments purportedly must pay Enron the full amount of the termination payments, but only possess unsecured claims in the bankruptcy proceedings for purposes of receiving back those unjust profits, thereby resulting in extremely limited relief (it is estimated that

3400209v3

Unofficial FERC-Generated PDF of 20040825-0096 Received by FERC OSEC 08/23/2004 in Docket#: EL02-113-007

unsecured creditors will receive approximately 20¢ on the dollar under Enron's Plan of Reorganization); or (iii) that disgorgement claims purportedly should be subordinated as a penalty and therefore receive no distribution at all under Enron's Plan of Reorganization.

Specifically, with respect to unjust profits already paid to Enron, Snohomish recommends that the procedure be clarified or modified such that the relief is provided directly to customers and the Commission determines, as part of any order requiring disgorgement, the specific amount of unjust profits that each customer is entitled to from Enron. Parties may then seek to obtain payment or an adjustment of their claims in the Enron bankruptcy proceedings based on FERC's determination of the disgorged amounts to which they are entitled. This structure appears to be consistent with the position that Enron has taken in other litigation[37] and with the views expressed by Chairman Wood. Chairman Wood in a letter to Washington Attorney General Christine Gregoire stated that FERC's role in Enron-related adjudications is to determine the amounts owed to consumers who have been harmed, but he notes that it is those consumers, rather than FERC, who generally are responsible for filing proofs of claim to protect any FERC-ordered recovery.[38]

With respect to unjust profits Enron is still seeking to collect from customers such as Snohomish, the relief granted by the Commission should be in a different form whereby potential termination payments are reduced to eliminate the portion

---

[37] See In re Enron Corp., et al., No. 01-16034 (AJG), Memorandum of Law in Support of Application for Preliminary Injunction to Enforce Automatic Stay or Other Expedited Relief, at 4 (Bankr. S.D.N.Y.) (filed July 9, 2004) (Attachment A).
[38] Letter from Pat Wood III, Chairman, Federal Energy Regulatory Commission, to Christine Gregoire, Attorney General of the State of Washington, Docket Nos. EL03-180, et al. (July 28, 2004) (Attachment B).

13

Unofficial FERC-Generated PDF of 20040825-0096 Received by FERC OSEC 08/23/2004 in Docket#: EL02-113-007

constituting unjust profits. Thus, with respect to contracts under which Enron seeks a termination payment, the parties should present evidence on the total amount of unjust profits included in the termination payment sought by Enron. The Commission should then simply determine the amount of the termination payment that represents unjust profits and deduct those profits from any termination payment a party may be required to pay Enron. This structure will help avoid, to the greatest extent possible, further inequities resulting from Enron's status as a debtor in bankruptcy and its efforts to deny customers meaningful relief.

Snohomish therefore requests that the Commission clarify or modify the procedural mechanism outlined in Paragraph 35 of the July 22 Order as described above to allow customers to receive the greatest relief possible from Enron's illegal acts.

380U209v3

Unofficial FERC-Generated PDF of 20040825-0096 Received by FERC OSEC 08/23/2004 in Docket#: EL02-113-007

Respectfully submitted,

Deborah A. Swanstrom
Patton Boggs LLP
2550 M Street, N.W.
Washington, DC 20037
Telephone: (202) 457-6565
Email: dswanstrom@pattonboggs.com

Michael J. Gianunzio,
  General Counsel
Eric Lee Christensen,
  Assistant General Counsel
Public Utility District No. 1
of Snohomish County, Washington
2320 California Street
Everett, WA 98206-1107
Telephone: (425) 783-8649
Email: elchristensen@snopud.com

*Attorneys for Public Utility District No. 1 of
Snohomish County, Washington*

Date:   August 23, 2004

Unofficial FERC-Generated PDF of 20040825-0096 Received by FERC OSEC 08/23/2004 in Docket#: EL02-113-007

## Attachment A

Unofficial FERC-Generated PDF of 20040825-0096 Received by FERC OSEC 08/23/2004 in Docket#: EL02-113-007

CADWALADER, WICKERSHAM & TAFT LLP
Special Counsel to the Debtors
100 Maiden Lane
New York, New York 10038
Telephone: (212) 504-6000
Facsimile: (212) 504-6666
Edward A. Smith (ES 2461)
Shlomo Azarbad (SA 6133)

-and-

Mark C. Ellenberg
David F. Williams
1201 F Street, N.W.
Washington, D.C. 20004
Telephone: (202) 862-2200
Facsimile: (202) 862-2400

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re:<br><br>ENRON CORP., et. al,<br><br>                    Debtors. | Chapter 11<br><br>01-16034 (AJG) |
| ENRON CORPORATION, ENRON ENERGY SERVICES, INC., ENRON ENERGY SERVICES OPERATIONS, INC., ENRON ENERGY SERVICES, LLC, ENRON NORTH AMERICA CORP. and ENRON POWER MARKETING, INC.,<br><br>                    Plaintiffs,<br><br>          v.<br><br>PEOPLE OF THE STATE OF CALIFORNIA, EX REL. BILL LOCKYER, ATTORNEY GENERAL OF THE STATE OF CALIFORNIA.<br><br>                    Defendant. | (Jointly Administered)<br><br>Adv. Pro. No. 04-03386 (AJG) |

Unofficial FERC-Generated PDF of 20040825-0096 Received by FERC OSEC 08/23/2004 in Docket#: EL02-113-007

## MEMORANDUM OF LAW IN SUPPORT OF
## APPLICATION FOR PRELIMINARY INJUNCTION TO
## ENFORCE THE AUTOMATIC STAY OR OTHER EXPEDITED RELIEF

TO THE HONORABLE ARTHUR J. GONZALEZ,
UNITED STATES BANKRUPTCY JUDGE:

Debtors and Plaintiffs Enron Corp., Enron Energy Services, Inc., Enron Energy Services Operations, Inc., Enron Energy Services, LLC, Enron North America Corp., and Enron Power Marketing, Inc. (collectively, the "Enron Plaintiffs"), submit this memorandum of law in support of their motion, pursuant to §§ 105(a) and 362(a) of title 11 of the United States Code (the "Bankruptcy Code"), and Rule 65 of the Federal Rules of Civil Procedure, made applicable hereto by Rule 7065 of the Federal Rules of Bankruptcy Procedure, to enforce the automatic stay and for a preliminary injunction or other expedited relief prohibiting Bill Lockyer, Attorney General of the State of California ("Lockyer"), from prosecuting a lawsuit (the "California Litigation") filed against the Enron Plaintiffs in California state court on June 17, 2004.

### PRELIMINARY STATEMENT

Lockyer's lawsuit is about one thing, and one thing only -- money. The caption of Lockyer's Complaint (the "California Complaint") says it all: "COMPLAINT FOR RESTITUTION, DISGORGEMENT, AND/OR DAMAGES, AND CIVIL PENALTIES...."[1] The California Litigation seeks money, likely in excess of a billion dollars, from the Enron Plaintiffs' estates for wholly past, prepetition trading activities in the California electricity markets – which the Complaint itself acknowledges ended in 2001. Lockyer also admits that the California energy crisis, which he implies was

---

[1] *People of the State of California Ex Rel. Bill Lockyer, Attorney General of the State of California v. Enron Corp., et al.*, Case No. RG04161108 (Super. Ct. Alameda County June 17, 2004). The California Complaint is attached as Exhibit 1 to the Declaration of Edward A. Smith (the "Smith Decl.") accompanying this memorandum.

Unofficial FERC-Generated PDF of 20040825-0096 Received by FERC OSEC 08/23/2004 in Docket#: EL02-113-007

precipitated by the market manipulation of Enron and other traders, ended in 2001 as well. Removing all doubts as to the exclusively pecuniary nature of the California Complaint are *the facts that virtually identical monetary claims have been asserted by Lockyer* (1) in proofs of claim filed in these chapter 11 cases on October 11, 2002, and (2) in various proceedings pending before the Federal Energy Regulatory Commission ("FERC"). Indeed, Lockyer candidly announced that the purpose of filing his lawsuit against the Enron Plaintiffs was to create "a different pot of money."[2]  That Lockyer chose this moment to launch a collateral attack on both the bankruptcy claims process and the FERC regulatory process can be explained only by the exigencies of California politics, not the law or the facts.  If ever there were a case where the automatic stay would apply to a government civil money judgment action, this is it.

Although the California Complaint includes a prayer for injunctive relief to "stop" the Enron Plaintiffs from violating California law, this request is mere window dressing, designed to create the false appearance of a legitimate exercise of police power excepted from the automatic stay under Bankruptcy Code § 362(b)(4).  There is no continuing misconduct to enjoin and no continuing market to police.  On the contrary, the threat of future harm does not exist today and will not exist tomorrow.  The California energy markets administered by the California Power Exchange Corporation ("CalPX") were shut down in 2001, and the markets administered by the California Independent System Operator ("CalISO") have been overhauled.  FERC has revoked the Enron Plaintiffs' market-based rate authority to sell power.  And the Enron chapter 11 plan, which has been submitted to this Court for confirmation, does not contemplate future

---

[2]  *See* fn. 24 below and Ex. 12.

Unofficial FERC-Generated PDF of 20040825-0096 Received by FERC OSEC 08/23/2004 in Docket#: EL02-113-007

energy trading activities by the surviving companies. Last, but hardly least, the massive and ongoing criminal and regulatory investigations into Enron's trading activities by the Justice Department's Enron Task Force and by FERC eliminate any argument that the California Litigation fills a pressing law enforcement need.

Even if the California Litigation fits within the narrow confines of the police power exception (and the Enron Plaintiffs submit that it does not) the Court should stay the action on equitable grounds under § 105(a) of the Bankruptcy Code. The relief requested by Lockyer is fully redundant of the relief requested in the proofs of claim he has filed in these cases and of the requests for relief in the pending FERC proceedings. To the extent the relief requested in the California Complaint is not redundant, litigation of the complaint would be a futile act. Any claim not already asserted against the Enron Plaintiffs would be barred under the bar date order entered by the Court in these chapter 11 cases, and would be discharged under the Bankruptcy Code and the chapter 11 plan now *sub judice*. Further, under a July 6, 2004 ruling by the United States Court of Appeals for the Ninth Circuit involving similar claims brought by Lockyer against power generators, the claims asserted are preempted by the Federal Power Act and the Filed Rate Doctrine. Thus, Lockyer's only recourse is to obtain relief at FERC and to bring that relief to this Court to be allowed under his pending proofs of claim. The California Litigation serves no purpose whatsoever.

Further, the Court should issue a preliminary injunction under Fed.R.Civ.P. 65 to enjoin Lockyer from prosecuting the California Litigation Lockyer has waited two-and-a-half years to attempt a state court lawsuit and cannot demonstrate any harm for being compelled to wait until this adversary proceeding is adjudicated. The Debtors will suffer irreparable harm if the California Litigation proceeds, and Lockyer –

Unofficial FERC-Generated PDF of 20040825-0096 Received by FERC OSEC 08/23/2004 in Docket#: EL02-113-007

who can only enforce a money judgment through his proofs of claim in this Court – will not suffer any prejudice if it is preliminarily enjoined.

## STATEMENT OF FACTS

### A.    The Enron Plaintiffs' Chapter 11 Proceedings

Commencing on December 2, 2001, the Debtors filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code.  As of the date hereof, the Debtors continue to operate their businesses and manage their properties as debtors in possession in accordance with §§ 1107 and 1108 of the Bankruptcy Code.

The Court conducted a hearing on Debtors' proposed chapter 11 plan from June 3 through June 18, 2004.  Lockyer had notice of, and actively participated in, the confirmation hearing (near the end of which he filed the California Complaint).  Following the hearing, on July 2, 2004, the Debtors filed their Modified Fifth Plan of Reorganization, dated June 1, 2004 (the 'Modified Plan"), which reflects certain agreements made during the confirmation hearing.  The Court has taken confirmation under advisement and has indicated that it may rule on confirmation of the Modified Plan on or about July 15, 2004.

As discussed below, Enron has long since exited the California energy markets that are the subject of the California Litigation.  The Modified Plan does not contemplate continued power sales by any of the Enron Plaintiffs or any affiliate, in California or anywhere else.

Upon confirmation of the Modified Plan and the occurrence of certain conditions subsequent, all prepetition claims against the Enron Plaintiffs will be discharged.[3]  The Plan also enjoins persons asserting discharged claims from asserting

---

[3]    Modified Plan, § 42.3; 11 U.S.C. § 1141(d)(1).

Unofficial FERC-Generated PDF of 20040825-0096 Received by FERC OSEC 08/23/2004 in Docket#: EL02-113-007

those claims against the Enron Plaintiffs other than in connection with a properly filed proof of claim. This injunction applies even against actions of governmental units falling within their police power, to the extent the governmental unit is seeking to collect a money judgment.[4] Finally, the Court has entered an order providing that October 15, 2002 was the last date for filing prepetition claims against the Enron Plaintiffs.[5]

**B.**     **The Enron Plaintiffs' Participation in the California Energy Markets**

In September 1996, the California Legislature enacted legislation to restructure and deregulate the state's wholesale electricity industry. That legislation, among other things, established two new institutions: CalPX and CalISO. CalPX was established to operate and administer auction-style markets for the purchase and sale of electricity in California. Until it terminated its operations of the wholesale electricity markets in January 2001, CalPX administered markets through which wholesale electricity was bought and sold in the State of California.[6]

CalISO was established to operate the electricity transmission grid serving most of the state and was responsible for all real-time operations, such as balancing generation and load and managing congestion of the grid. In addition to operating the congestion management system, CalISO also administered a variety of auction markets to purchase the electricity necessary to operate the transmission system reliably. These

---

[4]   Modified Plan. § 42.4; 11 U.S.C. § 362(b)(4).

[5]   Order of August 1, 2002.

[6]   The primary market operated by CalPX was known as the "Core Market" – a spot market through which electricity was auctioned for delivery during the current day and the following day. It was comprised of two major trading operations: (i) the Day-Ahead Market, which set hourly, market clearing prices for purchasers and suppliers of electricity the following day; and (ii) the Day-Of Market, which served to implement a balance of the supply and demand for electricity on the same day.

Unofficial FERC-Generated PDF of 20040825-0096 Received by FERC OSEC 08/23/2004 in Docket#: EL02-113-007

markets included the "real-time" (also known as the "imbalance") energy market for purchase of power needed to match the amount of power being supplied to the grid with the amount of energy being demanded by customers, and certain ancillary services markets, through which CalISO purchased electricity to respond to a grid system emergency or to correct a routine imbalance on the grid.

The Enron Plaintiffs participated in the California wholesale electricity markets operated and administered by CalPX and CalISO, pursuant to tariffs approved by FERC. Between May 2000 and June 2001 – the period marking what is now known as the California Energy Crisis – the price of wholesale power in California rose to levels well above historical norms. On January 29, 2001, CalPX effectively ceased operations by suspending trading in its markets. CalPX filed a petition for relief under chapter 11 of the Bankruptcy Code on March 9, 2001.[7] The CalISO continues to operate, but under a revised tariff that addresses the conditions that gave rise to the energy crisis.

## C.    FERC Investigations and Proceedings Regarding Enron Trading Strategies and other Market Practices

FERC has launched a comprehensive investigation of Enron's trading activities in the California electricity markets, including the commencement of enforcement proceedings against Enron (and other market participants) for monetary and other remedies. On March 26, 2003, following completion of a Final Report by FERC investigation staff concerning price manipulation in the western state energy markets, FERC issued an order (the "Show Cause Order") directing EPMI and EES to show cause why their authority to sell power at market-based rates should not be revoked. 68 Fed.

---

[7]    *In re California Power Exchange Corp.*, Case No. LA 01-16577 ES (Bankr. C.D. Cal.) (the "CalPX Bankruptcy").

Unofficial FERC-Generated PDF of 20040825-0096 Received by FERC OSEC 08/23/2004 in Docket#: EL02-113-007

Reg. 15,712 (2003).[8]  On June 25, 2003, FERC issued an order (the "Revocation Order") immediately revoking the blanket licenses of EPMI and EES to sell power in various markets, including the California wholesale electricity markets that are the subject of Lockyer's California Complaint. 103 FERC ¶61,343 (June 25, 2003).[9]  FERC found in the Revocation Order, *inter alia*, that EPMI and EES had engaged in gaming in the form of inappropriate trading strategies. The "trading strategies" identified by FERC included the same trading strategies listed in the California Complaint (e.g., "Deathstar", "Ricochet"). FERC stated in the Revocation Order that any Enron company with any plan to market wholesale power following reorganization must apply to FERC for a new authorization. Otherwise, stated FERC, "Enron would be free to continue the status quo ante through an individual ... electric power marketer that has retained its authorization." Revocation Order at 6. By Order dated January 22, 2004, FERC denied requests for rehearing of the Revocation Order. 106 FERC ¶ 61,024 (Jan. 22, 2004).[10]

In companion orders also issued June 25, 2003 (the "Gaming and Partnership Orders"), FERC found that EPMI and EES, and others who had engaged in certain trading activities in the California electricity markets, could also be found to have engaged in "gaming and/or anomalous market behavior" in violation of the CalISO and CalPX tariffs during the period from January 1, 2000 through June 20, 2001. FERC ordered EPMI, EES and other entities to show cause in a trial-type evidentiary proceeding why they should not be found to have engaged in prohibited gaming practices, and

---

[8]   The Show Cause Order (Smith Decl. Ex. 2) invited interested parties to intervene in the proceedings. Among others, Lockyer intervened.

[9]   Smith Decl. Ex. 3.

[10]   Smith Decl. Ex. 4.

Unofficial FERC-Generated PDF of 20040825-0096 Received by FERC OSEC 08/23/2004 in Docket#: EL02-113-007

authorized the Administrative Law Judge to recommend monetary remedies of disgorgement of unjust profits and any other appropriate non-monetary remedies. 103 FERC ¶61, 345 (June 25, 2003) (Gaming Order); 103 FERC ¶61,346 (June 25, 2003) (Partnership Order).[11] The FERC-ordered evidentiary proceeding is currently in the pre-trial phase.

FERC is also considering claims by third-party purchasers of electricity in the California markets administered by CalPX and CalISO seeking refunds from EPMI, EES and other market participants for the difference between the actual prices paid and the market prices that allegedly should have prevailed absent the alleged dysfunction in those markets (the "Refund Proceedings").[12] The Refund Proceedings are ongoing.

Lockyer is a very active party in all three of the ongoing FERC proceedings noted above: the Partnership proceeding, Gaming proceeding and the Refund Proceeding. He has filed, and is aggressively prosecuting, claims against EPMI and other participants in the CalISO and CalPX markets.[13] Written testimony submitted to FERC on behalf of Lockyer describes the claims asserted in terms that are substantially identical to the claims asserted in the California Complaint. The written testimony further states that the Enron Plaintiffs are liable to Lockyer for damages of approximately $1.1 billion.[14]

---

[11]  Smith Decl. Exs. 5, 6.

[12]  *See e.g.*, California Parties' Motion to Lodge Additional Evidence of Market Manipulation, filed July 8, 2004 in *San Diego Gas & Electric Co. v. Sellers of Energy and Ancillary Services into the California Power Exchange and California Independent System Operator Markets, et al.*, Docket Nos. EL00-95-000, *et al.*, and in Investigation of Practices of the California Independent System Operator and the California Power Exchange, Docket Nos. EL00-98-000, *et al.* (filed in Refund Proceeding).

[13]  This participation is disclosed in the Proofs of Claim filed by Lockyer on October 11, 2002 in the Enron bankruptcy cases. *See, e.g.*, Smith Decl. Ex. 7.

[14]  *See* Prepared Supplemental Direct Testimony Jeffrey D. Merola on behalf of the California Parties dated April 6, 2004 and the Prepared Testimony of Dr. Gary A. Stern on behalf of the

Unofficial FERC-Generated PDF of 20040825-0096 Received by FERC OSEC 08/23/2004 in Docket#: EL02-113-007

Motion papers filed by Lockyer and other California parties in the FERC Refund proceeding *just yesterday* provide a striking case in point.[15]   In that motion, *Lockyer et al.* seek to introduce "additional evidence of market manipulation" by sellers of power, including (in particular) Enron, in the CalPX and CalISO markets during the California Energy Crisis timeframe of May 2000 until June 2001.  The motion discusses *the now-familiar Enron* trading strategies such as "Fat Boy" and "Ricochet", *refers to the* audiotaped conversations of Enron traders, and asserts that the evidence "now revealed about Enron's profits indicates that they exceeded $1.1 billion."[16]  The Lockyer movants ask FERC to consider the additional evidence -- which, they say, is already on file in the Gaming and Partnership proceedings – to determine whether the remedies FERC had already provided were adequate.[17]

**D.    The Federal Government's Criminal Proceedings Involving the Enron Trading Strategies and Other Practices**

In the wake of Enron's collapse and its entry into chapter 11 in December 2001, the United States government launched one of the most extensive investigations into allegations of corporate fraud and wrongdoing in the nation's history.  In January 2002, the U.S. Justice Department, with the assistance of the Treasury Department, established the Enron Task Force, which (in the words of the First Year Report to the President from the

---

California Parties dated February 27, 2004 in *Enron Power Marketing, Inc. et al.*, Docket Nos. EL03-180-000 et al. (Consolidated) (Smith Decl. Ex. 8).

[15]   California Parties' Motion To Lodge Additional Evidence Of Market Manipulation, filed July 8, 2004 in *San Diego Gas & Electric Co. v. Sellers of Energy and Ancillary Services into the California Power Exchange and California Independent System Operator Markets, et al.,* Docket Nos. EL00-95-000, *et al.,* and in *Investigation of Practices of the California Independent System Operator and the California Power Exchange,* Docket Nos. EL00-98-000, *et al.* (Smith Decl. Ex. 9).

[16]   *Id.* at 3, 4, 16-18.

[17]   *Id.* at 1-2, 20.

Unofficial FERC-Generated PDF of 20040825-0096 Received by FERC OSEC 08/23/2004 in Docket#: EL02-113-007

Corporate Fraud Task Force dated July 22, 2003) was charged "to investigate and prosecute all criminal matters relating to the sudden collapse of Enron Corp."[18] The Enron Task Force includes experienced prosecutors, FBI and IRS agents, and is coordinating its efforts with numerous other government agencies including the SEC, the CFTC, and FERC. The Enron Task Force constitutes part of the broader Corporate Fraud Task Force established by President Bush in July 2002 to investigate allegations of fraud and corruption at U.S. corporations.

Since June 2002, the Enron Task Force has brought criminal charges against 30 individuals, including 22 former Enron executives. These indictments include many of Enron's former top officials, including former Chairman and CEO Kenneth Lay, former CEO Jeffrey Skilling and former CFO Andrew Fastow.[19]  Ten defendants (in addition to the Arthur Andersen accounting firm) have been convicted to date, all pursuant to plea agreements. The work of the Enron Task Force is ongoing.

A significant part of the Enron Task Force's focus has been on California's energy markets. The U.S. Attorney's Office in San Francisco has charged three of Enron's top former energy traders based on conduct in those markets. As the California Complaint points out (¶ 2), two of those traders – Timothy Belden and Jeffrey Richter – have pleaded guilty. The third – John Forney – is under indictment.[20]

---

[18]  Smith Decl. Ex. 10 at p. 2.3.

[19]  The Enron Task Force's press release dated February 19, 2004 announcing the indictment of Mr. Skilling is attached to the Smith Decl. as Ex. 11.

[20]  Smith Decl. Ex. 10, at p. 3.12.

Unofficial FERC-Generated PDF of 20040825-0096 Received by FERC OSEC 08/23/2004 in Docket#: EL02-113-007

**E.    Proofs Of Claim Filed By Lockyer in the Enron Bankruptcy Cases**

On October 11, 2002, Lockyer filed a series of substantively identical proofs of claim (each accompanied by a "Supplemental Statement") in the Enron Plaintiffs' bankruptcy cases ( the "Lockyer POCs").[21]    The Lockyer POCs contain allegations that are substantially identical to the allegations contained in the California Complaint.  Each Lockyer POC states that Lockyer's claim "is based on the evidence that Debtors have improperly and illegally manipulated energy markets in California and the Western United States, overcharged for energy, and violated state and federal laws and regulations...." (Supplemental Statement, p. 1).  The POCs then state:

> Enron's revenues from California were obtained from, among other things, the improper use of market power, market manipulation, and misrepresentations concerning power and ancillary services it was to supply and load it was to serve, and congestion it claimed to relieve.  Enron's schemes included "Fat Boy," "Ricochet," "Load Shift," "Death Star," "Non-firm Export," selling of non-firm energy as firm energy, and others described in a Dec. 8, 2000 memo by Enron lawyers. (Exh. C hereto.)  The evidence so far obtained indicates that the activities of Enron may have violated, or be actionable under, many laws including but not limited to the Cartwright Act, Cal. Business and Professions Code §§16720 et seq., the Unfair Competition law, Cal. Business and Processions Code §§17200 et seq., the False Claims Act, Cal. Government Code §§12650 et seq., Cal. Penal Code §§395 and 396, Cal. Public Utilities Code § 2111, federal antitrust, mail and wire fraud, and RICO statutes (15 U.S.C. §1 et seq., 18 U.S.C. §§1341 et seq., 1961 et seq.), and as constituting fraud, misrepresentation, and conversion.   In addition to compensatory damages, restitution or disgorgement, Enron may be liable for punitive

---

[21]    Lockyer filed a proof of claim in the bankruptcy of the following Debtors: Enron Corp., Enron North America Corp, Enron Power Marketing, Inc., Enron Energy Services, Inc, Enron Energy Services North America, Inc., Enron Energy Services, LLC, Enron Energy Marketing Corp. and Enron Capital & Trade Resources International Corp.  A copy of proof of claim number 12173 filed in the Enron Energy Services Inc., et al., No. 01-16034, is attached to the Smith Decl. as Ex. 7.

Unofficial FERC-Generated PDF of 20040825-0096 Received by FERC OSEC 08/23/2004 in Docket#: EL02-113-007

damages, and in some instances treble damages and penalties.

The Lockyer POCs continue, "This claim is asserted for all injury and damages caused by Enron and its affiliates and subsidiaries of any kind whatsoever to the People of the State of California by reason of energy market misconduct and overcharges...." (*Id.* p. 4).

### F.   The Lockyer Complaint Filed In California State Court

Approximately three weeks ago, in the midst of the confirmation hearing on or about June 17, 2004, Lockyer filed the California Complaint in the Superior Court of the State of California for the County of Alameda. The complaint is captioned "COMPLAINT FOR RESTITUTION, DISGORGEMENT, AND/OR DAMAGES, AND CIVIL PENALTIES, (CALIFORNIA BUSINESS & PROFESSIONS CODE § 17200, CALIFORNIA CORPORATIONS CODE § 29536); DEMAND FOR JURY TRIAL." Paragraph No. 1 of the California Complaint alleges, *inter alia:* "This is a law enforcement action brought by the Attorney General of the State of California to enforce the State's police and regulatory powers...." The California Complaint alleges that, between 1998 and 2001, the Enron Plaintiffs (there defined as the Enron Defendants) engaged in a series of "manipulative and fraudulent" trading strategies (the "Enron Trading Strategies") through which they earned massive profits. Smith Decl. Ex. 1, ¶53. The California Complaint contains descriptive allegations of the Enron Trading Strategies, which were labeled with the following terms: "Deathstar", "Wheel-Out", Non-Firm Export", "Get Shorty", "Fat Boy" and "Ricochet" (also known as "Megawatt Laundering"). *Id.* The complaint suggests that the California energy crisis, which was alleged to have lasted from May 2000 through June 2001, was precipitated by the Enron

Unofficial FERC-Generated PDF of 20040825-0096 Received by FERC OSEC 08/23/2004 in Docket#: EL02-113-007

Trading Strategies (presumably along with the market manipulation activities of other traders).[22]

The First Cause of Action in the California Complaint alleges that the Enron Trading Strategies were unlawful, unfair and fraudulent business practices under the California Business and Professions Code § 17200 *et seq*. Smith Decl. Ex. 1 ¶¶ 65-71. The Second Cause of Action alleges that the Enron Trading Strategies were willful and fraudulent business practices in violation of California Corporations Code § 29500 *et seq*. *Id.* ¶¶ 73-81. The California Complaint alleges that, as a result, "California businesses and residents were subjected to the risks and dangers of power supply interruptions, rolling blackouts and other adverse consequences." *Id.* ¶¶ 71, 81.

In the Prayer for Relief, Lockyer requests an injunction against the Enron Plaintiffs permanently enjoining them from violating California Business & Professions Code § 17200 and California Corporations Code § 29536; an order "directing Defendants to pay restitution, disgorgement and/or damages" in an unspecified amount; an order assessing civil penalties; and the award of costs.[23]

Shortly before filing the California Complaint, Lockyer announced his plans to sue Enron. According to press reports, Lockyer made clear that the purpose of the lawsuit was to seek "separate damages to compensate the state for Enron's alleged market manipulation."[24] A spokesman from Lockyer's office was quoted as saying: "It'd be a different pot of money."[25]

---

[22] Smith Decl. Ex. 1, ¶¶ 42-43, 49,71.

[23] Smith Decl. Ex. 1 at 19-20 (Prayer for Relief).

[24] Foster Natural Gas Report, June 10, 2004, at p. 2 (Smith Decl. Ex. 12).

[25] *Id.*

Unofficial FERC-Generated PDF of 20040825-0096 Received by FERC OSEC 08/23/2004 in Docket#: EL02-113-007

# ARGUMENT

## POINT I

## THE AUTOMATIC STAY APPLIES TO THE CALIFORNIA LITIGATION

The automatic stay provided in the Bankruptcy Code is the cornerstone for the protection of debtors from their creditors during the process of reorganization. Section 362(a)(1) of the Bankruptcy Code provides that:

> Except as provided in subsection (b) of this section, a petition filed under section 301, 302, or 303 of this title . . . operates as a stay, applicable to all entities, of - (1) *the commencement or continuation,* including the issuance or employment of process, *of a judicial, administrative, or other action or proceeding against the debtor* that was or could have been commenced before the commencement of the case under this title, or to recover a claim against the debtor that arose before the commencement of the case under this title.

11 U.S.C. § 362(a)(1) (emphasis added). Similarly, section 362(a)(3) stays, *inter alia,* "any act to obtain possession of property of the estate."

Section 362(b) of the Bankruptcy Code provides for certain limited exceptions to the automatic stay, including actions by a governmental unit to enforce its police or regulatory power. Section 362(b)(4) of the Bankruptcy Code provides that the filing of a bankruptcy petition does not operate as a stay against:

> the commencement or continuation of an action or proceeding by a governmental unit . . . to enforce such governmental unit's or organization's police and regulatory power, including the enforcement of a judgment other than a monetary judgment, obtained in an action or proceeding by the governmental unit to enforce such governmental unit's or organization's police or regulatory power.

*Id.* However, even if a government action is a proper exercise of the police power, the collection of a money judgment is barred by the stay and can only occur (if at all) in the

-15-

Unofficial FERC-Generated PDF of 20040825-0096 Received by FERC OSEC 08/23/2004 in Docket#: EL02-113-007

bankruptcy court in connection with the debtor's distribution of estate assets to creditors. *Id.*; *see also, e.g., City of New York v. Exxon Corp.*, 932 F. 2d 1020, 1024 (2d Cir. 1991).

This Court, like the courts generally, applies a two-part test to determine whether a government's lawsuit or other action involves the exercise of its police or regulatory power: the "pecuniary purpose" test and the "public policy" test. *Ngan Gung Restaurant v. People of the State of New York (In re Ngan Gung Restaurant)*, 183 B.R. 689, 691 (Bankr. S.D.N.Y. 1995); *In re Chateaugay*, 115 B.R. 28, 31 (Bankr. S.D.N.Y. 1988). The focus of these tests is not whether the underlying law is intended to serve some public policy, but whether the government's lawsuit meets the tests for excepting governmental police and regulatory actions from the automatic stay. *Chateaugay*, 115 B.R. at 31.

The pecuniary purpose test focuses on whether the governmental action "relates primarily to the protection of the government's pecuniary interest in the debtor's property, and not to matters relating to public safety." *Id.* The public policy test focuses on whether the proceedings seek to effectuate public policy, or merely are being brought to adjudicate private (*i.e.* creditor) rights. *Ngan Gung Restaurant*, 183 B.R. at 691. As this Court found in *Chateaugay*, 115 B.R. at 32, the legislative history of § 362(b) makes clear that Congress intended that courts give the exceptions in § 362(b) a narrow construction:

> This section is intended to be given a narrow construction in order to permit governmental units to pursue actions to protect the public health and safety and not to apply to actions by a governmental unit to protect a pecuniary interest in property of the debtor or property of the estate.

124 Cong. Rec. 32,395 (1978) (Statement of Rep. Edwards); 124 Cong Rec. 33,995 (identical statement of Sen. DeConcini).

Unofficial FERC-Generated PDF of 20040825-0096 Received by FERC OSEC 08/23/2004 in Docket#: EL02-113-007

**A.    The Express Purpose of the California Litigation Is To Seek Monetary Penalties For Past Conduct**

When the primary purpose of a government lawsuit is to seek money damages or other monetary remedies for past conduct, and not to prevent future conduct that could harm the public health or safety, the courts hold that the police power exception to the automatic stay does not apply. *See, e.g., U.S. v. Seitles,* 106 B.R. 36, 39 (S.D.N.Y. 1989) *vacated on other grounds* 742 F. Supp. 1275 (S.D.N.Y. 1990); *Chateaugay,* 115 B.R. at 31-33; *In re Greenwald,* 34 B.R. 954, 956-57 (Bankr. S.D.N.Y. 1983) (New York State Department of Health action for reimbursement of medicaid overpayments did not fall within police power exception and was barred by automatic stay); *U.S. v. Wellham (In re Wellham),* 53 B.R. 195, 198 (Bankr. M.D. Tenn. 1985) (automatic stay applied because government action was merely for money damages for past conduct and did not purport to stop any continuing misconduct by debtor).

The Southern District's decision in *Seitles* is instructive. The court ruled that the government's action against a corporate debtor under the False Claims Act for damages and civil penalties was barred by the automatic stay. Stating that "the presence or absence of continuing harm as well as a threat to public health is relevant in determining the applicability of § 362(b)(4)", 106 B.R. at 39, the court concluded that "the present case involves no threat to public health or safety" and that the misconduct in question (fraudulently obtained printing contracts) "posed only a monetary, not a safety, threat to the government." *Id.* Furthermore, because the corporation no longer supplied its services to the government and its president had been convicted in a criminal trial, the court concluded that the lawsuit "does not serve to stop any continuing misconduct by the debtor." The government's real motive, stated the court, appeared to be "a purely

Unofficial FERC-Generated PDF of 20040825-0096 Received by FERC OSEC 08/23/2004 in Docket#: EL02-113-007

pecuniary endeavor which may be addressed after the orderly settlement of the bankrupt estate." *Id.*, at 40. As for the public policy test, the court (quoting *Chateaugay*) was "not convinced" that the public policy reasons of loss reimbursement and deterrence were the government's "primary motivation" in filing its damages action. The court noted, in this regard, that the company's president had already been ordered to pay restitution in the criminal matter, and that the "deterrent value" of the civil action had already been largely served by the president's criminal conviction. *Id.* at 39-40.

In contrast, courts apply the police power exception in cases where the primary motivation of the government action is the prevention of ongoing harm to the public, and where the monetary relief sought either serves or is incidental to that purpose. In *SEC v. Thrasher*, 2002 WL 523279, at *1 (S.D.N.Y. Apr. 5, 2002), for example, the court allowed the SEC to proceed with an action against an individual. The SEC requested both an injunction against future securities laws violations and "to fix damages in furtherance of the SEC's police powers to deter [the individual] from violating securities laws in the future and to protect the public from fraud." The court stressed that the damages aspect was in furtherance of the SEC's regulatory interest in curbing future misconduct. *See also, e.g., Exxon Corp.*, 932 F.2d at 1024 (government action to recover past and future environmental cleanup costs under federal Superfund law served to deter polluters from inflicting future and ongoing environmental harm); *Ngan Gung Restaurant*, 183 B.R. at 693, n.4 (court allowed government action for injunctive relief and restitution against debtor restaurant for labor law violations to proceed, where restaurant remained in business and might engage in improper conduct in the future).

The conclusion is inescapable that Lockyer's primary, if not only, purpose in filing the California Litigation is to obtain a money judgment for Enron's past conduct

in the California power markets. Lockyer publicly announced that, in the wake of the ongoing FERC and criminal investigations, he was filing his lawsuit to collect a "different pot of money" from the Enron estate. His proofs of claim, which are substantively indistinguishable from the allegations in the California Complaint, seek money for "injury" and "damage" to the State of California. His complaint, which lists in its caption the monetary remedies demanded by Lockyer – but not injunctive relief – seeks damages, disgorgement, restitution and civil penalties for activities that indisputably ended in 2001 and that the Enron Plaintiffs are disabled from resuming. The "injunctive relief" Lockyer purports to seek in his Prayer would be a meaningless and completely unenforceable remedy. There is no ongoing Enron conduct to enjoin and no ongoing energy market in need of additional protection. Indeed, FERC has already taken the preventative action that Lockyer pretends to want, by revoking the Enron Plaintiffs' market-based rate authority to sell power. By including a (spurious) demand for injunctive relief in the California Complaint, Lockyer effectively confesses that his real purpose – the collection of money for past conduct – is barred by the automatic stay. [26]

**B.    The California Litigation Has No Deterrence Value**

Lockyer also cannot claim that the California Litigation would serve any public policy of deterrence. The courts have repeatedly held that the institution of criminal proceedings addressed to the subject matter of the government's civil action robs the civil action of any meaningful deterrence value, especially where the conduct complained of is entirely in the past. *See, e.g., Seitles*, at 39-40 (deterrence value of civil action is negated

---

[26]    On its face, the California Complaint violates the stay by praying for an order "directing Defendants to pay restitution, disgorgement and damages." Even if the substance of the complaint were found to fit within the narrow police power exception, the prayer, by its terms, asks for much more than the "fixing" of damages. *See Thrasher*, 2002 WL 523279 at *2.

Unofficial FERC-Generated PDF of 20040825-0096 Received by FERC OSEC 08/23/2004 in Docket#: EL02-113-007

where a criminal action was previously commenced); *Wolf Financial Group, Inc. v. Hughes Construction Co. (In re Wolf Financial Group, Inc.)*, 1994 WL 913278, at *8-9 (Bankr. S.D.N.Y. Dec. 15, 1994) (government civil action has deterrence value where no criminal actions were filed against the debtors); *Chateaugay*, 115 B.R. at 32 (deterrence value negated where debtors' "alleged violations occurred over ten years ago," the debtors were out of business and had been previously indicted for fraud and conspiracy).

Enron's collapse and ensuing bankruptcy triggered one of the most comprehensive criminal investigations in U.S. history.  As noted above, 30 criminal indictments of individuals have sprung out of that investigation, resulting in eleven convictions. More indictments undoubtedly are on the way.  Three of the indictments (with two convictions to date) were of former Enron traders operating in the California energy markets that are the subject of Lockyer's lawsuit.  What is more, FERC has been pursuing its own intensive investigation into the Debtors' practices in the energy trading business, which has resulted in the revocation of Enron's market-based rate authority and may lead to future orders requiring disgorgement and other monetary penalties.

For the above reasons, the California Litigation does not fall within the police power exception and is barred by the automatic stay.

<div align="center">

**POINT II**

</div>

## THE ENRON PLAINTIFFS ARE ENTITLED TO AN EQUITABLE STAY

Wholly apart from § 362(a), the Court should enjoin prosecution of the California Action under § 105(a) of the Bankruptcy Code.  Section 105(a) authorizes this Court to "issue any order, process or judgment that is necessary or appropriate to carry out the provisions of this title." 11 U.S.C. § 105(a).  Under § 105, this Court has broad,

Unofficial FERC-Generated PDF of 20040825-0096 Received by FERC OSEC 08/23/2004 in Docket#: EL02-113-007

equitable powers to "assure the orderly conduct of the reorganization proceedings." *Garrity v. Leffler (In re Neuman)*, 71 B.R. 567, 571 (S.D.N.Y. 1987) (*citing In re Baldwin-United Corp. Litigation*, 765 F.2d 343, 348 (2d Cir. 1985). A bankruptcy court may use its power to issue injunctive relief to stay or enjoin proceedings in other fora in order to protect the estate's property. *See In re Johns-Manville Corp. v. The Asbestos Litigation Group (In re Johns-Manville Corp.)*, 40 B.R. 219, 226 (S.D.N.Y. 1984) (courts have ample power under § 105(a) to enjoin actions that threaten the rehabilitative process in both liquidation and reorganization cases). The power to protect the reorganization process includes enjoining governmental actions which conflict with the bankruptcy court's control over estate property. *NLRB v. Superior Forwarding, Inc.*, 762 F.2d 695, 698 (8th Cir. 1985) (bankruptcy court has authority to enjoin federal proceedings when such proceedings threaten debtor's estate); *Missouri v. U.S. Bankruptcy Court*, 647 F.2d 768, 777 (8th Cir. 1981) ("the bankruptcy court possesses power in its discretion to enjoin state courts, officials, and agencies from interfering with assets in custody of the bankruptcy court").

The facts presented here warrant the entry of an injunction against Lockyer. As this Court recognized in *AP Indus., Inc. v. SN Phelps & Co. (In re AP Indus., Inc.)*, 117 B.R. 789 (Bankr. S.D.N.Y. 1990), this Court has authority to issue an injunction pursuant to § 105(a) of the Bankruptcy Code without the Debtors having to establish irreparable harm or the other traditional equitable grounds for injunctive relief. *Id.*, at 802. *See also Wolf Financial Group*, at *10. "Injunctions against state court actions are proper if the Bankruptcy Court 'finds that the action would embarrass, burden, delay or otherwise impede the reorganization proceedings.'" *Neuman*, 71 B.R. at 572 (citations omitted).

Unofficial FERC-Generated PDF of 20040825-0096 Received by FERC OSEC 08/23/2004 in Docket#: EL02-113-007

The California Litigation should be stayed because it is either redundant of the Lockyer POCs and the FERC Partnership and Gaming and Refund Proceedings or it is an exercise in futility. The California Litigation is entirely redundant of Lockyer's proofs of claim and of the ongoing proceedings before FERC, in which both Lockyer and the affected Enron Plaintiffs are participating. In addition, as previously discussed, the California Litigation is a pointless exercise, because Lockyer must enforce any money judgment in this Court, in this bankruptcy case. Again, as previously discussed, the California Litigation – if allowed to proceed – would consume management's time and divert resources to the detriment of the estate. *See Superior Forwarding*, 762 F.2d at 699 (court must determine whether costs associated with defending against governmental actions will "threaten the assets of the estate because otherwise the court's power to preserve the estate over which it presides is illusory"). This Court is the correct forum to adjudicate the pecuniary remedies available to the State of California from the debtors, as its claims for damages must be "dealt with within the parameters of these bankruptcy proceedings because of their potential impact on the other creditors, parties in interest and to the entire reorganization process." *Chateaugay*, 115 B.R. at 34.

Further, the July 6 decision in *People of the State of California, ex rel Bill Lockyer v. Dynegy, et al.*, Nos. 02-16619 and 02-16625 (9th Cir. July 6, 2004) (Smith Decl Ex. 13), makes clear that Lockyer cannot prosecute the claims in the California Complaint in state court. In *Lockyer v. Dynegy*, Lockyer sued power generators under, among other statutes, Cal. Bus. & Prof. Code § 17200, *et seq*. The basis for the action was the manner in which the defendants interacted with the CalPX and CalISO, particularly with respect to the provision of "ancillary services." The California Complaint asserts the same type of claims, including claims concerning "ancillary services."

Unofficial FERC-Generated PDF of 20040825-0096 Received by FERC OSEC 08/23/2004 in Docket#: EL02-113-007

The United States Court of Appeals for the Ninth Circuit affirmed orders (1) denying remand of the removed actions to state court and (2) dismissing Lockyer's claims, with prejudice. The decision was based on the court of appeals' conclusion that, even though the complaint made no reference to the Federal Power Act, the claims asserted necessarily required a determination that the conduct of the defendants violated the applicable CalPX and CalISO tariffs. The court of appeals ruled that (1) the Federal Power Act preempted state law that covered such conduct, including a general fraud statute such as Cal. Bus. & Prof. Code § 17200, and (2) the Filed Rate Doctrine precludes any forum other than FERC from considering the claims.

The *Lockyer v. Dynegy* decision applies to the California Litigation with full force. Lockyer's only recourse on the claims asserted is in FERC, where the claims are already pending. Once FERC rules, the FERC award, if any, can be brought to this Court as a liquidation of the Lockyer POCs. Independent litigation of the claims in the California courts is out of the question.

## POINT III

### THE ENRON PLAINTIFFS ARE ENTITLED TO EXPEDITED RELIEF FROM THIS COURT ENJOINING LOCKYER FROM PROSECUTING THE CALIFORNIA LITIGATION

The Enron Plaintiffs have shown above that the California Litigation violates the automatic stay of Bankruptcy Code § 362(a) and, further, should be enjoined under Bankruptcy Code § 105. The clock is ticking fast in that action, however, which will require the Enron Plaintiffs to take responsive measures as early as July 21 if they do not

Unofficial FERC-Generated PDF of 20040825-0096 Received by FERC OSEC 08/23/2004 in Docket#: EL02-113-007

first secure expedited relief from this Court.[27]  Accordingly, the Enron Plaintiffs seek an order pursuant to § 362 of the Code and Federal Rule 65 for preliminary injunctive relief enjoining Lockyer from prosecuting the California Litigation.  In the alternative, Plaintiffs are entitled to an order immediately enjoining Lockyer from prosecuting the California Litigation under § 105(a) of the Code, which this Court has discretion to grant even if it determines that the automatic stay does not apply.

Rule 65 of the Federal Rules of Civil Procedure, which applies by virtue of Bankruptcy Rule 7065, requires the party seeking a preliminary injunction to show: "(a) irreparable harm and (b) either (1) likelihood of success on the merits or (2) sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly toward the party requesting the preliminary relief." *Roso-Lino Beverage Distributors, Inc. v. Coca-Cola Bottling Company of New York, Inc.*, 749 F.2d 124, 125 (2d Cir. 1984) (*citing Jackson Dairy, Inc. v. H.P. Hood & Sons, Inc.*, 596 F.2d 70, 72 (2d Cir. 1979)).

The Enron Plaintiffs have shown above that the California Litigation both violates the automatic stay and should be stayed under § 105(a).  Therefore, the Enron Plaintiffs satisfy the "likelihood of success on the merits" prong of the standard.  Even if the Court finds that showing to fall short, at a minimum, the Enron Plaintiffs have raised "sufficiently serious" questions about the application of the automatic stay and § 105(a) to make them a fair ground for litigation.  As for the other requirements, irreparable harm exists in the bankruptcy context if the "action sought to be enjoined would so consume the time, energy and resources of the debtor that it would substantially hinder the debtor's

---

[27]  Plaintiffs' answer or other response to the California Complaint must be filed on or before July 21.

Unofficial FERC-Generated PDF of 20040825-0096 Received by FERC OSEC 08/23/2004 in Docket#: EL02-113-007

reorganization effort." *Archambault v. Hershman (In re Archambault)*, 174 B.R. 923, 930 (Bankr. W.D. Mich. 1994). The onerous and unnecessary dollar and time costs that will be expended to vigorously defend a jury trial in California will cause the estate irreparable harm. That litigation, in which Lockyer will likely seek damages in excess of $1 billion, will drain resources and manpower as the Debtors produce documents, attend depositions, file and respond to motions and do all the myriad tasks that are necessary to defend a lawsuit of such magnitude. Moreover, the large amount of money that Lockyer is claiming as damages creates uncertainty and risk as to the timing, reserves and the amount of distribution to creditors.

Further, the Court's jurisdiction will be irreparably impaired if the state court has jurisdiction over the adjudication of claims that are vital to the plan process and necessary for distribution to the creditors. *See LTV Corp. v. Back (In re Chateaugay Corp.)*, 201 B.R. 48, 70 (Bankr. S.D.N.Y. 1996) (irreparable harm requirement met under Rule 65 because state action threatened debtors' reorganization and impaired bankruptcy court's jurisdiction). The continuation of the California Litigation will interfere with the Court's ability to marshal estate assets until the claims in the state court are finally adjudicated, a process that may take years. This Court is, obviously, fully competent to decide Lockyer's pecuniary claims for damages within the greater context of the chapter 11 cases. Indeed, Lockyer's own proofs of claim acknowledge as much. *See In re Theobald Industries, Inc. v. Local 786, Int'l Chemical Workers Union AFL-CIO (In re Theobald Industries, Inc.)*, 16 B.R. 537, 540 (Bankr. D. N.J. 1981) (in furtherance of the underlying purpose of the Bankruptcy Code to expedite the efficient handling of bankruptcy cases, court enjoined governmental action as it was an essentially pecuniary claim).

Unofficial FERC-Generated PDF of 20040825-0096 Received by FERC OSEC 08/23/2004 in Docket#: EL02-113-007

As for the balance of hardships, Lockyer will not be prejudiced by the entry of a preliminary injunction.  As previously discussed, Lockyer's lawsuit is simply a damages action with a spurious claim for injunctive relief thrown in as window dressing. Lockyer has already filed proofs of claim in the Enron bankruptcy cases and is participating in FERC proceedings that seek the same monetary relief as in the California Litigation  There is no question that, even if the California Litigation were permitted to proceed, Lockyer would have to enforce any money judgment in this Court and in this bankruptcy case.   11  U.S.C.  § 362(b)(4);  *Exxon Corp.*,  932  F.2d at  1024;  *S.E.C.  v. Brennan*, 230 F.3d 65, 71-72 (2d Cir. 2000).

Unofficial FERC-Generated PDF of 20040825-0096 Received by FERC OSEC 08/23/2004 in Docket#: EL02-113-007

## CONCLUSION

For the reasons shown above, the Enron Plaintiffs respectfully request that their motion be granted. They request (a) entry of a preliminary injunction enjoining Lockyer from prosecuting the California Litigation pending a decision on the merits, and (b) an expedited order under §105 enjoining Lockyer from prosecuting the California Litigation.

Dated:    New York, New York
          July 9, 2004

CADWALADER, WICKERSHAM & TAFT LLP

By: /s/ Edward A. Smith
    Edward A. Smith (ES 2461)
    Shlomo Azarbad (SA 6133)
    100 Maiden Lane
    New York, New York 10038
    Telephone: (212) 504-6000
    Fax: (212) 504-6666

    - and -

    Mark C. Ellenberg
    David F. Williams
    1201 F Street, NW
    Washington, DC 20004
    Telephone: (202) 862-2200
    Fax: (202) 862-2400

    Special Counsel to the Debtors

CADWALADER, WICKERSHAM & TAFT LLP
Special Counsel to the Debtors
100 Maiden Lane
New York, New York 10038
Telephone: (212) 504-6000
Facsimile: (212) 504-6666
Edward A. Smith (ES 2461)
Shlomo Azarbad (SA 6133)

-and-

Mark C. Ellenberg
David F. Williams
1201 F Street, N.W.
Washington, D.C. 20004
Telephone: (202) 862-2200
Facsimile: (202) 862-2400

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re:<br><br>ENRON CORP., et. al.,<br><br>                         Debtors. | Chapter 11<br><br>01-16034 (AJG) |
| ENRON CORPORATION, ENRON ENERGY SERVICES, INC., ENRON ENERGY SERVICES OPERATIONS, INC., ENRON ENERGY SERVICES, LLC, ENRON NORTH AMERICA CORP. and ENRON POWER MARKETING, INC.,<br><br>                       Plaintiffs,<br><br>               v.<br><br>PEOPLE OF THE STATE OF CALIFORNIA, ex rel. BILL LOCKYER, ATTORNEY GENERAL OF THE STATE OF CALIFORNIA.<br><br>                     Defendants, | Adv. Pro. No. _____ |

**ORDER TO SHOW CAUSE**

Unofficial FERC-Generated PDF of 20040825-0096 Received by FERC OSEC 08/23/2004 in Docket#: EL02-113-007

Upon the application (the "Application") of plaintiffs for an order, pursuant to 11 U.S.C. §§ 105 and 362 and Rule 7065 of the Federal Rules of Bankruptcy Procedure, enjoining the continuation of a litigation filed by defendant in the Superior Court of the State of California for the County of Alameda (the "California Court") entitled People of the State of California ex. rel. Bill Lockyer, Attorney General of the State of California v. Enron Corp. et al, No. RG04161108 (Super. Ct. Alameda County June 17, 2004) (the "California Litigation"), and the Court having considered the Declaration of Edward A. Smith dated July 9, 2004, together with the exhibits annexed thereto, and the memorandum of law filed in support of the Application, and it appearing that good cause exists for granting an order to show cause under Local Rule 9077-1, it is hereby,

ORDERED, that defendant is hereby directed to appear before the Honorable Arthur J. Gonzalez, United States Bankruptcy Judge, in Room 523 of the United States Bankruptcy Court for the Southern District of New York, One Bowling Green, New York, New York 10004 at 3:00 o'clock p.m. on the 15th day of July, 2004, or as soon thereafter as counsel can be heard, to show cause why an order should not be entered, pursuant to 11 U.S.C. § 105 and 362 and/or Rule 7065 of the Federal Rules of Bankruptcy Procedure, staying, restraining and enjoining defendant and its officials, agencies, agents, servants, employees, and attorneys, and those persons in concert or participation with it, and each of them, from taking any action whatsoever to prosecute or otherwise litigate the California Litigation; and it is further;

ORDERED, that all papers opposing the Application shall be in writing and describe the basis therefor, and shall be served upon Cadwalader, Wickersham & Taft LLP, 1201 F Street N.W., Suite 1100 Washington, DC 20004 (Attention: Mark C. Ellenberg, Esq. and David F. Williams, Esq.) and Cadwalader, Wickersham & Taft LLP, 100 Maiden Lane, New York, NY 10038 (Attention: Edward A. Smith, Esq.) so as to be received no later than _____ a.m. (New York time) on July___, 2004; and it is;

2

Unofficial FERC-Generated PDF of 20040825-0096 Received by FERC OSEC 08/23/2004 in Docket#: EL02-113-007

ORDERED, that service of a copy of this Order, and the papers upon which it is based, upon defendant's counsel, Bill Lockyer, Attorney General of the State of California, 1300 I Street, Sacramento, California 94244-2550 by (1) overnight express mail, Federal Express or DHL Courier, whichever method is most feasible to effectuate such service, and (2) by electronic mail on or before July___, 2004 shall be deemed good and sufficient service thereof and sufficient notice of this Order and the proceedings to be held thereon.

Date:   New York, New York
        July ___, 2004


_____
UNITED STATES BANKRUPTCY JUDGE

nofficial FERC-Generated PDF of 20040825-0096 Received by FERC OSEC 08/23/2004 in Docket#: EL02-113-007

# Attachment B

Unofficial FERC-Generated PDF of 20040825-0096 Received by FERC OSEC 08/23/2004 in Docket#: EL02-113-007

*EL02-114, EL02-113*
*EL03-180, EL00-95*
*PA03-2*

**FEDERAL ENERGY REGULATORY COMMISSION**
WASHINGTON, DC 20426

July 28, 2004

OFFICE OF THE CHAIRMAN

The Honorable Christine O. Gregoire
Attorney General
State of Washington
1125 Washington Street SE
P. O. Box 40100
Olympia, WA 98504-0100

Re:    CA Energy Crisis/Enron

Dear Attorney General Gregoire:

Thank you for your July 12, 2004 letter regarding Enron's bankruptcy and the recent Freedom of Information Act (FOIA) request that you submitted to the Commission. You express concern that, if the Commission fails to act promptly, the acceptance of Enron's plan of reorganization by the bankruptcy court may compromise any orders the Commission may issue for refunds, disgorgement or penalties. For this reason, you urge the Commission to use the evidence recently submitted by Public Utility District No. 1 of Snohomish County, additional evidence in the possession of the United States Department of Justice and evidence already before the Commission in various proceedings to provide Washington and other western customers with just and reasonable relief. You also seek the prompt release of the requested documents and records relevant to Enron's activities because you believe the information will be useful in the prosecution of the state's claims.

I understand your concern that the Commission act quickly to protect the rights of customers in the Enron bankruptcy case, and commit to you that the Commission will take all actions it can to do so. In the context of bankruptcies by public utilities, the Commission has two roles. One is as a creditor for monies owed to the federal government, e.g., for civil penalties or annual charges. In this role, the Commission has filed proofs of claim in bankruptcy proceedings to preserve the government's claims, as the Commission has done in the Enron case. The Commission's other role is to adjudicate cases involving whether bankrupt public utilities owe refunds or disgorgements to their customers (to the extent these cases are not barred by the bankruptcy code's automatic stay or otherwise). Any required refunds or disgorgements would be owed to customers and, thus, the proofs of claim for these amounts in the bankruptcy proceeding would generally be filed by the customers (or others representing their interests as creditors, such as your office and your counterparts in other States).

*2004-00220*

- 2 -

While the Commission has only a limited role in the Enron bankruptcy proceeding, I assure you that the Commission in its role as an adjudicator has acted, and continues to act, to address Enron's illegal activities as quickly as possible, within the constraints set by due process requirements and the Federal Power Act (FPA). In February 2002, the Commission initiated a wide-ranging investigation to find and document all market manipulation during the Western energy crisis. The interim results of this investigation were released in August 2002, at which time the Commission opened several formal proceedings against Enron and others. In March 2003, the final results of the investigation were released, and the Commission opened a much larger set of proceedings against Enron and many other power sellers.

When the Final Report was issued, the Commission initiated a proceeding under FPA section 206 proposing to revoke the market-based rate authority of two Enron power marketers and terminate the natural gas blanket marketing certificates of six Enron gas marketers in Docket No. EL03-77-000. Enron opposed this action but, in June 2003, the Commission followed through on its proposal, based on its finding that these entities had engaged in a variety of unjust and unreasonable practices in 2000-01. This case is now on appeal. This remedy taken against Enron marks the first time the Commission has taken such broad action against a company and its affiliates. I understand the need for strong and effective enforcement actions to serve as a deterrent for unlawful market behavior, and believe that the revocation of market-based rate authority of the Enron entities is such an action.

Also, in June 2003, the Commission initiated proceedings in which it proposed the potential retroactive disgorgement of Enron's profits associated with "gaming" or other behavior in violation of the California Independent System Operator's or the California Power Exchange's tariff in Docket Nos. EL03-180-000, et al., pending before Administrative Law Judge Benkin. A portion of the Enron audiotapes and other evidence is being reviewed in this pending case, which includes a public hearing with witness cross-examination. Upon the conclusion of the hearing and the issuance of the judge's decision, the full Commission will review the case. As described below, the Commission has ruled that the remedy in this case may involve Enron's sales as far back as 1997.

On July 22, 2004, the Commission concluded in Docket No. EL02-113-000 that Enron's failure to inform the Commission of its business relationship with El Paso Electric Company violated a condition of the order authorizing Enron to charge market-based rates. The Commission also held that Enron must disgorge $32.5 million in profits associated with sales involving El Paso's facilities. However, the Commission concluded that because the Enron-El Paso relationship was a subset of broader Enron relationships and practices in the West at issue in the proceeding in Docket No. EL03-180-000, et al., the proceedings should be consolidated; and the Commission directed Judge Benkin to determine any additional amount of money that Enron should be required to disgorge. The Commission noted that, given the evidence, Enron potentially could be required to

- 3 -

disgorge profits for all of its wholesale power sales in the Western Interconnect for the period January 16, 1997 to June 25, 2003. Moreover, the Commission stated that an appropriate remedy should take into account all evidence of violations of tariffs on file or orders of the Commission in all pending dockets involving Enron's role in the Western power crisis.

In another proceeding, Nevada Power Company and Sierra Pacific Power Company filed a complaint against Enron Power Marketing, Inc., in Docket No. EL04-1-000, challenging Enron's right to a termination payment under certain contracts entered into in 2001. On July 22, 2004, the Commission set for hearing, on an expedited basis, whether Enron reasonably exercised its discretion in terminating the contracts and whether Enron is entitled to a termination payment.

While the Commission is acting expeditiously in these proceedings, we must operate within the limits set by due process requirements and the FPA. We cannot simply issue an order once we discover evidence of possible wrongdoing and we cannot always devise remedies of our own choosing. The law requires sufficient due process for proceedings such as ours. I understand your sense of frustration over this necessary process, but I think customers would be poorly served if our decisions were overturned by the courts on review because we failed to follow the law.

Finally, let me also assure you that the Commission is working diligently on your FOIA request. I understand the need for prompt action and the Commission is making every effort to process your request as quickly as possible.

Thank you for your interest in these matters. If I can be of further assistance to you, please do not hesitate to contact me.

Best regards,

Pat Wood, III
Chairman

Unofficial FERC-Generated PDF of 20040825-0096 Received by FERC OSEC 08/23/2004 in Docket#: EL02-113-007

## CERTIFICATE OF SERVICE

I hereby certify that I have this day caused an electronic copy of the foregoing document to be sent to all participants via the electronic listservs established by the Federal Energy Regulatory Commission in Docket Nos. EL02-113, EL03-137, and EL03-180. I have also caused a hard-copy to be sent to FERC Staff via first-class U.S. mail.

Dated at Washington, DC this 23rd day of August, 2004.

Adam A. Moniz*
PATTON BOGGS LLP
2550 M Street, N.W.
Washington, DC 20037
Tel.: (202) 457-6056
amoniz@pattonboggs.com

_____

* Bar admission pending

3800209v3

Westlaw.

106 FERC P 61,024                                                      Page 1
106 FERC P 61,024, 2004 WL 1483824 (F.E.R.C.)
**(Cite as: 106 FERC P 61,024, 2004 WL 1483824 (F.E.R.C.))**

H

FEDERAL ENERGY REGULATORY COMMISSION
**1 Commission Opinions, Orders and Notices

Before Commissioners: Pat Wood, III, Chairman; Nora  Mead Brownell, Joseph T.
Kelliher, and Suedeen G. Kelly.

Enron Power Marketing, Inc. and Enron Energy Services,  Inc.

Bridgeline Gas Marketing L.L.C., Citrus Trading Corporation, ENA Upstream
Company, LLC, Enron Canada Corp., Enron Compression Services Company, Enron
Energy Services, Inc., Enron MW,  L.L.C., and Enron North America Corp.

Docket No. EL03-77-001

Docket No. RP03-311-001

ORDER DENYING REHEARING

(Issued January 22, 2004)


*61089 1. This order denies the requests for rehearing of  the Commission's June 25,
2003 Order in these proceedings, [FN1] in  which the Commission revoked the market-based
rate authorities of  Enron Power Marketing, Inc. (EPMI) and Enron Energy Services, Inc.
(EESI) (collectively, Enron Power Marketers), and terminated the  natural gas blanket
marketing certificates of EESI, ENA Upstream  Company, LLC (EEUA), Enron Canada Corp.
(ECC), Enron Compression  Services Company (ECS), Enron MW, L.L.C. (EMW), and Enron North
America Corp. (ENA) (collectively, Enron Gas Marketers).

2. In the Revocation Order we found that the Enron  Power Marketers and the Enron Gas
Marketers engaged in a range of  unjust and unreasonable practices, [FN2] from gaming in
the form of  inappropriate trading strategies in the electric markets to 378  natural gas
wash trades in 2000-01. We found that these activities  warranted the revocation of the
Enron Power Marketers' market-based  rate authorities and the termination of the Enron Gas
Marketers blanket marketing certificates. [FN3] We continue to hold the same.

3. Our action fulfills the Commission's obligation,  pursuant to Sections 205 and 206 of
the Federal Power Act (FPA),  16 U.S.C. )) 824d, 824e (2000), to  prevent unjust and
unreasonable practices and rates, and Sections 4,  5, and 7 of the Natural Gas Act (NGA),
15 U.S.C. )) 717c, 717d, 717f (2000), to prevent unjust and unreasonable practices and
rates and activities not in the public convenience and necessity.

Background

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

4. On February 13, 2002, the Commission directed a Staff fact-finding investigation into whether any entity manipulated prices in electricity *61090 or natural gas markets in the West or otherwise exercised undue influence over wholesale electricity prices in the West, since January 1, 2000. [FN4]

5. On August 13, 2002, Staff released its Initial Report in Docket No. PA02- 2-000. In that Report, Staff recommended the initiation of various company-specific proceedings [FN5] to further investigate possible misconduct, and recommended several generic changes to market-based tariffs to prohibit the deliberate submission of false information or the deliberate omission of material information and to provide for the imposition of both refunds and penalties for violations. [FN6]

**2 6. On March 26, 2003, the Commission released the Final Staff Report on Price Manipulation in Western Markets. [FN7] Concurrently, the Commission also issued a Show Cause Order [FN8] based on the evidence discussed in the Final Staff Report. The Show Cause Order found that the Enron Power Marketers apparently: (1) violated Section 205(a) of the FPA [FN9] by engaging in gaming; and (2) acted inconsistently with their market-based rate authority, not only by engaging in gaming, but also by failing to inform the Commission in a timely manner of changes in their market shares by gaining influence/control over others' facilities in violation of their market-based rate authority.

7. In addition, the Show Cause Order found that the Enron Gas Marketers apparently misused their authority under their natural gas blanket marketing certificates to make sales to and purchases from gas markets serving California at rates that were unjust and unreasonable from the summer of 2000 through the winter of 2000-2001. For instance, that order stated that this evidence indicated that the Enron Gas Marketers, through their electronic trading platform, EnronOnline (EOL), [FN10] apparently manipulated the price of natural gas at the Henry Hub located in Louisiana, on at least one occasion to profit from positions taken in the over-the-counter (OTC) financial derivatives markets (OTC markets).

8. In view of this evidence, the Show Cause Order directed the Enron Power Marketers to show cause why their authority to sell power at market-based rates should not be revoked by the Commission, and the Enron Gas Marketers to show cause why the Commission should not terminate their blanket marketing certificates under Section 284.402 of the Commission's regulations [FN11] to make sales for resale at negotiatedrates in interstate commerce of categories of natural gas subject to the Commission's NGA jurisdiction. [FN12]

9. After reviewing the submissions to the Show Cause Order and the responses thereto, the Commission issued the Revocation Order. The Commission revoked the market-based rate authorities of the Enron Power Marketers. It found that the Enron Power Marketers engaged in gaming in the form of inappropriate trading strategies:

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.



106 FERC P 61,024                                                      Page 3
106 FERC P 61,024, 2004 WL 1483824 (F.E.R.C.)
**(Cite as: 106 FERC P 61,024,  2004 WL 1483824 (F.E.R.C.))**


    (1) False Import (i.e., Ricochet or  Megawatt Laundering); (2) congestion-related
practices such as  Cutting Non-firm (i.e., Non-firm Export), Circular Scheduling  (i.e.,
Death Star), Scheduling counter flows on out of service lines (i.e., Wheel Out), and Load
Shift; (3) ancillary  services-related strategies known as Paper Trading and Double
Selling; and (4) Selling Non-firm Energy as Firm. [FN13] In addition,  the Revocation
Order found that the Enron Power Marketers failed to  inform the Commission in a timely
manner of changes in their market  shares that resulted from their gaining
influence/control over  others' facilities, as required under their market-based rate
authorizations. [FN14] The Commission concluded that such behavior:  (1) undermines the
functioning of the wholesale power market and our  reliance on that market to ensure that
rates are just and  reasonable; (2) constitutes market manipulation and results in  unjust
and unreasonable rates; and (3) violates the express  requirements, in the orders allowing
the Enron Power Marketers to  make sales at market-based rates, to report changes in their
status.

    **3 10. With regard to the Enron Gas Marketers, the  Revocation Order terminated their
blanket marketing certificates.  The Commission found that the Enron Gas Marketers engaged
in wash  trading on EOL that resulted in the manipulation of prices and that  such
activity is contrary to the fundamental purpose in granting the  blanket marketing
certificate. The Commission found that the  *61091 termination of their blanket marketing
certificates was  ""necessary to maintain the integrity and efficiency of  the Commission's
program of authorizing natural gas marketers to  make jurisdictional sales at negotiated
rates.'' [FN15]

    11. Rehearing requests of the Revocation Order have  been timely filed by the Enron
Power Marketers and Enron Gas  Marketers (collectively, Enron Entities), as well as by
Metropolitan  Water District of Southern California, Nevada Power Company and  Sierra
Pacific Power Company, Snohomish County, Washington, City of  Palo Alto, California, City
of Santa Clara, California, and the  California Parties. [FN16]

 Discussion

    12. The rehearing requests make many of the same  arguments previously addressed in the
Revocation Order. To the  extent that these arguments warrant further Commission
elaboration  or new arguments are raised, we address them below.

 A. Due Process

    13. The Enron Entities argue that the Commission  denied them due process by not
providing for a formal trial-type  evidentiary hearing before an administrative law judge.
Specifically, they argue that the intent of a trader is an essential  element to a finding
that the trader engaged in either price manipulation or wash trading and that a trial-type
evidentiary  hearing is necessary to make that determination. [FN17] We disagree.  As we
stated in the Revocation Order, we do not find intent to be an  issue in these
proceedings. [FN18] These proceedings are neither  criminal nor are they imposing

                 Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.



sanctions or civil penalties on the  Enron Entities. The authorization to sell power at market-based  rates and natural gas at negotiated rates -- as opposed to traditional, cost-based rates - is a privilege, and granted if, and  only if, the Commission determines that an applicant's use of such  rates will be just and reasonable. [FN19] Having found that the Enron  Entities engaged in a range of unreasonable practices (e.g.,  gaming and wash trading), it was well within the Commission's  discretion to revoke that privilege, i.e., revoke their market-based  rate authorities and blanket marketing certificates.

14. Furthermore, the Commission is certainly permitted to act without a trial-type evidentiary hearing. [FN20] There were no disputed issues that could not be resolved on this record.

15. The Enron Entities also were and are entitled to  a meaningful opportunity to be heard. [FN21] Through their Show Cause  submittals and through the instant request for rehearing, [FN22]  the Enron Entities have been given a full opportunity to make their case . Thus, their right to due process has been protected (and in fact,  they have exercised it, by responding to the Show Cause Order and  the Revocation Order).

**4 16. The Enron Entities also argue that the Commission  denied them due process both by not providing them adequate notice  that their behavior was prohibited and by not providing them  adequate notice of the facts and law asserted against them in these proceedings. We disagree. While constitutional due process  requirements mandate that the Commission's rules and regulations be  sufficiently specific to give regulated parties adequate notice of  the conduct they require or prohibit, [FN23] this standard is satisfied ""Yi"f, by reviewing Your rules" and other  public statements issued by the agency, a regulated party acting in good faith would be able to identify, with ascertainable certainty,  the standards with which the agency expects parties to conform.'' [FN24] The Commission's orders authorizing the  Enron Power Marketers to sell power at market-based rates (which  tracked Commission precedent [FN25] ), and the blanket marketing  certificate authorizing the Enron Gas Marketers to sell natural gas  at negotiated rates, coupled with the Show Cause and Revocation  Orders, satisfy this due process requirement ""so long  as Ythey are" sufficiently specific that a reasonably prudent  person, familiar with the conditions the regulations are meant to  address and the objectives the regulations are meant to achieve,  would have fair warning of what the regulations  require.'' [FN26] And, in fact, these authorizations *61092 and orders meet this standard, as we explain below.

17. As applied by the courts, this standard has been  held to allow for flexibility in the wording of an agency's rules  and for a reasonable breadth in their construction. [FN27] The courts  have recognized, in this regard, that regulations cannot begin to  cover all of the infinite variety of cases to which they may apply  and that ""Yb"y requiring regulations to be too specific, Ycourts" would be opening up large loopholes allowing  conduct which should be regulated to escape regulation.'' [FN28]

18. The Supreme Court has further noted that the  degree of vagueness tolerated by the

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.



106 FERC P 61,024                                                    Page 5
106 FERC P 61,024, 2004 WL 1483824 (F.E.R.C.)
(Cite as: 106 FERC P 61,024, 2004 WL 1483824 (F.E.R.C.))

Constitution, as well as the relative importance of fair notice and fair enforcement, depend in part on the nature of the rules at issue. [FN29] In Hoffman, for example, the Court held that in the case of economic regulation (as opposed to criminal sanctions), the vagueness test can be applied in a less strict manner because, among other things, ""the regulated enterprise may have the ability to clarify the meaning of the regulation by its own inquiry, or by resort to an administrative process.'' [FN30]

19. Applying these standards here, we find that the Commission's orders authorizing the Enron Power Marketers to sell power at market-based rates (which tracked Commission precedent [FN31]) and the blanket marketing certificate authorizing the Enron Gas Marketers to sell natural gas at negotiated rates, coupled with the Show Cause and Revocation Orders, provided the Enron Entities with notice of the facts and law sufficient to satisfy the due process requirement. Given the breadth of the Enron Entities' Commission-jurisdictional activities, the number of filings they made with the Commission over the years, the number of proceedings before the Commission that they participated in, and the legal and other expertise they had available to them and made use of, we would be hard-pressed to conclude that the Enron Entities somehow did not understand the requirements of the FPA and NGA, our regulations and our precedent and policies. [FN32] Moreover, the Final Staff Report and proceedings in Docket No. PA02-2-000, as well as the Show Cause and Revocation Orders, provide more than adequate notice of the law and facts at issue.

**5 20. With regard to the electricity markets and sales at market-based rates in those markets, the authorization to sell power at market-based rates, as opposed to at cost-based rates, is not a license to engage in the unjust and unreasonable market manipulations perpetrated by the Enron Entities. [FN33] Moreover, implicit in Commission orders granting market-based rates is a presumption that a company's behavior will not involve fraud, deception or misrepresentation. [FN34] Companies failing to adhere to such standards were and are subject to revocation of their market-based rate authority. [FN35] In addition, the Enron Power Marketers were expressly directed, when they were granted market-based rate authority, to inform the Commission promptly of changes in status (which would include changes in their generation market shares) that reflect a departure from the characteristics (such as generation market shares) that the Commission relied upon (indeed, expressly considered and relied upon) in granting market-based rate authority. [FN36]

21. With regard to the blanket marketing certificates, it was more than reasonable for the Commission to conclude that it has authority under the NGA to revoke a blanket marketing certificate's authorization as it applies to particular persons who have engaged in misconduct contrary to the Commission's fundamental purpose in granting the certificates. [FN37] Under NGA Section 7, in order for the Commission to issue a certificate, it must find that the certificated service ""will be required *61093 by the present or future public convenience and necessity.'' In order for the Commission to carry out the NGA's purpose of providing customers what the Supreme Court has characterized as a ""complete, permanent and effective bond of protection,'' [FN38] it must have the

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

106 FERC P 61,024                                                    Page 6
106 FERC P 61,024, 2004 WL 1483824 (F.E.R.C.)
(Cite as: 106 FERC P 61,024,  2004 WL 1483824 (F.E.R.C.))

authority  to terminate a certificate when the holder violates the certificate  by
engaging in misconduct that undermines the basic purpose for  issuing the certificate in
the first instance. [FN39] Moreover, Order No. 547, which  granted the blanket marketing
certificates, expressly stated that  the Commission would monitor the operation of the
market through the complaint process.

22. Therefore, there can be no reasonable doubt as to  the fundamental  ""rules of the
road'' to comply with market-based  rate authorizations and blanket marketing
certificates, and we find  the Enron Entities had sufficient notice of them.

B. Revocation of Market-Based Rate Authority

1. Unjust and Unreasonable Rates

23. The Enron Entities argue that the Revocation  Order failed to justify action
against them under Section 206 of the  FPA. They argue that the Commission failed to
demonstrate that the  activities of the Enron Power Marketers resulted in unjust and
unreasonable rates and that the rates were outside of the ""zone of  reasonableness.''

24. As we stated in the Revocation Order and as our  analysis below demonstrates, we
find, based on the record in this  proceeding, that the behavior of the Enron Power
Marketers  constitutes market manipulation and results in unjust and  unreasonable rates.

**6 25. The Enron Power Marketers' market-based rate  privileges were granted,
consistent with our precedent, based upon a  finding that they lacked market power or had
adequately mitigated  their market power. [FN40] In Louisville Gas and Electric  Company,
62 FERC / 61,016  at 61,143-44 (1993) (footnotes omitted), the Commission explained  the
basis for the Commission's granting market-based rate  privileges:

The seller can demonstrate that it lacks  market power (or has adequately mitigated
its market power) if it  can show that neither it nor any of its affiliates: (1) is a
dominant firm in the sale of generation in the relevant market; (2)  owns or controls
transmission facilities through which the buyer  could reach alternative sellers (or, if
the seller or any of its affiliates does own such facilities, it has adequately mitigated
its  ability to block the buyer from reaching other sellers); and (3) can  erect or
control any other barrier to market entry. Additionally,  before allowing non-traditional
pricing, the Commission has required  a showing that there exists no affiliate abuse.

26. The Enron Power Marketers, in contrast, exercised  unmitigated market power in the
form of gaming through multiple  inappropriate trading strategies. They were able to erect
and  control barriers to market entry by not only engaging in  inappropriate trading
strategies, but also by filing false schedules  in the California markets that
misrepresented the nature of electricity to be supplied and the intended load to be
served. As  explained in the signed plea agreements of Timothy N. Belden and  Jeffrey S.
Richter, former Enron executives, the purpose of filing  false schedules was to
artificially increase congestion on  California transmission lines, which, in turn,

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

106 FERC P 61,024                                                        Page 7
106 FERC P 61,024, 2004 WL 1483824 (F.E.R.C.)
**(Cite as: 106 FERC P 61,024, 2004 WL 1483824 (F.E.R.C.))**


increased the market  price for congestion fees for transmission between zones. [FN41]

    27. It is also clear that affiliate abuse existed.  The Final Staff Report documents
that Enron routinely disregarded  the corporate separation of the various Enron
affiliates, and used  one or another to facilitate misconduct. In fact, the Revocation
Order notes one example involving EPMI:

    Traders nominally employed by EPMI frequently acted as employees of EOL and controlled
the bid management software that produced the prices that users saw on their  screens.
Since EPMI routinely was one of the two parties to each EOL  transaction, in essence, the
same company that ran the trading platform was a party to transactions on that platform, a
situation  that would not be tolerated in a regulated trading exchange and  which afforded
traders from the power marketer a significant  informational advantage over
counter-parties. [FN42]

    28. With regard to the ""zone of reasonableness,''  the Enron Entities cite to <u>Farmers
Union Central Exchange, Inc.,  et al., 734 F.2d 1486, 1502 (D.C. Cir. 1984)</u>, and state
that  the Commission must establish a delineation of the  ""zone of  reasonableness'' to
find whether a rate is ""less than compensatory'' or ""excessive.'' They state that under
the principles of Farmers Un ion, the delineation begins  with an inquiry into the costs
of theEnron Power Marketers. The  overwhelming evidence presented in the Final Report, in
accordance  with Farmers Union,  makes such an inquiry unnecessary. [FN43]

    **7 *61094 29. In Farmers Union, the Court stated that  ""Yr"ates that permit
exploitation, abuse, overreaching  or gouging are by themselves not "just and reasonable.'
'' [FN44] In light of our findings that the  Enron Power Marketers engaged in multiple
gaming schemes and submitted false schedules to increase the market price for congestion
fees for transmission between zones, it is clear that the  rates permitted not only
exploitation, but also abuse, overreaching,  and gouging.

    30. Therefore, in light of the overwhelming evidence  that the Enron Power Marketers
exercised and engaged in market  manipulation, which resulted in unjust and unreasonable
rates,  we  affirm our decision in the Revocation Order and find the Enron Power
Marketers' rates to be unjust and unreasonable.

    31. In any event, we also find that the Enron Power  Marketers engaged in unjust and
unreasonable practices. Trading  strategies such as Circular Scheduling (i.e., Death
Star), where  the Enron Power Marketers scheduled energy in the opposite direction  of
congestion (counterflow), but no energy was actually put onto the  grid or taken off the
grid, were designed to generate payments for  relieving transmission congestion by
""fooling'' the California  Independent System Operator's computerized congestion
management program with imaginary transactions. Such practices undermine the  functioning
of the wholesale power market and our reliance on that  market to carry out the mandate of
the FPA.

    32. The Commission's response to these findings was  to revoke the Enron Power

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

106 FERC P 61,024                                                      Page 8
106 FERC P 61,024, 2004 WL 1483824 (F.E.R.C.)
**(Cite as: 106 FERC P 61,024, 2004 WL 1483824 (F.E.R.C.))**


Marketers' market-based rate authorities and immediately terminate their electric
market-based rate tariffs. (The Commission added that, in the event that the Enron Power
Marketers emerge from reorganization with a power marketing function, should they wish to
charge market-based rates they must reapply for market-based rate authority. [FN45]) We
again find this remedy to be reasonable in view of these findings.

2. Business Relationships

   33. The Enron Entities argue that the Commission erred in finding that the Enron Power
Marketers violated their market-based rate authorizations by failing to report certain
business relationships. They assert that the Commission failed to: (1) demonstrate that
the alleged business relationships resulted in affiliation or long-term control over
generation necessary to trigger the reporting requirements; and (2) provide evidence that
the business relationships increased the Enron Power Marketers' market shares.

   34. We find the Enron Entities' arguments to be unpersuasive; indeed, they essentially
repeat earlier arguments. As we stated in the Revocation Order, the Final Staff Report
explains that Enron created a marketing program based on the use of other entities'
assets, thus avoiding large capital expenditures and the risk of owning its own
resources, to carry out its various trading strategies. Enron focused not only on
partnerships and alliances with investor-owned utilities, but also on smaller utilities,
such as public utility districts, municipalities, and qualifying facilities. Enron,
using these partnerships and alliances, gained market share. [FN46] Enron formed these
business alliances or partnerships without notifying the Commission, as required under
their market-based rate authorizations. [FN47]

   **8 35. In light of this evidence, we affirm our finding that the Enron Power
Marketers' failure to inform the Commission in a timely manner of changes in their market
shares that resulted from their gaining influence/control over others' facilities
warrants revocation of their market-based rate authorities and termination of their
market-based rate tariffs.

C. Termination of Blanket Marketing Certificate

1. Section 7 of the NGA

   36. The Enron Entities continue to argue that the Commission lacks the legal authority
under NGA Section 7 to revoke a certificate in the circumstances of this case. In
addition, they argue that the Commission did not attach to blanket marketing
certificates any condition that would prohibit a certificate holder from engaging in wash
trades or manipulating prices. They state that the Commission decided there should be no
guidelines or criteria that limit the prices that parties could negotiate under the
blanket marketing certificate. [FN48] Thus, they argue that, in effect, the Commission
has added a new condition to the blanket marketing certificate. They contend, based upon
the legislative history of NGA Section 7, that the Commission lacks the authority to
attach a new condition to a certificate after it has been issued. Therefore, the Enron

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

106 FERC P 61,024                                                      Page 9
106 FERC P 61,024, 2004 WL 1483824 (F.E.R.C.)
**(Cite as: 106 FERC P 61,024, 2004 WL 1483824 (F.E.R.C.))**


Entities argue, the Commission can only revoke a certificate if ""the certificate holder fails to exercise the rights granted by the certificate in accordance with the terms and conditions under which it was issued.'' They further concede that negotiated rates are subject to being found unjust and unreasonable, **\*61095** but that the Commission must proceed under Section 5 of the NGA to make such a finding.

37. We find the Enron Entities's arguments to be misplaced. First, as we stated in the Revocation Order, the Commission has ""authority under the NGA to revoke a blanket marketing certificate authorization as it applies to particular persons who have engaged in misconduct contrary to the Commission's fundamental purpose in granting the blanket marketing certificate,'' [FN49] i.e., contrary to ""fosterYing" a truly competitive market for natural gas sales for resale in interstate commerce, giving purchasers of natural gas access to multiple sources of natural gas and the opportunity to make gas purchasing decisions in accord with market conditions.'' [FN50] This condition is not new, but rather was part of the certificate since its inception. As such, the Commission has the fullest ability to enforce the conditions of the blanket marketing certificate. In fact, the Enron Entities even agree that the Commission may revoke a certificate if ""the certificate holder fails to exercise the rights granted by the certificate in accordance with the terms and conditions under which it was issued.''

38. Second, the issue before us in the Revocation Order was whether the conduct of the Enron Gas Marketers was contrary to the fundamental premise of their blanket marketing certificates. Having found this to be true, the Commission terminated their blanket marketing certificates under Section 7 of the NGA. The cornerstone of our decision was the misconduct of the Enron Gas Marketers, i.e., engagement in wash trades and price manipulation, rather than the outcome of the conduct. Therefore, the Enron Entities' argument that all sales pursuant to their blanket marketing certificates were at negotiated rates is inconsequential to our determination to terminate their blanket marketing certificates.

**\*\*9** 39. Moreover, the Commission does not have to proceed under Section 5 of the NGA in these circumstances because the Enron Gas Marketers' blanket marketing certificates were originally issued under, and so were terminated under, Section 7 of the NGA. To the extent Section 5 does apply, however, we find the practices, i.e ., wash trading and price manipulation, to be unjust and unreasonable . As explained above, these practices undermined the fundamental purpose of the blanket marketing certificates. In addition, the creation of false price signals through wash trades is contrary to the goal of allowing gas purchasers to make purchasing decisions ""in accord with market conditions.'' [FN51]

2. Price Manipulation and Wash Trading

40. The Enron Entities argue that the NGA does not prohibit price manipulation or wash trading. They also argue that specific intent, market power and the existence of an artificial price are all essential elements in determining price manipulation and that

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.



106 FERC P 61,024                                                        Page 10
106 FERC P 61,024, 2004 WL 1483824 (F.E.R.C.)
(Cite as: 106 FERC P 61,024,  2004 WL 1483824 (F.E.R.C.))

the Commission has not demonstrated any of these. With  regard to wash trades, although
the Enron Entities find the  Commission's definition [FN52] unobjectionable, they argue
that the Commission must find specific intent in order to find a prohibited transaction.
In addition, the Enron Entities argue that, even if  each of the 378 wash trades
identified in the Final Staff Report and  the Revocation Order that occurred during the
53,445 ""choice  market'' periods studied is a wash trade, 378 is a low number. [FN53]
Also, they argue that the Final Staff report provides no evidence  that any of the wash
trades distorted markets, increased prices or  hurt customers.

    41. We find the Enron Entities' analysis to be misplaced and incorrect. First, with
regard to wash trades, the Revocation Order stated that the participation in wash trades
for no  legitimate business purpose is anti-competitive and deceptive. Wash  trades can
mislead the market in a number of ways, including by  sending false price signals to other
market participants and making  the market at particular points appear more liquid than it
really is . More importantly, wash trades undermine the fundamental purpose of Order No.
547, which is  to ""foster a truly competitive market for natural gas sales for resale in
interstate commerce, giving purchasers of natural gas access to multiple sources of
natural gas and the opportunity to make gas purchasing decisions in accord with market
conditions.'' [FN54] In essence, wash trades by  themselves are enough to allow the
Commission to terminate a gas  marketer's blanket marketing certificate, regardless of
intent and regardless of the number of trades.

    42. Second, it is clear from the evidence in the  Final Staff Report that on July 19,
2001, the price of natural gas  was manipulated at the Henry Hub. The Enron Entities do
not  challenge the facts that occurred on that day. We repeat them here:

    **10 One of the most egregious examples of  abuse through EOL resulted in the
manipulation of natural gas prices  at the Henry Hub located in Louisiana on at least one
occasion to  profit from positions taken in the over-the-counter (OTC) financial
derivatives markets (OTC markets). Although the price change in the  physical markets was
only about $.10/MMBtu, Enron Gas Marketers  nevertheless profited due to the effect *61096
that this small change in the physical price had on its large financial position; Enron
Gas Marketers earned approximately $3.2 million from this manipulation.

    On July 19, 2001, a number of traders entered relatively large short positions in the
financial markets through OTC swaps and Gas Daily financial swaps. These traders continued
to  increase the short positions throughout the initial phase of the  manipulation, which
was the period when the EOL market maker (who  was, at times, the desk manager) quickly
and steadily raised prices  on EOL, resulting in the purchase of a very large amount of
next-day  physical gas. This purchasing caused prices in the financial markets  to rise,
but by a lesser amount.

    The financial traders stopped increasing their short  positions near the end of the
EOL market maker's buying streak, at a  point when the EOL market maker stopped raising
prices and began to  hold prices steady at the high levels. Once the EOL market maker

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.



leveled out prices, the OTC swap began to fall. The EOL market maker then began to lower the prices and sold a very large amount of gas at rapidly falling prices. The falling of the physical price then further pushed down the OTC swap price, generating significant profits for the financial traders. These profits greatly exceeded the losses that were generated from the buying and selling of the physical gas. [FN55]

43. Therefore, we find that the engagement in wash trades and the manipulation of natural gas prices, standing alone, warrant the termination of the Enron Gas Marketers' blanket marketing certificates.

44. With regard to the Enron Entities' argument that the Commission is required to find that the Enron Gas Marketers had a specific intent to manipulate prices or to engage in wash trading and that the Enron Gas Marketers had market power or that an artificial price existed in the market, we find it to be unpersuasive. All of the case law [FN56] that the Enron Entities cite to support this argument involve allegations of trading practices that violated the Commodity Exchange Act [FN57] and the imposition of civil penalties and/or sanctions. Here, however, the Commodity Exchange Act is not at issue and we are not imposing a civil penalty and/or sanction, but simply withdrawing the Enron Gas Marketers' privilege to make jurisdictional sales at negotiated rates.

D. Retroactive Remedies

45. Other entities seeking rehearing argue that the Commission should impose retroactive remedies, such as revoking the Enron Entities' market-based rate authorities and blanket marketing certificates as of a date prior to June 26, 2003 or ordering disgorgement of profits prior to that date.

**11 46. As we stated in Fact-Finding Investigation of Potential Market Manipulation of Electric and Natural Gas Prices, 105 FERC / 61,063 at P 7 (2003), these proceedings should be treated as Part 1b investigations. [FN58] Therefore, there can be no ""parties'' and thus no requests for rehearing. To the extent that we may have erroneously granted any interventions in the Revocation Order, we rescind those interventions. It further follows that the rehearing requests filed by the non-Enron parties in these proceedings must be dismissed, as requests for rehearing can only be filed by parties .

47. In any event, these proceedings, and the Show Cause and Revocation Orders, were focused only on the prospective revocation of market-based rate authorities and blanket marketing certificates. Other remedies are beyond the scope of these proceedings. They are the subject of, for example, the proceedings instituted in the orders cited in note 13, supra, as well as in San Diego Gas & Electric Company, et al., 102 FERC / 61,317, order on reh'g, 105 FERC / 61,066 (2003).

The Commission orders:

The requests for rehearing are hereby denied.

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

106 FERC P 61,024                                                    Page 12
106 FERC P 61,024, 2004 WL 1483824 (F.E.R.C.)
**(Cite as: 106 FERC P 61,024,  2004 WL 1483824 (F.E.R.C.))**


By the Commission.

   (SEAL)

   Linda Mitry

   Acting Secretary

   FN1. Enron Power Marketing, Inc., et al., 103 FERC / 61,343   (2003) (Revocation
Order).

   FN2. See 15 U.S.C. ) 717d(a) (2000); 16 U.S.C. )  824e(a) (2000).

   FN3. Revocation Order, 103 FERC / 61,343 at P 14-17; accord  id. at P 51-56, 61-71.

   FN4. Fact-Finding Investigation of Potential Manipulation of  Electric and Natural Gas
Prices, 98 FERC / 61,165 (2002).

   FN5. Docket Nos. EL02-11 3-000, EL02-114-000, and EL02-115-000. In recent months,  the
Commission has acted on a series of settlements in these dockets . E.g., Portland General
Electric Company, 105 FERC / 61,302 (2003); El Paso Electric  Company, 104 FERC / 61,115 (
2003).

   FN6. Docket Nos. EL01-118-000  and EL01-118-001. The  Commission has addressed this
proceeding in Investigation of Terms  and Conditions of Public Utility Market-Based Rate
Authorizations, 105 FERC / 61,218 (2003).

   FN7. Final Staff Report on Price Manipulation in Western Markets:  Fact-Finding
Investigation of Potential Manipulation of Electric and  Natural Gas Prices, Docket No.
PA02-2-000 (March 2003) (Final Staff Report) .

   FN8. Enron Power Marketing, Inc., et al., 102 FERC / 61,316  (2003).

   FN9. 16 U.S.C. ) 824d(a) (2000).

   FN10. The EnronOnline system is administered by Enron Networks, an  Enron Corporation
subsidiary. EnronOnline is a free, Internet-based,  transaction system which allows the
Enron Gas Marketers to buy from  and sell gas to third parties.

   FN11. 18 C.F.R. ) 284.402 (2003).

   FN12. See 15 U.S.C. )) 717, et seq. (2000) .

   FN13. These practices are described in more detail in American  Electric Power Service
Corp., et al., 103 FERC / 61,385  (2003), reh'g denied, 106 FERC / 61,020 (2004),  and
also are discussed in Enron Power Marketing, Inc., et al.,  103 FERC / 61,346 (2003),
reh'g denied, 106 FERC / 61,024 (2004).


Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

106 FERC P 61,024                                                    Page 13
106 FERC P 61,024, 2004 WL 1483824 (F.E.R.C.)
**(Cite as: 106 FERC P 61,024,  2004 WL 1483824 (F.E.R.C.))**


FN14. See <u>Enron Power Marketing, Inc., 65 FERC / 61,305</u> at 62,405 (1993); <u>Enron Energy Services Power, Inc., 81 FERC / 61,267</u> at 62,319 (1997). Moreover, to the extent that they were jurisdictional, they were not  filed with the Commission.

FN15. <u>Revocation Order, 103 FERC / 61,343</u> at P 66.

FN16. People of the State of California, ex rel., Bill Lockyer, Attorney General, the California Electricity Oversight Board, the California Public Utilities Commission, Pacific Gas and  Electric Company, and Southern California Edison Company.

FN17. Citing, e.g., <u>CFTC v. Savage, 611 F.2d 270, 284  (9th Cir. 1979)</u>.

FN18. <u>Revocation Order, 103 FERC / 61,343</u> at P 33 & n.25.

FN19. See, e.g., <u>Enron Power Marketing, Inc., 65 FERC /  61,305 (1993)</u>; <u>Enron  Energy Services Power, Inc., 81 FERC / 61,267 (1997)</u>.

FN20. See, e.g., <u>Exxon Company, U.S.A. v. FERC, et  al., 182 F.3d 30, 45- 46 (D.C. Cir. 1999)</u>; <u>Kansas Power and  Light Company v. FERC, 851 F.2d 1479, 1484 (D.C. Cir. 1988)</u>; <u>Ohio Power Company v. FERC, 744 F.2d 162, 170 (D.C. Cir. 1984)</u>; <u>Cities of Batavia, et al. v. FERC, 672 F.2d 64, 91 (D.C. Cir. 1982)</u>; see also <u>Williams Natural Gas Company, 53 FERC / 61,060</u> at 61,188, order  on reh'g, <u>53 FERC / 61,231</u> at 61,966-67 (1990); <u>Northwest Pipeline Corporation, 53 FERC / 61,012</u> at 61,051-52 (1990); <u>El Paso Natural Gas Company, 48 FERC / 61,202</u> at 61,756-57 (1989).

FN21. See, e.g., <u>Mathews v. Eldridge, 424 U.S. 319, 333,  348-49 (1976)</u>; <u>Ecee,  Inc. v. FERC, 645 F.2d 339, 352 (5th Cir. 1981)</u>; see also <u>Vermont Yankee Nuclear Power Corporation v. Natural Resources Defense Council, Inc., 435 U.S. 519, 524-25, 543-46 (1978)</u>.

FN22. E.g., <u>State of California, ex rel. Bill Lockyer,  Attorney General v. FERC, 329 F.3d 700, 708-13 (9th Cir.  2003)</u>.

FN23. See <u>Freeman United Coal Mining Company v. Federal Mine  Safety and Health Review Commission, 108 F.3d 358, 362 (D.C. Cir.  1997)</u> (Freeman).

FN24. See <u>General Electric Co. v. EPA, 53 F.3d 1324, 1329-30  (D.C. Cir. 1995)</u>.

FN25. Compare infra P  25-26 with supra note 14.

FN26. See <u>Freeman, 108 F.3d at 362.</u> See also <u>Faultless Division, Bliss & Laughlin Industries, Inc. v. Secretary  of Labor, 674 F.2d 1177, 1185 (7th Cir. 1982)</u> (""YT"he regulations will pass constitutional muster even though they are not drafted with the utmost precision; all that  due process requires is a fair and reasonable warning.'').

FN27. See <u>Grayned v. City of Rockford, 408 U.S. 104, 110  (1971)</u> (holding that an anti-noise ordinance was not vague where the words of the ordinance ""are marked by

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

106 FERC P 61,024                                               Page 14
106 FERC P 61,024, 2004 WL 1483824 (F.E.R.C.)
**(Cite as: 106 FERC P 61,024, 2004 WL 1483824 (F.E.R.C.))**

flexibility and reasonable breadth, rather than meticulous specificity.'').

FN28. See Ray Evers Welding Co. v. OSHRC, 625 F.2d 726, 730 (6th Cir. 1980).

FN29. See Village of Hoffman Estates, et al. v. The Flipside, Hoffman Estates, Inc., 455 U.S. 489, 498 (1982) (Hoffman).

FN30. Id.; See also Texas Eastern Products Pipeline Co. v. OSHRC, 827 F.2d 46, 50 (7th Cir. 1987) (""Texas Eastern, as a major pipeline company, in which trenching and excavation are a part of its routine, had ample opportunity to know of the earlier interpretation, should have been able to see the sense of the regulations on their face, and if still in doubt Texas Eastern should have taken the safer position both for its employees and for itself.'').

FN31. Compare infra P 25-26 with supra note 14.

FN32. See 16 U.S.C. ) 824e(a) (2000) (prohibiting unjust, unreasonable, and unduly discriminatory or preferential practices); 15 U.S.C. ) 717d(a) (2000) (same).

FN33. See 16 U.S.C. ) 824e(a) (2000) (prohibiting unjust, unreasonable, and unduly discriminatory or preferential practices).

FN34. If the Enron Entities are arguing that they reasonably thought that, under the FPA and our regulations, precedent and policies, their fraudulent, deceptive and misrepresentative practices were permitted as just and reasonable practices affecting jurisdictional rates, that argument is hardly credible.

FN35. Fact Finding Investigation of Potential Manipulation of Electric and Natural Gas Prices, 99 FERC / 61,272 at 62,153-54 (2002); accord Investigation of Terms and Conditions of Public Utility Market-Based Rate Authorizations, 97 FERC / 61,220 at 61,975-77 (2001); GWF Energy, LLC, et al., 98 FERC / 61,330 at 62,390 (2002); New York Independent System Operator, Inc., 91 FERC / 61,218 at 61,798-800 (2000), order on reh'g, 97 FERC / 61,155 (2001); Washington Water Power Company, 83 FERC / 61, 097 at 61,462-64, order in response to show cause presentation, 83 FERC / 61,282 (1998); Kansas City Power & Light Company, 74 FERC / 6 1,066 at 61,175, order on reh'g, 75 FERC / 61,244 (1996).

FN36. See supra note14; accord Revocation Order, 103 FERC / 61,343 at P 36 & n.26, 51, 55.

FN37. 15 U.S.C. ) 717d(a) (2000) (prohibiting unjust, unreasonable, and unduly discriminatory or preferential practices).

FN38. See Atlantic Refining Co. v. Public Service Commission of New York, 360 U.S. 378, 388 (1959).

FN39. To rule otherwise would be to find that granting a certificate under NGA Section7 authorizes rates that are unjust and unreasonable under NGA Sections 4 and 5. Phrased

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

106 FERC P 61,024                                                    Page 15
106 FERC P 61,024, 2004 WL 1483824 (F.E.R.C.)
(Cite as: 106 FERC P 61,024, 2004 WL 1483824 (F.E.R.C.))

differently, a  certificate under NGA Section 7 does not entitle the certificate  holder to charge rates that are unjust and unreasonable under NGA  Sections 4 and 5.

FN40. See supra note14.

FN41. See U.S. v. Timothy N. Belden, (N.D. Cal. Case No.  CR-02-0313-MJJ); U.S. v. Jeffrey S. Richter, (N.D. Cal. Case No. CR-03-0026-MJJ).

FN42. Revocation Order, 103 FERC / 61,343 at P 16.

FN43. Moreover, the Enron Entities having sought and been granted  the privilege to charge market-based, i.e., non-cost-based,  rates, the Enron Entities can now hardly claim that the Commission  must justify its actions in these proceedings by reference to the  Enron Entities' costs.

FN44. Farmers Union, 734 F.2d at 1502 (emphasis in original); accord  American Electric Power Service Corp., 106  FERC / 61,020 at P 36 n.27 (2004).

FN45. E.g., Revocation Order, 103 FERC / 61,343 at P 93.

FN46. These partnerships and alliances are described in more  detail in  Enron Power Marketing, Inc., et al., 103 FERC /  61,346 (2003).

FN47. See supra note14; accord Revocation Order, 103  FERC / 61,343 at P 36 &  n.26, 51, 55. Moreover, to the extent that such arrangements were jurisdictional, they were not filed with the Commission under  Section 205 or Section 203.

FN48. This argument, rephrased, amounts to a claim that, since the  Commission did not expressly say ""no cheating,'' the Enron Entities  were perfectly free to ""cheat.'' To state it plainly is to  discredit it.

FN49. Revocation Order, 103 FERC / 61,343 at P 69.

FN50. Regulations Governing Blanket Marketer Sales Certificate,  Order No. 547, FERC Stats & Regs., Reg. Preambles January 1991-June 1996 / 30,957 at 30,719 (1992), order on reh'g, Order No. 547-A, 62 FERC /  61,239 (1993).

FN51. Id.

FN52. A prearranged pair of trades of the same good between the  same parties, involving no economic risk and no change in beneficial  ownership.

FN53. We are not persuaded that ""cheating'' only 378 times is  acceptable behavior.

FN54. Order No. 547,  FERC Stats & Regs., Reg. Preambles January 1991-June 1996 at 30,719.

FN55. Revocation Order, 103 FERC / 61,343 at P 63-65.

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

106 FERC P 61,024                                        Page 16
106 FERC P 61,024, 2004 WL 1483824 (F.E.R.C.)
**(Cite as: 106 FERC P 61,024,  2004 WL 1483824 (F.E.R.C.))**


    FN56. See, e.g., <u>Reddy v. CFTC, 191 F.3d 109 (2d Cir.  1999)</u> (involving artificial
trades and sanctions); <u>CFTC v. Savage, 611 F.2d 270, (9th Cir. 1979)</u> (involving fraudulent
activities and a permanent injunction); <u>Cargill, Inc. v. Hardin,  452 F.2d 1154 (8th Cir.
1971 )</u> (involving price manipulation and sanctions).

    FN57. 7 U.S.C. )) 1,  et seq. (2000).

    FN58. 18 C.F.R. ) 1b.11 (2003).

 106 FERC P 61,024, 2004 WL 1483824 (F.E.R.C.)

END OF DOCUMENT

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

92 FERC P 61,160                                                        Page 1
92 FERC P 61,160, 2000 WL 1211331 (F.E.R.C.)
**(Cite as: 92 FERC P 61160,  2000 WL 1211331 (F.E.R.C.))**

C

**1 Commission Opinions, Orders and Notices

Order Directing Staff Investigation

(Issued July 26, 2000)

*61548 Before Commissioners: James J. Hoecker, Chairman; William L. Massey, Linda
Breathitt, and Curt H (acute)ebert, Jr.

  The Commission's long-standing goal has been to promote and maintain competition in the
Nation's electric bulk power markets. These markets are in different stages of the
transition to competition in different regions of the country. In particular, some parts
of the country have in place independent transmission system operators or power exchanges
or both, and in some states competition is permitted in retail electricity markets as well
as wholesale markets. Some areas have been experiencing wholesale price volatility. In
light of rapidly changing markets and market price volatility, we believe it is incumbent
on us to take steps to assure well functioning markets to the extent we have jurisdiction
to do so. The Commission therefore intends to gather information on whether bulk power
markets are working efficiently and, if not, the underlying causes.

  Accordingly, we direct the staff to undertake a fact-finding investigation of the
conditions in electric bulk power markets (including volatile price fluctuations) in
various regions of the country. Staff should: (a) determine any technical or operational
factors, regulatory prohibitions or rules (Federal or State), market or behavioral rules,
or other factors affecting the competitive pricing of electric energy or the reliability
of service; and (b) report its findings to the Commission by November 1, 2000. The
Commission will then determine what steps it *61549 might take within its jurisdiction to
remedy any market behavior, operation, design or structural problems.

  Among other things, the Commission may use the information developed by the
investigation to:

  * analyze FPA Section 205 filings involving market pricing or market rules;

  * institute FPA Section 206 proceedings tomodify: (a) existing transmission or power
exchange tariffs or agreements to change market rules; (b) bylaws for existing
institutions; or (c) the institutions themselves, if we find they are adversely affecting
the efficient operation of competitive wholesale electric power markets.

  * help analyze the Order No. 2000 regionaltransmission organization  (RTO) filings
that will be made on October 15, 2000 and January 15, 2001.

  The Commission orders:

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

92 FERC P 61,160                                                    Page 2
92 FERC P 61,160, 2000 WL 1211331 (F.E.R.C.)
**(Cite as: 92 FERC P 61160,  2000 WL 1211331 (F.E.R.C.))**


    Staff is directed to institute an investigation of factors affecting competition and
market price fluctuations in electric bulk power markets, as discussed in the body of this
order, and report its findings to the Commission by November 1, 2000.

Federal Energy Regulatory Commission

  92 FERC P 61,160, 2000 WL 1211331 (F.E.R.C.)

END OF DOCUMENT

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

```
 1
 2
     (**AS CORRECTED AND CITATIONS ADDED BY
 3   THE COURT UP TO AND INCLUDING 12/23/2004)
 4   UNITED STATES BANKRUPTCY COURT
     SOUTHERN DISTRICT OF NEW YORK
 5   --------------------------------x
     In re
 6                              Case No.
     ENRON CORP., et al,         01-16034
 7                  Debtors.
     --------------------------------x
 8   ENRON NORTH AMERICA CORP.,
                     Plaintiff,
 9                              Adv. Pro.
        -against-               03-02062
10   CITY OF PALO ALTO, a Chartered
     California Municipal Corporation,
11                  Defendant.
     --------------------------------x
12   ENRON POWER MARKETING, INC.,
                     Plaintiff,
13                              Adv. Proc.
        -against-               03-02063
14   CITY OF PALO ALTO, a Chartered
     California Municipal Corporation,
15                  Defendant.
     --------------------------------x
16   (caption continued next page)
17               December 21, 2004
                 4:07 p.m.
18
                 United States Custom House
19               One Bowling Green
                 New York, New York   10004
20
        (Proceedings -- Entire Day)
21        (calendar on page 2)
22   B E F O R E :
23     THE HONORABLE ARTHUR J. GONZALEZ
       United States Bankruptcy Judge
24
25
```

```
 1
 2     (caption continued from first page)
       ------------------------------x
 3     ENRON POWER MARKETING, INC.,
 4                        Plaintiff,
                                        Adv. Proc.
 5            -against-                 03-02064
 6     PUBLIC UTILITY DISTRICT NO. 1
       OF SNOHOMISH COUNTY,
 7
                        Defendant.
 8     ------------------------------x
 9              C A L E N D A R
           (Proceedings -- Entire Day)
10
       3:30 01-16034 ENRON CORP., ET AL
11     (03-02062) Enron North America Corp. v.
       City of Palo Alto:
12
       DECISION TO BE RENDERED
13     Motion filed by Enron North America Corp.
       for an order (I) enforcing the automatic
14     stay and the Court's mediation order and
       (II) enjoining the City of Palo Alto from
15     seeking clarification from the FERC.
16     THIS MATTER HAS BEEN RESOLVED
17     3:30 01-16034 ENRON CORP., ET AL
       (03-02064) Enron Power Marketing, Inc. v.
18     Public Utility District No. 1 of
       Snohomish County:
19
       DECISION TO BE RENDERED
20     Motion filed by Enron Power Marketing,
       Inc. for an order (I) enforcing the
21     automatic stay and the Court's mediation
       order and (II) enjoining Public Utility
22     District No. 1 of Snohomish County from
       seeking clarification from the FERC.
23
          (calendar continued on next page)
24
25
```

3

```
 1
 2   Calendar:   (continued)
 3   3:30 01-16034 ENRON CORP., ET AL
     (03-02063) Enron Power Marketing, Inc. v.
 4   City of Palo Alto:
 5   DECISION TO BE RENDERED
     Motion filed by Enron Power Marketing,
 6   Inc. and Enron North America Corp. for
     orders (I) enforcing the automatic stay
 7   and the Court's mediation order and (II)
     enjoining the City of Palo Alto from
 8   seeking clarification from the FERC.
 9   THIS MATTER HAS BEEN RESOLVED
10   3:30 01-16034 ENRON CORP., ET AL
     (02-02719) Enron Power Marketing, Inc. v.
11   City of Santa Clara:
12   DECISION TO BE RENDERED
     Hearing re motion filed by Enron Power
13   Marketing, Inc. for an order enforcing
     the automatic stay and the Court's
14   mediation order; enjoining Santa Clara's
     further prosecution to the FERC Action
15   and for civil contempt sanctions.
16   Adj. to 12/29 at 11:00
17
18
19
20
21
22
23
24
25
```

```
 1
 2   A P P E A R A N C E S:
 3      WEIL, GOTSHAL & MANGES LLP
        Attorneys for Reorganized Debtors
 4           767 Fifth Avenue
             New York, New York    10153
 5
        BY:  PETER GRUENBERGER, ESQ.
 6
 7      CADWALADER WICKERSHAM & TAFT
        Special Counsel for Debtors
 8           100 Maiden Lane
             New York, New York    10038
 9
        BY:  JONATHAN D. POLKES, ESQ.
10                       (via telephone)
11
        MOSES & SINGER LLP
12      Attorneys for The City of Palo Alto
        and Public Utility District No. 1 of
13      Snohomish County
             1301 Avenue of the Americas
14           New York, New York    10019
15      BY:  ALAN E. GAMZA, ESQ.
                         (via telephone)
16               -and-
             PHILIPPE A. ZIMMERMAN, ESQ.
17                       (via telephone)
18
        LAW OFFICES OF MICHAEL GOLDFARB
19      Attorneys for Public Utility District
        No. 1 of Snohomish County
20           1150 Market Place Tower
             2025 First Avenue
21           Seattle, Washington    98121
22      BY:  MICHAEL A. GOLDFARB, ESQ.
                         (via telephone)
23
24
25
```

```
 1

 2   A P P E A R A N C E S:   (continued)

 3      PATTON BOGGS
        Attorneys for Public Utility District

 4      No. 1 of Snohomish County
             2550 M Street N.W.

 5           Washington, D.C.   20037

 6      BY:  DEBORAH A. SWANSTROM, ESQ.
                        (via telephone)

 7

 8      SILICON VALLEY LAW GROUP
        Attorneys for The City of Palo Alto

 9           25 Metro Drive, Suite 600
             San Jose, California   95110

10

        BY:  DAVID DUPERRAULT, ESQ.

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
1              Proceedings
2              JUDGE GONZALEZ:   Sorry for the
3    delay.
4              We are addressing only one of
5    the matters that was brought before me,
6    and that being the matter with respect to
7    Snohomish County.   The Palo Alto matter I
8    understand has been at least settled in
9    principle, and late yesterday the Court
10   adjourned the Santa Clara matter until
11   December 29th.   So this ruling only
12   affects Snohomish County.
13             D E C I S I O N
14             Enron North America and Enron
15   Power Marketing, Inc. (together, Enron or
16   the "Debtor") commenced adversary
17   proceedings against various trading
18   partners (the "Trading Cases"), including
19   an adversary proceeding filed on January
20   31, 2003, against the Public Utility
21   District No. 1 of Snohomish County,
22   Washington, alleging that Snohomish
23   breached contractual obligations to Enron
24   by failing to make a termination payment
25   required under their trading agreement.
```

```
 1              Proceedings
 2   As such, any termination payment owed
 3   constitutes property of the Debtor's
 4   estate.
 5              On July 22, 2004, the Federal
 6   Energy Regulatory Commission issued an
 7   order (herein referred to as the "FERC
 8   Order") in the context of a proceeding
 9   before it.  Previously, FERC had
10   initiated a proceeding to determine
11   whether Enron's failure to disclose its
12   "partnership" arrangement with another
13   trading partner violated the terms of
14   Enron's market-based authority.  The FERC
15   Order confirmed an Administrative Law
16   Judge's findings concerning payments for
17   disgorgement owed to that trading
18   partner.  The FERC Order also
19   consolidated the Gaming and Partnership
20   Proceeding pending before FERC with other
21   proceedings.  In the FERC Order, FERC
22   directed the Administrative Law Judge to
23   determine the amount of "unjust profits"
24   that Enron should disgorge.
25              The FERC Order did not directly
```

```
 1              Proceedings
 2   involve Snohomish or any Termination
 3   Payment.  Nevertheless, on August 4,
 4   2004, Snohomish and Palo Alto, who
 5   ("who," meaning Palo Alto) has since
 6   resolved its dispute with the Debtor and
 7   other parties to the consolidated
 8   proceedings, filed with FERC a "Request
 9   for Clarification" of the FERC Order in
10   which they inquire whether the scope of
11   the proceeding before FERC includes
12   submission of evidence concerning the
13   Termination Payment.
14              Enron argues that the Request
15   for Clarification improperly seeks to
16   bring before FERC the contract
17   interpretation issues that are currently
18   pending before this Court and which have
19   been referred to mediation by this Court.
20   Enron contends there is no support for
21   Snohomish's contention that what it seeks
22   in its clarification request involves any
23   enforcement of FERC's contract
24   modification powers under section 206.
25              Snohomish argues that it was a
```

```
 1              Proceedings
 2   party to the proceeding in which FERC
 3   issued the FERC Order.  In addition,
 4   Snohomish alleges that the Request for
 5   Clarification was properly filed in that
 6   proceeding before the FERC proceedings
 7   involving Snohomish had been consolidated
 8   with the FERC Proceeding concerning the
 9   entity for which the FERC Order was
10   issued.  Snohomish contends that FERC
11   also substantially increased the scope of
12   those proceedings and directed the
13   presiding FERC Administrative Law Judge
14   to determine the total amount of unjust
15   profits that Enron should disgorge going
16   back several years.  Thus, Snohomish
17   contends that in the context of
18   formulating a remedy, what is to be
19   considered is evidence on the amount of
20   Enron's unjust profits.  Snohomish
21   contends that testimony related to unjust
22   profits, including unjust profits in the
23   form of termination payments, had already
24   been submitted to FERC without objection
25   from Enron.  Further, it notes that it
```

```
 1                 Proceedings
 2   was only when the July 22nd order was
 3   issued, that FERC first referred to a
 4   "retroactive" disgorgement.  Based upon
 5   that reference, it alleges that it sought
 6   clarification of the scope of FERC's
 7   proceeding, because while the
 8   Administrative Law Judge had been
 9   developing a record on unjust profits, it
10   wanted clarification on whether it should
11   include amounts that had been charged
12   previously and those that Enron was
13   seeking to still charge in the future.
14                 FERC has exclusive jurisdiction
15   to ensure that the rates, terms, and
16   conditions set forth in the contracts
17   affecting wholesale electric power
18   transactions are just and reasonable.
19   See Federal Power Act section 205.  Any
20   contract which affects or relates to such
21   rates, charges, classifications, and
22   services must be filed with and approved
23   by FERC.  16 U.S.C. Section 824d(c)(e).
24   Section 206 of the FPA authorizes FERC to
25   find that the terms of a wholesale power
```

```
 1              Proceedings
 2  contract are "unjust, unreasonable,
 3  unduly discriminatory or preferential,"
 4  and to modify the contract to include the
 5  "just and reasonable" terms "to be
 6  thereafter observed and in force" (11
 7  U.S.C. 824(e)(a)). (emphasis added).
 8              In its Request for
 9  Clarification, Snohomish framed its
10  submission as a request seeking a
11  determination that
12       (i) the Commission did not intend to
13  exclude from the scope of this proceeding
14  Enron contracts that were executed during
15  the period January 16, 1997 to June 25,
16  2003, and under which Enron continues to
17  demand, but has not yet collected, unjust
18  profits in the form of termination
19  payments; and (ii) the Commission did not
20  intend to foreclose parties under
21  disputed, terminated contracts from
22  seeking, as an "appropriate remedy" for
23  Enron's violations of tariffs and/or
24  Commission orders, an order holding that
25  Enron forfeited its privilege to receive
```

```
 1              Proceedings

 2   profits, in excess of Enron's actual

 3   costs, due to Enron's unlawful acts and

 4   that counterparties need not make

 5   windfall payments in excess of Enron's

 6   actual costs under those contracts.

 7              ENA contends that under the

 8   guise of a Request for Clarification,

 9   Snohomish has attempted to interpose into

10   the consolidated FERC Proceeding the

11   dispute with ENA concerning the issue of

12   the Termination Payment.  ENA further

13   argues that the issue concerning the

14   Termination Payment is a state-law

15   contract interpretation issue that

16   exceeds the scope of the issues presented

17   in the FERC proceeding.

18              Snohomish argues that the

19   clarification request concerns only the

20   question of the scope of the remedies

21   available under the Federal Power Act for

22   the violations that FERC is investigating

23   in the consolidated proceeding and has

24   nothing to do with any issues of contract

25   law that are before this Court.
```

```
1                 Proceedings
2    Snohomish contends that it only seeks
3    "guidance from FERC as to the scope of
4    the newly consolidated proceedings, the
5    remedies FERC would consider, and the
6    nature of the evidence it would
7    entertain."
8              Snohomish argues that its
9    Request for Clarification was filed in
10   the context of the FERC Proceeding and
11   therefore is excepted from the automatic
12   stay by the Bankruptcy Code section
13   362(b)(4) governmental unit exception to
14   the automatic stay.
15             The governmental unit exception
16   provided in section 362(b)(4) of the
17   Bankruptcy Code applies only in relation
18   to actions enforcing "generally
19   applicable regulatory laws" governing a
20   debtor's conduct.  See Corporacion de
21   Servicios Medicos Hospitalarios de
22   Fajardo v. Mora (In re Corporacion de
23   Servicios Medicos Hospitalarios de
24   Fajardo), 850 F.2d 440, 445 (1st Cir.
25   1986).  The exception is narrowly
```

```
 1              Proceedings
 2   construed.  Id. at 447.  Even where an
 3   action by a governmental agency is
 4   related to the agency's regulatory power,
 5   where the action seeks to enforce a
 6   contractual right, the action remains
 7   subject to the automatic stay.
 8   Corporacion de Servicios, 805 F.2d at
 9   445.
10              While the "police and
11   regulatory power" exception to the
12   automatic stay applies to the FERC
13   Proceeding that was conducted and
14   resulted in the issuance of the July 22,
15   2004 Order, the exception does not apply
16   to any private state-law contractual
17   dispute.  Enron's rights under their
18   agreement with Snohomish are property of
19   the Debtor's estate, and any
20   interpretation issues concerning that
21   contract are properly brought before this
22   Court.  A commercial contract dispute
23   does not involve FERC's police or
24   regulatory powers and FERC could only
25   exercise its concurrent jurisdiction in
```

```
 1              Proceedings
 2  that area if Snohomish obtained relief of
 3  the automatic stay from this Court.
 4  Without obtaining relief from the stay,
 5  any action taken by FERC to interpret the
 6  terms of the contract would be void
 7  ab initio.
 8              The Court, however, does not
 9  accept the Debtor's argument that FERC is
10  precluded from proceeding on the basis
11  that its determination might render the
12  mediation process, and the adversary
13  proceedings, moot.  This is because if
14  FERC were acting in its capacity as a
15  regulator, the fact that its enforcement
16  action could affect the Bankruptcy
17  Court's control over property of the
18  estate would not stay such enforcement
19  proceeding as it would be expressly
20  exempted under section 362(b)(4).  Board
21  of Governors of the Federal Reserve
22  System v. MCorp Financial, Inc.,
23  et al. (In re MCorp Financial Inc., et
24  al, 502 U.S. 32, 41, 112 S.Ct. 459, 464,
25  116 L.Ed.2d 358 (1991).  When FERC is
```

1              Proceedings
2    acting in its capacity as a regulator,
3    its action is not subject to substantive
4    review by a bankruptcy court.
5              Enron argues that by means of
6    the Request for Clarification, Snohomish
7    attempts to bring matters before FERC
8    that are not within FERC's police and
9    regulatory authority.  Enron maintains
10   that Snohomish attempts to prod FERC into
11   considering whether the Termination
12   Payment is enforceable under the terms of
13   the contract, a purely state-law contract
14   interpretation issue.
15             A matter concerning state-law
16   contract interpretation is unlike the
17   MCorp case, because it does not concern
18   an issue that is within FERC's regulatory
19   authority.  In the MCorp case the intent
20   of the Board of Governors of the Federal
21   Reserve System in the proceeding before
22   it was to determine whether the Debtor
23   had violated a certain regulatory
24   provision that had been promulgated by
25   the Board.  MCorp, 502 U.S. at 41, 112

```
 1            Proceedings
 2   S.Ct. at 464.  The Supreme Court found
 3   that enforcement of that provision in
 4   issue was excepted from the bankruptcy
 5   stay because it was within the Board's
 6   police and regulatory role to enforce the
 7   provisions it had promulgated regardless
 8   of whether the provision's enactment
 9   exceeded the Board's statutory authority.
10   MCorp, 502 U.S. at 43-44, 112 S.Ct. at
11   462.  The Supreme Court reasoned that if
12   the Board had exceeded its authority, the
13   Debtor would have a meaningful and
14   adequate opportunity for judicial review
15   of the validity of the regulation that
16   the Board was seeking to enforce.  Id.
17            Snohomish argues that it does
18   not seek that FERC interpret the
19   contract.  Rather, Snohomish allegedly
20   seeks clarification as to any
21   "disgorgement" or "refund" action and its
22   impact on the Termination Payment.  The
23   Termination Payment is a "lost profit"
24   calculation.  The question is what should
25   be the impact on such payment were
```

```
 1              Proceedings
 2   "disgorgement" or "refund" found to be
 3   warranted.  The definition of "refund" is
 4   a return of money by a person who
 5   overpaid and the definition of
 6   "disgorgement" is giving up something,
 7   such as profits, illegally obtained.
 8              The awarding of a refund or the
 9   direction to disgorge is a regulatory
10   function, to the extent it is based upon
11   pricing -- or in the case of
12   disgorgement, the fraud on the
13   "marketplace" issue which is before FERC.
14   It is within FERC's purview to determine
15   issues related to those matters and FERC
16   does not need prodding from Snohomish on
17   what it should consider in the form of
18   submissions to the agency.
19              However, the state-law contract
20   issues, such as reasonableness of
21   conduct, concern the terms of the
22   contract.  For example, assume that there
23   were allegations that there was fraud in
24   that it was fraudulently represented that
25   one hundred units were delivered, but in
```

```
 1                Proceedings
 2   actuality only 50 units were delivered,
 3   here clearly fraud is in the context of
 4   the contact itself.
 5           The record is unclear as to
 6   precisely what Snohomish is requesting of
 7   FERC.  Any state-law contract issues are
 8   matters within this Court's jurisdiction
 9   and currently before this Court in the
10   pending adversary proceeding.  Whether
11   the Debtors are entitled to the
12   Termination Payment under the terms of
13   the parties' agreement is precisely the
14   issue to be decided in the adversary
15   proceeding before this Court and which
16   this Court has referred to mediation.
17   However, insofar as FERC determines that
18   certain payments should be disgorged
19   based on the exercise of its police and
20   regulatory power in formulating a remedy
21   for any market manipulation or market
22   abuse, such determination would be
23   excepted from the automatic stay even if
24   it were to impact property of the estate.
25   Any challenge to such determination or
```

```
1                    Proceedings
2      the authority to do so is not a challenge
3      that this Court could entertain under
4      MCorp.
5                    Therefore, the Court denies
6      Enron's request for entry of an order
7      requiring Snohomish to withdraw its
8      Request for Clarification before FERC.
9      However, to the extent that the FERC
10     Proceeding would exceed FERC's authority
11     in exercising its police and regulatory
12     function concerning correcting market
13     abuse and if FERC were to actually
14     undertake to interpret the terms of the
15     contract, any such action would be void
16     ab initio absent relief from the
17     automatic stay.
18                   Moreover, even if FERC were to
19     order disgorgement related to the
20     Termination Payment, there would remain
21     issues as to how any such order for
22     disgorgement would impact on the
23     adversary proceeding or how the
24     disgorgement would be treated for
25     purposes of distribution under a plan of
```

```
 1              Proceedings
 2    reorganization confirmed by this Court.
 3             The Court has considered
 4    Snohomish's request to annul the
 5    automatic stay and denies the request.
 6    The contract interpretation issues are
 7    properly before this Court as FERC could
 8    only grant declaratory relief if it were
 9    to interpret the contract's terms.
10                 *   *   *   *
11             Counsel for Snohomish is to
12    settle an order consistent with this
13    Court's decision.
14             Thank you.
15             (Time noted:   4:24 p.m.)
16
17
18
19
20
21
22
23
24
25
```

22

1

2               C E R T I F I C A T E

3      STATE OF NEW YORK      )

                            : SS:

4      COUNTY OF NEW YORK     )

5

6          I, DEBORAH HUNTSMAN, a Shorthand

7      Reporter and Notary Public within and for

8      the State of New York, do hereby certify:

9          That the within is a true and

10     accurate transcript of the proceedings

11     taken on the 21st day of December, 2004.

12         I further certify that I am not

13     related by blood or marriage to any of

14     the parties and that I am not interested

15     in the outcome of this matter.

16         IN WITNESS WHEREOF, I have

17     hereunto set my hand this 23rd day of

18     December, 2004.

19                    *Deborah Huntsman*
20                    DEBORAH HUNTSMAN

21     (**AS CORRECTED AND CITATIONS ADDED BY

       THE COURT UP TO AND INCLUDING 12/23/2004)

22

23

24

25

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| In re: | : | Chapter 11 |
| ENRON CORP., *et al.*, | : | Case No. 01 B 16034 (AJG) |
| Debtors. | : | |
| | : | |
| ENRON POWER MARKETING, INC. | : | |
| Plaintiff, | : | |
| v. | : | Adv. Pro. No. 03-2064 A |
| PUBLIC UTILITY DISTRICT NO. 1 OF SNOHOMISH COUNTY, | : | |
| Defendant. | : | |

ORDER (i) GRANTING MOTION BY ENRON POWER MARKETING, INC. SEEKING AN ORDER ENFORCING THE AUTOMATIC STAY, AND (ii) DENYING MOTION BY ENRON POWER MARKETING INC. SEEKING TO COMPEL PUBLIC UTILITY DISTRICT NO. 1 OF SNOHOMISH COUNTY TO WITHDRAW ITS REQUEST FOR CLARIFICATION, DATED AUGUST 4, 2004, PENDING BEFORE FERC

Upon the Motion (the "Motion") of Enron Power Marketing, Inc. ("EPMI"), dated October 25, 2004, to enforce the automatic stay and to enjoin Defendant Utility District No. 1 of Snohomish County, Washington ("Snohomish") from seeking to pursue a Request for Clarification in proceedings before the Federal Energy Regulatory Commission ("FERC") under Consolidated Docket Nos. EL02-113, EL03-154, and EL03-180, and the Court having considered the pleadings filed in support of and in opposition to the Motion, and a hearing having been conducted concerning the Motion on December 1, 2004, and, after due deliberation, the Court having read a decision concerning the Motion into the

record on December 21, 2004, it is hereby

Ordered, that because it is unclear precisely what relief Snohomish seeks from FERC in its

Request for Clarification, dated August 4, 2004, Enron's Motion seeking that Snohomish withdraw the

Request for Clarification is denied, in essence, as premature as it could not be determined if such relief

were necessary; however, to the extent that FERC were to undertake to interpret the terms of the

Agreement or to determine the rights of the parties under the terms of the Agreement, any such action

would be void *ab initio*, and it is further

Ordered, that Snohomish's request to annul the automatic stay is denied, and it is further

Ordered, that to the extent FERC were to order disgorgement related to the Termination

Payment, there would remain issues for this Court to determine as to how any such order for

disgorgement would impact on the adversary proceeding or how the disgorgement would be treated for

purposes of distribution under a plan of reorganization.

Dated: New York, New York
     January <u>14</u>, 2005

                          *s/ Arthur J. Gonzalez*
                          UNITED STATES BANKRUPTCY JUDGE

MOSES & SINGER LLP
1301 Avenue of the Americas
New York, New York 10019
Alan Kolod (AK-3108)
Alan E. Gamza (AG-2014)
Philippe Zimmerman (PZ-7744)

LAW OFFICES OF MICHAEL A. GOLDFARB
1150 Market Place Tower
2025 First Avenue
Seattle, Washington 98121
Michael A. Goldfarb, Esq.

Counsel to Public Utility District No. 1 of Snohomish County

and

Snohomish County PUD
2320 California Street
P.O. Box 1107
Everett, WA 98206
Michael Gianunzio, Esq.
Eric Christensen, Esq.

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re:<br><br>ENRON CORPORATION<br><br>       Debtors. | Chapter 11<br>Case No. 01-16034 (AJG)<br>Jointly Administered |
| ENRON POWER MARKETING, INC.,<br><br>       Plaintiff,<br><br>– against –<br><br>PUBLIC UTILITY DISTRICT NO. 1 OF<br>SNOHOMISH COUNTY,<br><br>       Defendant. | Adv. Pro. No. 03-02064 |

## NOTICE OF APPEAL

PLEASE TAKE NOTICE that, pursuant to 28 U.S.C. § 158(a) and in accordance with Rules 8001(a) and 8002(a) of the Federal Rules of Bankruptcy Procedure, Defendant Public Utility District No. 1 of Snohomish County ("Snohomish") hereby appeals from the following Order entered in this adversary proceeding:

The Order entered by the United States Bankruptcy Court for the Southern District of New York on January 14, 2004 (Docket No. 30), *inter alia* (1) denying the motion of Enron Power Marketing, Inc. ("EPMI") for an order (a) Enforcing the Automatic Stay and the Court's Mediation Order and (b) Enjoining Snohomish from Seeking Clarification from the Federal Energy Regulatory Commission ("FERC") (Docket No. 19) as premature, but stating that if FERC were to interpret the terms of the Agreement or to determine the rights of the parties under the Agreement, any such action would be void *ab initio* and (2) denying Snohomish's alternative request to annul the automatic stay.

The parties to the Order appealed from and the name, addresses and telephone numbers of their attorneys are set forth below:

Attorneys for Plaintiff
Enron Power Marketing, Inc.:

Jonathan D. Polkes, Esq.
Cadwalader, Wickersham & Taft LLP
One World Financial Center
New York, New York 10281
Tel: (212) 504-6000
Fax: (212) 504-6666

Mark C. Ellenberg, Esq.
Cadwalader, Wickersham & Taft LLP
1201 F Street NW
Washington, D.C. 20004
Tel: (202) 862-2200
Fax: (202) 862-2400


Attorneys for Defendant
Public Utility District No. 1 of Snohomish County

Alan Kolod, Esq.
Alan E. Gamza, Esq.
Philippe Zimmerman, Esq.
Moses & Singer LLP
1301 Avenue of the Americas
New York, New York 10019
Tel: (212) 554-7800
Fax: (212) 554-7700

Michael A. Goldfarb, Esq.
LAW OFFICES OF MICHAEL A. GOLDFARB
1150 Market Place Tower
2025 First Avenue
Seattle, Washington 98121

Michael Gianunzio, Esq.
Eric Christensen, Esq.
Snohomish County PUD
2320 California Street
P.O. Box 1107
Everett, WA 98206

Dated: New York, New York
      January 24, 2005

                            MOSES & SINGER LLP

                            By: /s/ Alan E. Gamza
                                  Alan E. Gamza (AG 2014)
                                  Alan Kolod (AK 3108)
                                  Philippe Zimmerman (PZ 7744)
                            1301 Avenue of the Americas
                            New York, New York 10019
                            (212) 554-7800

                            Michael A. Goldfarb, Esq.
                            LAW OFFICES OF MICHAEL A.
                            GOLDFARB
                            1150 Market Place Tower
                            2025 First Avenue
                            Seattle, Washington 98121

                            Attorneys for Public Utility District No. 1 of
                            Snohomish County

                            and

                            Michael Gianunzio, Esq.
                            Eric Christensen, Esq.
                            Snohomish County PUD
                            2320 California Street
                            P.O. Box 1107
                            Everett, WA 98206

MOSES & SINGER LLP
1301 Avenue of the Americas
New York, New York 10019
Alan Kolod (AK-3108)
Alan E. Gamza (AG-2014)
Philippe Zimmerman (PZ-7744)

LAW OFFICES OF MICHAEL A. GOLDFARB
1150 Market Place Tower
2025 First Avenue
Seattle, Washington 98121
Michael A. Goldfarb, Esq.

Counsel to Public Utility District No. 1 of Snohomish County

and

Snohomish County PUD
2320 California Street
P.O. Box 1107
Everett, WA 98206
Michael Gianunzio, Esq.
Eric Christensen, Esq.

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re:<br><br>ENRON CORPORATION<br><br>       Debtors. | Chapter 11<br><br>Case No. 01-16034 (AJG)<br><br>Jointly Administered |
| ENRON POWER MARKETING, INC.,<br><br>       Plaintiff,<br><br>– against –<br><br>PUBLIC UTILITY DISTRICT NO. 1 OF<br>SNOHOMISH COUNTY,<br><br>       Defendant. | Adv. Pro. No. 03-02064 |

## AMENDED NOTICE OF APPEAL

A612

PLEASE TAKE NOTICE that, pursuant to 28 U.S.C. § 158(a) and in accordance with Rules 8001(a) and 8002(a) of the Federal Rules of Bankruptcy Procedure, Defendant Public Utility District No. 1 of Snohomish County ("Snohomish") hereby appeals from the following Order entered in this adversary proceeding:

The Order entered by the United States Bankruptcy Court for the Southern District of New York on January 14, 2005 (Docket No. 30), *inter alia* (1) denying the motion of Enron Power Marketing, Inc. ("EPMI") for an order (a) Enforcing the Automatic Stay and the Court's Mediation Order and (b) Enjoining Snohomish from Seeking Clarification from the Federal Energy Regulatory Commission ("FERC") (Docket No. 19) as premature, but stating that if FERC were to interpret the terms of the Agreement or to determine the rights of the parties under the Agreement, any such action would be void *ab initio* and (2) denying Snohomish's alternative request to annul the automatic stay.

The parties to the Order appealed from and the name, addresses and telephone numbers of their attorneys are set forth below:

Attorneys for Plaintiff
Enron Power Marketing, Inc.:

Jonathan D. Polkes, Esq.
Cadwalader, Wickersham & Taft LLP
One World Financial Center
New York, New York 10281
Tel: (212) 504-6000
Fax: (212) 504-6666

Mark C. Ellenberg, Esq.
Cadwalader, Wickersham & Taft LLP
1201 F Street NW
Washington, D.C. 20004
Tel: (202) 862-2200
Fax: (202) 862-2400


Attorneys for Defendant
Public Utility District No. 1 of Snohomish County

Alan Kolod, Esq.
Alan E. Gamza, Esq.
Philippe Zimmerman, Esq.
Moses & Singer LLP
1301 Avenue of the Americas
New York, New York 10019
Tel: (212) 554-7800
Fax: (212) 554-7700

Michael A. Goldfarb, Esq.
LAW OFFICES OF MICHAEL A. GOLDFARB
1150 Market Place Tower
2025 First Avenue
Seattle, Washington 98121

Michael Gianunzio, Esq.
Eric Christensen, Esq.
Snohomish County PUD
2320 California Street
P.O. Box 1107
Everett, WA 98206

Dated: New York, New York
       January 25, 2005

                                MOSES & SINGER LLP

                                By:  /s/ Alan E. Gamza
                                    Alan E. Gamza (AG 2014)
                                    Alan Kolod (AK 3108)
                                    Philippe Zimmerman (PZ 7744)
                                1301 Avenue of the Americas
                                New York, New York 10019
                                (212) 554-7800

                                Michael A. Goldfarb, Esq.
                                LAW OFFICES OF MICHAEL A.
                                GOLDFARB
                                1150 Market Place Tower
                                2025 First Avenue
                                Seattle, Washington 98121

                                Attorneys for Public Utility District No. 1 of
                                Snohomish County

                                and

                                Michael Gianunzio, Esq.
                                Eric Christensen, Esq.
                                Snohomish County PUD
                                2320 California Street
                                P.O. Box 1107
                                Everett, WA 98206