96 FERC P 61,313
**(Cite as: 96 FERC P 61313, \*62207,  2001 WL 1076596, \*\*3 (F.E.R.C.))**

the Commission's resolution.

**\*\*4** The contract dispute between PPL Montana and Energy West does not meet the three-part test for exercise of the Commission's primary jurisdiction. First, the Commission does not possess greater expertise than a court in the interpretation of contracts. Moreover, the construction of the specific contractual language at issue here, to determine whether, under the **\*62208** terms of the parties' Agreement, Energy West is scheduling more power than it is entitled to schedule, is a question unique to these parties and over which the Commission holds no special expertise. [FN13]

Second, we find that there does not appear to be a need for uniformity of interpretation of the types of questions raised in this dispute. Since this contract is unique to these parties, an interpretation of this contract by Montana courts, even if different from other courts' interpretations of similar contracts, will not impinge significantly on the operations of public utilities across the nation. [FN14]

Third, this matter is not important in relation to the regulatory responsibilities of the Commission; it does not involve policy questions. Whether Energy West is scheduling more power than permitted under its Agreement with PPL Montana is simply not a question central to the Commission's regulatory responsibilities. The parties to power sales contracts regularly define the terms and conditions of services to be provided under their contracts, and we generally allow them to do so freely. Indeed, the Commission has long held that disputes over contracts for the sale of electric energy at negotiated, market-based rates are more appropriately resolved in court or by arbitration. [FN15]

For these reasons, the Commission declines to exercise primary jurisdiction over this case. We will reject PPL Montana's notice of cancellation, without prejudice to PPL Montana refiling its notice of cancellation after the conclusion of court proceedings.

The Commission orders:

The Commission hereby rejects PPL Montana's Notice of Cancellation, as discussed in the body of this order.

By the Commission.

(SEAL)

Linwood A. Watson, Jr.

Acting Secretary.

FN1. 16 U.S.C. § 824d (1994).

FN2. See Arkansas Louisiana Gas Co. v. Hall, 7 FERC ¶ 61,175, reh'g denied, 8 FERC ¶ 61,031 (1979) (Arkla). Accord Trigen-Syracuse Energy Corp., 95 FERC ¶ 61,326 at 62,153 (2001); PPL Electric Utilities Corp., 92 FERC ¶ 61,057 at 61,147 (2000); Southern California Edison Co., 85 FERC ¶ 61,023 at 61,068-69 (1998); Portland General Electric Co., 72 FERC ¶ 61,009 at 61,021-22 (1995).

FN3. The Purchase and Sales Agreement and the Confirmation collectively will be referred to as the Agreement. The Commission accepted the Agreement for filing in Docket No. ER00-3320-000, effective July 1, 2000.

FN4. PPL Montana Notice of Cancellation at 5.

FN5. Schedule 4 of the MPC OATT provides for scheduling margins of error within two separate bands. Deviation Band 1 permits a deviation in any hour equal to the greater of 2 MW or 2.5 percent between a transmission customer's

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

96 FERC P 61,313
**(Cite as: 96 FERC P 61313, \*62208,  2001 WL 1076596, \*\*4 (F.E.R.C.))**

scheduled amounts of energy and actual load requirements. Deviation Band 2 permits a deviation in any hour equal to the greater of 2 MW or 10 percent. Id. at 6-8.

    FN6. Id. at 6-7.

    FN7. Energy West Protest at 16.

    FN8. Id. at 7-12.

    FN9. Id. at 16.

    FN10. Energy West Resources, Inc. v. PPL Montana, LLC, Cause No. CV-01-090-GF, U.S. District Court for the District of Montana, Great Falls Division.

    FN11. PPL Montana, LLC v. Energy West Resources, Inc., Case No. DV 01-0566, Montana Thirteenth Judicial District Court, Yellowstone County.

    FN12. PPL Montana cites to a case in which Universal Studios, Inc. (Universal) alleged that Southern California Edison deliberately underscheduled its load with the California Independent System Operator (ISO) and then assessed penalties on interruptible customers that refused to shut down their facilities. Universal Studios, Inc. v. Southern California Edison, 96 FERC ¶ 61,043 (2001). In that case, the Commission dismissed the complaint. Although the Commission also stated in passing that it has jurisdiction over Southern California Edison's transactions with the ISO, id. at 61,109, this language when read in context does not stand for the proposition that the Commission possesses exclusive jurisdiction over any contract dispute involving scheduling practices. Furthermore, unlike the current proceeding, that case did not involve a bilateral contract between two parties or the application of the Arkla primary jurisdiction test.

    FN13. See, e.g., Southern California Edison Co., 85 FERC ¶ 61,023 at 61,069 (1998).

    FN14. See, e.g., Trigen-Syracuse Energy Corp., 95 FERC ¶ 61,326 at 62,153 (2001); PPL Electric Utilities Corporation, 92 FERC ¶ 61,057 at 61,147 (2000) (citing Southern California Edison Co., 85 FERC at 61,069 (1998)).

    FN15. See, e.g., Clarksdale Public Utilities Commission v. Entergy Services Inc., 93 FERC ¶ 61,002 at 61,005 (2000); Dartmouth Power Associates Limited Partnership, 74 FERC ¶ 61,037 at 61,090 (1996); Dartmouth Power Associates Limited Partnership v. Commonwealth Electric Co., 73 FERC ¶ 61,096 at 61,309-10 (1995).

  96 FERC P 61,313, 2001 WL 1076596 (F.E.R.C.)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# TAB 28

898 F.2d 1                                                      **Page 42**
898 F.2d 1
**(Cite as: 898 F.2d 1)**
**C**

United States Court of Appeals,
First Circuit.
**In re PUBLIC SERVICE COMPANY OF NEW
HAMPSHIRE, Debtor.  (Two Cases)
Appeal of PUBLIC SERVICE COMPANY OF
NEW HAMPSHIRE.
Appeal of UNITED ILLUMINATING
COMPANY, et al.
Nos. 89-1947 to 89-1949.**

Heard Feb. 6, 1990.
Decided March 1, 1990.

Debtor appealed from order of the United States
District Court, District of New Hampshire, Shane
Devine, Chief Judge, which dismissed creditors'
appeal from bankruptcy court order.  The Court of
Appeals, Breyer, Circuit Judge, held that debtor
could not appeal judgment entered in its favor.

Appeal dismissed.

West Headnotes

**Bankruptcy** ☞3771
51k3771
or
Debtor could not appeal district court judgment
entered in its favor, despite its contention that
judgment's dismissal of creditors' appeal "without
prejudice" was to its disadvantage; debtor obtained
relief it sought and reasons court gave in support of
its dismissal would not bind debtor if reasoning led
to further order opposed by debtor.
**\*1** John R. Harrington, with whom Warren C.
Nighswander, Sulloway Hollis & Soden, Concord,
N.H., and Stutman, Treister & Glatt, Los Angeles,
Cal., were on brief, for appellant Public Service
Co. of New Hampshire.

Christopher T. Katucki with whom Daniel M.
Glosband, Theodore Orson, and Goodwin, Procter
& Hoar, Boston, Mass., were on brief, for
appellants United Illuminating Co., New England
Power Co., Montaup Elec. Co., EUA Power
Corp., The Connecticut Light & Power Co. and
Canal Elec. Co.

Peter B. McGlynn with whom Owen R. O'Neill,
Rosen, Crosson, McGlynn & Resnek, Boston,
Mass., Nathan Paven, Quincy, Mass., and Nathan
Paven & Associates, were on brief, for appellees

Hudson Light and Power Dept. and Peabody Mun.
Light Plant.

Before BREYER, ALDRICH and SELYA, Circuit
Judges.

BREYER, Circuit Judge.

Public Service Company of New Hampshire is in
the midst of bankruptcy proceedings.  In December
1988, Hudson Light and Power filed a proof of
claim.  It said that it "has contract claims" against
Public Service (1) as a "joint owner," and (2) as an
"intended beneficiary" of certain contracts.    In
January 1989, Peabody Municipal Light filed a
similar proof of claim, asserting similar claims, but
only as an "intended beneficiary," not as a "joint
owner."    Public Service then filed a motion for
"partial summary judgment," asking the bankruptcy
court to dismiss the "derivative" claims, namely,
those that the two companies asserted as "intended
beneficiaries" (*i.e.,* leaving in effect Hudson's
claims as "joint owner").    The bankruptcy court
filed a paper on March 22, 1989 in which it
"ORDERED" that the "Motion for Partial Summary
Judgment is granted with respect to the claims of
Hudson, ... Peabody, ..." and various other firms
that had made similar "derivative" claims.

Hudson and Peabody wished to appeal this decision
to the district court, but they could not decide
whether the order was "final," in which case they
could appeal as of right, or "interlocutory," in
which case they needed the district court's
permission to appeal.  28 U.S.C. § 158(a).  They
tried to protect themselves by filing both a motion
for leave to appeal on March 30 and a notice of
appeal on March 30.  Bankruptcy Rule 8001(a) and
(b).     Unfortunately, they then made a major
mistake.  On March 30, they also filed a motion
asking the bankruptcy **\*2** court to reconsider its
grant of partial summary judgment.  Under
Bankruptcy Rule 8002(b), which closely tracks
Fed.R.App.P. 4(a)(4), the filing of such a motion
automatically cancels the effect of having earlier
filed a notice of appeal.  The rules are very clear
about this.  They say, "A notice of appeal filed
before the disposition of any of [certain motions
including a motion to reconsider] ... shall have no
effect;  a new notice of appeal must be filed."  *See
Griggs v. Provident Consumer Discount Co.,* 459
U.S. 56, 61, 103 S.Ct. 400, 403, 74 L.Ed.2d 225

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

898 F.2d 1
(Cite as: 898 F.2d 1, *2)

(1982) (the filing of a new notice of appeal after a timely post-judgment motion is denied is mandatory and jurisdictional). Neither Hudson nor Peabody filed a new notice of appeal. And, sometime after the bankruptcy court denied their motion to reconsider and the time for filing a subsequent notice of appeal expired, their opponent, Public Service, told the district court about their mistake and asked it to dismiss their appeal.

The district court, recognizing that it had no choice in the matter, *Griggs,* 459 U.S. at 61, 103 S.Ct. at 403; *In re Johnson Cover Co.,* 92 B.R. 712 (S.D.Tex.1988); *In re Crystal Sands Properties,* 84 B.R. 665 (9th Cir. BAP 1988), dismissed the appeal. But, it went on to say (1) it might consider the motion for "leave to appeal," (2) it felt that such a motion was appropriate because the bankruptcy order appealed from was "interlocutory," not "final," (3) it would deny the motion for the present, but, (4) its denial was "without prejudice" to Hudson or Peabody asking the bankruptcy court to enter what Fed.R.Civ.P. 54(b) refers to as a "final judgment as to ... fewer than all of the claims or parties," *i.e.,* to issue a piece of paper saying that its summary judgment about the "derivative" claims was final even though Hudson still has pending claims as a "joint owner." *See, e.g., Spiegel v. Trustees of Tufts College,* 843 F.2d 38 (1st Cir.1988). Public Service now wishes to appeal to us from the district court's decision, even though it seems to have won before the district court (which did not hear the appeal). Public Service apparently thinks the words "without prejudice" somehow work to its disadvantage.

Hudson and Peabody argue that the bankruptcy court's "partial summary judgment" order is "interlocutory," and that the bankruptcy court will therefore be able to enter a later "final" judgment under Rule 54(b); and they will then be able to appeal. We note that the bankruptcy rules, particularly in "Part VII Adversary Proceedings," draw strong analogies between an "adversary proceeding" in bankruptcy and an ordinary "case" in a district court. *In re Saco Local Development Corp.,* 711 F.2d 441 (1st Cir.1983) (indicating that a "final" order in an adversary proceeding is "final" for purposes of appeal); *Reichman v. United States Fire Ins. Co.,* 811 F.2d 1112, 1116 (7th Cir.1987)

(decision in a bankruptcy case is final "when it wraps up a piece of litigation that would have been a stand-alone suit outside of bankruptcy law"); 9 *Collier on Bankruptcy,* § 8001.06 (1989). Were the partial summary judgment order one entered by a district court judge in a district court case, rather than one issued by a bankruptcy judge in an adversary proceeding, we should consider it *not* to be "final;" it would have "adjudicate[d] fewer than all the claims ... of fewer than all the parties," for Hudson's "joint owner" claim would remain; hence the order at issue would not "terminate the action;" Fed.R.Civ.P. 54(b); it would be "interlocutory," not "final," and the only way for it to become "final" (without termination of the "joint owner" claim) would be for the court to enter a special Rule 54(b) "final judgment" as to fewer than all claims. *See Adelman v. Fourth National Bank and Trust Co.,* 893 F.2d 264 (10th Cir.1990).

We cannot decide this matter now, however, for a party cannot appeal a judgment entered in its own favor. *Bath Iron Works Corporation v. Coulombe,* 888 F.2d 179, 180 (1st Cir.1989). The district court dismissed the appeal, precisely what Public Service of New Hampshire wished. The reasons it gave in support of its dismissal will not bind Public Service of New Hampshire should that reasoning lead to a further order that Public Service opposes, when, and if, Public Service appeals such a *3 further order to this court. *Bath Iron Works,* 888 F.2d at 180. Indeed, it may well turn out that dismissal was proper for a totally different reason. The Bankruptcy Rules require the same "notice of appeal," whether a party appeals from a "final" order as of right, or seeks "leave to appeal" from an "interlocutory" order; *see* Bankruptcy Rule 8001(b), referring to Rule 8001(a), and, through cross-reference, to Rule 8002. We can find no timely filed "notice of appeal" to the district court, in respect either to the appeal by right or the appeal by leave.

The appeal is

*Dismissed.*

898 F.2d 1

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# TAB 29

Citation                    Found Document            Rank 1 of 1            Database
85 FERC P 61,023                                                            FEN-FERC
85 FERC P 61,023, 1998 WL 683334 (F.E.R.C.)
**(Cite as: 85 FERC P 61023,  1998 WL 683334 (F.E.R.C.))**
H

**1 Commission Opinions, Orders and Notices
Southern California Edison Company
Docket No. EL98-34-000
Order Dismissing Petition for Declaratory Order
(Issued October 2, 1998)
*61067 Before Commissioners: James J. Hoecker, Chairman; Vicky A. Bailey,
William L. Massey, Linda Breathitt, and Curt H (acute)ebert, Jr.
Introduction
   Southern California Edison Company (SoCal Edison) has filed a petition for a
declaratory order (Petition), requesting that the Commission rule that the
Sacramento Municipal Utility District (SMUD) remains bound by two pre-existing
contracts with SoCal Edison, and that these contracts have not been abrogated by
certain events (related to electric restructuring) that have transpired in
California. For the reasons stated below, we will exercise our discretion and
allow the contractual dispute to be decided in a California state court.
Background
   SoCal Edison has been selling capacity and associated energy to SMUD under two
Power Sale Agreements (PSAs) since January 1990 *61068 and October 1994,
respectively. [FN1] As a consequence of electric restructuring in California and
SoCal Edison's alleged resulting inability to fulfill its contractual
obligations to sell capacity to SMUD (because SoCal Edison has divested its
generation and instead must purchase through the CPX), [FN2] SMUD took the
position that it was entitled to abrogate its contracts with SoCal Edison.
Accordingly, SMUD filed a notice of termination of the PSAs with SoCal Edison on
March 20, 1998 and filed an action in a California state court on April 24, 1998
seeking to abrogate the contracts. [FN3] In anticipation of SMUD's efforts to
terminate the PSAs, [FN4] SoCal Edison filed its Petition with the Commission on
March 18, 1998.
   Notice of the SoCal Edison's Petition was published in the Federal Register,
63 Fed. Reg. 17,832 (1998), with comments, protests, and interventions due on or
before April 24, 1998.
   A timely motion to intervene was filed by Northern California Power Agency
(NCPA) and a timely motion to intervene, protest, and answer was filed by SMUD.
On May 5, 1998, SMUD filed a supplement to its answer. On May 11, 1998, SoCal
Edison filed an answer to SMUD's pleading. On May 26, 1998, SMUD filed a reply
to SoCal Edison's answer. On July 27, 1998, SoCal Edison filed a letter,
advising the Commission that the California Superior Court for Sacramento County
had issued a stay of SMUD's action in state court pending Commission action in
this proceeding.
Discussion
   Procedural Matters
   Pursuant to Rule 214 of the Commission's Rules of Practice and Procedure, 18
C.F.R. § 385.214 (1998), the timely, unopposed motions to intervene of NCPA and
SMUD serve to make them parties to this proceeding.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

85 FERC P 61,023
**(Cite as: 85 FERC P 61023, \*61068,  1998 WL 683334, \*\*1 (F.E.R.C.))**

Jurisdictional Issues

SMUD takes the position that the Petition should be rejected or held in abeyance pending the outcome of the litigation before the California state court. SMUD argues that, under the Commission's precedent, [FN5] the Commission shares concurrent jurisdiction with the state court as to whether, under the terms of the parties' agreements, SoCal Edison remains capable of meeting its contractual obligations to sell capacity to SMUD, and that this matter would more appropriately be decided in the state court. SMUD argues that this matter involves questions of contractual interpretation that: (1) California courts are as competent to resolve as is the Commission; (2) do not require uniform interpretation; and (3) are not important in relation to the Commission's regulatory responsibilities. SMUD also argues that SoCal Edison's position in this matter is contradicted by the position that SoCal Edison advanced in an analogous case, Portland General.

**\*\*2** SoCal Edison does not dispute that the Commission shares concurrent jurisdiction with California state courts over this matter. SoCal Edison argues, however, that it is important that the Commission decide this matter because: (1) the Commission has special expertise over the issues present in this proceeding; (2) there is a need for the Commission to adopt a uniform regulatory policy regarding industry restructuring; (3) the issues in this proceeding are central to the Commission's regulatory responsibilities; and (4) the issues involved in this case are distinguishable from those in Portland General.

As we stated in Portland General, 72 FERC at p. 61,021, we are guided in this decision by Arkla, wherein we devised a three-part test for deciding whether to assert primary jurisdiction over a contractual matter that otherwise would be subject to state court jurisdiction. The Commission there stated (7 FERC at p. 61,322) as follows:

Whether the Commission should assert jurisdiction over contractual issues otherwise litigable in state courts depends, we think, on three factors. Those factors are: (1) whether the Commission possesses some special expertise which makes the case peculiarly appropriate for Commission decision; (2) whether **\*61069** there is a need for uniformity of interpretation of the type of question raised in the dispute; and, (3) whether the case is distant in relation to the regulatory responsibilities of the Commission.

Applying this test to the present proceeding, we find, first, that we do not possess special expertise in this particular subject matter. The construction of the specific contractual language at issue, to determine whether, under the terms of the parties' agreements, SoCal Edison remains capable of meeting its contractual obligations to sell capacity to SMUD, is a narrow question over which the Commission holds no special expertise. We reject SoCal Edison's assertion that resolution of this narrow issue calls into review broader issues relating to the Commission's "oversight of the restructuring of the electric industry in California." [FN6] In our view, the issue here involves a narrower, more fact- specific determination, based on the terms of the agreements between SoCal Edison and SMUD.

It is true that the California restructuring has changed the California electric industry significantly and that these changes may have an impact on many pre-restructuring contracts, some of which may involve jurisdictional

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

85 FERC P 61,023
**(Cite as: 85 FERC P 61023, \*61069,  1998 WL 683334, \*\*2 (F.E.R.C.))**

services and others that may not. The Commission, in fact, already has spoken to the more general question of whether nationwide restructuring initiatives (and, to a more limited extent, restructuring in California) have so significantly changed the electric industry that pre-restructuring contracts should generally be abrogated, finding that restructuring does not warrant a "a generic abrogation of existing contracts." [FN7] However, this generic determination that contracts will not be abrogated in no way forecloses the possible abrogation of particular contracts based on the specific circumstances involved in a particular contractual dispute between specific parties.

**\*\*3** Second, we find that the Commission's responsibilities do not require a uniform interpretation of the contractual language at issue here. To paraphrase our discussion in Portland General, 72 FERC at p. 61,022, an interpretation of this particular contract language by California courts, even if different from that of other state courts' interpretations of other contractual language, will not impinge significantly on the operations of public utilities across the Nation. Indeed, it is likely that the disputed issues are unique to the PSAs, and that resolution of the contractual dispute will have no impact beyond the parties involved.

Third, we find that resolution of this case is  distant from the regulatory responsibilities of the Commission. The parties to power sales contracts regularly define the terms and conditions of services to be provided under their contracts, and we generally allow them to do so freely. Therefore, whether SoCal Edison remains capable of meeting its contractual obligations under the PSAs, is not a question central to the Commission's responsibilities.

For these reasons, we decline jurisdiction and  dismiss SoCal Edison's Petition. However, we encourage the parties in this matter, as we encourage all parties generally, to communicate with each other informally and make best efforts to resolve their differences in a mutually agreeable manner. [FN8] We are aware that the parties here already have had some discussions, but so far apparently have been unable to resolve their differences. [FN9] We encourage them to continue their efforts. We are hopeful that, in light of our decision here, they may yet be able to resolve the issues between them.

The Commission orders:

SoCal Edison's petition for a declaratory order is hereby dismissed.

Commissioner Massey dissented with a separate statement attached.

William L. M'SCassey, C'ECommissioner,  dissenting:

I respectfully dissent from this order. I would have preferred an order that took jurisdiction of this petition for declaratory order and set it for a formal hearing before an Administrative Law Judge.

Southern California Edison Company (SoCal Edison) filed this petition asking the Commission to rule that Sacramento Municipal Utility District (SMUD) cannot terminate two power sales agreements that were entered into with SoCal Edison before the California restructuring. SMUD filed to terminate these contracts last March and also filed an action in California state court to abrogate these same contracts. This action is stayed pending Commission action in this docket.

In essence, SMUD alleges a sea change in circumstances since these contracts were entered **\*61070** into. SMUD is referring to SoCal Edison's divestiture of generation and the establishment of a competitive electric market in California.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

85 FERC P 61,023
**(Cite as: 85 FERC P 61023, \*61070,  1998 WL 683334, \*\*3 (F.E.R.C.))**

   Specifically, SMUD argues that SoCal Edison is unable to perform its obligations under the terms of the power sales agreements. The agreements provide for SoCal Edison to provide contract capacity and associated energy from SoCal Edison's system, which SMUD argues is now impossible since SoCal Edison must sell all owned generation into the California power exchange. Further, the pricing provision of the 1988 power sale agreement is tied to SoCal Edison's actual costs of natural gas or oil utilized in its gas-fired generating plants, and now, because SoCal Edison soon will have divested all of these units, SMUD contends that the pricing provisions of this agreement fail. While there are other terms of the agreements in dispute, these two clearly point to the involvement of the restructuring of the California market that this Commission is overseeing.

**\*\*4** SoCal Edison asks that the Commission take jurisdiction and rule that SMUD should remain bound to its arrangements. It specifically requests that this Commission rule since this matter is one of generic applicability and is in the Commission's expertise.

   The majority's order declines to take jurisdiction. It applies the three-part test devised in Arkansas Louisiana Gas Co. v. Hall [FN1] and finds that: (1) the Commision does not possess special expertise in this matter; (2) the dispute does not require a uniform interpretation of the contractual language at issue; and (3) the resoluion of this issue is distant from the regulatory responsibilities of the Commission.

   When I apply this same three-part test, on balance I arrive at a different conclusion. I believe the Commission does possess a special expertise in this area. Central to this dispute are the facts surrounding the restructuring of the wholesale electricity market in California. This Commission has been thoroughly involved with the establishment of the California ISO and PX.

   As to whether this matter requires uniform interpretation, a strong argument can be made that this matter may have generic applicability. Parties who have similar contracts will be better served if this Commission, with its understanding of the complexities of wholesale market restructuring in general and the power exchange in particular, hears the arguments and rules on the dispute.

   Finally, I do not believe that the resolution of this issue is distant from our regulatory responsibilities. The Commission's primary focus in the last three years has been the establishment of a competitive electric wholesale market. This dispute is not purely a local matter involving primarily local interests. It involves the interface among pre-existing contracts, divestiture, and sales through the power exchange, a FERC jurisdictional entity.

   In sum, I would assert jurisdiction over this matter and set it for hearing because there are facts in dispute. The issues raised by the parties are clearly within our expertise and are relevant to the Commission's electric policy. Therefore, I respectfully dissent.

   FN1     The first PSA, entered on August 10, 1988, involves the sale by SoCal Edison to SMUD of up to 700 MW of capacity, from January 1990 through December 1999. See Appendix A to Petition. SoCal Edison currently makes 200 MW of capacity available to SMUD under this PSA. SMUD Answer at 11. The second PSA, entered on August 31, 1994, involves the sale of various levels of capacity,

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

85 FERC P 61,023
**(Cite as: 85 FERC P 61023, \*61070,  1998 WL 683334, \*\*4 (F.E.R.C.))**

ranging from 50MW to 200 MW, from October 1994 through December 1999. See Appendix B to Petition.

FN2    Specifically, the Public Utilities Commission of the State of California (California Commission) required SoCal Edison to divest its generating units and instead purchase its energy requirements from, and sell energy to, the California Power Exchange Corporation (CPX).

FN3    Case No. 98AS02152 before the Sacramento County, California, Superior Court. See attachment to SMUD's Supplemental Answer.

FN4    SoCal Edison apparently was aware, from communications between the parties, that SMUD intended to take steps to abrogate the PSAs.

FN5    See, e.g., Arkansas Louisiana Gas Company v. Hall, 7 FERC P 61,175, at pp. 61,323-24, reh'g denied, 8 FERC P 61,031 (1979) (Arkla); accord, Portland General Electric Company, 72 FERC P 61,009, at pp. 61,021- 22 (1995) (Portland General).

FN6    SoCal Edison Petition at 15.

FN7    See Pacific Gas and Electric Company, et al., 81 FERC P 61,122, at p. 61,470 (1997). With respect to restructuring in California specifically, the Commission found that pre-restructuring transmission contracts need not be abrogated generically. See id.

FN8    See, e.g., Interstate Power Company, 75 FERC P 61,321, at p. 62,022 (1996); Alabama Power Company, 75 FERC P 61,233, at p. 61,769 (1996).

FN9    See SMUD motion to intervene at 15-16.

FN1    7 FERC P 61,175, reh'g denied, 8 FERC P 61,031 (1979).

Federal Energy Regulatory Commission
 85 FERC P 61,023, 1998 WL 683334 (F.E.R.C.)
END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# TAB 30

52 Fed.Appx. 589                                                     **Page 73**
52 Fed.Appx. 589, 2002 WL 31648372 (3rd Cir.(Pa.))
**(Cite as: 52 Fed.Appx. 589, 2002 WL 31648372 (3rd Cir.(Pa.)))**

**Briefs and Other Related Documents**

This case was not selected for publication in the Federal Reporter.

NOT PRECEDENTIAL

Please use FIND to look at the applicable circuit court rule before citing this opinion. Third Circuit Local Appellate Rule 28.3(a) and Internal Operating Procedure 5.3. (FIND CTA3 Rule 28.0 and CTA3 IOP APP I 5.3.)

United States Court of Appeals,
Third Circuit.
**Tonya JOHNSON, Appellant,**
v.
**HOUSING AUTHORITY OF THE CITY OF PITTSBURGH.**
No. 02-1490.

Submitted Nov. 19, 2002.
Decided Nov. 25, 2002.

On Appeal from the United States District Court for the Western District of Pennsylvania. D.C. Civil No. 01-cv-01216. District Judge: The Honorable Donetta W. Ambrose.

Before BARRY, AMBRO, Circuit Judges, and ACKERMAN, [FN*] District Judge.

> FN* The Honorable Harold A. Ackerman, United States District Judge for the District of New Jersey, sitting by designation.

OPINION

BARRY, Circuit Judge.

**\*\*1** Appellant Tonya Johnson filed a petition pursuant to Chapter 7 of the United States Bankruptcy Code on January 12, 2001. Twelve days later, on January 24, Johnson applied to appellee Housing Authority of the City of Pittsburgh ("HACP" or "the Housing Authority") for public housing. On February 16, HACP rejected her application because she owed HACP rent from her public housing tenancy six years earlier. In response, Johnson filed a motion for contempt against HACP in the United States Bankruptcy Court for the Western District of Pennsylvania, claiming that HACP's denial of her public housing

application because she owed back rent violated the Bankruptcy Code. She sought, as well, an order requiring the immediate approval of her housing application, damages, and attorneys' fees.

In an Order dated May 16, 2001, the Bankruptcy Court held that HACP's denial of Johnson's application on the basis of her debt for past rent violated 11 U.S.C. § 525(a), which prohibits, *inter alia,* government discrimination against a debtor on the basis of unpaid dischargeable debts, and also violated the automatic stay granted by 11 U.S.C. § 362(a). The Bankruptcy Court ordered that HACP immediately accept Johnson's application for public housing retroactive to the date of Johnson's original application, but expressly declined to hold HACP in contempt. The Bankruptcy Court then went on to state:

> **\*590** The preceding holding notwithstanding, the Court also recognizes, and shares as well, the concern of the Housing Authority that the potential exists for a debtor to file for bankruptcy not with the intent of obtaining a discharge of debts but simply so as to obtain public housing assistance. To counter the preceding concern, which were it to be realized would constitute an abuse of bankruptcy process, the Court rules that the Housing Authority can, without fear of violating either the automatic stay or § 525(a), delay acceptance of a bankrupt debtor's public housing application until the conclusion of that debtor's § 341 creditor's meeting....

Because Johnson's creditors' meeting had already been held at the time the May 16 Order was issued, however, the above-quoted statement had no effect on her case.

It is that statement, however, which was the sole basis of her appeal to the District Court and the appeal to this Court. Thus, although HACP granted Johnson's public housing application on June 20 in accordance with the Bankruptcy Court's Order, Johnson appealed to the District Court on the narrow question of whether the Bankruptcy Court had erred in stating that the Housing Authority may delay acceptance of "a bankrupt debtor's" public housing application until completion of the section 341 creditor's meeting. In an Order and Opinion dated December 5, 2001, the District Court found that the only part of the May 16 Order that was appealed by Johnson--the statement--was moot. Surprisingly, the District Court affirmed the Order of the Bankruptcy Court rather than dismissing the

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

appeal as moot, and Johnson filed a timely notice of appeal. We will dismiss the appeal.

**2 We agree with the District Court that Johnson's appeal to it was moot because she had obtained the public housing she sought and the resolution of the issue she raised on appeal could have had no effect on her case or her legal rights. *See County of Morris v. Nationalist Movement,* 273 F.3d 527, 533 (3d Cir.2001) ("[T]he requirement that an action involve a live case or controversy extends through all phases of litigation, including appellate review."). For the same reasons, her appeal to this Court is moot. The only issue on appeal, both to the District Court and to us, was the Bankruptcy Court's statement, which was nothing more than an advisory opinion, concerning the propriety of delaying *future* debtors' housing applications, mere dicta which had no relevance to or effect upon the already resolved dispute between Johnson and HACP. *See McDonald v. Master Fin., Inc. (In re McDonald),* 205 F.3d 606, 608 (3d Cir.2000) (no appellate jurisdiction exists to review unauthorized advisory opinion issued by Bankruptcy Court); *see also McCord v. Agard (In re Bean),* 252 F.3d 113, 118 (2d Cir.2001). Stated somewhat differently, the "onerous restriction" Johnson seems to believe the Bankruptcy Court "put in place" for the future has no force and effect because it was not essential to the resolution of the issues before it and was not even before that Court for adjudication.

We will dismiss the appeal.

52 Fed.Appx. 589, 2002 WL 31648372 (3rd Cir.(Pa.))

**Briefs and Other Related Documents (Back to top)**

. 2002 WL 32817043T2 (Appellate Brief) Reply Brief of Appellant Tonya Johnson (Jul. 08, 2002)Original Image of this Document (PDF)

. 2002 WL 32817044T2 (Appellate Brief) Brief of Appellee Housing Authority of the City of Pittsburgh (Jun. 24, 2002)Original Image of this Document (PDF)

. 2002 WL 32817045T2 (Appellate Brief) Brief of Appellant Tonya Johnson (May. 20, 2002)Original Image of this Document with Appendix (PDF)

.                   02-1490                (Docket) (Feb. 28, 2002)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# TAB 31

Citation                    Found Document         Rank 1 of 1              Database
98 FERC P 61,342                                                            FEN-FERC
98 FERC P 61,342, 2002 WL 471197 (F.E.R.C.)
**(Cite as: 98 FERC P 61342,  2002 WL 471197 (F.E.R.C.))**
▷


FEDERAL ENERGY REGULATORY COMMISSION
**\*\*1** Commission Opinions, Orders and Notices
Before Commissioners: Pat Wood, III, Chairman; William L. Massey, Linda
Breathitt, and Nora Mead Brownell.
Kansas Gas Service
v.
Enbridge Pipelines KPC
Docket No. RP02-143-000
ORDER ON COMPLAINT
(Issued March 28, 2002)

   **\*62446** On January 2, 2002, Kansas Gas Service, a Division of OneOK, Inc.
(Kansas Gas Service) filed a complaint against Enbridge Pipelines KPC (KPC),
asking the Commission to find that KPC has violated its tariff and the Natural
Gas Act (NGA). We deny a part of the relief requested by the complainant,
finding that it presents a question of contract interpretation which is best
addressed in state court, and grant the complainant's request that we reaffirm
our earlier determination that we are not interpreting or nullifying that
contract.
Background
   Kansas Gas Service is a natural gas utility serving retail customers in
Kansas. [FN1] It is a transportation customer of KPC, an interstate pipeline.
KPC consists of three formerly instrastate pipelines, which the Commission found
in an order issued on November 2, 1995 to be a single interstate pipeline
subject to the Commission's jurisdiction. [FN2]
   Kansas Gas Service and KPC are parties to several contracts for natural gas
transportation that were entered into between 1988 and 1995 by the predecessors
in interest of Kansas Gas Service and KPC (the Pre-1995 Contracts). [FN3] At the
time that these contracts were executed, both sides were subject to the
jurisdiction of the Kansas Corporation Commission (KCC).
   Several disputes arose out of the performance of the Pre-1995 Contracts. To
resolve all of these disputes, on July 9, 1997, Kansas Gas Service and KPC,
assisted by the staff of the KCC, entered into a settlement (Global Settlement)
which amended the parties' existing contracts. The Global Settlement provided,
inter alia, that:
   1) The parties agreed to support a cost of service for KPC of $31 million
annually for four years, beginning on August 1, 1997.
   2) Kansas Gas Service would make a one-time payment of $7.4 million to KPC.
   3) KPC agreed to lower the rates it was charged under the Pre-1995 Contracts
as of the time of the Global Settlement, as follows:
   4) (a) Effective August 1, 1998, KPC agreed to reduce its Zone 3 reservation
charge to Kansas Gas Service.
   (b) For the fifth, sixth and seventh year after execution of the Global
Settlement, KPC would reduce its rates to Kansas Gas Service to "competitive"
levels (i.e., to the rates charged by KPC's competitor pipeline Williams Natural

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

98 FERC P 61,342
**(Cite as: 98 FERC P 61342, \*62446,  2002 WL 471197, \*\*1 (F.E.R.C.))**

Gas Company (Williams)).
    5) KPC agreed that for seven years it would not unilaterally file a new rate case, unless ordered to by the Commission.
    The Global Settlement was approved by the KCC after a hearing at which the parties discussed the meaning and intent of the terms of the Global Settlement. When asked whether the parties had an "implied duty" to "vigorously pursue FERC approval" of the Global Settlement, KPC replied that it was its intention "to implement anything the FERC needs to do," and that "we intend to vigorously pursue . . . **\*62447** and to obtain [FERC approval]." When asked if the Global Settlement would survive if it was not approved by the Commission, KPC replied that it would. The KCC approved the Global Settlement on July 29, 1997.
    **\*\*2** In an order issued on October 3, 1997, the Commission granted KPC a certificate and set rates for it based on a $28 million cost of service, which would have resulted in rates for Kansas Gas Service that were lower than those provided by the Global Settlement. [FN4] At that time, the Global Settlement was before the Commission for informational purposes only, and the Commission did not address the merits of the Global Settlement in the October 1997 Order.
    KPC sought rehearing and a stay of the effectiveness of the rates contained in the October 1997 Order. The Commission granted the stay on November 25, 1997, and allowed KPC to continue charging its prior rates pending the Commission's order on rehearing. [FN5] While rehearing was pending, KPC made a filing with the Commission stating that the Global Settlement was now final, and that KPC was required to seek implementation of its terms. KPC also, on February 27, 1998, filed a motion asking the Commission to approve, as initial rates for KPC's service to Kansas Gas Service, the rates contained in the Global Settlement, that were being charged as of August 1, 1997 (the motion rates), until KPC filed a rate case under Section 4 of the NGA. [FN6] The Commission granted rehearing on April 30, 1998 and allowed KPC to charge the motion rates until it filed a Section 4 rate case, which the Commission required it to do within sixteen months. [FN7]
    On August 7, 1998, KPC filed with the Commission copies of the Pre-1995 Contracts and the Global Settlement, asking the Commission to accept all of those contracts, including the Global Settlement, as nonconforming service agreements. [FN8] In its filing, however, KPC described the Global Settlement in what Kansas Gas Service considers to be "disparaging terms," including stating that rates therein did not reflect "FERC-approved ratemaking principles" and that the rate adjustments called for by the Global Settlement were outside the scope of discounts which KPC could grant to Kansas Gas Service without FERC approval. KPC subsequently stated, in a response to a protest filed by Kansas Gas Service, that the Global Settlement was "not a contract between [KPC] and [Kansas Gas Service]." [FN9]
    On April 2, 1999, the Commission issued an order granting rehearing of and clarifying its April 1998 Order. [FN10] In that order, it accepted the Pre-1995 Contracts as nonconforming service agreements. It did not accept the Global Settlement, however, for several reasons. The Commission stated that the settlement did not purport to be a contract amendment, but rather a settlement agreement of various regulatory and court proceedings. The Commission also noted that Kansas Gas Service and KPC disputed the interpretation of parts of the

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

98 FERC P 61,342
**(Cite as: 98 FERC P 61342, \*62447,  2002 WL 471197, \*\*2 (F.E.R.C.))**

Global Settlement. Finally, the Commission noted,
    we are concerned that the settlement, which was negotiated among the parties
in Kansas . . . to resolve many issues which were never before this Commission,
was approved by a state regulatory body . . . nevertheless purports to limit the
Commission's discretion in addressing rate and service issues for a company that
has never had its rates determined to be just and reasonable by this Commission
pursuant to the data standards for NGA Section 4 filings. . . . Under the
circumstances, we cannot find that accepting such a document as part of Kansas
Pipeline's tariff, even as part of a "nonconforming service agreement," is in
the public interest. [FN11]
    **\*\*3** Kansas Gas Service sought clarification of the Commission's order, asking
the Commission to clarify that it did not intend to modify, amend or interpret
the Global Settlement. On June 18, 1999, the Commission granted clarification,
stating that despite not having accepted the Global Settlement, the Commission
"did not intend to interpret the various provisions,**\*62448** nor did it intend to
void, or otherwise disturb, the [Global Settlement]." [FN12]
    Kansas Gas Service filed suit in state court in Johnson County, Kansas
asserting that KPC was not acting in good faith and had repudiated its
obligations under the Global Settlement. This litigation has been removed to
federal court and returned to state court twice. On October 15, 2001, the state
trial judge granted KPC's motion to dismiss, and Kansas Gas Service has now
filed an appeal of that state trial court's decision to the Kansas Court of
Appeals. Kansas Gas Service asserts that KPC has not charged Kansas Gas Service
the lower rates which, under the Global Settlement, it was obligated to charge
beginning on August 1, 2001. Kansas Gas Service has refused to pay the rates
charged by KPC, as a result of which KPC has filed an action in the U.S.
District Court for the District of Kansas seeking to recover amounts billed to
Kansas Gas Service. Should Kansas Gas Service elect to pay these amounts, the
KCC has refused to allow Kansas Gas Service to flow through to its retail
customers any of these amounts pending resolution of this matter.
Kansas Gas Service's Complaint
    Kansas Gas Service alleges in its complaint here that KPC has engaged in
unjust and unreasonable rate practices which violate its tariff and Section 4 of
the NGA, as follows.
    Actions regarding the rates charged by KPC. Kansas Gas Service argues that the
Pre-1995 Contracts, which are now nonconforming service agreements to KPC's FERC
tariff, all provide that, upon KPC's written agreement, KPC will charge an
amount less than the maximum transportation rate contained in the service
agreements, and that in the Global Settlement, KPC provided that agreement.
Kansas Gas Service alleges that KPC is thus in violation of the commitments it
made in the Global Settlement, because since the Commission's acceptance of
KPC's motion rates, KPC has continued to charge Kansas Gas Service the rates
specified by the Global Settlement effective August 1, 1997. KPC has not lowered
its Zone 3 Reservation charges to Kansas Gas Service, effective August 1, 1998,
and did not lower its rates to be comparable to those charged by Williams
beginning in August 2001, as the Global Settlement provided.
    Actions regarding the filing of the Global Settlement rates with the
Commission. Kansas Gas Service states that KPC did not file the Global

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

98 FERC P 61,342
**(Cite as: 98 FERC P 61342, \*62448,  2002 WL 471197, \*\*3 (F.E.R.C.))**

Settlement as an Offer of Settlement under Rule 602 of the Commission's Rules of Practice and Procedure, 18 C.F.R. § 385.602 (2001), and that KPC should have made such a filing, but instead, KPC "attacked" the Global Settlement and caused the Commission to view it in a negative light. Kansas Gas Service recognizes that KPC filed the Global Settlement, along with the Pre-1995 Contracts, with the Commission in its August 7, 1998 filing, and asked the Commission to accept both the Global Settlement and the Pre-1995 Contracts as nonconforming service agreements. Kansas Gas Service argues, however, that KPC made "only negative comments" about the Global Settlement and did nothing to support its acceptance and legitimacy, contrary to the commitment it had made in the Global Settlement.

  **\*\*4** Kansas Gas Service also alleges that in its February 27, 1998 motion, KPC only urged the Commission to adopt the rates which the Global Settlement provided would be charged effective August 1, 1997, without similarly urging the Commission to accept the lower rates which the Global Settlement provided would be charged as of August 1, 2001. Kansas Gas Service asserts that KPC has improperly invoked the Commission's acceptance of KPC's motion rates in its April 1998 Order to excuse its failure to charge the lower rates contained in the Global Settlement as a discounted or negotiated rate. KPC states that the absence of provisions for discounts in KPC's tariff does not prevent KPC from giving a discount to Kansas Gas Service under KPC's and Kansas Gas Service's nonconforming service agreements. [FN13] Kansas Gas Service also notes that since the rates contained in the Global Settlement fall between KPC's maximum and minimum rates, KPC can charge such lower rates without having to make any further filings. Finally, Kansas Gas Service asserts that KPC could also give effect to the Global Settlement rates as negotiated rates, if KPC made the necessary tariff filing to implement negotiated rates.

  Actions with regard to litigation between the parties. Kansas Gas Service states that KPC's tactics in the state court litigation between the parties have been disingenuous and abusive, and seek at all costs to avoid trial on the issues in state court. [FN14]

  Kansas Gas Service asks the Commission to determine that KPC's actions are not just and reasonable, and violate its FERC tariff and Section 4 of the NGA, and that KPC should **\*62449** take whatever steps necessary to implement the rates contained in the Global Settlement, whether considering them to be discounted or negotiated rates. Kansas Gas Service also asks the Commission to affirm that in its April 1999 Order, the Commission did not intend to void or modify the Global Settlement or adjudicate the issue of whether the Global Settlement amended the Pre-1995 Contracts; that Kansas Gas Service's claims for common law relief properly belong in state court; and that if Kansas Gas Service obtains the relief it seeks in state court, that will neither violate the filed rate doctrine nor impinge on the Commission's jurisdiction under the NGA.

Notice, Interventions and Comments

  Notice of Kansas Gas Service's complaint was published in the Federal Register, 67 Fed. Reg. 2425 (2002), with answers, comments, protests, and interventions due on or before January 30, 2002. Dynegy Marketing and Trade and Missouri Gas Energy filed timely motions to intervene, and the KCC filed a timely notice of intervention. On February 1, 2002, KPC filed an answer and a request that the Commission accept its answer two days out of time.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

98 FERC P 61,342
**(Cite as: 98 FERC P 61342, \*62449,  2002 WL 471197, \*\*4 (F.E.R.C.))**

Answer
   KPC states in its answer that Kansas Gas Service is arguing, in essence, that
KPC is violating the NGA by charging the rates contained in its tariff, which it
asserts is clearly an impossibility. KPC asserts that because all of Kansas Gas
Service's arguments turn on the Global Settlement, which is not part of KPC's
FERC tariff, resolution of a complaint based on it is outside of the
Commission's jurisdiction. According to KPC, Kansas Gas Service is seeking an
interpretation of the parties' rights and obligations under the Global
Settlement - namely, a contract interpretation, which is controlled by state law
and which may be provided by either the Commission or a state court. KPC argues
that, based on the criteria of Arkansas Louisiana Gas Co. v. Hall, [FN15] the
Commission should decline to exercise jurisdiction and decide this contract
question. KPC moves to dismiss Kansas Gas Service's complaint on this basis.
   **\*\*5** KPC also argues that when the Commission ruled in its April 1999 Order
that it would not accept the Global Settlement as a nonconforming service
agreement to KPC's tariff, Kansas Gas Service could have appealed that
determination. Instead, KPC states, Kansas Gas Service chose to seek relief in
state court. Thus, according to KPC, Kansas Gas Service is now forum-shopping
and seeking to avoid the consequences of that original choice.
Subsequent Pleadings
   On February 14, 2002, Kansas Gas Service filed an answer to KPC's motion to
dismiss and a motion for summary disposition. In its answer, Kansas Gas Service
states that KPC's answer does not address the core allegation of its complaint,
namely, that FERC's tariff now includes the Pre-1995 Contracts as rate
schedules, that the Pre-1995 Contracts provide that KPC will charge rates lower
than the maximum transportation charge as soon as KPC provides written
agreement, that the Global Settlement constitutes that written agreement, and
that thus, KPC's failure to lower its rates as set forth in the Pre-1995
Contracts constitutes a violation of its tariff. Kansas Gas Service argues that
the Arkla v. Hall test is inapplicable here, because only the Commission has
jurisdiction over claims asserted under the NGA, and Kansas Gas Service is
seeking relief only for claims under the NGA. [FN16] Kansas Gas Service also
states that it is not seeking reconsideration of the Commission's former orders,
but rather is seeking confirmation that the Commission did not intend to
adjudicate the Global Settlement. Kansas Gas Service also moves for summary
disposition on the basis that KPC has violated Rule 213(c) of the Commission's
Rules of Practice and Procedure, 18 C.F.R. § 385.213(c) (2001) by failing to
answer Kansas Gas Service's complaint by specifically admitting or denying each
material allegation of the complaint and by failing to set forth the defenses on
which it relies.
   On March 1, 2002, KPC filed an answer to Kansas Gas Service's motion for
summary disposition, stating that its answer complies with Rule 213(c). KPC
claims that Kansas Gas Service's claims are primarily legal in nature, and it is
therefore not necessary for KPC to provide facts or documents in response. KPC
also asserts that the general denials contained in its answer are not
inconsistent with Rule 213(c).
   Also on March 1, 2002, KPC filed a renewed motion to dismiss, again stating
that resolution of this complaint will require the Commission **\*62450** to make a

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

98 FERC P 61,342
**(Cite as: 98 FERC P 61342, *62450,  2002 WL 471197, **5 (F.E.R.C.))**

determination as to the rights and responsibilities of the parties under the
Global Settlement, which is not part of KPC's tariff, so this matter does not
lie within the Commission's exclusive jurisdiction. KPC further states that
nothing Kansas Gas Service has asserted defeats the fact that this matter does
not satisfy the Arkla v. Hall test for when the Commission should take
jurisdiction of a contract claim. [FN17] KPC also states that the rates to which
Kansas Gas Service claims it is entitled cannot be negotiated rates, because the
Commission did not give KPC the authority to charge negotiated rates, [FN18] and
also cannot be discounted rates because KPC's rates contain no minimum or
maximum rate to create a band within which discounted rates could be charged.
Discussion
A. Procedural Matters
**6 Pursuant to Rule 214 of the Commission's Rules of Practice and Procedure,
18 C.F.R. § 385.214 (2001), the notices of intervention and timely, unopposed
motions to intervene of the parties serve to make them parties to this
proceeding.
   KPC states that good cause exists to accept its answer late, in part because a
severe ice storm occurred in the Midwest which caused power outages in parts of
Kansas and hampered the ability of Washington and Kansas counsel to exchange
drafts. KPC also notes that Kansas Gas Service does not oppose acceptance of the
late-filed answer. The Commission will accept KPC's answer to the complaint for
good cause shown.
   B. Complaint
   We deny Kansas Gas Service's request that we determine that KPC's actions are
not just and reasonable, and violate its FERC tariff and Section 4 of the NGA,
and that KPC should take whatever steps necessary to implement the rates
contained in the Global Settlement. We grant Kansas Gas Service's request that
we affirm that in our April 1999 Order, the Commission did not intend to void or
modify the Global Settlement or adjudicate the issue of whether the Global
Settlement amended the Pre-1995 Contracts, and that if Kansas Gas Service
obtains the relief it seeks in state court, that will neither violate the filed
rate doctrine nor impinge on the Commission's jurisdiction under the NGA.
   1. With regard to the relief that we deny, Kansas Gas Service makes two
arguments. First, it argues that KPC breached the obligation contained in the
Global Settlement to vigorously support the Global Settlement before the
Commission and do whatever was required to obtain the Commission's acceptance of
the Global Settlement rates. Second, Kansas Gas Service argues that (a) the
Pre-1995 Contracts all provide that upon KPC's written agreement, an amount less
than the maximum transportation charges will be charged, (b) the Global
Settlement constitutes that "written agreement" by KPC, (c) the Pre-1995
Contracts have been made part of KPC's FERC gas tariff as nonconforming service
agreements, and therefore (d) KPC is in violation of its FERC tariff by failing
to charge less than the maximum rate.
   Kansas Gas Service seeks to distinguish between its claims as to KPC's
violations of the Global Settlement, which it asserts are pending in state
court, and its claims that KPC has violated its FERC tariff and the NGA, which
Kansas Gas Service asserts are properly before this Commission. But in fact,
each of the two arguments above turns on the meaning of the Global Settlement.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

98 FERC P 61,342
**(Cite as: 98 FERC P 61342, \*62450,  2002 WL 471197, \*\*6 (F.E.R.C.))**

To resolve the first argument, it will be necessary to determine what commitment the parties understood KPC to make to vigorously support the Global Settlement before this Commission when it entered into the Global Settlement. To resolve the second argument, it will be necessary to determine (a) what the parties intended in the Pre-1995 Contracts when they stated that "upon written agreement" KPC would lower its rates, and (b) whether the parties intended the Global Settlement to be the "written agreement" that would trigger the requirement to lower the rates contained in the Pre-1995 Contracts. These are questions of contract interpretation which can be as well or better resolved in state court, where Kansas Gas Service is already pursuing such relief, as before this Commission.

**\*\*7** As KPC points out, in Arkla v. Hall, the Commission established a three-part test for determining when it should assert primary jurisdiction over a contract dispute that could otherwise be subject to the jurisdiction of another forum:

Whether the Commission should assert jurisdiction over contractual issues otherwise litigable **\*62451** in state courts depends, we think, on three factors. Those factors are: (1) whether the Commission possesses some special expertise which makes the case peculiarly appropriate for Commission decision; (2) whether there is a need for uniformity of interpretation of the type of question raised in the dispute; and, (3) whether the case is important in relation to the regulatory responsibilities of the Commission. [FN19]

The Commission finds that under this test, it should not take jurisdiction of this contract dispute. The Commission does not possess special expertise as to what the parties intended when they negotiated the Global Settlement with the assistance of the KCC. There is no need for uniformity of interpretation of the type of question raised here, since the parties have not alleged that there are other agreements so similar to the Global Settlement that there would be a need for uniform interpretation. And this matter, while clearly of great significance to the parties, is not important in relation to the regulatory responsibilities of the Commission.

2. With regard to the relief that we grant, we note that, as Kansas Gas Service pursues its state court remedies in the Kansas Court of Appeals, it may be of assistance to that court for us to make clear that we view the interpretation of the parties' rights and obligations under the Global Settlement as a matter to be considered in state court. The Commission does not now and has not previously interpreted the Global Settlement. [FN20] We also state that a ruling by the state court interpreting the parties' intent in the Global Settlement would not violate the filed rate doctrine and would not infringe on the Commission's jurisdiction.

In its dismissal of Kansas Gas Service's state court action, [FN21] the trial court addressed a possible conflict between the state court's ruling and the filed rate doctrine, noting that "[w]hile certain contractual provisions may be interpreted and even enforced in court actions, that cannot be done when it would violate the filed-rate doctrine." [FN22] The trial court was similarly concerned that a judgment under state law might conflict with federal law, if the state court issued a ruling and then either Kansas Gas Service or KPC might be left "unable to comply both with the ultimate judgment in this case and with

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

98 FERC P 61,342
**(Cite as: 98 FERC P 61342, \*62451,  2002 WL 471197, \*\*7 (F.E.R.C.))**

federal regulatory laws or orders." [FN23]

    In our view, however, neither of these problems are likely to arise in this
particular case. The Pre-1995 Contracts were made a part of KPC's tariff as
filed with the Commission; thus, whatever rate the Pre-1995 Contracts require to
be charged is, in fact, the filed rate. If a state court should determine that
the Pre-1995 Contracts provide that upon KPC's written agreement, an amount less
than the maximum transportation charges will be charged, and that the Global
Settlement constitutes that written agreement, then that lower rate will be
KPC's filed rate for service to Kansas Gas Service. If, on the other hand, the
state court determines that the Pre-1995 Contracts (as modified by the Global
Settlement, or otherwise) do not require KPC to lower its rates to Kansas Gas
Service, then the lower rates sought by Kansas Gas Service will not become the
filed rate under the Pre-1995 Contracts.

    **\*\*8** Similarly, no filed rate problem would appear to occur if the state court
should find that KPC is in breach of its obligations under the Global Settlement
to vigorously seek FERC approval of the Global Settlement. If the court should
grant monetary damages to Kansas Gas Service, the filed rate would remain at its
current level, and any damages paid would be outside of the rate paid for
transportation by Kansas Gas Service to KPC. If, on the other hand, the court
should require KPC to take some specific action that would change the filed
rate, then KPC would need to seek Commission **\*62452** approval prior to
implementing such a change.

The Commission orders:

    The Commission denies Kansas Gas Service's complaint in part and grants it in
part, as discussed above.

By the Commission.

(SEAL)

Magalie R. Salas,
Secretary.

    FN1. Kansas Gas Service is the successor to the natural gas distribution
business that was previously operated by Western Resources, Inc.

    FN2. Kansas Pipeline Company, et al., 72 FERC ¶ 61,160 at 61,484-85  (1995).

    FN3. Several of these contracts were initially for sales and transportation,
but they have been converted so that all the Pre-1995 Contracts are now
transportation-only. Complaint at 9.

    FN4. Kansas Pipeline Company, et al., 81 FERC ¶ 61,005 (1997) (the October
1997 Order).

    FN5. Kansas Pipeline Company, et al., 81 FERC ¶ 61,250 (1997).

    FN6. 15 U.S.C. § 717c (1982).

    FN7. Kansas Pipeline Company, et al., 83 FERC ¶ 61,107 (1998) (the April 1998
Order).

    FN8. A nonconforming agreement is one that deviates materially from the Form
of Service Agreement and the tariff, so that it must be filed for Commission
review. See Tennessee Gas Pipeline Company, 97 FERC ¶ 61,225 (2001).

    FN9. Kansas Gas Service argues that these assertions were in conflict with
KPC's statements to the KCC in July 1997, when the KCC was in the process of
approving the Global Settlement. At that time, according to Kansas Gas Service,
KPC expressly stated that "[a] settlement agreement is a contract" and it was

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

98 FERC P 61,342
**(Cite as: 98 FERC P 61342, \*62452,  2002 WL 471197, \*\*8 (F.E.R.C.))**

"binding . . . on KPC." Complaint at 17. KPC does not dispute this claim.
  FN10. Kansas Pipeline Company, et al., 87 FERC ¶ 61,020 (1998) (the April 1999
Order).
  FN11. April 1999 Order, 87 FERC at 61,066-67.
  FN12. Kansas Pipeline Company, et al., 87 FERC ¶ 61,329 at 61,282 (1999).
  FN13. Kansas Gas Service here is presumably referring to the Pre-1995
Contracts.
  FN14. Kansas Gas Service states here that the relief it seeks before the
Commission is not the same as the relief it is seeking in its state court
litigation. According to Kansas Gas Service, its contract and fraud claims in
state court are based on KPC's conduct, whereas its claims in this complaint are
based on KPC's tariff and Section 4 violations.
  FN15. 7 FERC ¶ 61,175, reh'g denied, 8 FERC ¶ 61,031 (1979) (Arkla v. Hall).
  FN16. Kansas Gas Service does, however, ask the Commission to find that Arkla
v. Hall applies to the relief that Kansas Gas Service is seeking in state court.
  FN17. In Kansas Gas Service's February 14 answer, Kansas Gas Service claimed
for the first time that it is seeking relief under both Section 4 of the NGA and
Section 5, 15 U.S.C. § 717d (1982). KPC asserts that good cause exists, if
necessary, to permit it to answer new claims by Kansas Gas Service.
  FN18. See April 1999 Order, 87 FERC at 61,068-69 ("Kansas Pipeline does not
have negotiated rate authority").
  FN19. Arkla v. Hall, 7 FERC at 61,322, reh'g denied, 8 FERC ¶ 61,031  (1979).
Accord, American Ref-Fuel Company of Niagara, L.P. v. Niagara Mohawk Power
Corporation, 97 FERC ¶ 61,158 at 61,601 (2001) and cases cited therein.
  FN20. We also note that there are currently two ongoing proceedings before the
Commission involving the appropriate rates for KPC to charge Kansas Gas pursuant
to its tariff and the NGA. Concurrently with this order, in Docket No.
CP96-152-029, the Commission is issuing an order denying rehearing of our order
on remand (Kansas Pipeline Company, 97 FERC ¶ 61,168 (2001)) in which we
reaffirm our decision to accept KPC's motion rates as its initial rates. In a
separate proceeding, Docket No. RP99-485-000, KPC filed a Section 4 case
proposing a general rate increase, which the Commission accepted and suspended
to take effect on March 1, 2000, subject to refund and the outcome of a hearing.
To date, however, KPC has not moved the rates it proposed in this Section 4
filing into effect, so its initial rates are still in effect. An initial
decision on the rate case was issued on July 31, 2001 (Kansas Pipeline Company,
96 FERC ¶ 63,014 (2001)), which is pending Commission review. Kansas Gas Service
has been an active participant in both these proceedings.
  FN21. See Exhibit M to Complaint, Journal Entry of Final Judgment, OneOK, Inc.
d/b/a Kansas Gas Service Company v. Kansas Pipeline Company, Case No. 99C06574
(District Court of Johnson Co., KS, Civil Court Department, October 15, 2001).
  FN22. Exhibit M at 11.
  FN23. Exhibit M at 20.
 98 FERC P 61,342, 2002 WL 471197 (F.E.R.C.)
END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# TAB 32

162 B.R. 935                                                                                                    **Page 114**
162 B.R. 935, 30 Collier Bankr.Cas.2d 947, Bankr. L. Rep. P 75,670
**(Cite as: 162 B.R. 935)**
**H**

United States Bankruptcy Court,
S.D. New York.
**In re KEENE CORPORATION, Debtor.
KEENE CORPORATION, Plaintiff,
v.
ACSTAR INSURANCE CO., Amwest Surety
Insurance Co., Citibank, N.A., Continental
Bank, N.A., Lumbermans Mutual Casualty Co.,
St. Paul Fire and Marine Insurance
Co. a/k/a St. Paul/Seaboard, Shawmut Bank,
N.A., and John Does 1 through 100,
Defendants.
Bankruptcy No. 93 B 46090 (SMB).
Adv. Proc. No. 93-9987.**

Jan. 4, 1994.

Chapter 11 debtor moved for temporary restraining order (TRO) and preliminary injunction prohibiting final judgment creditors in asbestos litigation from satisfying their judgments from proceeds of appeal bonds or escrows. After issuing TRO, the Bankruptcy Court, Stuart M. Bernstein, J., held that: (1) automatic stay did not prevent final judgment creditors from enforcing judgments against appeal bonds or escrows, and (2) debtor failed to establish interference with reorganization process that would warrant injunction.

Order vacated, and motion denied.

West Headnotes

**[1] Bankruptcy ⟨⟩2395**
51k2395
Automatic stay precluded banks that had issued letters of credit to back appeal bonds in connection with debtor's appeal of asbestos litigation judgments from enforcing their rights against collateral securing debtor's reimbursement obligation. Bankr.Code, 11 U.S.C.A. § 362.

**[2] Bankruptcy ⟨⟩2395**
51k2395
Automatic stay precluded asbestos litigation judgment creditors from enforcing their final judgments against Chapter 11 debtor's property. Bankr.Code, 11 U.S.C.A. § 362.

**[3] Bankruptcy ⟨⟩2395**
51k2395
Automatic stay prevents adverse, nonfinal judgment from becoming final and triggering judgment creditor's right to payment from surety or escrow agent in connection with appeal bonds provided by debtor.

**[4] Bankruptcy ⟨⟩2395**
51k2395
Whether action is "against the debtor" and in violation of automatic stay is determined by examining proceeding at time that it is initiated, and not by who has appealed; if action was commenced against debtor, appeal is stayed even though debtor is appellant. Bankr.Code, 11 U.S.C.A. § 362.

**[5] Bankruptcy ⟨⟩2395**
51k2395
Creditor holding nonfinal judgment as of petition date cannot obtain final judgment or enforce claim against estate property absent relief from automatic stay. Bankr.Code, 11 U.S.C.A. § 362.

**[6] Bankruptcy ⟨⟩2395**
51k2395
Automatic stay does not prevent final judgment creditors from enforcing their judgments against appeal bonds. Bankr.Code, 11 U.S.C.A. § 362.

**[7] Bankruptcy ⟨⟩2535(3)**
51k2535(3)
Debtor retains reversionary interest in appeal bond subject to divestiture if debtor is unsuccessful once appeal process has been completed.

**[8] Bankruptcy ⟨⟩2535(3)**
51k2535(3)
Debtor does not have interest in appeal bond that is estate property if debtor's appeal has been completed prepetition and debtor has been divested of its reversionary interest.

**[9] Bankruptcy ⟨⟩2392**
51k2392

**[9] Bankruptcy ⟨⟩2558**
51k2558
Proceeds from letters of credit issued by Chapter 11 debtor's banks and which debtor collateralized with its own property were not estate property, and automatic stay did not preclude surety from drawing on proceeds of letter of credit if it paid judgment or judgment debtor demanded payment; letter of credit was independent third-party obligation, and

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

proceeds were not debtor's property, even if letter of credit was secured by debtor's property. Bankr.Code, 11 U.S.C.A. § 362.

**[10] Bankruptcy** ☜2392
51k2392

**[10] Bankruptcy** ☜2535(3)
51k2535(3)
Escrows securing New York final judgments against Chapter 11 debtor in connection with asbestos litigation were not estate property protected by automatic stay; any reversionary interest debtor had in escrow was divested once judgments became final. Bankr.Code, 11 U.S.C.A. § 362.

**[11] Deposits and Escrows** ☜11
122Ak11
Deposit arrangements constituted "escrows" under New York law, where Chapter 11 debtor and judgment creditors agreed that debtor would deliver funds to depository bank to secure payment of final judgment, agreement was intended to substitute for supersedeas bond arrangement, and debtor delivered funds to bank on condition that they would be paid to judgment creditor to extent that judgment became final and would be paid to debtor if debtor prevailed on appeal or if debtor paid judgment from other funds.

**[12] Deposits and Escrows** ☜18.1
122Ak18.1
Under New York law, delivery of fund of money into escrow creates equitable interest in favor of grantee and places funds beyond reach of grantor's creditors.

**[13] Deposits and Escrows** ☜18.1
122Ak18.1
Under New York law, once contingency in escrow agreement occurs, grantor's legal title merges with grantee's equitable title, and passes to grantee by operation of law, which divests grantor of any further interest.

**[14] Bankruptcy** ☜2395
51k2395
Enforcement of final judgments against sureties and escrow agents that provided appeal bonds and held funds and had independent contractual obligations based Chapter 11 debtor's asbestos litigation appeals could not be considered actions against debtor that would violate automatic stay. Bankr.Code, 11 U.S.C.A. § 362.

**[15] Bankruptcy** ☜2396
51k2396
Automatic stay is deemed to extend to actions against third parties if there is identity of interest between debtor and third party that makes judgment against third party effectively judgment or finding against debtor. Bankr.Code, 11 U.S.C.A. § 362.

**[16] Bankruptcy** ☜2367
51k2367
Debtor seeking injunctive relief based on bankruptcy court's equitable powers need not show irreparable harm; rather, court can enjoin activity that threatens reorganization process or impairs court's jurisdiction with respect to case. Bankr.Code, 11 U.S.C.A. § 105.

**[17] Bankruptcy** ☜2368
51k2368
Chapter 11 debtor asbestos litigation defendant seeking injunction preventing enforcement of final judgments against appeal bonds and escrows and preventing sureties from drawing proceeds of letters of credit failed to establish that injunction was necessary to prevent interference with reorganization process, where debtor's sole prepetition business was carrying on asbestos-related litigation, and enforcement of judgments was consistent with prepetition settlement requiring debtor to pay all final judgment creditors. Bankr.Code, 11 U.S.C.A. § 105.

**[18] Bankruptcy** ☜2367
51k2367
Chapter 11 debtor asbestos litigation defendant seeking injunction preventing enforcement of final judgments against surety bonds failed to establish that enforcement would improperly elevate judgment claims from contingent to secured based on fact that if surety satisfied judgment and drew proceeds from letter of credit, bank issuing letter would hold secured claim against debtor's property; debtor elevated the claims when it elected to appeal adverse judgments and post secured appeal bonds to avoid disruption of collection activity, thereby creating in favor those creditors rights greater than those enjoyed by general creditor body. Bankr.Code, 11 U.S.C.A. § 105.

**[19] Bankruptcy** ☜2368
51k2368
Chapter 11 debtor asbestos litigation defendant seeking injunction preventing enforcement of final

162 B.R. 935
(Cite as: 162 B.R. 935)

judgments against appeal bonds and escrows and preventing sureties from drawing proceeds of letters of credit failed to establish that disallowance or subordination of underlying judgments was warranted, where debtor failed to identify any legal basis that would prevent final judgment creditors from enforcing their entire judgments against third-party sureties or nonestate property held by escrow agents. Bankr.Code, 11 U.S.C.A. § 105.

**[20] Judgment** ⬤══**828.21(2)**
228k828.21(2)

**[20] States** ⬤══**5(2)**
360k5(2)
Statute requiring that federal courts give full faith and credit to acts, records and judicial proceedings of any state, territory or possession applies to bankruptcy courts, and absent fraud in procurement of default judgment, bankruptcy proceedings may not be used to relitigate issues already resolved in court of competent jurisdiction. 28 U.S.C.A. § 1738.

**[21] Judgment** ⬤══**660**
228k660
Under doctrines of res judicata and collateral estoppel, later court cannot alter results of prior final judgment even if that judgment is wrong.

**[22] Bankruptcy** ⬤══**2831**
51k2831

**[22] Bankruptcy** ⬤══**2957**
51k2957
Bankruptcy court can subordinate, disallow, or limit punitive damage claims.

**[23] Bankruptcy** ⬤══**2831**
51k2831

**[23] Bankruptcy** ⬤══**2957**
51k2957
Preclusive effect of final judgment would not bar consideration of argument that bankruptcy court should subordinate, disallow, or limit punitive damage claim if judgment creditor asserted judgment as claim against bankruptcy estate.

**[24] Bankruptcy** ⬤══**3412**
51k3412
Limitation on effect of bankruptcy discharge against codebtors would preclude bankruptcy court from preventing judgment creditor from enforcing its

disallowed or subordinated punitive damage award against surety or escrow. Bankr.Code, 11 U.S.C.A. §§ 105, 524(e).

**[25] Bankruptcy** ⬤══**3412**
51k3412
Limitation on effect of bankruptcy discharge against codebtors prevents mechanics of administering bankruptcy from operating as private contract to relieve codebtors of their liabilities. Bankr.Code, 11 U.S.C.A. § 524(e).
 **\*937** Berlack Israels & Liberman (Edward S. Weisfelner, Carole Fern, of counsel), New York City, and Gainsburg & Hirsch (Hal M. Hirsch, of counsel), Purchase, NY, for debtor Keene Corp.

 Greitzer & Locks (Gene Locks, of counsel), Philadelphia, PA, Baron & Budd (Frederick M. Baron, of counsel), Dallas TX, Levy Phillips & Konigsberg (Stanley J. Levy, of counsel), New York City, for various judgment creditors.

 Gottesman, Wolgel, Secunda, Malamy & Flynn, P.C. (Steven Weinberg, of counsel), New York City, for Lumbermans Mut. Cas. Co. and Amwest Sur. Ins. Co.

 **\*938** Vinson & Elkins, L.L.P. (D. Bobbitt Noel, Jr., of counsel), Houston, TX, for St. Paul Fire & Marine Ins. Co.

 Wilson, Elser, Moskowitz, Edelman & Dicker (Jerold R. Ruderman, Mark G. Ledwin, Carol F. Elicetta, of counsel), White Plains, NY, for Acstar Ins. Co.

 Henry Paul Monaghan, New York City, for Kansas City, MO.

## MEMORANDUM AND DECISION DENYING STAY AND PRELIMINARY INJUNCTION

STUART M. BERNSTEIN, Bankruptcy Judge.

 On December 3, 1993, Keene Corporation ("Keene") filed its Chapter 11 petition with this Court. At the time of the filing, Keene was a defendant in approximately 101,000 lawsuits involving asbestos-related property damage, personal injury or death. Adverse judgments, aggregating approximately $63 million, had been rendered against Keene in approximately 200 of these cases. To stay enforcement of the majority of these judgments, Keene had posted supersedeas

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

162 B.R. 935
(Cite as: 162 B.R. 935, *938)

Page 117

("appeal") bonds issued by third party sureties, or had entered into escrow arrangements with the judgment creditor's attorneys. The appeal bonds were backed by standby letters of credit which, in turn, were secured by Keene's assets. As of December 3, 1993, seventy-five judgments, aggregating nearly $29 million were final, and not subject to any further appeal.

To prevent a run on the appeal bonds, escrows and letters of credit, Keene moved at the outset of its Chapter 11 case for a temporary restraining order and a preliminary injunction. While Keene requested broad relief, the primary focus of its application sought to prevent the final judgment creditors from satisfying their judgments from the proceeds of the appeal bonds or escrows, and in the case of the appeal bonds, to prevent the sureties from drawing the proceeds of the standby letters of credit. At Keene's request, this Court issued a temporary restraining order on December 6, 1993, pending the hearing on Keene's motion for a preliminary injunction, and following three days of hearings, extended the temporary restraining order pending its determination. For the reasons set forth below, this Court vacates its temporary restraining order, and denies Keene's motion for a preliminary injunction.

## FACTS

### A. Background

Although not entirely necessary to this Court's decision, the background to this case sheds light on Keene's predicament. Keene was formed in 1967, and in 1968, acquired Baldwin-Ehret-Hill ("BEH") for approximately $8 million. BEH was engaged in the business of manufacturing acoustical ceilings, ventilation systems and thermal insulation. Certain of these products contained asbestos which was manufactured by third parties.

The acquisition of BEH embroiled Keene in asbestos-related litigation. Initially, Keene joined with other asbestos defendants in a variety of cooperative arrangements intended to maximize assets, minimize transaction costs, compensate claims and litigate when necessary. Keene also pursued litigation against its insurers, and eventually obtained $423 million in insurance coverage for asbestos-related claims as a result of that litigation. [FN1] Keene did not, however, recover this total sum because some of its insurers became insolvent.

FN1. The details of that litigation and Keene's success can be found in *Keene v. Insurance Company of North America,* 667 F.2d 1034 (D.C.Cir.1981), *cert. denied,* 455 U.S. 1007, 102 S.Ct. 1644, 71 L.Ed.2d 875 (1982).

Dissatisfied with these cooperative arrangements with the other asbestos defendants, Keene withdrew in June 1990, and decided to "go it alone". It established its own internal guidelines for settling asbestos-related claims and litigating when necessary. Between July 1, 1990 and November 30, 1993, Keene was able to settle or dismiss some 35,000 claims aggregating $27 million; many of the claims it could not settle, however, cost Keene dearly. Thus, for much of 1991, Keene did not have any outstanding judgments against it; by late 1991, it had $32 *939 million in adverse judgments. In 1992, that number jumped to $83 million, and since then, has fluctuated between $55 million and $75 million. As of the petition date, the adverse judgments exceeded $63 million.

### B. The Appeal Bonds and Escrows

Keene appealed many of these judgments. To stay enforcement, Keene posted appeal bonds issued by third party sureties or some other security arrangement consistent with the requirements of the jurisdiction in which the judgment was rendered. Keene typically worked with four different sureties who supplied the appeal bonds: Acstar Insurance Co., Amwest Surety Insurance Co., Lumbermans Mutual Casualty Co. and St. Paul Fire & Marine Insurance Co. While the precise terms of the various bonds differed, each provided, in substance, that the surety's obligation would be "void" in the event the judgment was vacated on appeal.

The appeal bonds were backed by letters of credit issued by Continental Bank, N.A. or Shawmut Bank, N.A. In the case of St. Paul, all of its surety bonds were cross-collateralized by all of the letters of credit issued in its favor. Thus, even where a judgment was reversed, the corresponding letter of credit stood as security for St. Paul's other appeal bond obligations. The surety was entitled to draw the proceeds of a letter of credit under one of two circumstances which it was required to certify to the issuing bank: the surety had paid on the bond, or the judgment creditor had made a demand on the bond.

The letters of credit were, in turn, secured by

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

162 B.R. 935
**(Cite as: 162 B.R. 935, \*939)**

Page 118

Keene's assets. In some cases, Keene entered into a security agreement with the issuing bank under which it posted collateral to secure its contingent reimbursement obligation to the issuing bank should the surety draw the proceeds of the letter of credit. In other situations, Keene placed marketable securities in a trust account at the issuing bank to secure its contingent reimbursement obligation.

As an alternative to the appeal bond, and particularly in New York, Keene and the judgment creditor's attorney entered into a court-approved escrow arrangement. Keene delivered a marketable security (generally a United States Treasury Bill) to Citibank, N.A. or Continental Bank, N.A., which held it pending disposition of the appeal. Although the escrow agreements uniformly provided that the escrow would not be considered Keene's assets or property for any purposes, Keene nonetheless retained an interest in the escrow. Like the appeal bonds, the escrow "reverted" to Keene in the event the judgment was vacated. Further, Keene reported the income earned on the escrow, and if necessary, paid taxes on account of that income.

By the time that Keene filed its Chapter 11 petition, nearly half of Keene's assets--approximately $52 million--were pledged to stay enforcement of adverse judgments. [FN2]

> FN2. Not all judgments are secured by bonds or escrows. There are approximately $63 million in outstanding judgments, of which $52 million are backed by bonds or escrows. It appears, however, that all of the judgments that are now final are secured by bonds or escrows.

### C. The Limited Fund Action

By the end of 1992 or the beginning of 1993, Keene had reached a critical stage. It had already exhausted the substantial insurance proceeds that it had garnered through litigation. It had paid $455 million in asbestos-related judgments or claims. It had paid its own lawyers $165 million. Yet, it was a defendant in over 100,000 asbestos-related lawsuits, was a judgment debtor in many, and new claims continued to be filed at a rate of 2,000 per month. Further, it had pledged nearly half of its assets to secure the letters of credit that backed the appeal bonds or to fund the alternative escrow arrangements.

To resolve its present and future asbestos-related liability and retain some equity for its shareholders, Keene commenced an action on May 13, 1993 before Senior District Judge Jack B. Weinstein, sitting as a United States District Judge for the Eastern and Southern Districts of New York, to impose a settlement on all present and future asbestos claimants. Entitled *Keene v. Fiorelli, et al.,* 93 Civ. 2129 (JBW), 1993 WL 604077, the action sought (1) to certify a class of defendants **\*940** under Rules 23(a) and 23(b)(1)(B) comprised of all potential and actual asbestos plaintiffs, outstanding judgment creditors, and persons or entities who have sought or might seek contribution, (2) to obtain Court assistance to negotiate a settlement with Keene's limited funds, (3) to obtain injunctive relief against present and future asbestos litigation and (4) to obtain declaratory relief adjudging Keene's non-liability for asbestos-related injuries. *Keene v. Fiorelli,* 93 Civ. 2129 (JBW), 1993 WL 604077, Memorandum and Order and Preliminary Injunction, at p. 2 (E.D.N.Y., signed July 1, 1993) ("Injunction Order"). By order dated May 19, 1993, the District Court appointed former Federal Judge Marvin E. Frankel as a Special Master to hear and report on two issues: (1) were Keene's assets so limited that there was a substantial risk that payment to present and prospective claimants would be jeopardized, and (2) was there a substantial possibility that the claims of the earlier claimants would exhaust Keene's available assets and projected assets, including pertinent insurance proceeds. *Id.* at pp. 2-3.

Judge Frankel answered both questions in the affirmative in his Special Master's Report, dated June 29, 1993. [FN3] Judge Weinstein thereupon issued the Injunction Order on July 1, 1993, in which he preliminarily enjoined litigation and enforcement activity directed against Keene and/or its assets, as well as collection activities directed against any "bonds, escrow accounts, or letters of credit" based on any asbestos claims, judgments or settlements. Injunction Order at pp. 13-14.

> FN3. On June 16, 1993, Keene had sought a temporary restraining order which Judge Weinstein granted on June 18, 1993. With certain exceptions, the temporary restraining order stayed all pending actions against Keene, and also stayed the enforcement of any judgments obtained against Keene, including the enforcement of judgments against the appeal bonds or escrows, or the drawing of the proceeds of the standby letters of credit by the sureties.

In addition, Judge Weinstein provisionally certified five subclasses under Fed.R.Civ.P. 23(b)(1)(B). These subclasses included (1) present asbestos personal injury claimants, (2) future claimants, (3) creditors with "secured" judgments against Keene, (4) manufacturers and distributors of asbestos-related products who have or may have contribution or indemnity claims against Keene and (5) property damage claimants. *Id.* at p. 9. Judge Weinstein designated attorneys to represent each of the subclasses, and appointed David I. Shapiro, Esq. to serve as Special Settlement Master. *Id.* at pp. 9-11.

### D. The Settlement in Principle

Following the provisional certification of the subclasses, the parties engaged in settlement negotiations. On or about November 19, 1993, they executed a written Term Sheet which provided, in pertinent part, that Keene would transfer the majority of its assets to the claimants or an entity created for their benefit, retain certain other assets, and be absolved from further asbestos-related liability.

The only claimants entitled to a definite, fixed payment under the Term Sheet were those holding final judgments. Paragraph 5 of the Term Sheet provided:

5. With regard to any Tax Net Operating Loss (NOL) carry back refunds to be sought by Keene:
....
(b) Keene will pay by December 31, 1993, subject to order of the United States District Court for the Eastern District of New York, all outstanding judgments no longer subject to any appellate review.

The Term Sheet also provided that this subclass would be paid even if the definitive settlement agreement had not yet been approved. Paragraph 12 of the Term Sheet stated that pending Court approval of a "definitive settlement agreement", the July 1 preliminary injunction would remain in effect, and none of Keene's assets would be transferred "except as provided in paragraph 5(b)".

Although paragraph 5(b) is arguably ambiguous, any doubt regarding its import was dispelled by the testimony adduced in this Court in connection with Keene's motion for injunctive relief. Keene's obligation to pay the final judgment creditors by December 31, 1993, was absolute, and was motivated by tax considerations. It was not dependent upon Keene's receipt of an NOL refund, and moreover, *941 payment was not limited to final judgments secured by appeal bonds or escrows. All final judgments were to be paid. Finally, it appears that Keene contemplated using the collateral securing the letters of credit and the funds held in escrow to discharge its final judgment obligations totalling nearly $29 million.

### E. The Decision of the Second Circuit and Its Aftermath

In its decision dated December 1, 1993, the United States Court of Appeals vacated the District Court's July 1, 1993 preliminary injunction, and ordered that the complaint be dismissed for lack of subject matter jurisdiction. Finding that Keene's complaint was an attempt to readjust creditors' rights outside of the Bankruptcy Code, the Court of Appeals concluded that there was no substantive right to compel creditors to settle, and hence, no case or controversy. [FN4]

> FN4. The creditors holding final judgments in this case place great emphasis on a statement in the opinion of the Court of Appeals that the supersedeas bonds and escrows securing final judgments are not Keene's assets. *Keene v. Fiorelli,* 14 F.3d 726, 732 (2d Cir.1993). This statement does not, however, foreclose consideration by this Court of whether these bonds or escrows are property of the estate. First, the statement in the opinion of the Court of Appeals is *dicta;* the Court vacated the District Court's preliminary injunction and dismissed the complaint for lack of subject matter jurisdiction. Its statement regarding Keene's property interests in the supersedeas bonds and escrows was not necessary to its determination. Second, the issue before this Court is whether the bonds and escrows are property of the debtor-in-possession's estate pursuant to Section 541 of the Bankruptcy Code. This issue was not and could not have been before the Court of Appeals.

On December 2, 1993, Keene filed its petition for rehearing and stay with a suggestion for rehearing *en banc.* Taking the position that this filing stayed the mandate of the Court of Appeals pursuant to Rule 41(a) of the Federal Rules of Appellate Procedure, Keene immediately advised its sureties, the banks that issued the standby letters of credit and the attorneys for certain judgment creditors that payment on any bonds or letters of credit would violate that stay and be actionable.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

At or about that same time, St. Paul presented Continental Bank with letters of credit aggregating approximately $21.3 million, including letters of credit backing bonds where the underlying appeals were not final, had been reversed in Keene's favor, or had been satisfied by Keene. Further, attorneys for some of the final judgment creditors whose judgments had been stayed, first by the posting of the escrows and then by the July 1, 1993 injunction, demanded payment from the escrow agent.

Against this background, Keene filed its Chapter 11 petition on December 3, 1993.

## DISCUSSION
### A. The Automatic Stay

The filing of Keene's Chapter 11 petition triggers the automatic stay. 11 U.S.C. § 362. The automatic stay provides broad protection to Keene, preventing the commencement or continuation of litigation against Keene on account of pre-petition claims, 11 U.S.C. § 362(a)(1), preventing the enforcement of judgments based on pre-petition claims against the debtor or property of the estate, 11 U.S.C. § 362(a)(2), and preventing any act to obtain possession or control of property of the estate. 11 U.S.C. § 362(a)(3).

[1][2] The automatic stay insulates the debtor and its property, and provides Keene with much of the immediate protection that it seeks from on-going asbestos-related litigation. For example, none of the judgment creditors can enforce their judgments against Keene's property. Further, those banks that have issued letters of credit to back the appeal bonds cannot enforce their rights against the Keene collateral that secures Keene's reimbursement obligation. *In re M.J. Sales & Distributing Co.,* 25 B.R. 608, 615 (Bankr.S.D.N.Y.1982).

[3][4][5] In addition, the automatic stay prevents the adverse, non-final judgments from becoming final, thereby triggering the judgment creditor's right to payment from the surety or the escrow agent. Whether an action is "against the debtor" is determined *942 by examining the proceeding at the time that it is initiated, and not by who has appealed; if the action was commenced against the debtor, the appeal is stayed even though the debtor is the appellant. *Commerzanstalt v. Telewide Systems, Inc.,* 790 F.2d 206, 207 (2d Cir.1986); accord *Borman v. Raymark Industries, Inc.,* 946 F.2d 1031, 1035 (3d Cir.1991); *Sheldon v.

*Munford, Inc.,* 902 F.2d 7, 8-9 (7th Cir.1990); *Cathey v. Johns-Manville Sales Corp.,* 711 F.2d 60, 61-62 (6th Cir.1983). In short, any creditor holding a non-final judgment as of the petition date cannot obtain a final judgment or enforce his or her claim against property of the estate absent relief from the automatic stay.

[6][7][8] The automatic stay does not, however, provide Keene with all of the protection that it seeks. It does not prevent final judgment creditors from enforcing their judgments against the appeal bonds. The debtor retains a reversionary interest in an appeal bond subject to divestiture if the debtor is unsuccessful once the appeal process has been completed. *In re Celotex Corp.,* 128 B.R. 478, 482 (Bankr.M.D.Fla.1991). If that appeal has been completed prior to the filing of the petition, and the debtor has been divested of its reversionary interest, the debtor does not have an interest in the bond that is property of the estate. *Edwards v. Armstrong World Industries, Inc.,* 6 F.3d 312, 316-17 (5th Cir.1993); *Willis v. Celotex Corp.,* 978 F.2d 146, 149 (4th Cir.1992), *cert. denied,* 507 U.S. 1030, 113 S.Ct. 1846, 123 L.Ed.2d 470 (1993); *In re Celotex Corp.,* 128 B.R. at 482; *see M.J. Sales,* 25 B.R. at 612-13.

[9] The same conclusion applies to the letters of credit which were issued by Keene's banks and which Keene collateralized with its own property. The surety can draw on the proceeds of the letter of credit if it pays the judgment or the judgment debtor makes a demand for payment. The letter of credit is an independent third party obligation, and the proceeds are not the debtor's property even if, as here, the letter of credit is secured by the debtor's property. *Willis v. Celotex Corp.,* 978 F.2d at 148 n. 3; *In re Ocana,* 151 B.R. 670, 672 (S.D.N.Y.1993) (Leval, J.); *M.J. Sales,* 25 B.R. at 613.

[10] Finally, the escrows securing the New York judgments that are final are not property of the estate protected by the automatic stay. In reaching this conclusion, the Court does not rely on the language of the escrows which states that the escrows shall *not* be considered Keene's property for any purpose whatsoever. At a minimum, Keene retained a reversionary interest in the escrows which secured non-final judgments; if the judgments were ultimately reversed and Keene prevailed, it was entitled to the return of the escrow.

[11] Nevertheless, any interest that Keene had in an escrow was divested once the judgment became final. Under New York law--which governs the subject escrows--a deposit will operate as an escrow if (1) an agreement exists as to the subject matter and delivery of the deposit; (2) the deposit is delivered to a third party depository conditioned upon the performance of an act or occurrence of an event; and (3) the grantor relinquishes control over the deposit. 55 N.Y.Jur.2d, Escrows § 3, at pp. 589-90 (1986).

The escrows created to secure the New York judgments satisfy these requirements. Keene and the judgment creditors agreed that Keene would deliver funds to a depository bank to secure payment of a final judgment. This agreement was intended to be a substitute for the supersedeas bond arrangement. Keene delivered the funds to the bank upon the condition that they would be paid to the judgment creditor to the extent his or her judgment became final, and would be paid to Keene, *inter alia,* if Keene prevailed on appeal or paid the judgment out of other funds. Upon delivery, Keene relinquished control over the deposit except for certain limited purposes, such as investment decisions.

[12] Under New York law, the delivery of a fund of money into escrow (i) creates an equitable interest in favor of the grantee and (ii) places the funds beyond the reach of the grantor's creditors. *In re O.P.M. Leasing Services, Inc.,* 46 B.R. 661, 666-67 (Bankr.S.D.N.Y.1985). The grantor retains bare legal *943 title until the contingency occurs, at which point it is divested of even this limited interest:

> Thus, the general rule in New York regarding escrow accounts is that unless the judgment debtor, as grantor, retains an interest in the escrowed property over and above the interest of the grantee, the escrow account cannot be reached by the debtor's judgment creditors. *See Jamaica Savings Bank v. Lefkowitz,* 390 F.Supp. 1357, 1363 (E.D.N.Y.), *aff'd,* 423 U.S. 802, 96 S.Ct. 10, 46 L.Ed.2d 23 (1975); *Creel v. Birmingham Trust National Bank,* 383 F.Supp. 871, 879 (N.D.Ala.1974), *aff'd,* 510 F.2d 1363 (5th Cir.1975); *In re Simon,* 167 F.Supp. 214, 215 (E.D.N.Y.1958); *In re Treiling,* 21 B.R. 940, 943 (Bankr.E.D.N.Y.1982); *Valerio v. College Point Savings Bank,* 48 Misc.2d 91, 92, 264 N.Y.S.2d 343, 344 (Sup.Ct. Suffolk Co.1965)....
> It is true that under New York law legal title to

property placed in escrow remains with the grantor until the occurrence of the condition specified in the escrow agreement. *See Press v. Marvalan Industries, Inc.,* 422 F.Supp. 346, 349 (S.D.N.Y.1976); *In re Ellison Associates,* 13 B.R. 661, 670 (Bankr.S.D.N.Y.1981); *Stanton v. Miller,* 58 N.Y. 192, 201 (1874); *Alexander v. Quality Leather Goods Corp.,* 150 Misc. 577, 579-580, 269 N.Y.S. 499, 502 (Sup.Ct., N.Y.Co.1934). However, it is equally true that the deposit of property placed in escrow creates in the grantee such an equitable interest in the property that upon full performance of the conditions according to the escrow agreement, title will vest at once in him. Hence, although pending full performance of the conditions, the legal title remains in the grantor and is subject to ... the lien of a judgment against him to the extent of his interest therein, it has been held that such lien, obtained with notice of the escrow agreement, is subject to the equity of the grantee. 28 Am.Jur.2d Escrow § 10 (1964). *See also May v. Emerson,* 52 Or. 262, 96 P. 454, 455 (Or.1908).
46 B.R. at 667. *Cf. In re Ocana,* 151 B.R. at 673-71 (where debtor creates a trust to secure the claims of its insureds, the trust is not property of the estate, and the debtor retains a reversionary interest to the extent the trust property exceeds the purpose for which the trust was established.)

[13] Once the contingency occurs, the grantor's legal title merges with the grantee's equitable title, and passes to the latter by operation of law. In the present case, Keene was divested of legal title in escrows securing judgments that became final prior to the filing of the petition. Divested of legal title, it had no further interest--legal or equitable--in the escrows, and hence, these escrows are not property of the estate.

[14][15] Finally, the enforcement of the final judgments cannot be considered as actions against Keene within the meaning of 11 U.S.C. § 362(a)(1). The automatic stay is deemed to extend to actions against third parties where there is such an identity of interest between the debtor and the third party that "a judgment against the third-party defendant will in effect be a judgment or finding against the debtor." *A.H. Robins v. Piccinin (In re A.H. Robins ),* 788 F.2d 994, 999 (4th Cir.) *cert. denied,* 479 U.S. 876, 107 S.Ct. 251, 93 L.Ed.2d 177 (1986) (citing *In re Johns-Manville Corp.,* 26 B.R. 405, 410 (Bankr.S.D.N.Y.1983)); *accord Edwards*

v. *Armstrong World Industries,* 6 F.3d at 316; *Solow v. PPI Enterprises (U.S.) Inc.,* 150 B.R. 9, 11 (S.D.N.Y.1992). "The obligations of a surety are sufficiently independent to provide the basis of an action by the judgment creditor to collect on the bond unfettered by the automatic stay provisions of the Bankruptcy Code." *Edwards v. Armstrong World Industries,* 6 F.3d at 317; *accord, Willis v. Celotex Corp.,* 978 F.2d at 149; *In re Johns-Manville Corp.,* 26 B.R. at 431 ("[T]he interests of these insurers and sureties are not sufficiently interwoven with those of the debtor to comport with the narrow scope of Section 362 of the Code."). The enforcement of these claims against the sureties and escrow agents, based on independent contractual obligations whose resolutions do not involve Keene's employees and management, does not constitute an action against Keene. *Willis v. Celotex,* 978 F.2d at 148-49; *Washburn & Kemp, P.C. v. Committee of Dalkon Shield Claimants, (In re A.H. Robins Co.),* 846 F.2d 267, 271 (4th Cir.1988).

**\*944 B. Preliminary Injunction Motion**

**1. Introduction**

The Court will now turn to the more difficult issue raised by Keene's motion: under 11 U.S.C. Section 105(a), does the Court have the power to enjoin enforcement of the final judgments against the appeal bonds and escrows, and prevent the sureties from drawing the proceeds of the letters of credit? Section 105(a) empowers the bankruptcy court to "issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title." It is a broad grant of power which exceeds the limits of the automatic stay, and empowers the Court to "use its equitable powers to assure the orderly conduct of the reorganization proceedings." *In re Neuman,* 71 B.R. 567, 571 (S.D.N.Y.1987) (quoting *In re Baldwin-United Corp. Litigation,* 765 F.2d 343, 348 (2d Cir.1985)) (citing *In re Johns-Manville Corp.,* 40 B.R. 219 (S.D.N.Y.1984)).

Preliminary injunctive relief is governed by Bankruptcy Rule 7065 which incorporates Fed.R.Civ.P. Rule 65. *Feit v. Drexler (In re Feit & Drexler, Inc.),* 760 F.2d 406, 415 (2d Cir.1985). Ordinarily, the party requesting the preliminary relief must:

demonstrate both irreparable harm and a likelihood of success going to the merits or a

sufficiently serious question regarding the merits to make it a fair ground for litigation with the balance of hardship tipping decidedly in its favor. *Accord Tucker Anthony Realty Corp. v. Schlesinger,* 888 F.2d 969, 972 (2d Cir.1989) (citing *Fireman's Fund Ins. Co. v. Leslie and Elliott Co., Inc.,* 867 F.2d 150 (2d Cir.1989) (per curiam)).

[16] Under Section 105, however, a debtor need not show irreparable harm. *In re Neuman,* 71 B.R. at 571; *C & J Clark America, Inc. v. Carol Ruth, Inc. (In re Wingspread Corp.),* 92 B.R. 87, 92 (Bankr.S.D.N.Y.1988). Rather, the Court can enjoin an activity that threatens the reorganization process or impairs the court's jurisdiction with respect to a case before it. *Alert Holdings, Inc. v. Interstate Protective Services, Inc.,* 148 B.R. 194, 200 (Bankr.S.D.N.Y.) (citing *LTV Steel Company, Inc. v. Bd. of Educ. (In re Chateaugay Corp., Reomar, Inc.),* 93 B.R. 26, 29 (S.D.N.Y.1988)).

Keene has proffered several grounds for injunctive relief. These include (1) interference with the orderly reorganization process through undermining the plan foundation contained in the pre-petition settlement, piecemeal dissipation of Keene's assets and diversion of Keene's management, employees and resources (2) elevation of contingent judgment claims to secured reimbursement claims and (3) prevention of full recovery on claims which should be subordinated or disallowed. The Court will address these seriatim.

**2. Interference with the Reorganization Process**

[17] The Court finds from the credible evidence that Keene has failed to demonstrate that the enforcement activities which it challenges will interfere with the reorganization. Keene is an unusual debtor-in-possession; its sole pre-petition business involved managing its asbestos-related litigation, and the automatic stay has stopped that litigation in its tracks. This is not a debtor faced with the challenge of carrying on a business while trying to formulate a plan. It has no business to carry on.

Keene has also failed to demonstrate how the failure to grant an injunction will undermine the settlement in principle or the plan, or cause the piecemeal dissipation of its assets. To the contrary, enforcement of the final judgments is wholly consistent with the settlement in principle.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

162 B.R. 935
(Cite as: 162 B.R. 935, *944)

Page 123

Under the terms of the settlement, Keene was required to pay all final judgment creditors by December 31, 1993; permitting the final judgment creditors to execute against non-debtor property is consistent with this goal, and does not dissipate property of the estate. Further, Keene apparently contemplated payment from the very property it now seeks to shield.

Moreover, this does not preclude Keene from consummating the balance of the settlement in principle with its remaining creditors as part of the reorganization. Under the settlement in principle, Keene and the representatives **945** of the other four classes of creditors agreed to carve out the final judgment creditors, pay them in full, and then deal with the claims of the other four classes. Keene has failed to articulate, much less show, why it cannot use the settlement as a foundation for a plan involving creditors in the remaining four classes or reach the same agreement with the remaining creditors that it reached pre-petition.

Finally, Keene has failed to demonstrate that permitting enforcement will divert its management, employees and resources. As noted, the filing of the petition has freed them from their daily tasks of managing on-going litigation. In the case of the enforcement of final judgments against appeal bonds, there is little for Keene to do. The evidence showed that the judgment creditor provides the necessary information to the surety who, at some point, makes a demand on the letter of credit. None of this requires Keene's involvement.

Although Keene has more direct involvement in connection with the payments out of the escrows, Keene has failed to show that it is so time consuming and disruptive as to warrant injunctive relief. Keene must calculate the amount that has to be paid, including interest, and take whatever steps are necessary to release funds from the appropriate escrows. While it is important to ensure that the correct amounts are paid, the task appears neither time consuming nor overly involved.

**3. Elevation of claims**

[18] According to Keene, the enforcement of the final judgments, at least in the case against surety bonds, will elevate the judgment claims from contingent to secured. If the surety satisfies the judgment and draws the proceeds of the letter of credit, the bank issuing the letter of credit will hold

a liquidated reimbursement claim against Keene. This claim is secured by Keene's property.

This argument misperceives the nature of the final judgment creditors' claims, and exalts form over substance. Keene "elevated" these claims when, prior to bankruptcy, it elected to appeal adverse judgments, and post appeal bonds to avoid the disruption of collection activity. *See In re Johns-Manville Corp.,* 26 B.R. at 433. Having done so, Keene created in favor of these creditors rights greater than those enjoyed by the general creditor body, and those rights became liquidated, fixed and non-contingent once the underlying judgments became final. Payment of these claims by the sureties and the ultimate creation of non-contingent secured reimbursement claims have no practical effect, therefore, on this estate or its creditors.

**4. Disallowance or Subordination of the Underlying Judgment**

[19] The most serious argument which Keene makes in favor of injunctive relief concerns the possible disallowance or subordination of all or some portion of the final judgment claims. Keene raises several points. It vociferously contends that asbestos-related litigation is unfair and results in inequitable judgments that this Court should remedy under its general equitable powers, and that components of the final judgments--particularly punitive damages and "delay" damages--can or should be disallowed or subordinated. If so, argues Keene, the final judgment creditors should be prevented from enforcing their claims against the sureties and escrows.

Similar concerns under analogous circumstances led to the issuance of injunctive relief in the bankruptcy of Celotex Corporation, another asbestos producer. At the time of its filing in October, 1990, Celotex was a defendant in over 141,000 asbestos-related personal injury actions, and Celotex had posted supersedeas bonds totalling nearly $70 million. *Willis v. Celotex Corporation,* 978 F.2d at 149. The bonds were secured by letters of credit issued by First Florida Bank, N.A., which, in turn, were secured by certificates of deposit pledged by Celotex. *Id.* at 147-48.

At the inception of the bankruptcy, the Celotex court issued an injunction that, *inter alia,* prevented the judgment creditors from proceeding against the supersedeas bonds. *In re Celotex Corp.,* 128 B.R.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

at 482. Instead, **946** the Court sought to require each final judgment creditor to seek relief from the Section 105 injunction to enable the Court to review the final judgment, for certain limited purposes, on a case-by-case basis:

> As to the utilization of Section 105 vis-a-vis the supersedeas bonds, once the judgment creditor has been successful throughout the appellate process, the judgment creditor is not able to proceed against the supersedeas bond without seeking to vacate the Section 105 stay in this Court. Under these circumstances, it will be Debtor's burden to establish that the Section 105 stay should continue. The Court's inquiry will include Debtor's ability to avoid any final judgment under the Bankruptcy Code and the necessity to protect its sureties or disenfranchise them if such surety agreements can be considered executory contracts or avoided under the avoiding powers in the Bankruptcy Code. (11 U.S.C. §§ 365, 547, and 548.) Additionally, consideration will be given to Debtor's ability to deal with the targeted litigation within the reorganization plan and the effect on that process if the Section 105 stay is extinguished. The analysis may also include the treatment of those judgments which include punitive damages or joint and several liability or contribution with other asbestos co-defendants. This Court does not seek to establish an exhaustive list of inquiry, as each specter of the Section 105 stay may relate differently to an aspect of Debtor's reorganization process which seeks to be protected.

128 B.R. at 484 (footnote omitted).

Whatever merit this approach has as a case management technique, this Court declines to follow it. Keene has failed to identify any legal basis which would prevent final judgment creditors from enforcing their entire judgments against third party sureties or non-estate property held by escrow agents, or prevent the sureties from drawing on the letters of credit. [FN5] If these rights cannot be denied, they should not be delayed.

> FN5. Keene has failed to show that it could avoid the transfer of its collateral to secure the letters of credit as preferences. The pledge of collateral as well as the establishment of the escrows occurred more than ninety days prior to the filing of the petition.

[20][21] It is axiomatic that Keene cannot collaterally attack the *amount* of the final judgments

in this Court. Section 1738 of Title 28 of the United States Code mandates that every United States Court give full faith and credit to the "acts, records and judicial proceedings" of any state, territory or possession to the same extent they have in their own courts. Section 1738 applies to Bankruptcy Courts, and absent fraud in the procurement of a default judgment, "[b]ankruptcy proceedings may not be used to re-litigate issues already resolved in a court of competent jurisdiction." *Kelleran v. Andrijevic,* 825 F.2d 692, 695 (2d Cir.1987). Under the doctrines of res judicata and collateral estoppel--which also apply to federal court judgments--the later court cannot alter the results of a prior final judgment even if that judgment was wrong. *Federated Dept. Stores, Inc. v. Moitie,* 452 U.S. 394, 398, 101 S.Ct. 2424, 2427, 69 L.Ed.2d 103 (1981).

Keene does not argue that the courts that rendered the final judgments at issue lacked jurisdiction to do so or that under local law, the final judgment creditor cannot enforce the judgment against the appeal bond or escrow. Nor does Keene allege fraud in the procurement of the judgment. Instead, Keene launches an attack against the tort system, arguing that it unfairly causes inflated verdicts and judgments which frequently have little relationship to actual injury.

It is unnecessary for this Court to review Keene's criticisms of the tort system, however meritorious or compelling one might find them. The final judgments at issue were rendered by courts of competent jurisdiction, and have been upheld on appeal. This Court cannot and will not revisit the damage awards to determine if they are excessive or the product of an inequitable system.

[22][23][24] Keene's challenge concerning punitive damages raises a different issue. [FN6] **947** Keene correctly argues that a Bankruptcy Court can subordinate, disallow or limit punitive damage claims. *In re Johns-Manville Corp.,* 68 B.R. 618, 627 (Bankr.S.D.N.Y.1986), *aff'd,* 78 B.R. 407 (S.D.N.Y.1987). Further, the preclusive effect of a final judgment would not bar consideration of this argument if the judgment creditor asserted the judgment as a claim against the estate. *See Pepper v. Litton,* 308 U.S. 295, 305-06, 60 S.Ct. 238, 244-45, 84 L.Ed. 281 (1939).

> FN6. Keene also challenges enforcement of the final judgments to the extent that they will be paid

to attorneys under contingency fee arrangements or to the extent they include "delay damages". Given the Court's determination regarding the punitive damages, it is unnecessary to separately consider these arguments.

It does not follow, however, that a court of equity can prevent the judgment creditor from enforcing its disallowed or subordinated punitive damage award against the surety or escrow. Such a result ignores 11 U.S.C. § 524(e) which provides:

Except as provided in subsection (a)(3) of this section, discharge of a debt of the debtor does not affect the liability of any other entity on, or the property of any other entity for, such debt.

[25] Although Section 524(e) speaks in terms of "discharge", its scope is greater. The "import" of this provision is that "the mechanics of administering bankruptcy, no matter how suggestive, do not operate as a private contract to relieve co-debtors of the bankrupt of their liabilities." *Union Carbide Corp. v. Newboles,* 686 F.2d 593, 595 (7th Cir.1982) (per curiam) (construing Section 16 of the 1898 Bankruptcy Act, the predecessor to Section 524(e)).

In light of Section 524(e), Courts have declined to permit guarantors to invoke claim limitations existing under other subparagraphs of Section 502(b). In *Stoller's Inc. v. Peoples Trust Bank, (In re Stoller's Inc.),* 93 B.R. 628 (Bankr.N.D.Ind.1988), a secured creditor sought to recover its claims, including post-petition interest and attorneys fees, from the debtor and non-debtor guarantors. Section 502(b)(2) precludes allowance of post-petition interest, and Section 506(b) creates an exception if the creditor is oversecured.

Although the Court concluded that the creditor was not oversecured, and hence, that its claim for post-petition interest could not be allowed against the debtor, 93 B.R. at 635, the Court nonetheless held, in light of Section 524(e), that the claims for post-petition interest as well as the contractual right to attorneys fees could be asserted against the guarantors:

Summit Bank further argues that it is entitled to post-petition interest and attorney's fees from Mr. and Mrs. Stoller as guarantors of the debtor's note, since their obligation is not abated by these bankruptcy proceedings. 11 U.S.C. § 524(e), while not directly addressing this question, sheds light on the effect of a debtor's bankruptcy upon

co-debtors and guarantors. The section states that "discharge of a debt of the debtor does not affect the liability of any other entity on, or the property of any other entity for, such debt." As the legislative history explains, "[s]ubsection [e] provides the discharge of the debtor does not affect co-debtors or guarantors." S.Rept. No. 95-989 to accompany S. 2266, 95th Const., 2d Sess. 80-81 (1978), U.S.Cong. & Admin.News p. 5787, 5867.

In view of the import of this section, i.e., bankruptcy proceedings do not affect the liabilities of co-debtors and guarantors, the court agrees Mr. and Mrs. Stoller's independent obligation to Summit Bank is not affected by the debtor's bankruptcy.... The court therefore determines that Mr. and Mrs. Stoller are liable for post-petition interest and attorneys' fees as allowed by the terms of their guarantee.

*Id.* at 635-36 (citations omitted).

Just as Section 524(e) prevents a guarantor from escaping liability for interest that is not allowable against the debtor-principal obligor under Section 502(b)(2), it prevents sureties and escrow agents from avoiding liability to final judgment creditors for claims that might otherwise be disallowed or subordinated if asserted against Keene's estate.

Further, any inequity in this result is the product of Keene's election to post appeal bonds before filing for bankruptcy. In *Johns-Manville,* certain judgment creditors sought relief from the automatic stay to authorize the debtor to prosecute its appeal to finality. The underlying judgments contained punitive damage components, and the *948 entire judgments were bonded by sureties. Granting relief from the automatic stay, Judge Lifland rejected the notion that he could or should prevent the creditors from enforcing their punitive damage awards against the sureties in the event they ultimately prevailed:

The debtor further argues that this Court must deny these plaintiffs relief from the automatic stay because their claims based upon judgments awarded both compensatory and punitive damages could be converted by a surety into ones for contractual indemnification. Manville asserts that it is unfair for it to have to pay a surety for both compensatory and punitive damages when, pursuant to the Code, it may subordinate punitive damages claims. See 11 U.S.C. 726.

However, this possibly inequitable result does not pertain to the criteria for lifting the automatic stay

herein.    Manville must bear the risk of this inequity as a risk of having filed in Chapter 11 after posting supersedeas bonds pending appeal. The issue as to whether the surety's potential claim is contractual or partially subordinate as punitive is not presently before the Court. Appellee plaintiffs' risks were eliminated when the debtor procured these bonds.    The bonds served to protect these plaintiffs from the debtor's failure to pay these judgments for any reason, including bankruptcy.    *See In re Fintel,* 10 B.R. 50, 52 (Bankr.D.Oreg.1981).
26 B.R. at 433.

Judge Lifland's observations apply with equal force to this case.    As previously stated, Keene "elevated" the final judgment claims when it procured bonds or escrows.    This removed the risk of Keene's insolvency and bankruptcy.    This Court will not disturb this reallocation of that risk.

Keene has cited only one case which actually prevented a final judgment creditor from enforcing the punitive damage component against a surety. In *Gnidovec v. Alwan (In re Alwan Brothers Co.),* 105 B.R. 886 (Bankr.C.D.Ill.1989), the plaintiffs (the "movants") had obtained a pre-petition state court judgment against the debtors.    The judgment consisted of $110,059.00 in compensatory damages and $750,000.00 in punitive damages, plus costs and interest.    The debtors appealed the judgment, and the parties entered into a Supersedeas Bond Trust Agreement which was approved by the state trial court.    Under the agreement, the debtors transferred certain real estate to a trustee.    Upon the entry of an adverse final judgment, the debtors had thirty days to pay it; if they did not, the trustee was authorized to sell the real estate and use the proceeds to satisfy the judgment.

After the appeals were affirmed and the judgments became final, the debtors filed their Chapter 11 petitions.    In the course of subsequent bankruptcy court litigation, the Court concluded that the parties' agreement was the equivalent of a supersedeas bond, and that "so much of the real estate which is the subject of the Agreement that is necessary to satisfy the Movant's claims is not property of the bankruptcy estate over which this Court has jurisdiction."    *Id.* at 895.

The Court nevertheless held that the intervention of bankruptcy subjected the movants' claim to the jurisdiction of the Bankruptcy Court.    Having

determined that the punitive damage portion of the judgment was dischargeable, the Court concluded that the movants could only satisfy the compensatory portion of their judgment together with costs and interest against the trust, and that the balance of the trust reverted to the estate.    *Id.*

In a subsequent decision on the movants' motion for reconsideration, the Bankruptcy Court amplified its reasoning:

> This Court's ruling that so much of the real estate which is necessary to satisfy the MOVANTS' claims for compensatory damages should be sold was premised upon a determination that the ALWANS' bankruptcy filing did in fact require alteration of the terms of the Supersedeas Bond Trust Agreement.    In this Court's view, this result serves the purpose of the SUPERSEDEAS bond in that the real estate is appropriated to the benefit of the MOVANTS to make them whole while according the status of PUNITIVE DAMAGES its proper place in a bankruptcy proceeding....    **\*949** Unlike the typical supersedeas bond which is not property of the estate and cannot be used to fund a plan of reorganization, the property which is the subject of the Supersedeas Bond Trust Agreement is nine parcels of real estate.    It is those properties which now remain that the ALWANS seek to reorganize.

*In re Alwan Brothers Co.,* 112 B.R. 294, 296-97 (Bankr.C.D.Ill.1990).

Although the trust agreement in *Alwan* is similar to the escrow agreements at issue, this Court declines to follow the *Alwan* reasoning because it is logically inconsistent and contravened by case law in this district.    The debtors' interest in the trust was always subject to the equities created in the judgment creditors' favor, and of little value to their other creditors. *In re O.P.M. Leasing,* 46 B.R. at 667.    Further, once the Court ruled that the trust was not property of the estate, the filing of the petition could not drag it back in.    The debtors' reversionary interest had been extinguished and the final judgment creditors should have been free to pursue their judgments against non-estate property.

The *Alwan* decision is also inconsistent with the case law already discussed.    In *Johns-Manville,* the Court noted that the procurement of the supersedeas bond reallocated the risk of the debtor's insolvency and bankruptcy.    If inequities resulted, they flowed from the posting of the bond before the filing of the

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

162 B.R. 935                                                                              **Page 127**
**(Cite as: 162 B.R. 935, \*949)**

Chapter 11 petition.   The *Alwan* court chose to ignore these temporal distinctions, finding that the purpose of the bond was to preserve the status quo, and that the debtors could have filed their petitions earlier without posting any bond and at a time when they were just as insolvent.   Hence, the judgment creditors did not suffer damages as a result of the delay in executing the judgment.

The final judgment creditors, however, are not required to prove delay damages to enforce their rights.   That Keene could have filed a Chapter 11 at an earlier time is beside the point;  it didn't.   It is equally true that Keene could have paid these judgments--or these judgment creditors could have enforced them against Keene's assets--long before the bankruptcy was filed. Many things could have occurred to change the outcome of this proceeding, but what actually occurred must dictate the result.

### CONCLUSION
The automatic stay prevents the continuation of asbestos-related litigation against Keene, including

pending appeals by Keene, prevents Keene's banks from seizing the collateral backing the letters of credit and prevents any judgment creditor from satisfying the judgment against property of the estate.   The automatic stay does not prevent, and this Court will not stay, final judgment creditors from enforcing their judgments against the appeal bonds or escrows, or the sureties from drawing the proceeds of the letters of credit in accordance with their terms.

The foregoing shall constitute the Court's findings of fact and conclusions of law.  Fed.R.Civ.P. 52(a), made applicable by Fed.R.Bankr.P. 7052.

Settle an order on five days notice consistent with this decision.

IT IS SO ORDERED.

162 B.R. 935, 30 Collier Bankr.Cas.2d 947, Bankr. L. Rep.  P 75,670

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# TAB 33

592 F.2d 70
592 F.2d 70, Bankr. L. Rep. P 67,045
**(Cite as: 592 F.2d 70)**
C

United States Court of Appeals,
Second Circuit.
**In re CHANTICLEER ASSOCIATES, LTD.,
Debtor.
LOEWI REALTY CORPORATION, Plaintiff-
Appellee,
v.
CHANTICLEER ASSOCIATES, LTD.,
Defendant-Appellant.
No. 395, Docket 78-5046.**

Argued Nov. 27, 1978.
Decided Jan. 23, 1979.

A decision of the United States District Court for the Southern District of New York, Charles S. Haight, Jr., J., reversed two orders of a bankruptcy judge, Stanley T. Lesser, J., in the course of a Chapter XII arrangement proceeding. On appeal by the debtor, the Court of Appeals, Gurfein, Circuit Judge, held that the bankruptcy court had exceeded its authority by imposing, pursuant to ex parte application, a stay on a judicial sale of the debtor's property that had been expressly authorized by the bankruptcy court as a remedy for default under the confirmed plan, the stay being an adverse modification of a plan and exceeding the bankruptcy court's authority in view of failure to comply with procedural requirements of the Bankruptcy Act.

District court's order affirmed.

West Headnotes

**[1] Bankruptcy ☞2361**
51k2361
        (Formerly 51k391(3), 51k391, 51k391(.8), 51k391(3.8), 51k217.1, 51k217(4))
Bankruptcy Court is court of equity, and court's power to preserve its jurisdiction by enjoining proceedings that would remove property from the bankrupt's estate is fundamental to scheme of Bankruptcy Act. Bankr.Act, §§ 2, sub. a(15), 411, 414, 11 U.S.C.A. §§ 1(a)(15), 811, 814; Bankruptcy Rules, rule 12-43(b, f), 11 U.S.C.A.

**[2] Bankruptcy ☞3661.114**
51k3661.114
        (Formerly 51k1007)
In Chapter XII arrangement proceeding, Bankruptcy Court's equity power to preserve jurisdiction usually comes into play during period leading up to

confirmed plan of arrangement to determine extent to which interests of secured creditors may be affected to further possibilities of rehabilitation of debtors, but it can also be exercised after plan has been confirmed if court properly reserved jurisdiction and circumstances necessitate stay. Bankr.Act, §§ 2, sub. a(15), 411, 414, 11 U.S.C.A. §§ 1(a)(15), 811, 814; Bankruptcy Rules, rule 12-43(b, f), 11 U.S.C.A.

**[3] Bankruptcy ☞3661.114**
51k3661.114
        (Formerly 51k1007)
Last-minute stay which effectively denied mortgagee right of foreclosure in state court and aimed to compel mortgagee to accept delayed payment of mortgage after default which had triggered its right to foreclose under unmodified and confirmed plan of arrangement in Chapter XII proceeding was "modification" of confirmed plan of arrangement which was "adverse" to mortgagee's interests, and Bankruptcy Court in granting stay on ex parte application committed error, not cured by subsequent hearing, by violating requirements of notice and hearing which must precede any adverse modification of plan of arrangement. Bankr.Act, §§ 2, sub. a(15), 81-126, 401-526, 414, 461, 468, 469-471, 470, 482, 11 U.S.C.A. §§ 1(a)(15), 401-526, 801-926, 814, 861, 868, 869- 871, 870, 882;   Vernon's Ann.Tex.Civ.St. art. 3810; Bankruptcy Rules, rules 12-39, 12-41(b), 12-43, 12-43(d), 11 U.S.C.A.

**\*71** Louis Kruger, New York City (Barbara G. Kaplan, William J. Lowy, Krause, Hirsch & Gross, New York City, of counsel), for defendant-appellant.

Philip Pierce, New York City (Edgar H. Booth, Jack R. Friedman, Booth, Lipton & Lipton, New York City, of counsel), for plaintiff-appellee.

Before LUMBARD, MOORE and GURFEIN, Circuit Judges.

GURFEIN, Circuit Judge:

This appeal presents for our review a decision by the United States District Court for the Southern District of New York (Hon. Charles S. Haight, Jr., Judge), reversing two orders issued by Bankruptcy Judge Stanley T. Lesser in the course of a Chapter XII arrangement proceeding.   Bankruptcy Act ss

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

592 F.2d 70
(Cite as: 592 F.2d 70, *71)

401- 526; 11 U.S.C. ss 801-926.[FN1] The question is whether the Bankruptcy Court exceeded its authority when it ordered, without a prior hearing, the stay of a forced sale of the debtor's property, on a mortgage foreclosure in a state court, after default by the debtor under a confirmed and unmodified Plan of Arrangement which provided that precise remedy for the debtor's default. For essentially the reasons *72 stated in Judge Haight's opinion below, we agree that the bankruptcy court in this case did exceed its authority. Hence we affirm the district court's order reversing and remanding for further proceedings.

> FN1. Hereinafter citations will be made only to the Act.

  Appellant Chanticleer Associates, Ltd. ("Chanticleer"), the debtor, holds title to an apartment complex located in Dallas, Texas. In the summer of 1976 the property was encumbered by both first and second mortgages. The second mortgage was a lien for unpaid principal of $120,000, due in two equal installments in March 1977 and March 1978. Chanticleer defaulted on the first of these payments, and appellee Loewi Realty Corp. ("Loewi") thereafter purchased the second mortgage at a discount. Loewi immediately began proceedings for a forced sale of the property under Tex.Rev.Civ.Stat.Ann. art. 3810 (Vernon 1966). A receiver was appointed by the Texas court, and the property was posted to be sold on the first Tuesday of July, 1977. Chanticleer filed its Chapter XII petition on the eve of sale, thereby obtaining an automatic stay of the Texas proceedings. See Bankruptcy Rule 12-43.

  The Bankruptcy Judge convened the creditors with what Judge Haight termed "commendable speed," and by December 22, 1977 a third amended plan of arrangement was confirmed, over Loewi's objection. See Bankruptcy Act ss 461, 468. Provisions were made for all creditors. The Bankruptcy Court reserved jurisdiction pursuant to s 482 of the Act and Rule 12-41(b) of the Rules of Bankruptcy Procedure "until (the) Second Mortgage is paid in full. . . ."

  The plan made provision with respect to Loewi requiring full repayment of the second mortgage, with interest. A first payment in the principal amount of $60,000 was due on confirmation, and a second $60,000 payment was due on February 1, 1978, both with interest from March 1, 1977. In addition, Loewi was to be reimbursed for expenditures made for operation and preservation of the apartment complex during the receivership. An installment of $100,000 for reimbursement was to be paid on March 1, 1978, and a second installment of $64,140.31 was due on April 1, 1978, both with interest from May 1, 1977. Finally, Loewi was to be reimbursed for legal fees and other expenses, in an amount to be determined by the Bankruptcy Court. This final payment was also due on April 1, 1978.

  This schedule of payments, and other provisions not here relevant, were treated in the plan of arrangement as modifications of Loewi's second mortgage. The plan provided, however, that "(i)f the Second Mortgage, as modified, at any time is in default, the Second Mortgagee may exercise all of its rights and remedies under said Second Mortgage, as modified."

  Chanticleer made the first payment to Loewi in January 1978, but it defaulted on the February payment. On February 24, 1978, the Bankruptcy Court entered an order requiring immediate tender of the missed payment by Chanticleer and authorizing Loewi "to treat the second mortgage, as modified by the Third Amended Plan, as being in default, and to exercise any or all of its rights and remedies under said second mortgage, including, without limitation, the right to post and otherwise enforce its rights under Texas law with respect to the sale of the property encumbered by said second mortgage. . . ."

  On March 10, 1978, the Bankruptcy Judge denied Chanticleer's application for an extension of time in which to make the payments to Loewi. In so doing, Judge Lesser treated the application as a proposal for a modification of the plan adverse to Loewi and rejected it.[FN2] Hence Loewi was free to *73 re-activate the Texas receivership and conduct the sale on the next sale date available under Texas law April 4, 1978.

> FN2. The March 10 hearing was actually on Loewi's application to dismiss the reorganization proceeding, pursuant to Bankruptcy Rule 12-41(b), by reason of Chanticleer's default. Counsel for Chanticleer responded by orally requesting "one further modification of the plan concerning the repayment schedules." The Bankruptcy Judge denied the request in the following colloquy: Mr. Samet (Counsel for Chanticleer): You are denying my application for leave to file an amended plan?

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

The Judge: Yes, I am denying it even if it was in writing as it should be, in order to satisfy the rulings (Sic ).

Mr. Samet: Need I submit an order to that effect?

The Judge: About what?

Mr. Samet: That you are denying it or is the record sufficient?

The Judge: Let it be on the record. I am not denying it because it is not properly made and because the debtor is not entitled to any relief here. I am denying it Because it is an adverse modification.

App. at 135-36 (emphasis added).

On April 3, on the eve of sale, the Texas court held a hearing on an action by Chanticleer to restrain the foreclosure. The application was denied on the morning of April 4. At that point, counsel for Chanticleer appeared Ex parte before Judge Lesser to request the Bankruptcy Court to stay the sale. The judge was apparently informed that Loewi had frustrated Chanticleer's efforts to pay its debt and thus to avoid the sale by demanding expenses that were not properly compensable. Finding that "the Dallas court had refused to fix the correct amount of the Loewi debt or to stay the sale so as to permit the same to be done," Judge Lesser decided to stay the sale on the basis of Chanticleer's oral Ex parte application before him. The judge communicated the stay to counsel in Dallas by telephone on April 4, and memorialized his action in an order "entered on April 5, 1978 as of 11:00 A.M. on April 4. . . . ." The sale, which had already begun on the morning of April 4 before Loewi's counsel learned of the stay, was completed thereafter. Loewi was the only bidder, offering $246,829.98 for the property, which was subject to prior indebtedness totalling over $2,500,000. The decision of Judge Lesser rested on assurances from counsel for the debtor that Chanticleer's general partner, Eastern Development and Investment Corp., would arrange the deposit with a disbursing agent in New York of approximately $275,000 for payment to the second mortgagee. This amount covered the Bankruptcy Court's best estimate at that time of the debt due and owing to Loewi.[FN3]

FN3. A separate controversy has arisen with respect to these funds. It appears that Walter J. Cook, a limited partner in Chanticleer and the controlling shareholder of Eastern, arranged the $275,000 deposit by a series of banking maneuvers that left First City Bank of Dallas, Texas, which supplied most of the funds, holding several dishonored checks drawn on insufficiently funded Eastern accounts. First City Bank has applied for a "return" of $195,000 in the hands of the disbursing agent, and Judge Haight has ordered the bankruptcy court to resolve First City's claim. That order is not before us on this appeal.

After a series of procedural maneuvers by both parties and a hearing on April 14, 1978, Judge Lesser entered an order on June 7, 1978 Confirming the oral stay, with a scholarly opinion filed thereafter. He relied on the equitable power of the bankruptcy court to stay state court proceedings. Bankruptcy Act ss 2(a)(15), 414, and on its power under Rule 12-43(d) to "terminate, annul, modify or condition such stay." The Bankruptcy Judge reasoned that "(i)t would be a disservice to secured parties if courts could not reimpose stays after they had once been lifted." He wrote:

Circumstances change and courts must be able to react. The court's ability to reconcile divergent views in Chapter (XII) proceedings is often accomplished against the backdrop of the power to affect rights to lien enforcement. Until the debtor is finally divested of its property, the court has exclusive jurisdiction if it chooses to exercise it. Until a sale is consummated and the rights of a bona fide purchaser arise, the court must be able to reassert control.

Because of the obstacles Chanticleer had encountered in the Texas proceeding and its apparent new-found ability to satisfy its debt to Loewi, the court determined that it would serve the rehabilitative purpose of Chapter XII to reimpose the stay and give Chanticleer, in the court's words, "one more chance" to save its property.

[1][2] We do not disagree with the bankruptcy court's assessment of the equities, nor do we find error in its view of the general powers of the Bankruptcy Court. A bankruptcy court is a court of equity; *74 and the court's power to preserve its jurisdiction by enjoining proceedings that would remove property from the bankrupt estate is fundamental to the scheme of the Bankruptcy Act. Bankruptcy Act ss 2(a)(15), 411, 414; See Pepper v. Litton, 308 U.S. 295, 303-06, 60 S.Ct. 238, 84 L.Ed. 281 (1939); Continental Illinois Nat'l Bank & Trust Co. v. Chicago, Rock Island & Pacific Ry., 294 U.S. 648, 676, 55 S.Ct. 595, 79 L.Ed. 1110 (1935); 6 Collier on Bankruptcy P 3.09(1) (14th ed. 1978); Cf. Baum v. Anderson, 541 F.2d 1166 (5th Cir. 1976), Cert. denied, 430 U.S. 932, 97 S.Ct. 1553, 51 L.Ed.2d 776 (1977). In a Chapter XII arrangement this power usually comes into play

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

during the period leading up to the confirmed plan of arrangement to determine "the extent to which the interests of secured creditors may be affected to further the possibilities of rehabilitation of debtors." In re Colonial Realty Investment Co., 516 F.2d 154, 160 (1st Cir. 1975). We do not doubt, however, that it can also be exercised after the plan has been confirmed if the court properly reserved jurisdiction and the circumstances necessitate a stay. Rule 12-43(b), (f); 9 Collier on Bankruptcy, Supra, s 414, P 3.06 at 804-07; Cf. Prudence-Bonds Corp. v. City Bank Farmers Trust Co., 186 F.2d 525, 527 (2d Cir. 1951) (court may take "all proper measures" to "superintend and enforce the execution of the 'plan' ").

[3] These general principles, however, are not enough to sustain the action of the Bankruptcy Court. The flaw in the Bankruptcy Court's handling of the stay lies, not in its perception of its powers, but in its manner of exercising them. As Judge Haight correctly noted below, the Bankruptcy Court's powers, however broad, must be exercised in accordance with the procedural requirements of the Bankruptcy Act and Rules. "A bankruptcy court is a court of equity, s 2, 11 U.S.C. s 11, and is guided by equitable doctrines and principles Except in so far as they are inconsistent with the Act." SEC v. United States Realty & Improvement Co., 310 U.S. 434, 455, 60 S.Ct. 1044, 1053, 84 L.Ed. 1293 (1940) (emphasis added). See Knox v. Lines, 463 F.2d 561, 563 (9th Cir. 1972). We agree with the District Court that the April 5 stay violated the requirements of notice and of a hearing which must precede any adverse modification of a plan of arrangement. See Prudence-Bonds Corp. v. City Bank Farmers Trust Co., supra, 186 F.2d at 527.

The last-minute stay was a "modification" of the confirmed plan of arrangement which was "adverse" to Loewi's interests. The plan expressly obligated Chanticleer to make its second payment to Loewi by February 1, and it expressly empowered Loewi to go forward with foreclosure and sale of the property in the event of default. The April 4 stay effectively denied Loewi its right of foreclosure and aimed to compel it to accept late payment of the mortgage after the default which had triggered its right to foreclose under an unmodified and confirmed Plan of Arrangement. Changing the

event of default was a "modification" of the arrangement "materially and adversely affect(ing)" Loewi. Bankruptcy Act s 470; 14A Collier on Bankruptcy, Supra, P 12-39.02(2) at 12-39-7; Cf. Knight v. Wertheim & Co., 158 F.2d 838, 842-44 (2d Cir. 1946), Cert. denied, 331 U.S. 818, 67 S.Ct. 1307, 91 L.Ed. 1836 (1947). Indeed, the Bankruptcy Judge explicitly recognized that an extension of time for payment would be an adverse modification when he rejected such a proposal during the March 10 hearing.

We hold, accordingly, that a stay of the Texas state proceedings was subject to the procedural requirements for adverse modification of a confirmed plan provided by Bankruptcy Act ss 469-471 and Rule 12-39. These provisions specify that a proposal for adverse modification must be submitted in writing; that the filing of such a proposal requires the creditors' meeting to be reopened; that creditors must receive at least 10 days' advance notice; and that creditors must be afforded the opportunity to submit written objections to the proposal. None of these procedures was followed. Nor could the subsequent hearing on April 14 cure the failure to abide by legal requirements. Although a court of equity should not be bound unduly by mechanistic adherence to *75 formality, the requirements of the Bankruptcy Act and Rules are not mere technicalities that may be overlooked or postponed. Rather, they are essential to a fair balancing between debtors' needs and creditors' rights. Cf. In re Siddell, 446 F.Supp. 86, 87-88 (W.D.N.Y.1978). When rights become fixed by confirmation of a Plan, the Bankruptcy Court is without power to affect a creditor adversely without due notice and an opportunity to object. The very basis for procedural rules is the protection of substantive rights. Because the mandated procedures were ignored, the manner in which the stay was issued by the Bankruptcy Court went beyond its statutory authority.

The order of the District Court remanding the case to the Bankruptcy Court for further proceedings consistent with its opinion is affirmed.

592 F.2d 70, Bankr. L. Rep. P 67,045

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# TAB 34

116 B.R. 887                                                                                    **Page 152**
116 B.R. 887
**(Cite as: 116 B.R. 887)**
**H**

United States Bankruptcy Court,
S.D. New York.
**In re CHATEAUGAY CORPORATION,
Reomar, Inc., the LTV Corporation, et al.,
Debtors.**
**The LTV CORPORATION, LTV Steel
Company, Inc., BCNR Mining Corporation and
Nemacolin Mines Corporation, Plaintiffs,**
**v.**
**The AETNA CASUALTY AND SURETY
COMPANY, National Fire Insurance Company
of
Hartford and the Commonwealth of
Pennsylvania, Defendants.**
**Bankruptcy Nos. 86 B 11270 (BRL) through 86 B
11334 (BRL), 86 B 11402 (BRL) and
86 B 11464 (BRL).
Adv. No. 88-5971A.**

July 11, 1990.

Chapter 11 debtor brought adversary proceeding
seeking declaratory judgment that sureties were
liable under workers' compensation surety bonds,
and the Pennsylvania Bureau of Workers'
Compensation, whose state court action seeking
similar declaratory judgment was removed, filed
cross claims. Debtor moved for partial summary
judgment and surety moved for a dismissal or stay
and for summary judgment. The Bankruptcy
Court, Burton R. Lifland, J., held that: (1)
adversary proceeding brought by Chapter 11 debtor
seeking declaratory judgment that surety was liable
on workers' compensation surety bonds and should
reimburse debtor for any interim payments for
benefits was core proceeding; (2) evidence
established that, following merger of two principals
on workers' compensation surety bonds, at which
time one of existing bonds was cancelled and penal
sum of second bond was increased, novation
occurred so that surety was liable only under
remaining bond, and not under termination
provisions of cancelled bond, which provided for
retroactive liability; and (3) conduct by Bureau and
debtor in advising surety that premerger bonds were
no longer required and that replacement bond would
be sufficient equitably estopped them from asserting
surety's liability beyond penal sum of $27 million,
the amount on replacement bond.

So ordered.

West Headnotes

**[1] Bankruptcy** ☞2048.2
51k2048.2
        (Formerly 51k2048(2))
Adversary proceeding brought by Chapter 11 debtor
seeking declaratory judgment that surety was liable
on workers' compensation surety bonds and should
reimburse debtor for any interim payments made for
benefits, in which proceeding Pennsylvania Bureau
of Workers' Compensation asserted cross claims
against surety, was core proceeding as matter
concerning administration of estate, even though
proceeding required determination of meaning of
certain bond language under Pennsylvania law.
Bankr.Code, 11 U.S.C.A. § 1101 et seq.; 28
U.S.C.A. § 157(a), (b)(2)(A, O), (b)(3); 28
U.S.C.(1982 Ed.) § 1471(a-c).

**[2] Bankruptcy** ☞2045
51k2045
Normally, suit involving beneficiary's action to
recover on bond issued by debtor's surety is
proceeding "related to" the bankruptcy case, so that
bankruptcy court has jurisdiction over proceeding as
case may affect plaintiff's status as creditor of
debtor's estate by reducing or eliminating its claim.
28 U.S.C.A. § 157(a).

**[3] Bankruptcy** ☞3501
51k3501
Purpose of protection provided by Chapter 11 is to
give debtor a breathing spell, an opportunity to
rehabilitate its business and to enable debtor to
generate revenue. Bankr.Code, 11 U.S.C.A. §
1101 et seq.

**[4] Bankruptcy** ☞2048.2
51k2048.2
        (Formerly 51k2048(2))
Suit by Chapter 11 debtor seeking declaratory
judgment that surety was liable on workers'
compensation surety bonds and should reimburse
debtor for any interim payments for benefits made
by debtor, in which proceeding Pennsylvania
Bureau of Workers' Compensation asserted cross
claim against surety, was dispute involving property
of the estate, and thus was core proceeding; surety
bonding agreements were contracts for which debtor
bargained and paid valuable consideration, and
employee good will and contentment was asset vital
to continuation of debtors' business operations and

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

116 B.R. 887                                                    **Page 153**
**(Cite as: 116 B.R. 887)**

its ability to effectively reorganize, which court considered in permitting debtor to make hardship payments to injured workers. Bankr.Code, 11 U.S.C.A. §§ 541(a), 1101 et seq.; 28 U.S.C.A. § 157(b)(2)(A, O).

**[5] Bankruptcy** ⊜⇒2554
51k2554
Contractual rights in tangible property is included within definition of estate of debtor. Bankr.Code, 11 U.S.C.A. § 541(a).

**[6] Bankruptcy** ⊜⇒2048.2
51k2048.2
        (Formerly 51k2048(2))
Suit by Chapter 11 debtor seeking declaratory judgment that surety was liable under workers' compensation surety bonds and reimbursement for interim payments made by debtor and authorized by court, in which case Pennsylvania Bureau of Workers' Compensation asserted cross claims against one surety, would directly affect debtor-creditor relationship, and thus was core proceeding; sureties had filed at least 42 proofs of claim relating to workers' compensation surety bonds seeking aggregate recovery of over $58 million, and whether debtors were entitled to reimbursement from one surety would first require determination as threshold matter whether surety was liable for payments. Bankr.Code, 11 U.S.C.A. § 1101 et seq.; 28 U.S.C.A. § 157(b)(2)(O).

**[7] Declaratory Judgment** ⊜⇒301
118Ak301
Chapter 11 debtor demonstrated personal stake or direct interest in outcome of adversary proceeding sufficient to warrant finding of standing to commence proceeding seeking declaratory judgment that surety was liable under workers' compensation surety bonds and that surety should reimburse debtors for interim payments made for workers' compensation benefits, as authorized by bankruptcy court, even though debtor would have no standing under Pennsylvania law to seek declaration as to extent of surety's liability; debtor was forced to seek permission to pay injured workers hardship payment as a result of dispute between Pennsylvania Bureau of Workers' Compensation and surety as to extent of surety's liability under bonds.

**[8] Federal Civil Procedure** ⊜⇒103.2
170Ak103.2
Plaintiff has standing only if it alleges some threatened or actual injury directly impacting its

own legal rights and interests; it is not sufficient that plaintiff's claim for relief rests on legal rights and interests of third parties.

**[9] Principal and Surety** ⊜⇒65
309k65
Under Pennsylvania law, principal cannot maintain suit against surety to compel performance; rather, surety is entitled to reimbursement from principal when surety performs due to principle's default.

**[10] Federal Civil Procedure** ⊜⇒2465.1
170Ak2465.1
        (Formerly 170Ak2465)
Cases with complex factual record may be appropriately disposed of on summary judgment; complexity of factual issues alone cannot justify denial of summary judgment.

**[11] Federal Civil Procedure** ⊜⇒2465.1
170Ak2465.1
        (Formerly 170Ak2465)
Even when question of party's belief is at issue, there are circumstances in which summary judgment is appropriate; "rule" that summary judgment should be reluctantly granted where state of mind is at issue should not preclude granting such motion in the absence of material fact issue.

**[12] Evidence** ⊜⇒450(9)
157k450(9)
Workers' compensation surety bonds were ambiguous as to definition of "terminated," for purpose of provisions limiting surety's prospective liability but not retroactive liability upon termination of bonds, thus warranting admission of parol evidence in order to establish whether four surety bonds were "terminated.".

**[13] Workers' Compensation** ⊜⇒1065
413k1065
Under termination provisions of workers' compensation surety bonds, termination of bond only limited surety's prospective liability, not its retroactive liability.

**[14] Principal and Surety** ⊜⇒59
309k59
In interpreting nature and scope of surety bond, courts are guided by contract principals.

**[15] Principal and Surety** ⊜⇒59
309k59
In determining intent of parties to surety agreement,

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

116 B.R. 887                                                                                           **Page 154**
**(Cite as: 116 B.R. 887)**

court has duty to ascertain intent as manifested in language of agreement.

**[16] Principal and Surety ☜59**
309k59
If terms of surety agreement are clear from face of document, intent of parties is found in document, but court must adopt construction which gives effect to parties' reasonable and probable intent in view of surrounding circumstances and purposes of agreement.

**[17] Evidence ☜397(2)**
157k397(2)
Thereto;
Parol evidence rule prevents alteration of integrated contract by extrinsic evidence.

**[18] Evidence ☜397(3)**
157k397(3)
"Integration" of contract for parol evidence purposes is determined by whether terms of contract are clear, definite, and complete on their face; typically, court will look to whether contract on its face represents entire understanding of parties, whether contract contains any ambiguous terms, and whether there is any objective reason to look outside document to interpret its meanings.

**[19] Evidence ☜448**
157k448

**[19] Evidence ☜450(5)**
157k450(5)
When terms of contract are ambiguous or subject to interpretation by parties, parol evidence may be admitted to determine contract's meaning, and such situations include both material ambiguity which springs from words of contract, as well as external ambiguity which springs from words of contract within context of circumstances of contract.

**[20] Evidence ☜448**
157k448
When two parties disagree as to meaning of contractual term, parol evidence may be admitted to extinguish any ambiguity.

**[21] Customs and Usages ☜15(1)**
113k15(1)

**[21] Evidence ☜397(1)**
157k397(1)

**[21] Evidence ☜448**
157k448
Parol evidence may be introduced: when contracts are standardized forms, to show meaning of terms; when terms are subject to common trade usage, to show which interpretation is more generally known within trade; and when there has been course of dealing between parties which has established common understanding, to supplement contract.

**[22] Evidence ☜445(1)**
157k445(1)
Parol evidence is admissible under Pennsylvania law to establish new and distinct agreement upon new consideration.

**[23] Contracts ☜241**
95k241

**[23] Novation ☜10**
278k10
Contract may not be altered by evidence pertaining to its formation, but it may be altered or discharged by new agreement.

**[24] Evidence ☜417(1)**
157k417(1)
Evidence tending to show that fundamental assumption of parties was not expressed in writing should not be excluded by parol evidence rule.

**[25] Evidence ☜158(1)**
157k158(1)

**[25] Evidence ☜158(28)**
157k158(28)
Under best evidence rule, affidavits submitted by principal and surety under workers' compensation surety bonds, to extent that they were submitted to show subjective intent, were not necessary or relevant to interpretation of bonds, and would be disregarded; correspondence and other documents relating to bonds spoke for themselves.

**[26] Affidavits ☜18**
21k18
Portions of affidavits submitted by parties to workers' compensation surety bonds and by Pennsylvania Bureau of Workers' Compensation, including affidavit submitted by surety to show Bureau protocol, were relevant and admissible in declaratory judgment action to determine extent of surety's liability on bonds.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

116 B.R. 887
(Cite as: 116 B.R. 887)

**Page 155**

**[27] Novation** ☞4
278k4

**[27] Principal and Surety** ☞89
309k89
Surety's issuance of new workers' compensation surety bond in response to request of Pennsylvania Bureau of Workers' Compensation, following merger of three companies for which surety had issued three bonds, was a "substituted contract" or "novation" discharging surety's obligation on prior bonds, rather than "termination" not limiting surety's retroactive liability on prior bonds.

**[28] Novation** ☞1
278k1
Although terms "novation" and "substituted contract" are frequently used interchangeably, there is technical distinction; "substituted contract" is one that is accepted in satisfaction of original contract and thereby discharges it, while a novation is substituted contract and includes party who was not party of original contract.

**[29] Novation** ☞4
278k4
"Novation" occurs when parties to contract mutually agree to relieve one another from liability on valid contract and to substitute new contract in place of old one; since substituted contract is accepted as satisfaction of preexisting duty, it bars revival of preexisting duty following breach of substituted contract.

**[30] Novation** ☞12
278k12
Novation may be established by evidence of express understanding or by circumstances showing assent, and may be implied or inferred from all surrounding circumstances.

**[31] Novation** ☞12
278k12
Party asserting existence of novation has burden of proving that later agreement was specifically intended as complete substitute for prior agreements.

**[32] Novation** ☞4
278k4
Evidence established that, following merger of two principals on workers' compensation surety bonds, at which time one of existing bonds was cancelled and penal sum of second bond was increased,

novation occurred so that surety was liable only under remaining bond, and not under termination provisions of cancelled bond providing for retroactive liability; correspondence indicated that cancelled bond was displaced and extinguished, remaining bond had increased penal sum and changed principals, surety agreed to accept surety bond for new corporate entity with increased penal sum, and change was instituted at request of new principal.

**[33] Workers' Compensation** ☞1100
413k1100
Conduct by Pennsylvania Bureau of Workers' Compensation and Chapter 11 debtor principal under workers' compensation surety bonds in advising surety that premerger bonds were no longer required and that replacement bond would be sufficient equitably estopped them from asserting surety's liability beyond penal sum of $27 million, the amount of replacement bond based on penal sums of cancelled bonds.

*890 Davis Polk & Wardwell by Karen E. Wagner, Regina Shannahan, New York City, for debtors.

Stroock & Stroock & Lavan by Mark Speiser, New York City, for Steel Creditors Committee.

LeRoy S. Zimmerman, Atty. Gen., Com. of Pa. by Calvin R. Koons, Harrisburg, Pa.

Hebb & Gitlin by Harold Horwich, Hartford, Conn., Thomas & Thomas by James K. Thomas, II, Harrisburg, Pa., Moses & Singer by Thomas R. Slome, Michael Luskin, New York City, Luskin & Stern, New York City, for Aetna Cas. & Sur. Co.

Zalkin, Rodin & Goodman by Richard S. Toder, New York City, for Nat. Fire Ins. Co. of America.

MEMORANDUM DECISION ON MOTIONS TO DISMISS AND CROSS-MOTIONS FOR SUMMARY JUDGMENT

BURTON R. LIFLAND, Bankruptcy Judge.

The central dispute which must be determined by this Court is whether certain surety bonds issued pursuant to the worker's compensation self-insurance program of the Commonwealth of Pennsylvania, were in effect when the principals filed for bankruptcy protection.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

## *891 BACKGROUND

On July 17, 1986 and thereafter LTV Steel Company, Inc. ("LTV Steel") and sixty-six affiliated companies, including BCNR Mining Corp. ("BCNR") and Nemacolin Mines Corp. ("Nemacolin"), filed petitions for reorganization under Chapter 11 of the Bankruptcy Code (the "Code") and were continued in the management and possession of their businesses and properties as debtors-in-possession (collectively, the "Debtors").

Prior to the filing, LTV Steel was self-insured in twelve states. [FN1] As of the Chapter 11 filings, LTV Steel had open workers' compensation liabilities of approximately $146 million. Upon the filing, LTV Steel was obligated to cease payment of all pre-petition obligations including pre-petition workers' compensation obligations. Most of LTV Steel's pre-petition workers' compensation obligations were shared by either surety companies or state-sponsored funds, which assumed and began paying such claims upon the default of LTV Steel. As a result of such payments the state funds and surety companies, including The Aetna Casualty and Surety Company ("Aetna") and National Fire Insurance Company of Hartford ("National"), have filed over 194 proofs of claim in these bankruptcy proceedings in excess of $450 million. Aetna and National alone have filed approximately forty-two proofs of claim for over $58 million with respect to the surety bonds which are in dispute in this action.

FN1. Alabama, Ohio, Pennsylvania, Michigan, Minnesota, Illinois, Indiana, West Virginia, Kentucky, New Jersey, New York and Connecticut.

Prior to the filing date, LTV Steel, its predecessors, and its subsidiaries Nemacolin and BCNR, applied and qualified for status as self-insured employers under the Pennsylvania Workmen's Compensation Act, Pa.Stat.Ann. tit. 77 § 501 (Supp.1988) (the "Workmen's Compensation Act"). Pursuant to that statute and the regulations promulgated thereunder, the Commonwealth of Pennsylvania, Department of Labor and Industry, Bureau of Workers' Compensation (the "Bureau") reviews each employer's annual application for self-insured status. The Bureau conditions its approval on the requirement that the employer post a surety bond which will provide coverage in the event that the employer defaults on its workers' compensation obligations. 34 Pa.Code 121.19. Between 1978 and 1986 such bonds were supplied by Aetna and National.

Beginning in August 1986 and continuing thereafter, the Bureau made periodic demands upon Aetna, National and another surety, American Casualty Company of Reading Pennsylvania ("American Casualty") as sureties for the workers' compensation obligations of these Debtors in accordance with the applicable terms of the surety bonds [FN2]. In August 1988, due to the periodic demands made by the Bureau, the full value of the American Casualty surety bond No. 573 59 44 with a penal sum of $2 million, had been drawn down. The Bureau *892 therefore made additional demands upon Aetna and National with respect to workers whose injuries occurred during or prior to the effective date of the American Casualty surety bond. In November 1988, the Debtors were informed by the Bureau that National and Aetna were refusing to make payments for workers injured prior to October 1983 because they were disputing the extent of their obligations as sureties for certain workers' compensation bonds issued to LTV Steel. The Bureau further informed the Debtors that due to the refusal of Aetna and National to fulfill their obligations, it would be forced to cease making payments to these workers.

FN2. For example, ¶ 1 of the Aetna surety bonds, reads as follows:
1. In the event of default or failure of the Principal to pay compensation including, without limitation, payments for burial expenses, hospital services, hospital supplies, physician's fees and all other payment provided for under The Pennsylvania Workmen's Compensation Act and The Pennsylvania Occupational Disease Act, including, but not limited to, awards for disability or death arising out of and in the course of employment which occurred prior to the effective date of this bond, as required under said acts as amended, or as may be amended, or the rules and regulations issued thereunder or the agreement and undertaking executed by the Principal as a self-insurer, or in the event of insolvency, bankruptcy or receivership of the Principal, the Director of the Bureau of Workers' Compensation may from time to time make written demand personally or by mail upon the Principal and Surety to pay to said Director such sum or sums as the Director may require to discharge promptly all or any part of the obligations of the Principal, past, present, future or potential, under or pursuant to said acts, or rules and regulations, issued thereunder or the agreement and undertaking as a self-insurer. Such payment shall be made within fifteen (15) business days after receipt of such demand by the Surety.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

> The Surety shall not be liable for any obligations of the Principal otherwise payable under an approved Workmen's Compensation insurance policy or prior duly accepted Surety bond filed as self-insurer.

In order to prevent hardship to the workers, on December 12, 1988, LTV Steel made an application for and received authority from this Court to make certain interim payments for the benefit of the injured workers.   At the time of the application, based upon estimates presented to LTV Steel by the Bureau, LTV Steel expected those payments to be no more than $500,000 per quarter. However, at the hearing on the matter, the Debtors informed this Court that the Bureau had informed LTV Steel that the original estimates were incorrect. Rather than 70, there were approximately 242 injured workers whose compensation payments were not being paid by Aetna and National and the quarterly cost would be closer to $600,000 rather than the originally estimated $500,000.    At that time, the Debtors asserted that they were concerned that future demands for interim hardship payments would become even greater and more burdensome as Aetna and National continued to deny liability for the full extent of their obligations as sureties.   On December 27, 1988, pursuant to this Court's order, LTV Steel paid $200,000 over to the Bureau for the benefit of the affected workers.

Subsequently, in May 1990, the Debtors again applied to this Court for permission to make additional hardship payments.   In its application, the Debtors stated that in March 1990 the Bureau informed LTV Steel that Aetna had announced its intention to cease making payments when the one surety bond, under which Aetna believed that it was solely liable, was exhausted.     It was also represented to the Court that Aetna's bond would be exhausted sometime in June and that the Bureau does not have an established fund from which to pay benefits due to injured workers whose payments were covered by the disputed Aetna surety bonds. Moreover, the Debtors also stated that because of these circumstances, it now estimated that approximately 500 individuals will cease being paid workers' compensation benefits and will suffer hardship as a result.     The Debtors estimated that the annual cost of providing such benefits would be $7 million.     Consequently, LTV Steel sought authorization to pay interim hardship workers' compensation benefits for claims which are the focus of the instant controversy.     On May 30,

1990, this Court approved the Debtors' request.

The dispute between Aetna and the Bureau essentially centers around the extent of Aetna's obligations under five surety bonds.   Aetna alleges that from December 15, 1978 and thereafter, Aetna issued surety bonds on behalf of certain LTV Corporations and their predecessors.   In connection with the merger of those corporations and their combination with other corporations, Aetna maintains that certain of those bonds were discharged by operation of law or by agreement. Consequently, Aetna contends that at the time of the filing, Aetna had outstanding only one surety bond on behalf of certain LTV Corporations in the penal sum of $27.0 million.     In contrast, both the Debtors and the Bureau contend that Aetna is liable under all five bonds with an aggregate bond penalty of $51.0 million.

The bonds that the Debtors and the Bureau contend are collectible are as follows:
*Bond No. 018 S 69174:*  issued on behalf of Emerald Mines and Nemacolin Mines.   Emerald Mines was deleted by rider and the penal sum was reduced effective 7/1/80.   The penal sum of this bond is $2.5 million.  Aetna asserts that this bond was replaced by bond No. 018 S 71955.
*\*893 Bond No. 018 S 69175:*  issued on behalf of General Alloy Casting Company.   The penal sum of this bond is $.5 million.     Aetna asserts that this bond was replaced by bond No. 018 S 71955.
*Bond No. 018 S 68212:*  issued on behalf of Jones & Laughlin.     The penal sum of this bond is $14 million.     Aetna asserts that this bond was replaced by bond No. 018 S 71955.
*Bond No. 018 S 100071193:*  issued on behalf of Republic Steel and BCNR. The penal sum of this bond is $7 million.   Aetna asserts that this bond was replaced by bond No. 018 S 71955.
*Bond No. 018 S 71955:*  initially issued on behalf of Jones & Laughlin in the penal sum of $12 million.   Aetna asserts that this bond was initially issued as the replacement for the three pre-existing bonds (Nos. 018 S 69174, 018 S 69175 and 018 68212) and subsequently replaced bond No. 018 S 100071193 upon the merger of Jones & Laughlin and Republic Steel, with an increase in the penal sum to $27 million.

*Procedural History of the Case*

On December 1, 1988, the Debtors filed an action in this Court seeking a declaratory judgment that

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

116 B.R. 887
(Cite as: 116 B.R. 887, *893)

Aetna and National [FN3] are liable to the full extent of their obligations as sureties as expressed by the terms of the bonds (the "Adversary Proceeding"). LTV Steel seeks judgment, *inter alia,* declaring that certain surety bonds issued by Aetna remain in force and effect and that Aetna's liability to the Bureau pursuant to those bonds is coextensive with the face value, as modified by rider, of each bond; and declaring that Aetna must reimburse the Debtors for any interim payments made for workers' compensation benefits, as authorized by this Court, that are found to be the obligations of Aetna. The Bureau is a party to this lawsuit.

> FN3. The Debtors' action against National involves a controversy as to whether National is liable to the Bureau for any unsatisfied claims made against a surety bond issued by American Casualty for the period from October 23, 1979 through October 23, 1983, which bond has been exhausted by claims in excess of the bond's penal sum. National disputes its liability for injuries which occurred prior to the date of issuance of its bond. As a result of settlement negotiations among the parties, LTV Steel has agreed to adjourn without a date its motion for partial summary judgment against National. Accordingly, the discussion herein does not address that motion.

On December 19, 1988 LTV Steel moved for partial summary judgment for a declaration as a matter of law that all five worker's compensation surety bonds issued by Aetna remain in force and effect. Aetna then moved to dismiss LTV Steel's complaint, alleging, *inter alia,* lack of jurisdiction or, alternatively, that this action is subject to mandatory abstention. [FN4] Subsequently, Aetna filed its own cross-motion for summary judgment.

> FN4. Similarly, National also moved to dismiss the Debtors' complaint on those causes of actions relating to its dispute as to the extent of its liability to the Bureau. To the extent that National raises in co-extensive fashion the same issues relating to jurisdiction and abstention as are raised by Aetna, this Court has considered National's submissions and briefs in connection with its determination of these discrete issues.

On March 3, 1989, the Bureau requested leave to amend its answer in this Adversary Proceeding, and on April 10, 1989, the Bureau was granted leave to file its cross-claims (the "Cross-Claims"). The Bureau seeks in its Cross-Claims an order, *inter*

*alia,* compelling Aetna to comply with its full obligations as surety for the liabilities of the principal; and compelling Aetna to comply with its full obligations for the liabilities of the principal with respect to which National has refused to make payment. The Bureau has joined in the Debtors' motion for partial summary judgment. [FN5] Aetna has also moved to dismiss or stay the Bureau's Cross-Motions.

> FN5. Additionally, the Official Committee of Unsecured Creditors of LTV Steel (the "Steel Committee") supports the Debtors' motion for partial summary judgment and opposes Aetna's cross-motion for summary judgment.

The matters presently before this Court are also the subject of two other separate legal actions. Prior to the commencement of this declaratory judgment action, lawsuits between the Commonwealth of Pennsylvania *894 and the sureties were commenced in other courts. On September 2, 1988, Aetna filed an action in the United States District Court for the Middle District of Pennsylvania against the Bureau seeking a declaratory judgment that certain surety bonds issued by Aetna are null and void (the "District Court Action"). *Aetna Casualty and Surety Co. v. Commonwealth of Pennsylvania,* slip op. 88- 1387 (M.D.Pa. May 8, 1989). LTV Steel was not a party to the lawsuit. The District Court Action was dismissed based upon the District Court's finding that the Bureau is the "alter ego" of the Commonwealth of Pennsylvania and as such it cannot be considered a citizen for diversity purposes. *Id.* at 18. Subsequently, the Third Circuit denied Aetna's appeal. Although the District Court Action has been dismissed based on the Bureau's rights pursuant to the Eleventh Amendment, it is clear that the Bureau has submitted to Federal jurisdiction in this Court. ( *See,* Transcript of April 10, 1989 Hearing at 21- 23).

On December 8, 1988 the Bureau filed an action in the Commonwealth Court of Pennsylvania (the "Commonwealth Court") seeking a declaratory judgment similar in nature to the motion before this Court. That case was removed upon petition by Aetna to the United States District Court for the Middle District of Pennsylvania. Upon petition of the Bureau, that case has been remanded to the Commonwealth Court. LTV Steel is not a party to the lawsuit. The Bureau has agreed to adjourn its

own action in the Commonwealth Court upon this Court's determination to take jurisdiction of the dispute.

## RELIEF REQUESTED

After sifting through the plethora of documents which have been placed before this Court, the basic issue which must be determined is the amount of Aetna's liability for surety bonds issued on behalf of LTV Steel and its predecessor corporations pursuant to the workers' compensation self-insurance program of the Commonwealth of Pennsylvania. Specifically, the dispute involves which surety bonds remained in effect when LTV Steel and its subsidiaries filed for bankruptcy protection in July 1986 and defaulted on their Pennsylvania workers' compensation obligations. Aetna maintains that its surety bond No. 018 S 71955 in the penal sum of $27 million is the only surety bond collectible. In sharp contrast, both the Debtors and the Bureau assert that all five surety bonds issued by Aetna in the total penal sum of $51 million are collectible.

Before reaching a decision on the merits of the cross-motions for summary judgment, this Court must first address several threshold issues which were raised in Aetna's motion to dismiss the Debtors' complaint and the Bureau's Cross-Claims. Pursuant to Rules 12(b)(1) and 12(b)(6) of the Federal Rules of Civil Procedure (the "Federal Rules") made applicable herein pursuant to Bankruptcy Rule 7012 and pursuant to Bankruptcy Rule 5011, Aetna has moved for the dismissal or stay of the within Adversary Proceeding because (1) the Debtors do not state a claim upon which relief can be granted; (2) the Debtors do not have standing to bring an action for declaratory relief in this instance; (3) this Court lacks subject matter jurisdiction over this matter or should abstain from taking jurisdiction; and (4) only the first filed action should proceed. Aetna has also moved for the dismissal or stay of the Bureau's Cross-Claims on similar grounds.

## ISSUES

1) Whether this Court has subject matter jurisdiction of this Adversary Proceeding.

2) Whether LTV Steel has standing to commence this Adversary Proceeding.

3) Whether summary judgment is appropriate in this instance on behalf of either Aetna or the Debtors.

4) Whether parol evidence is admissible to show the intent of the parties involved in these transactions.

5) Whether the affidavits submitted should be stricken for failure to comply with the requirements of Federal Rule 56(e) and Bankruptcy Rule 7056.

*895 6) Whether a novation or substitution of contract occurred.

7) Whether LTV Steel and the Bureau should be estopped from asserting Aetna's liability beyond the penal sum of $27 million.

## DISCUSSION

1) *Whether this Court has subject matter jurisdiction of this Adversary Proceeding.*

[1] Aetna asserts that this Court has no subject matter jurisdiction over the Debtors' first cause of action in their complaint and the Bureau's Cross-Claims. Aetna argues that because the matters herein deal with a dispute between Aetna and the Bureau concerning the rights of the Bureau under certain surety bonds issued by Aetna in connection with the Debtors' self-insured workers' compensation program, this action does not arise in, or relate to the Debtors' cases under Chapter 11, nor does it involve property of their estates.

With the passage of a new Bankruptcy Code in 1978 (the "Code"), Congress vested the United States district courts with original and exclusive jurisdiction of all cases commenced under title 11. 28 U.S.C. § 1471(a) (repealed, 1984). The district courts also had original but not exclusive jurisdiction over all civil proceedings arising under title 11 or arising in or related to cases pending under title 11. 28 U.S.C. § 1471(b) (repealed, 1984). Section 1471(c) (repealed, 1984) conferred upon the bankruptcy courts within the district where the title 11 case was pending all of the jurisdiction granted to the district court under 28 U.S.C. § 1471(a).

The scope of the jurisdiction accorded the bankruptcy courts under the newly enacted Code met with constitutional challenges in *Northern Pipeline Construction Co. v. Marathon Pipeline Co.* ("*Marathon* "), 458 U.S. 50, 102 S.Ct. 2858, 73 L.Ed.2d 598 (1982). In *Marathon,* the Supreme Court held that the jurisdiction conferred upon the

bankruptcy courts by Congress under 28 U.S.C. § 1471(c) was too broad and, therefore, unconstitutional. *Id.* at 87, 102 S.Ct. at 2880. In response to the Supreme Court's ruling, Congress enacted the 1984 Amendments to the Code (the "1984 Amendments"), which pursuant to 28 U.S.C. § 1334, now vested the district courts with original jurisdiction of all bankruptcy-related cases and proceedings. The district courts are, in turn, authorized under 28 U.S.C. § 157(a) to refer to bankruptcy judges "any or all cases under title 11 or arising in or related to a case under title 11...." Accordingly, pursuant to 28 U.S.C. § 1334(d), the "district court in which a case under title 11 is commenced or is pending shall have exclusive jurisdiction of all of the property, wherever located of the debtor ... and of property of the estate." The District Court for the Southern District of New York (the "District Court") has referred its jurisdiction to this Court by the "Standing Order of Referral of Cases to Bankruptcy Judges" dated July 10, 1984 (Ward, Acting C.J.).

Under the 1984 Amendments, all proceedings in the bankruptcy case are categorized as either "core" or "non-core". [FN6] The employment of this terminology by Congress *896 is in recognition of *Marathon's* holding that "the restructuring of debtor-creditor relations, which is at the core of the federal bankruptcy power, must be distinguished from the adjudication of state-created private rights...." *Marathon,* 458 U.S. at 71, 102 S.Ct. at 2871; *see also, In re Baldwin-United Corp.,* 48 B.R. 49, 53 (Bankr.S.D.Ohio 1985).

> FN6. Section 157(b)(3) provides that "[t]he bankruptcy judge shall determine, on the judge's own motion or on timely motion of a party, whether a proceeding is a core proceeding under this subsection or is a proceeding that is otherwise related to a case under title 11. A determination that a proceeding is not a core proceeding shall not be made solely on the basis that its resolution may be affected by State law." 28 U.S.C. § 157(b)(3). This determination "is binding, subject only to conventional appellate review." *In re Lion Capital Group,* 48 B.R. 329, 338 (S.D.N.Y.1985).
> Pursuant to 157(b)(1), bankruptcy judges are granted the authority to hear and determine all "core" proceedings and to enter dispositive orders and judgments in connection therewith, subject to appellate review by a district court under 28 U.S.C. § 158(a). In contrast, in "non-core" proceedings the bankruptcy judge is authorized only to conduct a hearing on such proceedings and to submit proposed findings of fact and conclusions

of law to the district court for final disposition which are subject to *de novo* review by the district court, unless the parties consent to a final determination thereof by the bankruptcy judge. *See, In re Outlet Dept. Stores, Inc.,* 82 B.R. 694, 695 (Bankr.S.D.N.Y.1988).

This Court's jurisdiction is further defined by § 157(b)(2)(A) and (O), which state in pertinent part as follows:

> Core proceedings include, but are not limited to--
> (A) matters concerning the administration of the estate;
>
> \* \* \* \* \* \*
>
> (O) other proceedings affecting the liquidation of the estate or the adjustment of the debtor-creditor or the equity security holder relationship, except personal injury tort or wrongful death claims.

[2] Under normal circumstances, a suit involving a beneficiary's action to recover on a bond issued by the debtor's surety constitutes a civil proceeding "related to" the bankruptcy case, so that a bankruptcy court has jurisdiction over the proceeding, as the case may affect the plaintiff's status as a creditor of the debtor's estate by reducing or even eliminating its claim. *See, Howard Brown Co. v. Reliance Ins. Co.,* 66 B.R. 480, 481-82 (E.D.Pa.1986). The unique circumstances in this case, however, justifies this Court's determination that this matter is a "core proceeding" rather than merely a proceeding which is "related to" the bankruptcy case. In this instance, this declaratory judgment action was brought by the Debtors themselves, and is not just an adjudication of an action between two creditors. Even more compelling is the effect this matter has on the administration of the estate. LTV Steel's workers' compensation obligations are matters of major importance and their resolution is of central concern to the administration of these estates. Based on the doctrine of necessity [FN7], this Court has previously approved the Debtors' request to provide interim hardship payment to injured workers pending a resolution of this dispute. It is estimated that the Debtors will have to pay approximately $7 million a year in order to fill the gap. The Debtors and their creditors are entitled to know as expeditiously as possible whether such payments will need to be made on a more permanent basis. In fact, the Steel Committee has already expressed its concerns as to the duration and amount of these payments [FN8]. Accordingly, it is clear that the administration of these estates is substantially

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

impacted by the outcome of this Adversary Proceeding.

> FN7. For a thorough discussion of the doctrine of necessity, *see, In re Ionosphere Clubs Inc.* 98 B.R. 174 (Bankr.S.D.N.Y.1989); *see also,* Eisenberg & Grecker, *The Doctrine of Necessity and its Parameters,* 73:1 Marq.L.Rev. 1-39 (1989).

> FN8. *See,* Transcript of the May 30, 1990 hearing.

[3] With respect to the administration of the estate, the purpose of the protection provided by Chapter 11 is to give the debtor a breathing spell, an opportunity to rehabilitate its business and to enable the debtor to generate revenue. *See, In re Johns-Manville Corp.,* 801 F.2d 60, 64 (2d Cir.1986); *In re Talladega Steaks, Inc.,* 50 B.R. 42, 44 (Bankr.N.D.Ala.1985). If the surety bonds at issue are available to provide for compensation to injured workers' claims on an interim basis during the period of reorganization, LTV Steel will be relieved of a drain on its cash flow resulting from the hardship payments it has been authorized to pay to the Bureau.

This Court has previously determined that a debtor has a right to preserve the reorganization process as a whole. *In re Johns-Manville Corp.,* 52 B.R. 879, 890 (Bankr.S.D.N.Y.1985). Other courts also have recognized that the bankruptcy court has jurisdiction to hear all matters to expeditiously and effectively administer the estate. *See, e.g., In re Wood,* 825 F.2d 90, 92 (5th Cir.1987); *In re Lion Capital Group,* 46 B.R. 850, 856 (Bankr.S.D.N.Y.1985).

The fact that this declaratory judgment action requires a determination of the *897 meaning of certain bond language pursuant to relevant Pennsylvania law does not render this Adversary Proceeding a non-core proceeding. Section 157(b)(3) states that "[a] determination that a proceeding is not a core proceeding shall not be made solely on the basis that its resolution may be affected by state law." Indeed, as noted by Justice White in *Marathon,* 458 U.S. at 96-97, 102 S.Ct. at 2884-2885, bankruptcy courts are constantly enmeshed in state law issues and any distinction between claims based on state law/federal law is meaningless when the vast majority of claims presented in bankruptcy proceedings are based on state law created rights. Accordingly, issues of comity and state created rights must give way to the

aim of Congress to confer the broadest jurisdiction on bankruptcy courts as is constitutionally permissible. *See, NLRB v. Bildisco & Bildisco,* 465 U.S. 513, 104 S.Ct. 1188, 79 L.Ed.2d 482 (1984). "The involvement of state created rights in a bankruptcy matter does not, *ipso facto,* result in a finding that [the state law matter] should not be adjudicated by [the] Court." *In re DeLorean Motor Co.,* 49 B.R. 900, 909 (Bankr.E.D.Mich.1985) (quoting *In re Tom Carter Enterprises, Inc.,* 44 B.R. 605 (C.D.Cal.1984)).

[B]ankruptcy courts are not precluded from hearing state law claims when the claims bear heavily on the administration of the estate. [*See In re Ben Cooper Inc., (Ben Cooper, Inc. v. The Insurance Company of the State of Pennsylvania),* 896 F.2d 1394, 1399 (2d Cir.1990), *cert. granted sub nom., Ins. Co. of Pennsylvania v. Ben Cooper, Inc.,* 497 U.S. 1023, 110 S.Ct. 3269, 111 L.Ed.2d 779 (1990) ]; *In re Manville Forest Products Corp., Gulf States Exploration Co. v. Manville Forest Products Corp.,* 896 F.2d 1384, 1380 [ ] (2d Cir.1990). "The relevant inquiry is whether the nature of [the] adversary proceeding, rather than the state or federal basis for the claim, falls within the core of federal bankruptcy power." *In re Manville Forest Products Corp., id.* at 1389; *see also In re Wood,* [825 F.2d 90, 97 (5th Cir.1987) ]; *In re Arnold Print Works, Inc.,* [815 F.2d 165, 169 (1st Cir.1987) ].

*In re Harbor Park Assoc. Ltd. Partnership,* 112 B.R. 555, 558 (S.D.N.Y.1990). It is interesting to note that the Bureau, a state agency whose interests and policies will be substantially impacted by a determination by this Court, has not only consented to this Court's jurisdiction of these matters and therefore opposes Aetna's motions to dismiss or stay these proceedings, but has also filed its own Cross-Claims against Aetna and has joined in the Debtors' motion for partial summary judgment.

The recent Second Circuit case, *In re Ben Cooper, Inc.,* 896 F.2d 1394, 1398 (2d Cir.1990), supports finding a broad jurisdictional mandate. In *Ben Cooper,* the court found that in the context of § 157(b)(2)(A) "[t]he statements of several influential legislators ... indicate that bankruptcy jurisdiction was to be construed as broadly as possible within the constitutional constraints of *Marathon." Id.* Moreover, the Second Circuit agreeing with the First Circuit's analysis of the legislative history of § 157 stated as follows:

"the legislative history of [§ 157] indicates that Congress intended that 'core proceedings' would

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

be interpreted broadly, close to or congruent with constitutional limits. The sponsors repeatedly said that 95 percent of the proceedings brought before bankruptcy judges would be core proceedings. *See* 130 Cong.Rec. E1108-1110 (daily ed. March 20, 1984) (statement of Representative Kastenmeier); *id.* at H1848, H1850 (daily ed. March 21, 1984) (statement of Representative Kindness).

*In re Ben Cooper, Inc.,* 896 F.2d at 1398 (quoting *In re Arnold Print Works, Inc.,* 815 F.2d 165, 168 (1st Cir.1987)).

[4] This Court also finds that jurisdiction is proper in this instance because the dispute involves property of the estate. The filing of a petition in bankruptcy creates an estate that encompasses "all legal and equitable interests of the debtor in property as of the commencement of the case." 11 U.S.C. § 541(a). This provision has been broadly construed. "The scope of *898 [§ 541(a)(1) ] is broad. It includes all kinds of property, including tangible or intangible property, causes of action ... and all other forms of property currently specified in Section 70a of the Bankruptcy Act." *United States v. Whiting Pools, Inc.,* 462 U.S. 198, 205 n. 9, 103 S.Ct. 2309, 2313 n. 9, 76 L.Ed.2d 515 (1983) (quoting S.Rep. No. 989, 95th Cong., 2d Sess. 82 (1978), *reprinted in* 1978 U.S.Code Cong. & Admin.News 5787, 5868).

The [Supreme] Court [in *Whiting Pools* ], explained that 'both the Congressional goal of encouraging reorganizations and Congress' choice of methods to protect secured creditors suggests that Congress intended a broad range of property to be included in the estate.'

*MacArthur Co. v. Johns-Manville Corp.,* 837 F.2d 89, 92 (2d Cir.1988) (quoting *United States v. Whiting Pools, Inc.,* 462 U.S. at 204, 103 S.Ct. at 2313; *accord Johns-Manville Corp. v. Asbestos Litigation Group (In re Johns-Manville),* 40 B.R. 219, 230 (S.D.N.Y.1984)).

It is well established under the law of Pennsylvania that a principal cannot maintain a suit against his surety to compel performance. *See e.g., Tooks v. Indemnity Insurance Co.,* 381 Pa. 607, 114 A.2d 135 (1955). Accordingly, Aetna argues that the Debtors have no legal or equitable interest in the surety bonds. In support of its assertion, Aetna relies on several cases in which courts have held that a surety bond did not constitute property of the estate. *In re Mansfield Tire and Rubber Co.,* 660 F.2d 1108 (6th Cir.1981); *In re Apache*

*Construction, Inc.,* 34 B.R. 415 (Bankr.D.Or.1983) ; *In re Fintel,* 10 B.R. 50 (Bankr.S.Or.1981); *In re Buna Painting & Drywall Co., Inc.,* 503 F.2d 618 (9th Cir.1974). However, Aetna has failed to persuade this Court that LTV Steel has neither a legal nor equitable interests in the bonds. Instead, this Court finds the reasoning of the court in *In re Wegner Farms Co.,* 49 B.R. 440 (Bankr.N.D.Iowa 1985), more compelling under the circumstances.

To the extent these cases can be read as merely holding that a Debtor has no interest in the penal sums intended for the benefit of the third party claimants, this Court passes no judgment on these decisions. To the extent, however, these decisions can be construed as holding that debtor as a contracting party to the bonding agreement has no legal or equitable interest in the contract, this Court concludes these decisions are incorrect as a matter of law.

*Id.* at 443.

[5] The bonding agreements are valid contracts, for which the Debtors bargained and paid valuable consideration. Contractual rights are intangible property which is included within the definition of the estate of the debtor. *Id.; see also, In re Titan Energy,* 837 F.2d 325 (8th Cir.1988).

Additionally, employee good will and contentment is an asset which is vital to the continuation of a debtor's business operation and its ability to effectively reorganize during the Chapter 11 process. *See, In re Inslaw Inc.,* 88 B.R. 484, 488-89 (Bankr.D.C.1988). In granting Debtors' applications for permission to provide hardship payments to injured workers, this Court determined that the uninterrupted payment of LTV Steel workers' compensation obligations is essential to employee morale and industrial tranquility which, in turn, are critical to a successful reorganization. Consequently, since the actions taken by Aetna have impacted assets of these estates, this Adversary Proceeding constitutes a core proceeding. *See, MacArthur Company v. Johns-Manville Corp.,* 837 F.2d at 92.

[6] This declaratory judgment action also falls within the jurisdiction provided by § 157(b)(2)(O) because it will directly affect the debtor-creditor relationship. As stated previously, Aetna and National have filed at least forty-two proofs of claim relating to the Pennsylvania workers' compensation surety bonds in these cases seeking aggregate recovery of over $58 million. These

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

proofs of claim seek recovery with respect to the surety bonds which are the subject of this action. Resolution of these claims requires resolution of the extent of Aetna's liabilities. Aetna has consented to this Court's jurisdiction over their claims as *899 creditors by filing numerous proofs of claim relating to the bonds at issue. *See, In re Depo,* 40 B.R. 537, 542 (N.D.N.Y.1984) (holding that filing a proof of claim implies consent to bankruptcy court jurisdiction over counterclaims asserted by debtor which are related to the claim). *See also, In re Lombard-Wall, Inc.,* 44 B.R. 928 (Bankr.S.D.N.Y.1984); *In re Lombard-Wall Inc.,* 48 B.R. 986 (S.D.N.Y.1985); *Katchen v. Landy,* 382 U.S. 323, 86 S.Ct. 467, 15 L.Ed.2d 391 (1966). It is clear that a declaratory judgment as to Aetna's liability on these bonds will affect its claims against LTV Steel. As such, it will effect an adjustment of the debtor-creditor relationship. *See, In re Ermco Erectors, Inc.,* 69 B.R. 233, 234 (Bankr.E.D.N.Y.1986). Aetna's argument that a determination in this matter will only affect which party has a claim against the estate, but not the amount of the claim, is unpersuasive. The fact that the beneficiary of a surety bond, and a surety who pays that beneficiary and assumes the claim of the beneficiary against the estate, both have an unsecured claim does not preclude a determination that the beneficiary and the surety are not entitled to identical treatment in a debtor's plan of reorganization. *See, In re U.S. Truck Co., Inc.,* 42 B.R. 790 (Bankr.E.D.Mich.1984).

Moreover, based upon the Debtors' third cause of action, *i.e.,* whether the Debtors are entitled to reimbursement from Aetna to the extent of any interim workers' compensation payments made by the Debtors, this is a core matter. In a separate adversary proceeding in these cases, Judge Kram for the District Court stated that in order for these Debtors to recover the cost of continuing the retiree benefits after its contractual obligations ended, it was necessary for this Court to determine if the United Mine Workers of America 1974 Benefit Plan and Trust (the "Plan & Trust") was liable for the benefits. *In re Chateaugay Corp., (LTV Steel Company, Inc., et al. v. Joseph P. Conners, Jr., et al.),* 111 B.R. 399 (S.D.N.Y.1990). The District Court held that "[t]he resolution of the Plan & Trust's liability was a core proceeding because it was an attempt by the [Debtors] to collect a post-petition debt." *Id.* at 406. Similarly, here, in order for the Debtors to recover the cost of continuing to provide interim workers' compensation payments, it

is first necessary as a threshold matter to determine whether Aetna is liable for such payments.

Judge Kram also held as follows:
The payment of retiree benefits by the Debtors was an administrative activity. The recovery of those monies which the Debtors paid after their obligation had ceased is a core proceeding. Also, LTV's ability to recover the amount paid is a matter that effects the final administration of the estate under § 157(b)(2)(A).
*In re Chateaugay Corp., supra,* at 406. Although in this instance, it is undisputed that LTV Steel is primarily liable for paying the workers' compensation benefits, its ability to be reimbursed by Aetna, should it be determined that Aetna is liable as a surety under the bonds at issue in this dispute, is clearly a core matter which affects the administration of these estates. "The collection of a post-petition debt is a core proceeding under 28 U.S.C. § 157(b)(2)(A) and (O)." *Id.; see, In re Arnold Print Works, Inc.,* 815 F.2d 165, 168 (1st Cir.1987); *In re Sattlers, Inc.,* 82 B.R. 229, 232 n. 4 (Bankr.S.D.N.Y.1988).

In accordance with the foregoing discussion, this Court finds that this Adversary Proceeding is a core proceeding pursuant to § 157(b)(2)(A) and (O).

*2) Whether LTV Steel has standing to commence this Adversary Proceeding.*

[7] Aetna also asserts that the Debtors do not have standing to commence this declaratory action and therefore the Debtors' first cause of action in its complaint must be dismissed pursuant to Federal Rule 12(b)(6) for failure to state a claim upon which relief can be granted. Although the standing of the Debtors to bring suit is implicit in the above "core holding", the issue of standing under these circumstances can and should be addressed independently as it is at the heart of Aetna's dismissal/abstention contentions.

*900 [8] In order to have standing, the Debtors must establish that they are the "proper plaintiff" to raise the issues sought to be litigated" in their declaratory judgment action. *S. v. D.,* 410 U.S. 614, 616, 93 S.Ct. 1146, 1147, 35 L.Ed.2d 536 (1973). They "must allege some threatened or actual injury" before this Court may assume jurisdiction. *Id.* Such injury must directly impact their own legal rights and interests; it is not sufficient that the Debtors' claim for relief rests on

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

116 B.R. 887
(Cite as: 116 B.R. 887, *900)

Page 164

the legal rights and interest of third parties. *Warth v. Seldin,* 422 U.S. 490, 499, 95 S.Ct. 2197, 2205, 45 L.Ed.2d 343 (1975).

[9] It is well established under the law of Pennsylvania that a principal cannot maintain a suit against his surety to compel performance. *See e.g., Tooks v. Indemnity Insurance Co.,* 381 Pa. 607, 114 A.2d 135 (1955). Indeed, the long standing rule is that the surety is entitled to reimbursement from the principal when the surety performs due to the principal's default. *Jacobs v. Northeastern Corp.,* 416 Pa. 417, 206 A.2d 49 (1965); *Smith v. Harry,* 91 Pa. 119 (1879); *Continental Bank v. Axler,* 353 Pa.Super. 409, 510 A.2d 726 (1986); *Maryland Casualty Co. v. Mullett,* 295 F.Supp. 875 (W.D.Pa.1969). Consequently, Aetna argues that the Debtors cannot satisfy the burden of establishing standing because the Debtors have failed to allege or show that their request for declaratory relief will address or redress a threatened or actual injury to them. Aetna also asserts that giving the Debtors standing to pursue this action would stand the law of suretyship on its head. However, Aetna's position in this regard is without merit.

The Debtors were not a "mere volunteer" in seeking permission to pay injured workers hardship payments. The Debtors were forced to seek those orders to make the payments as a result of the dispute between the Bureau and Aetna as to the extent of Aetna's liability under the surety bonds. It is undisputed that those orders were necessary for the administration of the Debtors' estates.

As noted by the United States Supreme Court, no justiciable case or controversy exists where, the plaintiff fails to raise issues or facts showing such a personal stake or direct interest in the outcome as to justify Plaintiffs' invocation of federal court jurisdiction. *S. v. D.,* 410 U.S. at 616, 93 S.Ct. at 1147; *Warth v. Seldin,* 422 U.S. 490, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975). The Debtors have clearly been placed in an untenable position. Although it is undisputed that the Debtors have no standing under state law to seek a declaration as to the extent of Aetna's liability, the Debtors cannot be forced to sit idly by while assets of these estates dissipate awaiting the outcome of a dispute in which it cannot participate. Although the Debtors in their first cause of action are seeking a determination of the Bureau's rights or obligations, the Debtors have clearly demonstrated a personal stake or direct interest in the outcome of this litigation to warrant a

finding of standing.

In accordance with the foregoing discussion, this Court hereby denies Aetna's motions to dismiss the Debtors' first cause of action and the Bureau's Cross-Claims [FN9].

> FN9. Pursuant to Bankruptcy Rule 5011(b), a separate *Report And Recommendation* on Aetna's motion for abstention has been filed with the District Court.

3) *Whether summary judgment is appropriate in this instance on behalf of either Aetna or the Debtors.*

The Debtors seek judgment that as a matter of law the bonds at issue were terminated in compliance with the terms of the bonds themselves, and therefore remain effective to provide coverage for injuries occurring prior to the dates on which each of the bonds terminated. The Debtors assert that the sole issue before this Court is to determine the coverage provided by the words of the bond. Moreover, they argue that there is no dispute among the parties as to the issuance of the bonds, and that their provisions are clear and unambiguous. Thus, the Debtors conclude that judgment may be rendered without reference to extraneous evidence and therefore summary judgment is appropriate.

*901 In contrast, Aetna cross moves for summary judgment asserting that the pre-existing bonds were not "terminated" pursuant to ¶ 2 of the bonds. Rather, Aetna maintains that the bonds were replaced with the mutual consent of all parties and at the request of the Bureau. Aetna argues that its obligation was consolidated under one bond to reflect the new corporate principal. Aetna contends that based upon the legal theories of novation, estoppel, reformation, and merger, its liability is limited to the replacement bond, No. 018 S 71955, in an amount not to exceed $27 million.

Pursuant to Federal Rule 56 as made applicable herein pursuant to Bankruptcy Rule 7056, summary judgment is appropriate when there is no material fact in dispute and the court may decide the issues as a matter of law. Federal Rule 56(c); Bankruptcy Rule 7056; *Quinn v. Syracuse Model Neighborhood Corp.,* 613 F.2d 438, 444 (2d Cir.1980). The court's role in ruling on a motion for summary judgment is to determine whether there exists a genuine issue as to any material fact.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

116 B.R. 887                                                                    **Page 165**
**(Cite as: 116 B.R. 887, \*901)**

*Celotex Corp. v. Catrett,* 477 U.S. 317, 322-23, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). Where the movant demonstrates the lack of any genuine issues of material fact to be tried, summary judgment is appropriate. *In re O.P.M. Leasing Services, Inc.,* 46 B.R. 661, 665 (Bankr.S.D.N.Y.1985). However, the court must deny summary judgment where there exists disputes over facts that might affect the outcome of the suit under the governing law. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

Summary judgment has frequently been issued where a court has been requested to interpret the terms of a contract. *Tokio Marine Fire Ins. v. McDonnell Douglas Corp.,* 617 F.2d 936, 940 (2d Cir.1980); *Parish v. Howard,* 459 F.2d 616, 618 (8th Cir.1972); *Freeman v. Continental Gin Co.,* 381 F.2d 459, 465 (5th Cir.1967); *Nat'l Util. Serv., Inc. v. Whirlpool Corp.,* 325 F.2d 779, 781 (2d Cir.1963); *In re Tikijian,* 76 B.R. 304 (Bankr.S.D.N.Y.1987).

[10] Cases with a complex factual record may be appropriately disposed of on summary judgment; the complexity of factual issues alone cannot justify denial of summary judgment. *See, Apex Oil Co. v. DiMauro,* 641 F.Supp. 1246, 1255-57 (S.D.N.Y.1986), *aff'd in part, rev's in part on other grounds,* 822 F.2d 246 (2d Cir.1987). Both the Supreme Court and the Second Circuit "have encouraged the use of summary judgment in complex cases to avoid unnecessary trials." *H. L. Hayden Co. of N.Y., Inc. v. Siemens Medical Systems, Inc.,* 879 F.2d 1005, 1011-12 (2d Cir.1989). "Summary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed 'to secure the just, speedy and inexpensive determination of every action.' " *Celotex Corp. v. Catrett,* 477 U.S. at 327, 106 S.Ct. at 2554. *Accord, Knight v. United States Fire Insur. Co.,* 804 F.2d 9, 12 (2d Cir.1986), *cert. den.* 480 U.S. 932, 107 S.Ct. 1570, 94 L.Ed.2d 762 (1987).

[11] Even when the question of a party's belief is at issue, there are circumstances in which summary judgment is appropriate. *Morgan v. Prudential Group, Inc.,* 527 F.Supp. 957, 959 (S.D.N.Y.1981), *aff'd,* 729 F.2d 1443 (2d Cir.1983). The "rule" that summary judgment should be reluctantly granted where state of mind is

at issue should not preclude granting such a motion in the absence of a material fact issue. *Guitar v. Westinghouse Electric Corp.,* 396 F.Supp. 1042, 1053 (S.D.N.Y.1975), *aff'd,* 538 F.2d 309 (2d Cir.1976).

Based upon all of the pleadings, the affidavits and the exhibits submitted, this Court finds that there are no genuine issues of material fact which would preclude the granting of summary judgment in this instance. Consequently, in accordance with the discussion to follow, Aetna's request for summary judgment is hereby granted, and the Debtors' motion for partial summary judgment is hereby denied.

*4) Whether parol evidence is admissible.*

[12] The Debtors and the Bureau contend that pursuant to the express language of the termination provisions of each workers' compensation surety bond in dispute, \*902 Aetna is liable, with respect to injuries occurring to workers prior to termination, for the full penal sum of any bond in effect at the time of termination. In response, Aetna argues that the termination provisions are inapplicable because the bonds were "cancelled" or "replaced", rather than "terminated".

[13] This Court agrees with the Debtors that based upon the plain meaning of the language of the bonds, the termination of a bond only limits Aetna's prospective liability--not its retroactive liability. However, the issue which must be decided is not what Aetna's liability would be upon termination of a bond, but rather, if, indeed, the bonds were "terminated" as contemplated by the language of the bonds themselves.

Each of the Aetna surety bonds provides coverage for the workers' compensation obligations of the named principals for injuries occurring prior to their termination dates. Each of the bonds contains specific termination procedures, which, if employed, may limit the surety's exposure with respect to liability for future injuries, but does not limit the surety's liability for injuries which occurred prior to the termination, up to the face value of the bond. Thus, ¶ 2 of each of the surety bonds reads:

> 2. This is a continuous bond and shall remain in force and effect until terminated by the Surety, as hereinafter provided, or until the Principal's status as a self-insurer has been revoked or terminated

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

by the Director, and in either of such events the Surety shall have no further liability except for the said obligations of the Principal; including a rateable part of the assessments for the current period, preexisting or incurred during or with respect to any period prior to the termination of the this bond. *Such termination shall not relieve the Surety of liability for obligations of the Principal arising from injuries and occupational diseases that occur prior to the effective date of such termination.*
(emphasis added).

Accordingly, the Debtors assert that Aetna remains liable with respect to each of the five surety bonds for amounts payable in the future with respect to obligations which were incurred prior to the termination dates of each of the bonds. Thus, the Debtors conclude that the aggregate value of Aetna's liability is $51 million. The Debtors also assert that parol evidence precludes admission of Aetna's proffered evidence in the form of correspondence between the parties and affidavits.

[14][15][16] In interpreting the nature and scope of a surety bond, courts are guided by contract principles [FN10]. *See, e.g., County of Erie v. American States Ins. Co.,* 573 F.Supp. 479, 483 (W.D.Pa.1983); *aff'd,* 745 F.2d 45 (3d Cir.1984). In determining the intent of the parties the court has a duty to ascertain the intent as manifested in the language of the agreement. *St. Paul Fire & Marine Ins. Co. v. United States Fire Ins. Co.,* 655 F.2d 521 (3rd Cir.1981); *Mohn v. American Casualty Co.,* 458 Pa. 576, 326 A.2d 346 (1974). If the terms of the agreement are clear from the face of the document, the intent of the parties is found *903 in the document. *Vogel v. Berkley,* 354 Pa.Super. 291, 511 A.2d 878 (1986); *American Home Products Corp. v. Liberty Mutual Insurance Co.,* 748 F.2d 760, 765 (2d Cir.1984). However, the "court must adopt the construction which gives effect to the parties reasonable and probable intent in view of the surrounding circumstances and the purposes of the contract." *Kohn v. Kohn,* 242 Pa.Super. 435, 364 A.2d 350, 353 (1976). *See also, D'Huy v. D'Huy,* 390 Pa.Super. 509, 568 A.2d 1289 (1990).

FN10. The Supreme Court has held that in actions on contracts made and to be performed in states other than the forum state, the rights and liabilities of the parties shall be established following a determination as to whether the laws of the forum state or the other state shall apply. This

determination shall be made according to the forum state's rule in the field of conflict of laws. *See, Klaxon Co. v. Stentor Electric Manufacturing Co.,* 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941). So long as no policy of the Code would be offended, a court is free to apply the *Klaxon* rule in the bankruptcy forum. *See, Fore Improvement Corp. v. Selig,* 278 F.2d 143, 147 (2d Cir.1960).

In applying the *Klaxon* rule, this Court relies on the conflict of law rules of the State of New York, the forum state. In the leading case determining New York's rule on conflict of laws, *Auten v. Auten,* 308 N.Y. 155, 124 N.E.2d 99 (1954), New York's highest court adopted the "center of gravity" or the "grouping of contracts" theory with respect to choice of law in contract cases. *Id.* 308 N.Y. at 160, 124 N.E.2d at 101-102.

In applying the "center of gravity" test, this Court notes that, as the surety bonds are contracts which were made in Pennsylvania, and that the parties are in agreement that the laws of Pennsylvania should be applied, the applicable substantive law is that of Pennsylvania. *See, In re PCH Associates,* 55 B.R. 273 (Bankr.S.D.N.Y.1985), *aff'd,* 60 B.R. 870 (S.D.N.Y.1986); *aff'd,* 804 F.2d 193 (2d Cir.1986).

[17][18][19] The admissibility of extrinsic written or oral evidence which modifies or varies the terms of a contract is determined by the parol evidence rule. Although frequently dealt with as a rule of evidence, the parol evidence rule is actually a rule of substantive law. *Garza v. Marine Transport Lines, Inc.,* 861 F.2d 23, 26 (2d Cir.1988); *see,* 3 *Corbin on Contracts,* § 573 (1960). The rule prevents alteration of an integrated contract by extrinsic evidence. *Id.; see, In re PCH Assoc.,* 55 B.R. at 279. Integration is determined by whether the terms of the contract are clear, definite, and complete on their face. 3 *Corbin on Contracts* at § 573. Typically, the court will look to whether the contract on its face represents the entire understanding of the parties, whether the contract contains any ambiguous terms, and whether there is any objective reason to look outside the document to interpret its meaning. *See, McGuire v. Schneider Inc.,* 368 Pa.Super. 344, 534 A.2d 115 (1987), *aff'd,* 519 Pa. 439, 548 A.2d 1223 (1988). When the terms are ambiguous or subject to interpretation by the parties, parol evidence may be admitted to determine the contract's meaning. 3 *Corbin on Contracts* at § 579; *see, In re PCH Assoc.,* 55 B.R. at 280. This includes both internal ambiguity which springs from the words of the contract, as well as external ambiguity which springs from the words of the contract within the context of the circumstances

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

of the contract. *Metzger v. Clifford Realty Corp.,* 327 Pa.Super. 377, 476 A.2d 1 (1984).

Although the parties seem to be in agreement that the bonds are clear on their face and that the language contained therein is neither vague nor ambiguous, this Court disagrees.    This entire dispute turns on the application of the word "terminated", however, there is no definition for the term provided within the four corners of the bonds. Aetna argues that the termination provisions are inapplicable because the bonds were "no longer required," "cancelled" or "replaced", rather than "terminated".    In contrast, the Debtors assert that Aetna's interpretation of the term is tortured and that the terminology used by Aetna is consistent with the language of the bonds themselves.

[20] When two parties disagree as to the meaning of a contractual term, parol evidence may be admitted to extinguish any ambiguity.    The courts have often looked to extrinsic evidentiary sources when defining an ambiguous term. *See e.g., DeWitt v. Kaiser,* 335 Pa.Super. 258, 484 A.2d 121 (1984) (court defines "income"); *Lohmann v. Piczon,* 338 Pa.Super. 485, 487 A.2d 1386 (1985) (court defines "net income"); *Daset Mining Corp. v. Industrial Fuels Corp.,* 326 Pa.Super. 14, 473 A.2d 584 (1984) (court defines "marketable bituminous coal").    *See also, Mellon Bank, N.A. v. Aetna Business Credit, Inc.* 619 F.2d 1001 (3d Cir.1980), *In re Fessman,* 386 Pa. 447, 126 A.2d 676 (1956); *Pavlich v. Ambrosia Coal & Construction Co.,* 441 Pa. 210, 273 A.2d 343 (1971).    "[B]oth parties are entitled to present evidence outside the four corners of the agreement that bears on the meaning and application of the several clauses."    *Garza v. Marine Transport Lines, Inc.,* 861 F.2d at 26.

For example, in *Metzger v. Clifford Realty Corp.,* 327 Pa.Super. 377, 476 A.2d 1 (1984), the court faced the question of whether the termination clause of a sale agreement was ambiguous, and therefore allowed for the entertainment of parol evidence. The court held that despite the clear "definition of the word 'terminate'," the clause failed for "indefiniteness of expression." *Id.* 476 A.2d at 6. The court pointed to the ambiguity of the word in the context of the contract, as well as the failure of the provisions of the contract to **\*904** shed light on the phrase.    Moreover, the court held that "more precise language denoting [what was meant by the term] would have put this matter beyond reasonable question.    In the absence thereof, however, the

meaning of that language is ambiguous." *Id.* at 7.

[21] Parol evidence may also be introduced when the following circumstances exist:    (1) when contracts are standardized forms, parol evidence may be admitted to show the meaning of terms. *Rest., Contracts* at § 211; (2) when terms are subject to common trade usage, parol evidence may be admitted to show which interpretation of a term is the more generally known within the trade. *Id.* at §§ 221, 222;    (3) when there has been a course of dealing between the parties which has established a common understanding, parol evidence may be admitted to supplement a contract. *Id.* at § 223.

[22][23][24]    Moreover,    parol    evidence    is admissible to establish a new and distinct agreement upon a new consideration. *In re Westbrook Foods, Ltd.,* 7 B.R. 100 (Bankr.E.D.Va.1980).    A contract may not be altered by evidence pertaining to its formation, however it may be altered or discharged by a new agreement.    "Today may control the effect of what happened yesterday;  but what happened yesterday cannot change the effect of what happens today." 3 *Corbin on Contracts,* § 574 at 372.    The Pennsylvania courts allow the "parties to a written agreement [to] introduce parol evidence as to subsequent modifications of written agreements." *Malesh v. Chechak,* 342 Pa.Super. 446, 493 A.2d 106 (1985).    Courts have also recognized that a substituted contract may be established by extrinsic evidence including other writings, words, conduct or by all three. *Buttonwood Farms, Inc. v. Carson,* 329 Pa.Super. 312, 478 A.2d 484 (1984); *Wagner v. Graziano Construction Co.,* 390 Pa. 445, 136 A.2d 82 (1957) .    Furthermore, evidence tending to show that a fundamental assumption of the parties was not expressed in the writing should not be excluded by the parole evidence rule. 3 *Corbin on Contracts* at § 590.

Additionally, the language of the bonds themselves also compels this Court to look beyond the four-corners of the document in order to determine whether the bonds have been terminated.    The surety bonds provide that the bonds may be terminated in the following manner:
  3. This bond may be terminated by the Surety by written notice of its intention to do so filed in the Office of Director of the Bureau of Workmen's Compensation, and by giving written notice thereof to the Principal, in which event the Surety's liability shall terminate at the expiration

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

116 B.R. 887                                                              **Page 168**
**(Cite as: 116 B.R. 887, \*904)**

of forty-five (45) days from the date of such filing and not earlier, subject however to the provisions of paragraph 2.

Therefore, even if the Debtors are correct in their assertion that the bonds were in fact terminated, such a determination clearly cannot be made by examining only the bonds themselves. Rather, this Court must also examine the various correspondence between the parties in order to determine whether or not the termination provision in ¶ 2 had been activated.

Based upon the above discussion, this Court finds that there is ample justification under these circumstances to admit parol evidence in order to establish whether the four bonds were "terminated".

5) *Whether the affidavits submitted should be stricken.*

[25] Filed contemporaneously with its cross-motion for summary judgment, Aetna also filed its motion to strike the affidavits submitted by the Debtors for failure to comply with the requirements of Federal Rule 56(e) and Bankruptcy Rule 7056. Although the Debtors have not formally moved to strike Aetna's affidavits, they have objected to their admissibility on various grounds in support of their own motion for summary judgment and in opposition to Aetna's cross-motion.

Federal Rule 56(e) states, in pertinent part:
Supporting and opposing affidavits shall be made on personal knowledge, shall set forth such facts as would be admissible **\*905** in evidence and shall show affirmatively that the affiant is competent to testify to the matters stated therein.

"[T]he policy of Rule 56(e) is to allow the affidavit to contain all evidentiary matter, which, if the affiant were in court and testifying on the witness stand, would be admissible as part of his testimony." 6 *Moore's Federal Practice* at ¶ 56.22[1] (2d ed. 1988).

Although as discussed previously, this Court will allow parol evidence to be admitted in order to ascertain the intent of the parties, the affidavits submitted by both parties are either inadmissible or, if admissible, not entitled to any weight, to the extent that they merely show the affiant's subjective intent. Generally speaking, the affidavits contain post hoc, self-serving statements about the affiants' view of the intent of the parties involved in the

transaction. The documents which the affidavits purport to interpret have all been submitted and are part of this record. Where proof is to be made of a fact which is recorded in a writing, the best evidence of the contents of the writing consists of the document itself. 29 Am.Jur.2d *Evidence* § 448 (1967). "The elementary wisdom of the best evidence rule rests on the fact that the document is a more reliable, complete and accurate source of information as to its contents and meaning than anyone's description...." *Gordon v. United States,* 344 U.S. 414, 421, 73 S.Ct. 369, 374, 97 L.Ed. 447 (1953). Thus, pursuant to the best evidence rule, this Court finds that the correspondence and other documents speak for themselves and therefore the affidavits, to the extent that they are submitted to show subjective intent, are neither necessary nor relevant, and will therefore be disregarded.

[26] Nevertheless, portions of the affidavits submitted which are based on personal knowledge and do not deal with the subjective intent of the affiant are admissible. For example, portions of the affidavits of Jan Smith, former Director of the Pennsylvania Bureau and Reta Davis, Manager of the Self-Insurance Section of the Bureau, submitted by Aetna to show Bureau protocol are clearly relevant and therefore admissible. The Debtors' assertion that Mr. Smith's affidavit should be disregarded because it flatly contradicts a letter he sent to Aetna on August 1, 1986 in which he states that all of the Aetna surety bonds are in effect and demands payment on those bonds on behalf of the Bureau, is not compelling in this instance. The portions of Mr. Smith's affidavit which are deemed admissible involve only the Bureau's internal procedures and do not go to his subjective intent. "Even if an affidavit does contain some inadmissible matter, the whole affidavit need not be stricken or disregarded; the court may strike or disregard the inadmissible parts and consider the rest of the affidavit." 6 *Moore's Federal Practice* at ¶ 56.22 [1].

6) *Whether a novation or substitution of contract occurred.*

[27] The Debtors assert that even if parol evidence is admissible, a fair reading of the documents upon which Aetna relies discloses that they are entirely consistent with the plain meaning of the language of the bonds which contemplates Aetna's continuous liability in this instance on all five bonds. Thus, the Debtors argue that no novation or substitution

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

occurred when Aetna's surety bond No. 018 S 71955, in the penal sum of $27 million, was issued. Instead, the Debtors maintain that the other four bonds were merely "terminated" pursuant to the language of the bonds in question which triggers Aetna's retrospective liability up to the penal sum of $51 million.

As can be seen from the following, an application of the law to the undisputed material facts clearly establishes that based upon the intent and understanding of the parties, only Aetna's surety bond No. 018 S 71955 in the penal sum of $27 million is available as security for the default of LTV Steel on its Pennsylvania workers' compensation obligations.

In 1979, Aetna had three surety bonds in place for three separate companies. In 1981, a merger occurred effectively combining those three companies. As a consequence of the merger, the initial correspondence, *906 originating from the Bureau, requested that a "new" surety bond be issued naming the successor corporation as the principal. [See Aetna's Document 1]. Conspicuously absent from this letter was a request by the Bureau for the written notice by Aetna to both the Bureau and the Debtors which would comport with the language of ¶ 3 indicating an intent by the parties that the surety bonds would be "terminated". Indeed, there is not one document submitted by any of the parties which fulfills the requirement of ¶ 3 and would demonstrate an intent that the termination liability would be triggered. The Court is unpersuaded by the Debtors argument that the term "replacement" which is repeatedly used in the correspondence between the parties is consistent with the intent of the parties to "terminate" the surety bonds.

According to Black's Law Dictionary (5th ed. 1979), the term "terminate" means "[t]o put an end to; to make to cease; to end". Although there appears to be no reported case which has dealt with the definition of the word "terminate" in the context of a surety bond, the word "termination" for purposes of insurance, "refers to the expiration of a policy by lapse of the policy." *Waynesville Sec. Bank v. Stuyvesant Ins. Co.,* 499 S.W.2d 218, 220 (Mo.App.1973).

In contrast, "replacement" is defined as "the action or process of replacing: the state of being replaced: SUBSTITUTION". Webster's Collegiate

Dictionary, (3d ed. 1981). The term "replace" given its plain, ordinary meaning, means to supplant with substitute or equivalent. *Olenick v. Government Employees Ins. Co.,* 346 N.Y.S.2d 320, 42 App.Div.2d 760 (1973). Black's Law Dictionary, 5th ed., also defines replace as "[t]o take the place of".

Moreover, Reta Davis, Manager of the Self-Insurance Section of the Bureau stated in ¶ 4 of her affidavit:

The term "replacement" is a term-of-art in the Bureau. As used in the Bureau, "replacement" means supplanting of an existing bond by the issuance of substitute bond. In a "replacement", the liability of the replaced bond(s) is extinguished.

Affidavit of Davis, at ¶ 4. Additionally, Jan Smith, the former Director of the Bureau provided in ¶ 3 of his affidavit as follows:

The word "replacement" is a term of art when used by the Bureau, in relation to worker's compensation self-insurance bonds. The term "replacement," when used by the Bureau, meant the supplanting of an existing bond by the issuance of a substitute bond.

It can therefore be concluded that the term "terminate" and "replacement" each have a distinct meaning and are not interchangeable. Additionally, the other terminology used in the parties' correspondence such as "no longer required," "will be sufficient" and "cancelled" are not sufficiently analogous to the term "terminate" to warrant the triggering of Aetna's liability on all five bonds. The parties to this transaction are all sophisticated entities. Had they intended to trigger Aetna's liability pursuant to the termination provision in ¶ 2 of the surety bond, they would have stated so in unequivocal terms. Consequently, this Court finds that the issuance of the new surety bond in response to the request of the Bureau constituted a substituted contract or novation discharging Aetna's obligation on the prior bonds. The writing, words, and conduct of Jones & Laughlin/ LTV, the Bureau, Marsh & McLennan, Inc. (the broker to these transactions) and Aetna all lead to the inescapable conclusion that the parties intended the substitution of bond No. 018 S 71955 and the extinction of liability under bonds Nos. 018 S 69174, 018 S 69175, 018 S 68212, and 018 S 100071193.

[28] While the courts have frequently used the

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

terms novation and substituted contract interchangeably, there is a technical distinction. A substituted contract is one that is accepted in satisfaction of the original contract and thereby discharges it. A novation is a substituted contract that includes a party who was not part of the original contract. *See, Rest., Contracts,* 2d, §§ 279, 280. A review of the legal *907 precedents clearly establishes that the bond replacements qualify as both a substituted contract and novation.

The required elements of a substituted contract or novation are set forth in *Yoder v. T.F. Scholes, Inc.,* 404 Pa. 242, 173 A.2d 120 (1961) as follows:
   1. the displacement and extinction of a valid contract;
   2. the substitution for it of a valid new contract;
   3. a sufficient legal consideration for the new contract; and
   4. the consent of the parties.
*Id.* 173 A.2d at 121; *see also, Schmucker v. Hanna,* 377 Pa.Super. 301, 547 A.2d 379 (1988).

[29] A novation occurs when the parties to a contract mutually agree to relieve one another from liability on a valid contract and to substitute a new contract in place of the old one. *First Pennsylvania Bank, N.A. v. Triester,* 251 Pa.Super. 372, 380 A.2d 826 (1977). Since a substituted contract is accepted as satisfaction of a pre-existing duty, it bars the revival of the pre-existing duty following a breach of the substituted contract. *Nowicki Construction Co. v. Panar Corp., N.V.,* 342 Pa.Super. 8, 492 A.2d 36 (1985). As the District Court stated in *National American Corp. v. Federal Republic of Nigeria,* 448 F.Supp. 622 (S.D.N.Y.1978), *aff'd,* 597 F.2d 314 (2d Cir.1979):

   [A] substitute contract operates as its name implies--as an immediate discharge and satisfaction of existing claims in return for the new contract, even though performance is to commence in the future. Should a breach later occur, the creditor is limited to his rights under the substitute agreement. *Restatement, Contracts,* Section 418 (1932); 6 *Corbin* § 1269 at 81-2. 448 F.Supp. at 643.

[30] A novation may be established by evidence of an express understanding or by circumstances showing such assent. *First Pennsylvania Bank, N.A. v. Triester,* 380 A.2d at 831. A novation may be implied or inferred from all surrounding circumstances. *In re Stader,* 90 B.R. 29, 32

(Bankr.D.Conn.1988). As discussed previously, the intention of the parties to effect a novation or substituted contract may be shown by other writings, words, conduct or by all three. *Buttonwood Farms, Inc. v. Carson,* 329 Pa.Super. 312, 478 A.2d 484, 487 (1984).

[31] The party asserting the existence of a novation has the burden of proving that the later agreement was specifically intended as a complete substitute for the prior agreements. *American Acceptance Corp. v. Scott Housing Sys., Inc.,* 630 F.Supp. 70, 75 (E.D.Pa.1985) (citing *First Pennsylvania Bank, N.A. v. Triester, supra* ).

The Debtors assert that Aetna has failed to establish a novation or substitution in this instance because there is no language in the new bond which would demonstrate such an intent. It is well established that evidence which courts find probative of an intent to extinguish an old contract and to accept a new contract as a full substitute includes language in the second contract expressly stating that it supplants the earlier agreement. *Nowicki Constr. Co. v. Panar Corp., N.V.,* 492 A.2d at 40; *National American Corp. v. Federal Republic of Nigeria,* 448 F.Supp. 622 (S.D.N.Y.1978), *aff'd,* 597 F.2d 314 (2d Cir.1979). Courts also find the surrender of the original contract, annuity, or note a clear indication of the parties' intent to extinguish the rights and obligations under the original contract. *See, Hong v. Teachers Ins. and Annuity Ass'n,* 718 F.2d 871, 872 (8th Cir.1983); *see also, First Pennsylvania Bank, N.A. v. Triester, supra; Nikimiha Securities Ltd. v. Trend Group Ltd.,* 646 F.Supp. 1211 (E.D.Pa.1986). However, in this instance it is undisputed that the bond language was prepared by the Bureau. [*See,* Affidavit of Reta Davis at ¶ 7; Aetna's Document 1]. Accordingly, the Debtors' assertion that any ambiguity must be construed against Aetna is misplaced under these circumstances.

A. The 1981 Transaction

The elements of a substituted contract or novation are found in a chronological review *908 of the correspondence and documents. On June 30, 1981, H.V. Knighton, Chief of the Operations Evaluation Division of the Bureau, agreed to the cancellation of the bonds filed "on behalf of the merged subsidiaries" upon receipt of a "*new* surety bond" on behalf of the successor corporation. [*See,* Aetna's Document 1]. This letter in itself

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

116 B.R. 887                                                                                              **Page 171**
(Cite as: 116 B.R. 887, *908)

establishes the factual predicate of a novation and substituted contract. Knighton's authorization to extinguish liability on the pre-existing bonds was conditioned upon submission of a replacement bond and proof of the merger. Aetna's liability on the risk was to continue but was evidenced by a new bond on behalf of the successor corporation. Further proof of the substitution is found in the requested penal sum. Knighton's requested penal sum for the replacement bond on behalf of the successor corporation was $17 million, the exact total of the three pre-existing bonds. The specification of identical penal sums further evidences that the Bureau intended a substitution of contracts.

On July 20, 1981, Dan Minnick of Jones & Laughlin responded to the Bureau. The letter provided in pertinent part as follows:

> Thank you for making the changes in the self-insurance status for our company which resulted from our corporate reorganization. In doing so you requested that the security bond amount of $17 million be provided by the new corporation. *While we recognize that this is the total of all bonds previously filed,* we would appreciate your reviewing the security requirements in lieu of our changed organization and improved financial status.

[*See,* Aetna's Document 2, emphasis added]. The Bureau agreed to reduce the penal sum to $12 million. [*See,* Aetna's Document 3].

In her correspondence of July 28, 1981, Veronica Kelcha, Insurance Administrator of Jones & Laughlin, stated that the consolidated bond "will *replace* the existing workers' compensation bonds for Jones & Laughlin Steel Corporation (018 S 68212), General Alloy Casting Company (018 S 69175), and Nemacolin Mines Corporation (018 S 69174)." [*See,* Aetna's Document 4, emphasis added].

Ralph Burt, of the bond department of Aetna's Dallas office memorialized his phone conversation with Brenda Martin of the broker, Marsh & McLennan. Martin requested authority for a bond "*replacing* " the pre-existing bonds. [*See,* Aetna's Document 6, emphasis added]. Aetna states that with that understanding, Aetna granted authority to issue the replacement bond. On August 4, 1981, Brenda Martin of the broker prepared the Bond Order and Report Blank for bond No. 018 S 71955 in the amount of $12 million. In the remarks

section of the application, she wrote that "[t]his bond *replaces* Bond ## 018 S 68212 (J&L), Bond # 018 S 69174 (Nemacolin Mines) & Bond # 018 S 69175 (General Alloy Casting).... We are closing all 3 bonds as of July 1, 1981." [*See,* Aetna's Document 7, emphasis added]. On the same day, Martin forwarded the bond to Jones & Laughlin, stating that she was "requesting that Aetna cancel Bond No. 018 S 68212 (J&L), Bond No. 018 S 69174 (Nemacolin) & Bond No. 018 S 69175 (General Alloy)." [*See,* Aetna's Document 8]. Aetna documented the issuance of bond No. 018 S 71955, stating in the report that this bond "*replaces* Jones & Laughlin 018 S 86212; General Alloy Casting 018 S 69175; & Nemacolin Mines 018 S 69174." [*See,* Aetna's Document 10, emphasis added].

On September 8, 1981, Robert Conner, of Jones & Laughlin, wrote to the Bureau stating:

> We recently *replaced* three bonds with one bond to cover our workers' compensation exposure in the State of Pennsylvania under the recent merger. The three bonds *replaced* were Bond Nos. 018S69174, 018S69175, 018S68212 all with Aetna Casualty Company and covered Jones & Laughlin, Nemacolin Mines and General Alloy.
>
> I am attempting to cancel the three bonds in question since they have been *replaced* by the new $12 million bond. Prior to cancellation, Aetna would prefer notification from the State of Pennsylvania *909 that the three bonds in question are no longer required and, in fact, have been *replaced* by a new bond. Would you please provide me with such a statement in order that I may cancel these three bonds.

[*See,* Aetna's Document 11, emphasis added].

On October 8, 1981, Reta Davis, Manager of the Self-Insurance Section of the Bureau, responded:

> This is to acknowledge your telephone communication of October 6, 1981 regarding the *replacement* bond for Jones & Laughlin Steel Corporation and Subsidiaries.
>
> Jones & Laughlin Steel recently *replaced* three bonds with one bond to cover their security requirement for self-insurance in the State of Pennsylvania.
>
> The three bonds *replaced* were bond Nos. 018 S 69174, 018 S 69175, 018 S 68212 all with The Aetna Casualty Company. *These three bonds are no longer required.*
>
> Upon approval of the new bond by the Insurance Department and Attorney General's Office the

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Bond No. 018 S 71955 (*replacement* bond) in the amount of 12 million dollars will be sufficient. [*See,* Aetna's Document 13, emphasis added].

The Aetna Surety Adjustment Report for each original bond states that the bond was "*replaced by Jones & Laughlin Bond No. 018 S 71955.*" [*See,* Aetna's Documents 14, 15, 16, emphasis added].

On November 25, 1981, Reta Davis confirmed that bond No. 018 S 71955 was approved by the Insurance Department and the Attorney General. She also granted authority for Aetna "to cancel the bond numbers 018 S 69174, 018 S 69175 and 018 S 68212 covering Jones & Laughlin Steel Corporation, Nemacolin Mines and General Alloy Casting Company." [*See,* Aetna's Document 17]. It should be noted that in neither the October 8th nor the November 25th letters from Pennsylvania's Manager of the Self-Insurance Section does Reta Davis see fit to use the word "terminate" to describe the transaction.    In her affidavit, Davis in explaining the Bureau procedure indicated:

> My letter of November 25, 1981 is not in the form I would use for termination of bonds. When a bond was terminated and there was to be continuing liability for injuries occurring during the term of the bond, I had a form letter that specifically stated that the termination of the bond "does not relieve liability for the time during which the bond was in effect."    My letter of November 25, 1981, which does not contain such language, is consistent with the "replacement" of bonds 018 S 69174, 018 S 69175 and 018 S 68212 rather than their termination.  [Document 17].

[Affidavit of Reta Davis at ¶ 6].

Although the record is replete with correspondence from all parties referring to the transaction as a "replacement", the displacement or extinction of the three pre-existing bonds are most specifically demonstrated in four related documents, three of which were authored by the Bureau and one by Jones & Laughlin/LTV.  First, on June 30, 1981, the Bureau advised that the three pre-existing bonds could be cancelled upon receipt of the replacement bond and merger documents.    [*See,* Aetna's Document 1].    Second, on September 8, 1981, Jones & Laughlin wrote to the Bureau indicating that it was "attempting to cancel the three bonds in question since they have been replaced" by the new bond.    Jones & Laughlin requested confirmation from the Bureau that the three bonds were "no

longer required" and had been replaced.    [*See,* Aetna's Document 11].    The third document is the Bureau's response of October 8, 1981.    In that letter, the Manager of Pennsylvania Self-Insurance Section advised that the "three bonds are no longer required" and that the "replacement bond" would be sufficient.  [*See,* Aetna's Document 13].  Finally, on November 25, 1981, the Bureau wrote to Aetna granting Aetna specific authority "to cancel" the three bonds.  The correspondence notably omitted a standard caveat that there would be continuing liability on the bonds. [*See,* Aetna's Document 17].

**\*910** Based upon the record as submitted, this Court does find that the three bonds were in fact replaced by the new bond issued, and not terminated.  Accordingly, the first requirement for a novation has been met.  The Bureau's and J & L/ LTV's own correspondence establishes and grants authority for the displacement or extinction of the three pre-existing bonds.  Furthermore, it appears that the cancellation was conditioned upon the second requirement, *i.e.,* the substitution of a new bond.

The second requirement for a novation is the substitution of a valid new contract.    The documentation between the parties clearly establishes that the Aetna bond No. 018 S 71955 was substituted for the three pre-existing bonds. The Bureau's letter of October 8, 1981, provided that Jones & Laughlin "recently replaced three bonds with one bond to cover their security requirements for self-insurance in the State of Pennsylvania". [ *See,* Aetna's Document 13].    In the same correspondence, Reta Davis specifically described bond No. 018 S 71955 as "the replacement bond". Moreover, Davis, in her affidavit, stated that the term "replacement", when used by the Bureau, meant the issuance of a substitute bond to supplant pre-existing bonds.  [Affidavit of Reta Davis at ¶ 4; *see also,* Affidavit of Jan Smith at ¶ 3].  Finally, as discussed previously, the correspondence is replete with references to the transaction as a "replacement" of bonds.    This Court therefore concludes that Aetna has established the second requirement *i.e.* that the parties intended a substitution of contract.

The third requirement is sufficient consideration. This Court finds that sufficient consideration existed as part of the overall transaction.

Paragraph 4 of the bond provides:

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

4.  In the event of change in the legal entity of the Principal, the Principal shall immediately notify the Director of the Bureau of Workers' Compensation and the Surety agrees to notify forthwith the Director in writing of any such change as soon as it receives notice of any knowledge thereof; provided, however, the Surety shall not be liable for the obligations of the new entity unless it consents thereto in writing.
[*See,* Aetna's Documents 28, 29, 30].

Since a merger occurred and "legal entity of the Principal" had changed, Aetna could not be liable by virtue of the bond language for the obligations of the new entity, Jones & Laughlin Steel Incorporated.  The consideration is found by virtue of Aetna's agreement to accept liability for the obligations of the new corporate entity in exchange for extinguishment of the three pre-existing bonds. The substitution of one unexecuted contract for another has been held to be adequate consideration. *Yoder v. T.F. Scholes, Inc.,* 173 A.2d at 122.

The correspondence between Jones & Laughlin, the Bureau, and Marsh & McLennan evidence the fourth requirement for a novation, consent. Particularly, the correspondence of September 8, 1981 [*see,* Aetna's Document 11], October 8, 1981 [*see,* Aetna's Document 13], and November 25, 1981 [*see,* Aetna's Document 17], in conjunction with Aetna's Surety Adjustment Reports support the conclusion that the Bureau and Jones & Laughlin/ LTV not only consented to the replacement but actively sought it.

Some legal authorities impose a further requirement to establish novation.  Those authorities require as an additional element, the inclusion of a party who neither owed the previous duty, nor was entitled to its performance. *See,* 15 *Williston on Contracts,* § 1865 (3rd ed. 1972). Even that potential requirement is met in this transaction by the change of principal.  Prior to the issuance of bond No. 018 S 71955, no obligation was owed by Aetna on behalf of the merged corporation, the New J & L Steel Corporation, whose name was immediately changed to Jones & Laughlin Steel Incorporated.  [*See,* Aetna's Document 37].  The addition of the new corporation as a principal fulfills any requirement that a new party be involved.

B. The 1985 Transaction

[32]  A similar analysis applies to the 1985 transaction.  Prior to the 1985 merger, *911 Aetna had two surety bonds in place, bond No. 018 S 100071193 for Republic Steel and BCNR, and bond No. 018 S 71955 for Jones & Laughlin.  In 1985, Jones & Laughlin and Republic merged forming LTV Steel Company, Inc.  As a result of the merger, the penal sum of bond No. 018 S 71955 was increased to $27 million, the names of the principals were changed to reflect the new corporate entities, and bond No. 018 S 100071193 was "cancelled".

The displacement or extinguishment of bond No. 018 S 100071193 is well documented.  On June 13, 1985, LTV wrote to Marsh & McLennan confirming the Bureau's agreement to cancel bond No. 018 S 100071193.  [*See,* Aetna's Document 18].  The Bureau granted its approval, stating the reason as "Bond Replacement".  [*See,* Aetna's Document 24].  The Bureau's letter of August 27, 1985, granted specific authority to make the change effective July 1, 1985 since there was "no need for overlapping coverage".  [*See,* Aetna's Document 26].  The bond was cancelled and Aetna closed its bond file.  [*See,* Aetna's Document 27].  The Bureau's correspondence, the affidavit of the Bureau Director, and other documents establish that bond No. 018 S 100071193 was displaced and extinguished.

Additionally, bond No. 018 S 71955 with its increased penal sum and change of principals satisfies the second element of a novation, the substitution of a new contract.  The second element is further satisfied by the Bureau's employee, Charles W. Wilson's description of the transaction as a "bond replacement".  [*See,* Aetna's Documents 24, 25].  As stated previously, the Bureau recognized that the terms "replacement" and "substitution" are synonymous.  [*See,* Affidavit of Jan Smith at ¶ 3;  *see also,* Affidavit of Reta Davis at ¶ 4].  Therefore, the substitution is established by the documents and affidavits of the Bureau's personnel.

The consideration for the novation or substituted contract is found in Aetna's agreement to accept the suretyship for the new corporate entities and with an increased penal sum.  As discussed previously, under ¶ 4 of the bond a change in the legal entity of the principal relieves the surety from liability for obligations of the new entity.  Aetna's agreement to provide the bond for the new corporate entities in

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

the increased penal sum is clearly adequate consideration for the replacement and cancellation of bond No. 018 S 100071193. *See, Yoder v. T.F. Scholes, Inc.,* 173 A.2d at 122.

It is also clear that the parties consented to the substitution since it was instituted at the request of LTV in its meeting with the Bureau Director. The consent of the parties is documented in LTV's letter of June 13, 1985, [*see,* Aetna's Document 18]; approved by the Bureau's response on Aetna's notice of July 12, 1985, [*see,* Aetna's Document 24]; and confirmed by the Bureau's letter of August 27, 1985. [*See,* Aetna's Document 26].

Finally, the additional requirement for a novation which is sometimes included by certain authorities, *i.e.* that the new contract include a party who neither owed the previous duty nor was entitled to its performance, is likewise met. Prior to the 1985 transactions Aetna owed no duty on either bond to respond in the event of a default by LTV Steel Company, Inc. or LTV Steel Specialty Products Company. The addition of those two principals fulfills any requirement that an additional party be involved.

Based upon the correspondence and the other documents submitted, this Court finds that there are no genuine issues as to any material fact that the 1981 and 1985 transactions constituted a substituted contract and novation. The three pre-existing bonds were replaced with the express permission of the Bureau by bond No. 018 S 71955. It is clear that the parties intended that this new bond was substituted for the pre-existing bonds to maintain Jones & Laughlin's and subsequently, LTV Steel's self-insured status. Neither the Debtors nor the Bureau have produced any document which comports with the language of ¶ 3 of the bonds which would have clearly demonstrated that the parties intended to "terminate" the surety bonds. This *912 Court also finds that there was adequate consideration, that the parties consented to the substitution, and that the successor corporation was named as the new principal. There is nothing in the documents which supports the Debtors' assertion that either the 1981 or 1985 transactions constituted a "termination" within the meaning of the bond language. Accordingly, this Court finds that Aetna is liable only under its surety bond No. 018 S 71955 in the maximum penal sum of $27 million with respect to the Debtors' default on its Pennsylvania Workers' Compensation liability.

7) *Whether LTV Steel and the Bureau should be estopped from asserting Aetna's liability beyond the penal sum of $27 million.*

[33] In the alternative, Aetna asserts that based on the doctrines of both equitable and promissory estoppel it is also entitled to summary judgment. Although this Court has already found sufficient grounds for the granting of summary judgement on behalf of Aetna on the theory of novation or substitution of contract, based on the documents and the affidavits submitted there is a sufficient basis for a finding of estoppel under these circumstances. [FN1]

> FN1. Since Aetna has prevailed on its motion for summary judgment under the theories of novation and estoppel, there is no need to address Aetna's alternative theories for relief, *i.e.,* reformation and merger.

The doctrine of equitable estoppel is one of fundamental fairness. *Brog Pharmacy v. Commonwealth, Department of Public Welfare,* 87 Pa.Cmwlth. 181, 487 A.2d 49, 52 (1985). Equitable estoppel is a defense which precludes a person from denying or asserting a claim. *Paul v. Lankenau Hospital,* 375 Pa.Super. 1, 543 A.2d 1148, 1152, *app. den.,* 520 Pa. 618, 554 A.2d 510 (1988).

In Pennsylvania, the doctrine of equitable estoppel is well established:

> Equitable 'estoppel arises when one by his acts, representations, or admissions, or by his silence when he ought to speak out, intentionally or through culpable negligence induces another to believe certain facts to exist and such other rightfully relies and acts on such belief, so that he will be prejudiced if the former is permitted to deny the existence of such facts.'

*Northwestern Nat'l Bank v. Commonwealth,* 345 Pa. 192, 27 A.2d 20, 23 (1942) (citations omitted); *accord, Blofsen v. Cutaiar,* 460 Pa. 411, 333 A.2d 841, 843-44 (1975); *Schuylkill Prods., Inc. v. H. Rupert & Sons, Inc.,* 305 Pa.Super. 36, 451 A.2d 229, 233 (1982); *Cerami v. Dignazio,* 283 Pa.Super. 424, 424 A.2d 881, 887-88 (1980).

The party asserting the estoppel must establish grounds therefore by "clear, precise and unequivocal evidence." *Blofsen v. Cutaiar,* 333 A.2d at 844; *accord Novelty Mills, Inc. v. Siskind,*

116 B.R. 887                                                                      **Page 175**
**(Cite as: 116 B.R. 887, \*912)**

500 Pa. 432, 457 A.2d 502, 504 (1983).

Although similar, the doctrine of promissory estoppel is separate and distinct from the doctrine of equitable estoppel.    Promissory estoppel is an independent cause of action.    *Paul v. Lankenau Hospital,* 543 A.2d at 1153. This doctrine allows courts to enforce promises to remedy a manifest injustice.    *Cardamone v. University of Pittsburgh,* 253 Pa.Super. 65, 74, 384 A.2d 1228, 1232 (1978) .   Promissory estoppel has long been recognized as a vehicle by which a promise may be enforced in order to remedy an injustice. *Travers v. Cameron County School District,* 117 Pa.Cmwlth. 606, 544 A.2d 547, 550 (1988).

These doctrines of estoppel can be applied against agencies of the Commonwealth. "[A]pplication of the doctrine of estoppel should not be denied merely because it is being asserted against the government." *Commonwealth, Department of Public Welfare v. UEC, Inc.,* 483 Pa. 503, 514, 397 A.2d 779, 785 (1979).    Statements by compensation authorities which are misleading can operate as an estoppel. *Burgit v. Commonwealth, Unemployment Compensation Board of Review,* 97 Pa.Commw. 615, 511 A.2d 247, 248, *app. den.,* 515 Pa. 625, 531 A.2d 432 (1986).    *See also, Commonwealth Department of Revenue v. King Crown \*913 Corp.,* 52 Pa.Cmwlth. 156, 415 A.2d 927 (1980) and *Central Dauphin School District v. Commonwealth, Department of Education,* 63 Pa.Cmwlth. 48, 437 A.2d 527 (1981).

A case directly on point which, parenthetically, involved the Bureau is *Utica Mutual Insurance Co. v. Commonwealth of Pennsylvania, Department of Labor and Industry, Bureau of Worker's Compensation,* slip op. No. 1759 (C.D. May 16, 1989).    In *Utica Mutual,* the insurer, Utica Mutual, issued a bond on behalf of Mesta Machine Company in the penal sum of $2 million pursuant to the requirements of the Pennsylvania workers' compensation program.    The Bureau, through the correspondence of Bureau Director, Jan Smith, agreed that Utica could reduce the penal sum of the bond from $2 million to $750,000.  Subsequently, the Bureau advised Utica that it was the Bureau's position that no reduction of the bond obligations had taken place, and that Utica would be held to the full amount of the $2 million surety bond.    The Pennsylvania court rejected the Bureau's position, stating as follows:
    Whether the authority of Jan Smith to modify the

surety agreement was actual or apparent, the Court believes that Utica justifiably relied on the authority of the Director of a State Agency to authorize modification of the surety bond.  Utica cites *Commonwealth of Pennsylvania, Department of Revenue, Bureau of Sales and Use Tax v. King Crown Corporation,* 52 Pa.Commonwealth Ct. 156, 415 A.2d 927 (1980), for the proposition that justifiable reliance on the apparent authority of a government official may estop the Commonwealth from later denying the validity of his actions.... [T]he Court believes *King Crown* is applicable.    Like the parties in *King Crown* who relied on the apparent authority of the assistant attorney general to approve a compromise tax settlement, we believe Utica justifiably relied on the authority of the Director of the Bureau of Workers' Compensation to approve modification of a surety bond.
    It would be unconscionable for the Commonwealth to deny the validity of reduction agreement approved by the Director of a State Agency....
    *Utica Mutual,* slip op. at 5.

Similarly, LTV and the Bureau should be estopped in the present matter.    The undisputed material facts in this action satisfy the requirements under the doctrine of estoppel since the Bureau and J & L/ LTV made representations and acted to induce action;  Aetna reasonably relied on the Bureau's and J & L's/LTV's words, conduct and writings;  and injustice would result by the failure to enforce the promises of the Bureau and J & L/LTV.
    Whenever a person has made to another person a written promise for which that other has given consideration or in reliance on which he has reasonably changed his position, the court in its interpretation of the words of that promise must take into account the intention and understanding of each of the two parties-- the "meaning" attributed to the words by each of them.    If they have inconsistent intentions and understandings, having given materially different interpretations to the words, no valid contract has been made unless the conduct of the promisor has been such that he is equitably estopped from asserting his own interpretation as against that given to his words by the promisee.    A promisor may be legally bound in accordance with the promisee's intention and understanding if he actually knew or had reason to know such intention and understanding.    The promisor is thus bound, not because the promisee's interpretation is the one and only true

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

or objective interpretation of the written words, but because he knew or had reason to know the understanding of the promisee and permitted him to act in reliance thereon. In determining whether a promisor is bound by reason of his having had reason to know (without actual knowledge), his conduct must be considered in relation to all the circumstances of the case, including the customs and usages of other men in similar circumstances. Among these usages are the usages of words, as *914 reported in respectable dictionaries and testified to by competent witnesses.

A.L. Corbin, *The Interpretation of Words and the Parol Evidence Rule,* 50 Cornell L.Q. 161, 189-90 (1965).

This Court finds that even if it were to consider all of the affidavits submitted by the parties [FN2], a fair reading reveals a meager attempt to establish that the Bureau and LTV never intended to extinguish retroactive liability on the pre-merger bonds. However, their subjective intent does not prevent an estoppel where their conduct and statements, as clearly established by their own documents, misled Aetna.

FN2. *See,* discussion herein at 904-905.

Moreover, the representations by the Bureau's officials are noteworthy by what was not said. In other situations where the Commonwealth intended to continue retroactive liability on terminated bonds it had a deliberate policy of notifying the surety of its continuing liability. No such notice was provided in this case and no explanation for its absence has been offered. [*See,* Affidavit of Reta Davis, ¶¶ 3, 4, 5, 6]. Consequently, this Court finds that advising that the pre-merger bonds were "no longer required" and that the replacement bond would be "sufficient", in conjunction with the deviation from its standard practice of advising sureties of "continuing liability", constitutes misleading words, conduct or silence which induced Aetna to issue the replacement bond. Such conduct clearly satisfies the requirements of both equitable and promissory estoppel.

Additionally, this Court finds that Aetna was justified in relying upon the behavior and representations of LTV Steel and the Bureau when it issued the replacement bonds. The

representations and dealings were by individuals in positions of authority. Robert C. Conner was the Manager-Insurance for J & L/LTV; Reta Davis was the Manager of Self-Insurance Section of the Bureau; and Jan Smith was the Director of the Bureau. Indeed, the Bureau has been estopped in similar circumstances. *See, In re Utica Mutual Insurance Co. v. Commonwealth of Pa.,* slip op., *supra.*

Based upon the correspondence and the other documents submitted, including the affidavits submitted by both parties, this Court holds that there are no genuine issues as to any material fact that Aetna has met both the factual and legal requirements for a finding of both equitable or promissory estoppel. Accordingly, both the Debtors and the Bureau are estopped from asserting that Aetna is liable beyond the penal sum of $27 million under the surety bond No. 018 S 71955.

CONCLUSION

In accordance with the foregoing discussion, Aetna's motions to dismiss are hereby denied.

Moreover, this Court concludes that surety bonds Nos. 018 S 69174, 018 S 69175, 018 S 68212 and 018 S 100071193 have been replaced and not "terminated". Thus, only surety bond No. 018 S 71955 in the maximum penal sum of $27 million is available with respect to the Debtors' default on its Pennsylvania workers' compensation liability. Consequently, the Debtors' motion for partial summary judgment is hereby denied and Aetna's cross-motion for summary judgment is hereby granted [FN3].

FN3. Accordingly, based on this Court's holding that Aetna is not liable beyond the penal sum of $27 million, the Debtors' request for reimbursement by Aetna pursuant to the third cause of action in their complaint is moot.

A separate *Report And Recommendation On Motion For Abstention* has been simultaneously entered.

Submit an order in accordance with the foregoing.

116 B.R. 887

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# TAB 35

93 B.R. 26
93 B.R. 26, 50 Ed. Law Rep. 814
**(Cite as: 93 B.R. 26)**
▷

United States District Court,
S.D. New York.
**In re CHATEAUGAY CORPORATION,
REOMAR, INC., the LTV Corporation, et al.,
Debtors.
LTV STEEL COMPANY, INC., et al., Plaintiffs,
v.
BOARD OF EDUCATION OF the CLEVELAND
CITY SCHOOL DISTRICT, et al., Defendants.
Bankruptcy Nos. 86 B 11270(BRL)-86 B
11334(BRL), 86 B 11402(BRL) and 86 B
11464(BRL).
No. 87 Civ. 6014(PNL).**

Oct. 4, 1988.

Board of education appealed from order of the Bankruptcy Court preliminarily enjoining it from prosecuting action in the United States District Court for the Northern District of Ohio to recover real and personal property taxes. The District Court, Leval, J., held that bankruptcy court did not abuse its discretion in issuing injunction.

Affirmed.

West Headnotes

**[1] Bankruptcy ⬤═2368**
51k2368
Usual grounds for injunctive relief such as irreparable injury need not be shown in proceeding for injunction under provision of Bankruptcy Code governing general equitable powers of bankruptcy court; rather, bankruptcy court may enjoin proceedings in other courts when it is satisfied that such proceeding would defeat or impair bankruptcy court's jurisdiction with respect to case before it. Bankr.Code, 11 U.S.C.A. § 105(a).

**[2] Bankruptcy ⬤═2374**
51k2374
Bankruptcy court acted within its powers in preliminarily enjoining Ohio school board from pursuing action in Ohio court so that bankruptcy court could determine whether automatic stay applied to action commenced by school board to collect taxes that board alleged arose after debtor's petition in bankruptcy was filed. Bankr.Code, 11 U.S.C.A. §§ 105(a), 362.
*27 Levin & Weintraub & Crames, New York City. Davis Polk & Wardwell, New York City,

for plaintiffs.

Kenneth F. Seminatore, Climaco Climaco Seminatore Lefkowitz & Garofoli Co L.P.A., Cleveland, Ohio, for defendants.

MEMORANDUM AND ORDER

LEVAL, District Judge.

This is an appeal from a decision and order of the Bankruptcy Court preliminarily enjoining defendant-appellants, Board of Education of the Cleveland City School District (the "Cleveland School Board"), and its counsel, Baker and Hostetler and Climaco, Climaco, Seminatore, Lefkowitz and Garofoli, L.P.A., from prosecuting an action in the United States District Court for the Northern District of Ohio (the "Ohio action") to recover real property and personal property taxes. The Ohio action was commenced several days before the action below appealed from. In it, the Cleveland School Board sought a declaratory judgment for tax obligations that the Board alleged arose after LTV's petition in bankruptcy was filed and relief from the automatic stay, 11 U.S.C. § 362 , with respect to other tax obligations that were concededly incurred pre-petition. The appellants assign as error the Bankruptcy Court's determination to enjoin a parallel action to determine the scope of the automatic stay and various evidentiary rulings made by the Court below.

BACKGROUND

The action below was instituted by complaint and order to show cause. The plaintiff is LTV Steel, which with its affiliates filed petitions for reorganization under Chapter 11 of the Bankruptcy Code, 11 U.S.C. § 1101 et seq., on July 17, 1986, in the United States Bankruptcy Court for the Southern District of New York. This is now the debtor in one of the largest bankruptcy proceedings in the United States. An automatic stay, 11 U.S.C. § 362(a), and a restraining order, embodying the terms of the stay and issued ex parte on July 17, 1986, are in effect with respect to actions against LTV Steel. Defendant, Cleveland School Board, is a political subdivision of the State of Ohio and a beneficiary of taxes payable by LTV Steel to the Treasurer of Cuyahoga County, Ohio. As a major employer and property owner in the Cleveland

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Metropolitan area, LTV Steel is a significant taxpayer in Cuyahoga County.

On May 29, 1987, the Cleveland School Board filed a complaint in the United States District Court for the Northern District of Ohio, *Board of Education of the Cleveland City School District v. LTV Steel Company, Inc.,* Cv. Act. No. C87-1308, seeking a declaratory judgment that LTV was obligated to pay personal property and real property taxes and requesting the court to assume jurisdiction over various tax disputes then pending between LTV and the Cleveland School Board.    The first claim for relief seeks judgment for "a significant amount of personal property taxes unpaid by LTV, which are post petition in nature, and which are due to be paid in the period since July 17, 1986"; and the second claim for relief seeks judgment for "a significant amount of real property taxes due and to be paid in the period since *28 July 17, 1986, during which period LTV has conducted its businesses under the authority of the United States Bankruptcy Court for the Southern District of New York."    The third claim for relief, which is made expressly "subject to the granting of the School Board's motion for relief from the stay," asks the court to "exercise its jurisdiction to hear and resolve all disputes between LTV and the School Board relating to real property tax valuations and any other ancillary issues relating to the tax collection process."

With the complaint, the Cleveland School Board filed a motion to enjoin LTV Steel, its attorneys, and agents of the Bankruptcy Court from taking any action to interfere with the Board's prosecution of the complaint and a motion seeking to have the case assigned as a related matter to the Court handling the desegregation of the Cleveland City schools. The Cleveland School Board also filed with the Ohio court a motion for relief from the automatic stay to prosecute the third claim for relief and a motion to withdraw the reference of that matter to the United States Bankruptcy Court for the Northern District of Ohio.    Judge Battisti of the Northern District of Ohio declined to issue the temporary restraining order, apparently finding that no irreparable injury was threatened.    *See* Appellees' Brief in Opposition to Appeal at 7.

Shortly thereafter, on June 2, 1987, LTV Steel commenced the instant adversary proceeding (the "New York action") against the Cleveland School Board and its attorneys.    It alleges contempt of

court for a violation of the automatic stay and the Bankruptcy Court's July 17, 1986 restraining order and asks the court to restrain the defendants from prosecuting the action in the Ohio District Court. The New York action seeks an order (i) decreeing that the Ohio action is subject to the automatic stay, (ii) restraining and enjoining the defendants from litigating the action in Ohio, and (iii) decreeing that the Bankruptcy Court below alone has authority to decide the stay relief motion.    The Bankruptcy Court entered a temporary restraining order on June 2, 1987, restraining the Cleveland School Board from proceeding against LTV in the Ohio action. By agreement of the parties, the restraining order was continued in force until June 29, 1987, at which time the Bankruptcy Court held a hearing on LTV's application for injunctive relief.

The hearing consisted of argument of counsel, the introduction of various filings that were part of the record of the Ohio action or the New York bankruptcy proceeding, and the testimony of John T. Delmore, Assistant Comptroller, corporate accounting for LTV Steel, who testified first as a witness for the plaintiff and then as a witness for defendants.        Delmore testified that the tax payments at issue were not made because LTV believed that they were subject to the provisions of the automatic stay.    He also testified that permitting the Ohio action to go forward would subject LTV to the possibility of separate lawsuits by each of the approximately 150 taxing authorities to which LTV Steel pays taxes and would be disruptive of LTV Steel's reorganization efforts.

At the conclusion of the hearing, the Bankruptcy Court entered an order enjoining the defendants from continuing to litigate the first two counts in the Ohio complaint pending a determination by the Bankruptcy Court as to the nature of the disputed tax claims, and restraining the defendants from proceeding with the stay relief motion in the Ohio court.    The court postponed decision on the request for sanctions or contempt pending a future hearing on that matter.    With respect to the injunction, the court    reasoned    that    centralization    of    the determination of the scope of the automatic stay was vital to the scheme of the reorganization process. It found that the alternative was to subject the debtors to potentially inconsistent and conflicting judicial decisions regarding their tax liabilities. The need for uniform determination of the applicability of the automatic stay was particularly great in so large a case, the second largest

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

93 B.R. 26
(Cite as: 93 B.R. 26, *28)

Page 340

bankruptcy case with "an extraordinarily large number of claimants." The court therefore issued an injunction under 11 U.S.C. § 105, finding that *29 the defendants' actions threatened to irreparably harm the debtor's reorganization. [FN1]

> FN1. The court also determined that even the more rigorous standards for a preliminary injunction under Fed.R.Civ.P. Rule 65 were met. The plaintiff had demonstrated irreparable injury and a likelihood of success on the merits, and the balance of hardships favored the plaintiff. *See Sperry International Trade, Inc. v. Government of Israel,* 670 F.2d 8, 11 (2d Cir.1982).

## DISCUSSION

### 1. *The Issuance of the Injunction*

The principal issue presented on this appeal is whether the Bankruptcy Court abused its discretion, *see In re Johns-Manville Corp.,* 60 B.R. 842, 847-49 (S.D.N.Y.), *rev'd on other grounds,* 801 F.2d 60 (2d Cir.1986); *Matter of Emergency Beacon Corp.,* 52 B.R. 979, 986 (S.D.N.Y.1985), *aff'd,* 781 F.2d 973 (2d Cir.1986), in enjoining the School Board from pursuing the Ohio action pending the Bankruptcy Court's determination on the applicability of the automatic stay. [FN2] Defendants argue that the Bankruptcy Court's order violates the mandatory venue provisions of 28 U.S.C. §§ 959(a) and 1409(d) by requiring the Cleveland School Board to litigate the question whether the Ohio tax obligations are pre- or post-petition in the Bankruptcy Court for the Southern District of New York. They further contend that there is no harm to LTV to litigate in the Ohio District Court. Defendants also argue that the Bankruptcy court made a number of erroneous evidentiary decisions. [FN3]

> FN2. The court has jurisdiction over this appeal as an appeal of an order enjoining an action in another court. *See In re Neuman,* 71 B.R. 567, 574 (S.D.N.Y.1987).

> FN3. In their brief, appellants argue that the Ohio action did not violate the automatic stay, that an Ohio forum is a more convenient forum for adjudication of the merits of the tax claims, and that the issue of contempt, having been fully presented in the hearing on a preliminary injunction, may not be reopened through a new hearing. The District Court's jurisdiction, however, is limited to "final judgments, orders, and decrees" of bankruptcy judges, 28 U.S.C. § 158, and cannot be exercised over matters such as

these that were not decided by the bankruptcy judge.

[1] The Bankruptcy Act provides the Court with broad equitable powers to preserve its own jurisdiction. "The court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title." 11 U.S.C. § 105(a). "[T]he Bankruptcy Court has authority under section 105 broader than the automatic stay provisions of section 362 and may use its equitable powers to assure the orderly conduct of the reorganization proceedings." *In re Baldwin-United Corp. Litig.,* 765 F.2d 343, 348 (2d Cir.1985); *see also In re Chanticleer Associates, Ltd.,* 592 F.2d 70, 74 (2d Cir.1979) ("the Court's power to preserve its jurisdiction by enjoining proceedings that would remove property from the bankrupt estate is fundamental to the scheme of the Bankruptcy Act"). The usual grounds for injunctive relief such as irreparable injury need not be shown in a proceeding for an injunction under section 105(a). *In re Neuman,* 71 B.R. 567, 571 (S.D.N.Y.1987). Rather, a bankruptcy court may enjoin proceedings in other courts when it is satisfied that such a proceeding would defeat or impair its jurisdiction with respect to a case before it. *In re Johns-Manville Corp.,* 26 B.R. 420, 425 (Bankr.S.D.N.Y.1983), *aff'd,* 40 B.R. 219 (S.D.N.Y.). *rev'd in part,* 41 B.R. 926 (S.D.N.Y.1984); *see Continental Illinois National Bank v. Chicago,* 294 U.S. 648, 675, 55 S.Ct. 595, 605-06, 79 L.Ed. 1110 (1935) ("The power to issue an injunction when necessary to prevent the defeat or impairment of its jurisdiction is inherent in a Court of Bankruptcy, as it is in a duly established Court of Equity."); *A.H. Robins Co. v. Piccinin,* 788 F.2d 994, 1008 (4th Cir.), *cert. denied,* 479 U.S. 876, 107 S.Ct. 251, 93 L.Ed.2d 177 (1986). In particular, it has been held that the Bankruptcy Court has the authority to issue an injunction on the grounds that it rather than another court should be the forum to decide whether a property is the property of the estate. *In re Neuman,* 71 B.R. 567 (S.D.N.Y.1987).

[2] In my view the Bankruptcy Court acted within its powers in preliminarily enjoining the School Board from pursuing the Ohio action so that the Bankruptcy Court *30 could determine whether the automatic stay, 11 U.S.C. § 362(a), covers that action. Section 362(a)(1) of the Bankruptcy Code, provides that the filing of a petition in bankruptcy operates as a stay of "the commencement or

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

continuation, including the issuance or employment of process, of a judicial, administrative, or other proceeding against the debtor that was or could have been commenced before the commencement of the case under this title, or to recover a claim against the debtor that arose before the commencement of the case under this title." Under 11 U.S.C. § 362(d), a motion to *modify* or *lift* the provisions of the automatic stay with respect to a particular action must be made to the bankruptcy court which is supervising the reorganization. *See In re Fields,* 55 B.R. 294 (Bankr.D.D.C.1985); *In re Johns-Manville Corp.,* 26 B.R. 919, 921 (Bankr.S.D.N.Y.1983); *In re Coleman American Companies, Inc.,* 8 B.R. 384 (Bankr.D.Kan.1981). In contrast, the issue of the *applicability* of the automatic stay to the litigation in question is within the competence of both courts--the court in which *the litigation is pending, see In re Baldwin-United Corp. Litig.,* 765 F.2d 343, 347 (2d Cir.1985); *accord NLRB v. Edward Cooper Painting, Inc.,* 804 F.2d 934 (6th Cir.1986); *Hunt v. Bankers Trust Co.,* 799 F.2d 1060, 1069 (5th Cir.1986), and *the bankruptcy court supervising the reorganization. See In re Baldwin-United Corp. Litig.,* 765 F.2d at 347.

The automatic stay is of great importance to the administration of the bankruptcy law. It "is designed to prevent a chaotic and uncontrolled scramble for the debtor's assets in a variety of uncoordinated proceedings in different courts. The stay insures that the debtor's affairs will be centralized, initially, in a single forum in order to prevent conflicting judgments from different courts and in order to harmonize creditors' interests with one another." *Fidelity Mortgage Investors v. Camelia Builders, Inc.,* 550 F.2d 47, 55 (2d Cir.1976), *cert. denied,* 429 U.S. 1093, 97 S.Ct. 1107, 51 L.Ed.2d 540 (1977); *accord A.H. Robins Co. v. Piccinin,* 788 F.2d 994, 998 (4th Cir.1986). The same interests in the uniform treatment of creditors and the orderly administration of the bankrupt estate also warrants deference to the Bankruptcy court in the interpretation of the automatic stay. *See In re Baldwin-United Corp. Litig.,* 765 F.2d 343, 348 (2d Cir.1985) ("the equities do not warrant either preventing the Bankruptcy Court from construing its stay *or determining in the District Court whether the stay applies* ") (emphasis added). In *In re Baldwin-United Corp. Litig.,* the Court of Appeals stressed that "[t]he necessary uniformity is best achieved by centralizing construction of the automatic stay in the

Bankruptcy Court." 765 F.2d at 349.

Thus, as an initial matter, the Ohio federal court has no authority to relieve the Cleveland School Board from the automatic stay with respect to the third claim. That matter can only be heard by the Bankruptcy Court for the Southern District of New York. 11 U.S.C. § 362(d); *Cathey v. Johns-Manville Sales Corp.,* 711 F.2d 60, 62 (6th Cir.1983), *cert. denied,* 478 U.S. 1021, 106 S.Ct. 3335, 92 L.Ed.2d 740 (1986); *In re Holtkamp,* 669 F.2d 505, 507 (7th Cir.1982); *Fidelity Mortgage Investors v. Camelia Builders, Inc.,* 550 F.2d 47, 57 (2d Cir.1976), *cert. denied,* 429 U.S. 1093, 97 S.Ct. 1107, 51 L.Ed.2d 540 (1977).

The Bankruptcy Court was also justified in temporarily enjoining prosecution of the first and second claims. There was evidence from which the Bankruptcy Court could have found that permitting the Ohio action to go forward without an initial determination by the Bankruptcy Court of the applicability of the automatic stay would have burdened and impeded the reorganization proceeding and impaired the Bankruptcy Court's jurisdiction. The testimony was to the effect that LTV Steel pays taxes to approximately 150 different taxing authorities. LTV owes property taxes for 1986 in substantially all of these jurisdictions, totalling approximately $44 million, which it has not paid because of its interpretation of the automatic stay. Based on this evidence, the Bankruptcy Court found that "[i]f each of these entities or recipients were to commence actions *31 similar to the defendants' actions, the Debtors' reorganization efforts would be irreparably harmed [and] the Debtors [might] be subject to inconsistent and conflicting judicial decisions regarding its tax liabilities." Tr. 148. This determination is not clearly erroneous. Even if LTV Steel were required to show irreparable injury, *see In re MacDonald Associates, Inc.,* 54 B.R. 865, 870 (Bankr.D.R.I.1985), the Bankruptcy Court would have been within its discretion in finding that an injunction was warranted.

The Cleveland School Board argues that an injunction prohibiting it from seeking the decision of the Ohio District Court whether it has jurisdiction over the complaint effectively circumvents the venue provisions of 28 U.S.C. §§ 959(a) and 1409(e). This is without merit. As the Cleveland School Board itself recognizes the venue provision of 28 U.S.C. § 1409(e) is merely permissive. *See,*

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

*e.g., Brock v. American Messenger Service, Inc.,* 65 B.R. 670 (D.N.H.1986). That section provides: "A proceeding arising under title 11 or arising in or related to a case under title 11, based on a claim arising after the commencement of such case from the operation of the business of the debtor *may* be commenced against the representative of the estate in such case in the district court for the district where the State of Federal court sits in which the party commencing such proceeding may, under applicable nonbankruptcy venue provisions, have brought an action on such claim, *or* in the district court in which such case is pending." 28 U.S.C. § 1409(e). The Cleveland School Board has cited no authority for the proposition that section 1409(e) gives it the right to have the Ohio District Court determine the scope of the automatic stay notwithstanding that it will be disruptive of the reorganization process.

Appellants argue that LTV Steel may be sued under 28 U.S.C. § 959(a) as a debtor in possession which has failed to pay its local taxes pursuant to 28 U.S.C. § 960. Section 959(a) provides that "Trustees ..., including debtors in possession, may be sued without leave of the court appointing them, with respect to any of their acts or transactions in carrying on business connected with such property. Such actions shall be subject to the general equity power of such court so far as the same may be necessary to the ends of justice." 28 U.S.C. § 959(a). [FN4] The second sentence of section 959(a) limits the first sentence's broad grant of permission to sue, subjecting it to the general equity powers of the bankruptcy court. *See Diners Club, Inc. v. Bumb,* 421 F.2d 396 (9th Cir.1970). Thus where there is a showing that the action "would embarrass, burden, delay or otherwise impede the reorganization proceedings," *In re Investors Funding Corp.,* 547 F.2d 13, 16 (2d Cir.1976), the courts have held that the Bankruptcy Court may enjoin even an action that involves transactions of the debtor in carrying on business connected with its property. *Id.* at 16-17; *see also In re Neuman,* 71 B.R. 567, 572 (S.D.N.Y.1987). [FN5] If the court may enjoin those matters, it should be able to temporarily stay an action pending a determination whether it is barred by the automatic stay of section 362, where the only effect of the stay is to "prevent [the] action[ ] in other forums, permitting such a motion in the Bankruptcy Court itself." *In re Neuman,* 71 B.R. 567, 572 (S.D.N.Y.1987).

FN4. 28 U.S.C. § 960 provides "Any officers and

agents conducting any business under authority of a United States court shall be subject to all Federal, State and local taxes applicable to such business to the same extent as if it were conducted by an individual or corporation."

FN5. *In re Johns-Manville Corp.,* 801 F.2d 60 (2d Cir.1986), is not to the contrary. There, the Court of Appeals reversed an injunction entered in favor of the debtor restraining members of the Equity Committee from calling a shareholders' meeting for the purposes of electing a new Board of Directors. The Court of Appeals recognized that even the right to call a shareholders' meeting, which implicated the stockholders' interest in being adequately represented in the debtor's affairs, *id.* at 65, could be abrogated if it would " 'jeopardize both [the debtor's] rehabilitation and the rights of creditors and stockholders,' " *id.* at 67 (quoting *In re Potter Instrument Co.,* 593 F.2d 470, 475 (2d Cir.1979)), but held that the debtor had failed to introduce sufficient evidence of irreparable injury.

*\*32 I conclude that the injunction was not an abuse of discretion. [FN6]

FN6. In light of my conclusion that the Bankruptcy Court had authority to issue the injunction under § 105(a), I do not reach the question whether the Cleveland School Board breached its fiduciary duty to members of the LTV Creditors' Committee. *See In re Johns-Manville Sales Corp.,* 26 B.R. 919, 926 (Bankr.S.D.N.Y.1983).

### 2. Evidentiary Objections

The Cleveland School Board raises a host of evidentiary objections to the conduct of the hearing by the bankruptcy court. It argues that the court impermissibly relied on evidence explicitly excluded in reaching its decision (particularly the affidavit of John T. Delmore), improperly admitted documents on the basis of judicial notice, admitted hearsay testimony, permitted testimony about settlement discussions, and refused to admit evidence about the lack of irreparable injury to plaintiff. [FN7]

FN7. The Cleveland School Board also argues that the trial judge sought to require introduction of evidence through an offer of proof and accepted testimony about Ohio law from an unqualified lay witness. These arguments are meritless. After initially requiring an offer of proof, the Bankruptcy Judge permitted counsel for defendants to ask questions regarding the convenience of the Ohio forum. *See* Tr. 88. The testimony of Delmore that defendants object to consists of a statement from the witness's personal knowledge that

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

taxpayers in Ohio submit a tax return to the State Tax Commissioner which is used as a basis for taxes that are paid by each individual taxpayer. It is not expert testimony on a matter of law. *See* Tr. 40.

Evidentiary rulings of a trial judge are not ordinarily disturbed unless "manifestly erroneous" and material. *In re Martin-Trigona*, 760 F.2d 1334, 1344 (2d Cir.1985); Fed.R.Evid. 103. The purported evidentiary errors were neither. Although the Delmore affidavit was not admitted into evidence, all of its averments were testified to personally by Delmore. The documents admitted on the basis of judicial notice were all documents that had previously been filed with the Bankruptcy Court of which the court had the power to take judicial notice. *See Jacques v. United States Railroad Retirement Board*, 736 F.2d 34, 40 (2d Cir.1984); 9 C. Wright & A. Miller, *Federal Practice and Procedure* § 2410, at 359-61 (1971). The court's decision to exclude a list of cases pending against LTV offered to show that litigation of the action in Ohio would not be burdensome was based on the representation of plaintiff that the vast majority of those cases were stayed; it came within the trial court's discretion to exclude non-probative evidence. *See O'Rourke v. Eastern Air Lines, Inc.*, 730 F.2d 842, 854 (2d Cir.1984); Fed.R.Evid. 402 .

The Bankruptcy Court admitted testimony that, the

day before the Ohio action was filed, LTV held settlement discussions with the taxing authorities of five counties in Ohio at which the counties indicated that they were not interested in settlement because of a letter they had received from the Cleveland School Board to the effect that LTV had a large cash balance and had been paying its top executives bonuses. Those settlement discussions did not pertain to the litigation in question; the evidence was admitted to show the effect of the Ohio action on the settlement of tax disputes with other taxing authorities; it was not within the purview of Fed.R.Evid. 408. This evidence was properly receivable on the states of mind of other taxing authorities in their refusal to make settlements.

## CONCLUSION

The order of the Bankruptcy Court preliminarily enjoining the defendants from prosecuting the Ohio action pending a determination of the applicability of the automatic stay, and enjoining the prosecution of motions in the Ohio Court for an order terminating the automatic stay as to the third claim for relief and withdrawing the reference to the Bankruptcy Court of the Ohio stay relief motion, is affirmed.

SO ORDERED.

93 B.R. 26, 50 Ed. Law Rep. 814

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# TAB 36

205 F.3d 606                                                                 **Page 75**
205 F.3d 606, 43 Collier Bankr.Cas.2d 1381, 35 Bankr.Ct.Dec. 220, Bankr. L. Rep. P 78,132
**(Cite as: 205 F.3d 606)**

▷

**Briefs and Other Related Documents**

United States Court of Appeals,
Third Circuit.
**In re Stephen J. McDONALD; Rosemarie J.
McDonald, Debtors**
**Stephen J. McDonald; Rosemarie J. McDonald
v.
Master Financial, Inc.,
Frederick L. Reigle, Esq., Standing Chapter 13
Trustee; Frederic J. Baker,
Esq., Assistant U.S. Trustee, Trustees,
Stephen J. McDonald; Rosemarie J. McDonald,
Appellants
No. 99-1381.**

·  Argued Dec. 6, 1999
Filed: March 9, 2000

Chapter 13 debtors brought adversary proceeding
against mortgagee holding second mortgage on their
residence. The Bankruptcy Court ruled that
Bankruptcy Code's antimodification provision
applied to mortgagee even if mortgage was wholly
unsecured. Appeal was taken. The United States
District Court for the Eastern District of
Pennsylvania, James T. Giles, Chief Judge,
affirmed. Appeal was taken. The Court of Appeals,
Cowen, Circuit Judge, held that: (1) bankruptcy
court's ruling was not unauthorized advisory
opinion, and (2) a wholly unsecured mortgage on
Chapter 13 debtor's residence is not subject to
Bankruptcy Code's antimodification clause.

District court judgment reversed; case remanded.

West Headnotes

**[1] Bankruptcy** ⬥⇒3708(9)
51k3708(9)

**[1] Federal Courts** ⬥⇒13
170Bk13
Bankruptcy court's ruling that Bankruptcy Code's
antimodification provision applied to second
mortgagee whose mortgage allegedly was wholly
unsecured was decided on motion to dismiss for
failure to state claim, notwithstanding parties'
references to nonbinding stipulation of facts as to
whether mortgage was unsecured, and therefore
ruling was not unauthorized advisory opinion.
Bankr.Code, 11 U.S.C.A. § 1322(b)(2); Fed.Rules

Civ.Proc.Rule 12(b)(6), 28 U.S.C.A.

**[2] Federal Courts** ⬥⇒12.1
170Bk12.1
Federal courts are not authorized to issue advisory
opinions.

**[3] Federal Civil Procedure** ⬥⇒1721
170Ak1721
Even though allowing discovery and conducting a
hearing on the facts could provide an alternative,
and perhaps in some sense narrower, ground for
resolving the suit, a court can still consider a legal
issue that, if decided in the defendant's favor,
would be dispositive on a motion to dismiss for
failure to state claim upon which relief may be
granted.    Fed.Rules Civ.Proc.Rule 12(b)(6), 28
U.S.C.A.

**[4] Bankruptcy** ⬥⇒3782
51k3782
Court of Appeals would exercise plenary review
over district court determination that resulted from a
plenary review of bankruptcy court's conclusions of
law.

**[5] Bankruptcy** ⬥⇒2852
51k2852
Under provision of Bankruptcy Code sorting
allowed claims into secured and unsecured claims,
an undersecured claim is treated as a secured claim
only up to the value of the collateral;  the excess
debt becomes an unsecured claim. Bankr.Code, 11
U.S.C.A. § 506(a).

**[6] Bankruptcy** ⬥⇒3708(9)
51k3708(9)
Bankruptcy Code's antimodification clause bars a
Chapter 13 debtor from modifying the rights of a
creditor who has a claim secured only by the
debtor's principal residence.    Bankr.Code, 11
U.S.C.A. § 1322(b)(2).

**[7] Courts** ⬥⇒92
106k92
"Dictum" is a statement in a judicial opinion that
could have been deleted without seriously impairing
the analytical foundations of the holding--that, being
peripheral, may not have received the full and
careful consideration of the court that uttered it.

**[8] Courts** ⬥⇒92

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

205 F.3d 606
**(Cite as: 205 F.3d 606)**

Page 76

106k92
Court should not idly ignore considered statements
that the Supreme Court makes in dicta.

**[9] Bankruptcy ⬨⟿3708(9)**
51k3708(9)
A wholly unsecured mortgage on Chapter 13
debtor's residence is not subject to the Bankruptcy
Code's antimodification clause.    Bankr.Code, 11
U.S.C.A. §§ 506(a), 1322(b)(2).
***607** Dexter K. Case, Esq., Alisa R. Hobart, Esq.
(Argued), Reading, PA, Counsel for Appellants.

Michael A. Tier, Esq. (Argued), Bayville, NJ,

Joseph A. Diorio, Esq., Philadelphia, PA, Counsel
for Appellee.

Before: SLOVITER, ROTH and COWEN, Circuit
Judges

**OPINION OF THE COURT**

COWEN, Circuit Judge.

In this appeal we must determine whether the so-
called "antimodification provision" in 11 U.S.C. §
1322(b)(2) applies to a second, wholly unsecured
mortgage on a Chapter 13 debtor's home.    In
*Nobelman v. American Savings Bank*, 508 U.S.
324, 113 S.Ct. 2106, 124 L.Ed.2d 228 (1993), the
Supreme Court held that a Chapter 13 debtor who
had a single mortgage with an outstanding balance
greater ***608** than the value of the debtor's residence
could not divide the mortgage, pursuant to 11
U.S.C. § 506(a), into secured and unsecured parts
and treat only the secured part as subject to the
antimodification clause.    According to *Nobelman*,
the full outstanding balance of the mortgage is
governed by the antimodification clause.    Justice
Thomas's opinion for the Court left unresolved,
however, whether the antimodification clause
applies to a second or junior mortgage if that
mortgage is wholly unsecured by any remaining
value in the residence. [FN1]

> FN1. Note that the phrase "wholly unsecured" in
> this context carries a specific meaning.    While the
> mortgage holder of course initially obtained a
> security interest in the debtor's residence and in
> that sense has a secured claim, the second
> mortgage is now deemed wholly unsecured in the
> sense that the value of the debtor's residence is less
> than the amount due to a first or senior mortgage
> holder, leaving no remaining value for the second

mortgage.    Thus, at a foreclosure sale the holder
of the wholly unsecured second mortgage would
receive nothing from the direct proceeds of the
sale.

In interpreting *Nobelman* the Bankruptcy and
District Courts both concluded that the second
mortgage on the McDonalds' residence is subject to
the antimodification clause, even if the value of
their home is less than the outstanding balance of
the first mortgage, leaving the second mortgage
wholly unsecured.    Because we conclude that this
interpretation fails to take into account several
strands of the Supreme Court's reasoning in
*Nobelman*, we will reverse.

I

Before reaching when the antimodification clause
applies, we must address a question about our
jurisdiction.    In the Bankruptcy Court the parties
purportedly entered into a stipulation of facts
specifying that the outstanding balance of the first
mortgage is greater than the value of the
McDonalds' home.    At oral argument before this
court, however, Master Financial, the appellee and
holder of the second mortgage on the McDonalds'
home, asserted that their "stipulation" is not
binding.    On Master Financial's view if the
Bankruptcy Court had held that the antimodification
provision does not apply to wholly unsecured
mortgages, then Master Financial would have
contested whether the value of the home was indeed
less than the outstanding balance of the first
mortgage.    Master Financial's interpretation of the
"stipulation" apparently captured the Bankruptcy
Court's understanding of the case, for that Court's
opinion simply noted that Master Financial disputed
the value of the home and stated that no evidentiary
hearing had been held on the issue.    Thus, as
matters stand, we can only say that the McDonalds
have alleged that the value of their home is
$126,400, the balance of the first mortgage is
$127,633.33, and the balance of the second is
$46,846.42.

**[1][2]** In light of Master Financial's disavowal of
any binding stipulation, we raised the issue of
whether the bankruptcy court's decision amounted
to an advisory opinion and consequently whether we
have jurisdiction to hear this appeal.    Federal
courts are not authorized to issue advisory opinions.
*See, e.g., United States Nat'l Bank v. Independent
Ins. Agents of America, Inc.*, 508 U.S. 439, 446,
113 S.Ct. 2173, 2178, 124 L.Ed.2d 402 (1993);

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

205 F.3d 606
(Cite as: 205 F.3d 606, *608)

*Coffin v. Malvern Federal Savings Bank,* 90 F.3d 851 (3d Cir.1996).

[3] The precise analytical contours of what constitutes an advisory opinion, however, are less than clear. For example, Fed.R.Civ.P. 12(b)(6) allows a court to resolve certain legal disputes in advance of factual disputes. Even though allowing discovery and conducting a hearing on the facts could have provided an alternative, and perhaps in some sense narrower, ground for resolving the suit, a court can still consider a legal issue that, if decided in the defendant's favor, would be dispositive on a motion to dismiss. Doing so conserves both the court's and the parties' resources. In keeping with this logic we appreciate that in the context of a Chapter 13 bankruptcy involving comparatively *609 small sums of money, the parties understandably wanted to avoid expenses, such as the cost of expert testimony, that would have been incurred contesting the value of the home if in the end the evidence produced would be legally irrelevant.

While the record is not entirely clear, we conclude that this case was decided on a motion to dismiss, notwithstanding the parties' odd references to a nonbinding stipulation of facts. The Bankruptcy Court's opinion accepted as true the McDonalds' allegations that the second mortgage was wholly unsecured and still held as a matter of law that the debtors must lose their adversary proceeding. Under these circumstances, it is clear that the Bankruptcy Court's interpretation of *Nobelman* conclusively resolved the litigation and did so without improperly issuing an advisory opinion.

[4] Accordingly, we conclude that we are authorized to hear this appeal. We have jurisdiction pursuant to 28 U.S.C. § 158(d), and since we are presented with a purely legal issue, we exercise plenary review over the District Court's determination, a determination that in turn resulted from a plenary review of the Bankruptcy Court's conclusions of law. *See, e.g., In re Anes,* 195 F.3d 177, 180 (3d Cir.1999).

II

[5] Our analysis of the merits of this appeal begins with two provisions of the bankruptcy code. The first, 11 U.S.C. § 506(a), applies to bankruptcies under all chapters, *see* 11 U.S.C. § 103(a), and sorts creditors' allowed claims against the debtor into secured and unsecured claims. Under § 506(a)

any allowed claim that is secured by a lien on the debtor's property "is a secured claim to the extent of the value of [the] creditor's interest in the estate's interest in such property," and is deemed an unsecured claim to the extent it exceeds that value. An undersecured claim is thus treated as a secured claim only up to the value of the collateral; the excess debt becomes an unsecured claim.

[6] The second relevant provision, the antimodification clause, applies only to Chapter 13 bankruptcies. The antimodification clause states that a Chapter 13 plan may "modify the rights of holders of secured claims, other than a claim secured only by a security interest in real property that is the debtor's principal residence...." 11 U.S.C. § 1322(b)(2). Put more directly, the antimodification clause bars a debtor from modifying the rights of a creditor who has a claim secured only by the debtor's principal residence.

Before *Nobelman* some courts had concluded that in a Chapter 13 bankruptcy they should look first to § 506(a) to determine both the value of a debtor's residence and how much of the mortgage remained secured. The courts would then treat only the portion deemed secured under § 506(a) as subject to the antimodification provision in § 1322(b)(2). *See, e.g., In re Bellamy,* 962 F.2d 176 (2d Cir.1992); *In re Hart,* 923 F.2d 1410 (10th Cir.1991); *Wilson v. Commonwealth Mortgage Corp.,* 895 F.2d 123 (3d Cir.1990); and *In re Hougland,* 886 F.2d 1182 (9th Cir.1989). Other courts, by contrast, concluded that there was a conflict between § 506(a) and § 1322(b)(2) and decided that § 1322(b)(2) should prevail as the more specific provision. *See, e.g., In re Nobleman,* 968 F.2d 483 (5th Cir.1992).

In reviewing the Fifth Circuit opinion, the Supreme Court agreed that § 1322(b)(2) applies to both the part of a mortgage that is currently secured by value in the residence and the part that is unsecured, but significantly the Court nevertheless rejected the Fifth Circuit's position that § 506(a) does not apply. Justice Thomas began his analysis by pointing out that it is "correct to look to § 506(a) for a judicial valuation of the collateral to determine the status of the bank's secured claim," and doing so in *Nobelman,* he continued, showed that the mortgage holder, American Savings Bank, was "still the 'holder' of a 'secured claim,' because petitioner's home retains $23,500 of value as *610 collateral." 508 U.S. at 329, 113 S.Ct. at 2110.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

205 F.3d 606
**(Cite as: 205 F.3d 606, \*610)**

Once it was clear that American Savings was a holder of a claim secured by the debtor's principal residence, Justice Thomas reasoned that § 1322(b)(2) dictates that none of the bank's "rights" could be "modified" for its claim, even though part of the bank's claim was deemed unsecured under § 506(a). Finding that the term "rights" was not defined by the Bankruptcy Code, Justice Thomas invoked state law to determine the word's meaning and therefore concluded that, when the antimodification clause applies, it prevents the debtor's Chapter 13 plan from modifying the mortgage holder's state-law rights to repayment. What counts as impermissibly "modifying" a creditor's rights, however, should not be understood too broadly. Justice Thomas hastened to add that the mortgage holder's rights are still "affected" by the bankruptcy. The automatic stay, for example, still blocks the creditor's right to foreclose, and debtors can cure repetition defaults on a home mortgage under § 1322(b)(5). *See Nobelman*, 508 U.S. at 330, 113 S.Ct. at 2110.

The McDonalds argue that because *Nobelman* stated that § 506(a) still applies and determines the "status" of a creditor's claim, it follows that a wholly unsecured mortgage is no longer a secured claim under the Bankruptcy Code and hence is not subject to the antimodification clause. *Nobelman* specifically said that the bank was a holder of a secured claim "because the petitioner's home retains $23,500 of value as collateral." 508 U.S. at 329, 113 S.Ct. at 2110. In the McDonalds' case they allege that there is no value left in their home as collateral for Master Financial's mortgage.

So far the only appellate panel to apply *Nobelman* to a wholly unsecured mortgage has agreed with the McDonalds that such a mortgage is not subject to the antimodification clause. *In re Lam*, 211 B.R. 36 (9th Cir. BAP 1997), *appeal dismissed*, 192 F.3d 1309 (9th Cir.1999). The many bankruptcy courts to consider the issue have split, with a majority favoring the McDonalds' view [FN2] but some adopting the opposing view. [FN3] Bankruptcy treatises are also divided on the issue. *Compare* 5 Collier on Bankruptcy, § 1322.06[1][a] at 1322-16 ("If the creditor had held a lien on property that had no value (perhaps because the property was fully encumbered by prior liens), then under this analysis it would not have been a 'holder of a secured claim' entitled to protection by section 1322(b)(2).") with Keith M. Lundin, Chapter 13 Bankruptcy 2d ed., § 4.46 at 4-56 \*611 ("Although

the concept of an 'unsecured secured claim' is impossible under § 506(a), Justice Thomas's focus on the 'rights' of the 'holders' of a 'claim secured only by ...' in § 1322(b)(2) extends the protection from modification ... without regard to the allowance or disallowance of secured claims under § 506(a).").

> FN2. *See, e.g., In re McCarron*, 242 B.R. 479 (Bankr.W.D.Mo.2000); *In re Johnson*, 226 B.R. 364 (D.Md. 1998); *In re Cerminaro*, 220 B.R. 518 (Bankr.N.D.N.Y.1998); *In re Phillips*, 224 B.R. 871 (Bankr.W.D.Mich.1998); *In re Reeves*, 221 B.R. 756 (Bankr.C.D.Ill.1998); *In re Smith*, 215 B.R. 716 (Bankr.W.D.Tenn.1998); *In re Bivvins*, 216 B.R. 622 (Bankr.E.D.Tenn.1997); In re Scheuer, 213 B.R. 415 (Bankr.N.D.N.Y.1997); I%In re Cervelli, *213 B.R. 900 (Bankr.D.N.J.1997)*; In re Geyer, *203 B.R. 726 (Bankr.S.D.Cal.1996)*; In re Sanders, *202 B.R. 986 (Bankr.D.Neb.1996)*; I%In re Purdue, 187 B.R. 188 (S.D.Ohio 1995); *Wright v. Commercial Credit Corp.*, 178 B.R. 703 (E.D.Va.1995); *In re Thomas*, 177 B.R. 750 (Bankr.S.D.Ga.1995); *In re Lee*, 177 B.R. 715 (Bankr.N.D.Ala.1995); *In re Woodhouse*, 172 B.R. 1 (Bankr.D.R.I.1994); *In re Sette*, 164 B.R. 453 (Bankr.E.D.N.Y.1994); *In re Castellanos*, 178 B.R. 393 (Bankr.M.D.Pa.1994); *In re Mitchell*, 177 B.R. 900 (Bankr.E.D.Mo.1994); *In re Hornes*, 160 B.R. 709 (Bankr.D.Conn.1993); *In re Plouffe*, 157 B.R. 198 (Bankr.D.Conn.1993); *In re Lee*, 161 B.R. 271 (Bankr.W.D.Okla.1993); *In re Moncrief*, 163 B.R. 492 (Bankr.E.D.Ky.1993); *In re Kidd*, 161 B.R. 769 (Bankr.E.D.Ky.1993); *In re Williams*, 161 B.R. 27 (Bankr.E.D.Ky.1993).

> FN3. *See, e.g., In re Boehmer*, 240 B.R. 837 (Bankr.E.D.Pa.1999); *In re Tanner*, 223 B.R. 379 (Bankr.M.D.Fla.1998); *In re Lewandowski*, 219 B.R. 99 (Bankr.W.D.Pa.1998); *In re Bauler*, 215 B.R. 628 (Bankr.D.N.M.1997); *In re Mattson*, 210 B.R. 157 (Bankr.D.Minn.1997); *In re Shandrew*, 210 B.R. 829 (Bankr.E.D.Cal.1997); *In re Fraize*, 208 B.R. 311 (Bankr.D.N.H.1997); *In re Barnes*, 207 B.R. 588 (Bankr.N.D.Ill.1997); *In re Neverla*, 194 B.R. 547 (Bkrtcy.W.D.N.Y.1996); *In re Barnes*, 199 B.R. 256 (Bankr.S.D.N.Y.1996); *In re Jones*, 201 B.R. 371 (Bankr.D.N.J.1996); *In re Witt*, 199 B.R. 890 (W.D.Va.1996).

While we acknowledge that there is some ambiguity in the language in *Nobelman*, we believe that the better interpretation is that reached by Collier's, the Ninth Circuit bankruptcy panel in *Lam*, and the majority of bankruptcy courts to consider the issue. The Supreme Court did not

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

adopt the Fifth Circuit's view that § 506(a) is inapplicable, and § 103(a) provides that § 506(a) does apply to a Chapter 13 bankruptcy.  Once we accept that courts must apply § 506(a), then it follows, even under *Nobelman*, that a wholly unsecured mortgage holder does not have a secured claim.   Justice Thomas specifically said that the bank in *Nobelman* had a secured claim "because" the bank's lien still attached to some existing value in the debtor's house.  We do not think there is any meaningful sense in which a court could be said to apply § 506(a) if the sole function of the section was simply to adopt the state-law label of the claim as secured.   Moreover, if the value of the collateral were irrelevant, then it is hard to see why Justice Thomas would instruct that the debtors "were correct in looking to § 506(a) for a judicial valuation of the collateral to determine the status of the bank's secured claim."  *Nobelman*, 508 U.S. at 328, 113 S.Ct. at 2110.   Courts hardly need to perform a valuation of the collateral to adopt the original state-law label of the claim as secured.

The only reason there is any doubt about the result is Justice Thomas's discussion of the term "claim" occurring in the antimodification clause.  When he rejected the approach of the courts holding that the antimodification clause applies only to the still secured part of a mortgage under § 506(a), Justice Thomas said that those courts had incorrectly relied on the rule of the last antecedent.   To see how that rule applies, recall that § 1322(b)(2) states that a debtor's Chapter 13 plan can "modify the rights of holders of secured claims, other than a claim secured only by a security interest in ... the debtor's principal residence...."  Under the rule of the last antecedent, the clause "other than a claim secured only by a security interest in ... the debtor's principal residence," modifies its immediate antecedent, "secured claims."   With "secured claims" as the term modified, courts had reasoned before *Nobelman* that the antimodification clause must apply only to the part of a mortgage that remained a "secured claim."   Justice Thomas agreed that this reading "is quite sensible as a matter of grammar," but concluded that the reading "is not compelled."  *Nobelman*, 508 U.S. at 330, 113 S.Ct. at 2111.

He explained that the statute deliberately used the unmodified term  "claim" in the antimodification clause, rather than the term "secured claim."  Since "claim" receives a broad interpretation under the Bankruptcy Code, the term encompasses both the

secured and unsecured portions of the mortgage, a conclusion showing that the antimodification clause applies to both parts of the mortgage.

This discussion of the term "claim" has created some confusion because earlier Justice Thomas emphasized that applying § 506(a) in the case before the Court showed that, since value remained in the collateral, the bank was "still the 'holder' of a 'secured claim.' "  *Id.* at 329, 113 S.Ct. at 2110.   If his subsequent discussion concluded that the antimodification clause, by using the unmodified term "claim," applied to both the unsecured and secured part of the mortgage, then why did he bother to establish earlier that the bank was still a holder of a secured claim?   Doesn't the expansive reading of the term "claim" make it irrelevant whether the bank remains a holder of a secured claim?

We think the Supreme Court's discussion of 506(a) and 1322(b)(2) is consistent.   Perhaps the clearest explanation of how the Court's discussion of the two sections *612 can be reconciled is to point out that while the antimodification clause uses the term "claim" rather than "secured claim" and therefore applies to both the secured and unsecured part of a mortgage, the antimodification clause still states that the claim must be "secured only by a *security interest in ...* the debtor's principal residence."  11 U.S.C. § 1322(b)(2) (emphasis added).   If a mortgage holder's claim is wholly unsecured, then after the valuation that Justice Thomas said that debtors could seek under § 506(a), the bank is not in any respect a holder of a claim secured by the debtor's residence.   The bank simply has an unsecured claim and the antimodification clause does not apply.   On the other hand, if any part of the bank's claim is secured, then, under Justice Thomas's interpretation of the term "claim," the entire claim, both secured and unsecured parts, cannot be modified.   We think this reading reconciles the various parts of the Court's opinion. [FN4]

> FN4. Master Financial asserts in its brief that wholly unsecured mortgages are regularly bought and sold, and therefore a wholly unsecured mortgage has value and is still subject to the antimodification clause. Whatever value a wholly unsecured mortgage might have in the market Master Financial has in mind, that value has no bearing on the inquiry under § 506(a). Section 506(a) compares the value of the collateral against the "creditor's interest in the estate's interest in

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

[the collateral]." Master Financial's position would only make sense if the creditor was entitled to collect from the debtor not only the money owed on the debt but also the price that the mortgage might be sold to someone else.

[7] Master Financial insists that the Supreme Court's statement that § 506(a) still applies is dictum and should be ignored. We disagree. Chief Judge Posner has aptly defined dictum as "a statement in a judicial opinion that could have been deleted without seriously impairing the analytical foundations of the holding--that, being peripheral, may not have received the full and careful consideration of the court that uttered it." *Sarnoff v. American Home Prods. Corp.,* 798 F.2d 1075, 1084 (7th Cir.1986). Justice Thomas's statement that it is correct to apply § 506(a) is critical to *Nobelman*'s holding, for if the petitioner's home had not retained some value as collateral, the Supreme Court's discussion of § 506(a) implies that the result would have been different. The Supreme Court's discussion is only dictum, in other words, if you assume Master Financial's reading of the case is correct at the outset.

The bare fact that the Supreme Court was not considering a wholly unsecured mortgage does not convert into dicta every piece of reasoning in *Nobelman* bearing on that issue. A holding, as *Sarnoff*'s definition makes clear, extends beyond a statement of who won or lost a case. A court can choose among different holdings that offer broader or narrower ways of resolving a dispute. It is also worth emphasizing that the Supreme Court's discussion of § 506(a) was not likely to have been an ill-considered remark since the Fifth Circuit opinion that the Supreme Court reviewed expressly rejected that § 506(a) applies. *See In re Nobleman,* 968 F.2d 483, 488 (5th Cir.1992). Furthermore, on Master Financial's interpretation the Supreme Court's discussion of § 506(a) is not dictum in the sense that it resolved a real legal issue, but one that could be readily deleted from the court's rationale for deciding the case; rather, Master Financial's view makes the Court's discussion of § 506(a) a useless aside that could not be relevant to any case involving the antimodification clause.

[8] But even if the discussion of § 506(a) could be accurately characterized as dictum--and we think it cannot be--we should not idly ignore considered statements the Supreme Court makes in dicta. The Supreme Court uses dicta to help control and

influence the many issues it cannot decide because of its limited docket. "Appellate courts that dismiss these expressions [in dicta] and strike off on their own increase the disparity among tribunals (for other judges are likely to follow the Supreme Court's marching orders) and *613 frustrate the evenhanded administration of justice by giving litigants an outcome other than the one the Supreme Court would be likely to reach were the case heard there." *United States v. Bloom,* 149 F.3d 649, 653 (7th Cir.1998).

We think the textual arguments about *Nobelman* by themselves require the result we reach today, but we also are unpersuaded by Master Financial's policy arguments that the Supreme Court reached the wrong result. The first point to stress is that, as Justice Stevens noted in his concurrence, the antimodification clause's legislative history shows that the provision's "favorable treatment of residential mortgagees was intended to encourage the flow of capital into the home lending market." 508 U.S. at 332, 113 S.Ct. at 2112. Because second mortgages are rarely used to purchase a home, making wholly unsecured second mortgages subject to the antimodification clause would have at best a minimal impact in encouraging home building and buying. The holder of a second mortgage is apt to be very much like other general creditors, and therefore it seems reasonable that a wholly unsecured second mortgage will be subject to the same rules that apply to other secured claims-- i.e., a claim not secured by any current value in the specified collateral is deemed an unsecured claim.

One often-cited concern that Master Financial invokes is that it would be unjust and arbitrary to allow a mortgage holder to have an unmodifiable claim when there is merely one dollar of value left in the residence, but leave a mortgage holder with a modifiable (and hence potentially valueless) claim if there is no remaining value in the residence. We will begin with the complaint that the result is arbitrary and then turn to the objection that it is unjust.

Bright-line rules that use a seemingly arbitrary cut-off point are common in the law. A day beyond the statute of limitations and the plaintiff must lose, even if the claim was otherwise unquestionably a winning one. If the evidence is just over a preponderance, the plaintiff wins full damages; just under, the plaintiff gets nothing. In bankruptcy law a Chapter 7 trustee cannot contest the validity

of a debtor's claimed exemption when the 30-day period for objecting has expired and the trustee failed to obtain an extension; and this is true even if the debtor has no colorable basis for claiming the exemption. *Taylor v. Freeland & Kronz*, 503 U.S. 638, 112 S.Ct. 1644, 118 L.Ed.2d 280 (1992). To take an example closer to our case, we have read the word "only" in the antimodification clause's phrase, "secured only by a security interest in ... the debtor's principal residence," to mean that the clause's protection is unavailable when the loan is secured not just by the debtor's residence but by other property as well. *See, e.g., Hammond v. Commonwealth Mortgage Corp.,* 27 F.3d 52 (3d Cir.1994); *Wilson v. Commonwealth Mortgage Corp.,* 895 F.2d 123, 126-29 (3d Cir.1990). What these examples show is that line drawing is often required in the law and, at the boundary, the appearance of unfairness is unavoidable. Simply pointing out that some arbitrariness occurs is not a compelling objection.

Master Financial believes that the law should always prevent the modification of a mortgage in a Chapter 13 bankruptcy and hence the law should not require a distinction between a wholly unsecured and a partially secured mortgage. This is essentially the argument that the result is unjust. As we have explained, there is no way to reconcile Master Financial's position with the reasoning in Justice Thomas's opinion. Even if we agreed with Master Financial's argument that the result is unjust, we would be bound. But in any event, holders of second mortgages are in a sense unintended beneficiaries of congressional intent to boost the home-buying and home-building markets. And to the extent there is any unfairness in the distinction between wholly unsecured mortgage holders and those secured only by a nominal value, the creditor with only a dollar's worth of security in the property *614 cannot be heard to complain-- such a creditor can invoke the antimodification clause. Any unfairness in that circumstance falls on the debtor. The only class of creditors who can complain are those who are wholly unsecured, but as we set forth above, these creditors are not worse off than other secured creditors who operate outside of mortgage lending.

We also note that our holding frequently will not make holders of wholly unsecured residential mortgages worse off than they would be under Master Financial's own rule making a wholly unsecured residential mortgage unmodifiable. This

is true because a debtor who has outstanding balances on multiple mortgages exceeding the current value of the debtor's home often will not try to keep a home encumbered with so much debt, and instead will turn to a Chapter 7 bankruptcy and allow the home to be sold in liquidation. For example, consider that in our case Master Financial's reading of *Nobelman* would have the McDonalds pay, according to the McDonalds' statement of the facts, $174,479.75 to keep a home worth $126,400. A rational debtor might well decide to switch to Chapter 7, lose the home, and start over. Once the debtor proceeds under Chapter 7, a holder of a wholly unsecured mortgage will again, under § 506(a), be deemed unsecured and receive no more (and possibly less) money than that creditor would have under our interpretation of the antimodification clause. See 11 U.S.C. § 1325 (providing requirements for a Chapter 13 plan's payment of unsecured creditors).

We also think it is significant that courts have repeatedly emphasized Congress's preference that individual debtors use Chapter 13 instead of Chapter 7. Part of the reason for this preference is that unsecured creditors often receive more money under successful Chapter 13 plans than they would under a Chapter 7 liquidation bankruptcy. To the extent Master Financial's rule would stampede more debtors into Chapter 7, Master Financial's strong interpretation of the antimodification clause would pursue the tenuous gains for holders of wholly unsecured mortgages by imposing losses on other unsecured creditors who will be worse off in Chapter 7 than they would have been in Chapter 13.

Master Financial responds that Chapter 7 will not offer a viable alternative for debtors because the Supreme Court has rejected lien-stripping in Chapter 7. *See Dewsnup v. Timm,* 502 U.S. 410, 112 S.Ct. 773, 116 L.Ed.2d 903 (1992). It is true that in *Dewsnup* the Supreme Court concluded that a debtor in Chapter 7 could not use § 506(d) to " 'strip down' a creditor's lien on real property to the value of the collateral, as judicially determined, when that value is less than the amount of the claim secured by the lien." *Id.* at 412, 112 S.Ct. at 775. The Court reached this conclusion to prevent debtors from benefitting from any increase in the value of their home between the time its value was judicially determined (and hence the time part of the debt was deemed unsecured) to the time of the later foreclosure sale. For example, before *Dewsnup* if the outstanding balance on the mortgage was

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

205 F.3d 606
**(Cite as: 205 F.3d 606, \*614)**

Page 82

$120,000, the house was judicially valued at $100,000, and the house's value later rose to $130,000 by the foreclosure sale, the debtor could strip down the lien to $100,000 and later take the $30,000 increase free of the creditor's claim to the $20,000. Because *Dewsnup* allowed the creditor in Chapter 7 to maintain a claim against the property for the unsecured balance, the decision prevented a Chapter 7 debtor from benefitting from an increase in the value of the home. But what matters for our purposes is that even under *Dewsnup* the debtor is still discharged of personal liability, so *Dewsnup* does not eliminate the incentive to switch from Chapter 13 to 7 in order to escape debt on a home that far exceeds the home's value. A debtor in the McDonalds' position would still view Chapter 7 as a better alternative than Chapter 13.

It is also worth noting that courts are split on whether *Dewsnup*'s rejection of lien-stripping in Chapter 7 applies to a wholly unsecured lien, although of course \***615** we express no view on that dispute. *Compare In re Yi,* 219 B.R. 394 (E.D.Va.1998), and *Howard v. National Westminister Bank,* 184 B.R. 644 (Bankr.E.D.N.Y.1995), with *In re Laskin,* 222 B.R. 872 (9th Cir.BAP 1998).

One last point should be mentioned. This appeal does not require us to decide what date a court should use to determine whether a mortgage is wholly unsecured. The parties appear to have assumed that the date the adversary proceeding was initiated should be used. There is no clear consensus in the caselaw. *Compare In re McCarron,* 242 B.R. 479, 482 (Bankr.W.D.Mo.2000)(using the date the bankruptcy petition was filed) *with In re Crain,* 243

B.R. 75 (Bkrtcy.C.D.Calif. 1999)(using the effective date of the Chapter 13 debtor's plan or ten days after the order confirming the plan if no timely appeal has been made). Section 506(a) states, "Such value shall be determined in light of the purpose of the valuation and of the proposed disposition or use of such property, and in conjunction with any hearing on such disposition or use or on a plan affecting such creditor's interest." Although we need not resolve the issue, we point out that whatever rule is adopted, it is desirable to avoid allowing an appeal to delay the date used for evaluation. Such a rule could encourage the losing party to bring an appeal in the hope of obtaining a more favorable evaluation.

[9] For the foregoing reasons, we hold that a wholly unsecured mortgage is not subject to the antimodification clause in § 1322(b)(2). The judgment of the District Court will be reversed. The case will be remanded to the District Court for it to remand the matter to the Bankruptcy Court for further proceedings consistent with this opinion. Costs taxed against appellee.

205 F.3d 606, 43 Collier Bankr.Cas.2d 1381, 35 Bankr.Ct.Dec. 220, Bankr. L. Rep. P 78,132

**Briefs and Other Related Documents (Back to top)**

. 1999 WL 33613438T1 (Appellate Brief) Brief of Appellee (Jul. 29, 1999)

.                    99-1381                    (Docket) (May. 14, 1999)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# TAB 37

378 F.3d 511                                                                                    **Page 247**
378 F.3d 511, Util. L. Rep. P 14,515, 43 Bankr.Ct.Dec. 111, Bankr. L. Rep. P 80,139
**(Cite as: 378 F.3d 511)**
H

Briefs and Other Related Documents

United States Court of Appeals,
Fifth Circuit.
**In the Matter of: MIRANT CORP., Debtor.
(Matter of Debtor's Motion for Order
Authorizing the Debtor to Reject the Back-
to-Back Agreement Dated December 19, 2000,
and Amendments Thereto, With Potomac
Electric Power Company as Executory
Contracts).
Mirant Corp.; MLW Development LLC;
Mirant Americas Energy Marketing LP;
Mirant Americas Generation LLC; Mirant Mid-
Atlantic LLC; et al. and Official
Committee of Unsecured Creditors of Mirant
Corporation, Appellants,
v.
Potomac Electric Power Co.; Federal Energy
Regulatory Commission, Appellees,
and
Official Committee of Equity Security Holders,
Intervenor.
In the Matter of: Mirant Corporation; Et Al.,
Debtors.
Mirant Corp.; MLW Development LLC;
Mirant Americas Energy Marketing LP;
Mirant Americas Generation LLC; Mirant Mid-
Atlantic LLC; et al. and Official
Committee of Unsecured Creditors of Mirant
Corporation, Appellants,
v.
Potomac Electric Power Co.; Federal Energy
Regulatory Commission Appellees and
Official Committee of Equity Security Holders,
Intervenor.
Nos. 04-10001, 04-10004 and 04-10094.**

Aug. 4, 2004.

**Background:** Chapter 11 debtor-in-possession
moved for order that authorized rejection of
executory power purchase agreement, and that
enjoined any person or entity from seeking specific
performance of rejected agreement. The United
States Bankruptcy Court for the Northern District of
Texas, Dennis Michael Lynn, J., 299 B.R. 152,
granted injunctive relief, but did not rule on merits
of debtor's motion to reject prior to withdrawal of
reference. Following new hearings, the District
Court, John H. McBryde, J., entered order denying

rejection motion, 303 B.R. 304, and vacated the
Bankruptcy Court's injunctive orders, 2004 WL
1621186, and debtor appealed.

**Holdings:** The Court of Appeals, Emilio M.
Garza, Circuit Judge, held that:
(1) debtor-utility's use of the filed rates applicable
to its power-purchase agreements as criterion in
deciding which agreements to reject did not convert
its permissible decision to reject power purchase
agreement, as unnecessary to permit debtor to fulfill
its supply obligations, into prohibited collateral
attack on filed rate, of kind preempted by the
Federal Power Act (FPA);
(2) bankruptcy court's injunctive orders were too
broad as, inter alia, requiring the FERC to give ten-
day advance notice to bankruptcy court prior to
taking any regulatory action with respect to the
hundreds of debtor's contracts that were within
jurisdiction of the FERC; and
(3) "business judgment" standard was
inappropriate standard to judge rejection decision.
Affirmed in part, reversed in part and remanded.

West Headnotes

**[1] Bankruptcy ☞3836**
51k3836
District court's conclusions on jurisdictional
questions are conclusions of law, that Court of
Appeals reviews *de novo*.

**[2] Statutes ☞223.1**
361k223.1
When faced with a conflict between two statutes,
courts must attempt to interpret them so as to give
effect to both statutes.

**[3] Bankruptcy ☞2041.1**
51k2041.1
Congress intended to grant comprehensive
jurisdiction to bankruptcy courts so that they might
deal efficiently and expeditiously with all matters
connected with bankruptcy estate.

**[4] Bankruptcy ☞3102.1**
51k3102.1
Debtor's authority to reject executory contracts is
vital to basic purpose of Chapter 11 reorganization,
as rejection can release debtor's estate from
burdensome obligations that can impede a successful
reorganization. Bankr.Code, 11 U.S.C.A. § 365.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

378 F.3d 511
(Cite as: 378 F.3d 511)

**[5] Electricity ☞11.3(1)**
145k11.3(1)
Federal Energy Regulatory Commission (FERC) has exclusive authority to determine the reasonableness of wholesale electricity rates under the Federal Power Act (FPA). Federal Power Act, §§ 1 et seq., 321, as amended, 16 U.S.C. §§ 792 et seq., 791a.

**[6] Public Utilities ☞119.1**
317Ak119.1

**[6] Public Utilities ☞194**
317Ak194
Under filed rate doctrine, utility's right to reasonable rate under the Federal Power Act is right to the rate which the Federal Energy Regulatory Commission (FERC) files or fixes; except for review of the FERC's orders, court can assume no right to a different one on the ground that, in its opinion, it is the only or the more reasonable one. Federal Power Act, §§ 1 et seq., 321, as amended, 16 U.S.C. §§ 792 et seq., 791a.

**[7] Public Utilities ☞194**
317Ak194
Under filed rate doctrine, reasonableness of rates and agreements regulated by the Federal Energy Regulatory Commission (FERC) may not be collaterally attacked in state or federal court; the only appropriate forum for such a challenge is before the FERC or court reviewing the FERC's order.

**[8] Public Utilities ☞119.1**
317Ak119.1

**[8] Public Utilities ☞129**
317Ak129
While the Federal Energy Regulatory Commission (FERC) has exclusive authority to change filed rate, its discretion is not completely unfettered: the FERC may not change filed rate solely because rate affords public utility less than a fair return, but only when rate is so low as to adversely affect public interest.

**[9] Bankruptcy ☞3105.1**
51k3105.1

**[9] Bankruptcy ☞3110.1**
51k3110.1
Chapter 11 debtor-utility's use of the filed rates applicable to its power-purchase agreements as criterion in deciding which agreements to reject did not convert its permissible decision to reject power purchase agreement, as unnecessary to permit debtor to fulfill its supply obligations, into prohibited collateral attack on filed rate, of kind preempted by the Federal Power Act (FPA), where other party's damages claim for debtor's rejection of contract would be calculated using filed rate; it did not matter that, pursuant to terms of debtor's plan, other party to contract might receive less than full payment on its damages claim, as any effect on filed rates was result, not of debtor's decision to reject contract, but of application of terms of confirmed plan to other party's unsecured claim. Bankr.Code, 11 U.S.C.A. § 365; Federal Power Act, §§ 1 et seq., 321, as amended, 16 U.S.C. §§ 792 et seq., 791a.

**[10] Public Utilities ☞145.1**
317Ak145.1

**[10] Public Utilities ☞181**
317Ak181
Outside bankruptcy context, the Federal Power Act (FPA) does not provide the Federal Energy Regulatory Commission (FERC) with exclusive jurisdiction over claims for breach of FERC-approved contract; while the FPA does preempt breach of contract claims which challenge a filed rate, district courts are permitted to grant relief in situations where breach of contract claim is based upon another rationale. Federal Power Act, §§ 1 et seq., 321, as amended, 16 U.S.C. §§ 792 et seq., 791a.

**[11] Statutes ☞195**
361k195
Where Congress provides exceptions in statute, it does not follow that courts have authority to create other exceptions; rather, proper inference is that Congress considered issue of exceptions and, in the end, limited exceptions to those set forth.

**[12] Injunction ☞189**
212k189
Fashioning appropriate injunctive relief depends on particular facts and circumstances of situation.

**[13] Bankruptcy ☞2125**
51k2125
Bankruptcy court's power to enter "necessary or appropriate" orders is not unlimited, and does not permit court to act as roving commission to do equity. Bankr.Code, 11 U.S.C.A. § 105(a).

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

378 F.3d 511
(Cite as: 378 F.3d 511)

**[14] Bankruptcy** ⊗⊃2371(1)
51k2371(1)

Although bankruptcy court could grant injunctive relief to prohibit the Federal Energy Regulatory Commission (FERC) from negating debtor-utility's rejection of its executory agreement to purchase electric power, by requiring continued performance at the pre-rejection filed rate, its injunctive orders were too broad as, inter alia, requiring the FERC to give ten-day advance notice to bankruptcy court prior to taking any regulatory action with respect to the hundreds of debtor's contracts that were within jurisdiction of the FERC; orders were inconsistent with the Bankruptcy Code's assumption that debtor is subject to ongoing agency regulation while in bankruptcy.

**[15] Bankruptcy** ⊗⊃3111
51k3111

Decision to reject debtor's executory contract is generally left to business judgment of bankruptcy estate. Bankr.Code, 11 U.S.C.A. § 365.

**[16] Bankruptcy** ⊗⊃3111
51k3111

"Business judgment" standard which is generally used when evaluating whether debtor will be allowed to reject executory contract was inappropriate, in context of motion by Chapter 11 debtor-utility to reject executory power purchase agreement, as not taking account of the public interest inherent in transmission and sale of electricity. Bankr.Code, 11 U.S.C.A. § 365.

**[17] Bankruptcy** ⊗⊃3837
51k3837

Upon reversal of district court's decision that Chapter 11 debtor-utility's rejection of its executory power purchase agreement was prohibited collateral attack on filed rate, of kind preempted by the Federal Power Act (FPA),

district court would have to decide whether debtor's decision to reject contract had to be evaluated under more rigorous standard than the traditional "business judgment" test, and in considering this issue, court would have to carefully scrutinize impact of rejection on public interest. Bankr.Code, 11 U.S.C.A. § 365; Federal Power Act, §§ 1 et seq., 321, as amended, 16 U.S.C. §§ 792 et seq., 791a.

*514 Judith Elkin, William Alan Wright, Anne M. Johnson, Haynes & Boone, Dallas, TX, Thomas E. Lauria (argued), White & Case, Miami, FL, Wayne Cross, Robert A. Milne, Jack E. Pace, J.

Christopher Shore, Luke A. McGrath, White & Case, New York City, for Mirant Corp., MLW Development LLC, Mirant Americas Energy Marketing LP, Mirant Americas Generation LLC, Mirant Mid-Atlantic LLC, et al.

Roger Frankel (argued), Jonathan P. Guy, Timothy A. Ngau, Swidler, Berlin, Shereff & Friedman, Washington, DC, Sander L. Esserman, Jo E. Hartwick, Stutzman, Bromberg, Esserman & Plifka, Dallas, TX, for Potomac Elec. Power Co.

Dennis Lane (argued), Beth Guralnick Pacella, Federal Energy Regulatory Com'n.

Eric Jay Taube, Mark Curtis Taylor, Hohmann, Taube & Summers, Austin, TX, Edward S. Weisfelner, Andrew Dash, Leslie H. Scharf, Brown, Rudnick, Berlack, Israels, New York City, Howard L. Siegel, Brown, Rudnick, Berlack, Israels, Hartford, CT, for Official Committee of Equity Sec. Holders.

Jason S. Brookner (argued), Andrews & Kurth, Dallas, TX, Paul N. Silverstein, Andrews & Kurth, Mark Thompson, Simpson, Thacher & Bartlett, New York City, Kendall Matthew Gray, Andrews & Kurth, Houston, TX, Kenneth L. Wiseman, Mark F. Sundback, Andrews & Kurth, Washington, DC, for Official Committee of Unsecured Creditors of Mirant Corp.

Appeal from the United States District Court for the Northern District of Texas.

Before BARKSDALE, EMILIO M. GARZA and PICKERING, Circuit Judges.

EMILIO M. GARZA, Circuit Judge:

The issue in this case is whether a district court may authorize the rejection of an executory contract for the purchase of electricity as part of a bankruptcy reorganization, or whether Congress granted the Federal Energy Regulatory Commission ("FERC") exclusive jurisdiction over these contracts. Mirant Corporation, its various subsidiaries, the Official Committee of *515 Unsecured Creditors of Mirant Corporation, and the Official Committee of Equity Security Holders as an intervenor (collectively "Mirant") argue that the district court's jurisdiction over Mirant's reorganization under Chapter 11 of the Bankruptcy Code, 11 U.S.C. § 101 et seq. (the "Bankruptcy

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

378 F.3d 511
**(Cite as: 378 F.3d 511, *515)**

Page 250

Code"), allows it to authorize the rejection of certain power contracts. In contrast FERC and the Potomac Electric Power Company ("PEPCO") maintain that because the Federal Power Act, 16 U.S.C. § 792 *et seq.* (the "FPA"), grants FERC the exclusive authority to regulate the wholesale rates in contracts for the interstate sale of electric power, any rejection of those contracts must occur in a FERC administrative proceeding. The district court in this case agreed with FERC's position, found the disputed contract to be within FERC's jurisdiction, and held that it lacked jurisdiction to authorize Mirant to reject this contract. Instead the district court held that a FERC proceeding was the proper forum for Mirant to seek relief from any of its power contracts. For the reasons described below, we find that the district court's jurisdictional ruling is erroneous, and that the district court may properly authorize the rejection of an executory power contract in bankruptcy.

**I**

Mirant is one of the largest regulated public utilities in the United States. It generates, buys, and sells electricity for use by utilities, municipalities, electric-cooperative utilities, and generators across the country. PEPCO is also a regulated public entity responsible for servicing the power needs of residential and commercial consumers in the District of Columbia and Maryland.

Pursuant to state deregulation legislation, PEPCO agreed to sell its electric generation facilities and assign most of its purchase power agreements ("PPAs") [FN1] to Mirant in June 2000 for approximately $2.65 billion in the Asset Purchase and Sale Agreement. The Asset Purchase and Sale Agreement allowed PEPCO to assign all of its PPAs to Mirant, however, a number of the PPAs contained contract language that required PEPCO to obtain the PPA supplier's consent before it could assign that particular PPA. The Asset Purchase and Sale Agreement addressed the possibility that some PPA suppliers would not consent to the assignment of their contracts with PEPCO. The parties agreed to reduce the purchase price by almost $260 million if PEPCO could not obtain consent to assign certain PPAs. They also agreed that any unassigned PPAs would be governed by the terms of a schedule attached to the Asset Purchase and Sale Agreement ("Schedule 2.4"). Under the terms of that schedule, PEPCO would comply with the terms of any unassigned PPAs listed in Schedule 2.4, and Mirant agreed to purchase from PEPCO an amount of

electricity equal to PEPCO's obligation under those unassigned PPAs at the rates set in those contracts.

> FN1. The PPAs are long-term fixed-rate contracts to purchase electricity from outside suppliers that PEPCO used to supplement its energy needs before deregulation.

PEPCO did not receive consent to assign two of its PPAs and invoked its Schedule 2.4 rights. The parties filed Schedule 2.4, and FERC approved the rates contained therein. The Schedule 2.4 payments relating to these unassigned PPAs are referred to by the parties, the bankruptcy court, and the district court as the Back-to-Back Agreement. We adopt that term for the sake of consistency. The parties agree that the Back-to-Back Agreement's rate for electricity is higher *516 than the market rate, causing Mirant significant financial losses.

In July 2003, Mirant filed for Chapter 11 bankruptcy. As part of its Chapter 11 reorganization, Mirant filed two motions in an adversary proceeding against FERC and PEPCO. First, Mirant filed a motion to reject the Back-to-Back Agreement, but not the Asset Purchase and Sale Agreement, as an executory contract. Second, Mirant sought, and received, an *ex parte* temporary restraining order preventing FERC or PEPCO from taking any actions to "require or coerce [Mirant] to abide by the terms of the Back-to-Back Agreement." Mirant subsequently initiated a second adversary proceeding to obtain another temporary *ex parte* injunction, which prevented FERC from "taking any action directly, or indirectly, to require or coerce [Mirant] to abide by the terms of any Wholesale Contract" on which Mirant either was substantially performing or was not performing pursuant to a court order without giving Mirant ten days advance notice. As this second injunction applied to all of Mirant's wholesale electric contracts and not just to the Back-to-Back Agreement, the parties recognize that this order would implicate hundreds of power contracts that are subject to FERC regulation.

After a hearing before the bankruptcy court, it held that it had the power to enjoin FERC; the authority to authorize Mirant to reject the Back-to-Back Agreement; and that an injunction was necessary in this case to protect its jurisdiction. Specifically, the bankruptcy court recognized that it was not the proper forum to challenge a FERC order, but found that an injunction was needed to protect the

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

378 F.3d 511
(Cite as: 378 F.3d 511, *516)

Page 251

reorganization process because any regulatory action FERC took with regard to a particular contract would divest the court of its jurisdiction over that contract. Consequently, the bankruptcy court converted both temporary restraining orders into preliminary injunctions, but did not rule on the merits of Mirant's motion to reject the Back-to-Back Agreement.

The district court then withdrew the reference to the bankruptcy court and held new hearings. [FN2] It concluded that FERC has exclusive authority to determine the reasonableness of the wholesale rates charged for electric energy sold in interstate commerce, and that those rates can only be challenged in a FERC proceeding, not through a collateral attack in state or federal court. The district court found that the only business justification supporting Mirant's motion to reject the Back-to-Back Agreement was the losses it suffered because the rate for electricity that FERC approved for that agreement exceeds the market rate. Based upon this analysis, the district court found that Mirant's rejection motion was a prohibited "attempt to avoid their electric energy purchase payment obligations under the Back-to-Back Agreement at the filed rates FERC has found to be just and reasonable." The district court then held that the Bankruptcy Code does not provide an exception to FERC's authority under the FPA and that Mirant must seek relief from the filed rate in the Back-to-Back Agreement in a FERC proceeding. Based upon this analysis, the district court denied Mirant's motion to reject the *517 Back-to-Back Agreement as well as its request for permanent injunctive relief. In a subsequent order, the district court vacated the bankruptcy court's injunctive relief because it would interfere with the performance of FERC's regulatory oversight functions. It then dismissed the case for failure to state a claim upon which relief could be granted. Mirant appeals each of the district court's orders.

FN2. While the district courts have original jurisdiction over all cases under title 11, 28 U.S.C. § 1334, these cases are generally referred to the bankruptcy court. See 28 U.S.C. § 157(a). The district court, however, shall withdraw the reference, upon a party's timely motion, in cases where "resolution of the proceeding requires consideration of both title 11 and other laws of the United States regulating organizations or activities affecting interstate commerce." 18 U.S.C. § 157(d).

II

[1][2]  "Questions concerning jurisdiction are questions of law. We therefore review the actions of the district court de novo." In re Moody, 41 F.3d 1024, 1026 (5th Cir.1995). When faced with a conflict between two statutes, courts must attempt to interpret them so as to give effect to both statutes. See Morton v. Mancari, 417 U.S. 535, 551, 94 S.Ct. 2474, 41 L.Ed.2d 290 (1974) ("The courts are not at liberty to pick and choose among congressional enactments, and when two statutes are capable of co-existence, it is the duty of the courts, absent a clearly expressed congressional intention to the contrary, to regard each as effective.").

A

Brief descriptions of the general authority that a district court has to authorize the rejection of an executory contract under Chapter 11 of the Bankruptcy Code, and of FERC's regulatory responsibility regarding contracts for the interstate sale of electricity under the FPA are necessary before we can determine how those statutes interact. Congress intended Chapter 11 to permit troubled enterprises to be restructured so that they could operate successfully in the future. United States v. Whiting Pools, Inc., 462 U.S. 198, 203, 103 S.Ct. 2309, 76 L.Ed.2d 515 (1983). Congress "presumed that the assets of the debtor would be more valuable if used in a rehabilitated business than if 'sold for scrap.' " Id. (citation omitted). Further, Congress anticipated that permitting a business to reorganize instead of liquidating would allow it to "continue to provide jobs, to satisfy creditors' claims, and to produce a return for its owners." Id.

[3]  "Congress intended to grant comprehensive jurisdiction to the bankruptcy courts so that they might deal efficiently and expeditiously with all matters connected with the bankruptcy estate." Celotex Corp. v. Edwards, 514 U.S. 300, 308, 115 S.Ct. 1493, 131 L.Ed.2d 403 (1995) (citation omitted). The statute governing a district court's jurisdiction over Chapter 11 filings states that the district courts shall have "original but not exclusive jurisdiction of all civil proceedings arising under title 11, or arising in or related to cases under title 11." 28 U.S.C. § 1334(b). That section also provides that the district court "in which a case under title 11 is commenced ... shall have exclusive jurisdiction of all of the property, wherever located, of the debtor as of the commencement of such case, and of property of the estate." 28 U.S.C. § 1334(e) .   Mirant contends that the district court has

exclusive jurisdiction under § 1334 over the Back-to-Back Agreement as property of the estate.

[4] Mirant also relies upon the authority it has under § 365 of the Bankruptcy Code to reject that agreement: "[T]he authority to reject an executory contract is vital to the basic purpose of a Chapter 11 reorganization, because rejection can release the debtor's estate from burdensome obligations that can impede a successful reorganization." *In re Nat'l Gypsum Co.,* 208 F.3d 498, 504 (5th Cir.2000) (citing *NLRB v. Bildisco & Bildisco,* 465 U.S. 513, 528, 104 S.Ct. 1188, 79 L.Ed.2d 482 (1984)) (alteration in original). Section 365 provides, subject to certain exceptions contained *518 within the Bankruptcy Code, that "the trustee, subject to the court's approval, may assume or reject *any* executory contract or unexpired lease of the debtor." 11 U.S.C. § 365(a) (emphasis added). [FN3]

> FN3. Section 365(a) does not define executory contract, but the legislative history of that section indicates that the term means a contract "on which performance is due to some extent on both sides." *NLRB v. Bildisco & Bildisco,* 465 U.S. 513, 522 n. 6, 104 S.Ct. 1188, 79 L.Ed.2d 482 (1984) (citation omitted).

[5][6] In addition to the Bankruptcy Code, we must also consider FERC's authority within the regulatory framework established by the FPA. Congress chose to regulate the interstate sale of electricity through the wholesale rates that utility companies are permitted to charge. *See* 16 U.S.C. §§ 824, 824d. Although utility companies determine electricity rates through private contract negotiations, those rates must be filed with FERC and certified as "just and reasonable" to be lawful under the FPA. 16 U.S.C. § 824d(a), (c). FERC has the "exclusive authority to determine the reasonableness of wholesale [electricity] rates" under the FPA. *Mississippi Power & Light Co. v. Mississippi ex rel. Moore,* 487 U.S. 354, 371, 108 S.Ct. 2428, 101 L.Ed.2d 322 (1988). That authority led to the development of the filed rate doctrine, which states that a utility's "right to a reasonable rate [under the Federal Power Act] is the right to the rate which the Commission files or fixes, and, ... except for review of the Commission's orders, [a] court can assume no right to a different one on the ground that, in its opinion, it is the only or the more reasonable one." *Id.* (quoting *Nantahala Power & Light Co. v. Thornburg,* 476 U.S. 953, 963-64, 106 S.Ct. 2349,

90 L.Ed.2d 943 (1986)) (alteration and omission in original).

[7][8] Under the filed rate doctrine, "[t]he reasonableness of rates and agreements regulated by FERC may not be collaterally attacked in state or federal courts. The only appropriate forum for such a challenge is before the Commission or a court reviewing the Commission's order." *Mississippi Power & Light,* 487 U.S. at 375, 108 S.Ct. 2428. While FERC has exclusive authority to change a filed rate, this discretion is not completely unfettered. FERC may not change a filed rate solely because the rate affords a public utility "less than a fair return" because "the purpose of the power given to the Commission ... is the protection of the public interest, as distinguished from the private interests of the utilities...." *Fed. Power Comm'n v. Sierra Pac. Power Co.,* 350 U.S. 348, 355, 76 S.Ct. 368, 100 L.Ed. 388 (1956). Instead FERC can change a filed rate only when "the rate is so low as to adversely affect the public interest--as where it might impair the financial ability of the public utility to continue its service, cast upon other consumers an excessive burden, or be unduly discriminatory." *Id.*

Based upon § 1334 and § 365 of the Bankruptcy Code, Mirant claims that it has the right, subject to the district court's approval, to reject any executory contract, including the Back-to-Back Agreement. FERC argues that the FPA preempts the district court's jurisdiction in this case because Mirant's efforts to reject the Back-to-Back Agreement is actually a collateral attack upon a filed rate. We address for the first time, a case arising at the intersection of these two statutes. After carefully examining the authority of each entity, we conclude that the power of the district court to authorize rejection of the Back-to-Back Agreement does not conflict with the authority given to FERC to regulate rates for the interstate sale of electricity at wholesale.

#### *519 B

[9] It is clear that FERC has the exclusive authority to determine wholesale rates, *see Mississippi Power & Light,* 487 U.S. at 371, 108 S.Ct. 2428, and Mirant does not contest that it would need FERC approval to either modify the rates in the Back-to-Back Agreement or to completely abrogate that agreement. *Cf.* 11 U.S.C. § 362(b)(4) (creating exception from automatic stay for agencies acting to enforce their regulatory power). Under the

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Bankruptcy Code, however, Mirant's *rejection* of the Back-to-Back Agreement is a *breach* of that contract. *See* 11 U.S.C. § 365(g) ("[T]he rejection of an executory contract ... constitutes a breach of such contract ...."); *see also In re Continental Airlines,* 981 F.2d 1450, 1459 (5th Cir.1993) ( "[Section] 365(g)(1) speaks only in terms of 'breach.' The statute does not invalidate the contract, or treat the contract as if it did not exist."). Thus, whether the FPA preempts a district court's jurisdiction over a bankruptcy rejection necessarily depends upon whether the FPA generally preempts a district court's jurisdiction over claims of breach related to executory power contracts.

[10] Outside of the bankruptcy context, the FPA does not provide FERC with exclusive jurisdiction over the breach of a FERC approved contract. While the FPA does preempt breach of contract claims that challenge a filed rate, district courts are permitted to grant relief in situations where the breach of contract claim is based upon another rationale. *Gulf States Utils. Co. v. Ala. Power Co.,* 824 F.2d 1465, 1471-73 (5th Cir.1987); *see also Arkansas Louisiana Gas Co. v. Hall,* 453 U.S. 571, 579 n. 9, 101 S.Ct. 2925, 69 L.Ed.2d 856 (1981) (declining to disturb a state court decision holding that a party breached a contract that was subject to FERC regulation by failing to comply with state laws that also applied to that contract). For example, *Gulf States* held that the FPA would preempt any breach of contract claim where damages were sought because a lower rate would have been filed with FERC absent the breach, but there is no preemption if damages were sought because the breach caused an increase in the *quantity* purchased at the filed rate. *Gulf States,* 824 F.2d at 1471. Thus, it is clear that the district court's authority under the general § 365(a) rejection provision permits it to rule on Mirant's motion to reject the Back-to-Back Agreement so long as that rejection does not constitute a challenge to that agreement's filed rate.

Whether rejection of the Back-to-Back Agreement is a challenge to the filed rate, granting the FPA exclusive jurisdiction, is a closer question. The Supreme Court has held that district courts are preempted from awarding breach of contract damage awards calculated using a rate other than the rate filed with FERC. *See Arkansas Louisiana Gas Co.,* 453 U.S. at 584-85, 101 S.Ct. 2925. In *Gulf States,* however, we held that courts are not

preempted from awarding breach of contract damages based upon a theory that the breach increased the amount that was purchased, so long as damages are calculated using the filed rate. *Gulf States,* 824 F.2d at 1472. Furthermore, *Gulf States* held that courts may set aside an energy contract that was obtained unconscionably or by fraud without interfering with FERC's rulemaking power, so long as that order was not based upon a theory that the filed rate was too high. *Id.* While *Gulf States* recognized that setting aside a contract "would affect the filed rates by eliminating them," it held that the FPA does not preempt such indirect effects. *Id.* at 1472 n. 9.

We conclude that the FPA does not preempt Mirant's rejection of the Back-to-Back Agreement because it would only *520 have an indirect effect upon the filed rate. When an executory contract is rejected in bankruptcy, the non-breaching party receives an unsecured claim against the bankruptcy estate for an amount equal to its damages from the breach. *See* 11 U.S.C. §§ 365(g)(1), 502(g). If Mirant's rejection of the Back-to-Back Agreement was approved, then PEPCO's unsecured claim against the bankruptcy estate would be based upon the amount of electricity it would have otherwise sold to Mirant under that agreement *at the filed rate.* Thus, the damages calculation from the rejection of a contract is analogous to the damages calculation we previously approved in *Gulf States* because the award calculation is based upon the filed rate. *See Gulf States,* 824 F.2d at 1471 (damages from breach claims challenging the quantity purchased are not preempted but they must be calculated using the filed rate).

The district court found that Mirant's rejection motion was a challenge to the filed rate because the business justification that Mirant gave for rejecting the Back-to-Back Agreement was that the filed rate exceeded the market rate for electricity. Mirant has also argued, however, that it does not need the electricity purchased under the Back-to-Back Agreement to fulfill its obligations to supply electricity. In that situation, Mirant may choose to reject this agreement as unnecessary to its reorganized business because it represents excess capacity in its system to supply electricity. Section 365(a) permits the bankruptcy estate to select, within certain limits, which executory contracts it will reject and which it will assume. *See In re Topco, Inc.,* 894 F.2d 727, 741 (5th Cir.1990) ("In effect, Section 365 allows debtors to pick and

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

378 F.3d 511
(Cite as: 378 F.3d 511, *520)

Page 254

choose among their agreements and assume those that benefit their estates and reject those that do not."). Presumably, a contract's filed rate will be a relevant factor to the bankruptcy estate when it makes this determination. A debtor's use of the filed rate as a criteria to select for rejection under § 365(a) those contracts which impose the greatest burden upon the bankruptcy estate does not convert that rejection decision into a prohibited collateral attack on the filed rate when the electricity purchased under the rejected contract is not necessary to fulfill a debtor's supply obligations. *Cf. Gulf States,* 824 F.2d at 1472 ("The district court would have jurisdiction if [the debtor] claimed that it cannot take [the supplier's] electricity *regardless of price.* If, however, [the debtor] can fulfill its purchase obligations at lower rate, then [the debtor] merely seeks rate relief not available in district court.").

FERC presents an alternative argument to support its claim that Mirant's rejection motion is a prohibited collateral attack on a filed rate. This argument is based upon the amount that the bankruptcy estate will have to pay to satisfy PEPCO's breach of contract damages claim. FERC concedes that the rejection of the Back-to-Back Agreement would not challenge the filed rate if Mirant guarantees that it would pay PEPCO the full amount of any damages resulting from that breach. However, FERC maintains that anything less than full payment would constitute a challenge to the filed rate because then Mirant would have changed the terms and conditions of the Back-to-Back Agreement by reducing the amount of its contract payments.

FERC's argument is unpersuasive because it is entirely dependant upon Mirant's bankrupt status. It does not challenge Mirant's ability to breach the Back-to-Back contract generally, nor does it challenge the calculation of damages from that breach. Instead, FERC's argument focuses on the amount that Mirant's bankruptcy estate may ultimately have to pay *521 to satisfy PEPCO's damages claim. It is true that Mirant's bankruptcy estate may be able to satisfy PEPCO's breach of contract damages claim without paying the full amount of that claim. However, any amount that PEPCO receives in satisfaction of its breach of contract claim will depend solely upon the terms applicable to unsecured creditors as a class under the reorganization plan as confirmed by the bankruptcy court. *See* 11 U.S.C. § 1129

(describing process for confirming reorganization plan); *see also* 11 U.S.C. § 1141 (discharging preconfirmation debts not paid as part of the reorganization plan). Thus, under FERC's analysis, any effect on the filed rates from a motion to reject would result not from the rejection itself, but from the application of the terms of a confirmed reorganization plan to the unsecured breach of contract claims.

In *Gulf States,* we held that a district court could set aside contracts subject to FERC jurisdiction that were obtained unconscionably or by fraud. *Gulf States,* 824 F.2d at 1472. While we acknowledged that this remedy would affect the filed rate by eliminating it entirely, we held that Congress did not mean for the FPA "to preempt such indirect effects." *Id.* at 1472 n. 9. Any effect that application of a reorganization plan's terms may have upon the Back-to-Back Agreement's filed rate is even further removed from the contract breach than are the effects of setting the contract aside entirely, and does not cause FPA preemption. Therefore, FERC must rely upon the provisions of the Bankruptcy Code to limit Mirant's ability to reject the Back-to-Back Agreement.

The structure of the Bankruptcy Code, however, indicates that Congress did not intend to limit the ability of utility companies to reject an executory power contract. Section 365, along with other Bankruptcy Code sections, details a number of specific limitations on and exceptions to the § 365(a) general rejection authority, including exceptions prohibiting rejection of certain obligations imposed by regulatory authorities. *See, e.g.,* 11 U.S.C. § 365(*o*) (requiring a trustee to assume "any commitment by the debtor to a Federal depository institutions regulatory agency ... to maintain the capital of an insured depository institution," and granting priority to any claim of a subsequent breach of this obligation); 11 U.S.C. § 1113 (setting forth requirements for the assumption or rejection of collective bargaining agreements); 11 U.S.C. § 1169 (providing special treatment for the rejection of a railroad lease); 11 U.S.C. § 365(d)(5) (describing the special conditions for deemed rejection of an air carrier's unexpired lease of an airport terminal or aircraft gate); *cf.* 11 U.S.C. § 1110 (setting forth special requirements for the assumption of executory contracts relating to aircraft equipment and vessels). The Bankruptcy Code does not, however, include an exception prohibiting rejection of, or providing other special

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

treatment for, wholesale electric contracts subject to FERC jurisdiction.

The fact that Congress did not create an exception from § 365(a) rejection for contracts subject to FERC regulation does not appear to be an accident or oversight. It is clear from other Bankruptcy Code provisions that Congress was aware that a debtor's bankruptcy reorganization could implicate the authority of a regulatory rate-setting commission with jurisdiction over that debtor. *See* 11 U.S.C. § 1129(a)(6) (permitting the confirmation of a reorganization plan only when "[a]ny governmental regulatory commission with jurisdiction, after confirmation of the plan, over the rates of the debtor has approved any rate change provided for in the plan, or such rate change is expressly conditioned on such approval"); *see also* 11 U.S.C. § 362(b)(4) (creating exception *522 from the automatic stay for government agencies acting to enforce their regulatory power). Obviously, Congress knew how to craft specific provisions to protect the rate setting authority of regulatory commissions when it wanted to do so.

[11] In light of the numerous specific exceptions to the general § 365(a) authority to reject contracts that Congress chose to include in the Bankruptcy Code, including those for other contracts subject to extensive regulation, and the absence of any exception for contracts subject to FERC jurisdiction, it is clear that Congress intended § 365(a) to apply to contracts subject to FERC regulation. *Cf. NLRB v. Bildisco & Bildisco,* 465 U.S. 513, 522-23, 104 S.Ct. 1188, 79 L.Ed.2d 482 (1984) ("Obviously, Congress knew how to draft an exclusion for collective-bargaining agreements when it wanted to; its failure to do so in this instance indicates that Congress intended that § 365(a) apply to all collective-bargaining agreements covered by the NLRA."). "When Congress provides exceptions in a statute, it does not follow that courts have authority to create others. The proper inference, and the one we adopt here, is that Congress considered the issue of exceptions and, in the end, limited the statute to the ones set forth." *United States v. Johnson,* 529 U.S. 53, 58, 120 S.Ct. 1114, 146 L.Ed.2d 39 (2000); *see also TRW Inc. v. Andrews,* 534 U.S. 19, 28, 122 S.Ct. 441, 151 L.Ed.2d 339 (2001) (where Congress includes specific exceptions to a statute, additional exceptions should not be implied).

The FPA does not preempt a district court's

jurisdiction to authorize the rejection of an executory contract subject to FERC regulation as part of a bankruptcy proceeding. A motion to reject an executory power contract is not a collateral attack upon that contract's filed rate because that rate is given full effect when determining the breach of contract damages resulting from the rejection. Further, there is nothing within the Bankruptcy Code itself that limits a public utility's ability to choose to reject an executory contract subject to FERC regulation as part of its reorganization process. Therefore, the district court erred by dismissing Mirant's motion to reject the Back-to-Back Agreement.

C

[12] As part of its order dismissing Mirant's motion to reject the Back-to-Back Agreement, the district court also vacated all of the injunctive relief that the bankruptcy court entered in this case. Mirant now requests that we enter injunctive relief *sua sponte* using substantially the same form as the bankruptcy court. Fashioning appropriate injunctive relief depends upon the particular facts and circumstances of a situation, and we leave the task of crafting the language of any injunctive relief in this case to the bankruptcy court. In the interest of judicial efficiency and to provide guidance on remand, however, we will consider whether the bankruptcy court acted within its authority when it previously entered injunctive relief.

The bankruptcy court issued two separate injunctions in this case that were subsequently vacated by the district court. First, it prohibited either FERC or PEPCO from taking any action to require Mirant to abide by the terms of the Back-to-Back Agreement. Second, it prohibited FERC from taking any action to require Mirant to abide by the terms of any contract subject to FERC regulation with which it was either complying or was not complying subject to a court order without giving Mirant ten days advance notice. We recognize that some injunctive relief is necessary to bring finality to Mirant's rejection*523 decisions and allow the reorganization process to proceed, but the injunctive relief as previously entered was overly broad.

The bankruptcy court issued both of its injunctions under 11 U.S.C. § 105(a), which allows the court to issue any order "that is necessary or appropriate to carry out the provisions" of the Bankruptcy Code. *Id.; see In re Cajun Elec. Power Coop., Inc.,* 185 F.3d 446, 453 n. 9 (5th Cir.1999). The bankruptcy

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

court relied upon its § 105(a) equitable authority because FERC is exempt from the Bankruptcy Code's automatic stay provision. *See* 11 U.S.C. § 362(b)(4) (providing exemption for the "commencement or continuation of an action or proceeding by a governmental unit ... to enforce such governmental unit's ... police and regulatory power"). While § 105(a) permits bankruptcy courts to enjoin actions that are excepted from the automatic stay by § 362(b)(4), *see In re Cajun Elec. Power,* 185 F.3d at 457 n. 18, this authority is typically used to stop proceedings excepted under § 364 only "in exceptional circumstances." *Id.* (citing *Corporacion de Servicios Medicos Hospitalarios de Fajardo v. Mora,* 805 F.2d 440, 449 n. 14 (1st Cir.1986)).

The Bankruptcy Code clearly anticipates ongoing governmental regulatory jurisdiction while a bankruptcy proceeding is pending. *In re Cajun Elec. Power,* 185 F.3d at 453; *see also* 11 U.S.C. § 362(b)(4) (creating exemption from automatic stay for administrative agencies exercising their regulatory power); 11 U.S.C. § 1129(a)(6) (requiring approval of any rate change in a reorganization plan by the government regulatory agency with the appropriate jurisdiction). FERC has a number of regulatory responsibilities under the FPA that continue while Mirant's bankruptcy case is pending that do not necessarily impact Mirant's ability to reject a contract. *See, e.g.,* 16 U.S.C. § 824a(c) (permitting FERC to require from public utilities, whenever it determines an emergency exists, "such generation, delivery, interchange, or transmission of electric energy as in its judgment will best meet the emergency and serve the public interest"); 16 U.S.C. § 824a(g) (to ensure continuity of service, FERC shall prescribe rules requiring public utilities to accommodate any shortages of electric energy or capacity); 16 U.S.C. § 824e(a) (allowing FERC to modify any filed rate that, after a hearing initiated either upon its own motion or upon complaint, it determines to be unjust or unreasonable).

[13][14] A court's powers under § 105(a) are not unlimited as that section only "authorizes bankruptcy courts to fashion such orders as are necessary to further the substantive provisions of the Code," and does not permit those courts to "act as roving commission[s] to do equity." *In re Southmark Corp.,* 49 F.3d 1111, 1116 (5th Cir.1995) (citations and internal quotations omitted). The bankruptcy court's injunctive relief

in this case exceeded its authority under § 105(a). The concern that the bankruptcy court expressed-- that FERC could negate Mirant's rejection of an executory power contract by ordering Mirant to continue performing under the terms of the rejected contract--is certainly a legitimate basis for injunctive relief. For example, a bankruptcy court can clearly grant injunctive relief to prohibit FERC from negating Mirant's rejection by requiring continued performance at the pre-rejection filed rate. [FN4]

> FN4. Prohibiting FERC from ordering a debtor to continue performing under a rejected contract's filed rate does not mean that the rejection decision itself was a challenge to the filed rate. We assume for purposes of our discussion of injunctive relief that the filed rate was given full effect in the bankruptcy court's calculation of the breach of contract damages resulting from the rejection of that contract.

**\*524** Both of the bankruptcy court's injunctions, however, attempted to accomplish the narrow goal of protecting Mirant's right to reject executory contracts by prohibiting FERC from taking *any* action to require Mirant to abide by the terms of those contracts within the scope of its injunctions. Thus, while the bankruptcy court found that injunctive relief was only warranted to prevent FERC from negating Mirant's rejection decisions, the relief that was actually granted implicated all of FERC's regulatory functions with respect to hundreds of contracts. The ten-day advance notice requirement included in the bankruptcy court's second injunction is particularly troublesome because that requirement in effect forced FERC to clear any regulatory action with the bankruptcy court. That requirement is inconsistent with the Bankruptcy Code's assumption that a debtor is subject to ongoing agency regulation while in bankruptcy. *See In re Cajun Elec. Power,* 185 F.3d at 453. Consequently, these injunctions were broader than were necessary to further the purposes of the Bankruptcy Code's rejection provision.

### D

As we hold that a district court may authorize the rejection of an executory power contract, we must also address Mirant's argument that we should render judgment on its motion to reject the Back-to-Back Agreement. The procedural posture of this case counsels against that action. Neither the bankruptcy court nor the district court has ruled on the merits of Mirant's motion to reject. Further, important issues must still be resolved before a

378 F.3d 511
(Cite as: 378 F.3d 511, *524)

Page 257

decision on the merits would be appropriate. For example, it is unclear whether or not the Back-to-Back Agreement is a separate agreement from the Asset Purchase and Sale Agreement for purposes of rejection. *See, e.g., Stewart Title Guar. Co. v. Old Republic Nat'l Title Ins. Co.,* 83 F.3d 735, 741 (5th Cir.1996) ("Where an executory contract contains several agreements, the debtor may not choose to reject some agreements within the contract and not others."). We, of course, express no opinion regarding this issue, and merely note its existence to indicate the significant work that remains. Developing the factual record necessary to answer these questions is the work of the trial courts.

[15] Although the bankruptcy court did not reach the merits of Mirant's motion to reject the Back-to-Back Agreement, its opinion indicated that it may choose to apply a more rigorous standard to Mirant's motion to reject than the usual business judgment standard. [FN5] Supreme Court precedent supports applying a more rigorous standard to this case. *See Bildisco,* 465 U.S. at 526-27, 104 S.Ct. 1188 (applying a more rigorous standard to the rejection of a collective-bargaining agreement under § 365), *superceded by statute as recognized in Am. Flint Glass Workers Union v. Anchor Resolution Corp.,* 197 F.3d 76, 82 (3d Cir.1999) (Congress overruled *525 Bildisco's* rejection standard for collective-bargaining agreements by passing 11 U.S.C. § 1113 to control the rejection of those agreements). The Supreme Court generally required more rigorous scrutiny in *Bildisco* because of "the special nature of a collective-bargaining contract." *See Bildisco,* 465 U.S. at 524, 104 S.Ct. 1188. The Supreme Court also included a specific negotiation requirement as part of the *Bildisco* standard to ensure that "the national labor policies of avoiding labor strife and encouraging collective bargaining" reflected in the National Labor Relations Act, 29 U.S.C. § 151, were "adequately served" before rejection was permitted. *See Bildisco,* 465 U.S. at 526, 104 S.Ct. 1188. [FN6]

FN5. The rejection decision under § 365 is generally left to the business judgment of the bankruptcy estate. *See Richmond Leasing Co. v. Capital Bank, N.A.,* 762 F.2d 1303, 1309 (5th Cir.1985) ("It is well established that 'the question [of] whether a lease should be rejected ... is one of business judgment.' ") (quoting *Group of Institutional Investors v. Chicago, Milwaukee, St. Paul & Pac. R.R. Co.,* 318 U.S. 523, 63 S.Ct. 727, 87 L.Ed. 959 (1943)) (omissions in original,

alteration added); *see also In re Liljeberg Enterprises, Inc.,* 304 F.3d 410, 438 (5th Cir.2002) (applying *Richmond Leasing* to rejection an executory contract).

FN6. "Before acting on a petition ... to reject a collective-bargaining agreement ... the Bankruptcy Court should be persuaded that reasonable efforts to negotiate a voluntary modification have been made and are not likely to produce a prompt and satisfactory solution." *Bildisco,* 465 U.S. at 526, 104 S.Ct. 1188.

[16] The nature of a contract for the interstate sale of electricity at wholesale is also unique. Additionally, Congress found when it passed the FPA that the public has an interest in the transmission and sale of electricity. 16 U.S.C. § 824(a). This includes an interest in the continuity of electrical service to the customers of public utilities. 16 U.S.C. § 824a(g). The FPA and the filed rate doctrine protect the public interest by imposing severe limitations upon a public utility's ability to alter the terms of those contracts after they are certified by FERC. Under the filed rate doctrine, FERC can only approve a change to a filed rate if "the rate is so low as to adversely affect the public interest--as where it might impair the financial ability of the public utility to continue its service, cast upon other consumers an excessive burden, or be unduly discriminatory." *Sierra-Pacific,* 350 U.S. at 355, 76 S.Ct. 368. This doctrine does not allow FERC to change a filed rate based upon the purely private concern that the rate "is unprofitable to the public utility." *Id.* Clearly the business judgment standard normally applicable to rejection motions is more deferential than the public interest standard applicable in FERC proceedings to alter the terms of a contract within its jurisdiction. Use of the business judgment standard would be inappropriate in this case because it would not account for the public interest inherent in the transmission and sale of electricity.

[17] Therefore, upon remand, the district court should consider applying a more rigorous standard to the rejection of the Back-to-Back Agreement. If the district court decides that a more rigorous standard is required, then it might adopt a standard by which it would authorize rejection of an executory power contract only if the debtor can show that it "burdens the estate, [ ] that, after careful scrutiny, the equities balance in favor of rejecting" that power contract, and that rejection of the contract would further the Chapter 11 goal of

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

378 F.3d 511
(Cite as: 378 F.3d 511, *525)

permitting the successful rehabilitation of debtors. *See Bildisco*, 465 U.S. at 526-27, 104 S.Ct. 1188. When considering these issues, the courts should carefully scrutinize the impact of rejection upon the public interest and should, *inter alia*, ensure that rejection does not cause any disruption in the supply of electricity to other public utilities or to consumers. *Cf. id.* at 527, 104 S.Ct. 1188. (requiring the bankruptcy court to balance the interests of the debtor, the creditors and the employees when determining what constitutes a successful rehabilitation). The bankruptcy court has already indicated that it would include FERC as a party in interest for all purposes in this case under 11 *526 U.S.C. § 1109(b) and Fed. R. Bankr.P. 2018. We presume that the district court would also welcome FERC's participation, if this case is not referred back to the bankruptcy court. [FN7] Therefore, FERC will be able to assist the court in balancing these equities.

> FN7. Mirant asks that we remand this case to the bankruptcy court, but the district court withdrew the reference in this case and accordingly we remand to the district court. Nothing in this opinion, however, should be understood to imply that the district court cannot refer this case back to the bankruptcy court.

### III

The portion of the district court's order dismissing this case for lack of jurisdiction to authorize the rejection of a contract for the interstate sale of electricity at wholesale is REVERSED, the portion of that order vacating the bankruptcy court's injunctive relief is AFFIRMED, and this case is REMANDED to the district court for proceedings not inconsistent with this opinion. All outstanding motions are DENIED.

378 F.3d 511, Util. L. Rep. P 14,515, 43 Bankr.Ct.Dec. 111, Bankr. L. Rep. P 80,139

### Briefs and Other Related Documents (Back to top)

. 2004 WL 2682160T2 (Appellate Brief) Amicus Brief of the Office of the People's Counsel for the

District of Columbia (Apr. 21, 2004)Original Image of this Document (PDF)

. 2004 WL 2682166T2 (Appellate Brief) Amicus Brief of Office of the People's Counsel for the District of Columbia (Apr. 21, 2004)Original Image of this Document (PDF)

. 2004 WL 2682159T2 (Appellate Brief) Reply Brief of Official Committee of Equity Security Holders in Further Support of Reversal (Apr. 20, 2004)Original Image of this Document (PDF)

. 2004 WL 2682162T2 (Appellate Brief) Reply Brief of Appellants Mirant Corporation, et Al. (Apr. 20, 2004)Original Image of this Document (PDF)

. 2004 WL 2682163T2 (Appellate Brief) Reply Brief of Appellant the Official Committee of Unsecured Creditors of Mirant Corporation (Apr. 20, 2004)Original Image of this Document (PDF)

. 2004 WL 2682011T2 (Appellate Brief) Brief of Official Committee of Equity Security Holders in Support of Reversal (Apr. 08, 2004)Original Image of this Document (PDF)

. 2004 WL 2682161T2 (Appellate Brief) Brief of Appellee Federal Energy Regulatory Commission (Apr. 08, 2004)Original Image of this Document (PDF)

. 2004 WL 2682164T2 (Appellate Brief) Brief of Appellee Potomac Electric Power Company (Apr. 08, 2004)Original Image of this Document (PDF)

. 04-10094 (Docket) (Jan. 29, 2004)

. 04-10004 (Docket) (Jan. 07, 2004)

. 04-10001 (Docket) (Jan. 05, 2004)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# TAB 38

25 F.3d 1132                                                      **Page 177**
25 F.3d 1132, 63 USLW 2015, 31 Collier Bankr.Cas.2d 209, 25 Bankr.Ct.Dec. 1213,
Bankr. L. Rep. P 75,943, 18 Employee Benefits Cas. 1571, Pens. Plan Guide (CCH) P 23899E
**(Cite as: 25 F.3d 1132)**
▷

United States Court of Appeals,
Second Circuit.
**In re MOMENTUM MANUFACTURING
CORPORATION, Debtor.
MOMENTUM MANUFACTURING
CORPORATION, Appellant,**
v.
**EMPLOYEE CREDITORS COMMITTEE,
Appellee.
No. 1168, Docket 93-5090.**

Argued March 4, 1994.
Decided June 6, 1994.

After Chapter 11 debtor's plan was confirmed, debtor moved to amend its schedules to delete amounts allocated to employees' severance pay claims and to object to employees' proofs of claim for severance pay. The Bankruptcy Court, Stephen D. Gerling, J., denied the motions. On appeal, the United States District Court for the Northern District of New York, Frederick J. Scullin, Jr., J., affirmed, and debtor appealed. The Court of Appeals, Leval, Circuit Judge, held that: (1) debtor was equitably estopped from denying severance pay claims, and (2) Employee Retirement Income Security Act (ERISA) did not preempt application of equitable estoppel.

Affirmed.

West Headnotes

**[1] Bankruptcy** ☞**3782**
51k3782
(Formerly 51k3779)
Order of district court functioning in its capacity as appellate court in bankruptcy case is subject to plenary review; thus, Court of Appeals independently reviews factual determinations and legal conclusions of bankruptcy court.

**[2] Bankruptcy** ☞**3782**
51k3782

**[2] Bankruptcy** ☞**3786**
51k3786
Bankruptcy court's legal conclusions are evaluated de novo; its findings of fact are subject to clearly erroneous standard.

**[3] Bankruptcy** ☞**2125**
51k2125
Bankruptcy courts are courts of equity empowered to invoke equitable principles to achieve fairness and justice in reorganization process. Bankr.Code, 11 U.S.C.A. § 105(a).

**[4] Bankruptcy** ☞**2125**
51k2125
Bankruptcy court's equitable powers are not unlimited and may not be exercised in contravention of Bankruptcy Code's provisions. Bankr.Code, 11 U.S.C.A. § 105(a).

**[5] Bankruptcy** ☞**3539.1**
51k3539.1
Chapter 11 debtor's disclosure obligation does not attach only to preparation of disclosure statements; full and fair disclosure is required during entire reorganization process. Bankr.Code, 11 U.S.C.A. § 1125(a)(1).

**[6] Bankruptcy** ☞**3569**
51k3569
Employees asserting equitable estoppel against Chapter 11 debtor based on debtor's postconfirmation denial of severance payments provided for in plan had to show that when they voted to accept debtor's plan they lacked knowledge of true facts, they reasonably relied on debtor's misleading conduct, and they suffered prejudice as result of their reliance.

**[7] Bankruptcy** ☞**3569**
51k3569
Chapter 11 debtor was equitably estopped from denying severance payments to its former employees postconfirmation by amending the schedules, even though debtor intended to deny severance benefits from inception of Chapter 11 case, where disclosure statement and debtor's preconfirmation actions fairly communicated debtor's intention to pay approximately $500,000 in severance pay under plan, several employees testified that they would not have voted for plan if they had been aware that severance benefits would be rejected, and plan could not have been approved if employees had rejected it.

**[8] Labor and Employment** ☞**407**
231Hk407

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

25 F.3d 1132
(Cite as: 25 F.3d 1132)

(Formerly 296k130)

**[8] States** ☜═18.51
360k18.51
ERISA did not preempt application of equitable estoppel to preclude Chapter 11 debtor from denying severance pay benefits to its employees after debtor obtained confirmation of its reorganization plan by promising severance pay. Employee Retirement Income Security Act of 1974, § 514(a), 29 U.S.C.A. § 1144(a).

**[9] Labor and Employment** ☜═407
231Hk407
(Formerly 296k130)

**[9] States** ☜═18.51
360k18.51
ERISA preemption does not shield employer from estoppel as consequence of its own inequitable or misleading conduct. Employee Retirement Income Security Act
of 1974, § 514(a), 29 U.S.C.A. § 1144(a).
 *1133 Martha L. Berry, Syracuse, NY (Hancock & Estabrook, Syracuse, NY), for debtor-appellant.

 Lee E. Woodard, Syracuse, NY (Martin, Martin, Piemonte & Woodard, Syracuse, NY), for creditors-appellees.

 Before KEARSE and LEVAL, Circuit Judges, and GLASSER, District Judge. [FN*]

> FN* Hon. I. Leo Glasser, United States District Judge for the Eastern District of New York, sitting by designation.

 LEVAL, Circuit Judge:

 This is an appeal from an order of the United States District Court for the Northern District of New York, Frederick J. Scullin, J., affirming an order of the Bankruptcy Court for the Northern District of New York, Stephen D. Gerling, B.J., denying the Debtor's motion to amend its schedules, and dismissing the Debtor's objections to portions of its former employees' proofs of claim. The order is affirmed.

 *1134 *Background*
 Appellant Momentum Manufacturing Corporation ("Debtor" or "Momentum") was a manufacturer of electrical component parts. On May 3, 1990, it filed a voluntary petition for reorganization under

Chapter 11 of the Bankruptcy Code, 11 U.S.C. §§ 1101 *et seq.* (1988) (the "Code"). The Debtor had dismissed approximately 260 of its 270 employees the day before filing its petition. Evidently hoping to continue operations, on May 14, 1990, Momentum rehired approximately 140 of the 260 recently-terminated employees.

 On June 7, 1990, the Debtor's employees established an employee creditors committee pursuant to 11 U.S.C. § 1102 (the "Committee"). Approximately two weeks later, the Debtor filed its schedule of liabilities pursuant to Section 521(1) of the Code and Fed.R.Bankr.P. 1007(b)(1). The Debtor submitted schedules of employee claims, which listed the amounts owed to employees for accrued wages, salaries, commissions, sick pay, severance pay and payment in lieu of termination. At issue in the instant appeal are employee claims for severance pay and payment in lieu of termination (hereinafter collectively referred to as "severance claims"). [FN1] In listing the severance claims on the Schedules, the Debtor did not identify them as "contested."

> FN1. The schedules of employee claims list severance payments for the approximately 120 dismissed employees who were not rehired after the May 2, 1990 layoff. Because the remaining employees were working at the time the Schedules were prepared, their claims to severance benefits were not ripe, and the Debtor did not include their names in the Schedules.

 By early September 1990, unable to continue operations, the Debtor released all but 25 employees. At approximately the same time, the Debtor filed its Original Disclosure Statement with the bankruptcy court. On November 5, 1990, pursuant to Sections 1121 and 1125(b) of the Code, the Debtor filed its Plan of Reorganization, together with an Amended Disclosure Statement. It then proceeded to solicit votes from its various creditors on its Plan of Reorganization.

 The Amended Disclosure Statement, together with other company communications, led the current and former employees to believe that under the Plan the Debtor would pay approximately $500,000 for employee severance claims of up to $2,000 per employee. The Amended Disclosure Statement stated in pertinent part:
 VI. (6) *Priority Unsecured Wage Claims*
 Class Six consists of holders of claims for wages and other benefits earned while employees of the

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

25 F.3d 1132
**(Cite as: 25 F.3d 1132, \*1134)**

Debtor.  Claims of the *current and former employees* of the Debtor that are entitled to priority under 11 U.S.C. § 507(a)(3) (earned within 90 days pre-petition *up to $2,000.00 per employee* ) *total approximately $500,000.00 as listed on Schedule A-1 prepared in May, 1990.* These claims are required by law to be paid after the First National Bank of Boston's secured claim and all administrative claims have been paid, but ahead of all other priority and unsecured claims, as the Amended Plan provides. (emphasis added.)
In listing the severance claims on the Schedules, the Debtor did not identify them as "contested."

The Debtor also represented in intra-company communications that the employees would receive money from the estate as severance pay.  For example, in a letter dated June 8, 1990, Momentum explained:

If you are terminated, then you have a claim to be paid according to company policies.... Please be aware that the Company may not have enough money to pay everybody in full.  You have a Prior[ity] Claim under the law for a payout to you of up to $2,000.  (This portion will hopefully be paid to *former* and qualifying *current* employees in the Fall.) (emphasis added.)

Several employees testified that Martin Zelbow, the former president of the company, reiterated the Debtor's intention to make severance payments during several meetings with employees.

The employees voted to approve the Plan. [FN2] The bankruptcy court confirmed the Plan on **\*1135** November 25, 1991, after a confirmation hearing. Without the employees' approval, the Plan could not have been confirmed.

> FN2. Because it was unable to continue operations, the Debtor filed a liquidating plan.

*Motion to Amend the Schedules and Objections to Employee Claims*

On January 14, 1992, soon after the court confirmed the Plan, the Debtor moved pursuant to Fed.R.Bankr.P. 1009(a) to amend its Schedules to delete the amounts allocated to employees' claims for severance pay.  The Debtor also sought to file objections to those portions of the employees' proofs of claim seeking severance payments.

Although mere listing of liabilities on the Schedules filed under Section 521(1) does not amount to a

concession that such claims are valid, the liabilities will be deemed "prima facie evidence of the validity and amount of the claims of creditors" *unless* they are listed as "disputed, contingent, or unliquidated." Fed.R.Bankr.P. 3003(b)(1).  If a debtor does not list the liabilities as contested, it must prove the invalidity of the claims.

Because Momentum did not list the severance payments as "disputed, contingent, or unliquidated," it bore the burden of proving the invalidity of such claims. It therefore sought to amend its Schedules in order to shift the burden of proof back to the employees.  The Debtor argued that it was entitled to amend the Schedules as a matter of right under Fed.R.Bankr.P. 1009(a).

In addition to seeking to amend the Schedules, the Debtor also filed objections to the employees' proofs of claim for severance payments.  *See* Fed.R.Bank.P. 3007.  The Debtor argued that it was entitled to object to the proofs of claim, even though the Plan had already been confirmed, because the court had set a deadline for filing objections 60 days after the confirmation.

*Bankruptcy Court Decision*

Concluding that the Debtor had represented in the Amended Disclosure Statement and in statements to its employees that the employees would receive payments from the estate as severance pay, and had procured the employees' vote in favor of the Plan through these representations, the bankruptcy court denied the Debtor's motion to amend the Schedules and to object to the proofs of claim on estoppel grounds. [FN3]

> FN3. The court granted the portions of the Debtor's motions seeking to limit employee priority claims to amounts earned within 90 days of the date of the Debtor's filing; it also corrected certain vacation and sick pay calculations.  The Appellant does not contest these rulings.

Regarding the motion to amend the Schedules, the court recognized that Rule 1009(a) does provide that a schedule "may be amended ... as a matter of course at any time before the case is closed."  The court emphasized, however, that the right cannot be exercised freely in all circumstances without regard to issues of bad faith and prejudicial reliance, *see In re Williamson,* 804 F.2d 1355, 1358 (5th Cir.1986); *In re Blaise,* 116 B.R. 398, 400-01 (Bankr.D.Vt.1990), and held that Momentum was

25 F.3d 1132
(Cite as: 25 F.3d 1132, *1135)

Page 180

estopped from amending its Schedules.

The bankruptcy court applied similar reasoning to the Debtor's motion to object to the proofs of claim. Just as there are equitable limitations on a Debtor's right to amend a schedule, there are also equitable limitations on a Debtor's right to object to proofs of claim. Thus, the bankruptcy court concluded that Momentum's conduct estopped it from objecting to the employees' claims.

*The District Court Decision*

On appeal, the Debtor argued that the bankruptcy court erroneously applied common law equitable principles to the case. It asserted that because its employee benefit plan was governed by the Employee Retirement Income and Security Act ("ERISA"), 29 U.S.C. § 1001 *et seq.* (1988), ERISA pre-empted the bankruptcy court's application of common law principles to restrict the Debtor's discretion under its benefit plan. Momentum contended that its company severance policy gave it broad discretion to deny payment of severance benefits, and that it could exercise this power even after the Plan had been confirmed.

The district court rejected these arguments and affirmed the holding of the bankruptcy court. The Debtor brought this appeal.

**\*1136 Discussion**

[1][2] An order of a district court functioning in its capacity as an appellate court in a bankruptcy case is subject to plenary review. Thus, we "independently review the factual determinations and legal conclusions of the bankruptcy court." *In re PCH Assoc.,* 949 F.2d 585, 597 (2d Cir.1991) (citation omitted). The bankruptcy court's legal conclusions are evaluated *de novo;* its findings of fact are subject to a clearly erroneous standard. *Id.*

Momentum contends that it was improper for the bankruptcy court to prevent it from a) amending its Schedules to delete employee severance claims, and b) objecting to the employee proofs of claim for severance payments. We disagree. In our view, the bankruptcy judge and district judge properly invoked their equitable powers and relied on the principle of equitable estoppel to bar the Debtor from taking these positions.

*I. Use of Equitable Principles in Reorganization*

[3] It is well settled that bankruptcy courts are courts of equity, empowered to invoke equitable principles to achieve fairness and justice in the reorganization process. Section 105(a) of the Code provides that "[t]he court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title."

[4] We have repeatedly emphasized the importance of the bankruptcy court's equitable power. In *In re Prudential Lines Inc.,* 928 F.2d 565 (2d Cir.), *cert. denied,* 502 U.S. 821, 112 S.Ct. 82, 116 L.Ed.2d 55 (1991), we explained that Section 105(a) should be " 'construed liberally to enjoin [actions] that might impede the reorganization process.' " [FN4] *Id.* at 574 (brackets in original; citation omitted). We have also stressed that a bankruptcy court

> FN4. This power is not unlimited. Thus, a bankruptcy court may not exercise this power in contravention of provisions of the Code. *See In re Joint Eastern & Southern Dist. Asbestos Litig.,* 982 F.2d 721, 751 (2d Cir.1992) ("equitable considerations ... not a license to courts to invent remedies that overstep statutory limitations").

"may sift the circumstances surrounding any claim in order to ascertain that injustice or unfairness is not accomplished in the administration of the debtor's estate, and in so doing it may adopt that remedy which it deems most appropriate under the circumstances."
*In re Stirling Homex Corp.,* 591 F.2d 148, 155-56 (2d Cir.1978) (quoting 6 Collier, *On Bankruptcy* ¶ 3.17 (14th ed. 1978)). *See also In re Sire Plan, Inc.,* 100 B.R. 690, 694 (Bankr.S.D.N.Y.1989).

[5] Of prime importance in the reorganization process is the principle of disclosure. The Code obliges a Debtor to engage in full and fair disclosure, providing to creditors "information of a kind, and in sufficient detail, as far as is reasonably practicable ... that would enable a hypothetical reasonable investor typical of holders of claims or interests of the relevant class to make an informed judgment about the plan...." 11 U.S.C. § 1125(a)(1). This disclosure requirement does not attach only to the preparation of disclosure statements. "Full and fair" disclosure is required during the *entire* reorganization process; it begins "on day one, with the filing of the Chapter 11 petition." *In re V. Savino Oil & Heating Co.,* 99 B.R. 518, 526 (Bankr.E.D.N.Y.1989).

[6][7] Consistent with these equitable principles,

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

the courts below properly applied the doctrine of equitable estoppel. To prevail on their claim of equitable estoppel, the employees were required to show that when they voted on the Plan, they (1) lacked knowledge of the true facts, (2) reasonably relied on the Debtor's misleading conduct, and (3) suffered prejudice as a result of their reliance. *See In re Roundabout Theatre Co.,* 131 B.R. 14, 17 (S.D.N.Y.1991). We believe the employees met their burden.

The Amended Disclosure Statement fairly communicated the Debtor's intention to pay under the Plan approximately $500,000 "in severance pay, earned within 90 days of the petition, to a maximum of $2,000 per employee." The Debtor continued to convey this impression through the confirmation hearing. The evidence showed that, notwithstanding such representations, the Debtor had intended to deny such benefits from the inception of the Chapter 11 case. For example, at the *1137 hearing on Momentum's motion to amend, Momentum's Vice President for Finance testified that when Momentum filed the original schedule, it had already decided not to provide severance payments. And although Momentum filed the applications at issue here two months after confirmation, its counsel had researched amending the schedules a month before the plan was confirmed.

The evidence showed furthermore that the employees relied on Momentum's misleading representations and suffered prejudice as a result: several employees testified that they would not have voted for the Plan had they been aware that the Debtor intended to reject their pension claims. [FN5] Had the employees rejected the Plan, the Plan would never have been approved.

FN5. Momentum argues that the employees who continued to work after the Schedules were filed were not entitled to rely on the Schedules as a basis for expecting to receive benefits from the estate. Momentum contends that to the extent the Schedules could be relied on by anyone, only the employees whose severance payments were included in the Schedules would be permitted to have any expectation arising out of the Schedules. We disagree. The Schedules referred to "current and former employees." Moreover, the only reason the employees who had been rehired were not included in the original Schedules is that their continued employment meant that their severance claims had not ripened. Finally, the Committee had produced other evidence that justified all of the

employees' expectation that they would receive severance payments.

Based on the Debtor's deceptive misrepresentation of its intention to deny severance payments, the district court justifiably found that the employees reasonably believed they would be receiving severance payments under the Plan and that the Debtor's conduct engendered this belief. Moreover, we are satisfied by the court's finding that the employees suffered prejudice as a result of their reliance on the Debtor's conduct.

We are convinced that the bankruptcy court's denial of the Debtor's motion to amend its Schedules and to file objections was a valid exercise of its equitable powers, reflecting a well-founded concern that the Debtor had engaged in deception rather than disclosure, [FN6] and that the employees had suffered prejudice thereby. The Debtor had breached its obligation to engage in "full and fair" disclosure; the court fashioned an appropriate remedy.

FN6. Because the court applied the same equitable principles to both the motion to amend the Schedules *and* the motion to object to the proof of claims, we consider the rejection of these applications together.

II. *ERISA and Pre-emption*

[8] Section 1144(a) of ERISA states that "the provisions of this subchapter … shall supersede any and all State laws insofar as they may now or hereafter relate to any employee benefit plan described in section 1003(a) of this title…." 29 U.S.C. § 1144(a). Arguing that its severance plan is an ERISA "employee benefit plan," the Debtor asserts that ERISA pre-empts the application of common law and equitable doctrines. Thus, Momentum argues that the bankruptcy court was precluded from using equitable doctrines to estop the Debtor from administering its Plan in accordance with ERISA. This argument is frivolous.

[9] The determinations made by the courts below did not supersede or interfere with the primacy of ERISA. ERISA does indeed supplant other law in the interpretation of the Plan and the determination of employee benefits under it. It does not follow that an employer is shielded from estoppel as a consequence of its own inequitable or misleading

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

conduct. This court and the courts below have not interpreted the Plan under any laws other than the governing law. They have simply barred the Debtor in litigation from asserting otherwise lawful positions where the Debtor's prior misleading conduct would make such an assertion inequitable. *See National Companies Health Benefit Plan v. St. Joseph's Hosp. of Atlanta,* 929 F.2d 1558, 1571-74 (11th Cir.1991) (equitable estoppel applies where employees relied on company representative's interpretation of pension plan).

*Conclusion*

The judgment of the district court is affirmed.

25 F.3d 1132, 63 USLW 2015, 31 Collier Bankr.Cas.2d 209, 25 Bankr.Ct.Dec. 1213, Bankr. L. Rep. P 75,943, 18 Employee Benefits Cas. 1571, Pens. Plan Guide (CCH) P 23899E

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# TAB 39

647 F.Supp. 671                                                                Page 371
647 F.Supp. 671, 25 ERC 1437
(Cite as: 647 F.Supp. 671)
H

United States District Court,
D. Connecticut.
MUMFORD COVE ASSOCIATION, INC., et
al., Plaintiffs,
Stanley J. Pac, Commissioner of Environmental
Protection, Plaintiff-Intervenor,
v.
The TOWN OF GROTON, CONNECTICUT,
Defendant.
The MUMFORD COVE ASSOCIATION, INC.,
et al., and Stanley J. Pac, Commissioner of
Environmental Protection, Plaintiffs,
v.
The CITY OF GROTON, CONNECTICUT;
Catherine J. Kolnaski, Mayor; The Groton
City Council, Diane Contino, Biagio Donatelli,
Eleanor Gergen, George Gregory,
Jr., Jack Kelley, Peter Racich, Jr.; the City of
Groton Conservation
Commission, Longene J. Chmura, Chairman,
William C. Spicer, Jr., Anthony Skiff,
Lorraine Santangelo, Winnifred Bonney, Thomas
Filburn, Doris Donatelli; the
City of Groton Planning and Zoning
Commission, Waldren Higgins, Betsy Gibson,
Harry Santangelo, Phillip Bergeron, Richard
Kowaleski, Arthur Greenleaf, III,
James Contino, Eugene T. Ramsey, Deborah
Dey; City of Groton Harbor Management
Commission, John Spicer, Chairman, Edward
Sheer, Thomas Clay, Frederic
Franzius, Zene Gergen, David J. Franco, Frank
Scheetz; Frank Varella, City of
Groton Highway Superintendent and Tree
Warden; Elliot Barnes, City of Groton
Zoning and Building Official; William Clinton,
City of Groton Director of
Utilities; and the Town of Groton, Connecticut,
Defendants to the Order to
Show Cause.
Civ. A. No. H 84-1256 (JAC).

Oct. 29, 1986.

Action was brought seeking injunctive relief against
city, local conservation commission, town, and
numerous individuals, seeking to prevent any
further interference with construction of sewer
outfall in accordance with District Court's prior
order. The District Court, Jose A Cabranes, J.,
held that: (1) district court had jurisdiction to

review local conservation commission's denial of
inland wetlands permit; (2) abstention was not
mandated; (3) district court had authority to enjoin
any city administrative agency which in effect
prevented, or purported to prevent, conduct
necessary to comply with court's prior order; (4)
local conservation commission acted outside its
regulatory jurisdiction by attempting to regulate
town's effluent discharges and its decision to deny
inland wetlands permit was arbitrary, capricious and
unsupported by evidence; (5) stay of matter
pending further action by city or conservation
commission was neither necessary nor appropriate;
and (6) bypassing of normal planning and zoning
procedures to protect and effectuate court's
jurisdiction was required.

Order accordingly.

West Headnotes

[1] Administrative Law and Procedure ⟨⟩701
15Ak701

[1] Environmental Law ⟨⟩640
149Ek640
        (Formerly 199k25.15(3.2)     Health and
Environment)
District court could review local conservation
commission's denial of inland wetlands permit to
town, required by district court order mandating
that town undertake whatever action was necessary
to construct sewer outfall through city to direct
discharges from town's sewage treatment plant in
accordance with town's national pollutant discharge
elimination system permit, where city, its agencies,
officials or residents and other persons had
attempted, and would continue to attempt, to
frustrate court's order.

[2] Federal Courts ⟨⟩54
170Bk54
Principles of comity and federalism did not require
district court abstention of action seeking to enjoin
city, local conservation commission and others from
further interference with construction of sewer
outfall in accordance with district court orders,
where state was firmly aligned with parties invoking
federal law, conservation commission's response to
town's request for permit was designed to frustrate
and obstruct authority of federal court, and even if
state court did review conservation commission's

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

647 F.Supp. 671
**(Cite as: 647 F.Supp. 671)**

Page 372

action under expedited schedule, delay would still effectively preclude compliance with schedule imposed by district court order.

**[3] Federal Courts ⬙10.1**
170Bk10.1
        (Formerly 170Bk10)
Motion for injunction seeking to prevent any further interference with construction of sewer outfall in accordance with prior court order pursuant to All Writs Act was not governed by requirements of Federal Civil Rule governing injunctions. Fed.Rules Civ.Proc.Rule 65, 28 U.S.C.A.; 28 U.S.C.A. § 1651.

**[4] Federal Civil Procedure ⬙2582**
170Ak2582
District court has broad discretion to fashion remedies that will protect and effectuate its judgments, particularly when public interest is involved.

**[5] Injunction ⬙192**
212k192
Persons who are not parties to original action may be enjoined from interfering with implementation of court orders which establish and protect public right.

**[6] Courts ⬙508(1)**
106k508(1)
District court need not wait for final judgment by state court before acting to protect its own decrees.

**[7] Environmental Law ⬙700**
149Ek700
        (Formerly 199k25.15(2.1),  199k25.15(2) Health and Environment)
District court had authority to enjoin any city administrative agency which in effect prevented, or purported to prevent, conduct necessary to comply with court's order requiring town to undertake whatever action was necessary to construct sewer outfall through city to direct discharges from town's sewer treatment plant in accordance with town's national pollutant discharge elimination system permit.

**[8] Administrative Law and Procedure ⬙500**
15Ak500

**[8] Environmental Law ⬙221**
149Ek221
        (Formerly  199k25.7(14)        Health and

Environment)
City and its agencies could not relitigate, under pretense of local regulation, Connecticut Department of Environmental Protection order which called for completion of sewer outfall to direct discharges from town's sewer treatment plant, nor could city, by challenging outfall in diverse local, state, and federal fora, collaterally attack state mandate to construct outfall through city, where order was final and not subject to collateral attack.

**[9] Environmental Law ⬙135**
149Ek135
        (Formerly  199k25.7(2)        Health and Environment)

**[9] Environmental Law ⬙179**
149Ek179
        (Formerly  199k25.7(2)        Health and Environment)
Under Connecticut law, city had no authority to regulate discharge of pollution from municipal waste water treatment plant; thus, local conservation commission acted outside its regulatory jurisdiction by attempting to regulate town's effluent discharge, and its decision to deny inland wetlands permit was arbitrary, capricious and unsupported by evidence.

**[10] Action ⬙69(6)**
13k69(6)
Stay of action seeking injunction against city, local conservation commission and others to prevent any further interference with construction of sewer outfall in accordance with district court's order was neither necessary nor appropriate, where conservation commission's reason for denying town's application for wetland permit arose from commission's objection to outfall's effluent discharge, and any further proceedings before commission would be inconsistent with schedule for construction of outfall required by court's order to remedy violations of federal law.

**[11] Environmental Law ⬙634**
149Ek634
        (Formerly  199k25.15(12)        Health and Environment)
Bypassing of normal planning and zoning procedures to protect and effectuate court's jurisdiction was necessary, where city's planning and zoning commission would effectively be required by municipal coastal program of city to

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

647 F.Supp. 671
**(Cite as: 647 F.Supp. 671)**

                 **Page 373**

deny coastal area management site plan approval claimed by city to be required, and such denial would conflict with Connecticut Department of Environmental Protection order and would further frustrate implementation of district court's order requiring compliance with federal Clean Water Act. Federal Water Pollution Control Act Amendments of 1972, § 101 et seq., 33 U.S.C.A. § 1251 et seq.

  **\*673** Mark R. Sussman, Charles Yuen, Murtha, Cullina, Richter & Pinney, Hartford, Conn., for plaintiffs, The Mumford Cove Ass'n and Its Individually-Named Members.

  Richard F. Webb, Asst. Atty. Gen., State of Conn., Hartford, Conn., for plaintiff-intervenor Stanley J. Pac, Com'r, Dept. of Environmental Protection.

  Gregory A. Sharp, Sharp & Berger, Hartford, Conn., James F. Brennan, Suisman, Shapiro, Wool, Brennan, Gray & Faulkner, P.C., New London, Conn., for defendant Town of Groton.

  Kathleen Eldergill, Beck & Eldergill, Manchester, Conn., for City of Groton, et al., defendants to the Order to Show Cause.

  Timothy D. Bates, Copp, Berall & Hempstead, New London, Conn., for defendant Conservation Com'n of the City of Groton, et al.

  Philip Tuthill (House of Representatives, State of Conn.), amicus curiae, pro se.

MEMORANDUM OF DECISION AND ORDER

JOSE A. CABRANES, District Judge:

  Since 1974, when the Town of Groton (the "Town") replaced a smaller sewage treatment plant with a large one, the Town has been discharging effluent into Fort Hill Brook, upstream from Mumford Cove. These discharges have "changed Mumford Cove from a tidal saltwater embayment, abounding in diverse plant and animal life and fit for human use, into a brackish water choked monoculture of algae excluding beneficial aquatic plant life." *Mumford Cove Association v. Town of Groton,* 786 F.2d 530, 532 (2d Cir.1986). On November 30, 1984, the Mumford Cove Association and its individually-named members (the **\*674** "Association") brought suit pursuant to the citizens' suit provisions of the Clean Water Act, 33 U.S.C. § 1365 (the "Act"). In their action for

declarative and injunctive relief the Association sought to compel the Town of Groton to comply with a National Pollutant Discharge Elimination System ("NPDES") permit issued by the Connecticut Department of Environmental Protection ("DEP") under authority granted by the Federal Environmental Protection Agency ("EPA"). One condition of the NPDES permit required the Town to comply with DEP Order No. 964, which called for the completion of a sewer outfall to direct discharges from the Town's sewage treatment plant to the Thames River by no later than October 31, 1979.

  In February 1985, Stanley J. Pac, the Commissioner of the DEP, successfully moved to intervene as a party-plaintiff. [FN1] In the same month, the City of Groton (the "City") and the City of New London (jointly, the "Cities") moved to intervene as defendants. This court denied the Cities' motions to intervene on April 29, 1985, holding that DEP Order No. 964 was final and could not be collaterally attacked. The Cities were permitted, however, to participate in this action as *amici curiae* and were served with copies of all filings in this case. *See Mumford Cove Association, Inc. v. Town of Groton,* 640 F.Supp. 392, 393 n. 1 (D.Conn.1986) (relevant procedural background described). This court's denial of the Cities' motion to intervene was affirmed by the Court of Appeals on March 20, 1986. *Mumford Cove Association v. Town of Groton,* 786 F.2d 530 (2d Cir.1986).

> FN1. For a general description of the respective roles of state and federal agencies under the Federal Clean Water Act, *see Mumford Cove Association v. Town of Groton,* 786 F.2d 530, 534 (2d Cir.1986).

  In a ruling of February 26, 1986, this court granted partial summary judgment for the plaintiffs on their federal claims, *see* Counts I and II of the Amended Complaint (filed May 9, 1985), based, *inter alia,* upon its findings that

> [i]t is undisputed that the defendant failed to comply with the effluent limitations and reporting requirements of its NPDES permit on 1,902 days between December 1, 1979, and December 31, 1985. It is also undisputed that the defendant has been in constant violation of its NPDES permit and [DEP] Order No. 964 since at least December 1, 1979, for having failed to construct the proposed sewer outfall. The defendant has

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

offered the court no basis to excuse any of these
violations of the Clean Water Act.
*Mumford Cove Association, Inc. v. Town of
Groton,* 640 F.Supp. 392, 397 (D.Conn. 1986) (the
"Ruling").

In granting partial summary judgment for plaintiff
on its federal claims, this court required the parties
to submit a proposed order to effectuate its Ruling.
After further briefing and argument by the parties
and *amici curiae,* the court on June 10, 1986
formally entered an order granting plaintiffs the
relief they requested (the "June 10, 1986 Order").

The June 10, 1986 Order required the Town to
undertake whatever action is necessary to construct
a sewer outfall through the City to direct discharges
from the Town's sewage treatment plant to the
Thames River, in accordance with the Town's
NPDES permit and DEP Order No. 964 and a
stated timetable.

Paragraph 6 of the order stated, in full:
*FURTHER INJUNCTIVE RELIEF.* Defendant,
Town of Groton, its officers, agents, servants,
employees, and attorneys and all persons, boards,
agencies, commissions, subdivisions, firms and
corporations in active concert or participation with
it who receive actual notice of this Order by
personal service or otherwise are hereby enjoined
from taking any action including, without
limitation, complying with any local or state
orders or rulings purporting to or tending to stay
or enjoin actions required by this Order, which
would frustrate or impede effectuation of this
Order or compliance with the Federal Clean
Water Act.

*675 In paragraph 7(c) of the June 10, 1986 Order,
the court retained jurisdiction, *inter alia,*
to issue such orders as are necessary or
appropriate to effectuate and protect this Order
and compliance with the Federal Clean Water
Act, and prevent interference by any person with
this Court's Order; and to issue such orders as
are necessary or appropriate in aid of this Court's
jurisdiction.

Copies of the June 10, 1986 Order were served on
the City, its chief executive officer, the City
Conservation Commission (the "Conservation
Commission"), the City Harbor Management
Commission, Anthony Skiff, William C. Spicer, Jr.
and State Representative Philip Tuthill, among

others. In addition, a legal notice advising the
public that the June 10, 1986 Order was available
for inspection at the City Clerk's office and other
locations was published in the area's principal
newspaper, *The New London Day.*

In response to this court's orders, the Town has
taken several steps in an effort to build the required
outfall in accordance with the schedule laid out in
the June 10, 1986 Order. One of these steps was
the application for a so-called inland wetlands
permit from the Conservation Commission, a local
board empowered under C.G.S. § 22a-42(c) to
promulgate regulations "to protect the wetlands and
watercourses within its territorial limits." After
two hearings, at which only the Town presented
expert testimony, the Conservation Commission on
July 1, 1986 voted unanimously to deny the Town's
application.

In response to this and other developments,
plaintiffs have filed motions for injunctive relief
against the City, the Conservation Commission, the
Town, and numerous individuals. These latest
motions are designed to prevent any further
interference with the construction of the sewer
outfall in accordance with this court's June 10, 1986
Order. On August 12, 1986, this court entered an
Order to Show Cause why an injunction should not
enter enjoining the City, the Conservation
Commission, the Town and a number of other
persons, as requested in plaintiffs' motions. [FN2]

FN2. It should be noted, however, that although
the Town is still nominally the defendant in the
main action and is a named defendant on the
current motion for injunctive relief, the Town is
now in full agreement that, unless enjoined, the
City of Groton, its agents, and other individuals
associated with the City and its agencies will
continue to take actions designed to frustrate its
compliance with this court's June 10, 1986 Order.
Accordingly, at the hearings on the Order to Show
Cause (filed Aug. 12, 1986), the Town was
effectively aligned as a party-plaintiff.

In response to the Order to Show Cause, extensive
briefs and exhibits were submitted to this court,
including the entire record of the Conservation
Commission's decision of July 1, 1986.
Evidentiary hearings were held on September 17,
1986 and September 24, 1986, at which the court
heard the testimony of three witnesses: William
Blanker, Director of Public Works for the Town;
Robert J. Norwood, an engineer with the DEP; and

William C. Spicer, Jr., a member of the Conservation Commission and the Chairman *pro tem* at the time of the hearings on the Town's application. Extensive argument was also heard from counsel and others who entered an appearance.

The court now enters the following findings of fact and conclusions of law, in accordance with Rule 52, Fed.R.Civ.P.

## FINDINGS OF FACT
### History of this Litigation

1. On November 30, 1984, the Association brought this civil action against the Town pursuant to section 505 of the Act, 33 U.S.C. § 1365. Stanley J. Pac, Commissioner of the DEP, successfully moved to intervene as a party-plaintiff in February 1985. (The Association, its individually-named members, and the DEP are collectively referred to herein as "plaintiffs").

2. On February 22, 1985, the City, at that time joined by the City of New London, simultaneously filed a Motion for Leave to Intervene as defendants and a motion to *676 dismiss the Association's complaint on the grounds that enforcement of DEP Order No. 964, which directs construction of a sewer outfall through the City to the Thames River, was not ripe.

3. On April 29, 1985, this court denied the Cities' motion to intervene as defendants, holding that DEP Order No. 964 was final and could not be collaterally attacked, and that the consideration of alternatives for purposes of federal construction grants has no relation to enforcement of the Town's NPDES permit. The Cities were permitted, however, to participate in this action as *amici curiae* and were served with copies of all filings made in this case. *See* Ruling, 640 F.Supp. at 393 n. 1; Certified Official Transcript of April 29, 1985 Hearing (filed May 23, 1985) ("4/29/85 Tr.").

4. The Cities appealed this court's order denying their motion to intervene to the United States Court of Appeals, which on March 20, 1986 affirmed this court's order. *Mumford Cove Association v. Town of Groton*, 786 F.2d 530 (2d Cir.1986). The Court of Appeals agreed with this court that DEP Order No. 964 is final and not now subject to collateral attack. 786 F.2d at 534- 535. Moreover, the Court of Appeals rejected the Cities' argument that the state order was not entitled to full faith and

credit under 28 U.S.C. § 1738, declaring that
> [t]he Cities[ ] may not "bootstrap" themselves into a more advantageous position and--by failing to seek state review of an adverse decision--be allowed to argue that the administrative Order is subject to challenge in federal court, when such attack otherwise would have been precluded.

786 F.2d at 535 (citations omitted). Finally, the Court of Appeals found, on the record of this case, that the DEP adequately protects the Cities' interest in the quality of the Thames River. *Id.*

5. On May 9, 1986, the Court of Appeals granted the Association's motion for an award of attorney's fees against the Cities and remanded that matter to this court for a determination of the appropriate amount of such fees.

6. While the Cities' appeal to the Court of Appeals was pending, plaintiffs moved for summary judgment on their claims that the Town had violated the Act in the past, and was continuing to, violate the Act by failing to construct a new sewer outfall to the Thames River and by exceeding certain effluent limitations in the Town's NPDES permit. Amended Complaint (filed May 9, 1985), Counts I and II.

7. On December 3, 1985, counsel for the Cities requested the court to extend the time for responding to plaintiffs' motions for summary judgment until two weeks after the issuance of the decision of the Court of Appeals on the Cities' appeal. The court denied the Cities' request on December 17, 1985. Although the Cities received copies of the motions and supporting documents, as well as the calendar setting the date for argument, the Cities declined to file any memoranda of law with respect to the motions or to participate in oral argument.

8. This court granted plaintiffs' motions for summary judgment on Counts I and II of the Amended Complaint in the Ruling entered on February 26, 1986. 640 F.Supp. 392 (D.Conn.1986). The court held, in part, that the Town "has been in constant violation of its NPDES permit and [DEP] Order No. 964 since at least December 1, 1979, for having failed to construct the proposed sewer outfall" to the Thames River. *Id.* at 397. The court directed the Town "to undertake whatever action is necessary to achieve full compliance with its NPDES permit and [DEP] Order No. 964 as expeditiously as possible," and

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

directed the parties to submit a proposed order effectuating its Ruling. *Id.*

9. In its Ruling, this court also rejected the Town's argument that it could not construct the outfall through the City without the City's consent:

the suit asks that the defendant be required to comply with a valid order of the Commissioner of Environmental Protection of the State of Connecticut. *677 There is nothing in Conn.Gen.Stat. § 7-246 that even purports to limit the power of the State of Connecticut to order a town to construct an outfall through the territory of one of its subdivisions.

*Id.*

10. On March 21, 1986, the court held oral argument on the proposed order effectuating its Ruling. At that hearing, the cities appeared through counsel to object to the proposed order. *See* Certified Official Transcript of March 21, 1986 Hearing (filed April 15, 1986). At the cities' request, the cities and the other parties were allowed to file briefs concerning the proposed order, and an additional hearing was held on June 10, 1986, at which the court further considered the arguments of the cities in opposition to the proposed order. *See* Certified Official Transcript of June 10, 1986 Hearing (filed June 17, 1986).

11. Among the Cities' objections to the order was their claim that DEP Order No. 964 does not require construction of a sewer outfall through the City to the Thames River. Memorandum of Law of the City of Groton and the City of New London in Opposition to the Proposed Order Dated April 1, 1986 (filed April 7, 1986) at 9-10. The court rejected this argument because the City had previously conceded that DEP Order No. 964 required construction of an outfall through the City. *See* 4/29/85 Tr. at 5-7. Furthermore, the undisputed Affidavit of Fred S. Banach confirms that the route selected by the Town is consistent with DEP Order No. 964 and "in terms of point of entry into the Thames River, is virtually identical to Alternate II, Route C" of the Hayden and Harding outfall report that is referred to in DEP Order No. 964. Affidavit of Fred S. Banach (dated April 14, 1986), *attached to* Plaintiffs' Memorandum of Law in Support of Proposed Order Effectuating the Court's Ruling on Motions for Partial Summary Judgment (filed April 14, 1986) at 4. Indeed, the entire record of this case demonstrates that the City has known for years that DEP Order No. 964

mandates construction of an outfall through the City to the Thames River.

12. On June 10, 1986, this court orally entered an order, entered in typescript form on June 12, 1986, effectuating its Ruling that the Town has been in continuing violation of the Act (the two versions of the order are referred to herein as "the June 10, 1986 Order"). The court's June 10, 1986 Order sets forth detailed compliance schedules, requiring the Town: (a) to construct a sewer outfall through the City to direct the discharges from the Town's sewage treatment plant to the Thames River in accordance with the Town's NPDES permit and DEP Order No. 964, and (b) to achieve full compliance with its NPDES permit.

13. The June 10, 1986 Order further enjoins the "Town of Groton, its officers, agents, servants, employees and attorneys and all persons, boards, agencies, commissions, subdivisions, firms and corporations in active concert or participation with it who receive actual notice of this Order ... from taking any action, including without limitation, complying with any local or state orders or rulings purporting to or tending to stay or enjoin actions required by this Order, which would frustrate or impede effectuation of this Order or compliance with the federal Clean Water Act." June 10, 1986 Order, ¶ 6.

14. Copies of the June 10, 1986 Order were served on the City, its chief executive officer, the City Conservation and Harbor Management Commissions, Anthony Skiff, William C. Spicer, Jr. and State Representative Philip Tuthill, among others. In addition, a legal notice advising the public that the June 10, 1986 Order was available for inspection at the Clerk's Office of the City and at other locations was published in *The New London Day*. June 10, 1986 Order, ¶ 8.

The City's Opposition to the Thames River Outfall

15. The City of Groton is a political subdivision of the defendant Town of Groton. The City's residents are citizens of the Town and vote to elect the Town's governing representatives. The Charter of *678 the City of Groton, Article 1, Section 3, provides that "[t]he inhabitants of the Town of Groton domiciled within the limits designated in section one [the corporate limits of the City of Groton] shall be entitled to all the privileges and subject to all the burdens of said town in the same manner and to the same extent as though this act

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

647 F.Supp. 671
**(Cite as: 647 F.Supp. 671, \*678)**

Page 377

were not in effect." Record Ex. G-100. The Court of Appeals concluded that "inasmuch as the City of Groton is a subdivision within the Town its interests ... appear adequately protected by that municipality." *Mumford Cove Association v. Town of Groton, supra,* 786 F.2d at 535.

16. The City has opposed construction of the Thames River outfall since the DEP first ordered the Town to construct the outfall in 1975. In June 1975, the City and the Town requested an administrative hearing on DEP Order No. 964 Modified, which required construction of the outfall to the Thames River. Defendant City of Groton's ("D's") Ex. A. After consideration of the evidence, the hearing officer approved, and the Commissioner of DEP affirmed, the order directing construction of the Thames River outfall. *Id.* (Copies of DEP Order No. 964, each of its modifications and the DEP's final decision are annexed as exhibits to the Affidavit of Robert Norwood (dated May 29, 1985), submitted in support of Plaintiffs' Motion for Partial Summary Judgment on the Second Count (filed May 29, 1985)).

17. In 1979, in response to inquiries made by the City, the DEP reaffirmed that the administrative appeal process had been exhausted and that the Thames River had been chosen as the acceptable discharge location. *See* Affidavit of Fred S. Banach (dated March 14, 1985) (post-hearing summary, p. 3), *attached as Exhibit 3 to* Joint Memorandum In Opposition To Motion of the City of Groton for Leave To Intervene (filed March 15, 1985).

18. On January 10, 1980, the City Conservation Commission wrote to the Connecticut Department of Agriculture, the Connecticut Department of Health, and the U.S. Fish and Wildlife Service seeking support in opposing an outfall to the Thames River. Record Exs. H-3, H-4, H-5.

19. On February 5, 1980, the City's Conservation Commission unanimously voted to return the Town's application to construct the sewer outfall through a red maple swamp in the City. The Conservation Commission asserted that it was returning the application because it was incomplete. Record Ex. H-11. Two days later, the Mayor of the City commended the Conservation Commission for its "extraordinary efforts assisting us in discouraging the State mandated sewer outfall route through the City of Groton." Record Ex. H-12.

20. On November 2, 1982, the City's Conservation Commission unanimously voted to submit comments to the Town's Water Pollution Control Authority ("WPCA") objecting to the construction of an outfall to the Thames River, and recommending that "no further consideration be given to removal of the outfall from Fort Hill Brook...." Record Exs. H-21, H-22.

21. The Town's WPCA held a public hearing on November 16, 1982 to solicit comments on the Thames River outfall. Plaintiff's ("P.'s") Ex. 3. At that hearing Anthony Skiff, one-time Deputy Mayor under Mayor Kolnaski, coordinated the City's opposition to the outfall at the request of the Mayor of the City. Skiff stated in that hearing that the City is "unalterably opposed to any outfall terminating in the Thames River." P.'s Ex. 3 at 64-65.

22. In October 1982, the City, alleging that the outfall would cause unreasonable pollution, filed an intervention petition with the DEP. P.'s Ex. 2. On November 19, 1982, the City, through its attorneys, formally requested that the DEP review the continued viability of DEP Order No. 964 and "that any further consideration of the Thames River outfall project be suspended pending that determination." P.'s Ex. 4.

23. The opposition of the City to the Thames River outfall runs so deep that it has been institutionalized in the City's Municipal Coastal Program ("MCP") purportedly adopted under the Coastal Management *679 Act, Conn.Gen.Stat. § 22a-90 et seq.; *see e.g.,* §§ 22a-101, 22a-104. The City's MCP includes the following goal and policy:
> Adamantly oppose the construction of the proposed Town of Groton sewer outfall through the City which will discharge into the Thames River.

P.'s Ex. 1 at VII-3. According to the MCP, any "future development within the Groton coastal zone must satisfy both state and *local* policies." (emphasis added) *Id.* at VII-1.

24. Following the issuance of this court's temporary restraining order on June 12, 1985, directing, *inter alia,* the parties to meet to attempt to settle this action, the Town redesigned the outfall route to move the discharge approximately 4000 feet to the north and to avoid completely any inland wetlands in the City. *See* Certified Official

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

647 F.Supp. 671
**(Cite as: 647 F.Supp. 671, \*679)**

Page 378

Transcript of September 17, 1986 Hearing (filed September 29, 1986) ("9/17/86 Tr.") (testimony of Walter Blanker). The Town's WPCA held another public hearing on this outfall route, known as the Electric Boat route, on December 10, 1985. P.'s Ex. 6 (transcript of hearing).

25. At the December 10, 1985 public hearing, Ms. Kathleen Eldergill, counsel for the cities publicly stated to the Town's WPCA, in behalf of the Cities, that "no outfall is ever going to be built without the cooperation of those cities." P.'s Ex. 6 at 24. Ms. Eldergill also declared that if the Town builds the Thames River outfall, the Town will be

   trading one lawsuit for another, because the City of Groton and the City of New London are going to have just as much right as the people in Mumford Cove to go into Federal Court and file lawsuits saying, "We don't want the outfall here." *Id.* at 25-26. Ms. Eldergill concluded her remarks with the following statement:
   One of the costs the Town should be taking into consideration is the cost of doing battle with the people of the City of New London, the City of Groton, if they intend to build the sewer outfall through the E.B. route. Because contrary to what the report says, *the cities are opposed to that route, will be opposed, and will do everything in their power to prevent that being built.*
   *Id.* at 30. (emphasis supplied)

26. Anthony Skiff also appeared at the December 10, 1985 hearing and stated that the route to the Thames River is "objectionable, unfair and impossible." He stated that "we would fight it [the outfall] to the bitter end." P.'s Ex. 6 at 62.

27. Prior to the December 10, 1985 hearing of the Town's WPCA, the City Conservation Commission voted unanimously to oppose the outfall at the WPCA hearing. Record Ex. H-21. L.J. Chmura, Chairman of the Conservation Commission, identified numerous City, state and federal permits that would be needed to build the outfall, and stated "of course, a law suit from the City is inevitable." P.'s Ex. 6 at 75. William C. Spicer, Jr., Conservation Commission member and its occasional chairman *pro tem,* also attacked the projected outfall. P.'s Ex. 6 at 55-62.

28. Following the December 10, 1985 hearing of the Town's WPCA, the Mayor of the City wrote a letter to William C. Spicer, Jr., to thank him for his support at the hearing on the Thames River outfall,

stating: "Your time and support in opposing any outfall going into the Thames will help the City in keeping the outfall out of the City and from going into the Thames.... The City will do everything in its power to protect our City and our river." P.s' Ex. 7.

29. On December 16, 1985, the City of Groton City Council unanimously passed the following resolution opposing the Thames River outfall:

RESOLUTION OPPOSING AND
DISAPPROVING A SEWER OUTFALL COMING
THROUGH CITY TO
EMPTY INTO THAMES
WHEREAS, the sewer outfall into the Thames River may pollute coastal areas and local beaches, and
**\*680** WHEREAS, the health, safety and welfare of all Groton residents must be protected, and
WHEREAS, our rivers, beaches and waterways must be preserved and upgraded, and,
WHEREAS, the Mayor and Council and City residents will continue to do all in our power to prevent the outfall from going into the Thames River,
THEREFORE BE IT RESOLVED that the Mayor and Council oppose and disapprove a sewer outfall coming through the City to empty into the Thames.
P.'s Ex. 8. The Mayor wrote to the Governor to express that opposition. *Id.*

30. The City of Groton, its Mayor, its Conservation Commission, and its Harbor Management Commission, and Anthony Skiff and William C. Spicer, Jr., intervened before the DEP to oppose the Town's application to the DEP for a water resources permit to construct the outfall. P.'s Exs. 11, 16. At hearings on January 16, 1986 and February 4, 1986, the City, its agencies and officials argued, *inter alia,* that the DEP had to reconsider alternatives to the outfall, including the use of advanced wastewater treatment. P.'s Ex. 16, Final Decision at 2; *see also* Conservation Commission Brief to the DEP, Record Ex. H-48. The Commissioner of the DEP rejected the City's arguments, finding that the "environmental effects of this activity are minimal." The Commissioner also found that the project is a facility in the national interest, as defined in the Coastal Management Act, Conn.Gen.Stat. § 22a-93(14)(D), and is consistent with the goals and policies of that state statute. P.'s Exs. 16 at 2.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

31. On December 31, 1985, the City also wrote to the U.S. Army Corps of Engineers to object to the issuance of a Corps structures permit for the outfall, once again objecting to "inadequate consideration of all feasible alternatives." Record Ex. H-34.

32. The City and its Conservation Commission each provided opposing comments to the DEP during the state environmental impact evaluation process that was conducted for state funding purposes. P.'s Exs. 13, Record Ex. H-36, H-37, H-46. The City in its comments repeated its demand, made four years earlier, that the DEP "review the continuing viability" of DEP Order No. 964, see P.'s Ex. 4 (letter to DEP dated November 19, 1982), and stated that "any action taken to comply with [DEP] Order [No.] 964 should be delayed until after the environmental impact evaluation is completed." P.'s Ex. 13.

33. The opposition of the City, its agencies and officials, and some of its residents, to the outfall continues to this day, despite the entry of this court's June 10, 1986 Order, requiring construction of the Thames River outfall. Since June 10, 1986, the City and its agencies and officials and some of its citizens have taken the following overt actions in an effort to obstruct or undermine this court's orders:

(a) On June 24, 1986, the City filed a Petition for Declaratory Ruling with the DEP alleging that the outfall, as designed by the Town, does not conform to the requirements of DEP Order No. 964. P.'s Ex. 22. Once the DEP rules on the petition, the City could, under Conn.Gen.Stat. § 4-175, file an action in state Superior Court challenging the DEP's ruling. The concept for this potential suit appears to have been suggested by Conservation Commission Chairman *pro tem* Spicer in a letter to Ms. Eldergill dated April 25, 1986. Record Ex. H-41.

(b) On June 19, 1986, the City submitted to Governor William O'Neill petitions signed by more than 700 city residents supporting "the actions of the Mayor and City Council in their efforts to oppose the construction of the Town sewer outfall through the City of Groton and into the Thames River and urg[ing] them to continue their effort in opposing the Thames Sewer Outfall project." P.'s Ex. 15. The petitions were signed by several of the defendants to the Order to Show Cause, including Mayor Kolnaski; Councilmen Donatelli,

Gregory, Gergen, and Kelley; Conservation Commissioners Chmura, L. Santangelo, and William C. Spicer, Jr.; Harbor *681 Management Commissioner John Spicer; Planning and Zoning Commissioners Higgins, L. Santangelo, Bergeron, and Kowaleski; and City Zoning Official Barnes, among others. *Id.*

(c) On July 1, 1986, the City's Conservation Commission unanimously denied the Town's application for an inland wetland permit to construct portions of the outfall adjacent to (but not through) four small regulated areas within the City. Record Ex. G-90.

(d) On August 8, 1986, the City filed suit in state Superior Court challenging the DEP's issuance of a water resources permit authorizing construction of the outfall structure and pipeline river crossings. P.'s Ex. 18.

(e) Some City officials have also continued to use their position in the Town to try to frustrate compliance with this court's June 10, 1986 Order. For example, on August 13, 1986, Phillip Bergeron, a City Planning and Zoning Commissioner and a member of the Representative Town Meeting ("RTM"), opposed the authorization to condemn easements needed for the outfall, stating that he "could not vote Yes on any issue involving sewer outfall." P.'s Ex. 24, at 13.

(f) On August 19, 1986, the City filed suit in this court challenging the U.S. Army Corps of Engineers' permit authorizing construction of the outfall. *City of Groton v. Department of the Army, Corps of Engineers,* Civil Action No. H 86- 899 (JAC), P.'s Ex. 19.

The Conservation Commission's Permit Denial
34. The DEP has jurisdiction over the entire outfall project. Conn.Gen.Stat. § 22a-2.

35. The DEP's Commissioner of Environmental Protection is charged with carrying out "the environmental policies of the state" and has "all powers necessary and convenient to faithfully discharge his duty." Conn.Gen.Stat. § 22a-5.

36. The Conservation Commission, composed of residents of the City, prescribes and implements regulations pursuant to the Connecticut Inland Wetlands and Watercourses Act, Conn.Gen.Stat. §§ 22a-36 to 45. The purpose of the statute is to

protect "wetlands and watercourses from random, unnecessary, undesirable and unregulated uses, disturbance or destruction." Conn.Gen.Stat. § 22a-36. Under this statute, the City's Conservation Commission has regulatory jurisdiction to protect inland wetlands and watercourses within the boundaries of the City from "random, unnecessary, undesirable and unregulated uses, disturbance or destruction."

37. Effective December 10, 1985, the Conservation Commission amended its regulations by expanding the definition of a "regulated activity" to bring within the Conservation Commission's jurisdiction any activity within 75 feet of a wetland or watercourse. Record G-99, Regulations for the Protection and Preservation of Inland Wetlands and Watercourses, § 2.1.7.

38. In compliance with this court's ruling of February 26, 1986 Order, the Town's WPCA, *see* Conn.Gen.Stat. § 7-245, *et seq.,* applied to the City's Conservation Commission on March 31, 1986 for approval of the construction of its sewer outfall pipeline at four locations where the proposed pipeline passes within 75 feet of inland wetlands or watercourses within the City. Record G-5 through G-14. "Wetlands," for the purposes of Conn.Gen.Stat. §§ 22a-28 *et seq.,* are identified by soil type, and include, for example, "poorly drained" soil. Conn.Gen.Stat. §§ 22a-38(15).

39. The Town's WPCA proposed plans for a northerly route to the Thames River which runs generally westward from the Town boundary along Thomas Road, then northwest along Shennecossett Road, then through the Town golf course and so-called Pfizer property, then along Shennecossett Road, Benham Road, Harmacy Place and Eastern Point Road and along the common boundary line of Amerada Hess and Electric *682 Boat into the Thames River. Record G-48.

40. The WPCA proposed this northerly route as an alternative to a previous proposal along a more southerly route which it had submitted to the Conservation Commission in 1980. The prior proposal, which would have required significant excavation and filling in a red maple swamp, was withdrawn as a result of concerns raised by the Conservation Commission. Record G-21, Attachment (Letter from City's Conservation Commission to Town's WPCA, dated February 7, 1980).

41. On March 26, 1986, counsel for the Town requested, by letter to the Mayor of the City, that the City Council appoint alternates to the Conservation Commission. Town Ex. C.

42. At the time the Town made the request, the Conservation Commission had no appointed alternates, and the WPCA had determined that Conservation Commission members William C. Spicer, Jr. and Anthony Skiff should not participate in deliberations upon the application because of their frequent public comments in opposition to the sewer line and Spicer's ownership of land adjacent to one of the areas of proposed construction. Record Ex. G-22.

43. In compliance with this court's February 26, 1986 Ruling and order to the Town to "undertake whatever action is necessary to achieve full compliance with its NPDES permit and [DEP] Order No. 964 as expeditiously as possible," *see* ¶ 8, *supra,* the WPCA applied to the Conservation Commission on March 31, 1986 for approval of the construction of its sewer outfall pipeline at four locations where the proposed pipeline passes within 75 feet of inland wetlands or watercourses within the City. Record Exs. G-5 through G-14.

44. None of the four activities for which the WPCA sought approval is within the boundary of the wetlands or involves activity in the watercourses themselves. Record Ex. G-47. The four activities included:

Location # 1: Installation of the sewer pipe within seventy-five (75) feet of mapped inland wetlands near Birch Plain Creek;
Location # 2: Installation of the sewer pipe in Shennecosset Road fifty (50) feet from the wetlands;
Location # 3: Installation of the sewer pipe in Shennecossett Road at Shennecossett Golf Course ten (10) feet from the wetlands;
Location # 4: Installation of the sewer pipe in Shennecossett Road ten (10) to fifty (50) feet from the wetlands.
*Id.*

45. The wetlands indicated for locations "1" and "4," *see* ¶ 44, *supra,* are shown on the Commission's Official Inland Wetlands Map. The wetlands indicated for locations "2" and "3," *id.,* are not designated as wetlands on the Official Inland Wetlands Map but were identified by the WPCA's

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

647 F.Supp. 671
(Cite as: 647 F.Supp. 671, *682)

**Page 381**

soil scientist.   Record Ex. G-50.

46. The Conservation Commission's regulations provide for an expedited review process by permitting an applicant to seek a Declaratory Ruling if the proposed activity is not within the Conservation Commission's jurisdiction, or a Summary Ruling if the proposed activity will not have a significant impact or major effect on inland wetlands or watercourses.   Record Ex. G-99, Regulations for the Protection and Preservation of Inland Wetlands and Watercourses, §§ 2.1.7; 6.2; 6.3.

47. Pursuant to the Conservation Commission's regulations, *see* ¶ 46, *supra,* the WPCA in its application requested a decision from the Conservation Commission, that, because the proposed activities would not take place or have any effect on the wetlands or watercourses, they were either not regulated or, in the alternative, were regulated but did not have a significant impact or major effect on wetlands or watercourses.   Record Exs. G-87, G-23.

48. On April 1, 1986, at a regularly scheduled meeting of the Conservation Commission which lacked a quorum, counsel for the WPCA requested that Commissioners Spicer and Skiff, who were present, not participate in the deliberation of its application due to their prior statements *683 and actions and due to Spicer's ownership of land abutting the construction activity at Location "1," *see* ¶ 44, *supra.*   Record Exs. G-3, G-15.

49. At the April 1, 1986 meeting, Spicer indicated that the entire Conservation Commission endorsed his opposition to the outfall proposal, that if he were to disqualify himself on that account, the entire Conservation Commission would have to do the same, and that there would then be no one available to issue the permit.   Record Exs. G-3, G-15.

50. On April 4, 1986, counsel for the WPCA wrote to the Conservation Commission, advising it of the WPCA's concerns over the participation of Spicer and Skiff in the proceedings.   Record Ex. G-3.

51. On or about April 8, 1986, the Conservation Commission held a special meeting concerning the plaintiff's application, at which the WPCA's counsel again requested the disqualification of Spicer and Skiff.   At this meeting, Spicer served as

Chairman *pro tem,* and requested a brief on the disqualification issue from the WPCA and from attorneys for the Conservation Commission.   Record Ex. G-15, at 1, 3.

52. At the April 8, 1986 meeting, representatives from the WPCA explained the application to the Conservation Commission, presented additional supporting information and answered questions on the application.   Record Ex. G-15.

53. On April 11, 1986, Spicer wrote to counsel for the WPCA raising a number of questions concerning the application, and requesting additional information.   Record Ex. G-17.

54. On May 5, 1986, counsel for the WPCA filed a memorandum on the claimed impropriety of Spicer and Skiff deliberating on the application, with documentation of their previously expressed opposition to the outfall route. Record Ex. G-22.

55. On May 5, 1986, counsel for the WPCA also filed a memorandum in support of its petition for Declaratory or Summary Rulings.   On the same date, counsel for the WPCA wrote to the Conservation Commission and addressed the questions raised by Spicer's letter of April 11, 1986, *see* ¶ 53, *supra.*   The letter also requested rulings from Spicer and Skiff on their disqualification from the proceedings, and sought a decision from the Conservation Commission on the petitions for Declaratory or Summary Rulings. Record Exs. G-23, G-21.

56. On May 6, 1986, the Conservation Commission held a regularly scheduled meeting and discussed the application of the Town's WPCA. Record Ex. G-31; Town Ex. B, at. 3-45.

57. At the meeting of May 6, 1986:

(a) Spicer served again as Chairman *pro tem,* despite the WPCA's request for recusal, and Spicer again requested briefs from attorneys for the Conservation Commission on the propriety of his and Skiff's participation in the deliberations.   Town Ex. B, p. 7;  Record Ex. G-31, at 2.

(b) Spicer and Skiff did not recuse themselves, nor did the Conservation Commission rule on the petitions for Declaratory or Summary Rulings. Record Ex. G-31, Town Ex. B, at 3-45.

647 F.Supp. 671
**(Cite as: 647 F.Supp. 671, \*683)**

**Page 382**

(c) The Association intervened as a party in the administrative proceeding before the Conservation Commission. Record Ex. G-31, at 2.

(d) The Conservation Commission scheduled a public hearing on the application despite the pendency of the petitions for Declaratory or Summary Rulings. Record Ex. G-31, at 8.

(e) Although the May 6, 1986 meeting was not a regularly convened public hearing, Spicer requested members of the public present to comment on the application and advise the Conservation Commission on whether the application provided any benefit to the city. Record Ex. G-31, at 2 and *passim;* Town Ex. B, at 10.

58. On May 15, 1986, counsel for the WPCA wrote to Spicer, as Chairman *pro tem,* again requesting a ruling by him and Skiff on their disqualification from the proceedings prior to the public hearing scheduled for May 20, 1986. In this May 15, 1986 letter, WPCA's counsel also requested *\*684 a decision on the petition for Declaratory and Summary Rulings immediately following the May 20, 1986 hearing. Record Ex. G-42.

59. On May 20, 1986, the Conservation Commission held a public hearing on the application. Prior to the public hearing, Skiff and Spicer ruled that they would participate in the proceedings and that they believed that they could be impartial in making a decision on the application. Record Ex. G-56, at 7-12.

60. At the May 20, 1986 public hearing, the Town, in support of its application, introduced testimony and other evidence by:

(a) A certified soil scientist, verifying the actual wetland locations and the fact that the outfall pipe would not pass through any wetlands. Record Exs. G-56, at 46-61; G-13; G-26.

(b) A botanist, confirming that the environmental impact upon the four wetland habitats would be negligible. Record Exs. G-56, at 61-73; G-14; G-28; G-51.

(c) The District Conservationist for the United States Department of Agriculture Soil Conservation Service, advising that the sedimentation and erosion control plans were adequate to protect water

quality. Record Exs. G-12, G-18, G-33, G-45, G-65, G-66, G-67 and G-68.

(d) Various engineers, describing the installation and operation of the sewer line, and confirming the reliability of the pipe itself. Record Ex. G-56, at 73-98.

61. On May 27, 1986, although the record of the public hearing was closed, Chairman Chmura of the Conservation Commission wrote to the counsel for WPCA, requesting further answers to several questions which were raised at the May 20, 1986 public hearing. The letter also advised that a second public hearing would be held on the application, despite the arguably doubtful authority for such a second hearing, *see* Conn.Gen.Stat. § 22a-42a, purportedly to permit rebuttal from the public on the plaintiff's answers to the Conservation Commission's questions. Record Ex. G-57.

62. The Conservation Commission made extraordinary demands for information from the Town. For example, the Commission asked for proof that the pipeline would withstand earthquakes and also requested evidence that the pipeline would not transmit "hostile viruses such as Cancer, Hepatitis and Aids [sic]." Record Ex. G-57. In his testimony before this court on September 24, 1986, Spicer reiterated that questions concerning the possible spread of AIDS and Hepatitis viruses were relevant. *See* Certified Official Transcript of September 24, 1986 Hearing (filed Oct. 9, 1986) ("9/24/86 Tr.") at 232.

63. The Conservation Commission scheduled a second public hearing for June 23, 1986. *See* ¶ 61, *supra,* Record Exs. G-58, G-59.

64. At the June 23, 1986 public hearing (held nearly two weeks after the entry of this court's June 10, 1986 Order), Spicer, again chairing the hearing *pro tem,* solicited comments from State Representative Philip Tuthill, who offered testimony (seemingly irrelevant to the application) attacking the Connecticut Council on Environmental Quality and making a variety of claims against counsel for the Town. Record Exs. G-85, at 112-123; G-60, G-76, G-77, G-78, G-79.

65. Following Tuthill's testimony, the Town's WPCA presented its written answers and provided oral responses to a number of questions and offered additional written documentation to the

647 F.Supp. 671
**(Cite as: 647 F.Supp. 671, \*684)**

Page 383

Conservation Commission showing the strength and safety of the sewer pipe and addressing other issues raised by the Conservation Commission. Record Ex. G-85, at 125-222.

66. At the close of the June 23, 1986 public hearing, at the request of counsel for the Town's WPCA and the Association, the Conservation Commission ruled on the petitions for Declaratory or Summary Rulings, denying both. Record Ex. G-85, at 155-156.

**\*685** 67. The application, supporting documents submitted by the WPCA and unrebutted expert testimony offered by the WPCA at two public hearings through a professional engineer, a certified soil scientist, and a professional botanist (which evidence was submitted to this court at the hearings of September 1986), establish the following:

(a) The pipeline, as proposed in the current plans requires no excavation, filling or other construction activity within the wetlands or watercourses of the city. Record Exs. G-13, G-26, G-50; G-56, p. 16, at 46-61, at 30-31.

(b) The plans for the proposed pipeline involve no stockpiling of materials in wetlands or watercourses. Record Ex. G-50; G-56, pp. 18-19.

(c) The plans for the proposed pipeline provide sedimentation and erosion control measures which are adequate to protect the wetlands and watercourses from siltation during construction. Record Exs. G-50, G-12, G-13, G-18, G-33, G-45, G-56, G-65, G-66, G-67, G-68.

(d) The plans for the proposed pipeline provide that in all areas adjacent to wetlands and watercourses, the land will be returned to its original grades. Record Ex. G-56, at 19.

(e) The plans for the proposed pipeline involve no stormwater run-off or other discharge to wetlands or watercourses. Record Exs. G-47, G-50; G-56, at 32- 33.

(f) The construction of the proposed pipeline in accordance with the plans will have no significant impact on the vegetative community in the four wetlands locations. Record Exs. G-56, at 61-73; G-14, G-28, G-51.

(g) The possibility of leakage of treated effluent

from the pipe into the wetlands or watercourses is minimized to the greatest extent possible given present levels of technology through pipe specifications, rigorous on-site performance testing prior to acceptance and use, a leakage factor five times more stringent than industry standard, and off-site monitoring of flow pressure and volume. Record Exs. G-72, G-75, G-80, G-83; G-85, at 167-201; *see* 9/24/86 Tr. at 276, *et seq.* (testimony of Robert Norwood, DEP).

68. At the hearing before the City's Conservation Commission, no expert testimony was offered in opposition to the WPCA application and none of the Conservation Commission members qualified themselves as experts in any of the areas relevant to the application. Record Exs. G-56, G-85; *see* 9/24/86 Tr. at 190. Likewise, no expert testimony was offered by the defendants to the Order to Show Cause in evidentiary hearings held in this court on September 17, 1986 and September 24, 1986. *See* 9/17/86 Tr. and 9/24/86 Tr., *passim.*

69. On July 1, 1986, the Conservation Commission voted unanimously to deny the permit to the Town's WPCA, Record Ex. G-80, for reasons set forth in a document dated July 1, 1986 and entitled "Findings of Fact." Record Ex. G-89.

70. The Conservation Commission's "Findings of Fact" were, *in toto,* as follows:
1. Two inland watercourses are crossed.
2. One tidal watercourse is crossed.
3. Watercourses contained in conduits or pipes are considered to be the class of the stream segment to which they discharge.
4. The discharge into the Thames River is inside the west boundary of the City.
5. Four of the applicants' maps show wetlands within 75 feet of the construction.
6. The construction requires a ditch which will alter the hydrology of its entire length.
7. The specifications for the pipe include leakage allowance.
8. There is no provision for monitoring the leakage except casual visual check.
9. Any leakage will gather at the low points which are the wetlands and will leach or drain into the ground water and surface streams.
**\*686** 10. The effluent has been catagorized [sic] in the Mumford Cove suit as "untreated or improperly treated sewerage [sic] which consists of human, animal and industrial wastes, which are filthy, putrefactive and noxious," *etc.*

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

647 F.Supp. 671
**(Cite as: 647 F.Supp. 671, \*686)**

11. The DEP has joined this complaint.

12. The DEP has jurisdiction over the discharge, but has not controlled it.

13. The City has its own sewer system.

14. The Town of Groton Charter guarantees autonomy to all its subdivisions.

15. The City contributes nothing to the Town WPCA, use or support.

16. There are no benefits to the City to offset the damages, permanent trespass, and wetlands and ground-water pollution.

17. There are risks to the health, welfare, safety and property of the 10,000 people of the City of Groton without offsetting benefits.

18. Other alternatives within Order 964 exist which will not impact the Poquonnock River, Birch Plain Creek, Thames River, beaches or any City environs.

19. Cost is not a reason for site selection when wetlands are involved.

Record Ex. G-89.

71. Spicer was the author of the Conservation Commission's "Findings of Fact."

72. Spicer has acknowledged that "Findings" 1, 2, 10, 11, 12, 13, 14, 15, 18, and 19, *see* ¶ 70, *supra*, are not relevant in that they are beyond the Conservation Commission's jurisdiction. *See* 9/24/ 86 Tr. at 226, *et seq.*

73. Spicer's testimony that the Conservation Commission does not intend to regulate beyond its jurisdiction is not credited.

74. Spicer's testimony that he is not opposed to the outfall as a "concept" is not credited.

75. Spicer's testimony that the Conservation Commission had not prejudged the Town's application prior to its hearings thereon is not credited.

76. Even those Conservation Commission "Findings of Fact" that are arguably within the Conservation Commission's limited jurisdiction, *see* ¶ ¶ 70, 72, *supra*, are not supported by the record.

77. The Conservation Commission exceeded its own narrowly limited jurisdiction under state law and did so with the conscious design to obstruct and impede the implementation of DEP Order No. 964 and this court's June 10, 1986 Order.

78. The Conservation Commission's actions are fully consistent with the long, well publicized, and well documented opposition of the City and its agencies and officials, and some of its citizens, to the construction of the outfall through its territory.

### Need for Injunctive Relief

79. Unless this court enters an order enjoining further obstructionist conduct, the City, its agencies, officials or others named in the Order to Show Cause will continue to conduct their purposeful campaign to undermine the authority of federal law, the State DEP and this court, and to impede the lawful efforts of the Town to obey the requirements of DEP Order No. 964 and the orders of this court.

80. The past actions and statements of the City, its agencies and officials, and some of its citizens, in opposition to the Thames River outfall clearly demonstrate that these parties will do everything in their power to prevent the outfall required by this court's June 10, 1986 Order from being built.

81. The Commissioner of DEP, having found that the Town was polluting Mumford Cove, a navigable water of the United States subject to protection under the Act, ordered construction of the Thames River outfall in 1975. However, the continuing and vehement opposition of residents of the City and Town prevented the aggressive or effective enforcement of the state order **\*687** until the Association brought the instant suit.

82. The pollution of Mumford Cove has been allowed to continue for far too long. This court's June 10, 1986 Order was entered to remedy this unacceptable and illegal pollution as expeditiously as possible, thereby fulfilling Congress' objective "to restore … the chemical, physical, and biological integrity of the Nation's waters." 33 U.S.C. § 1251(a)(1).

83. Any actions by the City, its agencies, officials or residents, or any other person, that would have the effect of delaying, preventing or frustrating compliance with this court's June 10, 1986 Order will cause plaintiffs, the Town and the public irreparable harm.

84. In order to comply with this court's June 10, 1986 Order, the Town would have to begin construction of the sewer outfall project by November 1986. *See* 9/17/86 Tr. at 109

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

647 F.Supp. 671
(Cite as: 647 F.Supp. 671, *687)

(testimony of William Blanker).

85. The DEP and the Town have appealed the Conservation Commission's decision in state court. Record Ex. A, B.

86. This action was taken only to assure that the DEP's and the Town's interests would be protected in the event this court does not act. *See* 9/17/86 Tr. at 127.

87. Even under the best of circumstances, those appeals would not be decided until early 1987. *See* Connecticut Practice Book § 257.

88. Plaintiffs have no adequate remedy at law. Regardless of whether the state court ultimately upheld the Conservation Commission's decision, or remanded the matter to the Conservation Commission for further proceedings, any such proceedings would tend "to stay or enjoin actions required by [the June 10, 1986] Order." June 10, 1986 Order at ¶ 6.

89. The City's denial of the inland wetlands permit, if it is enforced against the Town, will frustrate compliance with this court's June 10, 1986 Order and the Federal Clean Water Act. The Conservation Commission has already threatened to take enforcement action against the Town if it proceeds without a permit. Record Ex. G-57.

90. The City's denial of a permit effectively prohibits construction of the outfall. Even if the outfall could be redesigned to satisfy the Conservation Commission, such a redesign would cause a delay in the outfall's construction and thereby frustrate compliance with this court's June 10, 1986 Order. Moreover, further proceedings before the Commission would in itself cause delay.

91. Since the June 10, 1986 Order enjoins the Town from complying with any ruling "purporting or tending to stay or enjoin actions required by [the June 10, 1986] Order," June 10, 1986 Order at ¶ 6, *see,* ¶ 88 *supra,* the state court could not adequately and completely determine the controversy among the parties.

92. This court has had jurisdiction over the outfall controversy since 1984. The court entered its June 10, 1986 Order to correct, as expeditiously as possible, longstanding violations of the Federal Clean Water Act. The effective disposition of this

case, including the enforcement of the court's orders, requires that the court take jurisdiction over the entire outfall controversy.

93. If the City, its agencies, officials, residents and other persons are allowed to pursue in various state courts, and before various local and state agencies, collateral attacks on this court's orders, judgments and decrees, effectuation of the remedy required by the DEP of the State of Connecticut and by this court to abate pollution of the nation's waters will be frustrated. Further pollution of Mumford Cove and violations of the Federal Clean Water Act will inevitably follow. The public interest clearly necessitates that all challenges and objections to the Thames River outfall be heard and decided in this court in order to avoid the delay, expense and inconsistent adjudications incident to litigation of these issues in diverse state and federal fora.

94. Unless restrained by this court, the City, its agencies and officials and some of *688 its citizens, and others, can be expected to institute and continue collateral attacks on DEP Order No. 964 and this court's June 10, 1986 Order in various state and federal fora.

Other Steps Necessary to Construct the Outfall
95. The DEP has issued the Town the necessary permits to construct the Thames River outfall. P.'s Exs. 16, 17.

96. The U.S. Army Corps of Engineers has also issued the Town the necessary permit to construct the outfall, including the pump station. P.'s Ex. 14.

97. As required by this court's June 10, 1986 Order, the Town has awarded the contract for construction of the pump station. P.'s Ex. 20. The Town has given the pump station contractor notice to proceed with construction. *Id.*

98. As required by paragraph 1.b(c) of this court's June 10, 1986 Order, the Town has submitted final plans and specifications for the pipeline and outfall structure to the DEP and the DEP has approved those plans and specifications as being consistent with DEP Order No. 964. P.'s Ex. 26. The Town has also begun advertising for bids for the pipeline and outfall structure contracts. P.'s Ex. 23.

99. On September 8, 1986, the Town filed an application with the City's Highway Department for

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

647 F.Supp. 671
(Cite as: 647 F.Supp. 671, *688)

Page 386

an excavation permit. P.'s Ex. 21. Such permits are routinely issued by the City for similar construction work. 9/21/86 Tr. at 115 (testimony of William Blanker).

100. The City contends that the Town must also receive coastal site plan approval from the City's Planning and Zoning Commission, and a special permit and site plan approval under section 4.0 of the City's zoning regulations from that same Commission. *See* Answers to Town of Groton Interrogatory No. 2., Docket No. 163. The latter special permit is for filling and removing earth products only in those areas not subject to the highway excavation permit. Section 4.11, Zoning Regulations, Town Ex. A. The special permit assertedly required under Section 4.0 of the zoning regulations is intended to insure that excavation sites are restored insofar as possible to facilitate, and not impede, appropriate development in the area.

## CONCLUSIONS OF LAW

This court has jurisdiction over the parties and the subject matter of this action pursuant to the Federal Clean Water Act, 33 U.S.C. § 1365, and 28 U.S.C. § 1331. The court has ancillary jurisdiction under the All Writs Act, 28 U.S.C. § 1651 and its inherent powers to issue all writs necessary or appropriate in aid of its jurisdiction against persons or entities who are "in a position to frustrate the implementation of a court order or the proper administration of justice ... and encompasses even those who have not taken any affirmative action to hinder justice." *United States v. New York Telephone Co.,* 434 U.S. 159, 174, 98 S.Ct. 364, 373, 54 L.Ed.2d 376 (1977) (citations omitted); *see also In re Baldwin-United Corp.,* 770 F.2d 328, 338 (2d Cir.1985) (same). Having found as a matter of fact that the actions of the City Conservation Commission were outside its jurisdiction and were designed to frustrate this court's June 10, 1986 Order, it is clear that this court has jurisdiction and may take remedial action under the All Writs Act and federal common law, including decisions of the United States Court of Appeals for the Second Circuit.

## Abstention

[1] A finding that there have been, and will continue to be, attempts to frustrate this court's orders, also necessarily disposes of the claim that a state court is the only forum that can review the Conservation Commission's denial of the inland wetlands permit. However, the City and the

Conservation Commission argue that this court should exercise its discretion and abstain from exercising its jurisdiction in order to allow the state appellate review process to run its course. They make two arguments in support of this position. First, they *689 point out that it is the DEP and the Town themselves who have taken an appeal from the Conservation Commission's decision to the Superior Court, pursuant to Conn. Gen. Stat. § 22a-43. Second, they argue that *United States v. District of Columbia,* 654 F.2d 802, 810 (D.C.Cir.) , *cert. denied sub. nom., Prince George's County v. United States,* 454 U.S. 1082, 102 S.Ct. 637, 70 L.Ed.2d 616 (1981) ("*District of Columbia*"), upon which the plaintiffs and the Town rely heavily for the proposition that a federal court may enjoin state and local agencies and courts in order to vindicate the Federal Clean Water Act, differs from the instant case in that *District of Columbia* involved a consent order signed by the very party who then attempted to relitigate the issue. Neither argument is persuasive.

[2] In the first place, it is curious that a political subdivision of a state should invoke principles of "federalism" and "comity"--principles which govern federal-state relations--in litigation that finds the state firmly aligned with parties invoking federal law against that very political sub-division. It bears recalling, moreover, that counsel for the DEP is the only attorney able to represent the interests of the State of Connecticut in this case, and thus it is the state and the Association that jointly seek declaratory and injunctive relief against a subdivision that has been found to be in violation of both federal and state law.

The argument against federal court intrusion in state court proceedings has a surface plausibility, but it is similarly hollow. We are not here confronted by a situation that suggests, much less requires, that a federal court invoke principles of comity, or accord deference and consideration to the co-equal judicial system of a state government in order to minimize friction between our federal and state systems. *Compare, e.g., Rose v. Lundy,* 455 U.S. 509, 518, 102 S.Ct. 1198, 1203, 71 L.Ed.2d 379 (1982) (comity and deference in habeas corpus litigation); *Younger v. Harris,* 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971) ("comity" and "Our Federalism" as forbidding federal court injunctions directed at pending state criminal prosecutions absent extraordinary circumstances). In this instance, Connecticut's judicial system has

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

647 F.Supp. 671
(Cite as: 647 F.Supp. 671, *689)

Page 387

no special interest or stake in the litigation that the parties to the federal suit have brought, or might wish to bring, to the state courts. The federal courts, in acting to preserve and protect their jurisdiction over the subject matter of this lawsuit, do not in any sense purport to sit in judgment on the practices or processes of the state courts. In sum, the interests of the state courts *qua* courts are simply not at issue here. The plaintiffs (including the state) and the Town took their appeal of the decision of the Conservation Commission to state court only to protect their rights in the event the federal courts were unpersuaded by their argument. They have clearly and consistently argued that this court is the only appropriate forum to resolve this dispute. *See, e.g.,* 9/17/86 Tr. at 127. In any event, it is highly unlikely that this court will be required to consider, much less to enter, any injunction against a state court, although in the present circumstances an injunction against state court proceedings would be well within this court's authority. *See, e.g., James v. Belotti,* 733 F.2d 989, 993 (1st Cir.1984).

Furthermore, to accept the defendants' narrow characterization of the Conservation Commission's action as solely involving issues of state law, and thereby assertedly entitled only to normal state review, is to completely ignore reality. The application for the inland wetlands permit was a direct response to the February 26, 1986 Ruling of this court, and this court has found that the Conservation Commission's response was designed to frustrate and obstruct its authority. Accordingly, the federal court is necessarily the appropriate forum for dealing with any such resistance. Indeed, defendants' counsel has conceded as much. *See* 9/24/86 Tr. at 324-325 (statements of Ms. Eldergill). The argument that, in these circumstances, continued flagrant obstruction of federal court orders may be tolerated out of a deference to the co-equal state judicial system not only misperceives the nature of our federal system, but, alas, *690 the character of the state's own well-articulated interest in this very litigation.

Moreover, even if a state court could and did review the Conservation Commission's actions under an expedited schedule, as the City claims it would, the delay involved would still effectively preclude compliance with the schedule imposed by this court's orders. *See* Findings, ¶¶ 87-88, *supra.*

Finally, only this court, which has the entire case before it, can possibly afford complete relief to an aggrieved party. The June 10, 1986 Order requires the Town to take numerous steps. If the City were allowed to litigate each of its continuing efforts to obstruct or avoid compliance with the June 10, 1986 Order in separate state proceedings, the orders of this court would be frustrated regardless of the ultimate result of any particular state proceeding. The City has already lost the principal case, in which it attempted to stop the enforcement of DEP Order No. 964 and the construction of the sewer outfall through its territory; what it seeks now, in the guise of litigating "other issues," is to delay the project itself, in the knowledge that any delays, and especially prolonged or indefinite delays, would be a victory in fact if not in name. To allow the City to take its delaying tactics into a variety of state fora out of a presumed respect for the integrity of state judicial and administrative processes would mock the State of Connecticut's own environmental processes, ten years of DEP efforts to enforce applicable law, and efforts by the federal courts to enforce the Federal Clean Water Act. Meanwhile, the unlawful pollution that has been affecting Mumford Cove for over a decade will continue.

The attempt to distinguish the *District of Columbia* case is also not persuasive. There is little significance in the fact that that case involved a consent order. As far as the exercise of a federal court's jurisdiction is concerned, the operative term is "order," not "consent." In a consent order, the agreement between the parties has no particular legal effect until and unless it is entered as an order of the court. Absent court action, the parties' agreement is, in effect, a legal nullity; when, however, the court enters its order, that order binds the parties in exactly the same way as any other judicial decree. "We reject the argument … that a decree entered upon consent is to be treated as a contract and not as a judicial act." *United States v. Swift & Co. et al,* 286 U.S. 106, 115, 52 S.Ct. 460, 462, 76 L.Ed. 999 (1932) (Cardozo, J.) There is little to distinguish between a litigant who signs a consent order and then attempts to relitigate the issue and a litigant who professes its acceptance of a federal court ruling that an order is final and then attempts to relitigate it while denying it is doing so.

It should also be noted that the remedy adopted today is considerably less intrusive than that imposed by the district court in *District of*

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

647 F.Supp. 671
(Cite as: 647 F.Supp. 671, *690)

Page 388

Columbia. First, in *District of Columbia* a state court had already entered an injunction and the district court enjoined compliance with the prior state court order. As already noted above, in the instant case, no state court has acted, and this court's order does not interfere with any state judicial decrees. Second, the remedy adopted by this court is structured to allow the defendants to the Order to Show Cause a continuing role in the decisions that will affect them. Only obstruction is forbidden; cooperation and constructive suggestions are encouraged. Finally, this court is not itself directly taking control of the sewer outfall project. Today's order places the on-going responsibility for the effectuation of the June 10, 1986 Order and DEP Order No. 964 where it properly belongs under both Connecticut and federal law, with the DEP of the State of Connecticut.

### The Parties Bound

In the past, defendants have emphasized the fact that they are not named parties to the main lawsuit and this Court's June 10, 1986 Order. It is now well established, however, that one need not be named in an injunctive order to be bound by it. *See, e.g., Washington v. Washington State *691 Commercial Fishing Association,* 443 U.S. 658, 692 n. 32, 99 S.Ct. 3055, 3078 n. 32, 61 L.Ed.2d 823 (1979); *United States v. New York Telephone Co., supra,* 434 U.S. at 174, 98 S.Ct. at 373; *In re Baldwin-United Corp., supra,* 770 F.2d at 338. More important, such a claim is simply untenable at this point in the proceedings. Not only did the defendants to the Order to Show Cause participate in the proceedings that led to the June 10, 1986 Order itself, they themselves are the named parties in the instant ancillary proceedings.

### Additional Conclusions

In accordance with the findings of fact and discussion above, the court hereby enters the following additional conclusions of law:

1. The City, its agencies, officials and residents were brought into this action by two orders to show cause secured by plaintiffs, and therefore, they must be considered parties for the purposes of the pending motions for injunctive relief. *See United States v. American Society of Composers, Authors and Publishers,* 442 F.2d 601, 605 (2d Cir.1971).

[3] 2. Plaintiffs' motion for an injunction is not governed by the requirements of Rule 65,

Fed.R.Civ.P. *In re Baldwin-United Corp., supra,* 770 F.2d at 338. As the *Baldwin* Court observed: "Injunctions issued under the authority of the All-Writs Act stem from very different concerns than those motivating preliminary injunctions governed by Fed.R.Civ.P. 65." *Id.* In contrast to Rule 65 motions, which generally are designed to preserve the *status quo* pending a decision on the merits, injunctions such as that sought here "are needed to prevent third parties from thwarting the court's ability to reach and resolve the merits of the federal suit before it." *Id.* at 338-39.

[4][5] 3. This court has broad discretion to fashion remedies that will protect and effectuate its judgments, particularly when the public interest is involved. *See Golden State Bottling Co. v. National Labor Relations Board,* 414 U.S. 168, 179-180, 94 S.Ct. 414, 422-23, 38 L.Ed.2d 388 (1973); *In re Baldwin-United, supra.* Persons who were not parties to the original action may be enjoined from interfering with the implementation of court orders which establish and protect public rights. *Washington v. Washington State Commercial Passenger Fishing Vessel Association, supra,* 443 U.S. at 692 n. 32, 99 S.Ct. at 3077 n. 32 (enjoining nonparties who participated as *amici curiae* from interfering with an enforcement of Indian fishing treaty). *See also United States v. Hall,* 472 F.2d 261 (5th Cir.1982). The actions of the City, its agencies and officials, and some of its residents, threaten to interfere with this court's efforts to remedy pollution of federally-protected waters of the United States.

[6] 4. The All Writs Act, 28 U.S.C. § 1651, and the Anti-Injunction Act, 28 U.S.C. § 2283, mandate "an examination of the effect a state proceeding would have on a prior federal judgment, rather than a comparison of formal causes of action." *District of Columbia, supra,* 654 F.2d at 810. "Where a state court enjoins a course of conduct which is necessary to comply with a prior federal court order, the federal court has authority to effectuate its order by enjoining the state proceeding." *Id.* Moreover, this court need not wait for a final judgment by a state court before acting to protect its own decrees. *In re Baldwin-United, supra,* 770 F.2d at 335; *District of Columbia, supra,* 654 F.2d at 810.

[7] 5. This court may, using the analysis above, enjoin any city administrative agency which in effect prevents, or purports to prevent, conduct

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

647 F.Supp. 671
**(Cite as: 647 F.Supp. 671, \*691)**

Page 389

necessary to comply with this court's June 10, 1986 Order.

6. In view of the breadth of the federal interest in protecting navigable waters like Mumford Cove, the courts have exercised broad equitable powers to mandate compliance with the Act, "even where the exercise of such powers has necessitated the bypassing of normal state decisional processes." *District of Columbia, supra,* 654 F.2d at 808.

**\*692** [8] 7. DEP Order No. 964 is final and not now subject to collateral attack. *Mumford Cove Association v. Town of Groton,* 786 F.2d 530 (2d Cir.1986). The City and its agencies may not relitigate DEP Order No. 964 under the pretense of local "regulation," nor may they collaterally attack this state mandate to construct an outfall through the City to the Thames River by challenging the outfall in diverse local, state and federal fora.

[9] 8. The Conservation Commission acted outside its regulatory jurisdiction by attempting to regulate the Town's effluent discharges. The City has no authority to regulate the discharge of pollution from municipal waste water treatment plants. *See* Conn.Gen.Stat. § 22a-430; *Bredice v. City of Norwalk,* 152 Conn. 287, 292, 206 A.2d 433, 436 (1964). The Conservation Commission's decision to deny a permit in these circumstances is arbitrary, capricious, and unsupported by the evidence before it, and compliance with that decision would frustrate effectuation of this court's June 10, 1986 Order.

[10] 9. A stay of this matter pending further action by the City or the Conservation Commission is neither necessary nor appropriate, since it is clear that the Conservation Commission's reason for denying the Town's application arises from its objections to the outfall's effluent discharge and the record of this case demonstrates that any further proceedings before the Conservation Commission would be inconsistent with the schedule for construction of the outfall required by this court's June 10, 1986 Order to remedy violations of federal law and, in any event, would delay and impede implementation of this court's orders.

[11] 10. In view of the City's policy to oppose the outfall, as reflected in its Municipal Coastal Program, the City's Planning and Zoning Commission would effectively be required by the Municipal Coastal Program to deny Coastal Area Management site plan approval and the excavation

special permit and site plan approval claimed to be required by the City in its answers to the Town's interrogatories. Such denials would conflict with DEP Order No. 964 and would frustrate implementation of this court's June 10, 1986 Order. Accordingly, it is necessary to bypass normal planning and zoning procedures to protect and effectuate this court's jurisdiction.

11. In the circumstances of this case, protection of the public rights established by the Federal Clean Water Act and effectuated by this court's June 10, 1986 Order requires that all challenges and objections to the Thames River outfall be heard and decided in this court to avoid the delay, expense and potentially inconsistent rulings that would result from allowing litigation of the outfall controversy to proceed in a broad array of state and federal fora.

IT IS THEREFORE ORDERED THAT:

1. The City of Groton and its Conservation Commission are hereby enjoined from applying the City's Regulations for the Protection and Preservation of Inland Wetlands and Watercourses, as amended, to the Town of Groton sewer outfall mandated by DEP Order No. 964 Modified and this court's June 10, 1986 Order. The City and its Conservation Commission are further enjoined from the exercise of any regulatory or other authority over the outfall, except as provided for herein.

2. (a) The City of Groton and its Planning and Zoning Commission are hereby enjoined from exercising any regulatory, review or other claimed jurisdiction in respect to Coastal Area Management site plan approval or review of the construction of the sewer outfall mandated by DEP Order No. 964 Modified and this court's June 10, 1986 Order, provided, that if the DEP determines that any further review of the sewer outfall under the Coastal Management Act, Conn.Gen.Stat. § 22a-90 *et seq.,* is warranted, then the Town shall submit its final outfall plans and specifications to the DEP for such review at the time required by DEP and shall submit a copy of such plans and specifications to the City Planning and Zoning Commission.

**\*693** (b) The City Planning and Zoning Commission may suggest, not later than the time and in the manner required by the DEP, that DEP require the Town to use any further reasonable construction measures to mitigate impacts during construction of the same kind as the Commission

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

647 F.Supp. 671
**(Cite as: 647 F.Supp. 671, \*693)**

**Page 390**

would ordinarily impose on the construction of City water, sewer or utility lines.

(c) The Town is hereby enjoined to construct the sewer outfall utilizing such construction-related mitigative measures as the DEP may deem customary, appropriate and necessary.

3. (a) The Town of Groton is hereby enjoined to submit within ten (10) days of this Order, to the City Planning and Zoning Commission and the DEP, final plans and specifications showing final grading and seeding for those portions of the sewer outfall route passing through the City which are not within a public right-of-way.

(b) Within ten (10) days of such application, the City Planning and Zoning Commission is hereby enjoined to issue such approvals as may be required under Article 4 of its Regulations, conditioned upon the use of all the environmentally-protective measures described in the Town's application to the City Conservation Commission.

(c) In the event the City Planning and Zoning Commission shall determine that during construction the Town should utilize further environmentally protective measures to mitigate construction-related impact of the same kind as would ordinarily be required for the construction of City water, sewer or utility lines, the City Planning and Zoning Commission may submit to DEP within ten (10) days of such application its comments explaining the mitigation measures it would ordinarily require and the reasons why such measures are needed. If the DEP shall deem such further environmentally-protective measures customary, appropriate and necessary, the Town shall construct the sewer outfall utilizing such measures.

4. (a) The City of Groton and its Highway Superintendent, Frank Varella, are hereby enjoined to issue within five days of the date of this Order, the highway excavation permit for which the Town applied on September 9, 1986, in accordance with the requirements and standards in City of Groton Ordinance No. 47, entitled "An Ordinance Regulating Street Openings, Excavations and Pavement Cuts Within The Limits Of Any Public City Highway By Persons Other Than The City Of Groton, Providing Penalties for the Violation Thereof And Repealing Ordinances In Conflict Therewith."

(b) The Town shall not be required to furnish a performance bond nor furnish a certificate of insurance, provided it requires its contractors to name the City of Groton as an additional insured in their liability policies which provide coverage for the sewer outfall construction project.

5. The City of Groton, its officers, boards, commissioners, agents, servants, employees and attorneys, and all persons, boards, subdivisions, firms and corporations in active concert or participation with them who receive actual notice of this Order are hereby enjoined from taking any action which would frustrate, delay or conflict with the Town of Groton's compliance with this court's June 10, 1986 Order, including but not limited to attempting to exercise, in any manner except as provided in this Order, any claimed authority, right, interest or power over the Town of Groton or any of its agents, persons or other entities acting in concert with it concerning the outfall project.

6. (a) The City of Groton, its officers, boards, commissions, agents, servants, employees and attorneys, and all persons, boards, subdivisions, firms and corporations in active concert or participation with them who receive actual notice of this Order are hereby enjoined from applying to any state court or other state or local governmental entity for application or enforcement of any law, regulation, permit, or lack of permit which application or enforcement has the effect, or potential effect, of delaying the Town's compliance with the June 10, 1986 Order, except upon prior application to and with the consent of this court.

**\*694** (b) In particular, the City and the foregoing entities are enjoined immediately to withdraw the Superior Court action styled *City of Groton v. Stanley J. Pac* (return date August 26, 1986) (P.'s Ex. 18). The City may refile this appeal with the Clerk of this Court on or before November 24, 1986 if it desires review by this court.

(c) The DEP may rule upon the City's petition for declaratory ruling (P.'s Ex. 22), but the City, any party to this action and any person to which this injunction may apply may not seek any judicial review of any such DEP ruling, except before this court as provided herein.

(d) The Town of Groton, the DEP and the City of Groton Conservation Commission are hereby

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

enjoined to request the Superior Court to stay the appeals brought by the Town and the Commissioner from the July 1, 1986 denial by the City of Groton Conservation Commission of an inland wetlands permit for the construction of the sewer outfall and in support thereof to submit this Order as an attachment. In the event that the Superior Court denies this request, the Town and the DEP are directed to return to this court for such further relief as may be necessary to effectuate this Order.

7. The Town of Groton is hereby enjoined from complying with the City of Groton Conservation Commission's July 1, 1986 denial of an inland wetlands permit or any other order of the City, its agencies or officials, or any person or entity acting in concert with the City, its agencies or officials, respecting the outfall and is further enjoined to proceed in accordance with this court's June 10, 1986 Order to construct the sewer outfall using all the environmentally protective measures described in the Town's application to the City of Groton Conservation Commission and in the permits issued by the State DEP and the U.S. Army Corps of Engineers.

8. All persons named in the orders to show cause, all parties to this action and all persons, firms and corporations in active concert and participation with them who receive actual notice of this Order are hereby enjoined from taking any actions which would frustrate, delay or impede effectuation of DEP Order No. 964 or this court's rulings and orders or interfere with the court's jurisdiction herein.

9. Any person, firm, corporation or entity, who believes that there exists good grounds for modification or rescission of any order entered herein or that they have a valid health or safety objection to the Town's sewer outfall that has not already been raised before or considered by the DEP, may bring such grounds or objections before this court by filing a motion describing the nature of such grounds or objections, the action requested of this court and the reasons and evidence in support thereof.

647 F.Supp. 671, 25 ERC 1437

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# TAB 40

Citation                        Found Document           Rank 1 of 1            Database
98 FERC P 61,281                                                                FEN-FERC
98 FERC P 61,281, 2002 WL 398318 (F.E.R.C.)
**(Cite as: 98 FERC P 61281,  2002 WL 398318 (F.E.R.C.))**
H


                    FEDERAL ENERGY REGULATORY COMMISSION
                **1 Commission Opinions, Orders and Notices
 Before Commissioners: Pat Wood, III, Chairman; William L. Massey, Linda
Breathitt, and Nora Mead Brownell.
                    Pacific Gas and Electric Company
                    Pacific Gas and Electric Company
                    Northern California Power Agency
                                  v.
 Pacific Gas and Electric Company and the California Independent System Operator
                                Corporation
                    Docket No. ER01-2998-000
                    Docket No. ER02-358-000
            Docket No. EL02-64-000 (Not Consolidated)
    ORDER CONDITIONALLY ACCEPTING FOR FILING AND SUSPENDING, SUBJECT TO REFUND,
       INTERCONNECTION AGREEMENTS, AND SUBJECT TO FURTHER COMMISSION ORDER
                          (Issued March 14, 2002)
    *62211 On August 31, 2001 and November 16, 2001, Pacific Gas and Electric
Company (PG&E) filed notices of termination of interconnection agreements with
the Northern California Power Agency (NCPA) and Silicon Valley Power (Silicon
Valley), respectively, and unexecuted Interconnection Agreements intended to
replace the terminated agreements.
    On February 27, 2002, NCPA filed an emergency petition seeking an expedited
declaratory order confirming PG&E's continuing contractual obligations under
existing Interconnection Agreements and Contract 2948A. NCPA also requests the
Commission to institute a technical conference or other settlement resolution
procedure that will allow NCPA, PG&E, and other interested parties, including
the California Independent Systems Operator (California ISO) and Western Area
Power Administration (WAPA) to reach agreement on the terms of replacement
Interconnection Agreements, and any related implementation issues.
    In this order, we conditionally accept the unexecuted replacement
Interconnection Agreements for filing, suspend them for five months, to become
effective on September 1, 2002, subject to refund, and subject to further
Commission order. We also accept the notices of termination of existing
interconnection agreements, suspend them for five months, to become effective
concurrent with the replacement Interconnection Agreements. We also affirm that
PG&E will continue to operate under the terms of existing Interconnection
Agreements and Contract 2948A until the parties have worked out the terms of the
replacement agreements and any related implementation issues. Finally, we are
directing staff to convene a technical conference at Commission headquarters for
the parties in these proceedings to discuss the terms and implementation of the
replacement Interconnection Agreements.
    Our actions in this order will allow for the continuation of transmission
service under existing Interconnection Agreements and Contract 2948A and, if
subsequently authorized, a transition to non-discriminatory open access

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

98 FERC P 61,281
**(Cite as: 98 FERC P 61281, \*62211,   2002 WL 398318, \*\*1 (F.E.R.C.))**

transmission service without any interruption of service.
I. BACKGROUND
  A. Existing Interconnection Agreement with NCPA
  NCPA, a public agency organized under the laws of the State of California, and
PG&E entered into the existing Interconnection Agreement in November 1991, and
the Commission accepted the Agreement as PG&E Rate Schedule No. 142 on May 12,
1992. Under the terms of the existing Interconnection Agreement, PG&E provides
interconnection, transmission, reliability and energy services to NCPA. PG&E
notes that section 9.4 of the existing Interconnection Agreement' provides that
either party may terminate the agreement upon three (3) years' notice. PG&E gave
notice to NCPA on July 21, 1997 that it was terminating the existing
Interconnection Agreement effective July 31, 2000. PG&E and NCPA subsequently
agreed to extend the termination date until March 31, 2002. The existing
Interconnection Agreement therefore will terminate as of April 1, 2002, if the
Commission accepts the notice of termination.
  **\*\*2** B. Existing Interconnection Agreement with Silicon Valley
  Silicon Valley, a public agency organized under the laws of the State of
California, and PG&E entered into the existing Interconnection Agreement in
September 1983, and the Commission accepted the Agreement as PG&E Rate Schedule
No. 85 on October 27, 1983. Under the terms of the existing Interconnection
Agreement, PG&E provides interconnection, transmission, reliability and energy
services to Silicon Valley. PG&E notes that section 9.4 of the existing
Interconnection **\*62212** Agreement provides that either party may terminate the
agreement upon three (3) years' notice. PG&E gave notice to Silicon Valley on
May 6, 1998 that it was terminating the existing Interconnection Agreement
effective May 31, 2001. PG&E and Silicon Valley subsequently agreed to extend
the termination date until March 31, 2002. The existing Interconnection
Agreement therefore will terminate as of April 1, 2002 if the Commission accepts
the notice of termination.
  C. Contract 2948A Transmission Service Obligations
  Contract 2948A is an agreement between PG&E and the U.S. Department of the
Interior, contracting on behalf of WAPA. [FN1] Under the terms of the contract,
PG&E obtains excess energy from WAPA's hydropower resources, and provides energy
to WAPA during periods when WAPA resources are unable to meet the needs of its
customers. PG&E also provides transmission service to WAPA's municipal
customers, including NCPA, for the transmission of WAPA's power. The scheduling
provisions for the transmission service agreed upon by PG&E, WAPA and NCPA are
incorporated in Contract 2948A and in PG&E's existing Interconnection Agreement
with NCPA. WAPA supplies one half of NCPA's pool requirements.
  D. The Replacement Interconnection Agreements
  PG&E asserts that since the notice of termination, it has engaged in good
faith negotiations with both NCPA and Silicon Valley on replacement
Interconnection Agreements; however the parties have been unable to reach an
agreement. Consequently, PG&E has filed unexecuted replacement Interconnection
Agreements for those services PG&E believes are required to meet any ongoing
service obligation to the parties. [FN2] PG&E seeks an April 1, 2002 effective
date for the replacement Interconnection Agreements. PG&E contends that the
replacement Interconnection Agreements, which will provide only transmission

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

98 FERC P 61,281
**(Cite as: 98 FERC P 61281, \*62212,  2002 WL 398318, \*\*2 (F.E.R.C.))**

service, combined with the interconnection, energy and reliability services
available under the California ISO Tariff and the PG&E TO Tariff will provide
NCPA and Silicon Valley with services comparable to those provided under the
existing Interconnection Agreements. PG&E also argues that the replacement
Interconnection Agreements will remove inconsistencies within, and
administrative burdens to, the operation of the California ISO and the new
market structure.

    NCPA argues that PG&E is seeking to evade its contractual and license
obligations to NCPA, to turn those contractual and license obligations over to
the California ISO without NCPA's or the California ISO's permission, and to
preempt decisions in matters pending in other dockets at the Commission. [FN3]
According to NCPA, PG&E is abrogating its service obligation under the existing
Interconnection Agreement because it is obligated to provide certain
transmission- and generation-related services under a 1991 Settlement Agreement.
[FN4] Finally, NCPA argues that PG&E did not engage in good faith negotiations
on the terms of the replacement Interconnection Agreement.

    **\*\*3** The City of Santa Clara, California (Santa Clara) [FN5] argues that its
replacement Interconnection Agreement with PG&E fails to address long-standing
agreements between the parties; does not ensure Silicon Valley's access to
Western **\*62213** Area Power Administration power or to Silicon Valley's
California-Oregon Transmission Project; and no longer requires PG&E to continue
services required under a 1991 Settlement Agreement and Stanislaus Commitments.
[FN6] Santa Clara then identifies a number of specific perceived shortcomings,
errors, inconsistencies and improper provisions in the replacement
Interconnection Agreement. Santa Clara requests that, if the Commission will not
reject PG&E's filing, we suspend the Notice of Termination and replacement
Interconnection Agreement for five months subject to further order by the
Commission prior to the end of the suspension period.

    E. NCPA Request for Technical Conference

    On February 27, 2002, NCPA filed an emergency petition seeking a declaratory
order and a request for a technical conference. NCPA notes its ongoing
negotiations with the Cal ISO on the terms of new Interconnection Agreements to
provide services that will no longer be provided under PG&E's proposed
replacement Interconnection Agreements have not been successful to date. Among
other things, NCPA notes that the parties are negotiating on a Vertically
Integrated Utility operating agreement concept that would allow vertically
integrated utilities such as NCPA and its members to operate competitively with
other market participants in the Cal ISO market. According to NCPA, there are
aspects in the design of the Cal ISO operations that will penalize entities like
NCPA without some accommodation.

    Concurrently with the negotiations with the Cal ISO, NCPA notes that it is
engaged in negotiations with PG&E on the replacement Interconnection Agreements.
These negotiations with PG&E include not only the terms of the replacement
Interconnection Agreements but also Contract 2948A, a contract between PG&E and
WAPA that covers nearly half of NCPA's energy loads. NCPA notes that PG&E and
NCPA disagree on PG&E's surviving service obligations to NCPA and to WAPA that
NCPA contends will not end with the termination of the existing Interconnection
Agreements. If PG&E's service obligations are not agreed upon by the parties

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

98 FERC P 61,281
**(Cite as: 98 FERC P 61281, \*62213,  2002 WL 398318, \*\*3 (F.E.R.C.))**

before the replacement Interconnection Agreements take effect, then under the
Cal ISO tariff, PG&E will provide operating instructions as to the
interpretation of Contract 2948A. In that situation, PG&E's view will prevail
until the contract dispute is resolved. NCPA argues that if PG&E does not comply
with its obligations under Contract 2948A, it cannot finalize new
Interconnection Agreements with the Cal ISO. NCPA thus seeks a declaratory order
that confirms PG&E's continuing contractual obligations under the existing
Interconnection Agreements and Contract 2948A until the parties develop suitable
replacement arrangements and procedures. NCPA also seeks a technical conference,
or settlement or other less formal procedure for NCPA, the Cal ISO, PG&E and
WAPA, to work out these issues with the assistance of Commission staff.

II NOTICE OF FILING AND PLEADINGS

**\*\*4** A. Docket No. ER01-2998-000

Notice of PG&E's filing was published in the Federal Register, 66 Fed. Reg.
48,128 (2001), with comments, interventions and protests due on September 21,
2001. On September 19, 2001, the Commission issued a notice of extension of time
to file interventions and protests until September 28, 2001.

The Public Utilities Commission of California (California PUC) filed a notice
of intervention and comments in support of PG&E's filing. The California
Electricity Oversight Board (California Oversight Board) filed a timely motion
to intervene and comments in support of PG&E's filing.

NCPA filed a motion to intervene and protest and a motion to reject PG&E's
filing on September 28, 2001. The Modesto Irrigation District (Modesto) and
Santa Clara filed separate timely motions to intervene. On October 1, 2001, the
City of Roseville, California filed a motion to intervene and protest out of
time. The California ISO filed a motion to intervene out of time on November 13,
2001.

On October 12, 2001, PG&E filed an answer to NCPA's protest and motion to
reject on October 12, 2001. NCPA filed a reply to PG&E's answer on October 29,
2001.

B. Docket No. ER02-358-000

Notice of PG&E's filing was published in the Federal Register, 66 Fed. Reg.
59,588 (2001), with comments, interventions and protests due on December 7,
2001. Modesto filed a timely motion to intervene. NCPA and Santa Clara filed
separate timely motions to intervene and protest. Santa Clara subsequently filed
an amended protest and request for rejection or, in the alternative, suspension
and hearing.

**\*62214** PG&E filed an answer to Santa Clara's protest and request for rejection
on December 26, 2001.

C. Docket No. EL02-64-000

Notice of NCPA's filing was published in the Federal Register, 67 Fed. Reg.
10,395 (2001), with comments, interventions and protests due on March 11, 2002.
PG&E filed an answer and motion to dismiss NCPA's complaint on March 8, 2002.
The California ISO, Southern California Edison Company and Santa Clara filed
timely motions to intervene on March 11, 2002.

III. DISCUSSION

A. Preliminary Matters

We note that on April 6, 2001, PG&E filed for Chapter 11 bankruptcy

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

98 FERC P 61,281
**(Cite as: 98 FERC P 61281, \*62214,  2002 WL 398318, \*\*4 (F.E.R.C.))**

protection. Although the Bankruptcy Code provides that the filing of a
bankruptcy petition automatically stays certain actions against the debtor,
[FN7] the Code also provides an exception from this automatic stay for:
    An action or proceeding by a governmental unit . . . to enforce such
governmental unit's or organization's police and regulatory power, including the
enforcement of a judgment other than a money judgment, obtained in an action or
proceeding by the governmental unit to enforce such governmental unit's or
organization's police or regulatory power. [FN8]
    **5 The Commission has found in the past that actions taken under the
authority granted it by the Federal Power Act and the controlling regulations
fit within this exception, and, therefore, are exempt from the automatic stay
provision. [FN9] In the instant matter, we are exercising our regulatory power
under section 205 of the Federal Power Act as permitted by section 362(b)(4) of
the Bankruptcy Code to issue an order that does not threaten the bankruptcy
court's control over the property of the bankruptcy estate. [FN10]
    B. Procedural Matters
    Pursuant to Rule 214 of the Commission's Rules of Practice and Procedure, the
timely motions to intervene in the dockets in which they intervened, serve to
make those who filed a party to that proceeding.
    Due to the early stage of the proceeding in Docket No. ER01-2998-000, their
interest in the proceeding, and the lack of undue prejudice or delay, we find
good cause to grant the untimely motions of the City of Roseville and the
California ISO.
    Rule 213(a)(2) of the Commission's Rules of Practice and Procedure prohibits
the filing of an answer to a protest or answer unless permitted by the
decisional authority. We are not persuaded to permit PG&E's answers and NCPA's
reply in Docket Nos. ER01-2998-000 and ER02-358-000. Accordingly, we reject
them. We accept PG&E's answer in Docket No. EL02-64-000 as a valid answer
pursuant to Rule 213(a)(1) of the Commission's Rules of Practice and Procedure.
    C. Commission Determination
    We are unable to determine, on the record before us, whether termination of
the existing Interconnection Agreements is appropriate. Furthermore, PG&E has
not shown that the replacement Interconnection Agreements are just and
reasonable and they therefore may be unjust, unreasonable, unduly discriminatory
or preferential, or otherwise unlawful. Accordingly, we will accept the
replacement Interconnection Agreements for filing and shall suspend for them for
five months, subject to refund, to become effective on September 1, 2002.
However, as discussed below, we will make these proceedings subject to further
Commission order.
    In light of the arguments raised in the protests and the petition for
declaratory order, the Commission is concerned that terminating the existing
Interconnection Agreements for NCPA and Silicon Valley without appropriate
arrangements for replacement service that reflects the service obligations
embodied in various agreements between the parties may be unjust and
unreasonable. In addition, the protesters raise a number of issues with respect
to the reasonableness of the scope of services as well as the terms and
conditions of such services in the replacement Interconnection Agreements. In
light of these concerns, as discussed above, we will suspend the Notices of

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

98 FERC P 61,281
**(Cite as: 98 FERC P 61281, \*62214,  2002 WL 398318, \*\*5 (F.E.R.C.))**

Termination and the replacement Interconnection Agreements for five months.
Although an **\*62215** evidentiary hearing is one means to resolve the contested
issues, the parties appear to be trying to reach an agreement on replacement
service arrangements with the California ISO that will supercede PG&E's existing
Interconnection Agreements.

**\*\*6** We note that, on February 27, 2002, NCPA filed a request for technical
conference in Docket No. EL02-64-000. The Commission directs Commission staff to
schedule a technical conference at Commission headquarters inviting the parties
in all three dockets to negotiate the terms and implementation of replacement
Interconnection Agreements. In the meantime, we affirm PG&E's continuing
contractual obligations to NCPA under the existing Interconnection Agreement and
Contract 2948A, and PG&E's duty to comply with those obligations. Based on the
outcome of our action in this order and the technical conference , the
Commission will issue a subsequent order in these proceedings.
The Commission orders:

 (A) PG&E's replacement Interconnection Agreements with NCPA and Silicon Valley
are conditionally accepted for filing, suspended for a five-month period, to
become effective September 1, 2002, subject to refund, and subject to further
Commission order, as discussed in the body of this order.

 (B) The notices of termination filed in Docket Nos. ER01-2998-000 and
ER02-358-000, respectively, are hereby conditionally accepted for filing,
suspended for a five-month period, to become effective September 1, 2002, and
subject to further Commission order, as discussed in the body of this order.

 (C) Commission staff is directed to schedule a technical conference for the
parties to negotiate the terms and implementation of the replacement
Interconnection Agreements.
By the Commission.
(SEAL)
Linwood A. Watson, Jr.
Deputy Secretary

 FN1. Contract 2948A is on file at the Commission as PG&E Rate Schedule No. 79.
Contract 2948A will terminate on January 1, 2005. To date, PG&E is not seeking
to terminate Contract 2948A. However, NCPA alleges in its petition in Docket No.
EL02-64-000 that, according to PG&E, certain transmission scheduling services in
Contract 2948A and the existing Interconnection Agreements will terminate under
the Notice of Termination of the existing Interconnection Agreements. See NCPA's
Petition for Declaratory Order at p. 20 and Attachment E.

 FN2. PG&E further indicates that, upon termination of the existing
Interconnection Agreements, NCPA and Silicon Valley would obtain certain
services previously provided by PG&E directly from the California ISO.

 FN3. NCPA also questions whether it will be able to procure the services
required under the existing Interconnection Agreement from the California ISO
(NCPA Protest at 27-30). NCPA questions the ability of the California ISO to
provide the services that NCPA would require. We will not address in this order
the issue of if, and whether, the California ISO can provide the services that
would otherwise be provided under the existing Interconnection Agreement with
PG&E.

 FN4. According to NCPA, the 1991 Settlement Agreement between PG&E and NCPA

98 FERC P 61,281
**(Cite as: 98 FERC P 61281, \*62215,  2002 WL 398318, \*\*6 (F.E.R.C.))**

implemented the Stanislaus Commitments. The Stanislaus Commitments are a 1976 agreement between PG&E and the Department of Justice regarding conditions included in PG&E's Nuclear Regulatory Commission license for its Diablo Canyon Nuclear Plant. The Stanislaus Commitments, which resolved antitrust concerns against PG&E, describe conditions under which PG&E will provide interconnection, transmission, reliability and energy services to other utilities requesting such service.

FN5. Santa Clara is a city which owns and operates Silicon Valley Power, a municipal electric utility system engaged in the generation, transmission, distribution, purchase and sale of electric power and energy at wholesale and retail. Santa Clara purchases a portion of its energy requirements and certain transmission and coordination services from PG&E pursuant to certain contracts, including the Interconnection Agreement at issue in this proceeding and designated as PG&E Rate Schedule FERC No. 85.

FN6. According to Santa Clara, under the 1991 Settlement Agreement and the Stanislaus Commitments, PG&E is committed to provide services to Silicon Valley as a Neighboring Entity and Neighboring Distribution System. Based on the 1991 Settlement Agreement, PG&E withdrew a series of suits against its customers, including litigation against Santa Clara, on the understanding that the Settlement Agreement would bind PG&E to implement and be bound by the Stanislaus Commitments through January 1, 2050. See Santa Clara Amended Protest and Request for Rejection, pp. 10-11.

FN7. 11 U.S.C. § 362(a)(1) (1994 & Supp. 2000).

FN8. 11 U.S.C. § 362(b)(4) (1994 & Supp. 2000).

FN9. See Virginia Electric and Power Co., 84 FERC ¶ 61,254 (1998); and Century Power Corp., 56 FERC ¶ 61,087 (1991). The Commission conclusion on this matter is consistent with judicial precedent regarding the scope of the exemption to the automatic stay. E.g., Board of Governors of the Fed. Reserve Sys. v. MCorp Fin., Inc., 502 U.S. 32 (1991); SEC v. Brennan, 250 F.3d 65 (2nd Cir. 2000); NLRB v. Continental Hagen Corp., 932 F.2d 828 (9th Cir. 1991); United States v. Commonwealth Cos. Inc. 913 F.2d 518 (8th Cir. 1990); NLRB v. Edward Cooper Painting, Inc. 804 F.2d 934 (6th Cir. 1986); Penn Terra Ltd. v. Dept. of Envtl. Resources, 733 F.2d 267 (3rd Cir. 1984); see generally 3 Collier on Bankruptcy § 362.05 (15th ed. rev. 2000).

FN10. This order does not change any monetary obligations, and therefore, has no effect on the estate.

98 FERC P 61,281, 2002 WL 398318 (F.E.R.C.)
END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# TAB 41

928 F.2d 565                                                                                    **Page 183**
928 F.2d 565, 59 USLW 2590, 67 A.F.T.R.2d 91-972, 92-2 USTC  P 50,491, 24 Collier Bankr.Cas.2d 1503,
21 Bankr.Ct.Dec. 838, Bankr. L. Rep.  P 73,863
**(Cite as: 928 F.2d 565)**
▷

**Briefs and Other Related Documents**

United States Court of Appeals,
Second Circuit.
**In re PRUDENTIAL LINES INC., Debtor.**
**The OFFICIAL COMMITTEE OF**
**UNSECURED CREDITORS and Cold Spring**
**Shipping, L.P.,**
**Appellees/Cross-Appellants,**
**v.**
**PSS STEAMSHIP COMPANY, INC., Appellant/**
**Cross-Appellee.**
**Nos. 1023, 1131, Dockets 90-5063, 90-5073.**

Argued Feb. 6, 1991.
Decided March 20, 1991.

On appeal from an order entered September 28,
1990, in the Southern District of New York, Robert
P. Patterson, *District Judge,* affirming an order of
the bankruptcy court that permanently enjoined
appellant from taking a worthless stock deduction
with respect to its bankrupt subsidiary, since that
would have adversely affected the subsidiary's
ability to carryforward its net operating loss (NOL)
to offset future income, the Court of Appeals,
Timbers, Circuit Judge, held:  (1) that debtor's
NOL carryforward was property of estate, and (2)
that parent corporation's claiming of worthless stock
deduction in stock of Chapter 11 debtor subsidiary,
which would effectively eliminate value of debtor's
NOL carryforward, would be an act to exercise
control over estate property in violation of
automatic stay.

Affirmed.

West Headnotes

**[1] Bankruptcy** ☜═2550
51k2550
Net operating loss (NOL) carryforward attributable
to Chapter 11 debtor subsidiary, attributable to
debtor's prebankruptcy operation, was property of
Chapter 11 estate, despite debtor's status as
affiliated corporation filing consolidated tax return
along with its parent and other affiliated
corporations;  there was no explicit agreement
between debtor and parent as to allocation of NOL.
Bankr.Code, 11 U.S.C.A. §§ 541, 541(a)(1);  26
U.S.C.A. §§ 1501-1504.

**[2] Bankruptcy** ☜═2534
51k2534
Nature and extent of debtor's interests in property is
determined by applicable nonbankruptcy law, but
whether that interest is included in property of
debtor's estate is determined by bankruptcy law.
Bankr.Code, 11 U.S.C.A. § 541(a)(1).

**[3] Internal Revenue** ☜═3870
220k3870
Filing of bankruptcy petition by one member of
affiliated group of corporations does not mandate
deconsolidation of group, for purposes of filing
federal tax return. 26 U.S.C.A. §§ 1501-1504.

**[4] Internal Revenue** ☜═3879
220k3879
Fact that subsidiary's net operating loss (NOL)
ultimately may be used to offset another
corporation's income does not mean that subsidiary
loses any interest in its NOL;  parent acts as agent
on behalf of all members of consolidated group for
convenience and protection of the Internal Revenue
Service (IRS) only, corporations retain their
separate identities, and property interests of
subsidiaries are not absorbed by common parent.
26 U.S.C.A. §§ 1501-1504.

**[5] Bankruptcy** ☜═2535(1)
51k2535(1)
Interests whose value is speculative and interests
that involve tangible rights that are subject to
regulation may be included in property of estate.
Bankr.Code, 11 U.S.C.A. § 541.

**[6] Bankruptcy** ☜═2550
51k2550
Bankruptcy Code provision that estate succeeds to
tax attributes of individual debtor including any loss
carryover does not apply to corporate debtors, but,
since bankruptcy estate of corporate debtor is not
separate entity for tax purposes, there was no need
for Congress to provide that carryovers are
transferred to estate and then back to corporate
debtor at conclusion of estate.  Bankr.Code, 11
U.S.C.A. § 346(c)(1), (i).

**[7] Bankruptcy** ☜═2394.1
51k2394.1
(Formerly 51k2394)

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

928 F.2d 565
**(Cite as: 928 F.2d 565)**

Parent corporation's claiming of worthless stock deduction in stock of Chapter 11 debtor subsidiary, which would effectively eliminate value of debtor's net operating loss (NOL) carryforward, would be act to exercise control over estate property in violation of automatic stay.    Bankr.Code, 11 U.S.C.A. § 362(a)(3);    26 U.S.C.A. §§ 382, 382(b), (e)(1), (g)(4)(D).

**[8] Bankruptcy** ⬯2367
51k2367
Bankruptcy court's equitable powers granted under the Bankruptcy Code gave it authority to enter permanent injunction against parent corporation's claiming of worthless stock deduction in stock of Chapter 11 debtor subsidiary, which would eliminate debtor's net operating loss carryforward, and such injunction was not impermissible adjudication of tax liability of parent, a nondebtor. Bankr.Code, 11 U.S.C.A. §§ 105(a), 505(a)(1).

***566** W. Bruce Johnson, New York City (Richard O'Toole, Joanne Wilson, and Battle Fowler, New York City, on the brief), for appellant, cross-appellee PSS S.S. Co., Inc.

Max O. Truitt, Jr., Washington, D.C. (Wilmer, Cutler & Pickering, Washington, D.C., Allan L. Gropper, and White & Case, New York City, on the brief), for appellees, cross-appellants Cold Spring Shipping, L.P. and The Official Committee of Unsecured Creditors.

Before TIMBERS, NEWMAN and ALTIMARI, Circuit Judges.

TIMBERS, Circuit Judge:

Appellant/cross-appellee PSS Steamship Company, Inc. (PSS) appeals from an order entered September 28, 1990, in the Southern District of New York, Robert P. Patterson, *District Judge,* affirming an order of the bankruptcy court that permanently enjoined it from taking a worthless stock deduction on its 1988 federal income tax return with respect to its bankrupt subsidiary Prudential Lines, Inc. (PLI), since that would have adversely affected PLI's ability to carryforward its net operating loss (NOL) to offset future income.

On appeal, PSS contends that (1) the NOL generated by PLI was not property of PLI's estate within the meaning of § 541 of the Bankruptcy Code;    and (2) the bankruptcy court erred in enjoining PSS from taking a worthless stock

deduction on its 1988 federal income tax return as violative of the automatic stay.    On cross-appeal, the Official Committee of Unsecured Creditors (Creditors' Committee) and Cold Spring Shipping, L.P. (Cold Spring) contend that the bankruptcy court erred in denying relief based on a violation of PSS' fiduciary duty to PLI.

Since we agree with Judge Patterson's excellent district court opinion and for the reasons that follow, we affirm the judgment of the district court.

I.
We shall summarize only those facts and prior proceedings believed necessary to an understanding of the issues raised on appeal.

At all times relevant to this appeal, PLI was a wholly owned subsidiary of PSS that provided United States flag shipping between ports in Europe and the Black Sea.    Spyros S. Skouras, Sr. is chief executive ***567** officer and a director of PSS, and was Chairman and President of PLI until his resignation in November 1989.    Spyros S. Skouras, Jr. was Vice President, General Manager, and a director of PLI.    In addition, Skouras, Jr. has participated in the financial and tax affairs of PSS since 1986.    In that capacity, he consults with PSS' tax counsel and accountants and relays information to his father.

PSS and PLI, along with two other affiliated entities have filed consolidated tax returns since 1976 pursuant to 26 U.S.C. § 1501 *et seq.* (1988). In 1988, these entities had a combined NOL of $75 million available to be offset against income.    Of that amount, $74 million was attributable to PLI's pre-bankruptcy operations.    NOLs are tax deductible and may be carried back and applied against income in previous years (carryback), or carried forward and applied against income in subsequent years (carryforward). 26 U.S.C. § 172 (1988).

On September 12, 1986, an involuntary petition for reorganization under Chapter 11 of the Bankruptcy Code was filed against PLI.    Soon thereafter, PLI consented to an order for relief.    The Creditors' Committee was appointed pursuant to 11 U.S.C. § 1102 (1988) to represent the interests of PLI's unsecured creditors.    Cold Spring purchased a participation interest in the unsecured claim of the United States Maritime Administration (MARAD).

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

928 F.2d 565
(Cite as: 928 F.2d 565, *567)

In the summer of 1988, Skouras, Sr. and Skouras, Jr. began to formulate a plan for reorganization on behalf of PLI (the "PLI plan"). In connection with that plan, they prepared a term sheet dated August 4, 1988, which indicated that, under the PLI plan, the Skouras family would retain control of PLI and a NOL carryforward of $74 million would be available to offset future income of the reorganized company.

In February 1989, PSS was informed by tax counsel and by its accountants that it could take a $38.9 million worthless stock deduction in connection with its PLI stock on its 1988 federal income tax return. If PSS took that action, it would effectively eliminate the value of the NOL to PLI. Later that month, PLI filed a plan for reorganization with the bankruptcy court. Under that plan, Skouras, Jr. would retain a 75 percent interest in the reorganized company and serve as President. Skouras, Sr. would serve as Chairman of the reorganized company. The disclosure statement accompanying the PLI plan contemplated the availability of PLI's NOL to offset future income of the reorganized company.

In July 1989, PSS' accountants prepared a draft federal income tax return for 1988 that reflected a worthless stock deduction in connection with the PLI stock. The following month PLI filed an amended plan of reorganization. The disclosure statement accompanying the amended PLI plan still reflected the availability of the NOL carryforward to the reorganized company. It did not mention the possibility of PSS taking a worthless stock deduction on its 1988 federal income tax return.

The PLI plan failed to win the support of the creditors. On September 11, 1989, the Creditors' Committee and Cold Spring filed a draft of a joint plan for reorganization (creditors' plan). That plan provided for new management of the reorganized company and provided for no distributions to the Skouras family. The PLI stock owned by the Skouras family was to be cancelled. Like PLI's plan, it also contemplated a carryforward of PLI's $74 million NOL. In an objection to this plan, filed September 19, 1989, PSS announced for the first time its intention to take a worthless stock deduction in the amount of $38.9 million in connection with its PLI stock on its 1988 tax return.

Skouras, Jr. attended three meetings with officials of MARAD, the unsecured creditor holding the largest single claim against PLI, to urge them to support the PLI plan and reject the creditors' plan. At one of these meetings, Skouras, Jr. provided MARAD with a written comparison of the two plans that described the NOL as preserved under the PLI plan and uncertain under the creditors' plan. Skouras, Jr. informed MARAD that PSS might take a worthless stock deduction on its 1988 tax return, which would limit any NOL available to a reorganized PLI.

*568 On October 10, 1989, counsel for PLI met with counsel for the Creditors' Committee and Cold Spring. At that meeting counsel for PLI broached the subject of personal releases in favor of Skouras, Sr. and Skouras, Jr. in the event the creditors' plan was confirmed. The Creditors' Committee and Cold Spring sought assurances that PSS would not take the worthless stock deduction. PSS agreed, subject to revocation by written notice, that it would not take the deduction while negotiations continued.

On November 6, 1989, after the negotiations failed, PSS informed Cold Spring by letter that it reserved the right to take the worthless stock deduction. On the following day Skouras, Jr. met with officials at MARAD and presented them with a copy of the letter. He told them that he did not know whether PSS actually intended to take the worthless stock deduction on its 1988 federal income tax return.

PLI rejected the request of the Creditors' Committee and Cold Spring to take steps to prevent PSS from taking the worthless stock deduction. Skouras, Sr. resigned from his positions with PLI, effective November 3, 1989, after PSS decided to take the worthless stock deduction on its 1988 tax return.

On November 13, 1989, the Creditors' Committee and Cold Spring commenced an adversary proceeding in the bankruptcy court seeking to have PSS preliminarily and permanently enjoined from taking the worthless stock deduction on its 1988 tax return. Count one of the complaint alleged that taking the worthless stock deduction on its 1988 tax return would amount to a breach of PSS' fiduciary duty to PLI. Count two alleged that PSS was using the threat of the worthless stock deduction only to interfere with the creditors' plan to reorganize PLI. Count three alleged that the NOL attributable to PLI was property of PLI's bankruptcy estate and that taking the worthless stock deduction would violate

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

the automatic stay provision of the Bankruptcy Code.

On November 21, 1989, the bankruptcy court held a hearing on plaintiffs' motion for a preliminary injunction. At the conclusion of the hearing, the bankruptcy court denied relief on counts one and two, holding that there was a legitimate business purpose for taking the worthless stock deduction and that the business judgment rule precluded further review of the propriety of that decision. On December 4, 1989, the bankruptcy court granted preliminary injunctive relief on count three. *Official Committee of Unsecured Creditors v. PSS S.S. Co., Inc. (In re Prudential Lines, Inc.),* 107 B.R. 832 (Bankr.S.D.N.Y.1989). The bankruptcy court held that the NOL generated by PLI was property of PLI's bankruptcy estate and that the worthless stock deduction was an attempt to exercise control over that property in violation of the automatic stay. On December 19, 1989, the bankruptcy court permanently enjoined PSS from taking the worthless stock deduction on its 1988 tax return. *Official Committee of Unsecured Creditors v. PSS S.S. Co., Inc. (In re Prudential Lines, Inc.),* 114 B.R. 27 (Bankr.S.D.N.Y.1989). The creditors' plan for reorganization was confirmed on December 15, 1989. PSS has not yet filed its 1988 tax return.

PSS appealed from the decision of the bankruptcy court to the district court pursuant to 28 U.S.C. § 158(a) (1988). The Creditors' Committee and Cold Spring cross-appealed from the bankruptcy court's denial of the injunction on counts one and two. On September 28, 1990, the district court affirmed the judgment of the bankruptcy court. *Official Committee of Unsecured Creditors v. PSS S.S. Co., Inc. (In re Prudential Lines, Inc.),* 119 B.R. 430 (S.D.N.Y.1990). The district court denied the cross-appeal without prejudice.

This appeal followed.

## II.

Initially, we set forth our standard of review. Our review of the district court order is plenary. *Gulf States Exploration Co. v. Manville Forest Prods. Corp. (In re Manville Forest Prods. Corp.),* 896 F.2d 1384, 1388 (2 Cir.1990); *Brown v. Pennsylvania State Employees Credit Union,* 851 F.2d 81, 84 (3 Cir.1988). "This court exercises *569 the same review over the district court's decision that the district court may exercise [over

the bankruptcy court's decision]." *Brown, supra,* 851 F.2d at 84. Accordingly, we will accept the bankruptcy court's findings of fact unless clearly erroneous. *In re Manville Forest Prods., supra,* 896 F.2d at 1388; Bankr. Rule 8013. We review the bankruptcy court's legal conclusions *de novo. In re Manville Forest Prods., supra,* 896 F.2d at 1388.

## III.

[1] With the foregoing in mind, we turn first to PSS' contention that the NOL attributable to PLI does not constitute property of PLI's bankruptcy estate within the meaning of § 541 of the Bankruptcy Code. PSS contends that the law of consolidated tax returns gives it, and not PLI, the right to use PLI's NOL to offset income. PSS contends that the right to the NOL carryforward is not PLI's property and cannot be considered property of PLI's estate. We disagree.

Our inquiry begins with the definition of property of the estate set forth in the Bankruptcy Code. Property of the estate encompasses "all legal or equitable interests of the debtor in property as of the commencement of the case." 11 U.S.C. § 541(a)(1) (1988). In construing this section, we are mindful that Congress intended § 541 to be interpreted broadly. *United States v. Whiting Pools, Inc.,* 462 U.S. 198, 204, 103 S.Ct. 2309, 2313, 76 L.Ed.2d 515 (1983). To facilitate reorganization, it is vital to include all the debtor's property in its bankruptcy estate. *Id.* at 203, 103 S.Ct. at 2312.

[2] The nature and extent of the debtor's interest in property is determined by applicable non-bankruptcy law. *Crysen/Montenay Energy Co. v. Esselen Assocs., Inc. (In re Crysen/Montenay Energy Co.),* 902 F.2d 1098, 1101 (2 Cir.1990); *Sanyo Elec., Inc. v. Howard's Appliance Corp. (In re Howard's Appliance Corp.),* 874 F.2d 88, 93 (2 Cir.1989). Whether that interest is included in the property of the debtor's estate is determined by bankruptcy law. *In re Crysen/Montenay, supra,* 902 F.2d at 1101; *Coben v. Lebrun (In re Golden Plan of California, Inc.),* 37 B.R. 167, 169 (Bankr.E.D.Cal.1984).

### (A)

We turn next to PSS' contention that PLI's status as an affiliated corporation filing a consolidated tax return abolished any interest it had in the right to use its NOL to offset its income. We disagree.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

928 F.2d 565
**(Cite as: 928 F.2d 565, \*569)**

[3] Affiliated corporations that meet certain criteria are entitled to file a consolidated tax return. 26 U.S.C. §§ 1501-04 (1988). Such returns are filed in the name of the "common parent," who acts as the agent for each subsidiary in the group and acts on behalf of the group in all matters related to tax liability for the consolidated group. 26 C.F.R. § 1.1502- 77(a) (1990). A corporation must consent to the filing of a consolidated return on its behalf. 26 C.F.R. § 1.1502-75(b) (1990). Once consent is given, an affiliated group must obtain the permission of the IRS to deconsolidate. *Koscot Interplanetary, Inc. v. Glenn Turner Enters., Inc. (In re Koscot Interplanetary, Inc.),* 76-1 U.S. Tax Cas. (CCH) ¶ 9442, at 84,188, 1976 WL 1029 (M.D.Fla.1976); 26 C.F.R. § 1.1502-75(c) (1990). The filing of a bankruptcy petition by one of the members of the group does not mandate a deconsolidation of the group. *In re Koscot, supra,* at 84,187.

"Those [corporations that] file consolidated returns are 'treated as a single entity for income tax purposes as if they were, in fact, one corporation.' " *Exxon Corp. v. United States,* 785 F.2d 277, 280 (Fed.Cir.1986) (citation omitted); *see also International Tel. & Tel. Corp. v. United States,* 608 F.2d 462, 474, 221 Ct.Cl. 442 (Cl.Ct.1979) ("[a] consolidated group of corporations filing a consolidated return is considered a single taxpayer"); *American Standard, Inc. v. United States,* 602 F.2d 256, 261, 220 Ct.Cl. 411 (Cl.Ct.1979) ("purpose behind allowing corporations to file consolidated returns is to permit affiliated corporations, which may be separately incorporated for various business reasons, to be treated as a single entity for income tax purposes as if they were, in fact, one corporation"). Accordingly, NOLs of the affiliated corporations may be aggregated and \*570 applied against the consolidated income of the group. 26 C.F.R. § 1.1502-21 (1990).

In the instant case, PSS and PLI, along with two other affiliated corporations, have filed a consolidated tax return since 1976. Although the confirmation of the reorganization plan and the concomitant change in ownership of PLI will cause PLI's departure from the group, the corporations were still consolidated for tax purposes in the tax year in question. PSS contends that since PLI was a member of a group that filed a consolidated tax return, the common parent, not PLI, controlled the manner in which PLI's NOL would be applied

against income of the group members. PSS contends, therefore, that the right to the NOL carryforward was not PLI's property at the commencement of the bankruptcy case.

In support of its position, PSS relies on a series of cases that stand for the proposition that one member of an affiliated group does not have to compensate another member for tax benefits accruing to it through the use of the other member's NOL. *E.g., Western Pac. R.R. Corp. v. Western Pac. R.R. Co.,* 197 F.2d 994, 1004 (9 Cir.1951), *rev'd on other grounds,* 345 U.S. 247, 73 S.Ct. 656, 97 L.Ed. 986 (1953); *In re Coral Petroleum, Inc.,* 60 B.R. 377, 389 (Bankr.S.D.Tex.1986); *In re All Products Co.,* 32 B.R. 811, 814 (Bankr.E.D.Mich.1983); *M & M Transp. Co. v. U.S. Indus., Inc.,* 416 F.Supp. 865, 869 (S.D.N.Y.1976); *Meyerson v. El Paso Natural Gas Co.,* 246 A.2d 789, 791-94 (Del.Ch.1967); *Case v. New York Cent. R.R. Co.,* 15 N.Y.2d 150, 158, 204 N.E.2d 643, 647, 256 N.Y.S.2d 607, 612 (1965). That reliance is misplaced.

The above cases were decided under fiduciary duty and contract standards. *Western Pac., supra,* 197 F.2d at 999 (bankrupt subsidiary did not breach fiduciary duty by using parent's NOL to offset its income); *In re Coral Petroleum, supra,* 60 B.R. at 390-91 (corporate debtor did not have fiduciary duty to compensate subsidiary for use of its NOL to offset income of other subsidiaries on consolidated return and was not unjustly enriched by that action); *In re All Prods. Co., supra,* 32 B.R. at 813-15 (bankrupt subsidiary could not reduce parent's claim by amount that parent's tax liability was diminished through use of subsidiary's NOL on consolidated return); *M & M Transp. Co., supra,* 416 F.Supp. at 869 (former subsidiary seeking compensation from former parent for use of NOL on consolidated return that resulted in tax refund); *Meyerson, supra,* 246 A.2d at 791-94 (parent did not breach fiduciary duty by using subsidiary's NOL to offset its income on consolidated return); *Case, supra,* 15 N.Y.2d at 154-55, 204 N.E.2d at 644- 45, 256 N.Y.S.2d at 608-09 (action to rescind agreement among affiliated corporations regarding the allocation of federal tax liability on consolidated return). As such they are more appropriate to the issues raised by the cross-appeal. Moreover, although some of these cases involved bankrupt corporations, none purported to determine whether the NOL attributable to the bankrupt corporation was property of that corporation's bankruptcy estate.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Only *In re All Prods. Co.* involved a parent corporation's use of its bankrupt subsidiary's NOL to offset its income. In that case, the tax savings occurred prior to the filing of the bankruptcy petition, 32 B.R. at 813, and the court did not consider the issue of whether the NOL attributable to the debtor at the time of the filing of the bankruptcy petition was property of its bankruptcy estate. Moreover, the court in that case found implied consent on the part of the subsidiary to the use of its NOL to offset the parent's income. *Id.* at 814-15. It is not disputed that "where there is an explicit agreement, or where an agreement can fairly be implied, as a matter of state corporation law the parties are free to adjust among themselves the ultimate tax liability." *Western Dealer Management, Inc. v. England (In re Bob Richards Chrysler-Plymouth Corp., Inc.),* 473 F.2d 262, 264 (9 Cir.), *cert. denied,* 412 U.S. 919, 93 S.Ct. 2735, 37 L.Ed.2d 145 (1973) (footnotes omitted). However, "consent[ ] to the filing of a consolidated tax return ... cannot be construed to include the transfer of a valuable asset without further consideration." *In re Bob Richards, supra,* 473 F.2d at 264. There was no explicit agreement between PSS and *571 PLI as to the allocation of PLI's NOL. We discern no such implied agreement.

[4] The fact that a subsidiary's NOL ultimately may be used to offset another corporation's income does not mean that the subsidiary loses any interest in its NOL. The common parent acts as an agent on behalf of all the members of the consolidated group "for the convenience and protection of [the] IRS only." *Jump v. Manchester Life & Casualty Management Corp.,* 579 F.2d 449, 452 (8 Cir.1978); *accord In re Bob Richards, supra,* 473 F.2d at 265. The corporations retain their separate identities and the property interests of the subsidiaries are not absorbed by the common parent. *Wolter Constr. Co., Inc. v. Commissioner,* 634 F.2d 1029, 1038 (6 Cir.1980). It follows that a corporation does not lose any interest it had in the right to use its NOL to offset income because of its status in a group of affiliated corporations that file a consolidated tax return. *E.g.,* 26 C.F.R. § 1.1502-79(a)(1)(ii) (1990) (upon deconsolidation any remaining NOL attributable to a corporation is available to offset income on its separate tax returns); *see also In re Bob Richards, supra,* 473 F.2d at 265 ("[a]llowing the parent to keep any refunds arising solely from a subsidiary's losses simply because the parent and subsidiary chose a

procedural device to facilitate their income tax reporting unjustly enriches the parent").

We hold that at the commencement of the bankruptcy case against it, PLI had an interest in the $74 million NOL attributable to its pre-bankruptcy operation.

(B)

This brings us to the question whether PLI's interest in the right to carryforward its $74 million NOL to offset future income is property of the estate within the meaning of § 541. We hold that it is.

In *Segal v. Rochelle,* 382 U.S. 375, 86 S.Ct. 511, 15 L.Ed.2d 428 (1966) (Harlan, J.), the Supreme Court, construing § 541's predecessor, considered whether a NOL carryback that resulted in a tax refund to an individual debtor was property of that debtor's estate. The Court held that a NOL carryback was property of an individual debtor's estate. *Id.* at 380, 86 S.Ct. at 515. Recognizing the "conceptual[ ] as well as practical [ ]" differences between carrybacks and carryforwards, the Court declined to decide the issue of whether NOL carryforwards were also property of the estate. *Id.* at 381, 86 S.Ct. at 515. It expressed concern that including NOL carryforwards as property of the estate of an individual debtor could endanger the fresh start policy of the Bankruptcy Act by forcing the estate to remain open for a long period. *Id.*

The legislative history of § 541 demonstrates that Congress agreed with the result reached by the *Segal* Court.

"[T]he estate is comprised of all legal or equitable interest of the debtor in property, wherever located, as of the commencement of the case. The scope of this paragraph is broad. It includes all kinds of property, including tangible or intangible property, causes of action ... and all other forms of property currently specified in [the predecessor statute to § 541]. ... The result of *Segal v. Rochelle,* 382 U.S. 375 [86 S.Ct. 511, 15 L.Ed.2d 428] (1966), is followed, and the right to a refund is property of the estate."
S.Rep. No. 95-989, 95th Cong. 2d Sess. 82, *reprinted in* 1978 U.S.Code Cong. & Admin.News 5787, 5868; H.R.Rep. No. 95-595, 95th Cong. 1st Sess. 367, *reprinted in* 1978 U.S.Code Cong. & Admin.News 5963, 6323 (footnote omitted).

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Courts, applying *Segal,* have held that a subsidiary is entitled to a tax refund due to its NOL carryback to the extent that it offsets its own income. *E.g., Jump, supra,* 579 F.2d at 452; *In re Bob Richards, supra,* 473 F.2d at 264; *In re Revco D.S., Inc.,* 111 B.R. 631, 639 (Bankr.N.D.Ohio 1990). Courts considering whether NOL carryforwards constitute property of the estate have reached varying conclusions in varying contexts. *Compare Jump, supra,* 579 F.2d at 453 ("the right to use its net operating loss to gain carryover tax advantage was not an asset of [a liquidating subsidiary] because its value was conditioned on the existence of future income potential of [the subsidiary]") *and Davis v. Commissioner,* 69 T.C. 814, 827 (1978) *\*572* ("net operating loss carryover cannot constitute property" of an individual debtor's estate) *with In re Beery,* 116 B.R. 808, 810 (D.Kan.1990) (right to use NOL carryforward is property of debtor's estate).

PSS contends that *Segal* does not control the instant case since it involved a NOL carryback rather than a NOL carryforward, and an individual rather than a corporate debtor filing a consolidated return. Those distinctions do not require a contrary result here.

[5] Carryforwards differ in nature from carrybacks. Carrybacks result in the right to a tax refund of a definite amount. Carryforwards, by contrast, are speculative since their value depends on the availability of future income against which to apply them. The speculative nature of carryforwards does not place them outside the definition of property of the estate. "[T]he term 'property' has been construed most generously and an interest is not outside its reach because it is novel or contingent or because enjoyment must be postponed." *Segal, supra,* 382 U.S. at 379, 86 S.Ct. at 515; *see also* H.R.Rep. No. 95-595, 95th Cong., 2d Sess. 175-76, *reprinted in* 1978 U.S.Code Cong. & Admin.News 5963, 6136 (property of the estate "includes all interests, such as … contingent interests and future interests, whether or not transferable by the debtor"). The fact that the right to a NOL carryforward is intangible and has not yet been reduced to a tax refund also does not exclude it from the definition of property of the estate. *In re Golden Plan, supra,* 37 B.R. at 169. In short, interests whose value is speculative and interests that involve intangible rights that are subject to regulation may be included as property of the estate. *E.g., Neuton v. Danning (In re Neuton),* 922 F.2d 1379, 1382-83 (9

Cir.1990) (interest in trust contingent on survivorship is property of the estate); *Tringali v. Hathaway Mach. Co.,* 796 F.2d 553, 560 (1 Cir.1986) (liability insurance policy is property of the estate); *Beker Indus. Corp. v. Florida Land & Water Adjudicatory Comm'n (In re Beker Indus. Corp.),* 57 B.R. 611, 622 (Bankr.S.D.N.Y.1986) (right to truck products from mine is property of estate); *In re Golden Plan, supra,* 37 B.R. at 169 (corporate name is property of the estate). Thus, the nature of the interest involved in the instant case does not compel a conclusion that it is not property of the estate.

As the *Segal* Court observed, the main hurdle to including NOL carryforwards as property of the estate is the detrimental impact it could have on the fresh start policy that is promoted by the Bankruptcy Code. *Segal, supra,* 382 U.S. at 381, 86 S.Ct. at 515. Subsequent legislation has ameliorated that concern with respect to individual debtors and suggests that Congress intended that NOL carryforwards be included in the property of the estate of individual as well as corporate debtors.

[6] Congress provided for the tax treatment of debtors and their bankruptcy estates in § 346 of the Bankruptcy Code. With respect to individual debtors, Congress provided that the income to their estates could be taxed separately from the income to the individual debtor. 11 U.S.C. § 346(b)(1) (1988). Congress also provided that the estate succeeds to the tax attributes of individual debtors including "any loss carryover." 11 U.S.C. § 346(i)(1)(C) (1988). To address the *Segal* Court's concern that including carryforwards as property of the estate would jeopardize the fresh start policy, Congress provided that unutilized tax attributes revert to the debtor at the conclusion of the case. 11 U.S.C. § 346(i)(2) (1988). Section 346(i) seems to contemplate that NOL carryforwards, as well as carrybacks, become property of an individual debtor's bankruptcy estate. Other subsections contemplate use of NOL carryforwards by a corporate debtor. *E.g.,* 11 U.S.C. § 346(h) (1988) (determination of periods in which debtor may use NOL carryover); 346(j)(3) (NOL carryover of individual or corporate debtor is reduced by the amount of debt forgiven or discharged).

We do not read § 346(i) as applying to corporate debtors. *E.g., Maritime Asbestosis Legal Clinic v. LTV Steel Co., Inc. (In re Chateaugay Corp.),* 920 F.2d 183, 187 (2 Cir.1990) (section permitting

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

individual debtors to recover sanctions for willful *573 violations of automatic stay cannot be read to apply to corporate debtors). Congress' failure to include corporate debtors in that provision does not imply, however, that Congress meant to treat NOL carryforwards of corporate debtors differently than those of individual debtors. Since the bankruptcy estate of a corporate debtor is not a separate entity for tax purposes, 11 U.S.C. § 346(c)(1) (1988), there was no need for Congress to provide that carryovers are transferred to the estate and then back to the corporate debtor at the conclusion of the case.

Corporations attempting to reorganize under Chapter 11 are ongoing concerns that generate income used to pay pre-petition creditors. *Whiting Pools, supra,* 462 U.S. at 203, 103 S.Ct. at 2312. Furthermore, a liquidating corporation's debts are not discharged in bankruptcy. 11 U.S.C. § 727(a)(1) (1988). The fresh start policy, therefore, does not apply to corporate debtors. *City of New York v. Quanta Resources Corp. (In re Quanta Resources Corp.),* 739 F.2d 912, 915 n.7 (3 Cir.1984), *aff'd,* 474 U.S. 494, 106 S.Ct. 755, 88 L.Ed.2d 859 (1986); *In re Blanton,* 105 B.R. 811, 824 (Bankr.W.D.Tex.1989); *see also* Note, *Bankruptcy and the Union's Bargain: Equitable Treatment of Collective Bargaining Agreements,* 39 Stan.L.Rev. 1015, 1025 n.67 (1987) ("the fresh start policy does not apply to corporations"). Thus, the concern that the *Segal* Court expressed does not apply to a situation involving a corporate debtor. When the fresh start policy is not implicated, the argument for including NOL carryforwards as property of the bankruptcy estate is strengthened. *Compare In re Beery, supra,* 116 B.R. at 810 (NOL carryforward is property of the estate; fresh start policy not implicated since individual not entitled to discharge because of misconduct) *with Davis, supra,* 69 T.C. at 827-28 (relying on detriment to fresh start policy in case where NOL carryforward had value only to debtor, but not to estate, to conclude that it was not property of the estate).

Finally, in determining the scope of § 541 we must consider the purposes animating the Bankruptcy Code. *Kokoszka v. Belford,* 417 U.S. 642, 645, 94 S.Ct. 2431, 2433, 41 L.Ed.2d 374 (1974); *Lines v. Frederick,* 400 U.S. 18, 19, 91 S.Ct. 113, 113, 27 L.Ed.2d 124 (1970); *Segal, supra,* 382 U.S. at 379, 86 S.Ct. at 515. Including NOL carryforwards as property of a corporate debtor's estate is consistent with Congress' intention to "bring

anything of value that the debtors have into the estate." H.R.Rep. No. 95- 595, 95th Cong., 2d Sess. 176, *reprinted in* 1978 U.S.Code Cong. & Admin.News 5963, 6136. Moreover, "[a] paramount and important goal of Chapter 11 is the rehabilitation of the debtor by offering breathing space and an opportunity to rehabilitate its business and eventually generate revenue." *International Ass'n of Machinists and Aerospace Workers v. Eastern Air Lines, Inc.,* 121 B.R. 428, 433 (S.D.N.Y.1990), *aff'd,* 923 F.2d 26 (2 Cir.1991). Including the right to a NOL carryforward as property of PLI's bankruptcy estate furthers the purpose of facilitating the reorganization of PLI. The fact that both plans for reorganization contemplated its availability to the reorganized company suggests that PLI's $74 million NOL was a valuable asset of PLI.

We hold that the right to a carryforward attributable to its $74 million NOL was property of PLI's bankruptcy estate.

IV.

[7] We turn now to PSS' contention that the bankruptcy court erred in enjoining it from taking a worthless stock deduction on its 1988 tax return. We hold that the injunction entered by the bankruptcy court was proper.

The commencement of a bankruptcy case operates to stay "any act to obtain possession of property of the estate or of property from the estate or to exercise control over property of the estate." 11 U.S.C. § 362(a)(3) (1988). "The reach of the automatic stay is limited by its purposes." *Price & Pierce Int'l, Inc. v. Spicers Int'l Paper Sales, Inc.,* 50 B.R. 25, 26 (S.D.N.Y.1985); *accord Rett White Motor Sales Co. v. Wells Fargo Bank,* 99 B.R. 12, 13 (N.D.Cal.1989). One of the principal purposes of the automatic stay is to preserve the property of the debtor's estate for the benefit of all the creditors. *Holtkamp v. Littlefield (*574 In re Holtkamp),* 669 F.2d 505, 508 (7 Cir.1982); *In re Fed. Press Co.,* 117 B.R. 942, 946 (Bankr.N.D.Ind.1989); *In re Gatke Corp.,* 117 B.R. 406, 408 (Bankr.N.D.Ind.1989).

In the instant case, if PSS were allowed to take a worthless stock deduction on its 1988 tax return, it would effectively eliminate the value of the NOL carryforward to PLI and thus have an adverse impact on PLI's reorganization. The use of NOLs as tax deductions following a change in ownership

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

of a corporation is governed by 26 U.S.C. § 382 (1988). The amount of the deduction is limited to "the value of the old loss corporation" multiplied by "the long-term tax-exempt rate". 26 U.S.C. § 382(b) (1988). A change of ownership is deemed to have occurred if a greater than 50 percent shareholder takes a worthless stock deduction, but retains the stock at the end of the taxable year. 26 U.S.C. § 382(g)(4)(D) (1988). The value of the old loss corporation is generally measured by the value of the stock immediately prior to the ownership change. 26 U.S.C. § 382(e)(1) (1988). Since PSS owned 100 percent of the stock of PLI, if it declared that stock to be worthless and retained ownership of the stock at the end of the taxable year, the value of the PLI stock would be zero for the purposes of § 382. Accordingly, the "new" corporation would not be entitled to any NOL carryforward.

In *48th St. Steakhouse, Inc. v. Rockefeller Group, Inc. (In re 48th St. Steakhouse, Inc.)*, 835 F.2d 427 (2 Cir.1987), *cert. denied*, 485 U.S. 1035, 108 S.Ct. 1596, 99 L.Ed.2d 910 (1988), we held that a landlord's attempt to terminate its lease with a non-debtor was subject to the automatic stay since it would have had the legal effect of terminating the debtor's sublease. *Id.* at 431. Despite the fact that the landlord's action was not directed specifically at the debtor, we held that

"where a non-debtor's interest is intertwined ... with that of a bankrupt debtor ... [and an] action taken against the non-bankrupt party would inevitably have an adverse impact on property of the bankrupt estate, then such action should be barred by the automatic stay."

*Id.* Similarly, where a non-debtor's action with respect to an interest that is intertwined with that of a bankrupt debtor would have the legal effect of diminishing or eliminating property of the bankrupt estate, such action is barred by the automatic stay.

In the instant case, PSS' interest in its worthless stock deduction is intertwined with PLI's NOL. If PSS were permitted to take a worthless stock deduction on its 1988 tax return, it would have an adverse impact on PLI's ability to carryforward its NOL. Accordingly, despite the fact that PSS' action is not directed specifically at PLI, it is barred by the automatic stay as an attempt to exercise control over property of the estate.

[8] The permanent injunction entered by the bankruptcy court also is supported by its equitable

powers pursuant to § 105(a). That provision grants the bankruptcy court power to "issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of [the Bankruptcy Code]." 11 U.S.C. § 105(a) (1988). "This provision has been construed liberally to enjoin [actions] that might impede the reorganization process." *MacArthur Co. v. Johns-Manville Corp. (In re Johns-Manville Corp.),* 837 F.2d 89, 93 (2 Cir.), *cert. denied,* 488 U.S. 868 (1988). In light of the testimony of the parties that the $74 million NOL was a valuable asset of PLI, we will not disturb the bankruptcy court's finding that elimination of the right to apply its NOL to offset income on future tax returns would impede PLI's reorganization.

Finally, we consider PSS' claim that the bankruptcy court was without jurisdiction to enter the injunction. PSS relies for this proposition on a series of cases that held that § 505(a)(1) of the Bankruptcy Code, which gives the bankruptcy court the power to "determine the amount or legality of any tax", does not confer jurisdiction on the bankruptcy court to adjudicate the tax liability of non-debtors. *E.g., American Principals Leasing Corp. v. United States,* 904 F.2d 477, 480-81 (9 Cir.1990); *Brandt-Airflex Corp. v. Long Island *575 Trust Co., N.A. (In re Brandt-Airflex Corp.),* 843 F.2d 90, 95-96 (2 Cir.1988); *In re Vermont Fiberglass, Inc.,* 88 B.R. 41, 43-44 (D.Vt.1988).

In the instant case, the bankruptcy court did not determine the amount or legality of PSS' tax liability. The bankruptcy court's power was based on its jurisdiction over property of the estate. *In re Johns-Manville Corp., supra,* 837 F.2d at 91. Having properly exercised jurisdiction, the bankruptcy court may enter an injunction that affects derivative rights of a non-debtor. *Id.* at 92-93.

V.

Since we hold that the bankruptcy court's injunction was justified based on count three of the complaint, we find it neither necessary nor appropriate to consider the issues raised by the cross-appeal of the Creditors' Committee and Cold Spring.

VI.

To summarize:

We hold that the right to carryforward a tax

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

928 F.2d 565
(Cite as: 928 F.2d 565, *575)

deduction due to the NOL attributable to PLI's pre-bankruptcy operation was property of PLI's bankruptcy estate.   We further hold that PSS' attempt to take a worthless stock deduction with respect to its PLI stock that would effectively destroy the value of the NOL carryforward generated by PLI was properly enjoined by the bankruptcy court.   We do not consider the issues raised by the cross-appeal.

 Affirmed.

 928 F.2d 565, 59 USLW 2590, 67 A.F.T.R.2d 91-972, 92-2 USTC   P 50,491, 24 Collier Bankr.Cas.2d 1503, 21 Bankr.Ct.Dec. 838, Bankr. L. Rep.  P 73,863

 **Briefs and Other Related Documents (Back to**

top)

 . 1991 WL 11010227T2  (Appellate Brief) Reply Brief for Plaintiffs-Appellees/Cross-Appellants (Jan. 22, 1991)Original Image of this Document (PDF)

 . 1991 WL 11010228T2  (Appellate Brief) Reply Brief    for    Defendant-Appellant    (Jan.    11, 1991)Original Image of this Document (PDF)

 . 1990 WL 10023176T2  (Appellate Brief) Brief for Plaintiffs-Appellees/Cross-Appellants    (Dec.    28, 1990)Original Image of this Document (PDF)

 . 1990 WL 10023175T2  (Appellate Brief) Brief for Defendant-Appellant    (Nov.    30,    1990)Original Image of this Document (PDF)

 END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# TAB 42

667 F.2d 297                                                                                    **Page 111**
667 F.2d 297, 109 L.R.R.M. (BNA) 2197, 92 Lab.Cas. P 13,169, 5 Collier Bankr.Cas.2d 909,
8 Bankr.Ct.Dec. 616, Bankr. L. Rep.  P 68,475
**(Cite as: 667 F.2d 297)**
▷

United States Court of Appeals,
Second Circuit.
**In re William O. PETRUSCH, Jr., d/b/a B & L**
**Distribution Center, Debtor.**
**William O. PETRUSCH, Jr., d/b/a B & L**
**Distribution Center, Respondent-**
**Appellant,**
**v.**
**TEAMSTERS LOCAL 317, SYRACUSE, NY &**
**New York State Teamsters Council, Health&**
**Hospital Fund/Pension Retirement Fund,**
**Petitioners-Appellees.**
**No. 599, Docket 81-5055.**

Argued Nov. 13, 1981.
Decided Dec. 15, 1981.

On return of show cause order, union sought stay
pending appeal of temporary restraining order
signed by bankruptcy judge enjoining union from
commencement or continuation of picketing
debtor's business.  The United States District Court
for the Northern District of New York, Neal P.
McCurn, J., 14 B.R. 825, held Bankruptcy Court to
be without subject-matter jurisdiction to issue
injunction, and debtor appealed.   The Court of
Appeals held that: (1) Bankruptcy Court was
without subject-matter jurisdiction to issue
injunction to restrain labor union from picketing
debtor's place of business in labor dispute since
Norris-LaGuardia Act expressly prohibited such
injunctions by any United States court, and (2)
employer's obligation, by terms of collective
bargaining agreements between itself and union, to
make fringe benefit payments to union health and
hospital fund and pension and retirement fund was
part of "terms and conditions of employment," and
thus fit squarely into Norris-LaGuardia Act's
definition of labor dispute.

Affirmed.

West Headnotes

**[1] Labor and Employment** ⊗⟿2036
231Hk2036
    (Formerly 232Ak860  Labor Relations)
Bankruptcy court was without subject-matter
jurisdiction to issue injunction to restrain labor
union from picketing debtor's place of business in
labor dispute since Norris-LaGuardia Act expressly

prohibited such injunctions by any United States
court.   Norris-LaGuardia Act, §§ 1 et seq., 4, 29
U.S.C.A. §§ 101 et seq., 104;   Bankr.Code, 11
U.S.C.A. §§ 362, 1301 et seq.

**[2] Labor and Employment** ⊗⟿2049
231Hk2049
    (Formerly 232Ak884  Labor Relations)
Employer's obligation, by terms of collective
bargaining agreement between itself and union, to
make fringe benefit payments to union health and
hospital fund and pension and retirement fund was
part of "terms and conditions of employment," and
thus fit squarely into Norris-LaGuardia Act's
definition of labor dispute.   Norris-LaGuardia Act,
§ 13(c), 29 U.S.C.A. § 113(c).

**[3] Labor and Employment** ⊗⟿2014
231Hk2014
    (Formerly 232Ak851  Labor Relations)

**[3] Labor and Employment** ⊗⟿2018
231Hk2018
    (Formerly 232Ak851  Labor Relations)
Congress, by enacting automatic stay provision of
Bankruptcy Reform Act, did not intend to supersede
or transcend Norris-LaGuardia Act.     Norris-
LaGuardia Act, §§ 1 et seq., 4, 29 U.S.C.A. §§
101 et seq., 104;
Bankr.Code, 11 U.S.C.A. §§ 362, 1301 et seq.
 **\*298** Samuel J. Costa, Syracuse, N. Y. (Grass,
Balanoff, Costa & Whitelaw, Syracuse, N. Y., on
the brief), for appellant.

 James R. LaVaute, Syracuse, N. Y. (Blitman &
King, Syracuse, N. Y., on the brief), for appellee.

 Before TIMBERS and KEARSE, Circuit Judges,
and MURPHY, District Judge.[FN*]

        FN* Honorable Thomas F. Murphy, United States
        District Judge for the Southern District of New
        York, sitting by designation.

 PER CURIAM:

  [1] Petrusch, the debtor in a Chapter 13
proceeding, (11 U.S.C. s 1301 et seq. (Supp. III
1979)), appeals an order of the District Court for
the Northern District of New York staying, pending
appeal to this Court, an injunction by a Bankruptcy

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Judge restraining appellee labor union, Teamsters Local 317, from picketing his place of business in a labor dispute. The District Judge, in a reasoned opinion, held that the Bankruptcy Court was without subject matter jurisdiction because the Norris-La Guardia Act, 29 U.S.C. s 101 et seq., expressly prohibited such injunctions by any United States court. We agree, and affirm.

This appeal therefore, presents the issue whether the Automatic Stay section of the Bankruptcy Reform Act of 1978 (11 U.S.C. s 362), upon which the Bankruptcy Judge relied, supersedes pro tanto the historic Norris-La Guardia Act, 29 U.S.C. s 101 et seq. Section 4 of that Act (29 U.S.C. s 104) provides:

"No court of the United States shall have jurisdiction to issue any restraining order or temporary or permanent injunction in any case involving or growing out of any labor dispute to prohibit any person or persons participating or interested in such dispute (as these terms are herein defined) from doing, whether singly or in concert, any of the following acts:

*299 (e) Giving publicity to the existence of, or the facts involved in, any labor dispute, whether by advertising, speaking, patrolling, or by any other method not involving fraud or violence;

(f) Assembling peaceably to act or to organize to act in promotion of their interests in a labor dispute; ...."

Thirty years ago almost to the day this Court struck down a similar injunction issued in a Chapter X proceeding under the Bankruptcy Act of 1898 (11 U.S.C. s 501 et seq. (1976)), involving a threatened union strike of the Third Avenue Transit Corporation which served a million and a half passengers a day. Citing Mr. Justice Frankfurter's concurring opinion in United States v. United Mine Workers of America, 330 U.S. 258, 313-14, 320 n.6 (1947), we held: "Both the language and the purposes of that statute (Norris-La Guardia Act) ... forbids such a conclusion. The well established power of the reorganization court to issue orders necessary to conserve the property in its custody must be exercised within the scope of a jurisdiction which is limited by the broad and explicit language of the Norris-La Guardia Act." In Re Third Ave. Transit Corp., et al., Lehman, et al. v. Quill, et al., 192 F.2d 971, 973 (2nd Cir. 1951).

More recently, in Truck Drivers Local Union No. 807, International Brotherhood of Teamsters v. The

Bohack Corporation, 541 F.2d 312 (2nd Cir. 1976), cert. denied, 439 U.S. 825 (1978), also decided under the Bankruptcy Act of 1898, we issued the extraordinary writ of mandamus to the District Judge to vacate his order restraining the union from engaging in actions protected by Section 4 of the Norris-La Guardia Act, saying that "the district court did not have jurisdiction, ... to enjoin the picketing or other lawful union activity, and hence (we) will grant the writ of mandamus to the district court to dissolve any such order." Id. at 318.

[2] Petrusch contended before the district court that there was no labor dispute between him and the union but only an attempt by the union to collect a pre-petition debt for the Teamsters' funds. The Court correctly disposed of this contention by holding that Petrusch was obliged, by the terms of the collective bargaining agreements between the parties, to make fringe benefit payments to the Teamsters' Health and Hospital Fund and their Pension and Retirement Fund. Because such obligation is part of the terms and conditions of employment, it fits squarely into the Norris-La Guardia Act's definition of a labor dispute. 29 U.S.C. s 113(c), defining a labor dispute, includes "any controversy concerning terms or conditions of employment, ... regardless of whether or not the disputants stand in the proximate relation of employer and employee."

The "Automatic Stay" in all voluntary and involuntary bankruptcies as directed in Section 362(a) of the Bankruptcy Reform Act attaches upon the filing of the petition and applies to all entities included in 8 subdivisions of activities relating to diverse legal and administrative matters. In s 362(b), 8 situations are delineated where the stay does not attach. Labor disputes or picketing are not mentioned in either subsection.

The purpose of the Automatic Stay is explained in the House Report for the Bankruptcy Reform Act, H.R.Rep. 95-595, 95th Cong., 2d Sess., 340, reprinted in (1978) U.S.Cong. and Ad.News 6135, 6296-97:

"The automatic stay is one of the fundamental debtor protections provided by the bankruptcy laws. It gives the debtor a breathing spell from his creditors. It stops all collection efforts, all harassment, and all foreclosure actions. It permits the debtor to attempt a repayment or reorganization plan, or simply to be relieved of the financial pressures that drove him into

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

bankruptcy.
The automatic stay also provides creditor protection. Without it, certain creditors would be able to pursue their own remedies against the debtor's property. Those who acted first would obtain payment of the claims in preference to and to the detriment of other creditors...."

[3] Nowhere in the legislative history of the Bankruptcy Reform Act of 1978 (Report *300 of the Committee on the Judiciary, H.R.Rep.No.95-595, 95th Cong., 1st Sess., 1977; Notes of Committee on the Judiciary, Sen.Rep.No.989, 95th Cong., 2nd Sess. 54 reprinted in (1978) U.S.Cong. and Ad.News 5788, 5840-41) or in the Report of the Commission on the Bankruptcy Laws of the United States (H.R.Doc.No.93-137, 93rd Cong., 1st Sess., 1973) is any reference made to the Norris-La Guardia Act. Such omissions are to us self-evident proof that Congress never intended to supersede or transcend it, since we cannot believe the Norris-La Guardia

Act was to superseded, sub silentio.

Concern for the preservation of estates in bankruptcy and prevention from interference in their status quo has had a long history and effective remedies bottomed on the concept of custodia legis, but with exceptions and limitations. "It is as true of the present law as it was of that of 1867, that the filing of the petition is a caveat to all the world, and in effect an attachment and injunction,...." Mueller v. Nugent, 184 U.S. 1, 14 (1902); cf., Ex Parte Baldwin, et al., 291 U.S. 610, 615 (1934). Congress, pursuant to its constitutional powers, carved out an exception in labor disputes by withdrawing jurisdiction of all United States courts. Art. III, Sec. 1.

667 F.2d 297, 109 L.R.R.M. (BNA) 2197, 92 Lab.Cas. P 13,169, 5 Collier Bankr.Cas.2d 909, 8 Bankr.Ct.Dec. 616, Bankr. L. Rep. P 68,475

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# TAB 43

204 F.3d 805
204 F.3d 805, 2000 Copr.L.Dec. P 28,027, 53 U.S.P.Q.2d 1863
(Cite as: 204 F.3d 805)

**Page 369**

C

**Briefs and Other Related Documents**

United States Court of Appeals,
Eighth Circuit.
**PHILLIPS BEVERAGE COMPANY, through its
operating division, Millenium Import
Co., Appellee,**
v.
**BELVEDERE, S.A., formerly known as France
Euro Agro, S.A., Appellant.
Nos. 98-3602, 98-4046.**

Submitted Dec. 16, 1999.
Decided Feb. 18, 2000.

Importer sought injunction ordering designer-manufacturer of vodka bottles to withdraw its pending application before Customs to detain importer's allegedly infringing bottles. The United States District Court for the District of Minnesota, Richard H. Kyle, J., issued injunction and related civil contempt sanctions in favor of importer, and designer-manufacturer appealed. The Court of Appeals, Fagg, Circuit Judge, held that, after denying designer-manufacturer's request for temporary restraining order, district court had authority, under All Writs Act, to require manufacturer to withdraw its pending application before Customs to detain importer's shipments.

Affirmed.

West Headnotes

**Federal Courts** ⟲10.1
170Bk10.1
District court had authority, under All Writs Act, to require designer-manufacturer of vodka bottles to withdraw its pending application before Customs to detain importer's shipments of allegedly infringing bottles, after district court had denied designer-manufacturer's request for temporary restraining order, notwithstanding designer-manufacturer's alleged right to pursue alternative remedies. 28 U.S.C.A. § 1651(a); 19 C.F.R. § 133.43(e).
**\*805** Gary A. Orseck, Washington, D.C., argued (Lawrence S. Robbins, Neil M. Soltman and Frederick S. Levin, Washington, D.C., Richard Mark, Minneapolis, MN, on the brief), for appellant.

Peter D. Raymond, New York, NY, argued (Eric

Osterberg, New York, NY, Ronald J. Schutz and Rita Coyle DeMeules, Minneapolis, MN, on the brief), for appellee.

Before McMILLIAN and FAGG, Circuit Judges, and BOGUE, [FN*] District Judge.

> FN* The Honorable Andrew W. Bogue, United States District Judge for the District of South Dakota, sitting by designation.

FAGG, Circuit Judge.

Belvedere, S.A. (Belvedere) appeals from an injunction and related civil contempt sanctions issued by the district court in favor of Phillips Beverage Company, through its operating division, Millenium Import Company (Phillips). We affirm.

Belvedere designed and manufactured a vodka bottle for a Polish distillery. When the relationship between Belvedere and the distillery soured, Belvedere contends Phillips had counterfeit and infringing bottles made for the distillery and shipped to the United States. Belvedere moved for a temporary restraining order in federal district court, seeking to enjoin Phillips from importing the bottles. After the district court denied the motion, Belvedere turned **\*806** to the United States Customs Service (Customs), where Belvedere recorded its purported copyright and applied for a Customs order detaining Phillips's allegedly infringing bottles. *See* 19 C.F.R. § 133.43(a) (1999) (Customs can detain imported articles if Customs "has any reason to believe that an imported article may be an infringing copy ... of a recorded copyrighted work"). Customs made an initial determination of infringement and detained the vodka shipments.

In response, Phillips returned to the district court and requested an injunction ordering Belvedere to withdraw its pending application before Customs. The district court concluded the injunction was necessary to "prevent the undermining of [its] jurisdiction," ordered Belvedere to "withdraw its application for detention of ... vodka shipments now pending before [Customs]," and enjoined Belvedere "from prosecuting or taking any actions in support of the pending application for detention of ... vodka shipments." Because Belvedere repeatedly refused to withdraw its pending application, the district

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

204 F.3d 805
(Cite as: 204 F.3d 805, *806)

court also assessed civil contempt sanctions against Belvedere. Belvedere eventually complied with the district court order, and Customs released the vodka shipments.

On appeal, Belvedere contends the district court could not order Belvedere to withdraw its Customs application, arguing the relevant federal regulations permit Belvedere to seek relief before Customs on its infringement claims despite having already presented these claims to the district court. *See* 19 C.F.R. § 133.43(e) (1999) ("As an alternative to [presenting an infringement claim to Customs], the copyright owner ... may seek a court order enjoining importation of the article."). Contrary to Belvedere's view, we conclude the district court acted properly under the authority granted it by the All Writs Act to "issue all writs necessary or appropriate in aid of [its] ... jurisdiction[ ]." 28 U.S.C. § 1651(a) (1994). Here, Belvedere initially chose to invoke the district court's jurisdiction by filing its motion for a temporary restraining order. Belvedere then attempted to make an end run around the district court's refusal to grant the interim relief Belvedere sought in a case over which the district court continued to have jurisdiction by going back to Customs and asking Customs to do what the district court would not. In these circumstances, the district court could order Belvedere to withdraw its pending Customs application to "prevent the frustration of [the] order[ ] it ha[d] previously issued in its exercise of jurisdiction otherwise obtained ." *United States v. New York Tel. Co.,* 434 U.S. 159, 172, 98 S.Ct. 364, 54 L.Ed.2d 376 (1977); *accord NAACP v. Metropolitan Council,* 125 F.3d 1171, 1173 (8th Cir.1997) (district court properly issued order under All Writs Act to protect integrity of earlier order and to prevent parties over whom court had

continuing jurisdiction from resorting to alternative forum to relitigate settled issues), *vacated and remanded for reconsideration,* 522 U.S. 1145, 118 S.Ct. 1162, 140 L.Ed.2d 173 (1998), *reinstated after remand,* 144 F.3d 1168 (8th Cir.), *cert. denied,* 525 U.S. 826, 119 S.Ct. 73, 142 L.Ed.2d 57 (1998); *Ewart v. Y & A Group, Inc.,* 38 F.3d 380, 382-83 (8th Cir .1994) ("All Writs Act indirectly confers on injunction beneficiaries the right to judicial enforcement"); *VMS Ltd. Partnership Sec. Litig. v. Prudential Sec. Inc.,* 103 F.3d 1317, 1324 (7th Cir.1996) (approving "a district court's use of the All Writs Act to prevent litigants from frustrating or circumventing its orders" and "to guard the integrity of its prior rulings over which it had expressly retained jurisdiction"); *Winkler v. Eli Lilly & Co.,* 101 F.3d 1196, 1202-03 (7th Cir.1996) (same).

Belvedere also asks this court to vacate the district court's contempt orders because the underlying injunction was invalid. Because we have concluded the district court's injunction was proper, we reject Belvedere's claim.

204 F.3d 805, 2000 Copr.L.Dec. P 28,027, 53 U.S.P.Q.2d 1863

### Briefs and Other Related Documents (Back to top)

| | | |
|---|---|---|
| . | 98-4046 | (Docket) |
| (Dec. 15, 1998) | | |
| . | 98-3602 | (Docket) |
| (Oct. 16, 1998) | | |

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# TAB 44

225 F.3d 1144                                                                  **Page 91**
225 F.3d 1144, 51 ERC 1263, 31 Envtl. L. Rep. 20,098, 2000 CJ C.A.R. 5014
**(Cite as: 225 F.3d 1144)**
C

**Briefs and Other Related Documents**

United States Court of Appeals,
Tenth Circuit.
**PUBLIC SERVICE COMPANY OF
COLORADO, Petitioner,**
v.
**UNITED STATES ENVIRONMENTAL
PROTECTION AGENCY, Respondent,
Colorado Independent Energy, Amicus Curiae.**
v.
**No. 99-9542.**

Aug. 29, 2000.

Electric utility sought judicial review of determination by Environmental Protection Agency (EPA) that proposed new power plant and utility's existing plant would constitute "single source" of air emissions for purposes of air emissions permitting. EPA moved to dismiss for lack of subject matter jurisdiction. The Court of Appeals, Murphy, Circuit Judge, held that letters in which EPA opined that new and existing plant would be "single source" of air emissions was not final agency action.

Appeal dismissed.

West Headnotes

**[1] Environmental Law** ☞661
149Ek661
    (Formerly 145k8.5(1))
Two letters in which Environmental Protection Agency (EPA) opined that proposed new power plant and utility's existing plant would constitute "single source" of air emissions for purposes of air emissions permitting was not "final action" under provision of Clean Air Act governing judicial review; impact of letters was neither direct nor immediate, given that utility was not party seeking permit to build new plant and state agency, rather than EPA, was initial permitting agency, letters did not mark consummation of EPA's decision-making process, and letters, which did not order state or other party to take particular action, did not determine any rights or obligations of utility or other entity, nor did legal consequences flow from letters. Clean Air Act, §§ 113(a)(5), 307(b)(1), 505(b)(1), as amended, 42 U.S.C.A. §§ 7413(a)(5), 7607(b)(1), 7661d(b)(1);   40 C.F.R. §§ 52.02, 52.320.

**[2] Constitutional Law** ☞69
92k69
Court of Appeals would violate Article III's prohibition against advisory opinions if, in electric utility's challenge to determination of Environmental Protection Agency (EPA) that proposed new power plant and utility's existing plant would constitute "single source" of air emissions for purposes of air emissions permitting, Court of Appeals issued a mere statement that EPA's interpretation and application of the law was incorrect without ordering some related relief. U.S.C.A. Const. Art. 3, § 2, cl. 1.
    *1144 James A. Holtkamp, LeBoeuf, Lamb, Greene & MacRae, L.L.P., Salt Lake City, Utah, (Gary E. Parish, LeBoeuf, Lamb, Greene & MacRae, L.L.P., Denver, Colorado and Frank Prager, Associate General Counsel, New Century Energies, Denver, Colorado, with him on the briefs), for Petitioner.

    Daniel W. Pinkston, Senior Trial Attorney, (Lois J. Schiffer, Assistant Attorney General, Denver, Colorado, Teresa Lukas, Of Counsel, Office of Regional Counsel, U.S. Environmental Protection Agency, Denver, Colorado and M. Lea Anderson, **1145** Of Counsel, Office of General Counsel, U.S. Environmental Protection Agency, Washington, D.C., with him on the briefs), Environment and Natural Resources Division, U.S. Department of Justice, Denver, Colorado, for Respondent.

    Jeffrey G. Pearson, Kelly, Haglund, Garnsey & Kahn, LLC, Denver, Colorado, filed an amicus curiae brief for Colorado Independent Energy Association.

    Before BRORBY, McKAY, and MURPHY, Circuit Judges.

    MURPHY, Circuit Judge.

## I. INTRODUCTION

    The Environmental Protection Agency ("EPA") issued two letters opining that a proposed new power plant and an existing plant owned by Public Service Company of Colorado ("PSCo") will constitute a "single source" of air emissions for purposes of air emissions permitting.   Pursuant to 42 U.S.C. § 7607(b), PSCo brought this appeal to

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

challenge the EPA's determination. The EPA then moved this court to dismiss PSCo's appeal for lack of subject matter jurisdiction, arguing the opinion letters do not constitute "final action" as required by § 7607(b). This court grants the EPA's motion and **dismisses** the appeal. [FN1]

> FN1. The Colorado Association of Commerce and Industry and the Edison Electric Institute filed motions to become amici curiae in this appeal. Because their briefs only address the merits of PSCo's appeal and this court does not reach the merits, we deny both motions.

## II. BACKGROUND

Under the federal Clean Air Act, any major emitting facility, which includes stationary sources of air pollutants, located in an area of the country which has already achieved the national ambient air quality standards must obtain a prevention of serious deterioration ("PSD") permit prior to beginning initial construction or making certain modifications to an existing facility. *See* 42 U.S.C. §§ 7471; 7407(d)(1)(A)(ii); 7475(a)(1); 7410(a)(2)(C), (D); 7479(1), (2)(C); 7411(a)(2), (3), (4). Pursuant to rules and regulations promulgated by the EPA, the state of Colorado, rather than the EPA itself, is the permitting authority for almost all stationary sources within Colorado. *See* 40 C.F.R. §§ 52.02, 52.320; 51 Fed.Reg. 31,125 (1986). The Colorado Department of Public Health and Environment ("CDPHE") has thus promulgated its own regulations governing the applicability and requirements for a PSD permit. *See* Colorado Air Quality Control Commission ("CAQCC") Regulation No. 3, Parts A & B.

In November of 1998, KN Power Company ("KN Power") applied to the CDPHE for a PSD permit for the construction of a new power-generating plant (the "Front Range facility") in Fort Lupton, Colorado. The Front Range facility was to be constructed by Front Range Energy Associates, LLC ("Front Range"), a joint venture formed by two companies, Quixx Mountain Holdings, LLC ("Quixx") and FR Holdings, LLC. Quixx is a subsidiary of Quixx Corporation, which is a subsidiary of New Century Energies, Inc. ("New Century") and FR Holdings is a subsidiary of KN Power.

In April of 1999, PSCo, which owns and operates

an existing power-generating facility also in Fort Lupton (the "PSCo facility"), entered into a power-supply agreement (the "Agreement") with Front Range. Pursuant to the Agreement, Front Range would construct and operate the Front Range facility near the PSCo facility and PSCo would purchase the entire electric power and energy output from the Front Range facility. Moreover, the Front Range facility would be interconnected with the PSCo electric system. PSCo, like Quixx, is a subsidiary of New Century.

Also in April, KN Power withdrew its PSD permit application and instead applied for a "minor source permit," ostensibly because the Front Range facility would operate only during peak electricity demand periods and thus emit less than 250 tons of nitrogen dioxide and carbon monoxide per year. *See* 42 U.S.C. § 7479(1) *1146 (providing that certain types of stationary sources lacking the potential to emit 250 tons or more per year of an air pollutant do not qualify as "major emitting facilities"). After reviewing the minor source permit application and the attendant files, the CDPHE became concerned that the Front Range facility and the PSCo facility were, in part, under common ownership and that the two facilities would be co-managed. The CDPHE, therefore, questioned whether the Front Range facility would merely be a *modification* to the existing PSCo facility such that together they would actually constitute a single stationary source or major emitting facility, thus requiring a PSD permit prior to construction. *See id.* §§ 7479(2)(C), 7411(a)(2), (4); 40 C.F.R. § 51.166(b)(2)(i), (23)(i); 51.166(i)-(r).

Under both federal and Colorado law, if the new Front Range facility and the existing PSCo facility (1) belong to the same industrial grouping, (2) are located on contiguous or adjacent property, and (3) are under common control, they constitute a single stationary source. *See* 42 U.S.C. § 7411(a)(3); 40 C.F.R. § 51.166(b)(6); CAQCC Regulation No. 3, Part A § I.B.59. If the two facilities constitute a single stationary source, construction of the Front Range facility would therefore be deemed a major modification to an existing major emitting facility, triggering the PSD permit requirement. *See* 40 C.F.R. § 51.166(b)(2)(i), (23)(i); *id.* § 51.166(i)-(r). The CDPHE indicated that the two facilities "clearly" met the first two elements of the definition of a single stationary source and it was unsure as to whether the third element of common control was also present. The CDPHE thus solicited the EPA's

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

opinion about whether the two facilities would constitute a single source.

On October 1, 1999, in response to the CDPHE's inquiry, the EPA sent a letter to the CDPHE "outlin[ing] [its] views" on whether the proposed Front Range facility and the existing PSCo facility would constitute a single source. The letter stated, "it is our interpretation of the PSD regulations that the [Front Range facility] and existing PSCo generating facility constitute a single source" and that the Front Range facility, "if constructed as proposed, would be a major modification of this major source and therefore, is subject to the requirement to obtain a PSD permit." In the letter, the EPA reasoned that both the control vested in PSCo over the Front Range facility by the power supply agreement and New Century's common ownership interests in both facilities demonstrated common control over the two facilities. After PSCo requested the EPA to reconsider its determination, the EPA sent a second letter on November 12, 1999 to the Associate General Counsel for New Century briefly reconfirming its earlier opinion. To this date, the CDPHE has neither granted nor denied the minor source permit.

## III. DISCUSSION

[1] In appealing the opinion rendered in the two EPA letters, PSCo contends this court has jurisdiction over that appeal pursuant to 42 U.S.C. § 7607(b). The parties agree that the relevant portion of § 7607(b) provides,

A petition for review of the [EPA] Administrator's action in approving or promulgating any implementation plan under section 7410 of this title or section 7411(d) of this title, any order under section 7411(j) of this title, under section 7412 of this title,[ ] under section 7419 of this title, or under section 7420 of this title, or his action under section 1857c-10(c)(2)(A), (B), or (C) of this title ... or under regulations thereunder, or revising regulations for enhanced monitoring and compliance certification programs under section 7414(a)(3) of this title, or *any other final action of the Administrator under this chapter* (including any denial or disapproval by the Administrator under subchapter I of this title) which is locally or regionally applicable may be filed only in the United States Court of Appeals for the appropriate circuit.

*1147 *Id.* § 7607(b)(1)(emphasis added). On

EPA's motion to dismiss, the question before this court is whether the two EPA letters constitute "final action" within the meaning of § 7607(b)(1).

In *Harrison v. PPG Industries, Inc.,* the United States Supreme Court considered the meaning of the words "any other final action" within § 7607(b)(1). *See* 446 U.S. 578, 586, 100 S.Ct. 1889, 64 L.Ed.2d 525 (1980). The parties in *Harrison,* however, agreed that the challenged EPA action constituted " 'final action' as that term is understood in the context of the Administrative Procedure Act [ ('APA') ] and other provisions of federal law." *Id.* The Court, therefore, was left to construe only the words "any other." *See id.* at 586-94, 100 S.Ct. 1889. The holding in *Harrison* that § 7607(b)(1) conferred jurisdiction on the court of appeals over the challenged EPA action is thus inapposite to the instant case. Nonetheless, the Court's acceptance of the parties' agreement that the challenged action was a "final action" within the meaning of the APA counsels this court to look to interpretations of the term "final action" under the APA when construing that same term under § 7607(b)(1). [FN2] *See id.* at 586, 100 S.Ct. 1889.

FN2. Consistent with this approach, both the EPA and PSCo rely on decisions construing the words "final action" within the APA.

In resolving whether a particular agency action is final under the APA, this court recently stated, "we look to whether [the action's] impact is direct and immediate, whether the action marks the consummation of the agency's decisionmaking process, and whether the action is one by which rights or obligations have been determined, or from which legal consequences will flow." *Colorado Farm Bureau Fed'n v. United States Forest Serv.,* 220 F.3d 1171, 1172 (10th Cir.2000) (citations and quotations omitted). Application of these three factors in the instant case leads to the conclusion that the two EPA opinion letters do not constitute final action by the EPA.

The impact of the letters is neither direct nor immediate, particularly as it concerns PSCo. In *Franklin v. Massachusetts,* the Court indicated that the direct and immediate impact factor addresses "whether [the agency action] is one that will directly affect *the parties.*" 505 U.S. 788, 797, 112 S.Ct. 2767, 120 L.Ed.2d 636 (1992)(emphasis added). Because PSCo is not even the company seeking a permit to build the Front Range facility, the EPA's

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

opinion concerning the type of permit required for the construction of that facility does not directly impact PSCo. At most, the EPA's opinion letters could potentially cause an *indirect* impact upon PSCo, if the letters create delay in the construction of the Front Range facility which in turn inhibits Front Range from meeting its obligations to PSCo under the Agreement. [FN3] The EPA letters do not even cause a direct and immediate impact upon KN Power, the company actually seeking a permit to build the Front Range facility, because it is the CDPHE as the permitting agency, and not the EPA, which will initially determine whether a minor source permit or a PSD permit is required. Although the EPA ultimately *could* overturn any decision rendered by the CDPHE, the opinion expressed in the two letters "serves more like a tentative recommendation than a final and binding determination." *Id.* at 798, 112 S.Ct. 2767; *see* 42 U.S.C. §§ 7413(a)(5), 7661d(b)(1).

> FN3. Because this court dismisses PSCo's appeal for lack of subject matter jurisdiction under 42 U.S.C. § 7607(b), we need not resolve the separate question whether PSCo has standing to pursue its challenge to the EPA's determination.

Moreover, the two EPA opinion letters in no way mark the consummation of its decision-making process, which cannot occur before the CDPHE has acted on the permit application. As mentioned above, it is the CDPHE which first ascertains whether the Front Range facility may be constructed with merely a minor source *1148 permit or whether the PSD permit is required. *See* 40 C.F.R. §§ 52.02, 52.320; 51 Fed.Reg. 31,125 (1986). If the CDPHE issues a minor source permit, the EPA could then step in and take some enforcement action against the state or against Front Range or it could veto the permit issued. *See* 42 U.S.C. §§ 7413(a)(5), 7661d(b)(1). The EPA could also alter its opinion after the CDPHE has issued the minor source permit and allow construction of the Front Range facility to proceed under that permit. The EPA, however, cannot act until the CDPHE does, and the CDPHE has yet to act on the minor source permit application.

Even if the CDPHE accedes to the EPA's opinion as stated in the two letters and denies the minor source permit, the opinion letters still would not constitute the consummation of the EPA's decision-making process. Under Colorado law, KN Power would be entitled to a review by the Air Quality Control Commission of the CDPHE's denial of the minor source permit. *See* Colo.Rev.Stat. §§ 25-7-114.5(8), -03(7). If the Air Quality Control Commission upheld the CDPHE's determination, KN Power could still seek judicial review in state court. *See id.* § 25-7-120. The EPA might well be convinced by a decision rendered in state court or by the Air Quality Control Commission that construction of the Front Range facility does not trigger PSD permit requirements. The two letters issued well before this state process has even begun, therefore, do not mark the consummation of the EPA's decision-making process.

[2] Finally, the two opinion letters do not determine any rights or obligations of PSCo or any other entity; nor do legal consequences flow from these letters. *See Christensen v. Harris County,* 529 U.S. 576, 120 S.Ct. 1655, 1662, 146 L.Ed.2d 621 (2000) ("[Statutory] interpretations such as those in [agency] opinion letters ... lack the force of law...."). In arguing to the contrary, PSCo contends that a draft of the October 1 letter which was earlier sent to the CDPHE did determine Colorado's obligation to deny the minor source permit and require a PSD permit when it stated the following: "If Colorado issues the signed [minor source] permit to the applicant, the State will not be acting in compliance with requirements of the Act relating to the construction and modification of new sources. EPA Region VIII is considering what action to take to prevent such non-compliance...." PSCo contends that in this statement, the EPA overtly threatened enforcement action against Colorado, thus placing upon the CDPHE a legal obligation to deny the minor source permit. The nature of this letter as a mere draft and the deletion of this purported threat from the finalized version of the letter sent on October 1, however, suggest that the EPA had not definitively determined the obligations of the state of Colorado when it sent the October 1 letter. The October 1 letter itself began with far more temperate language, stating "this letter outlines the [EPA's] views," and it never ordered the state or any other party to take any particular action. [FN4]

> FN4. PSCo's failure to ask this court for any specific relief, other than a reversal of the EPA's determination in its opinion letters, perhaps reveals a tacit admission that the EPA has yet to impose any affirmative obligations upon or declare any rights of PSCo or other involved entities. This court would violate Article III's prohibition against advisory opinions were it to do that which PSCo

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

225 F.3d 1144
(Cite as: 225 F.3d 1144, *1148)

requests, i.e., issue a mere statement that the EPA's interpretation and application of the law was incorrect without ordering some related relief. *See generally United States v. Burlington N. R.R. Co.,* 200 F.3d 679, 699 (10th Cir.1999).

In arguing further that legal consequences flow from the EPA letters, PSCo relies on the Ninth Circuit decision in *Hawaiian Electric Co. v. United States Environmental Protection Agency,* 723 F.2d 1440, 1442 (9th Cir.1984). In *Hawaiian Electric,* the Ninth Circuit concluded an EPA determination that a PSD permit was required before a power plant could switch to a higher sulfur fuel constituted final agency action under § 7607(b)(1). *See id.* *1149 at 1441-42. The Ninth Circuit reasoned, "although the [EPA's] application of the major modification definition is an interim step in the PSD permitting process, it has immediate legal consequences, i.e., the requirement of PSD review." *Id.* at 1442. Admittedly, the major modification determination in *Hawaiian Electric* is very similar to the opinion expressed in the two EPA letters in the instant case. The legal consequence of the EPA's determination in *Hawaiian Electric* that PSD review was required, however, does not similarly flow from the EPA opinion letters here. Unlike in *Hawaiian Electric,* the EPA is not the permitting authority in the state of Colorado. *See id.* at 1441. As discussed above, the two EPA opinion letters do not obligate

the CDPHE to subject the Front Range facility construction project to PSD review; the CDPHE can instead choose to issue a minor source permit, and only then can the EPA take action to require PSD review. *Hawaiian Electric,* therefore, is distinguishable.

In sum, the nature of both the permitting process in Colorado and the EPA letters themselves defies characterization of those letters as "final action" from which an appeal may be taken under 42 U.S.C. § 7607(b)(1).

## IV. CONCLUSION

Because PSCo's appeal pursuant to 42 U.S.C. § 7607(b) fails to challenge a "final action" by the EPA, this court **DISMISSES** the appeal for want of subject matter jurisdiction.

225 F.3d 1144, 51 ERC 1263, 31 Envtl. L. Rep. 20,098, 2000 CJ C.A.R. 5014

**Briefs and Other Related Documents (Back to top)**

.                99-9542                (Docket) (Nov. 29, 1999)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# TAB 45

329 F.3d 310
329 F.3d 310
**(Cite as: 329 F.3d 310)**
**H**

                                                  **Page 68**

**Briefs and Other Related Documents**

United States Court of Appeals,
Second Circuit.
**RJE CORP., Plaintiff-Appellee,**
v.
**NORTHVILLE INDUSTRIES CORP.,**
**Defendant-Appellant.**
**Docket No. 02-9116.**

Argued: May 8, 2003.
Decided: May 15, 2003.

  Joint owner of pipeline system brought action against other joint owner, seeking declaratory judgment and specific performance of an agreement providing for its purchase of the system in event it was shut down. The United States District Court for the Eastern District of New York, Frederic Block, J., entered judgment in favor of plaintiff, 198 F.Supp.2d 249, and denied motion for reconsideration, 2002 WL 1750763. Appeal was taken. The Court of Appeals held that "fair market value" in provision of option agreement governing sale of jointly owned pipeline system in event one of the parties decided to shut it down did not include environmental liabilities of the system by operation of New York law.

  Affirmed.

West Headnotes

**[1] Contracts ⬅➡147(2)**
95k147(2)

**[1] Evidence ⬅➡448**
157k448
Under New York law, where a contract is clear and unambiguous on its face, the intent of the parties must be gleaned from within the four corners of the instrument, and not from extrinsic evidence.

**[2] Contracts ⬅➡143.5**
95k143.5
In assessing ambiguity of contract under New York law, courts consider the entire contract to safeguard against adopting an interpretation that would render any individual provision superfluous.

**[3] Contracts ⬅➡143(2)**
95k143(2)

Contract terms are not ambiguous under New York law if they have a definite and precise meaning and are not reasonably susceptible to differing interpretations.

**[4] Sales ⬅➡64**
343k64
"Fair market value" in provision of option agreement governing sale of jointly owned pipeline system in event one of the parties decided to shut it down did not include environmental liabilities of the system by operation of New York law, where contract listed system's assets and liabilities without mentioning environmental liabilities, expressly capped purchaser's obligations for environmental liabilities, and explicitly required assumption of environmental liabilities under another option.

**[5] Sales ⬅➡64**
343k64
Even if extrinsic evidence were considered in interpreting provision of option agreement governing sale of jointly owned pipeline system in event one of the parties decided to shut it down, evidence supported determination that the parties intended to proceed on the basis of a straight asset sale that did not consider environmental liabilities under New York law; attorney who drafted provision testified that parties intended the transaction to involve only assets, not liabilities, in the event of abandonment.

**[6] Federal Courts ⬅➡812**
170Bk812

**[6] Federal Courts ⬅➡829**
170Bk829
Court of Appeals reviews district court's denial of a motion for reconsideration for abuse of discretion; district court abuses its discretion when its decision rests on a legal error or a clearly erroneous factual finding, or when its decision does not fall within the range of permissible decisions.
  *311 John J. Kuster, D.A. Jeremy Telman, Fernando Menedez, Sidley Austin Brown & Wood LLP, New York, NY, for Plaintiff-Appellee.

  Maria T. Vullo, Andrew G. Frank, Matthew J. Kalmanson, Paul, Weiss, Rifkind, Wharton & Garrison LLP, New York, NY, for Defendant-Appellant.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

329 F.3d 310                                                                                           **Page 69**
**(Cite as: 329 F.3d 310, \*311)**

Before:    FEINBERG,    KATZMANN,    Circuit
Judges, and MURTHA, District Judge. [FN1]

> FN1. The Honorable J. Garvan Murtha of the
> United States District Court for the District of
> Vermont, sitting by designation.

PER CURIAM.

Defendant-appellant Northville Industries Corp.
appeals from a judgment of the United States
District Court for the Eastern District of New York
(Block, *J.*), granting summary judgment in favor of
plaintiff-appellee RJE Corp. as to the meaning of
"the fair market value of the Pipeline System" for
purposes of interpreting a contract between the
parties, and from an order of the District Court
denying Northville's motion for reconsideration.
Because    we    conclude    that    the    plain    and
unambiguous language of the contract defines "the
fair market value of the Pipeline \*312 System" as
only including the assets, not ongoing liabilities, of
the Pipeline System in the event of abandonment,
we affirm the judgment of the District Court. We
also conclude that the District Court did not abuse
its discretion in denying Northville's motion for
reconsideration.

### BACKGROUND

Northville is a large petroleum products company
whose businesses include the operation of oil
terminals (the "Pipeline System"). For many years,
Northville was owned by two brothers and their
respective families, with the Harold Bernstein
family owning 55.66% of Northville and the
Raymond Bernstein family owning the remaining
44.34%. As disputes between the two families
intensified in the mid-to-late 1980s, the families
began to negotiate an agreement by which the
Harold Bernstein family would purchase all of the
Raymond Bernstein family's Northville stock. The
Raymond Bernstein family incorporated RJE Corp.
for the purpose of entering into this stock sale.

As these negotiations were proceeding, Northville
discovered significant underground gasoline leaks at
two of its oil terminals. These leaks, which gave
rise to various governmental investigations and a
class action lawsuit brought by local landowners,
resulted    in    potential    and    indeterminate
environmental liabilities that presented an obstacle
for the parties' negotiations.

The parties executed a series of agreements in 1988

pertaining to the stock sale. The Stock Purchase
Agreement sets forth the terms for Northville's
purchase of RJE's Northville stock. Under the
Stock Purchase Agreement, Northville would
maintain and operate the Pipeline System, with the
parties continuing to share a joint interest in the
Pipeline System. The Stock Purchase Agreement
lists various "related agreements," including the
Purchase Price Adjustment Agreement and the
Option and Proceeds Distribution Agreement
("Option Agreement").

The Option Agreement enumerates five methods by
which the parties could sever their joint interest in
the Pipeline System: 1) Purchase Option Provision;
2) Purchase Option Termination Provision;    3)
Right of First Refusal Provision; 4) Sale Provision;
and 5) Abandonment Provision. On July 27, 2001,
Northville triggered the Abandonment Provision,
which governs the disposition of the Pipeline
System should Northville decide to shut down or
cease operating the Pipeline System. The provision
states:

> In the event [Northville] determines to shut down
> or cease operating all or substantially all of the
> Pipeline System (an "Abandonment"), [Northville]
> shall promptly notify RJE in writing and use its
> best efforts to obtain and deliver to RJE within 60
> days of the date of abandonment, an appraisal
> from an investment banking firm or independent
> appraiser, in each case mutually agreed upon by
> [Northville] and RJE ..., as to *the fair market
> value of the Pipeline System.*

Option Agreement § 2.03 (emphasis added). Once
the parties receive an appraisal of the fair market
value of the Pipeline System, RJE and Northville
"shall have the right to submit to each other, within
thirty days of the receipt of the appraisal, a bid ...
at which price it will purchase the Pipeline System
or    effect    a    Pipeline    Option    Termination,
respectively." *Id.* If neither bid exceeds the fair
market value, Northville "shall use its best efforts
for a period of one-year to obtain a third-party
buyer for the Pipeline System." *Id.*

Unable to agree on an appraiser, the parties altered
the process so that each \*313 party would choose its
own appraiser. The parties agreed to utilize the
average of these appraisals as the appraised price,
unless the appraisals were more than 10% apart, in
which case the two appraisers would choose a third
appraiser. The parties exchanged appraisals on
December 21, 2001. Northville's appraiser took
into account environmental liabilities in calculating

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

"the fair market value of the Pipeline System," and appraised the Pipeline System at a negative $12,857,000. RJE's appraiser, who ignored environmental liabilities, appraised the Pipeline System to be worth $45,000,000. Because the difference in appraisals exceeded 10%, a third appraiser was selected. On February 13, 2002, the third appraiser, who like RJE did not consider environmental liabilities, appraised the Pipeline System at $40,500,000.

The parties agreed to submit bids on March 15, 2002, but they continued to dispute how to calculate "the fair market value of the Pipeline System" for purposes of bidding. Northville declared that it was only willing to sell the Pipeline System on an "as is" basis, which would include environmental liabilities, and that if RJE bid on any other basis, Northville would consider that bid invalid. RJE brought the instant litigation seeking a declaratory judgment and specific performance as to the meaning of "the fair market value of the Pipeline System" under the Abandonment Provision in order to enable it to proceed with the bidding process. Northville agreed to toll the bidding process, and the court promptly conducted a two-day evidentiary hearing.

In a published decision dated April 25, 2002, the District Court "declare[d] that the 'fair market value of the Pipeline System' is to be based on the fair market value of the assets comprising the Pipeline System, without offset for the costs of future remediation for existing environmental liabilities." *RJE Corp. v. Northville Indus. Corp.,* 198 F.Supp.2d 249, 271 (E.D.N.Y.2002). The court "conclude[d] that the parties unambiguously intended a straight asset sale, meaning that the fair market value of the Pipeline System shall not take into account the appraised costs of future remediation." *Id.* at 263. The court also explained that "[e]ven if the meaning of 'fair market value of the Pipeline System' be deemed ambiguous, extrinsic evidence establishes that the bids are to proceed on the basis of a straight asset sale." *Id.* at 267. Finally, although the court concluded that the elements of specific performance were present, it permitted Northville to elect whether to proceed with the bidding process in accordance with the ruling or to withdraw from abandonment altogether, on the assumption that Northville would then compensate RJE for the incidental costs incurred by RJE.

Northville moved for reconsideration of the District Court's decision, requesting that the court omit certain portions of the decision that it contended are dicta and therefore should not be binding in future proceedings. Because Northville was not seeking to alter the court's conclusion, the District Court denied the motion. *RJE Corp. v. Northville Indus. Corp.,* No. 02-CV-1440, 2002 WL 1750763 (E.D.N.Y. July 29, 2002). The court noted that Northville's argument that certain language is dicta "should be reserved for any such future litigation" and refused to express an opinion as to the merits of those arguments. *Id.* at *1.

DISCUSSION

The heart of this appeal is the meaning of "the fair market value of the Pipeline System," under the Abandonment Provision of the Option Agreement. Northville *314 argues that the District Court erred because "the fair market value of the Pipeline System" must take into account environmental liabilities. RJE responds that the parties contracted for a straight asset sale that did not consider such liabilities in the event of abandonment. Both parties contend that the unambiguous language of the contract, as well as extrinsic evidence, support their interpretation.

Because this case was brought in a district court within the State of New York, we turn to New York substantive law. *Schiavone Constr. Co. v. City of New York,* 99 F.3d 546, 548 (2d Cir.1996). Section 7.08 of the Option Agreement sets forth a choice of law provision selecting New York law: "This Agreement shall be governed by and construed and enforced in accordance with the laws of the State of New York, without regard to its [ ] conflict of laws rules." It is the general policy of New York courts to enforce choice of law provisions, and we therefore apply New York contract law to determine the meaning of "the fair market value of the Pipeline System" under the Abandonment Provision. *See Finucane v. Interior Constr. Corp.,* 264 A.D.2d 618, 619-20, 695 N.Y.S.2d 322, 324 (1st Dept. 1999); *see also Schiavone,* 99 F.3d at 548.

[1][2][3] Where a "contract is clear and unambiguous on its face, the intent of the parties must be gleaned from within the four corners of the instrument, and not from extrinsic evidence." *De Luca v. De Luca,* 300 A.D.2d 342, 342, 751 N.Y.S.2d 766, 766 (2d Dept.2002). In assessing ambiguity, we consider the entire contract to

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

"safeguard against adopting an interpretation that would render any individual provision superfluous." *Sayers v. Rochester Tel. Corp. Supplemental Mgmt. Pension Plan,* 7 F.3d 1091, 1095 (2d Cir.1993). Contract terms are not ambiguous if they "have a definite and precise meaning and are not reasonably susceptible to differing interpretations." *Id.; see Red Rock Commodities, Ltd. v. Standard Chartered Bank,* 140 F.3d 420, 424 (2d Cir.1998) ("A contract is not ambiguous where there is no reasonable basis for a difference of opinion."). Whether a contract is ambiguous is a question of law that we review *de novo. Sayers,* 7 F.3d at 1094 .

[4] We disagree with Northville's contention that "fair market value" includes environmental liabilities by operation of New York law where a private contract unambiguously provides otherwise. Various provisions of the Option Agreement, read together, provide a "definite and precise" definition of the Pipeline System that excludes environmental liabilities. *See Sayers,* 7 F.3d at 1095. The preamble to the Option Agreement defines the Pipeline System as "the properties and assets of every kind, nature and description, real, personal and mixed, tangible and intangible, including the rights to use the properties or assets of another person, which constitute a network of terminals and pipelines on Long Island, New York." The question thus becomes whether environmental liabilities are among the "properties and assets" of the Pipeline System. The preamble further instructs that "all" of these properties and assets are "more particularly described on Annex A." Annex A explains that "The Pipeline Assets shall mean the following assets and properties, but shall not include any Excluded Assets." Annex A's comprehensive list makes no mention of environmental liabilities.

Further support for RJE's interpretation comes from the liability cap contained in the Purchase Price Adjustment Agreement. The Option Agreement incorporates the Purchase Price Adjustment Agreement at Section 1.04, and therefore we read the two agreements together. *315 The Purchase Price Adjustment Agreement discusses Covered Liabilities, which include "any claim, obligation or governmental or regulatory mandate arising out of environmental damage or contamination ... [and] any pending litigation or other proceedings against the Company, including, without limitation [various class action suits relating to the spills]." The Agreement expressly caps

RJE's payment obligations and RJE has since reached that cap. We agree with the District Court that this cap "would be illusory if Northville could obviate the limit at any time by invoking the Abandonment Provision." *RJE Corp.,* 198 F.Supp.2d at 265.

Moreover, as the District Court also noted, "[w]hen the drafters intended to require the assumption of environmental liabilities they did so explicitly." *Id.* at 267. Such is the case with the Option Agreement's Option Provision, which gives RJE an option to purchase the Pipeline System for $16,698,000. The Option Provision provides that "RJE will undertake to be liable for and discharge the liabilities and obligations set forth in Annex B hereto." Option Agreement § 1.03(b)(ii). Annex B then defines the "Assumed Liabilities" to include ongoing liabilities associated with the Pipeline System. Therefore, if RJE were to exercise the Option Provision, the contract expressly provides that RJE would assume the environmental liabilities. The Abandonment Provision contains no similar language.

Northville maintains that "[i]t would be completely anomalous for the parties to have intended for RJE to assume the environmental liabilities if it purchased the Pipeline System pursuant to the Purchase Option Provision, but not if it bid on and purchased the Pipeline System pursuant to the Abandonment Provision." This argument, however, ignores the critical distinctions between the Option Provision and the Abandonment Provision. As the District Court explained, the Option Provision "can only be invoked by RJE; the [Abandonment Provision] can only be invoked by Northville. Thus, the distinction that Northville claims would 'make no sense whatsoever,' is wholly consistent with RJE's assertion that it bargained for a cap on liabilities and that Northville could not compel RJE to assume any liabilities in excess of that cap." *RJE Corp.,* 198 F.Supp.2d at 267.

[5] Because we conclude that the meaning of "the fair market value of the Pipeline System" is unambiguous, we need not look beyond the express terms of the integrated contracts. *See Investors Ins. Co. of Am. v. Dorinco Reinsurance Co.,* 917 F.2d 100, 104 (2d Cir.1990) ("Parol evidence may be admitted to explain a writing only when the terms of the writing itself are ambiguous."). Even if we were to consider extrinsic evidence, we would find no clear error in the District Court's determination

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

that the parties intended to proceed on the basis of a straight asset sale that did not consider environmental liabilities. *See In Time Prods. Ltd. v. Toy Biz, Inc.,* 38 F.3d 660, 665 (2d Cir.1994) ( "When the district court as factfinder is confronted with a contract provision that is not unambiguous, it may properly consider evidence extrinsic to the contract itself, including testimony offered by the parties. The court's findings as to the meaning of such a provision are findings of fact that may not be disturbed unless they are clearly erroneous.") (citation omitted); *Marine Transp. Lines, Inc. v. Int'l Org. of Masters, Mates & Pilots,* 878 F.2d 41, 44 (2d Cir.1989) ("The intent of the parties to a contract is, there is little doubt, a question of fact."), *cert. denied,* 493 U.S. 1022, 110 S.Ct. 724, 107 L.Ed.2d 743 (1990).

The District Court found that the evidence from the hearing "revealed that *316 both parties understood the cap in the [Purchase Price Adjustment Agreement] to be the realization of Raymond Bernstein's desire to limit his exposure for environmental liabilities." *RJE Corp.,* 198 F.Supp.2d at 267. The court determined that throughout the negotiations that led to the 1988 agreements, it was clear that the Raymond Bernstein family would accept only plans that capped their liabilities. *Id.* at 268. The court further explained that the conduct of the parties evidenced this liability cap, noting that Northville had borne sole responsibility for the Pipeline System's environmental liabilities since RJE had reached its payment obligation cap under the Purchase Price Adjustment Agreement. *Id.* The court also feared that, were it to accept Northville's interpretation, Northville would receive an unwarranted windfall. *Id.* at 268-69.

Mark Shehan, RJE's attorney who drafted the Abandonment Provision testified that "understood at the time [by the parties, the transaction] only dealt with assets, because the way I explained it to [Northville's] lawyers ..., this was like a going out of business sale. You have to sell your assets, take the money, and pay off your liabilities." In response, Northville offered witnesses who testified that Northville wanted to be able to abandon the Pipeline System if the environmental liabilities became unmanageable. The District Court rejected this characterization of the genesis of the Abandonment Provision and accepted RJE and Shehan's testimony that the parties intended the

transaction to involve only assets, not liabilities, in the event of abandonment. Because evidence supported the District Court's conclusion, the court did not clearly err in finding that the extrinsic evidence weighed more in favor of RJE. *See In Time Prods.,* 38 F.3d at 665 ("The fact that there may have been evidence to support an inference contrary to that drawn by the trier of fact does not mean that the court's finding is clearly erroneous.").

[6] Lastly, Northville appeals the District Court's denial of its motion for reconsideration, in which it requested that the District Court either delete from its order statements pertaining to provisions not at issue or clarify that those statements are non-binding dicta. We review a district court's denial of a motion for reconsideration for abuse of discretion. *Devlin v. Trans. Communications Int'l Union,* 175 F.3d 121, 131-32 (2d Cir.1999). A court abuses its discretion when its decision rests on a legal error or a clearly erroneous factual finding, or when its decision does not fall within the range of permissible decisions. *Monegasque de Reassurances S.A.M. v. NAK Naftogaz of Ukraine,* 311 F.3d 488, 498 (2d Cir.2002).

We find no abuse of discretion in the District Court's denial of the motion to reconsider. The District Court properly discussed provisions related to the Option Agreement in its attempt to discern the meaning of "the fair market value of the Pipeline System." Further, whether portions of the court's discussion of these provisions is dicta is better suited to be addressed in any subsequent litigation where the issue arises.

We have considered all of the defendant-appellant's arguments and, for the reasons stated above, affirm.

329 F.3d 310

**Briefs and Other Related Documents (Back to top)**

. 2003 WL 23497756T2 (Appellate Brief) Reply Brief of Defendant-Appellant Northville Industries Corp. (Mar. 10, 2003)Original Image of this Document (PDF)

. 2003 WL 23497886T2 (Appellate Brief) Brief of Plaintiff-Appellee Rje Corp. (Feb. 24, 2003)Original Image of this Document (PDF)

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# TAB 46

922 F.2d 984                                                                      **Page 1**
922 F.2d 984, 59 USLW 2407, 136 L.R.R.M. (BNA) 2065, 118 Lab.Cas. P 10,548, Bankr. L. Rep.  P 73,747
**(Cite as: 922 F.2d 984)**
▷

United States Court of Appeals,
Second Circuit.
**In re IONOSPHERE CLUBS, INC. and Eastern
Airlines, Inc., Debtors.**
**Martin R. SHUGRUE, Jr., As Chapter 11
Trustee for Eastern Airlines, Inc.,
Appellant,**
v.
**AIR LINE PILOTS ASSOCIATION,
INTERNATIONAL, Appellee.**
**Nos. 580, 581, Dockets 90-5033, 90-5035.**

Argued Nov. 14, 1990.
Decided Dec. 21, 1990.

On appeal from an order entered April 10, 1990, in
the Southern District of New York, Robert W.
Sweet, *District Judge,* 114 B.R. 379, reversing two
orders of the bankruptcy court that stayed appellee's
attempts to arbitrate a dispute arising from its
collective bargaining agreement with appellant and
to bring an action to enjoin a practice of appellant
as violative of the collective bargaining agreement,
the Court of Appeals, Timbers, Circuit Judge, held:
(1) that arbitration brought pursuant to collective
bargaining agreement is not subject to automatic
stay, and (2) that union's action seeking judicial
enforcement of collective bargaining agreement
provision was stayed.

Affirmed in part, reversed in part and remanded.

Miner, Circuit Judge, concurred in part, dissented
in part, and filed opinion.

West Headnotes

**[1] Bankruptcy** ☞**3782**
51k3782

**[1] Bankruptcy** ☞**3786**
51k3786
Court of Appeals exercises same review over
district court's decision that district court exercised
over bankruptcy court's decision; thus, conclusions
of law are reviewed de novo, and findings of fact
are reviewed under clearly erroneous standard.

**[2] Bankruptcy** ☞**2391**
51k2391
Principle purposes of automatic stay are to provide
debtor with breathing spell from his creditors and to
centralize all disputes concerning property of
debtor's estate in bankruptcy court. Bankr.Code,
11 U.S.C.A. § 362(a).

**[3] Statutes** ☞**216**
361k216
Where no committee reports accompanied
enactment of statute, court looks to statements made
by sponsors of legislation on floor of Congress for
expression of legislative intent.

**[4] Bankruptcy** ☞**3025.1**
51k3025.1
(Formerly 51k3025)
Collective bargaining agreement remains in effect,
and collective bargaining process continues after
filing of bankruptcy petition unless and until debtor
complies with Bankruptcy Code provision for
termination of agreement. Bankr.Code, 11
U.S.C.A. § 1113.

**[5] Bankruptcy** ☞**3117**
51k3117
Application of any Bankruptcy Code provision is
prohibited when such
application would permit debtor to achieve
unilateral termination or modification of collective
bargaining agreement without meeting statutory
requirements for termination or modification of
such agreements. Bankr.Code, 11 U.S.C.A. §
1113(f).

**[6] Statutes** ☞**223.1**
361k223.1
When two statutes are capable of coexistence, it is
duty of courts to regard each as effective; when
statutes are in irreconcilable conflict, however,
court must give effect to most recently enacted
statute because it is most recent indication of
congressional intent.

**[7] Bankruptcy** ☞**2394.1**
51k2394.1
(Formerly 51k2394)
Bankruptcy Code section providing for exclusive
means of terminating collective bargaining
agreements precludes application of automatic stay
to disputes involving collective bargaining
agreements only when its application allows debtor
unilaterally to terminate or alter any provision of
agreement. Bankr.Code, 11 U.S.C.A. §§ 362(a),
1113(f).

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

922 F.2d 984
(Cite as: 922 F.2d 984)

**[8] Bankruptcy** ☞2394.1
51k2394.1
        (Formerly 51k2394)
Union's attempt to arbitrate dispute with Chapter 11 debtor over whether debtor had merged with second corporation, thereby triggering seniority provisions of collective bargaining agreement, was not stayed by debtor's filing of bankruptcy petition unless and until debtor obtained formal termination of agreement; application of stay would allow debtor unilaterally to alter collective bargaining agreement, in violation of specific Bankruptcy Code section providing exclusive means of modifying such agreements. Bankr.Code, 11 U.S.C.A. §§ 362(a), 1113(f).

**[9] Bankruptcy** ☞2394.1
51k2394.1
        (Formerly 51k2394)
Arbitration brought pursuant to provision of collective bargaining agreement is not subject to automatic stay because stay's application would allow debtor to unilaterally avoid its obligation to arbitrate. Bankr.Code, 11 U.S.C.A. §§ 362(a), 1113(f).

**[10] Bankruptcy** ☞2395
51k2395
Union's action seeking judicial enforcement of collective bargaining agreement provision was stayed by debtor's filing of Chapter 11 petition, even though debtor had not yet obtained termination or modification of agreement, where dispute could have been presented to bankruptcy court, which could have exercised jurisdiction over it. Bankr.Code, 11 U.S.C.A. §§ 362(a), 1113(f).

**[11] Bankruptcy** ☞2394.1
51k2394.1
        (Formerly 51k2394)
Only appropriate purpose that automatic stay promotes with respect to collective bargaining agreement is allowing bankruptcy court to protect its jurisdiction so that it can proceed efficiently with reorganization. Bankr.Code, 11 U.S.C.A. §§ 362, 1113(f).

**[12] Bankruptcy** ☞2047
51k2047
Issue of whether collective bargaining agreement precluded Chapter 11 debtor's postpetition leases of aircraft and crews was subject to jurisdiction of bankruptcy court; resolution of dispute did not demand substantial consideration of federal nonbankruptcy law, but rather involved routine application of non-Bankruptcy Code of federal statute. 28 U.S.C.A. § 157(b)(2)(A), (d).

**[13] Bankruptcy** ☞2125
51k2125
Bankruptcy court's equitable powers cannot be exercised in derogation of other sections of Bankruptcy Code. Bankr.Code, 11 U.S.C.A. § 105(a).

**[14] Bankruptcy** ☞2367
51k2367
Bankruptcy court had equitable power to enjoin enforcement of collective bargaining agreement outside bankruptcy court, even though agreement had not yet been formally rejected by debtor. Bankr.Code, 11 U.S.C.A. §§ 105(a), 1113.
  *986 Bruce R. Zirinsky, New York City (Laura M. Sillins, Matthew A. Cantor, and Weil, Gotshal & Manges, New York City, Joseph L. Manson, III, and Verner, Liipfert, Bernhard, McPherson & Hand, Washington, D.C., on the brief), for appellant Martin R. Shugrue, Jr., Chapter 11 Trustee for Eastern Airlines, Inc.

  Richard M. Seltzer, New York City (James L. Linsey, Russell S. Hollander, Richard B. Miller, and Cohen, Weiss & Simon, New York City, on the brief), for appellee Air Line Pilots Ass'n, Intern.

  Before MINER and TIMBERS, Circuit Judges, and SPRIZZO, District Judge, for the Southern District of New York, sitting by designation.

  TIMBERS, Circuit Judge:

  Appellant Martin R. Shugrue, Jr., Chapter 11 Trustee for Eastern Airlines, Inc. (Eastern), appeals from an order entered April 10, 1990 in the Southern District of New York, Robert W. Sweet, *District Judge,* reversing two orders of the bankruptcy court that stayed attempts by the Air Line Pilots Association, International (ALPA) to arbitrate a dispute arising out of their collective bargaining agreement with Eastern and to prosecute a lawsuit seeking to enjoin Eastern's practice of wet-leasing aircraft and crews as violative of the collective bargaining agreement.

  On March 9, 1989, Eastern filed a petition for reorganization under Chapter 11 of the Bankruptcy Code. Subsequently, ALPA, which was engaged in a sympathy strike against Eastern, sought relief

from the automatic stay to initiate an arbitration to determine whether labor protective provisions (LPPs) in the collective bargaining agreement had been triggered by Eastern's merger with Continental. The bankruptcy court, Burton R. Lifland, *Chief Bankruptcy Judge*, denied that petition. *In re Ionosphere Clubs, Inc.*, 105 B.R. 765 (Bankr. S.D.N.Y.1989) (the LPP-decision).

After the strike began and after Eastern filed its petition for reorganization, Eastern entered into wet-lease contracts with Continental. Wet-leasing is a practice by which one airline leases aircraft and crews from another airline. ALPA commenced an action in the Southern District of Florida, seeking to enjoin this practice as violative of its collective bargaining agreement with Eastern. In response, Eastern commenced an adversary proceeding in the bankruptcy court to enjoin ALPA from prosecuting the Florida action. The bankruptcy court, Burton R. Lifland, *Chief Bankruptcy Judge*, held that ALPA's action was violative of the automatic stay and enjoined its prosecution pursuant to its powers under 11 U.S.C. § 105(a) (1988). *In re Ionosphere Clubs, Inc.*, 105 B.R. 773 (Bankr.S.D.N.Y.1989) (the wet-lease decision).

ALPA appealed both bankruptcy court orders to the district court pursuant to 28 U.S.C. § 158(a) (1988). The district court reversed them both. The court held that 11 U.S.C. § 1113(f) (1988) precludes the application of the automatic stay and the bankruptcy court's equitable powers to any proceeding brought by a union to enforce a collective bargaining agreement against a debtor, unless and until the debtor complies with the provisions of § 1113, which regulates the termination or modification of collective bargaining agreements by a debtor in bankruptcy. *In re Ionosphere Clubs, Inc.*, 114 B.R. 379 (S.D.N.Y.1990).

On appeal, Eastern contends that (1) § 1113(f) of the Bankruptcy Code does not preclude application of the automatic stay *987 provisions of § 362 or of the bankruptcy court's equitable powers under § 105 to ALPA's attempts to enforce the collective bargaining agreement outside the bankruptcy court; and (2) the bankruptcy court decisions should be reinstated.

For the reasons that follow, we affirm the district court's order as to the LPP-decision and reverse its order as to the wet-lease decision. We remand the

case to the district court for further consideration.

## I.

We shall summarize only those facts and prior proceedings believed necessary to an understanding of the issues raised on appeal.

This appeal involves two issues in a labor dispute between Eastern and ALPA. At all times relevant to this appeal, the relationship between the two parties was governed by a collective bargaining agreement dated February 23, 1986 and entered into pursuant to the Railway Labor Act (RLA), 45 U.S.C. § 151 *et seq.* (1988).

On March 4, 1989, the International Association of Machinists and Aerospace Workers (IAM) began a primary strike against Eastern. Soon thereafter, ALPA and the Transportation Workers Union of America struck Eastern in sympathy with the IAM. On March 9, 1989, Eastern filed a petition for reorganization under Chapter 11 of the Bankruptcy Code in the Southern District of New York. On June 21, 1989, Eastern filed a motion in the bankruptcy court to reject the collective bargaining agreement pursuant to § 1113. Eastern withdrew that motion on July 26, 1989. At the time the bankruptcy court reached the decisions under review on the instant appeal, no application under § 1113 to terminate or modify the collective bargaining agreement was pending before it. Martin R. Shugrue, Jr. was appointed Trustee for Eastern on April 19, 1990.

## (A)

The collective bargaining agreement contained LPPs designed to protect ALPA members in the event of a merger. The collective bargaining agreement provided that disputes arising from it would be submitted to arbitration and it set forth a procedure governing that process. Eastern was sold to Texas Air Corporation (Texas Air) within days after the collective bargaining agreement became operative. After Eastern's acquisition by Texas Air, a dispute arose as to the operation of the LPPs. On June 10, 1986, Eastern commenced an action in the Southern District of Florida, seeking a declaration that the collective bargaining agreement was invalid. That contention was rejected and Eastern was ordered to arbitrate the dispute. *Eastern Air Lines, Inc. v. Air Line Pilots Ass'n, Int'l,* 670 F.Supp. 947 (S.D.Fla.1987), *aff'd,* 861 F.2d 1546 (11 Cir.1988).

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

922 F.2d 984
(Cite as: 922 F.2d 984, *987)

Page 4

On August 6, 1986, pursuant to the provisions of the collective bargaining agreement, ALPA filed a grievance with the System Board of Adjustments, the body established to hear and determine grievances based on disputes concerning the collective bargaining agreement.    On March 8, 1989, the arbitration panel ruled in favor of ALPA. It concluded that the LPPs provided that, in the event of a merger, seniority lists were to be merged.    The panel did not decide whether a merger had taken place that would have triggered the LPPs. The decision was not signed by all the panel members until the next day, approximately seven minutes after Eastern filed its bankruptcy petition.

On July 21, 1989, ALPA filed a motion in the bankruptcy court, seeking a determination that the arbitration decision became effective prior to Eastern's Chapter 11 filing and, thus, was not affected by the automatic stay, or, in the alternative, it sought relief from the automatic stay to implement the arbitration decision.    ALPA supplemented its motion requesting relief from the automatic stay with a request to commence a second arbitration to determine whether Eastern and Continental had merged, thus triggering the LPPs. Eastern did not oppose the request for relief from the stay to implement the first arbitration decision, but did oppose the supplemental request to commence a second arbitration.

*988 The bankruptcy court lifted the stay for the limited purpose of formally issuing the arbitration decision interpreting the LPPs, but declined to lift the stay for the purpose of allowing ALPA to initiate an arbitration to determine whether a merger had taken place.    *In re Ionosphere Clubs, Inc., supra,* 105 B.R. 765.    The court reasoned that issues raised in the arbitration would duplicate efforts being made by the examiner it had appointed. *Id.* at 771.

(B)

Wet-leasing refers to the practice of one airline leasing aircraft and crews from another airline. The collective bargaining agreement prohibited Eastern from engaging in this practice.    It required Eastern to employ ALPA pilots on the Eastern pilot's system seniority list to perform its flying. In August 1989, since its pilots were on strike and replacement pilots were still being trained, Eastern entered into wet-lease contracts with Continental.

On September 1, 1989, ALPA commenced an action in the Southern District of Florida (the Florida action), seeking to enjoin the wet-leasing as violative of the collective bargaining agreement and of the RLA.    The district court set the case on an expedited discovery schedule.    On September 25, 1989, Eastern commenced an adversary proceeding in the bankruptcy court, seeking to enjoin ALPA from prosecuting the Florida action.    In its complaint, Eastern alleged that its wet-lease contracts were reasonably necessary to its continued operation during the strike.

The bankruptcy court held that the Florida action violated the provisions of the automatic stay, specifically, 11 U.S.C. § 362(a)(3) (1988), which provides for a stay of "any act ... to exercise control over property of the estate."    *In re Ionosphere Clubs, supra,* 105 B.R. at 779.    The court determined that Eastern's actions were "reasonably necessary" to its continued operation during the strike and were protected under the doctrine announced in *Brotherhood of Ry. & S.S. Clerks v. Florida East Coast Ry.,* 384 U.S. 238, 248, 86 S.Ct. 1420, 1425, 16 L.Ed.2d 501 (1966). *In re Ionosphere Clubs, supra,* 105 B.R. at 780. Finally, the bankruptcy court enjoined further prosecution of the Florida action pursuant to its powers under § 105(a). *Id.*

(C)

ALPA appealed both bankruptcy court orders to the district court pursuant to    28 U.S.C. § 158(a) (1988).    The appeal from the LPP decision was assigned to Judge Sweet.    The appeal from the wet-lease decision was assigned to Judge Leval. Subsequently, the two appeals were consolidated before Judge Sweet.

On April 10, 1990, the district court entered its opinion and order, reversing the orders of the bankruptcy court in both cases.    *In re Ionosphere Clubs, Inc.,* 114 B.R. 379 (S.D.N.Y.1990).    The district court reasoned that § 1113 of the Bankruptcy Code was intended to be the "exclusive ... means in the Bankruptcy Code by which a debtor could modify or reject its collective bargaining contract obligations." *Id.* at 396.    The court concluded that application of the automatic stay to bar enforcement of a collective bargaining agreement outside the bankruptcy court was precluded by § 1113(f), which provides that no provision of the Bankruptcy Code other than § 1113 should be construed to permit a trustee unilaterally

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

to alter or terminate a collective bargaining agreement. *Id.* at 400.

This appeal followed.

## II.

[1] Initially, we set forth our standard of review. The district court order is subject to plenary review. *In re Hanratty,* 907 F.2d 1418, 1423 (3 Cir.1990); *In re Johnson,* 901 F.2d 513, 516 (6 Cir.1990); *In re Manville Forest Prods. Corp.,* 896 F.2d 1384, 1388 (2 Cir.1990). "This court exercises the same review over the district court's decision that the district court may exercise [over the bankruptcy court's decision]." *Brown v. Pennsylvania State Employees Credit Union,* 851 F.2d 81, 84 (3 Cir.1988). Accordingly, we review conclusions of law *de novo,* and findings of fact under a clearly erroneous standard. *\*989 In re Manville, supra,* 896 F.2d at 1388; *Brown, supra,* 851 F.2d at 84.

## III.

This appeal raises the question of the effect of § 1113 of the Bankruptcy Code on the application of the automatic stay provisions of § 362 of the Bankruptcy Code to non-bankruptcy proceedings to enforce a collective bargaining agreement. Resolution of this dispute requires us to consider the intent of Congress in enacting these sections.

### (A)

[2] Section 362 of the Bankruptcy Code provides that the filing of a petition in bankruptcy automatically stays certain actions directed against the debtor or against the debtor's property. 11 U.S.C. § 362(a) (1988). The automatic stay provisions promote two principal purposes of the Bankruptcy Code. First, the automatic stay "provides the debtor with 'a breathing spell from his creditors.' " *Teachers Ins. & Annuity Ass'n of America v. Butler,* 803 F.2d 61, 64 (2 Cir.1986) (quoting legislative history); *In re Petrusch,* 667 F.2d 297, 299 (2 Cir.1981) (same), *cert. denied,* 456 U.S. 974, 102 S.Ct. 2238, 72 L.Ed.2d 848 (1982). In addition, the automatic stay allows the bankruptcy court to centralize all disputes concerning property of the debtor's estate in the bankruptcy court so that reorganization can proceed efficiently, unimpeded by uncoordinated proceedings in other arenas. The Bankruptcy Code "provide[s] for centralized jurisdiction and administration of the debtor, its estate and its reorganization in the Bankruptcy Court, and [this policy] is effectuated by Sections 362 and 105 of the

Code." *In re Chateaugay Corp.,* 109 B.R. 613, 621 (S.D.N.Y.1990); *see also Hunt v. Bankers Trust Co.,* 799 F.2d 1060, 1069 (5 Cir.1986); *Holland America Ins. Co. v. Succession of Roy,* 777 F.2d 992, 995 (5 Cir.1985).

### (B)

We turn next to § 1113 of the Bankruptcy Code. Our discussion of that section must begin with the Supreme Court's decision in *National Labor Relations Bd. v. Bildisco & Bildisco,* 465 U.S. 513, 104 S.Ct. 1188, 79 L.Ed.2d 482 (1984). In *Bildisco,* the Court held, in part, that the filing of a petition in bankruptcy rendered collective bargaining agreements unenforceable. *Id.* at 532, 104 S.Ct. at 1199. The debtor, therefore, could terminate unilaterally the collective bargaining agreement or alter its provisions prior to seeking bankruptcy court approval for rejection of an executory contract under § 365(a). *Id.* at 533-34, 104 S.Ct. at 1199- 1200.

In response to *Bildisco,* Congress enacted § 1113 of the Bankruptcy Code as part of the Bankruptcy Amendments and Federal Judgeship Act of 1984 ("BAFJA"), Pub.L. No. 98-353, 98 Stat. 333, 390-91 (1984). Section 1113 governs the means by which a debtor may assume, reject or modify its collective bargaining agreement. 11 U.S.C. § 1113(a), (b) and (e) (1988). It ensures that the debtor attempt to negotiate with the union prior to seeking to terminate a collective bargaining agreement. § 1113(b). In the event such negotiations fail, it delineates the standard by which an application by the debtor to terminate the collective bargaining agreement is to be judged by the bankruptcy court and establishes a time frame in which this determination is to be made. 11 U.S.C. § 1113(c), (d) (1988). Subsection (f) provides:

"No provision of [the Bankruptcy Code] shall be construed to permit a trustee to unilaterally terminate or alter any provisions of a collective bargaining agreement prior to compliance with the provisions of [section 1113]."
11 U.S.C. § 1113(f) (1988).

In discerning Congress' intent in enacting § 1113, we look first to the language of the statute. *United States v. Bonanno Organized Crime Family of La Cosa Nostra,* 879 F.2d 20, 21 (2 Cir.1989). Subsection 1113(a) provides that a debtor "may assume or reject a collective bargaining agreement only in accordance with the provisions of [section 1113]." Subsection 1113(f) evinces an intent that

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Page 6

other provisions of the Bankruptcy Code are inoperable to the extent that they allow a debtor to bypass the requirements of § 1113. The language of the statute indicates that Congress intended § 1113 to be the sole method *990 by which a debtor could terminate or modify a collective bargaining agreement and that application of other provisions of the Bankruptcy Code that allow a debtor to bypass the requirements of § 1113 are prohibited.

[3] This conclusion is supported by the legislative history of § 1113. There are no committee reports accompanying the enactment of § 1113. We look therefore to statements made by sponsors of the legislation on the floor of Congress for an expression of legislative intent. *E.g., Regents of the University of California v. Public Employment Relations Bd.,* 485 U.S. 589, 595- 97, 108 S.Ct. 1404, 1408-10, 99 L.Ed.2d 664 (1988); *North Haven Bd. of Educ. v. Bell,* 456 U.S. 512, 527, 102 S.Ct. 1912, 1921, 72 L.Ed.2d 299 (1982). In support of the legislation, Senator Packwood, one of its sponsors, stated:

"The amendments also prohibit the trustee from unilaterally altering or terminating the labor agreement prior to compliance with the provisions of the section. This provision encourages the collective bargaining process, so basic to federal labor policy. The provision overrules the 5-4 portion of the Supreme Court's *Bildisco* decision and means that the labor contract is enforceable and binding on both parties until a court approved rejection or modification."
130 Cong. Rec. S8898 (daily ed. June 29, 1984).

Finally, the context in which § 1113 was enacted supports our conclusion. It is not disputed that § 1113 was enacted as the legislative response to the Supreme Court's decision in *Bildisco. In re Unimet Corp.,* 842 F.2d 879, 882 (6 Cir.), *cert. denied,* 488 U.S. 828, 109 S.Ct. 81, 102 L.Ed.2d 57 (1988); *Truck Drivers Local 807 v. Carey Transp., Inc.,* 816 F.2d 82, 88 (2 Cir.1987); *In re Century Brass Prods., Inc.,* 795 F.2d 265, 272 (2 Cir.1986) . It stands to reason, therefore, that the events that took place in *Bildisco* are representative of the ill that Congress sought to cure in enacting § 1113.

In *Bildisco,* a debtor ignored "its obligations under the collective-bargaining agreement, including the payment of health and pension benefits and the remittance to the Union of dues collected under the agreement … [and] refused to pay wage increases called for in the collective-bargaining agreement."

*Bildisco, supra,* 465 U.S. at 518, 104 S.Ct. at 1192 . Those alterations were made prior to seeking relief from those obligations in the bankruptcy court and absent negotiation with the union.

"Section 1113(f) reverses that part of *Bildisco & Bildisco* which held that a trustee or debtor in possession was not legally bound to a collective bargaining agreement subsequent to the filing date and prior to the court determination of the application for authority to reject such agreement. The trustee or debtor in possession must adhere to the terms of the collective bargaining agreement unless the court approves the application for rejection pursuant to section 1113(c) or grants interim relief under section 1113(e)."
5 Collier on Bankruptcy, ¶ 1113.01 at 1113-11 (15th ed. 1990).

[4] We conclude, from the language of the statute, statements made by the sponsors of the legislation, and the context in which it was enacted, that Congress intended that a collective bargaining agreement remain in effect and that the collective bargaining process continue after the filing of a bankruptcy petition unless and until the debtor complies with the provisions of § 1113. *E.g., In re Unimet Corp., supra,* 842 F.2d at 884 ("section 1113 unequivocally prohibits the employer from *unilaterally* modifying *any provision* of the collective bargaining agreement"); *In re Century Brass Prods., supra,* 795 F.2d at 272 (§ 1113 "created an expedited form of collective bargaining with several safeguards designed to insure that employers did not use Chapter 11 as medicine to rid themselves of corporate indigestion"); *In re Mile Hi Metal Sys., Inc.,* 51 B.R. 509, 510 (Bankr.D.Colo.1985) ("[o]ne of the primary purposes of [section 1113] was to emphasize the private collective bargaining process in an effort to avoid recourse to the bankruptcy court").

[5] We construe subsection 1113(f) quite literally. We hold that it was meant to prohibit the application of any other *991 provision of the Bankruptcy Code when such application would permit a debtor to achieve a unilateral termination or modification of a collective bargaining agreement without meeting the requirements of § 1113.

(C)
We consider, on the instant appeal, a very specific question, i.e., whether Congress intended in enacting § 1113(f) to preclude the application of the automatic stay provisions of § 362 to any dispute

concerning a collective bargaining agreement absent compliance with the provisions of § 1113. We find no evidence that Congress had that specific intent.

Section 1113(f) is circumstance specific rather than section specific. Congress did not choose to direct § 1113(f) at any specific provision whose application it deemed would always permit a debtor unilaterally to alter a collective bargaining agreement. Rather, § 1113(f) presumes a particularized determination in any circumstance as to whether the application of another provision of the Bankruptcy Code will permit a debtor unilaterally to terminate or alter a collective bargaining agreement.

If Congress had intended to preclude application of the automatic stay to any dispute involving a collective bargaining agreement, it could have excepted explicitly proceedings to enforce a collective bargaining agreement from the automatic stay provisions. 11 U.S.C. § 362(b) (1988). Indeed, in enacting the legislation that included § 1113, Congress added two exceptions to the automatic stay. BAFJA, Pub.L. No. 98-353, 98 Stat. 333, 365, 371 (1984) (11 U.S.C. § 362(b)(7), (10) (1988)). Moreover, other sections of the Bankruptcy Code explicitly state that § 362 is inapplicable. E.g., 11 U.S.C. § 1110(a) (1988) (right of secured creditor with purchase money security interest in aircraft or its parts not subject to § 362); 11 U.S.C. § 1168 (1988) (right of secured creditor with purchase money security interest in rolling stock equipment or accessories used on such equipment not subject to § 362).

[6] Since we discern no congressional intent on the specific issue before us, our analysis is governed by two rules of statutory construction. The first encourages consistent interpretations of statutes so as to give the fullest effect to congressional intent. United States v. Lopez-Cavasos, 915 F.2d 474, 479 (9 Cir.1990); Strobl v. New York Mercantile Exchange, 768 F.2d 22, 30 (2 Cir.), cert. denied, 474 U.S. 1006, 106 S.Ct. 527, 88 L.Ed.2d 459 (1985). " '[W]hen two statutes are capable of co-existence, it is the duty of the courts ... to regard each as effective.' " Radzanower v. Touche Ross & Co., 426 U.S. 148, 155, 96 S.Ct. 1989, 1993, 48 L.Ed.2d 540 (1976) (citation omitted). The second instructs us that, when two statutes are in irreconcilable conflict, we must give effect to the most recently enacted statute since it is the most recent indication of congressional intent. Id. at 154

, 96 S.Ct. at 1993.

We agree with the district court's conclusion that, to the extent the purpose of the automatic stay is to give the debtor a "breathing spell," it cannot be reconciled with § 1113, which provides the sole method by which a debtor may obtain a "breathing spell" from its obligations under a collective bargaining agreement. In re Ionosphere Clubs, supra, 114 B.R. at 397. Were that the only purpose of the automatic stay, we would be inclined to affirm the district court's thorough opinion in its entirety.

The automatic stay, however, also allows the bankruptcy court to protect its jurisdiction over property of the debtor's estate by ruling on the appropriate manner and forum in which such disputes should be resolved. We previously have recognized the importance of that policy in reorganization proceedings. Bohack Corp. v. Borden, Inc., 599 F.2d 1160, 1165 (2 Cir.1979). In view of the importance of that policy, we conclude that a bright line rule precluding the application of the automatic stay to any situation involving a collective bargaining agreement was not intended by Congress. Rather, we believe that a case by case adjudication is preferable. We will give effect to the automatic stay to the extent that its application is not in irreconcilable conflict with § 1113.

*992 [7] We hold, therefore, that § 1113(f) precludes application of the automatic stay to disputes involving a collective bargaining agreement only when its application allows a debtor unilaterally to terminate or alter any provision of a collective bargaining agreement.

IV.

[8] We turn now to the application of the foregoing principles to the disputes at issue in the instant case. We consider the LPP decision first. Eastern contends that the district court erred in determining that § 1113(f) precluded application of the automatic stay to the arbitration that ALPA sought to commence to determine whether the LPPs in the collective bargaining agreement had been triggered. We disagree.

Eastern contends that a stay of arbitration does not deprive a union of a forum in which to enforce the collective bargaining agreement. That argument ignores the fact that adjudication of this dispute in

the bankruptcy court would nullify effectively the arbitration clause in the collective bargaining agreement and would substitute the court's judgment for that of the arbitrator.

The collective bargaining agreement expressly provides for arbitration as the method of dispute resolution. "[S]ection 1113 unequivocally prohibits the employer from *unilaterally* modifying *any provision* of the collective bargaining agreement." *In re Unimet, supra,* 842 F.2d at 884 (emphasis in original). This prohibition applies to arbitration clauses.

"It would be anomalous to find that Congress enacted a mandatory procedure for rejecting a collective bargaining agreement without which the agreement stays in full force and effect, and then to hold that a previously enacted section of the same statute--11 U.S.C. § 362, providing for a stay of claims against a debtor's estate-- automatically invalidates the arbitration clause of a collective bargaining agreement...."

*In re Marine Pollution Serv., Inc.,* 88 B.R. 588, 595 (S.D.N.Y.), *rev'd on other grounds,* 857 F.2d 91 (2 Cir.1988).

Application of the automatic stay to ALPA's attempt to invoke that provision of the collective bargaining agreement would allow Eastern unilaterally to alter the collective bargaining agreement by avoiding its obligation to arbitrate. *In re Bob's Supermarket's, Inc.,* 118 B.R. 783, 785-86 (Bankr.D.Mont.1990); *In re Marine Pollution Serv., Inc., supra,* 88 B.R. at 595 (dicta); *see also* Haggard, *Labor Arbitration and Bankruptcy: A Trek into the Serbonian Bog,* 17 Loy.U.Chi.L.J. 171, 187-88 (1986) ("Under section 1113 of the Bankruptcy Code, a collective bargaining agreement remains in full force and effect until its rejection is approved by the bankruptcy judge or other interim relief is allowed. Thus, the debtor in possession or trustee has the contractual duty to adhere to the substantive provisions of the agreement *and* the duty to arbitrate any alleged breaches of those provisions."). In this context, application of the automatic stay is in irreconcilable conflict with § 1113(f), which requires that Eastern seek relief under the provisions of § 1113 if it wishes to avoid its obligation to arbitrate labor disputes. *Cf. In re Marine Pollution Serv., Inc.,* 89 B.R. 344, 346 (S.D.N.Y.1988) ("if the Trustee believes that the threat of slowdowns or other disturbance is such that he wishes to undo the arbitration award, he has open to him either a return to the arbitrator or a

rejection of the contract in the manner Congress prescribed in 11 U.S.C. § 1113"). We must give effect to § 1113(f) as the later expression of congressional intent.

Our holding is consistent with the purpose underlying § 1113 to the extent that it ensures that the collective bargaining process continue unless and until the bankruptcy court grants the debtor relief under § 1113. The federal judiciary and Congress both have recognized the importance to the collective bargaining process of arbitration. *E.g., United Steelworkers v. Warrior & Gulf Navigation Co.,* 363 U.S. 574, 578, 80 S.Ct. 1347, 1351, 4 L.Ed.2d 1409 (1960) ("arbitration of labor disputes under collective bargaining agreements is *993 part and parcel of the collective bargaining process itself"); 29 U.S.C. § 173(d) (1988) (favoring method of labor dispute resolution agreed to by parties).

[9] We hold that an arbitration brought pursuant to a provision in a collective bargaining agreement is not subject to the automatic stay since its application would allow a debtor unilaterally to avoid its obligation to arbitrate. The district court properly reversed the bankruptcy court's LPP decision.

V.

This brings us to the wet-lease decision. Eastern contends that the district court erred in reversing the bankruptcy court's determination that the Florida action was subject to the automatic stay. We agree.

(A)

[10] Unlike the LPP decision, application of the automatic stay to the action commenced by ALPA in the Southern District of Florida did not relieve Eastern of the obligation to participate in the method of dispute resolution provided for in the collective bargaining agreement. Adjudication in the bankruptcy court itself does not violate § 1113(f) . When a union seeks judicial enforcement of a collective bargaining agreement, the purposes behind §§ 362 and 1113(f) both can be promoted if the dispute can be adjudicated in the bankruptcy court.

We agree with ALPA's contention that precluding it from enforcing the collective bargaining agreement would render § 1113 illusory since a debtor would have no need to invoke it. If enforcement is foreclosed, then a union has no

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

recourse against unilateral modifications imposed by a debtor.

The application of § 362 to a non-bankruptcy judicial proceeding only forecloses enforcement of the collective bargaining agreement if it cannot be enforced in the bankruptcy court. Accordingly, if a union has a procedural mechanism to place the dispute before the bankruptcy court and the bankruptcy court has jurisdiction to resolve the dispute, enforcement of the collective bargaining agreement is not foreclosed and application of the automatic stay does not permit a debtor unilaterally to alter its collective bargaining agreement.

[11] We are not persuaded by ALPA's fear that the automatic stay may be interpreted to stay all proceedings against the debtor, even those commenced in the bankruptcy court. *E.g., In re Coastal Group, Inc.,* 100 B.R. 177, 178 (Bankr.D.Del.1989) (pre-petition breach of contract claim brought as adversary proceeding subject to automatic stay); *In re Penney,* 76 B.R. 160, 161 (Bankr.N.D.Cal.1987) (creditor cannot commence adversary proceeding against debtor in bankruptcy court for a cause of action that, if commenced in state court, would violate automatic stay); *In re Lessig Constr., Inc.,* 67 B.R. 436, 443-44 (Bankr.E.D.Pa.1986) (automatic stay applies to bankruptcy proceedings). *But see In re Vylene Enters., Inc.,* 63 B.R. 900, 905-07 (Bankr.C.D.Cal.1986) (automatic stay not applicable to proceedings seeking injunctive relief commenced in bankruptcy court); *In re American Spinning Mills, Inc.,* 43 B.R. 365, 367 (Bankr.E.D.Pa.1984) ("stay implicitly does not bar a party from commencing an adversary or contested proceeding against the debtor under the caption of the bankruptcy case in the court where the petition is pending"). The only appropriate purpose that the stay promotes with respect to collective bargaining agreements is allowing the bankruptcy court to protect its jurisdiction so that it can proceed efficiently with reorganization. Therefore, § 1113(f) compels the bankruptcy court to provide relief from the stay pursuant to § 362(d) to hear the dispute itself, to the extent that is necessary, or, in the event that the bankruptcy court determines that it is not the appropriate forum for the resolution of such a dispute, to allow the resolution of the dispute to proceed in a non-bankruptcy forum.

Moreover, the fact that the bankruptcy court may not have jurisdiction to hear every conceivable claim that might arise from the collective bargaining agreement does not invalidate our analysis. The relevant inquiry is whether the bankruptcy *994 court has jurisdiction to hear the particular dispute at issue. If the bankruptcy court does have jurisdiction to hear a dispute, it has the power to take the necessary steps to enforce its resolution. 11 U.S.C. § 105 (1988).

Finally, our concern with a procedural mechanism by which the union can present the dispute to the bankruptcy court does not foreclose debtor-initiated resolutions of disputes. A situation in which the union could not bring the dispute before the bankruptcy court and the debtor chose not to, however, would render the collective bargaining agreement unenforceable. That result is prohibited by § 1113(f).

(B)
It follows from our preceding analysis that, if the wet-lease dispute was properly presented to the bankruptcy court, or could have been, and the bankruptcy court could exercise jurisdiction over it, application of the automatic stay was not precluded by § 1113(f). In making this determination, we need not decide whether the bankruptcy court would have jurisdiction to resolve any dispute arising from the collective bargaining agreement, but only whether it had jurisdiction to decide this particular dispute.

Initially, since Eastern brought the merits of the dispute before the bankruptcy court, we need not consider whether ALPA had a procedural mechanism with which to place the dispute before the bankruptcy court. We turn, therefore, to the jurisdiction issue.

In *Northern Pipeline Constr. Co. v. Marathon Pipe Line Co.,* 458 U.S. 50, 102 S.Ct. 2858, 73 L.Ed.2d 598 (1982), the Supreme Court considered constitutional restraints on bankruptcy court jurisdiction. The plurality distinguished those issues "at the core of the federal bankruptcy power ... from the adjudication of state-created private rights." *Id.* at 71, 102 S.Ct. at 2871. The bankruptcy court can exercise jurisdiction over the former, but cannot exercise jurisdiction over a state law contract claim that arose pre-petition. Such a claim can be adjudicated only in an Article III court.

In response to *Marathon,* as part of the BAFJA,

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Congress amended the jurisdictional grant to bankruptcy courts. Bankruptcy courts may enter "appropriate orders and judgments" in "core" proceedings. 28 U.S.C. § 157(b)(1) (1988). Congress provided a non-exclusive list of proceedings it deemed to be core. 28 U.S.C. § 157(b)(2) (1988). In addition, a bankruptcy court can hear non-core proceedings if they are related to the bankruptcy case and the bankruptcy court submits proposed findings of fact and conclusions of law for review by the district court. 28 U.S.C. § 157(c)(1) (1988).

"[B]ankruptcy jurisdiction [is] to be construed as broadly as possible within the constitutional constraints of *Marathon*." *In re Ben Cooper, Inc.,* 896 F.2d 1394, 1398 (2 Cir.1990), *vacated on other grounds,* 498 U.S. 964, 111 S.Ct. 425, 112 L.Ed.2d 408 111 S.Ct. 425 (1990); *see also In re Chateaugay Corp., supra,* 109 B.R. at 621 ("[t]he reach of bankruptcy jurisdiction encompasses all matters the outcome of which would affect the debtor or its reorganization"). With the foregoing in mind, we consider whether the wet-lease dispute is a matter concerning the administration of the estate, justifying bankruptcy jurisdiction. 28 U.S.C. § 157(b)(2)(A) (1988).

[12] The instant dispute involves the effect of the collective bargaining agreement on a contract entered into post-petition. "Post-petition contracts with the debtor-in-possession ... are integral to the estate administration from the date they are entered into." *In re Ben Cooper, supra,* 896 F.2d at 1399. Although this dispute involves an alleged breach of the collective bargaining agreement, rather than an alleged breach of the post-petition contract, the ramifications of the dispute on the administration of the estate are of sufficient importance to justify bankruptcy court jurisdiction. *E.g., Elsinore Shore Assocs. v. Local 54 Hotel Employees,* 820 F.2d 62, 66 (3 Cir.1987) (determination of whether underlying cause of strike was arbitrable justifying *Boys Market* injunction against strike was matter concerning administration of the estate); *International Ass'n of* ***995** *Machinists and Aerospace Workers v. Eastern Air Lines, Inc.,* 121 B.R. 428, 432-33--- B.R. ----, (S.D.N.Y.1990) (labor dispute involving union's conduct during strike was matter concerning the administration of the estate).

We are aware that Congress has expressed an intent that district courts, rather than bankruptcy courts, hear disputes that involve "consideration of both title 11 and other laws of the United States regulating organizations or activities affecting interstate commerce." 28 U.S.C. § 157(d) (1988). Our holding is not inconsistent with congressional intent as expressed in that provision, which provides for mandatory withdrawal of such cases from the bankruptcy court to the district court. It has been construed narrowly. "Withdrawal under 28 U.S.C. § 157(d) is not available merely whenever non-Bankruptcy Code federal statutes will be considered in the Bankruptcy Court proceeding, but is reserved for cases where substantial and material consideration of non-Bankruptcy Code federal statutes is necessary for the resolution of the proceeding." *In re Ionosphere Clubs, Inc.,* 103 B.R. 416, 418-19 (S.D.N.Y.1989) (footnote omitted); *see also In re White Motor Corp.,* 42 B.R. 693, 700 (N.D.Ohio 1984) (" '[t]he district court should ... not allow a party to use this provision to require withdrawal where such laws are not material to resolution of the proceeding' " (quoting legislative history)).

Eastern's rights in this dispute are governed by *Florida East Coast, supra.* In that case, the Court held that, during a strike, a carrier could make unilateral changes in a collective bargaining agreement without complying with the terms of the RLA that were reasonably necessary to its continued operation. *Florida East Coast, supra,* 384 U.S. at 246-48, 86 S.Ct. at 1424-26. Application of that doctrine does not require the bankruptcy court to engage itself in the intricacies of the RLA. Resolution of the dispute in the instant case, therefore, does not demand substantial consideration of the RLA, but, rather "involves the routine application of [a] non-Bankruptcy Code federal statute[ ]." *In re Ionosphere Clubs, supra,* 103 B.R. at 420.

We hold that the bankruptcy court had jurisdiction to resolve the issues presented by the Florida action.

VI.

We turn next to the propriety of the bankruptcy court's exercise of its powers under § 105 to enjoin ALPA from prosecuting the wet-lease action. Eastern contends that the district court erred in holding that the bankruptcy court was precluded by § 1113(f) from issuing an injunction against prosecution of the Florida lawsuit. We agree.

[13][14] Section 105(a) of the Bankruptcy Code

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

provides that: "The court may issue any order, process or judgment that is necessary or appropriate to carry out the provisions of this title." This power "must and can only be exercised within the confines of the Bankruptcy Code." *Norwest Bank Worthington v. Ahlers,* 485 U.S. 197, 206, 108 S.Ct. 963, 968, 99 L.Ed.2d 169 (1988); *see also In re Johns-Manville Corp.,* 801 F.2d 60, 63 (2 Cir.1986) ( "Section 105(a) ... does not broaden the bankruptcy court's jurisdiction"). The bankruptcy court's equitable powers cannot be exercised in derogation of other sections of the Bankruptcy Code. *In re Morristown & Erie R.R. Co.,* 885 F.2d 98, 100 (3 Cir.1989); *In re NWFX, Inc.,* 864 F.2d 593, 595 (8 Cir.1989). The district court reasoned that an injunction issued to bar enforcement of a collective bargaining agreement outside the bankruptcy court would violate § 1113. It followed, from the district court's analysis, that the bankruptcy court's equitable powers could not be used to that end. *In re Ionosphere Clubs, supra,* 114 B.R. at 404-05.

Since § 105, like § 362, is a means by which the bankruptcy court can protect its jurisdiction, *In re Chateaugay Corp., supra,* 109 B.R. at 621, we hold that its application is not always inconsistent with § 1113. We hold that the bankruptcy court's exercise of its equitable powers pursuant to § 105 to enjoin enforcement of a collective bargaining agreement is subject to the same considerations set forth above for the application of § 362.

### *996 VII.

ALPA contends that the Norris-LaGuardia Act prohibited the bankruptcy court from enjoining the Florida action and raises several issues concerning the merits of the wet-lease decision. The district court did not reach these issues since it decided that application of the automatic stay violated § 1113(f). In light of our contrary holding, we remand the case to the district court for consideration of ALPA's claims.

### VIII.

To summarize:

We hold that application of the automatic stay provisions of § 362 of the Bankruptcy Code is precluded by § 1113(f) only to the extent that they permit a debtor unilaterally to terminate or alter a collective bargaining agreement. With respect to the LPP decision, we hold that application of the automatic stay to the arbitration brought pursuant to

the collective bargaining agreement violated § 1113(f) since it allowed Eastern unilaterally to avoid its obligation to arbitrate. We hold that the bankruptcy court may stay a non-bankruptcy judicial proceeding to enforce a collective bargaining agreement if the union can bring the dispute before the bankruptcy court and the bankruptcy court has jurisdiction to resolve it. With respect to the wet-lease decision, we hold that the bankruptcy court had jurisdiction to resolve the issues raised by the Florida action and, therefore, the stay of that action was not precluded by § 1113(f). Finally, we hold that section 1113(f) did not prohibit the bankruptcy court from issuing an injunction against prosecution of the Florida action. We remand the case to the district court for further consideration of the wet-lease decision.

Affirmed in part, reversed in part and remanded.

MINER, Circuit Judge, concurring in part and dissenting in part:

I agree with my colleagues insofar as they conclude that application of the automatic stay provided by § 362 of the Bankruptcy Code to the arbitration of the labor protective provisions of the collective bargaining agreement is violative of § 1113(f) of the Code. I respectfully disagree with my colleagues insofar as they conclude that § 1113(f) does not bar an automatic stay of the Florida action, the injunction issued by the Bankruptcy Court against further prosecution of that action, and the Bankruptcy Court's resolution of the wet-leasing dispute.

Section 1 of the Collective Bargaining Agreement between Eastern and ALPA provides:

> that all present or future flying including flight training (except for initial factory-conducted training in newly purchased equipment), revenue flying, ferry flights, charters and wet-leases performed in or for the service of Eastern Air Lines, Inc., shall be performed by pilots whose names appear on the then-current Eastern Air Lines' System Seniority List.

In apparent violation of the foregoing provision, Eastern entered into wet-leasing agreements whereby it leased aircraft with crews from Continental while Eastern pilots were on strike. As a debtor in a Chapter 11 reorganization, however, Eastern may not "unilaterally ... alter any provisions of a collective bargaining agreement" prior to court approval in the manner specified by §

922 F.2d 984
(Cite as: 922 F.2d 984, *996)

Page 12

1113 of the Code.  11 U.S.C. § 1113(f).

Rather than first seeking the requisite court approval authorizing rejection of the collective bargaining agreement upon a showing that modifications in the agreement "are necessary to permit the reorganization of the debtor," 11 U.S.C. § 1113(b)(1)(A), Eastern proceeded to lease aircraft and crews for its normal business operations. Eastern made no effort to negotiate with ALPA before making its arrangements with Continental. As a consequence, ALPA sought in the district court in Florida to compel expedited arbitration of its wet-leasing grievance, to procure the issuance of an injunction in aid of arbitration and to obtain other relief as well.   Arbitration of the wet-leasing grievance is required by the labor agreement, which *997 also requires arbitration of the labor protective provisions issue and of any other dispute that may arise out of the performance or non-performance of the agreement.

My colleagues "hold that application of the automatic stay to the arbitration brought pursuant to the collective bargaining agreement violated § 1113(f) since it allowed Eastern unilaterally to avoid the obligation to arbitrate." In their opinion, this holding serves only to bar the application of the stay to the labor protective provisions arbitration proceeding.    To the extent that § 1113(f) is implicated, however, it seems to me that there is no difference between rejecting the automatic stay as a bar to that arbitration proceeding and rejecting it as a bar to an action to *compel arbitration* of the wet-leasing issue.   *See In re Marine Pollution Serv., Inc.,* 88 Bankr. 588 (S.D.N.Y.1988).

In holding the automatic stay of § 362 applicable, and in enjoining further prosecution in the Florida District Court under the authority of § 105, the Bankruptcy Court proceeded to resolve the wet-lease issue by determining that "[t]hese wet-leases were, and are, reasonably necessary to Eastern's efforts to rebuild its operations." *In re Ionosphere Clubs, Inc.,* 105 Bankr. 773, 775 (S.D.N.Y.1989). The Bankruptcy Court also found that "[b]y proceeding to enjoin Eastern from continuing with those [wet-lease] operations, ALPA would disrupt Eastern's planned flight operations causing the estate to suffer irreparably by the substantial erosion of Eastern's operations." *Id.*    While these determinations may be taken as a finding that elimination of the wet-leasing prohibition is a modification "necessary to permit the reorganization

of the debtor," 11 U.S.C. § 1113(b)(1)(A), there was no compliance with the statutory scheme for rejection of the collective bargaining agreement, and the Bankruptcy Court therefore was without jurisdiction to excuse violation of the wet-leasing prohibition clause.   *See generally* Note, *Nobody Likes Rejection Unless You're a Debtor in Chapter 11: Rejection of Collective Bargaining Agreements Under 11 U.S.C. § 1113,* 34 N.Y.L.Sch.L.Rev. 169, 171-74 (1989).

By obtaining its relief in the Bankruptcy Court in the context of an action to enforce an automatic stay, Eastern is able to avoid compliance with a carefully-drawn statute enacted by Congress to govern labor-management relations in a bankruptcy reorganization.    As noted by my colleagues, the statute was designed to overcome the Supreme Court's decision in *National Labor Relations Board v. Bildisco & Bildisco,* 465 U.S. 513, 528-29, 104 S.Ct. 1188, 1197-98, 79 L.Ed.2d 482 (1984), which allowed a debtor unilaterally to terminate or alter a collective bargaining agreement prior to seeking bankruptcy court approval under § 365(a) for rejection of an executory contract.   The statute specifically forbids termination in the manner permitted by *Bildisco* and promotes the long-established national labor policy of encouraging collective bargaining.    *See In re Century Brass Prods., Inc.,* 795 F.2d 265, 266, 272 (2d Cir.), *cert. denied,* 479 U.S. 949, 107 S.Ct. 433, 93 L.Ed.2d 383 (1986).

Eastern simply cannot be relieved of its obligation to avoid wet-leasing unless it follows the step-by-step procedure established by Congress.    Since it contends that the modification in employee benefits and protection it seeks is necessary to permit its reorganization, it first must make a proposal to ALPA.  11 U.S.C. § 1113(b)(1)(A).    Eastern must provide ALPA with information relevant to an evaluation of the proposal.   *Id.* § 1113(b)(1)(B).    It must hold meetings with ALPA in a good faith effort to reach a mutually satisfactory modification. *Id.* § 1113(b)(2).    It may file an application for rejection only after the modification proposal has been made, discussed and rejected.    *Id.* § 1113(d)(1).    The court then will decide, after a hearing on notice to interested parties, whether to reject the agreement.   *Id.*

Eastern cannot prevail, even after a hearing, unless the court finds that a proposal of the sort contemplated by the statute was made prior to the

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

hearing, ALPA has refused without good cause to accept the proposal and "the balance of the equities clearly favors rejection of [the collective bargaining] agreement." *Id.* § 1113(c). In making its decision, "the *998 court must consider whether rejection would increase the likelihood of successful reorganization." *Truck Drivers Local 807 v. Carey Transp., Inc.,* 816 F.2d 82, 89 (2d Cir.1987); *see also In re Royal Composing Room, Inc.,* 62 Bankr. 403 (S.D.N.Y.), *aff'd,* 848 F.2d 345 (2d Cir.1988); *cert. denied,* 489 U.S. 1078, 109 S.Ct. 1529 103 L.Ed.2d 834 (1989). It is only after all the preliminary steps have been completed, and the court fails to rule on the application within thirty days after the hearing is commenced, that the debtor unilaterally "may terminate or alter any provisions of the collective bargaining agreement pending the ruling of the court on such application." 11 U.S.C. § 1113(d)(2). Eastern took this one-sided action without bothering with the preliminaries. *See In re American Provision Co.,* 44 Bankr. 907, 909 (D.Minn.1984). We should not countenance this conduct, for it precludes resolution of the wet leasing dispute through the preferred process of collective bargaining.

I have no quarrel with the notion that the Bankruptcy Court has jurisdiction to perform the court functions described in § 1113. That jurisdiction was not invoked here, however, and

there was accordingly an evasion of congressional purpose. My colleagues say that if a collective bargaining agreement can somehow be enforced in a bankruptcy court, then the automatic stay provisions of § 362 may be applied to enforcement of the agreement in a non-bankruptcy court; that the wet-leasing dispute properly was placed before the Bankruptcy Court here; and that the Bankruptcy Court's exercise of its equitable powers under § 105 to enjoin enforcement of the collective bargaining agreement is a means that may be used for the protection of bankruptcy court jurisdiction. I say that application of the automatic stay provisions of § 362 to an action brought to compel compliance with the arbitration provisions of a collective bargaining agreement is inconsistent with the broad purposes and specific language of § 1113; that the wet-leasing dispute was not properly placed before the Bankruptcy Court here; and that the equitable powers of a bankruptcy court under § 105 may not be used to enjoin enforcement of a collective bargaining agreement in any manner inconsistent with § 1113. Accordingly, I would affirm the judgment of the district court in all respects.

922 F.2d 984, 59 USLW 2407, 136 L.R.R.M. (BNA) 2065, 118 Lab.Cas. P 10,548, Bankr. L. Rep. P 73,747

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# TAB 47

**H**

United States Court of Appeals,
Second Circuit.
**Ernestine SPENCER, individually as the mother
of Samuel Benjamin Spencer III,
deceased, and as Administratrix of the estate of
Samuel Benjamin Spencer III,
Samuel B. Spencer, Jr., father of Samuel
Benjamin Spencer III, deceased,
Plaintiffs-Appellants,
v.
Frank CASAVILLA, Cosmo Muriale, Frank
D'Antonio, & Douglas Mackey, Defendants-
Appellees.
No. 38, Docket 93-9356.**

Argued Aug. 31, 1994.
Decided Dec. 19, 1994.

Family of murder victim sued convicted murderers. The United States District Court for the Southern District of New York, 717 F.Supp. 1057, dismissed for failure to state federal cause of action, and family appealed. The Court of Appeals, 903 F.2d 171, remanded. On remand, the District Court, Kimba M. Wood, J., 839 F.Supp. 1014, entered judgment on jury verdict for family, and appeal was taken. The Court of Appeals, Kearse, Circuit Judge, held that: (1) where jury did not award additional damages on federal claims and judgment dismissing federal claims did not disturb awards on state-law claims, dismissal of federal claims did not aggrieve plaintiffs, and (2) family members of murder victim failed to prove defendants convicted of murder had requisite intent by showing predominant purpose of conspiracy was interference with or punishment for exercise of right.

Affirmed in part; dismissed in part.

West Headnotes

**[1] Federal Courts** ⟶543.1
170Bk543.1
Ordinarily, party to lawsuit has no standing to appeal order unless he can show some basis for arguing that challenged action causes him cognizable injury.

**[2] Federal Courts** ⟶543.1
170Bk543.1
Party who receives all that he has sought generally is not aggrieved by judgment affording relief and cannot appeal from it.

**[3] Federal Courts** ⟶543.1
170Bk543.1
Party may not appeal from judgment or decree in his favor.

**[4] Federal Courts** ⟶544
170Bk544
Where jury did not award additional damages on federal claims and judgment dismissing federal claims did not disturb awards on state-law claims, dismissal of federal claims did not aggrieve plaintiffs.

**[5] Federal Courts** ⟶544
170Bk544
Theoretical availability of attorney fees in federal claim, which would not have been available in connection with recovery on state-law claims, did not give plaintiffs standing to appeal judgment dismissing necessary underpinnings for motion they chose not to make, owing to defendants' indigence. 42 U.S.C.A. § 1988.

**[6] Federal Courts** ⟶544
170Bk544
Family members of murder victim, who brought civil rights action against convicted murderers of their son, had standing to appeal from so much of judgment as dismissed individual claims under § 1985.

**[7] Conspiracy** ⟶19
91k19
In civil suit in which family members of murder victims sought damages from defendants convicted of murder, family members failed to prove that predominant purpose of conspiracy was to interfere with family members' relationship with her son, as necessary to recover damages. 42 § 1985(3).
**\*75** James I. Meyerson, New York City, for plaintiffs-appellants.

Before: NEWMAN, Chief Judge, KEARSE and CARDAMONE, Circuit Judges.

KEARSE, Circuit Judge:

This case returns to us after a jury trial and a judgment setting aside the jury's verdict on certain claims, following our remand in *Spencer v.*

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

*Casavilla,* 903 F.2d 171 (2d Cir.1990) ("*Spencer I*"). Plaintiffs Ernestine Spencer and Samuel Spencer, Jr., appeal from so much of the final judgment of the United States District Court for the Southern District of New York, Kimba M. Wood, *Judge,* as dismissed their claims pursuant to 42 U.S.C. §§ 1981 and 1985(3) (1988) for the racially motivated beating and murder of their son, Samuel Spencer III ("Spencer"). With respect to federal and state-law claims asserted on behalf of Spencer, the jury returned a verdict in favor of plaintiffs on liability issues, and it awarded a total of $700,000 in compensatory and punitive damages on the state-law claims, but awarded no additional damages on the federal claims. The jury also found for plaintiffs on their individual claims under § 1985(3) for conspiracy to deprive them of the services of Spencer, awarding them $300,000 on those claims. The district court set aside the verdicts on all of the federal claims, ruling principally (a) that the § 1981 claims must be dismissed for lack of state action, and (b) that the § 1985(3) claims on behalf of Spencer must be dismissed for lack of evidence from which a reasonable jury could conclude that defendants acted with the intent to deprive Spencer of his constitutional right to travel. On appeal, plaintiffs challenge the dismissals of their federal claims. For the reasons that follow, we dismiss so much of the appeal as seeks review of the dismissal of the federal claims asserted on behalf of Spencer; we affirm the dismissal of the federal claims asserted on behalf of plaintiffs individually.

## I. BACKGROUND

The events, as described in the district court's posttrial Amended Memorandum Opinion and Order dated December 7, 1993 ("Opinion"), may be summarized as follows. On May 28, 1986, Spencer, a young black man who resided with his parents in Yonkers, New York, was visiting his sister in the Coney Island section of Brooklyn. Sometime after midnight, Spencer left his sister's home *76 and rode his bicycle to Nathan's Restaurant. After an argument in the parking lot, Spencer was chased by defendants Frank Casavilla, Frank D'Antonio, Cosmo Muriale, and Douglas Mackey, young white men, who brutally beat and stabbed him to death, saying "Die, nigger." In a state criminal prosecution for their attack on Spencer, the four defendants eventually were convicted, after trial or pleas of guilty, of state-law crimes ranging from assault to murder.

Plaintiffs commenced the present action, asserting claims under § 1981, § 1985(3), and state law on behalf of Spencer for pain and suffering ("Spencer's claims"), and claims under §§ 1981 and 1985(3) on behalf of themselves individually for loss of the services of their son (plaintiffs' "individual claims"). Section 1981 provides that

[a]ll persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other.

42 U.S.C. § 1981(a). Section 1985(3) provides in pertinent part that

[i]f two or more persons in any State or Territory conspire ... for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws ... [and] do, or cause to be done, any act in furtherance of the object of such conspiracy, whereby another is injured in his person or property, or deprived of having and exercising any right or privilege of a citizen of the United States, the party so injured or deprived may have an action for the recovery of damages occasioned by such injury or deprivation, against any one or more of the conspirators.

42 U.S.C. § 1985(3).

The case was initially dismissed for lack of federal subject matter jurisdiction and failure to state a federal cause of action. *See* 717 F.Supp. 1057, 1062 (S.D.N.Y.1989) (Haight, J.). This Court reversed in *Spencer I* and remanded for trial. Addressing only Spencer's § 1985(3) claim, we held that the complaint could be construed to allege a violation of Spencer's constitutional right to intrastate travel. *See* 903 F.2d at 174 (citing *King v. New Rochelle Municipal Housing Authority,* 442 F.2d 646, 648 (2d Cir.) ("It would be meaningless to describe the right to travel between states as a fundamental precept of personal liberty and not to acknowledge a correlative constitutional right to travel within a state."), *cert. denied,* 404 U.S. 863, 92 S.Ct. 113, 30 L.Ed.2d 107 (1971), and *Memorial Hospital v. Maricopa County,* 415 U.S. 250, 255-56, 94 S.Ct. 1076, 1080-81, 39 L.Ed.2d 306 (1974) (declining to consider whether to draw a constitutional distinction between interstate and intrastate travel)). We noted that plaintiffs might

44 F.3d 74                                                                                                          Page 39
(Cite as: 44 F.3d 74, *76)

prove, for example, that Spencer had entered defendants' neighborhood and that defendants had sought to impede his right to travel freely in that area. *See Spencer I,* 903 F.2d at 174.

On remand, after trial before Judge Wood in 1992, the jury returned a special verdict, answering specific questions formulated by the court. As to the claims asserted on behalf of Spencer, the jury found in favor of plaintiffs on the issues of liability. On the § 1985(3) claim, the jury found that all four defendants had conspired for the purpose of depriving Spencer of his right to travel intrastate, that their actions had been motivated by a discriminatory attitude toward blacks, and that Spencer's injuries had been caused by defendants' conspiracy. On the § 1981 claim, the jury found that defendants' assault on Spencer was motivated by their racial animus. As to the state-law claims, the jury was directed, as a result of defendants' state-court convictions, that it must find that each of the defendants had assaulted Spencer in violation of state law. The jury was instructed to value the damages separately with respect to the state and federal claims. Because damages are not available for the value of a constitutional right itself, *see Memphis Community School District v. Stachura,* 477 U.S. 299, 310, 106 S.Ct. 2537, 2544, 91 L.Ed.2d 249 (1986), and because the jury *77 may not compensate a claimant twice for the same injury, *see, e.g., Gentile v. County of Suffolk,* 926 F.2d 142, 153-54 (2d Cir.1991), the district court specified that it was to award, for the federal cause of action *"only* compensatory damages that are in addition to those you awarded under the assault claim."  The jury awarded $250,000 in compensatory damages and $450,000 in punitive damages on Spencer's state-law claims; it awarded no additional damages on his federal-law claims.

The jury also found for plaintiffs on the liability issues on their individual claims. On their § 1985(3) claims, the jury found that all four defendants had conspired to assault Spencer, that the assault had been motivated by a discriminatory attitude toward blacks as a group, and that defendants had acted with reckless disregard for the consequences of their actions. On plaintiffs' individual § 1981 claims, the jury found that plaintiffs had a valuable relationship with Spencer; and it found that defendants' assault on Spencer was racially motivated, was committed with reckless disregard for the consequences, and caused damage to plaintiffs' relationship with their son. The jury

awarded plaintiffs jointly $300,000 in compensatory damages on their individual § 1985(3) claims; it awarded no additional damages on their claims under § 1981.

After the jury returned its verdicts, Judge Wood addressed defendants' posttrial renewal of earlier motions to dismiss plaintiffs' federal claims as a matter of law. In a ruling not challenged on this appeal, the court dismissed the complaint against D'Antonio because he had died prior to trial and plaintiffs had not continued the action against his personal representative as required by New York law. (The dismissal of the claims against D'Antonio had the effect of reducing the total punitive damages award, which had been apportioned by the jury among the defendants and was properly assessed against them individually, *see, e.g., McFadden v. Sanchez,* 710 F.2d 907, 912-14 (2d Cir.1983)). In the rulings that are the subject of the present appeal, the court set aside the jury's verdicts in favor of plaintiffs on all of the federal claims.

With respect to the claims under § 1985(3), which were premised on an interference with Spencer's constitutional right to travel, the court looked principally to the then-recent ruling in *Bray v. Alexandria Women's Health Clinic,* 506 U.S. 263, 113 S.Ct. 753, 122 L.Ed.2d 34 (1993) (*"Bray* "), in which the Supreme Court held that a suit seeking redress under that section requires proof (a) that a racial or other class-based invidiously discriminatory animus lay behind the coconspirators' actions, (b) that the coconspirators intended to deprive the victim of a right guaranteed by the Constitution against private impairment, and (c) that that right was consciously targeted and not just incidentally affected, *see id.* at ----, 113 S.Ct. at 762 ("The right must be *'aimed at,'* ...; its impairment must be a conscious objective of the enterprise.") (quoting *United Brotherhood of Carpenters & Joiners v. Scott,* 463 U.S. 825, 833, 103 S.Ct. 3352, 3358-59, 77 L.Ed.2d 1049 (1983) (emphasis in *Bray* )). The district court found that plaintiffs in the present case had "introduced no evidence at trial from which a jury could conclude that defendants 'aimed at' or acted with the purpose of depriving Spencer of his right to travel." Opinion at 7. It noted that though this Court in *Spencer I* had hypothesized that plaintiffs might prove that defendants attacked Spencer because he had entered their neighborhood, that possibility
   was not borne out by the evidence at trial: the

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

assault did not occur in defendants' neighborhood, or in any white neighborhood, but in the predominantly black neighborhood of Coney Island where Spencer's sister lived. At trial, plaintiffs' counsel conceded that plaintiffs could not show that defendants assaulted Spencer "because he was in an area they didn't want blacks to be in."

Opinion at 8 (quoting Trial Transcript at 99). The court noted that while it might be argued that in chasing Spencer defendants had wanted to interfere with his right to flee, that desire was merely incidental to their intent to assault him. The court concluded that, even if Spencer had been an interstate, rather than an intrastate, traveler, the verdicts on the § 1985(3) claims must be set aside *78 "because plaintiffs did not show that defendants acted with the purpose or intent to deprive Spencer of his right to travel." Opinion at 8.

With respect to the § 1981 claims, the court stated that most courts have interpreted that section's clauses guaranteeing the "right[s] ... to the full and equal benefit of [the] laws" and to no more than "like punishment" as requiring proof of state action. Citing *Mahone v. Waddle*, 564 F.2d 1018, 1029 (3d Cir.1977) ("[W]hile private discrimination may be implicated by the contract clause of section 1981, the concept of state action is implicit in the equal benefit clause. The like punishment clause may be read in the same way."), *cert. denied*, 438 U.S. 904, 98 S.Ct. 3122, 57 L.Ed.2d 1147 (1978), the district court agreed that in order to prove a claim under one of these clauses of § 1981, the claimant must show some state action. There being no evidence of state action in the events leading to Spencer's death, the court dismissed all of the § 1981 claims.

Except to the extent of vacating the judgment against the deceased defendant D'Antonio, the court did not disturb the jury's verdict on the state-law claims asserted on behalf of Spencer. *See*Opinion at 16 n. 12 ("Because the jury awarded no compensatory or punitive damages on plaintiff[s'] § § 1985(3) and 1981 causes of action on behalf of Spencer, the court's dismissal of the federal claims does not diminish that portion of plaintiffs' award.") Accordingly, a final judgment was entered awarding compensatory damages of $250,000 to plaintiffs on behalf of Spencer against the three surviving defendants jointly and severally, and awarding a total of $247,500 in punitive damages against the surviving defendants severally, in accordance with

the jury's apportionment of the punitive damages among the defendants.

## II. DISCUSSION

On appeal, plaintiffs make no challenge to the conduct of the trial or to the jury's verdicts. They contend only that the district court erred in setting aside the jury verdicts on their federal claims. Since we conclude that plaintiffs are not aggrieved insofar as the court dismissed the federal claims asserted on behalf of Spencer, we dismiss so much of the appeal as challenges the dismissal of those claims. We affirm the district court's dismissal of the federal claims asserted by plaintiffs individually.

### A. Spencer's Claims

[1][2][3] Ordinarily, a party to a lawsuit has no standing to appeal an order unless he can show some basis for arguing that the challenged action causes him a cognizable injury, *i.e.,* that he is "aggrieved" by the order. *See, e.g., Deposit Guaranty National Bank v. Roper*, 445 U.S. 326, 335, 100 S.Ct. 1166, 1172, 63 L.Ed.2d 427 (1980) ; *Association Against Discrimination in Employment, Inc. v. City of Bridgeport*, 710 F.2d 69, 73 (2d Cir.1983). "A party who receives all that he has sought generally is not aggrieved by the judgment affording the relief and cannot appeal from it." *Deposit Guaranty National Bank v. Roper*, 445 U.S. at 333, 100 S.Ct. at 1171. " 'A party may not appeal from a judgment or decree in his favor....' " *Id.* at 335, 100 S.Ct. at 1172 (quoting *Electrical Fittings Corp. v. Thomas & Betts Co.*, 307 U.S. 241, 242, 59 S.Ct. 860, 860-61, 83 L.Ed. 1263 (1939)).

[4] This principle forecloses plaintiffs' appeal from so much of the judgment as dismissed the federal claims asserted on behalf of Spencer. On Spencer's state-law claims, plaintiffs were awarded, in accordance with the jury's verdict, substantial compensatory and punitive damages. Since the jury declined to award any additional damages on Spencer's federal claims, and since the judgment dismissing Spencer's federal claims did not disturb the awards on his state-law claims, the dismissal of the federal claims, as a practical matter, did not aggrieve plaintiffs.

[5] We are aware that plaintiffs' complaint requested an award of attorneys' fees and that such an award would likely have been theoretically available in connection with the federal claims to

44 F.3d 74
(Cite as: 44 F.3d 74, *78)

the extent that plaintiffs were the prevailing parties on those claims, *see* 42 U.S.C. § 1988 (1988), but would not have been available in connection with their recovery on the state-law claims. In fact, however, owing to defendants' indigence,**79** plaintiffs declined to move in the district court for an award of fees. We conclude that the theoretical availability of such fees does not give plaintiffs standing to appeal so much of the judgment as dismissed the necessary underpinnings for a motion they chose not to make.

 In sum, since the judgment awarded plaintiffs their compensatory and punitive damages on Spencer's state-law claims, we cannot conclude that plaintiffs are aggrieved by the judgment dismissing his federal claims, and we therefore dismiss for lack of standing so much of the appeal as seeks review of that part of the judgment. Accordingly, we need not reach the questions of the correctness of the district court's dismissal of the federal claims asserted on behalf of Spencer or of the effect of *Bray* on *Spencer I* 's premise that the Constitution protects the right to travel intrastate.

B. *Plaintiffs' Individual Claims*

 [6] Plaintiffs do, however, have standing to appeal from so much of the judgment as dismissed their individual claims under § 1985(3), for the jury awarded them $300,000 on those claims and awarded them no damages on their other claims. We conclude, however, that their individual § 1985(3) claims were properly dismissed.

 [7] In their individual § 1985(3) claims, plaintiffs sought damages for the loss of their son. In support of their claims, they cite cases that have recognized a liberty interest in familial relationships that is protected from state interference, *see, e.g., Trujillo v. Board of County Commissioners,* 768 F.2d 1186, 1189 (10th Cir.1985) (recognizing a cause of action under 42 U.S.C. § 1983 for state interference with intimate familial relationships).

Assuming for purposes of the present appeal that familial relationships are, as required for a successful claim under § 1985(3), protected not only against impairment by governmental entities but also against impairment by a conspiracy of private persons, *see Bray,* 506 U.S. at ----, 113 S.Ct. at 762, we conclude that plaintiffs failed to prove the requisite intent. As discussed in Part I above, the Supreme Court in *Bray* held that in order to prevail in an action under § 1985(3), it is not sufficient for a plaintiff to show that a federally protected right has been affected. In addition, the claimant must show that the predominant purpose of the conspiracy was interference with, or punishment for, the exercise of that right. The *Bray* Court stressed that the right impaired "must be '*aimed at,*' " 506 U.S. at ----, 113 S.Ct. at 762 (quoting *United Brotherhood of Carpenters & Joiners v. Scott,* 463 U.S. at 833, 103 S.Ct. at 3358-59 (emphasis in *Bray* )), and that "its impairment must be a conscious objective of the enterprise," *Bray,* 506 U.S. at ----, 113 S.Ct. at 762.

 Plaintiffs have pointed to no evidence to support the proposition that defendants' objective was, even in part, to interfere with their relationship with their son. Accordingly, they did not establish their individual claims under § 1985(3).

CONCLUSION

 We have considered all of plaintiffs' contentions in support of their individual claims and have found them to be without merit. For the foregoing reasons, we affirm so much of the judgment as dismissed those claims. We hold that, in light of the favorable judgment on the state-law claims asserted on behalf of Spencer, plaintiffs lack standing to challenge the dismissal of Spencer's federal claims, and we accordingly dismiss so much of the appeal as seeks review of the parts of the judgment dismissing those claims.

 44 F.3d 74

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# TAB 48

29 F.3d 487                                                            **Page 46**
29 F.3d 487, 74 A.F.T.R.2d 94-5226, 94-2 USTC P 50,329
**(Cite as: 29 F.3d 487)**
Ħ

**Briefs and Other Related Documents**

United States Court of Appeals,
Ninth Circuit.
**UNITED STATES of America, Plaintiff-
Appellee,**
v.
**GOOD SAMARITAN CHURCH; Jerome F.
Przybyla and Priscilla Przybyla, Defendants-
Appellants.**
No. 93-35017.

Submitted June 9, 1994 [FN*].

FN* The panel unanimously finds this case suitable
for decision without oral argument. Fed.R.App.P.
34(a); 9th Cir.R. 34-4.

Decided July 7, 1994.

Taxpayers appealed from judgment in the United
States District Court for the District of Alaska, H.
Russel Holland, Chief Judge, which dismissed
Internal Revenue Services' (IRS) quiet title action.
The Court of Appeals, Kleinfeld, Circuit Judge,
held that taxpayers could not appeal adverse factual
determination made against them in granting IRS
partial summary judgment that was immaterial to
judgment entered below and would have no
preclusive effect on future litigation.

Appeal dismissed.

West Headnotes

**[1] Federal Courts** ◇══543.1
170Bk543.1
Only party aggrieved by judgment may appeal from
it.

**[2] Federal Courts** ◇══543.1
170Bk543.1
Collateral ruling may sometimes give rise to right to
appeal, even for party which has prevailed on
merits.

**[3] Federal Courts** ◇══544
170Bk544
Prevailing plaintiffs were not entitled to appeal from
judgment dismissing Internal Revenue Services'
(IRS) quiet title action which ended in dismissal of
IRS' suit, notwithstanding earlier adverse

determination made in granting IRS partial
summary judgment, where final judgment made no
reference to that issue and did not thus establish any
rights or liabilities with respect to that
determination.

**[4] Federal Courts** ◇══544
170Bk544
Prevailing plaintiffs would not be precluded under
doctrine of issue preclusion from relitigating
determination made on partial summary judgment
on alter ego issue where that issue was not
"necessarily determined" in dismissing
government's action on other grounds, and thus
prevailing plaintiff did not have basis for immediate
appeal.
*488 Jeffrey A. Dickstein, Tulsa, OK, for
defendants-appellants.

Michael L. Paup, Acting Asst. Atty. Gen.,
Washington, DC, for plaintiff-appellee.

Appeal from the United States District Court for
the District of Alaska.

Before: POOLE, BRUNETTI and KLEINFELD,
Circuit Judges.

KLEINFELD, Circuit Judge:

We dismiss this appeal because the appellants won
the case below. They lost on the issue which they
want us to review, but the decision on that issue has
no effect on them.

The Przybylas transferred property to the Good
Samaritan Church. A year later, the IRS assessed
a tax deficiency against them. The IRS seized the
church property on the ground that Good Samaritan
Church was the nominee or alter ego of the
Przybylas. The IRS bid the property in an auction,
and brought this action to quiet title to the church
property.

On cross-motions for summary judgment, the
district court determined that Good Samaritan
Church was the Przybylas' alter ego. But the IRS
lost anyway. The court determined that the sale
was invalid because the IRS improperly served the
notice of sale. The Przybylas lost nothing in the
lawsuit. Only the government sought affirmative
relief in the suit, and it got none. The Przybylas

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

want us to review the district court's alter ego determination. We do not review that determination, and intimate no conclusion about whether it was correct. *Cf. Towe Antique Ford Found. v. Internal Revenue Serv.,* 999 F.2d 1387 (9th Cir.1993).

[1][2] "A party may not appeal from a judgment or decree in his favor, for the purpose of obtaining a review of findings he deems erroneous which are not necessary to support the decree." *Electrical Fittings Corp. v. Thomas & Betts Co.,* 307 U.S. 241, 242, 59 S.Ct. 860, 860, 83 L.Ed. 1263 (1939) ; *see also Public Serv. Comm'n v. Brashear Freight Lines, Inc.,* 306 U.S. 204, 206- 07, 59 S.Ct. 480, 481-82, 83 L.Ed. 608 (1939) (party may not appeal favorable decision); *Clapp v. Commissioner,* 875 F.2d 1396, 1398 (9th Cir.1989) (same). The rule that only a party aggrieved by a judgment may appeal from it is one of federal appellate practice, not Article III jurisdiction, so a collateral ruling may sometimes give rise to a right to appeal, even for a party which has prevailed on the merits. *Deposit Guar. Nat'l Bank v. Roper,* 445 U.S. 326, 333-34, 100 S.Ct. 1166, 1171-72, 63 L.Ed.2d 427 (1980); *Alltrade, Inc. v. Uniweld Prods., Inc.,* 946 F.2d 622, 626 (9th Cir.1991).

[3] If the alter ego determination from the summary judgment order had found its way into the judgment then review might be appropriate to "direct reformation of the decree." *Electrical Fittings,* 307 U.S. at 242, 59 S.Ct. at 861. But the judgment in favor of the Przybylas and Good Samaritan Church dismissed the government's case without prejudice. That is all it did. The order granting the government's motion for summary judgment on the alter ego issue determined that Good Samaritan Church was the Przybylas' alter ego, but all the judgment said was that the government's "complaint is dismissed without prejudice." There was no declaratory judgment language in the form of judgment used, no injunctive relief, and nothing to establish any rights or liabilities on the basis of the alter ego determination. In these circumstances, all the summary *489 judgment established was that in the 1991 lawsuit, the Przybylas failed to establish a genuine issue of material fact regarding the alter ego issue.

[4] The government may now be able to give proper notice of sale and again sue to quiet title. The Przybylas fear that in a second lawsuit the government will use issue preclusion to bar them from relitigating the alter ego determination. Issue preclusion determines whether the Przybylas and Good Samaritan Church can appeal now. They have to be able to appeal the alter ego determination sometime if an adverse finding will cost them their property.

For issue preclusion to operate, the alter ego determination would have to have been "necessarily determined" in the district court decision. *Montana v. United States,* 440 U.S. 147, 153, 99 S.Ct. 970, 973, 59 L.Ed.2d 210 (1979); *Carter v. United States,* 973 F.2d 1479, 1482 (9th Cir.1992). It was not. The district court dismissed the government's case because the government did not give proper notice. It could have reached that decision regardless of how the alter ego issue came out, or without reaching the alter ego issue at all. The government correctly concedes that "[t]he District Court's ruling that the Good Samaritan Church was the alter ego of the Przybylas was clearly unnecessary to its ultimate conclusion that the Government did not acquire good title to the subject property because it failed to strictly comply with the notice of sale provisions." Appellee's brief at 16.

The Przybylas are not precluded from relitigating the alter ego determination. Determinations which are immaterial to the judgment below have no preclusive effect on subsequent litigation, especially if they cannot be appealed. *Alltrade,* 946 F.2d at 627 n. 10. The judgment was entirely favorable to appellants so we have no jurisdiction over the appeal. To the extent that the district court order was not favorable to appellants, it does not bind them in subsequent litigation. They will be able to relitigate the alter ego issue if the government sues them again, and, if they lose, they will have the right to appeal the determination.

The appeal is **DISMISSED.**

29 F.3d 487, 74 A.F.T.R.2d 94-5226, 94-2 USTC P 50,329

### Briefs and Other Related Documents (Back to top)

. 1993 WL 13011153T2 (Appellate Brief) Appellants' Reply Brief (Jul. 14, 1993)Original Image of this Document (PDF)

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

29 F.3d 487                                                                    **Page 48**
**(Cite as: 29 F.3d 487, \*489)**

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# TAB 49

973 F.2d 1065
973 F.2d 1065, 61 USLW 2114, 27 Collier Bankr.Cas.2d 800, 23 Bankr.Ct.Dec. 628,
Bankr. L. Rep.  P 74,791, 38 Soc.Sec.Rep.Serv. 482, Med & Med GD (CCH) P 40,714
(Cite as: 973 F.2d 1065)

▷

United States Court of Appeals,
Third Circuit.
**In re UNIVERSITY MEDICAL CENTER,
Debtor.**
**UNIVERSITY MEDICAL CENTER, et al.
v.
Louis W. SULLIVAN, Secretary of the United
States Department of Health and
Human Services, et al.
Louis W. Sullivan, Appellant No. 91-1407,
Trustee in Bankruptcy on behalf of University
Medical Center and the Unsecured
Creditors Committee, Appellants No. 91-1438.
Nos. 91-1407, 91-1438.**

Argued Feb. 3, 1992.
Decided Aug. 24, 1992.
Rehearing and Rehearing In Banc
Denied Oct. 21, 1992.

Hospital, which was Medicare provider, filed Chapter 11 petition. Department of Health and Human Services (HHS) withheld interim payments due for postpetition services on basis of overpayment for prepetition services.    The Bankruptcy Court, 93 B.R. 412, determined that HHS's withholding of interim payments violated automatic stay and awarded attorney fees and prejudgment interest.    The HHS appealed.    The District Court, 122 B.R. 919, affirmed in part; reversed in part and remanded.    In clarifying opinion on denial of reconsideration, the District Court, Robert S. Gawthrop, III, J., 125 B.R. 121, ruled that HHS was required to pay only actual costs incurred by hospital for postpetition Medicare services, and that debtor was not entitled to prejudgment interest and attorney fees.    Both parties appealed.    The Court of Appeals, Roth, Circuit Judge, held that:  (1) debtor's claim that creditor violated automatic stay arose under Bankruptcy Code, did not arise under Medicare statute and did not require exhaustion of administrative remedies;  (2) debtor did not assume its provider agreement at any time after filing its petition in bankruptcy, and thus, HHS's withholding of postpetition reimbursement violated automatic stay;  (3) HHS's withholding could not be termed valid setoff under Bankruptcy Code;  (4) debtor was entitled to reimbursement for reasonable value of its postpetition services pursuant to provider agreement despite lack of formal assumption of agreement; and

(5) HHS's violation of automatic stay was not willful so as to entitle debtor to attorney fees and prejudgment interest.

District court affirmed.

Becker, Circuit Judge, filed opinion concurring in part and dissenting in part.

West Headnotes

**[1] Bankruptcy** ⟊⟌**2042**
51k2042

**[1] Bankruptcy** ⟊⟌**2048.5**
51k2048.5
(Formerly 51k2048(5))
Debtor hospital's action against Department of Health and Human Services (HHS) alleging that HHS violated automatic stay by withholding payments for Medicare services rendered postpetition in order to recover prepetition overpayments arose under Bankruptcy Code and not under Medicare statute, and thus, bankruptcy and district courts properly had jurisdiction over debtor's claims even though debtor did not exhaust administrative remedies pursuant to Medicare statute; debtor's challenge to Secretary's attempt to recover prepetition overpayments through postpetition withholding was not inextricably intertwined with any dispute concerning fiscal intermediary's reimbursement determinations.  Social Security Act, §§ 205(h), 1872, 1878(a), (f)(1), as amended, 42 U.S.C.A. §§ 405(h), 1395ii, 1395oo(a), (f)(1);  28 U.S.C.A. §§ 157, 158, 158(d), 1291, 1334.

**[2] Health** ⟊⟌**556(3)**
198Hk556(3)
(Formerly 356Ak241.45)
Prior to exhaustion of administrative channel of review by Medicare provider of final agency determination, no court has jurisdiction over claims arising under Medicare Act.  Social Security Act, § 205(h), 1815(a), 1872, 1878(a), (f)(1), as amended, 42 U.S.C.A. §§ 405(h), 1395g(a), 1395ii, 1395oo(a), (f)(1);  28 U.S.C.A. §§ 157, 158, 158(d), 1291, 1334.

**[3] Bankruptcy** ⟊⟌**2041.1**
51k2041.1

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

973 F.2d 1065                                                              **Page 217**
**(Cite as: 973 F.2d 1065)**

(Formerly 51k2041)
Where there is independent basis for bankruptcy court jurisdiction, exhaustion of administrative remedies pursuant to other jurisdictional statutes is not required.

**[4] Bankruptcy ⬚2402(1)**
51k2402(1)
Withholding of debtor hospital's Medicare payments by Department of Health and Human Services (HHS) did not fall within police power exception to automatic stay; exception was not intended to permit government agencies to enforce contractual rights against debtor without first seeking relief from automatic stay. Bankr.Code, 11 U.S.C.A. §§ 101(14), 362, 362(a, b), (b)(4), 365.

**[5] Bankruptcy ⬚3101**
51k3101
During period of time trustee or debtor is allowed to determine whether adoption or rejection of executory contract would be beneficial to effective reorganization, terms of executory contract are temporarily unenforceable against debtor. Bankr.Code, 11 U.S.C.A. §§ 365, 365(a), 1107.

**[6] Bankruptcy ⬚3116**
51k3116
Assumption of executory contract requires debtor to accept its burdens as well as permitting debtor to profit from its benefits. Bankr.Code, 11 U.S.C.A. §§ 365, 365(a), 1107.

**[7] Bankruptcy ⬚3116**
51k3116
By assuming provider agreement, debtor hospital accepts burden of allowing Department of Health and Human Services (HHS) to recover amount of prior overpayments for Medicare reimbursement currently due; rejection, on other hand, both cuts off any right of contracting creditor to require estate to perform remaining executory portions of contract and limits creditor's claim to breach of contract. Social Security Act, §§ 205(h), 1872, 1878(a), (f)(1), as amended, 42 U.S.C.A. §§ 405(h), 1395ii, 1395oo(a), (f)(1); 28 U.S.C.A. §§ 157, 158, 158(d), 1291, 1334; Bankr.Code, 11 U.S.C.A. §§ 365, 365(a), 1107.

**[8] Bankruptcy ⬚3102.1**
51k3102.1
(Formerly 51k3102)
Medicare provider agreement can only be assumed by debtor hospital in accord with terms of

Bankruptcy Code provision governing assumption of executory agreements. Bankr.Code, 11 U.S.C.A. §§ 365, 365(a), 1113, 1113(a, b, e).

**[9] Bankruptcy ⬚3103.2**
51k3103.2
(Formerly 51k3103(8))
Debtor hospital did not "assume" its Medicare provider agreement at any time after filing its petition in bankruptcy, where formal court approval of assumption of agreement was neither sought nor granted. Bankr.Code, 11 U.S.C.A. §§ 365, 365(a), 1113, 1113(a, b, e).

**[10] Bankruptcy ⬚3103.2**
51k3103.2
(Formerly 51k3103(8))
By voluntarily continuing to render Medicare services after filing of bankruptcy petition, debtor hospital did not automatically assume Medicare provider agreement, particularly where Department of Health and Human Services (HHS) never moved bankruptcy court to compel debtor either to assume or reject provider agreement. Bankr.Code, 11 U.S.C.A. § 365(d)(2).

**[11] Bankruptcy ⬚2675**
51k2675
Bankruptcy Code provision giving creditor right to off set mutual debt owing by such creditor to debtor does not permit creditor's prepetition claims against debtor to be off set against postpetition debts owed to debtor. Bankr.Code, 11 U.S.C.A. § 553.

**[12] Bankruptcy ⬚2671**
51k2671
Common-law doctrine of recoupment provides exception to setoff in bankruptcy cases. Bankr.Code, 11 U.S.C.A. § 553.

**[13] Set-Off and Counterclaim ⬚6**
352k6
"Recoupment" is setting up of demand arising from same transaction as plaintiff's claim or cause of action, strictly for purpose of abatement or reduction of such claim.

**[14] Bankruptcy ⬚2674**
51k2674
So long as creditor's claim arises out of identical transaction as debtor's, that claim may be off set against debt owed to debtor, without concern for limitations put on doctrine of setoff by Bankruptcy Code provision giving creditor right to off set

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

973 F.2d 1065
**(Cite as: 973 F.2d 1065)**

mutual debt owing by such creditor to debtor. Bankr.Code, 11 U.S.C.A. § 553.

**[15] Bankruptcy** ⚖══**2671**
51k2671
Express contractual right is not necessary to effect "recoupment."

**[16] Bankruptcy** ⚖══**2671**
51k2671
Fact that contract exists between debtor and creditor does not automatically enable creditor to effect "recoupment."

**[17] Bankruptcy** ⚖══**2675**
51k2675
Withholding of postpetition Medicare payments by Department of Health and Human Services (HHS) to debtor hospital to recoup prepetition overpayments was not valid "setoff" under Bankruptcy Code. Bankr.Code, 11 U.S.C.A. § 553.

**[18] Bankruptcy** ⚖══**2399**
51k2399
Overpayments in 1985 by Department of Health and Human Services (HHS) to debtor hospital for Medicare services were not part of same transaction as debtor's postpetition claims for 1988 reimbursement for Medicare services; thus, HHS could not effect recoupment of overpayments without controverting automatic stay, where HHS would have made same estimated payments to debtor in 1985 regardless of number of Medicare patients debtor expected to serve in future. Social Security Act, § 1815(a), as amended, 42 U.S.C.A. § 1395g(a); Bankr.Code, 11 U.S.C.A. § 553.

**[19] Bankruptcy** ⚖══**2674**
51k2674
Open-ended standard employed to determine scope of compulsory counterclaim was inadequate for determining whether two claims arose from same transaction for purposes of equitable recoupment in bankruptcy; for purposes of recoupment, mere logical relationship was not enough, but rather, both debts had to arise out of single integrated transaction so that it would be inequitable for debtor to enjoy benefits of that transaction without also meeting its obligations. Bankr.Code, 11 U.S.C.A. § 553.

**[20] Bankruptcy** ⚖══**2674**
51k2674

Ongoing relationship that existed between Medicare provider and Department of Health and Human Services (HHS) was not sufficient to support conclusion that Medicare overpayments made in 1985 arose from same transaction, for purposes of equitable recoupment, as Medicare payments due hospital for services provided in 1988; 1988 payments were independently determinable and were due for services completely distinct from those reimbursed through 1985 payments.

**[21] Health** ⚖══**535(4)**
198Hk535(4)
    (Formerly 356Ak241.10)
During time debtor hospital remained in business in postpetition period, it remained Medicare provider subject to requirements of Medicare Act and regulations and was eligible for reimbursement for all postpetition Medicare services rendered up to time it ceased business, despite lack of formal assumption of provider agreement. Social Security Act, §§ 1801-1892, as amended, 42 U.S.C.A. §§ 1395-1395ccc; Bankr.Code, 11 U.S.C.A. §§ 362(h), 365, 365(a), 1113, 1113(a, b, e).

**[22] Health** ⚖══**485**
198Hk485
    (Formerly 356Ak241.10)

**[22] Health** ⚖══**535(4)**
198Hk535(4)
    (Formerly 356Ak241.10)
Prior to formal rejection of Medicare provider agreement, Medicare provider must continue to comply with requirements of Medicare Act and regulations; and reimbursement to provider for services rendered during this period would not be prohibited equitable, noncontract money remedy, not available against United States.

**[23] Federal Courts** ⚖══**31**
170Bk31
Party may not waive requirement of subject matter jurisdiction by failing to challenge it early in proceedings.

**[24] Federal Courts** ⚖══**612.1**
170Bk612.1
    (Formerly 170Bk612)
Because waiver of sovereign immunity is prerequisite for jurisdiction, Court of Appeals must decide issue of Department of Health and Human Services' sovereign immunity, even though it was neither presented nor considered below.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

973 F.2d 1065
(Cite as: 973 F.2d 1065)

**[25] United States** ☜125(28.1)
393k125(28.1)
     (Formerly 393k125(28))
Department of Health and Human Services, as agency of United States, enjoys immunity from suit unless United States has waived immunity.

**[26] United States** ☜125(5)
393k125(5)
Waivers of sovereign immunity must be unequivocally expressed.

**[27] United States** ☜125(6)
393k125(6)
Consent to be sued must be construed strictly in government's favor and may not be enlarged beyond what language of waiver requires.

**[28] Bankruptcy** ☜2679
51k2679
When government agency formally invokes jurisdiction of bankruptcy court through filing of proof of claim, government's exposure to counterclaim liability is undisputed; in such case, so long as debtor's claim against government both qualifies as property of estate and arises out of same transaction or occurrence as government's claim, sovereign immunity is waived. Bankr.Code, 11 U.S.C.A. §§ 106(a), 362(h).

**[29] Federal Civil Procedure** ☜775.1
170Ak775.1
     (Formerly 170Ak775)
Operative question in determining whether claim is compulsory counterclaim is whether it bears logical relationship to opposing party's claim. Bankr.Code, 11 U.S.C.A. §§ 106(a), 362(h), 541, 541(a), (a)(1); Fed.Rules Civ.Proc.Rule 13(a), 28 U.S.C.A.

**[30] Bankruptcy** ☜2679
51k2679
Department of Health and Human Services (HHS) waived its immunity with regard to debtor's claim for attorney fees and costs incurred as result of HHS's violation of automatic stay, where HHS filed proof of claim in debtor's bankruptcy proceeding, claim for attorney fees and costs qualified as property of estate, and claim for fees and costs arose out of same transaction and occurrence as HHS's withholding of prepetition overpayments to Medicare provider. Bankr.Code, 11 U.S.C.A. §§ 106(a), 362(h), 541, 541(a), (a)(1); Fed.Rules Civ.Proc.Rule 13(a), 28 U.S.C.A.

**[31] Bankruptcy** ☜2467
51k2467
Department of Health and Human Services' (HHS) violation of automatic stay by withholding payments from Medicare services rendered postpetition in order to recover prepetition overpayments was not "willful" so as to entitle debtor hospital to attorney fees and costs, where Secretary had persuasive legal authority supporting his position, and actions of Secretary were not in defiance of court order. Social Security Act, § 1815(a), as amended, 42 U.S.C.A. § 1395g(a); Bankr.Code, 11 U.S.C.A. § § 362, 362(h), 365.

*1069 Stuart M. Gerson, Asst. Atty. Gen., Michael M. Baylson, U.S. Atty., William Kanter, Mark B. Stern, and Jeffrey Clair (argued), U.S. Dept. of Justice, Civ. Div., Appellate Staff, Washington, D.C., for appellant/cross-appellee.

Mark H. Gallant (argued), James M. Matour, Todd L. Silverberg, and Howard A. Kirkwood, Jr., Wolf, Block, Schorr & Solis-Cohen, Philadelphia, Pa., for appellees/cross-appellants.

Before: BECKER, ROTH, Circuit Judges, and McCUNE, District Judge. [FN1]

    FN1. Honorable Barron P. McCune, United States District Court Judge for the Western District of Pennsylvania, sitting by designation.

OPINION OF THE COURT

ROTH, Circuit Judge:

These consolidated cross-appeals by plaintiffs, University Medical Center ("UMC") and the Official Creditors' Committee, and defendant Louis W. Sullivan, Secretary of Health and Human Services, require us to delineate the appropriate relationship between a Medicare provider and the Department of Health and Human Services ("HHS" or "the Department") from the time of the provider's bankruptcy petition filing until its cessation of business--a relationship shaped by the intersection of the Medicare Act and the Bankruptcy Code. Specifically, UMC raises the question of whether HHS, seeking to recover pre-petition Medicare provider reimbursement overpayments, may withhold payments for Medicare services rendered post-petition without controverting the Bankruptcy Code's automatic stay. The Secretary appeals the order of the district court, affirming the

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

bankruptcy court's finding that HHS violated the automatic stay by withholding such payments. UMC has filed a cross-appeal based on the district court's reversal of the bankruptcy court's award of attorneys' fees and costs to UMC. The district court found that the Department's violation of the automatic stay was not "willful," as is required for such an award under Bankruptcy Code section 362(h).

We agree with the district court that the Secretary's withholding of UMC's Medicare reimbursement, due for services rendered post-petition, in an attempt to recover pre-petition Medicare overpayments, violated the Bankruptcy Code's automatic stay. We further find that this violation was not willful as required for a section 362(h) award of attorneys' fees and costs. We will, therefore, affirm.

## I. STATUTORY AND REGULATORY BACKGROUND

UMC was a participant in the Medicare program, 42 U.S.C. §§ 1395-1395ccc (1988 & Supp. I 1989), which provides health insurance for the elderly and disabled. [FN2] As a general care hospital, UMC serviced Medicare beneficiaries pursuant to a "provider agreement" filed with HHS. This agreement, executed in 1966 between the Broad Street Hospital and the Secretary of Health, Education and Welfare, the predecessors in interest to UMC and HHS respectively, is similar to provider agreements entered into by hospitals and health care facilities across the country. Through executing the provider agreement, Broad Street Hospital became eligible to receive **\*1070** reimbursement payments, in accordance with the terms of the Medicare statute, for services rendered to Medicare beneficiaries. In exchange, the hospital agreed to charge these beneficiaries only as allowed by statute and to comply with certain civil rights laws in providing these services. [FN3]

> FN2. Specifically, UMC served as a health care provider under Part A of the Medicare Act, 42 U.S.C. §§ 1395c-1395i-4, which supplies insurance for eligible beneficiaries providing "basic protection against the costs of hospital, related post-hospital, home health services, and hospice care." 42 U.S.C. § 1395c.

> FN3. See 42 U.S.C. § 1395cc. This section sets forth the terms to which a provider agrees in order to receive payments for services rendered to Medicare beneficiaries under Part A of the

Medicare Act. Inter alia, a provider must agree to comply with the requirements of section 1395cc concerning the manner of charging Medicare beneficiaries; the return of monies incorrectly collected from Medicare beneficiaries; the release of patient data to the Secretary; and peer review procedures to ensure quality control. This section also details the procedures for terminating or modifying provider agreements. See, e.g., Monongahela Valley Hosp., Inc. v. Sullivan, 945 F.2d 576, 580 n. 8 (3d Cir.1991).

Medicare reimbursement of inpatient hospital services is governed by the Prospective Payment System ("PPS"). Under PPS, each discharged patient is classified into a Diagnosis Related Group ("DRG"). Providers are paid most reimbursable expenses pursuant to predetermined, national and regional rates that are fixed for each DRG. See 42 U.S.C. § 1395ww(d). HHS makes these reimbursements through fiscal intermediaries, such as the Blue Cross Association. To insure that providers are paid promptly, the Medicare statute requires that payments be made at least monthly and otherwise at the discretion of HHS. 42 U.S.C. § 1395g(a). Under the usual reimbursement procedure, periodic interim payments, which are estimates of actual expenditures, are made by the intermediary upon application of a provider at the discharge of each Medicare patient. Providers are also entitled to receive additional estimated payments based on their actual costs for capital expenses, outpatient services, and certain other costs. 42 C.F.R. § 412.113 (1991). Actual expenditures of each provider are audited by the intermediary annually to determine whether the provider has been over or underpaid for that cost-year. HHS then adjusts the provider's subsequent Medicare reimbursement payments to account for prior over or underpayments. 42 U.S.C. § 1395g(a). Such adjustments are mandated by Medicare's PPS.

## II. FACTS AND PROCEDURAL HISTORY

On January 1, 1988, UMC filed a voluntary petition under Chapter 11 of the Bankruptcy Code. 11 U.S.C. §§ 101-1330 (1988 & Supp. II 1990). After this filing UMC continued to serve Medicare patients as a debtor-in-possession. One week later, on January 8, 1988, Blue Cross of Greater Philadelphia ("Blue Cross"), UMC's fiscal intermediary, informed UMC by letter that the hospital had been overpaid $276,042 for Medicare services provided in 1985. This letter stated that Blue Cross would begin 100% withholding of

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

973 F.2d 1065
(Cite as: 973 F.2d 1065, *1070)

Page 221

interim reimbursement payments unless UMC made repayment or agreed to a long-term repayment schedule. UMC did not respond. On February 8, 1988, Blue Cross sent a second letter, again stating that 100% withholding of interim payments would begin unless other arrangements for return of the overpayment were made. Blue Cross subsequently withheld a $58,000 payment on February 18.

Prompted by this action, UMC officials met with a Blue Cross representative and orally agreed to provide Blue Cross with documentation detailing UMC's need for an extended repayment schedule. In the interim, UMC agreed to repay the 1985 overpayment at a rate of $15,000 per month over a period of 18 months. The UMC officials apparently consented to this arrangement in order to maintain the hospital's flow of Medicare reimbursement, which it required to meet its payroll obligations. On March 4, 1988, UMC remitted $15,000 to Blue Cross, after which Blue Cross released the $58,000 it had withheld. However, UMC neither sought court approval of this arrangement nor advised any other interested party, including the Creditors' Committee, of this repayment plan. UMC failed to supply Blue Cross with the documentation needed to formalize the repayment agreement. On March 28, 1988, Blue Cross announced that it would resume *1071 100% withholding. Three days later, UMC closed its doors and ceased doing business.

HHS, through Blue Cross, withheld from UMC a total of over $312,000 in reimbursement for Medicare services provided by UMC after it filed its petition in bankruptcy. [FN4] Meanwhile, Blue Cross determined that, in addition to the 1985 overpayment, UMC had been overpaid by $470,894 in 1986 and by $65,447 in 1987.

FN4. This $312,000 includes the March 4, 1988, payment of $15,000 by UMC to Blue Cross.

On June 17, 1988, UMC brought an adversary proceeding against HHS in the Bankruptcy Court for the Eastern District of Pennsylvania, alleging that the Department's actions, in demanding payment for pre-petition Medicare overpayments and in withholding post-petition reimbursement to recover the amounts overpaid, violated the automatic stay provision of the Bankruptcy Code, 11 U.S.C. § 362. UMC requested turnover of these funds, pursuant to Bankruptcy Code sections 542 and 543, and an award of attorneys' fees and costs under Code section 362(h). HHS answered

by claiming the affirmative defense of contractual recoupment. On July 8, 1988, HHS filed a separate motion for relief from the automatic stay.

The bankruptcy court held that HHS had violated the Bankruptcy Code's automatic stay provision. This conclusion was based upon the court's finding that UMC had not assumed its provider agreement and that as a consequence the Department's demand that UMC repay the pre-petition overpayments as a condition of receiving future Medicare reimbursement constituted the type of governmental discrimination against debtors prohibited by the anti-discrimination provision of the Bankruptcy code, 11 U.S.C. § 525(a). [FN5] In re University Medical Center, 93 B.R. 412, 416-417 (Bankr.E.D.Pa.1988). In reaching this decision, the bankruptcy judge relied heavily on his opinion in an unrelated case, In re St. Mary Hospital, 89 B.R. 503 (Bankr.E.D.Pa.1988), which was decided while the present action was pending. [FN6] Because the bankruptcy court held the withholding to be impermissible under section 525(a), it also refused to grant relief from the stay under 11 U.S.C. § 362(d) [FN7] and ordered HHS both to return the $15,000 payment made by UMC in accord with the tentative repayment agreement and to pay UMC the amount due for post-petition Medicare services. University Medical Center, 93 B.R. at 417-18. In addition, the court awarded UMC prejudgment interest, attorneys' fees, and costs, on the ground that the Department's decision to press this litigation after that court's decision in St. Mary Hospital amounted to a willful violation of the automatic stay. Id. at 418-19.

FN5. Section 525(a) states, in pertinent part:
[A] governmental unit may not deny, revoke, suspend, or refuse to renew a license, permit, charter, franchise, or other similar grant to, condition such a grant to, discriminate with respect to such a grant against, ... a person that is or has been a debtor under this title or a bankrupt or a debtor under the Bankruptcy Act ... solely because such bankrupt or debtor is or has been a debtor under this title or a bankrupt or debtor under the Bankruptcy Act.
11 U.S.C. § 525(a) (emphasis added).

FN6. St. Mary Hospital also involved a Medicare provider which had filed in bankruptcy under Chapter 11 and had been previously overpaid by HHS. In that case, the same bankruptcy judge found section 525(a) to preclude the Secretary's withholding of interim payments and granted an injunction preventing this withholding. St. Mary

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

973 F.2d 1065                                                          **Page 222**
**(Cite as: 973 F.2d 1065, \*1071)**

*Hospital,* 89 B.R. at 512.  HHS appealed the *St. Mary Hospital* ruling, asserting that its withholding was proper.  The district court vacated the bankruptcy judge's order and disposed of the action by approving a settlement agreement between the parties.  The court did not reach the merits of the withholding issue.

FN7. This section states:
On request of a party in interest and after notice and a hearing, the court shall grant relief from the stay provided under subsection (a) of this section, such as by terminating, annulling, modifying, or conditioning such stay--
(1) for cause, including the lack of adequate protection for an interest in property of such party in interest....
11 U.S.C. § 362(d).

 HHS appealed this decision to the United States District Court for the Eastern District of Pennsylvania.  In a published opinion, the district court affirmed the holding that HHS had violated the automatic stay but disavowed the reasoning of the bankruptcy \*1072 court, adjudging the record inadequate to support a finding of discrimination in violation of Bankruptcy Code section 525(a).  *University Medical Center v. Sullivan,* 122 B.R. 919 (E.D.Pa.1990).  Instead, the district court anchored its affirmance on its conclusions (1) that UMC had not assumed the provider agreement because, as an executory contract, assumption of that agreement had to receive formal court approval, (2) that the Department's withholding did not fall within the equitable doctrine of recoupment because the pre-petition overpayments arose from different transactions than did the post-petition Medicare reimbursement, and (3) that equity controls the relationship between debtor and creditor if, during the period between a bankruptcy filing and the assumption or rejection of an executory contract, performance under the contract continues.  However, the district court reversed the bankruptcy court's award of attorneys' fees and costs to UMC, finding that the Department's violation of the automatic stay was not willful as is required for such an award made under Bankruptcy Code section 362(h).  The district court also denied the parties' motions for reconsideration.  *University Medical Center v. Sullivan,* 125 B.R. 121 (E.D.Pa.1991).  Judgment was stayed pending appeal.

 Both parties filed timely notices of appeal to this court.  We review the district court's decision

under the same standards employed by the district court in reviewing the bankruptcy court's decision.  Thus our review of the district court's conclusions of law is plenary.  We review findings of fact under the clearly erroneous standard.  *In re Nelson Co.,* 959 F.2d 1260, 1263 (3d Cir.1992).

### III. JURISDICTION

 [1] The Secretary now takes issue with our ability to exercise jurisdiction over this case and contends that neither the bankruptcy court nor the district court properly had jurisdiction over UMC's claims.  [FN8]  In particular, he contends that UMC's claims arise under the Medicare statute and points to 42 U.S.C. § 405(h), made applicable to Medicare claims by 42 U.S.C. § 1395ii, which precludes judicial review of any "claim arising under" the Medicare statute prior to the exhaustion of administrative remedies. [FN9]  Because we agree with UMC that the Bankruptcy Code supplies an independent basis for jurisdiction in this case, we reject the Secretary's arguments and find that the district and bankruptcy courts properly had jurisdiction under 28 U.S.C. §§ 157, 158 and 1334 and that we may properly exercise jurisdiction over this appeal under 28 U.S.C. §§ 158(d) and 1291.

FN8. We note that the Secretary's answer to UMC's bankruptcy court complaint did not contest that court's jurisdiction pursuant to 28 U.S.C. §§ 157 and 1334.

FN9. Section 405(h) provides:
The findings and decision of the Secretary after a hearing shall be binding upon all individuals who were parties to such hearing.  No findings of fact or decision of the Secretary shall be reviewed by any person, tribunal, or governmental agency except as herein provided.  No action against the United States, the Secretary, or any officer or employee thereof shall be brought under section 1331 or 1346 of Title 28 to recover on any claim arising under this subchapter.
42 U.S.C. § 405(h) (1988).

 [2] The Medicare Act establishes an administrative channel of redress for health care providers dissatisfied with their reimbursement determinations.  If a provider disputes an intermediary's final determination of the reimbursement due for a fiscal year and the amount in controversy exceeds $10,000, the provider can, within 180 days, request a hearing before the Provider Reimbursement Review Board.  42 U.S.C. § 1395oo (a).  The Board's decision is then subject

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

to review by the Secretary. After exhausting these procedures, a provider may seek judicial review of the final agency determination. 42 U.S.C. § 1395oo (f)(1). *See, e.g., Abington Memorial Hosp. v. Heckler,* 750 F.2d 242, 244 (3d Cir.1984) , *cert. denied,* 474 U.S. 863, 106 S.Ct. 180, 88 L.Ed.2d 149 (1985). Prior to the exhaustion of this administrative channel of review, no court has jurisdiction over claims arising under the Medicare Act.

Neither party contends that these administrative procedures were in fact exhausted *1073 in this case. Our ability to exercise jurisdiction over this appeal thus turns on whether UMC's claims actually arise under the Medicare statute. The Supreme Court has construed the "claim arising under" language of section 405(h) broadly to encompass any claims in which "both the standing and the substantive basis for the presentation" of the claims is the Medicare Act. *Heckler v. Ringer,* 466 U.S. 602, 615, 104 S.Ct. 2013, 2022, 80 L.Ed.2d 622 (1984) (quoting *Weinberger v. Salfi,* 422 U.S. 749, 760- 61, 95 S.Ct. 2457, 2464-65, 45 L.Ed.2d 522 (1975)). According to the Secretary, both requirements are satisfied in this case: the complaint seeks a money judgment in payment for health care services provided by UMC to Medicare beneficiaries and the reimbursement sought by UMC conforms to the rates established by the Medicare Act.

UMC responds that the administrative review channel set forth in the Medicare Act and regulations is available only for claims brought by a provider when dissatisfied with final reimbursement determinations of the fiscal intermediary. *See* 42 C.F.R. § 405.1841 (1991) (a request for a Board hearing "must identify the aspects of the determination with which the provider is dissatisfied, explain why the provider believes the determination is incorrect in such particulars, and be accompanied by any documenting evidence the provider considers necessary to support its position"). This case, however, does not raise that type of claim, because the parties do not dispute the amount of reimbursement due for any cost reporting period. In fact, the parties stipulated both to the amounts of the overpayments made to UMC and to the separate pursuit of any substantive dispute concerning these amounts through the normal administrative processes set forth in the Medicare statute. Due to the fact that its adversary proceeding was based on the contention that HHS violated the automatic stay provision of the Bankruptcy Code, UMC maintains that its claims arose under the Bankruptcy Code, not the Medicare Act. Thus, the mandate of section 405(h) that the Medicare Act's administrative review procedures be exhausted before judicial review is sought simply does not apply to this case.

We agree with UMC. Its challenge to the Secretary's attempt to recover pre-petition overpayments through post-petition withholding is not inextricably intertwined with any dispute concerning the fiscal intermediary's reimbursement determinations. If UMC had not filed for bankruptcy, there would be no dispute concerning the monies due to HHS or the method for recovering them. Neither party questions the amount of pre-petition overpayments made to UMC nor any other determination of the fiscal intermediary that might be appealed to the Provider Reimbursement Review Board. Nor does either party take issue with the procedure by which the statute provides for making routine adjustments with a non-bankrupt provider for prior over or underpayments. *See* 42 U.S.C. § 1395g(a). This issue is only before us because UMC filed for bankruptcy and now claims that the withholding violated the automatic stay. We find, therefore, that UMC's claim arises under the Bankruptcy Code and not under the Medicare statute.

[3] In doing so, we recognize that a broad reading of section 405(h) might accord with Congress' intent to allow "the Secretary in Medicare disputes to develop the record and base decisions upon his unique expertise in the health care field. The misfortune that a provider is in bankruptcy when he has a reimbursement dispute with the Secretary should not upset the careful balance between administrative and judicial review." *In re St. Mary Hosp.,* 123 B.R. 14, 17 (E.D.Pa.1991). However, a finding that jurisdiction is proper in this case does not impinge upon this authority of the Secretary protected by section 405(h). Indeed, there is no danger of rendering the administrative review channel superfluous, for there is no system of administrative review in place to address the issues raised by UMC in its adversary proceeding. Thus we agree with the Ninth Circuit that "where there is an independent basis for bankruptcy court jurisdiction, exhaustion of administrative remedies pursuant *1074 to other jurisdictional statutes is not required." *In re Town & Country Home Nursing Servs. Inc.,* 963 F.2d 1146, 1154 (9th Cir.1991).

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

This conclusion advances the congressionally-endorsed objective of "the effective and expeditious resolution of all matters connected to the bankruptcy estate." *Id.* at 1155. *See also* H.R.Rep. No. 595, 95th Cong., 1st Sess. 43-48, *reprinted in* 1978 U.S.C.C.A.N. 5787, 5963, 6004-08. The Secretary's attack on the ability of the judicial system to resolve UMC's claims thus fails.

## IV. DISCUSSION

Having determined that we do have jurisdiction to hear this appeal, we must next consider whether the Department's withholding of UMC's post-petition payments violated the automatic stay provision of the Bankruptcy Code. To resolve this question we undertake a multiple-step analysis. First, does the automatic stay apply to government entities. Second, if it does, did UMC, after it filed for bankruptcy, assume its provider agreement. An important aspect of this second issue is whether formal court approval is a prerequisite to assumption of an executory contract pursuant to section 365 of the Bankruptcy Code. Third, even if the automatic stay is applicable and the agreement was not assumed, did HHS's withholding fall within the scope of the recoupment doctrine. Finally, if we find that the recoupment doctrine does not apply, does equity control the post-petition relationship between UMC and HHS; and, if it does, is HHS permitted under the provisions of the Medicare Act to reimburse a provider without making adjustments for past overpayments.

### A. *The Automatic Stay*

[4] The automatic stay is one of the fundamental debtor protections supplied by the Bankruptcy Code. *In re Atlantic Business & Community Corp.,* 901 F.2d 325, 327 (3d Cir.1990). Codified in section 362, the stay "prohibits, inter alia, the commencement or continuation of a judicial or administrative proceeding against the debtor that could have been initiated before the petition was filed, or to recover on a claim that arose pre-bankruptcy." *United States v. Nicolet, Inc.,* 857 F.2d 202, 207 (3d Cir.1988). The stay

> gives the debtor a breathing spell from his creditors. *It stops all collection efforts, all harassment, and all foreclosure actions.* It permits a debtor to attempt a repayment or reorganization plan, or simply to be relieved of the financial pressures that drove him into bankruptcy.

*In re Schwartz,* 954 F.2d 569, 571 (9th Cir.1992) (quoting H.R.Rep. No. 595, 95th Cong., 1st Sess.

340 (1978), *reprinted in* 1978 U.S.C.C.A.N. 5787, 5963, 6296-97). Thus, it is designed to replace the "unfair race to the courthouse" with orderly liquidation that treats all creditors equally. *Nicolet,* 857 F.2d at 207.

In drafting the Bankruptcy Code, Congress subjected the government, acting as creditor, to the limitations of the automatic stay provision. By its terms, section 362(a) applies to "all entities." 11 U.S.C. § 362(a). The Bankruptcy Code defines the term "entity" as including governmental units. 11 U.S.C. § 101(14). *See, e.g., In re Pearson,* 917 F.2d 1215, 1216 (9th Cir.1990), *cert. denied,* 503 U.S. 918, 112 S.Ct. 1291, 117 L.Ed.2d 514 (1992) ; *In re Parr Meadows Racing Ass'n,* 880 F.2d 1540, 1545 (2nd Cir.1989), *cert. denied,* 493 U.S. 1058, 110 S.Ct. 869, 107 L.Ed.2d 953 (1990); *Penn Terra Ltd. v. Department of Envtl. Resources,* 733 F.2d 267, 271-72 (3d Cir.1984) ("the fact that Congress created an exception to the automatic stay for certain actions by governmental units itself implies that such units are otherwise affected by the stay"). Government agencies are only excepted from the reach of the automatic stay when proceeding "to enforce such governmental unit's police or regulatory power." [FN10] 11 U.S.C. § 362(b). Congress intended this exception to apply

> FN10. Section 362(b) states that the filing of a bankruptcy petition does not operate as a stay
> (4) under subsection (a)(1) of this section, of the commencement or continuation of an action or proceeding by a governmental unit to enforce such governmental unit's police or regulatory power;
> (5) under subsection (a)(2) of this section, of the enforcement of a judgment, other than a money judgment, obtained in an action or proceeding by a governmental unit to enforce such governmental unit's police or regulatory power.
> 11 U.S.C. § 362(b).

**\*1075** where a governmental unit is suing a debtor to prevent or stop violation of fraud, environmental protection, consumer protection, safety, or similar police or regulatory laws, or attempting to fix damages for violation of such law.

H.R.Rep. No. 595, 95th Cong., 1st Sess. 343 (1977), *reprinted in* 1978 U.S.C.C.A.N. 5963, 6299; S.Rep. No. 989, 95th Cong., 2d Sess. 52, *reprinted in* 1978 U.S.C.C.A.N. 5787, 5838. Neither the language of section 362(b) nor its legislative history indicates that this exception was intended to permit government agencies to enforce

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

973 F.2d 1065
(Cite as: 973 F.2d 1065, *1075)

*contractual* rights against a debtor without first seeking relief from the automatic stay. *See In re Corporacion de Servicios Medicos Hospitalarios,* 805 F.2d 440, 445 (1st Cir.1986). [FN11] The Department's withholding of UMC's Medicare payments certainly did not fall within this police power exception to the stay, and the Secretary does not contend as much. Thus, unless we can conclude either that UMC assumed its provider agreement or that HHS was entitled to recoup the pre-petition overpayments through withholding UMC's post-petition reimbursement, HHS was constrained by the automatic stay.

> FN11. In fact, the legislative history of this provision draws a distinction between two types of police or regulatory action: "(1) actions in which the government seeks to protect public health, safety, and welfare, and (2) actions in which the government seeks to protect a pecuniary interest." *Medicos Hospitalarios,* 805 F.2d at 445 n. 4. Section 362(b)(4) exempts only the former from the automatic stay. *Id.* An action to protect a pecuniary interest has been defined as "one which directly conflicts with the bankruptcy court's control of that property." *In re Commonwealth Cos.,* 913 F.2d 518, 524 (8th Cir.1990). The Secretary's withholding of UMC's Medicare payments falls within this definition.

### B. *Assumption of the Provider Agreement*

[5] Bankruptcy Code section 365 empowers a trustee or debtor in possession, [FN12] "subject to the court's approval," to "assume or reject any executory contract or unexpired lease of the debtor." 11 U.S.C. § 365(a). [FN13] This section is designed to "allow[ ] the trustee or debtor in possession a reasonable time within which to determine whether adoption or rejection of the executory contract would be beneficial to an effective reorganization." *In re Whitcomb & Keller Mortg. Co.,* 715 F.2d 375, 379 (7th Cir.1983). During this period, the terms of an executory contract are temporarily unenforceable against the debtor. *NLRB v. Bildisco & Bildisco,* 465 U.S. 513, 532, 104 S.Ct. 1188, 1199, 79 L.Ed.2d 482 (1984).

> FN12. Although this section refers only to a trustee's power to assume an executory contract, Bankruptcy Code section 1107 gives the same power to a debtor in possession.

> FN13. Although the Bankruptcy Code does not define "executory contract," the Code's legislative history states that this term "generally includes

contracts on which performance remains due to some extent on both sides." H.R.Rep. No. 595, 95th Cong., 1st Sess. 347 (1978); S.Rep. No. 989, 95th Cong.2d Sess. 58 (1978), *reprinted in* 1978 U.S.C.C.A.N. 5787, 5844, 6303. *See also Sharon Steel Corp. v. National Fuel Gas Distribution Corp.,* 872 F.2d 36, 39 (3d Cir.1989). A Medicare provider agreement easily fits within this definition.

[6][7] Assumption of the executory contract requires the debtor to accept its burdens as well as permitting the debtor to profit from its benefits. Consequently, if UMC assumed its provider agreement, there is no question that HHS could withhold UMC's post-petition reimbursement in order to recover pre-petition overpayments without violating the automatic stay. Through executing a provider agreement, a hospital accepts the "burden" of allowing HHS to recover the amount of prior overpayments from Medicare reimbursement currently due. Rejection, on the other hand, both cuts off any right of the contracting creditor to require the estate to perform the remaining executory portions of the contract and limits the creditor's claim to breach of contract. *Leasing Serv. Corp. v. First Tennessee Bank Nat'l *1076 Ass'n,* 826 F.2d 434, 436 (6th Cir.1987). The district court concluded that formal court approval is required to effect an assumption of an executory contract in accord with the terms of section 365. Because UMC never sought court approval of its assumption of the provider agreement, the court found that this agreement was never assumed and, as a result, that its reimbursement overpayment provisions could not be enforced against UMC. We agree with this conclusion.

The Secretary contends, however, that, due to the detailed Medicare statutory scheme, a provider agreement is a unique type of executory contract that a debtor should be deemed to assume in accord with section 365 whenever performance under the agreement is continued beyond the filing of a bankruptcy petition, regardless of whether formal court approval is sought. Because, in the Secretary's view, court approval was not required to effect UMC's assumption of its provider agreement, the over-payments to UMC were properly withheld; UMC impliedly assumed the agreement, and a debtor that assumes the benefits of an executory contract cannot escape shouldering the burdens of that contract as well.

To buttress this argument, the Secretary points to

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

the text of the Medicare statute and its implementing
regulations. These state that a provider agreement
remains in effect until either the provider ceases to
do business or the agreement is formally terminated
by the provider or the Secretary. [FN14] This
requirement, the Secretary explains, is designed to
ensure that important Medicare interests are not
compromised by uncertainty concerning a hospital's
status as a Medicare provider and to preserve the
Department's statutory authority to enforce
prescribed standards covering patient care, quality
control, reimbursement, and coverage.

> FN14. Specifically, the Medicare Act provides:
> A provider of services may terminate an agreement
> with the Secretary under this section at such time
> and upon such notice to the Secretary and the
> public as may be provided in regulations, except
> that notice of more than six months shall not be
> required.
> 42 U.S.C. § 1395cc(b)(1).

We cannot agree that the complexity of the
Medicare scheme mandates a finding that court
approval is unnecessary for the assumption of a
provider agreement pursuant to section 365. By its
terms, section 365 "includes all executory contracts
except those expressly exempted." *Bildisco,* 465
U.S. at 521, 104 S.Ct. at 1194. No express
exemption exists for contracts formed with the
government, [FN15] and courts often have
assumed, without discussion, that the ability of a
debtor to assume or reject an executory contract
pursuant to section 365 extends equally to contracts
formed with the government. [FN16] *See, e.g.,*
*1077 *United States Dep't of Air Force v. Carolina
Parachute Corp.,* 907 F.2d 1469, 1472 (4th
Cir.1990) (analyzing the government's contract with
the debtor under section 365); *In re West
Electronics, Inc.,* 852 F.2d 79, 82 (3d Cir.1988)
(commenting, in the context of a debtor's contract
with the government, that "in general ... under 11
U.S.C. § 365 West as a debtor in possession could
assume an executory contract with court approval");
*In re Harris Management Co.,* 791 F.2d 1412, 1414
(9th Cir.1986) (same).

> FN15. Section 365(c)(1) does state that a debtor
> may not assume an executory contract if
> "applicable law excuses a party, other than the
> debtor, to such contract, ... from accepting
> performance from ... an entity other than the
> debtor or the debtor in possession [and] ... such
> party does not consent to such assumption." 11
> U.S.C. § 365(c)(1). Certain government contracts

fall within this exemption as a consequence of the
Anti-Assumption Act, 41 U.S.C. § 15, which
states in relevant part:
No [government] contract ... or any interest
therein, shall be transferred by the party to whom
such contract ... is given to any other party, and
any such transfer shall cause the annulment of the
contract ... transferred, so far as the United States
are concerned.
*See, e.g., United States Dep't of Air Force v.
Carolina Parachute Corp.,* 907 F.2d 1469,
1472-73 (4th Cir.1990). The Secretary, however,
does not contend that the Anti-Assumption Act is a
factor in this case.

> FN16. In confronting the analogous question of
> whether section 365 is available to a debtor seeking
> to assume a contract for the provision of
> governmental services that the government desires
> to terminate, the First Circuit concluded:
> We find nothing in the code or subsequent case law
> to persuade us that debtors with government
> contracts should be denied the opportunity to
> assume those contracts. Nor do we believe that
> government agencies, after choosing to contract
> with private corporations, should receive more
> favorable treatment than other similarly situated
> parties. The "police power" exception to the
> automatic stay, section 362(b)(4), (5), sufficiently
> protects the regulatory power of government
> agencies. *Given these protections, we see no
> reason why section 365 should not apply with full
> force to permit the assumption or rejection of
> government contracts by debtors. Medicos
> Hospitalarios,* 805 F.2d 440, 447 n. 10 (1st
> Cir.1986) (emphasis added). We find this
> rationale persuasive.

[8] Moreover, to circumscribe a debtor's power of
assumption Congress has legislated special treatment
for the assumption and rejection of collective
bargaining agreements, 11 U.S.C. § 1113, and for
the rejection of certain real property leases, 11
U.S.C. § 365(h). *See, e.g., Sharon Steel Corp. v.
National Fuel Gas Distrib. Corp.,* 872 F.2d 36, 40
(3d Cir.1989). Congress' failure to legislate
special treatment for the assumption or rejection of
Medicare provider agreements indicates that
assumption of these agreements, like that of other
executory contracts, should be deemed subject to
the requirements of section 365, unless and until
Congress decides otherwise. *Cf. Bildisco,* 465 U.S.
at 522, 104 S.Ct. at 1194 (concluding that because
Congress did not draft an exclusion for collective
bargaining agreements from the terms of section
365, Congress intended section 365 apply to those
agreements). [FN17] Thus, a provider agreement

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

can only be assumed by a debtor hospital in accord with the terms of section 365. *But see In re Advanced Professional Home Health Care, Inc.,* 94 B.R. 95, 97 (E.D.Mich.1988) (holding that through continuing to serve Medicare patients a debtor hospital obviates the need for strict compliance with the terms of § 365).

> FN17. In response to the *Bildisco* decision, Congress enacted Bankruptcy Code section 1113 to govern the means by which a debtor may assume, reject or modify its collective bargaining agreement. 11 U.S.C. § 1113(a), (b), & (e).

[9] We have generally treated court approval as a prerequisite to a debtor's assumption of an executory contract. *See e.g., Counties Contracting & Constr. Co. v. Constitution Life Ins. Co.,* 855 F.2d 1054, 1060 (3rd Cir.1988) (finding court approval "mandated for effective assumption under [§ 365(a) ]"). Formal court approval of assumption of the provider agreement was neither sought nor granted in this case. As a result, UMC maintains that the agreement was never assumed but that such approval is necessary to effect the purpose of section 365(a). UMC's position is consistent with the interpretation we have given to section 365(a) in cases such as *Counties Contracting.* In order to insure that a debtor has the opportunity to assess the advantages and disadvantages of assuming a contract, assumption must be approved. It cannot be presumed. As will be developed below, we acknowledge that the interests articulated by the Secretary are integral to the Medicare system and cannot merely be jettisoned in the wake of a provider's filing in bankruptcy. At the same time, however, there are definite interests protected by Bankruptcy Code section 365 that HHS completely discounts.

[10] In particular, the Secretary asserts that no purpose contemplated by Congress is advanced by requiring court approval of the assumption of a provider agreement when the debtor, without objection from creditors, voluntarily continues to render Medicare services. By so doing, the debtor hospital manifests its decision that continuation of the agreement is in the best interest of the estate. Thus, the Secretary contends, no further opportunity is needed for the exercise of the debtor's business judgment in deciding whether the contract is beneficial. Moreover, the Secretary opines that creditors would suffer no discernible prejudice if continued performance by a debtor

hospital were adjudged an implied assumption of the agreement. Rather than removing money from the estate and thus decreasing the funds available for distribution to a hospital's creditors, the assumption of a provider agreement insures that additional Medicare revenues will flow into the estate. For these reasons, the Secretary *1078 claims that creditors are in no way harmed by such an assumption.

These arguments misapprehend the interests of creditors that can be implicated through the assumption of a provider agreement. Indeed, it is conceivable that creditors of a debtor hospital may well benefit from a decision to reject such an agreement. Rejection or assumption of an executory contract determines the status of the contracting creditor's claim, namely whether "it is merely a pre-petition obligation of the debtor, or is entitled to priority as an expense of administration of the estate." *Leasing Serv. Corp.,* 826 F.2d at 437. Prior to assumption, HHS is in a position equivalent to general unsecured creditors: its recovery of pre-petition debt depends upon the amount left in the bankrupt's estate after secured and priority creditors are satisfied, and so is unlikely to be one hundred cents on the dollar. In contrast, if the provider agreement is assumed, HHS, like other parties to assumed executory contracts, effectively "gains an administrative priority" against the estate. 1 COLLIER BANKRUPTCY MANUAL § 365.01, at 365-2 (Lawrence P. King ed., 3rd ed. 1992). *See also, In re Taylor,* 913 F.2d 102, 106-07 (3d Cir.1990).

In this case, HHS has asserted a right to recover overpayments to UMC totaling more than $800,000 for the period 1985 through 1987. However, after UMC negotiated the oral repayment arrangement with HHS on February 18, 1988, UMC survived as a going concern for only six weeks. Given UMC's precarious financial position in February of 1988, the realistic result of an assumption of the provider agreement might have been to enhance temporarily UMC's post-petition coffers by a few hundred thousand dollars. At the same time, this assumption would significantly improve the status of the Secretary's pre-petition debts at the direct expense of all other unsecured creditors. Alternatively, though a rejection of the agreement would preclude the receipt of long-term future Medicare revenues, HHS still would have been required to pay for any services rendered post-petition. Moreover, HHS then would have been

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

treated in a manner equal to other unsecured creditors in the asset distribution for pre-petition debts. Thus, it is disingenuous to conclude that the interests of UMC's other creditors would not be affected if a provider agreement is automatically assumed when a debtor hospital continues to treat Medicare patients after filing for bankruptcy.

Furthermore, such a holding would thrust a Medicare provider contemplating bankruptcy into a dilemma. Immediately upon filing a bankruptcy petition and without the benefit of a reasonable period for financial reflection as contemplated by section 365, a hospital would be forced to decide whether to assume or reject its provider agreement. If the provider chooses to continue service of Medicare patients for any period of time, regardless of its prospects for a successful reorganization, it would be deemed to have assumed the provider agreement, thereby assuring HHS an administrative priority over all general creditors. Alternatively, the provider could choose to terminate Medicare services and immediately reject the agreement, thereby in all likelihood abandoning any hope for a successful reorganization. Despite the Secretary's protestations, we cannot deem such a result to be mandated by the Medicare statutory scheme; nor is it one contemplated by the Bankruptcy Code. *Accord In re Memorial Hosp. of Iowa County,* 82 B.R. 478, 484 (W.D.Wis.1988) ("[r]ecognition of an exception to the requirement of court approval of assumption of executory contracts nullifies the clear and unambiguous statutory language of sections 362 and 365").

We also find it significant that Bankruptcy Code section 365(d)(2) [FN18] enables a creditor, at any time after a bankruptcy petition *1079 is filed, to move the court to compel the debtor's assumption or rejection of an executory contract. Congress intended this provision to "prevent parties in contractual or lease relationships with the debtor from being left in doubt concerning their status vis-a-vis the estate." S.Rep. No. 989, 95th Cong., 2d Sess. 59 (1978), *reprinted in* 1978 U.S.C.C.A.N. 5787, 5845. Here the district court specifically noted that HHS never moved the bankruptcy court to compel UMC either to assume or reject the provider agreement. *See University Medical Center,* 125 B.R. at 124. Particularly in this situation, where the creditor has failed to avail itself of the procedure supplied by the Bankruptcy Code for compelling a debtor's decision on an executory contract, we find it inappropriate to announce a new

rule that a debtor hospital's continued treatment of Medicare patients results in an implied assumption of its provider agreement. [FN19] Thus, we conclude that UMC did not assume its provider agreement at any time after filing its petition in bankruptcy. As a result, the Department's withholding of UMC's post-petition reimbursement did violate the automatic stay.

> FN18. Section 365(d)(2) states, in pertinent part:
> In a case under chapter 9, 11, 12, or 13 of this title, the trustee may assume or reject an executory contract ... at any time before the confirmation of a plan but the court, on the request of any party to such contract ..., may order the trustee to determine within a specified period of time whether to assume or reject such contract or lease. 11 U.S.C. § 365(d)(2).

> FN19. We acknowledge that a number of bankruptcy and district courts have held that as a consequence of the unique Medicare statutory scheme, a debtor hospital "could not continue as a provider following the filing of a petition for reorganization ... unless it effectively assumed the obligations of the provider agreement under which it had previously been operating." *Advanced Professional Home Health Care,* 94 B.R. at 96. *See also In re Tidewater Memorial Hosp., Inc.,* 106 B.R. 876, 883-84 (Bankr.E.D.Va.1989); *In re Yonkers Hamilton Sanitarium,* 22 B.R. 427, 435 (Bankr.S.D.N.Y.1982), *aff'd* 34 B.R. 385 (S.D.N.Y.1983); *In re Monsour Medical Center,* 8 B.R. 606, 615 (Bankr.W.D.Pa.), *aff'd* 11 B.R. 1014 (W.D.Pa.1981). To the extent that these holdings can not be distinguished, we part from their rationale.

### C. Recoupment

HHS contends, however, that under the equitable doctrine of recoupment, it still should be able, without violating the automatic stay, to recover pre-petition overpayments by withholding UMC's post-petition reimbursement. The Secretary is correct that recoupment is an equitable exception to the automatic stay. Thus, if the Secretary's acts come within the scope of this doctrine, the withholding of UMC's post-petition Medicare reimbursement to recover prior overpayments would be proper, even though the provider agreement was not assumed. The district court found that the Department's withholding could not be deemed to fall within the purview of recoupment, and we agree. As a consequence, this attempt to circumvent the automatic stay also fails.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

973 F.2d 1065                                                    **Page 229**
**(Cite as: 973 F.2d 1065, \*1079)**

[11] To grasp the scope of the recoupment doctrine, it is helpful first to distinguish recoupment from a creditor's ability to set off certain claims. The doctrine of setoff, as incorporated in Bankruptcy Code section 553, gives a creditor the right "to offset a mutual debt owing by such creditor to the debtor," provided that both debts arose before commencement of the bankruptcy action and are in fact mutual. *In re Davidovich,* 901 F.2d 1533, 1537 (10th Cir.1990). "Setoff, in effect, elevates an unsecured claim to secured status, to the extent that the debtor has a mutual, pre-petition claim against the creditor." *Lee v. Schweiker,* 739 F.2d 870, 875 (3d Cir.1984). Generally, the mutual debt and claim are the product of different transactions. 4 COLLIER ON BANKRUPTCY § 553.03, at 553-14 (Lawrence P. King ed., 15th ed. 1992). Pursuant to the limitations imposed by Code section 553, a creditor's pre-petition claims against the debtor cannot be set off against post-petition debts owed to the debtor. *Id.*

[12][13][14][15][16] The Bankruptcy Code does not contain a recoupment provision. The common law doctrine of recoupment provides an exception to setoff in bankruptcy cases. Recoupment "is the setting up of a demand *arising from the same transaction* as the plaintiff's claim or cause of action, strictly for the purpose of abatement or reduction of such claim." 4 COLLIER ON BANKRUPTCY § 553.03, at 553-15-17 (emphasis added). This doctrine is justified on the grounds that "where the creditor's claim against the debtor arises from the same transaction as the debtor's claim, it is essentially a defense to the debtor's claim \*1080 against the creditor rather than a mutual obligation, and application of the limitations on setoff in bankruptcy would be inequitable." *Lee,* 739 F.2d at 875. Thus, so long as the creditor's claim arises out of the identical transaction as the debtor's, that claim may be offset against the debt owed to the debtor, without concern for the limitations put on the doctrine of setoff by Code section 553. *Davidovich,* 901 F.2d at 1537. In the bankruptcy context, recoupment has often been applied where the relevant claims arise out of a single contract "that provide[s] for advance payments based on estimates of what ultimately would be owed, subject to later correction." *In re B & L Oil Co.,* 782 F.2d 155, 157 (10th Cir.1986). However, an express contractual right is not necessary to effect a recoupment. *See In re Holford,* 896 F.2d 176, 178 (5th Cir.1990). Nor

does the fact that a contract exists between the debtor and creditor automatically enable the creditor to effect a recoupment.

[17] The district court correctly noted that the Department's withholding could not be termed a valid setoff: there is no doubt that section 553 prohibits the Department's *pre-petition* overpayments from being set off against the Department's *post-petition* debts to UMC. Thus the court turned to the question of whether the 1985 overpayments were part of the same transaction as UMC's claims for 1988 reimbursement; if so, HHS properly could effect a recoupment without controverting the automatic stay. We agree with the district court's conclusion that these claims were not part of a single transaction.

[18] The Medicare account reconciliation process supports this conclusion. The relevant regulations state that each provider cost-year is subject to a distinct annual audit, which follows the submission of a separate cost report for each fiscal year. *See* 42 C.F.R. §§ 413.20(b), 413.24(f) (1991). These regulations indicate that reimbursement payments made for any one year arise from transactions wholly distinct from reimbursement payments made for subsequent years.

The Secretary contends, nevertheless, that the text of the Medicare statute itself evinces the error of the district court's conclusion. In particular, the Secretary advances that portion of the Medicare statute which provides:

> The Secretary shall periodically determine the amount which should be paid under this part to each provider of services with respect to the services furnished by it, and the provider of services shall be paid, at such time or times as the Secretary believes appropriate (but not less often than monthly) and prior to audit or settlement by the General Accounting Office, from the Federal Hospital Insurance Trust Fund, the amounts so determined, with necessary adjustments on account of previously made overpayments or under payments....

42 U.S.C. § 1395g(a). According to the Secretary, this language renders each claim for Medicare reimbursement both subject to and contingent upon the Department's right to recover prior overpayments. It establishes the "mutuality of obligation" necessary for recoupment. Furthermore, the Secretary asserts that Medicare's reimbursement methodology is predicated on the

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

973 F.2d 1065
(Cite as: 973 F.2d 1065, *1080)

Page 230

principle that a provider has an ongoing legal relationship to the program that enables it to receive a stream of estimated payments subject to reconciliation at a later date. Because overpayments are a contemplated element of this relationship, HHS in each instance must consider prior overpayment as a factor determining the amount due on a subsequent claim for reimbursement. In the Secretary's view, this type of relationship cannot be parsed into a series of transactions, but instead amounts to one continuous transaction between the provider and HHS.

In an effort to bring the Department's post-petition withholding within the purview of the recoupment doctrine, the Secretary advocates an expansive definition of "transaction." He supports his position with citations from our decision in *Lee* and a discussion of compulsory counterclaims in *United States v. Aquavella,* 615 F.2d 12 *1081 (2d Cir.1979). The Secretary contends that the same "broad and flexible standard" employed to determine the scope of compulsory counterclaims should be utilized to determine the applicability of recoupment in the bankruptcy setting.

[19] We find that the open-ended standard, endorsed in the context of discerning compulsory counterclaims, is inadequate for determining whether two claims arise from the same transaction for the purposes of equitable recoupment in bankruptcy. Indeed, in *Lee* we stressed that both setoff and recoupment play very different roles in bankruptcy than in their original roles as rules of pleading. *Lee,* 739 F.2d at 875. For the purposes of recoupment, a mere logical relationship is not enough: the "fact that the same two parties are involved, and that a similar subject matter gave rise to both claims, ... does not mean that the two arose from the 'same transaction.' " *Id.* Rather, both debts must arise out of a single integrated transaction so that it would be inequitable for the debtor to enjoy the benefits of that transaction without also meeting its obligations. Use of this stricter standard for delineating the bounds of a transaction in the context of recoupment is in accord with the principle that this doctrine, as a non-statutory, equitable exception to the automatic stay, should be narrowly construed. *See B & L Oil,* 782 F.2d at 158.

[20] Applying this circumscribed definition of "transaction," we find that the ongoing relationship that exists between a Medicare provider and HHS is

not sufficient to support the conclusion that Medicare overpayments made to UMC in 1985 arise from the same transaction, for the purposes of equitable recoupment, as Medicare payments due UMC for services provided in 1988. The 1988 payments were independently determinable and were due for services completely distinct from those reimbursed through the 1985 payments. Further, the entire account reconciliation process established by the Medicare Act and regulations works on an annual basis. As the district court explained:

The Provider Agreement is a unique type of contract. It does not provide for a defined transaction or even a series of transactions. It simply establishes a relationship between the parties: if UMC treats eligible patients, HHS will reimburse them for their costs. Under the agreement, the parties established an arrangement for payment, with HHS providing reimbursement with respect to each patient treated. The arrangement called for the payments to be estimates and thus contemplated that over time an overpayment or underpayment might result, creating a debt in one or the other party. The arrangement called for this debt to be calculated on an annual basis. The result is that the overpayment debt presently owed by UMC is distinct from and bears no direct relation to the particular claims for reimbursement for services performed post-petition.

*University Medical Center,* 122 B.R. at 930.

Unlike the payment arrangement established by a provider agreement, the typical situation in which equitable recoupment can be invoked involves a credit and debt arising out of a transaction for the same goods or services. For example, in *Waldschmidt v. CBS, Inc.,* 14 B.R. 309 (M.D.Tenn.1981), the court held that under the recoupment doctrine a recording company was able to reduce the royalties it owed a bankrupt recording artist by the amount of pre-petition advance payments it had made to that artist in anticipation of an album. In such a case, the advance payments envisioned the album. In contrast, HHS would have made the same estimated payments to UMC in 1985 regardless of the number of Medicare patients UMC expected to serve in the future. The 1985 overpayments, therefore, cannot be deemed advance payments for UMC's post-1985 services.

The relationship between HHS and a Medicare provider entails transactions that last over an extended period. However, each of these

transactions begins with services rendered by the provider to a Medicare patient, includes payment to the provider, and concludes with HHS's recovery **\*1082** of any overpayment. Recovery of the 1985 overpayment, therefore, is the final act of the transactions that began in 1985. UMC's 1988 post-petition services were the beginning of transactions that would stretch into the future, but they were not part of the 1985 transactions. To conclude that these claims arose from the same transaction for the purposes of equitable recoupment would be to contort that doctrine beyond any justification for its creation. We conclude that the Department's post-petition withholding of the amount previously overpaid to UMC cannot be considered as equitable recoupment. [FN20] *Accord In re Memorial Hosp.,* 82 B.R. 478, 483-84 (W.D.Wis.1988). *But see In re Yonkers Hamilton Sanitarium Inc.,* 34 B.R. 385, 387-88 (S.D.N.Y.1983); *In re Visiting Nurse Ass'n,* 121 B.R. 114, 118-19 (Bankr.M.D.Fla.1990).

> FN20. We emphasize that the fact that HHS would be able to recoup these overpayments under the provider agreement, if that agreement were formally assumed, is an issue completely distinct from the question of whether HHS properly can withhold the amount of prior overpayments from UMC's post-petition reimbursement under the equitable doctrine of recoupment.

### D. *The Reasonable Value of UMC's Services*

Having determined that the automatic stay precluded HHS from withholding payment for post-petition services in order to recoup past overpayments and that the provider agreement was not assumed by UMC, we next must consider whether UMC is nevertheless entitled to payment for the reasonable value of the services it provided post-petition. UMC, as debtor-in-possession, continued to provide services to Medicare patients. Is HHS, as a result, required to pay for these services despite the lack of a formal assumption of the provider agreement? UMC argues that, pursuant to the Supreme Court's reasoning in *NLRB v. Bildisco & Bildisco,* 465 U.S. 513, 104 S.Ct. 1188, 79 L.Ed.2d 482 (1984), equity controls its post-petition, pre-assumption relationship with the Department, and it is therefore entitled to payment. The Secretary counters that *Bildisco* applies only to the relationship between private parties and has no bearing on the special rules that govern contractual or statutory relationships with the United States. He urges that the law prohibits the imposition of equity-based money remedies against the federal

government. The Secretary further concludes that UMC can only receive reimbursement in accord with the terms of a provider agreement. This contention is based on the language of the Medicare Act: a provider cannot receive Medicare reimbursement unless a provider agreement is in effect. [FN21]

> FN21. 42 U.S.C. § 1395cc.

We find that both parties miss the mark in their focus on the narrow holding of *Bildisco.* Rather, it is the broad principle articulated by the *Bildisco* Court, the idea of harmonizing the policies of intersecting statutes, that supplies us with guidance. *See Bildisco,* 465 U.S. at 535, 104 S.Ct. at 1201 (Brennan, J., dissenting) (approving the majority's standard for determining when a debtor in possession can reject a collective bargaining agreement as "properly accommodat[ing] the policies of the National Labor Relations Act and the Bankruptcy Code"). Indeed, the Supreme Court has repeatedly counseled that, if two statutes are capable of co-existence, "it is the duty of the courts, absent a clearly expressed congressional intention to the contrary, to regard each as effective." *Ruckelshaus v. Monsanto Co.,* 467 U.S. 986, 1018, 104 S.Ct. 2862, 2881, 81 L.Ed.2d 815 (1984) (quotations omitted). *See also Morton v. Mancari,* 417 U.S. 535, 551, 94 S.Ct. 2474, 2483, 41 L.Ed.2d 290 (1974); *West v. Keve,* 721 F.2d 91, 96 (3d Cir.1983) ( "[c]ompeting statutes should not, if at all possible, be interpreted so that the provisions of one will abrogate the provisions of another"). Our task is to "harmonize" the policies of the Bankruptcy Code's automatic stay with those of the Medicare statute's Prospective Payment System in order to define the appropriate post-petition relationship of UMC and HHS. In so doing we must reconcile these two statutes in a manner **\*1083** that respects the fundamental concerns of each.

In the preceding sections of this opinion, we discussed the policies behind the Bankruptcy Code's automatic stay and executory contract assumption provisions. We concluded that, with certain exceptions not applicable to this case, both of these provisions apply to the government just as to other creditors. Despite the fact that HHS, as a government agency, is subject both to the automatic stay and to the requirements of section 365, the Secretary still asks us to allow HHS to recover its pre-petition overpayments from the post-petition

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

973 F.2d 1065
(Cite as: 973 F.2d 1065, *1083)

reimbursement due UMC and to find that UMC's claim for Medicare reimbursement must be brought under the Medicare statute. To reach the Secretary's desired result we would be required to ignore the Supreme Court's teachings in *Bildisco* -- that we must harmonize the policies of the Bankruptcy Code that intersect with those of Medicare statute as a consequence of a provider's filing in bankruptcy--and to sanction a result contrary to what we have already determined in Section III A and B above.

We are aware that our task of harmonizing only begins with a consideration of the policies of the Bankruptcy Code. "Congress has repeatedly expressed its legislative determination that the trustee [or debtor-in-possession] is not to have *carte blanche* to ignore non-bankruptcy law." *Midlantic Nat'l Bank v. New Jersey Dep't of Envtl. Protection,* 474 U.S. 494, 502, 106 S.Ct. 755, 760, 88 L.Ed.2d 859 (1986). Indeed, as the Supreme Court has cautioned, a "debtor-in-possession is not relieved of all obligations under" a non-bankruptcy statute "simply by filing a petition for bankruptcy." *Bildisco,* 465 U.S. at 534, 104 S.Ct. at 1200.

The Secretary points to several interests advanced through the Medicare statutory scheme that he argues take precedence over the interests which underlie Bankruptcy Code sections 362 and 365: first, the Department's unfettered exercise of its recoupment powers is vital to the success of the Medicare statutory scheme; and, second, Medicare's prospective reimbursement methodology, which Congress instituted "in the hope of containing mushrooming hospital reimbursement costs and encouraging more cost-efficient delivery of health care services[,]" no longer would apply to hospitals that continue to render Medicare services after filing for bankruptcy. He contends that allowing a judicially determined amount to reflect the "reasonable value" of services rendered could undercut the cost-containing goals of the Medicare reimbursement system.

The Secretary also argues that the application of the district court's interpretation of *Bildisco* to Medicare provider agreements would interfere with the Medicare program's health and safety standards and would enable debtor hospitals to evade compliance with certain civil rights laws. For example, hospitals serving as Medicare providers and responsible physicians, who negligently violate

the requirements of the Emergency Medical Treatment and Active Labor Act (EMTALA), 42 U.S.C. § 1395dd, are subject to civil money penalties. 42 U.S.C. § 1395dd(d). However, only hospitals that voluntarily participate in the Medicare program and have an effective provider agreement must comply with EMTALA. *Burditt v. United States Dep't of Health & Human Servs.,* 934 F.2d 1362, 1376 (5th Cir.1991). Prior to a debtor hospital's formal assumption of its provider agreement, in the Secretary's view, HHS would lack authority to enforce these important standards.

Finally, the Secretary is concerned that, because a debtor hospital's status as a Medicare provider would be uncertain before that agreement is either assumed or terminated, Medicare services to the community might be disrupted during the post-petition, pre-assumption period.

Each of these policies of the Medicare Act advances an interest integral to the continued operation of the Medicare scheme. We recognize that implicitly intertwined with each concern articulated by the Secretary is the fundamental purpose of the Medicare system: the provision of adequate medical treatment to the elderly and *1084 disabled. Indeed, in enacting the 1965 amendments to the Social Security Act that have become known as the Medicare Act, Congress acknowledged that the "national problem of adequate medical care for the aged has not been met to the extent desired under existing legislation." S.Rep. No. 404, 89th Cong., 1st Sess. (1965), *reprinted in* 1965 U.S.C.C.A.N.1943, 1964. The overall purpose of these amendments was to "provide a coordinated approach for health insurance and medical care for the aged under the Social Security Act." *Id.* at 1943. This was to be effected through "an expanded medical assistance program for the needy and medically needy aged, blind, [and] disabled." *Id.* No accommodation of the intersecting policies of the Medicare Act and the Bankruptcy Code would be legitimate unless it gives full effect to these essential aims.

[21][22] Harmonizing these Medicare interests with those of the Bankruptcy Code, we conclude that, while UMC remained in business during the post-petition period, it remained a Medicare provider subject to the requirements of the Medicare Act and regulations. As such, we find that UMC was subject to the Prospective Payment System and the program's health and safety standards.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Concurrently, UMC was eligible for reimbursement for all post-petition Medicare services rendered up to the time that it ceased business. While we recognize that the filing of a bankruptcy petition renders an executory contract no longer immediately enforceable, *Bildisco,* 465 U.S. at 532, 104 S.Ct. at 1199, we find that the multiple interests underlying the Medicare program mandate a conclusion that prior to formal rejection of a provider agreement, a Medicare provider must continue to comply with the requirements of the Medicare Act and regulations. [FN22] To hold otherwise would not only adversely impact the Medicare system but would also controvert the Supreme Court's conclusion that a bankruptcy petition filing does not relieve a debtor-in-possession of all obligations under other relevant statutes. *See Midlantic Nat'l Bank,* 474 U.S. at 502, 106 S.Ct. at 760.

> FN22. To the extent that we find the Medicare statute applicable in this post-petition, pre-assumption period, we reject the Secretary's argument that reimbursement to the provider for services rendered during this period would be a prohibited equitable, non-contract money remedy, which is not available against the United States. *See OPM v. Richmond,* 496 U.S. 414, 110 S.Ct. 2465, 2471-72, 110 L.Ed.2d 387 (1990).

This is not the equivalent of finding that Medicare provider agreements may be informally assumed. Rather, we conclude that both the Bankruptcy and the Medicare policies alike are best preserved by holding that during this post-petition period, HHS remained subject to the automatic stay and thus was not free to withhold pre-petition overpayments from UMC's post-petition reimbursement. Only if UMC formally assumed the provider agreement, or if HHS sought and received relief from the stay from the bankruptcy court pursuant to section 362(d), would such withholding be proper. The automatic stay "is a crucial provision of the bankruptcy law. It prevents disparate actions against debtors and protects creditors in a manner consistent with the bankruptcy goal of equal treatment." *Parr Meadows Racing Ass'n,* 880 F.2d at 1545. It gives effect to Congress' intent to protect debtors and creditors from "piecemeal dismemberment" of the debtor's estate. *In re Computer Communications, Inc.,* 824 F.2d 725, 731 (9th Cir.1987). Our holding preserves this fundamental debtor protection. Further, supplying a community's financially troubled Medicare provider with the opportunity to reorganize and thus continue as a

going concern certainly is in the interests of that community's Medicare beneficiaries. In our view, this conclusion best harmonizes the Medicare Act's goal of providing medical care to the elderly and disabled with the Bankruptcy Code's goal of providing the debtor with a breathing spell from creditors in order to permit the debtor to attempt repayment or reorganization. Finally, we emphasize, as did the district court, that we are not holding that HHS can never recover the reimbursement overpayments made to UMC, only that HHS cannot ignore the reach of the automatic stay in its effort to attain an *1085 administrative priority over UMC's other general creditors. We thus will affirm the district court's order that HHS pay UMC the amount that would have been paid for UMC's post-petition services, had HHS not improperly withheld pre-petition overpayments.

### E. *Costs and Attorneys Fees*
1.

The consequences of a violation of the automatic stay are detailed in Bankruptcy Code section 362(h) : "[a]n individual injured by any *willful* violation of the stay provided by this section shall recover actual damages, including costs and attorneys' fees, and, in appropriate circumstances, may recover punitive damages." 11 U.S.C. § 362(h) (emphasis added). The bankruptcy court concluded that the Department's violation of the automatic stay was willful, and so awarded attorneys' fees for the period following that court's decision in *St. Mary Hospital.* That court also assessed prejudgment interest against HHS on the withheld payments "as an aspect of a penalty" for the withholding of these payments and because it deemed such an award mandatory in a breach of contract action. *University Medical Center,* 93 B.R. at 417. On appeal the district court reversed both of these awards, reasoning that, because the law concerning the Department's right to withhold Medicare payments from a debtor hospital after the filing of a petition in bankruptcy was unsettled, the Department's violation of the automatic stay could not be deemed willful as is required for an award under section 362(h). *University Medical Center,* 122 B.R. at 931-33.

UMC appeals this conclusion of the district court. According to UMC, in light of our decision in *In re Atlantic Business and Community Corp.,* 901 F.2d 325 (3d Cir.1990), the district court's finding incorrectly saddled the debtor's estate with attorneys' fees and interest expenses which were

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Page 234

incurred as the result of the Secretary's "willful" withholding of UMC's post-petition payments in violation of the automatic stay.

In response, the Secretary contends for the first time on appeal that HHS is immune from monetary awards made pursuant to section 362(h), and that Congress has not waived this sovereign immunity. Moreover, even assuming that the Department's sovereign immunity has been waived, the Secretary asserts that HHS should not be adjudged to have willfully violated the stay.

[23][24] A party may not waive the requirement of subject-matter jurisdiction by failing to challenge it early in the proceedings. *Insurance Corp. of Ireland v. Compagnie Des Bauxites de Guinee,* 456 U.S. 694, 702, 102 S.Ct. 2099, 2104, 72 L.Ed.2d 492 (1982). The United States, as sovereign, "is immune from suit, save as it consents to be sued ... and the terms of its consent to be sued in any court define that court's jurisdiction to entertain the suit." *United States v. Dalm,* 494 U.S. 596, 110 S.Ct. 1361, 1368, 108 L.Ed.2d 548 (1990) (quotations and citations omitted). Because a waiver of sovereign immunity is a prerequisite for jurisdiction, *United States v. Mitchell,* 463 U.S. 206, 212, 103 S.Ct. 2961, 2965, 77 L.Ed.2d 580 (1983), we must decide the issue of the Department's sovereign immunity, though it was neither presented nor considered below.

[25][26][27] HHS, as an agency of the United States, does enjoy immunity from suit unless the United States has waived this immunity. Waivers of sovereign immunity must be unequivocally expressed. *United States v. Nordic Village, Inc.,* 503 U.S. 30, 112 S.Ct. 1011, 1014, 117 L.Ed.2d 181 (1992). Such consent to be sued must be construed strictly in the government's favor and may not be enlarged beyond what the language of the waiver requires. *Id.* at ----, 112 S.Ct. at 1015 (citing *Ruckelshaus v. Sierra Club,* 463 U.S. 680, 685, 103 S.Ct. 3274, 3278, 77 L.Ed.2d 938 (1983); *McMahon v. United States,* 342 U.S. 25, 27, 72 S.Ct. 17, 19, 96 L.Ed. 26 (1951)).

Section 106 of the Bankruptcy Code provides a limited waiver of sovereign immunity for bankruptcy matters. UMC asserts that through subsections 106(a) and 106(c) *1086 Congress has expressly waived the sovereign immunity of federal agencies with respect to awards mandated by section 362(h). Pursuant to section 106(a), "[a]

governmental unit is deemed to have waived sovereign immunity with respect to any claim against such governmental unit that is property of the estate and that arose out of the same transaction or occurrence out of which the governmental unit's claim arose." 11 U.S.C. § 106(a).

[28] The Supreme Court has explained that this subsection plainly waives sovereign immunity with respect to monetary liability for compulsory counterclaims to governmental claims. *Id.* In fact, when a government agency formally invokes the jurisdiction of the bankruptcy court through filing a proof of claim, the government's exposure to counterclaim liability under section 106(a) is undisputed. *See In re Town & Country Nursing Servs., Inc.,* 963 F.2d 1146, 1150 (9th Cir.1991). In such a case, so long as the debtor's claim against the government both qualifies as property of the estate and arises out of the same transaction or occurrence as the government's claim, sovereign immunity is waived by this section.

[29] As suggested by the "same transaction or occurrence" requirement of this section, and by the legislative history of the Bankruptcy Reform Act of 1978, [FN23] courts have looked to the standards employed in identifying compulsory counterclaims under Federal Rule of Civil Procedure 13(a) for guidance in discerning the applicability of section 106(a)'s waiver of immunity. *See Ashbrook v. Block,* 917 F.2d 918, 923 (6th Cir.1990); *In re Bulson,* 117 B.R. 537, 541 (9th Cir. BAP 1990). The operative question in determining whether a claim is a compulsory counterclaim is whether it bears a "logical relationship" to the opposing party's claim. *Xerox Corp. v. SCM Corp.,* 576 F.2d 1057, 1059 (3d Cir.1978).

> FN23. This legislative history explains that "the filing of a proof of claim against the estate by a governmental unit is a waiver by that governmental unit of sovereign immunity with respect to compulsory counterclaims, as defined in the Federal Rules of Civil Procedure." S.Rep. No. 989, 95th Cong., 2d Sess. 29, *reprinted in* 1978 U.S.C.C.A.N. 5787, 5815.

UMC argues that its claim for attorneys' fees and costs comes within the purview of section 106(a)'s waiver of immunity because (1) HHS not only withheld post-petition reimbursement due to UMC, but also filed a proof of claim in bankruptcy court against the debtor's estate, and (2) UMC's claim for attorneys' fees under section 362(h) results directly

973 F.2d 1065
(Cite as: 973 F.2d 1065, *1086)

Page 235

from the Department's unlawful attempt to recover the very claim that is the subject of the Secretary's proof of claim, and so is part of the same transaction or occurrence.

[30] We agree that the requirements of 106(a) have indeed been met in this case. First, HHS did file a proof of claim on May 13, 1988, for the amount of the overpayments made to UMC. Thus, the Secretary himself invoked the jurisdiction of the bankruptcy court. Second, UMC's claim for attorneys' fees and costs qualifies as property of the estate under Bankruptcy Code section 541. [FN24] Any attorneys' fees incurred as a result of the Department's violation of the automatic stay, if imposed upon UMC rather than HHS, would diminish the assets UMC could devote to the payments of prior debts. Accord, *In re Solis*, 137 B.R. 121, 126 (Bankr.S.D.N.Y.1992); *In re Fernandez*, 132 B.R. 775, 780 (M.D.Fla.1991). Finally, UMC's claim for fees and costs arose out of the same transaction and occurrence as the Department's withholding of the pre-petition overpayments. UMC's claim for costs developed from the same set of operative facts as the Department's claim: the pre-petition overpayments made to UMC. In fact, UMC's claim arose directly from the Department's attempt to recover these overpayments, which are owed by UMC and for which the Secretary has filed a proof of claim. Both claims thus revolve around *1087 the aggregate core of facts concerning the pre-petition overpayments made to UMC. [FN25]

> FN24. Section 541(a) states, in relevant part, that the estate encompasses "all legal or equitable interests of the debtor in property as of the commencement of the case." 11 U.S.C. § 541(a)(1).
>
> FN25. We reject the Secretary's contention that a finding that UMC's section 362(h) claim for costs arises from the same transaction or occurrence as the Department's violation of the automatic stay mandates a finding that the pre-petition overpayments and post-petition reimbursement arose out of the same transaction for the purposes of recoupment. Our conclusion that UMC's claim for costs resulting from the impermissible setoff arose out of the 1985 overpayments does not preclude our finding that the illegal setoff itself was an attempt to offset separate 1985 and 1988 transactions.

Because each of the conditions necessary for a

section 106(a) waiver of sovereign immunity has been met, we conclude that the Department's immunity with regard to UMC's claim for attorneys' fees and costs has been waived. [FN26] *See Town & Country Home Nursing Servs.*, 963 F.2d at 1151-52 (Secretary's withholding of pre-petition Medicare overpayments from post-petition reimbursement constituted a waiver of sovereign immunity under § 106(a), even absent the filing of a formal claim in bankruptcy court). *Cf. In re Fernandez*, 132 B.R. 775, 780 (M.D.Fla.1991) (waiver of sovereign immunity pursuant to 106(a) for purposes of 362(h) award against the IRS for violation of the automatic stay); *In re Taborski*, Nos. 88-B-1624, 89-A-587, 1991 WL 236872, *2, 1991 Bankr. LEXIS 1393, *6 (Bankr.N.D.Ill.1991) (same); *United States by Farmers Home Admin. v. Ketelsen*, 104 B.R. 242, 252-53 (D.S.D.1988), *aff'd* 880 F.2d 990 (8th Cir.1989).

> FN26. Because we conclude that the Department's immunity was waived by section 106(a), it is not necessary for us to address the arguments made by UMC with regard to either 106(c) or the Equal Access to Justice Act, 28 U.S.C. § 2412(b) (1988). We note, however, that the Supreme Court's decision in *United States v. Nordic Village, Inc.*, conclusively establishes that Bankruptcy Code section 106(c) does not provide an unequivocal textual waiver of the Government's immunity from a bankruptcy trustee's claims for monetary relief. 503 U.S. at ----, 112 S.Ct. at 1016.

2.

[31] Consequently, we must turn to the question of whether the Secretary's violation of the automatic stay was "willful." If so, UMC is entitled to recover attorneys' fees and costs. In support of its contention that HHS willfully violated the automatic stay, UMC points to our decision in *Atlantic Business*, which articulated a definition of "willful" as not requiring that there be a specific intent to violate the automatic stay, but rather that the acts violating the stay be intentional. UMC argues that because HHS knew of the bankruptcy filing, was aware of the automatic stay, and intended to withhold post-petition payments in order to recover UMC's pre-petition debt, the Department's violation of the stay must be deemed willful.

In considering this issue, we find it helpful to analyze the facts in *Atlantic Business*, as applied to our definition there of "willfulness." The debtor Atlantic Business Community Development Corporation (ABCD) filed a petition in bankruptcy

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

under Chapter 11. It continued, however, to
operate a radio station. Cuffee, the owner of the
building, studio equipment, office furnishings and
record albums used by ABCD for the station,
advised the trustee in bankruptcy that he, Cuffee,
would no longer permit the radio station to use the
building. To accomplish this, Cuffee installed new
locks on the doors of the building. The trustee
filed an order requiring Cuffee to show cause why
he should not be held in contempt for violating the
automatic stay. As a result, the bankruptcy court
ordered Cuffee to cease any further interference
with the operation of the radio station and to allow
the trustee free access to the studio. Even in face
of this order, Cuffee installed additional, larger
locks. This further action caused the trustee to
order the radio station to cease broadcasting to
prevent any risk of injury. Moreover, "because
Cuffee placed additional locks on the studio, the
bankruptcy court found that Cuffee had violated the
automatic stay provisions of Section 362 of the
Bankruptcy Code." 901 F.2d at 327. [FN27] On
*1088 appeal, the district court affirmed the
judgment of the bankruptcy court. We then
affirmed the order of the district court in all
respects. *Id.* at 329. In doing so, we for the first
time defined the term "willful" as it is used in
Section 362(h):

> FN27. We read the holding by the bankruptcy
> court, that Cuffee had violated the automatic stay,
> as being based upon Cuffee's placing of the
> additional locks on the studio, *after* the court had
> ordered him to cease any further interference with
> the operation of the radio station. It was this
> holding which was affirmed by the district court
> and this court in *Atlantic Business*. It is because
> of this limited scope of the legal determination in
> *Atlantic Business* that we do not agree with Judge
> Becker that the holding in *Atlantic Business*
> constrains us to find a "willful" violation of §
> 362(h).

A 'willful violation' does not require a specific
intent to violate the automatic stay. Rather, the
statute provides for damages upon a finding that
the defendant knew of the automatic stay and that
the defendant's actions which violated the stay
were intentional. Whether the party believes in
good faith that it had a right to the property is not
relevant to whether the act was 'willful' or
whether compensation must be awarded.
*Id.* (quoting *In re Bloom,* 875 F.2d 224, 227 (9th
Cir.1989) [quoting *INSLAW, Inc. v. United States,*
83 B.R. 89, 165 (Bankr.D.D.C.1988) ] ). We then

determined that Cuffee's actions clearly satisfied
our definition of "willfulness" and that the finding
of the bankruptcy court [that the placing of the
additional locks on the studio violated the automatic
stay] was not clearly erroneous.

Here, however, the actions of the Secretary were
neither in defiance of a court order nor were they
contrary to certain contemporaneous interpretations
of sections 362 and 365. The Secretary believed in
"good faith" that he was not violating the stay.
This of course is not sufficient under *Atlantic
Business* to escape liability under section 362(h).
However, the Secretary also had persuasive legal
authority which supported his position. For this
reason we conclude that the withholding by HHS
did not fall within the parameters of "willfulness" as
such actions have been described in *Atlantic
Business* and that the Secretary should not be
penalized for the position he took toward UMC
after the filing of the petition.

At the time the Department withheld payments
from UMC, the law regarding the application of the
stay to the Department's actions was sufficiently
uncertain that HHS reasonably could have believed
its actions to be in accord with the stay. Both the
bankruptcy and district courts recognized that
"authority existed in this and other jurisdictions that
could be read to support the lawfulness of [such]
withholding." *University Medical Center,* 125 B.R.
at 127. The Secretary could find support for his
position both in the Medicare statute and in case
law. First, the Medicare Act provides that
> The Secretary shall periodically determine the
> amount which should be paid under this part to
> each provider of services with respect to the
> services furnished by it, and the provider of
> services shall be paid, at such time or times as the
> Secretary believes appropriate (but not less often
> than monthly) and prior to audit or settlement by
> the General Accounting Office, from the Federal
> Hospital Insurance Trust Fund, the amounts so
> determined, *with necessary adjustments on
> account of previously made overpayments or
> underpayments....*
42 U.S.C. § 1395G(a) (emphasis added). As the
Secretary has argued persistently, this language
appears to give him a clear mandate to withhold
past overpayments from any payments he is making
to a provider for services furnished--at whatever
time those services were rendered.

In addition, there were a number of decisions from

973 F.2d 1065
**(Cite as: 973 F.2d 1065, \*1088)**

bankruptcy and district courts which held to the effect that a debtor hospital "could not continue as a provider following the filing of a petition for reorganization ... unless it effectively assumed the obligations of the provider agreement under which it had previously been operating." *Advanced Professional Home Health Care,* 94 B.R. 95, 96 (E.D.Mich.1988). [FN28] Moreover, there had not been consideration of the question by any court of appeals.    Thus, as with the statutory language, the case law supported the Secretary's position.

> FN28. Other cases supporting this position are cited in footnote 20.

We have set out in Section III B and C above the reasons for which we hold, contrary **\*1089** to the above authority, that the Secretary did violate the automatic stay.    However, these are very close and complex legal questions.    We find that the Secretary was justified in standing firm in his position and in litigating these issues vigorously.    We conclude, therefore, that the actions of the Secretary, taken in reliance on statutory direction and case law support, were not "willful" as we have defined that term in section 362(h) or in our explication of it in *Atlantic Business.*

We will affirm the district court's conclusion that the Department's violation of the automatic stay was not willful and will decline to award attorneys' fees and costs pursuant to section 362(h).

### V. CONCLUSION
For the foregoing reasons, the order of the district court will be affirmed.

BECKER, Circuit Judge, concurring in No. 91-1407 and dissenting in No. 91- 1438.

I am pleased to join in Parts I, II, III, IV.A, IV.B, IV.C, IV.D, and IV.E.1 of Judge Roth's superb opinion.    I wholeheartedly concur in the majority's sensitive harmonization of the competing interests of the Medicare and bankruptcy statutes.    I also agree with the majority that in 11 U.S.C. § 106(a) Congress waived the sovereign immunity of the United States against awards of costs and fees under 11 U.S.C. § 362(h).    If we were writing on a clean

slate, moreover, I would further agree with the majority that, in light of the case law at the time, the United States did not "willfully" violate the automatic stay provision of 11 U.S.C. § 362(a) because it had good reason to believe that the automatic stay did not apply.    In my view, however, the standard set forth in our opinion in *Atlantic Business and Community Corp.,* 901 F.2d 325, 329 (3d Cir.1990), compels the conclusion that the United States "willfully" violated the automatic stay.

As the majority recognizes, in *Atlantic Business* we interpreted "willful violation" to mean that the defendant knew of the automatic stay and that its actions in violation of the automatic stay were intentional--not to require that the defendant specifically intended to violate the automatic stay. *Id.* (adopting the standard of *In re Bloom,* 875 F.2d 224, 227 (9th Cir.1989)).    We explicitly rejected good faith as a defense to "willfulness." *Id.*

In this case, the United States knew that UMC had declared bankruptcy when it refused to reimburse UMC and hence knew of the automatic stay.    The withholding of reimbursement was an intentional act.    Under the interpretation of 11 U.S.C. § 362(h) in *Atlantic Business,* that is enough to entitle UMC to its actual damages, including costs and attorneys' fees.    In my view, if the United States relied on the case law at the time, that would demonstrate its good faith, but we have held that good faith is insufficient to defeat a finding of "willfulness."    I agree that *Atlantic Business* may be distinguished on its facts, but I do not believe that we can avoid applying its legal standard.

I would therefore remand the case for the bankruptcy court to determine UMC's actual damages, including costs and attorneys' fees.    I accordingly respectfully dissent from the disposition of UMC's cross-appeal.

973 F.2d 1065, 61 USLW 2114, 27 Collier Bankr.Cas.2d 800, 23 Bankr.Ct.Dec. 628, Bankr. L. Rep. P 74,791, 38 Soc.Sec.Rep.Serv. 482, Med & Med GD (CCH) P 40,714

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# TAB 50

UNITED STATES CODE ANNOTATED
TITLE 11. BANKRUPTCY
CHAPTER 3--CASE ADMINISTRATION
SUBCHAPTER IV--ADMINISTRATIVE POWERS
§ 362. Automatic stay

(a) Except as provided in subsection (b) of this section, a petition filed under section 301, 302, or 303 of this title, or an application filed under section 5(a)(3) of the Securities Investor Protection Act of 1970, operates as a stay, applicable to all entities, of--

(3) any act to obtain possession of property of the estate or of property from the estate or to exercise control over property of the estate[.]

# TAB 51

UNITED STATES CODE ANNOTATED
TITLE 11. BANKRUPTCY
CHAPTER 5--CREDITORS, THE DEBTOR, AND THE ESTATE
SUBCHAPTER III--THE ESTATE
§ 541. Property of the estate

(a) The commencement of a case under section 301, 302, or 303 of this title creates an estate. Such estate is comprised of all the following property, wherever located and by whomever held:

(1) Except as provided in subsections (b) and (c)(2) of this section, all legal or equitable interests of the debtor in property as of the commencement of the case.

# TAB 52

UNITED STATES CODE ANNOTATED
TITLE 11. BANKRUPTCY
CHAPTER 5--CREDITORS, THE DEBTOR, AND THE ESTATE
SUBCHAPTER III--THE ESTATE
§ 541. Property of the estate

(a) The commencement of a case under section 301, 302, or 303 of this title creates an estate. Such estate is comprised of all the following property, wherever located and by whomever held:

(7) Any interest in property that the estate acquires after the commencement of the case.

# TAB 53

UNITED STATES CODE ANNOTATED
TITLE 28. JUDICIARY AND JUDICIAL PROCEDURE
PART IV--JURISDICTION AND VENUE
CHAPTER 85--DISTRICT COURTS;  JURISDICTION
§ 1334. Bankruptcy cases and proceedings

(a) Except as provided in subsection (b) of this section, the district courts shall have original and exclusive jurisdiction of all cases under title 11.